ACCEPTED
03-15-00293-CV
8312780
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/18/2015 5:38:37 PM
JEFFREY D. KYLE
CLERK

_____

## NO. 03-15-00293-CV

_____

In the Court of Appeals
For the Third Judicial District of Texas
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/18/2015 5:38:37 PM
JEFFREY D. KYLE
Clerk

_____

**BOB E. WOODY,**
*Plaintiff-Appellant*,

**v.**

**J. BLACK'S, LP and J. BLACK'S, GP, LLC,**
*Defendants-Appellees*.

_____

On Appeal from Cause No. D-1-GN-09-001436, In the 345th Judicial District Court of
Travis County, Texas, The Honorable Steven Yelenosky Presiding

---

## BRIEF FOR APPELLEES

---

Eric Taube
State Bar No. 19679350
etaube@taubesummers.com
Andrew Vickers
State Bar No. 24084021
avickers@taubesummers.com
Taube Summers Harrison Taylor
Meinzer Brown LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701
Telephone: (512) 472-5997
Telecopier: (512) 472-5248

ATTORNEYS FOR APPELLEES

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

INDEX OF AUTHORITIES ........................................................................v

ABBREVIATIONS ................................................................................. ix

STATEMENT OF THE CASE.................................................................. xi

REQUEST FOR ORAL ARGUMENT .................................................. xiv

ISSUES PRESENTED............................................................................xv

STATEMENT OF FACTS ........................................................................1

    **I.**    **THE SUBSTANTIVE FACTS SHOW THAT WOODY BREACHED THE SUBLEASE, UNDER WHICH J. BLACK'S WAS READY, WILLING AND ABLE TO PERFORM. ................................................................1**

        **A.**    **The Parties Entered a Sublease Agreement in August 2006 for a Three-Year Term with Four Extension Options. .........1**

        **B.**    **J. Black's Properly Exercised its First Extension Option, Woody Improperly Rejected J. Black's Exercise of the Extension Option and thereby Breached the Sublease. ........2**

        **C.**    **Woody Improperly Accused J. Black's of default and disregarded the default terms of the Sublease. ......................4**

        **D.**    **J. Black's was Ready, Willing, and Able to perform each and every one of its Obligations under the Lease. .................5**

    **II.**   **THE PROCEDURAL HISTORY DEMONSTRATES THAT J. BLACK'S WAS PROPERLY AWARDED SPECIFIC PERFORMANCE AND ITS ATTORNEY'S FEES. ................................................................6**

        **A.**    **The Parties Counter-Sued against Each Other: Woody Sought to Remove J. Black's as the Tenant, and J. Black's Sought to Remain in the Subleased Space. ...........................6**

        **B.**    **J. Black's First Motion for Partial Summary Judgment was Granted, Holding that J. Black's Properly Exercised its Extension Option and that Woody Breached the Sublease. .7**

C. Three Sanctions Orders were Granted in J. Black's Favor .8

D. J. Black's Second Motion for Partial Summary Judgment was Granted, Dismissing all of Woody's Claims. ...................9

E. J. Black's Third Motion for Summary Judgment was Granted, Resulting in a Final Judgment, which was then Partially Vacated........................................................................9

F. Woody's Motion for Summary Judgment was Denied—and a Fourth Sanctions Order was Granted in J. Black's Favor—because the Court had Already Conclusively Determined that J. Black's Properly Exercised its Extension Option and that Woody was in Breach of the Sublease. .....11

G. J. Black's Motion for Entry of a Final Judgment was Granted, and a Final Judgment was Entered in J. Black's Favor............................................................................................12

H. Appeal and Remand by Amarillo Court of Appeals ...........13

I. Grant of J. Black's Final Summary Judgment and Entry of Final Judgment.................................................................14

SUMMARY OF THE ARGUMENT .....................................................................15

ARGUMENT ......................................................................................................21

I. WOODY BREACHED THE SUBLEASE .................................................21

A. Woody's Breach was established by the District Court ......21

B. Woody's Breach affirmed by the Amarillo Court of Appeals ..........................................................................................23

C. Woody's new defense that he did not actually "breach" the Sublease, but merely "repudiated" his obligations thereunder, is untimely and unsupported by legal authority or the facts of this case............................................................24

II. THE TRIAL COURT CORRECTLY ENTERED FINAL JUDGMENT AWARDING SPECIFIC PERFORMANCE AND ATTORNEY'S FEES TO J. BLACK'S ON THE BASIS OF WOODY'S BREACH. ............................27

**A.** **J. Black's is entitled to specific performance of the Sublease and its extensions because it was ready, willing and able to perform its own obligations under the Sublease at all relevant times.............................................................28**

    1.    J. Black's was Ready, Willing and Able to perform its Obligations under the Sublease ......................................29

    2.    J. Black's Remedies at Law are inadequate ...................31

**B.** **Woody's arguments against the availability of the award of specific performance are a school of red herrings...............33**

    1.    Woody's "Three-Way Characterization" finds no support in the record, or in the authority ......................................34

    2.    Woody's claim that the decree of specific performance lacks a "mutuality of remedy" is incorrect....................35

    3.    The grant of specific performance does not require "continuous supervision" of the parties..........................37

    4.    The decree of specific performance does not deprive Woody of rights under the Sublease................................38

**III.** **WOODY'S CHALLENGE TO J. BLACK'S UNCONTROVERTED SUMMARY JUDGMENT EVIDENCE AND THE EXCLUSION OF A PORTION OF HIS OWN AFFIDAVIT IS SPURIOUS ....................................39**

**A.** **The District Court Correctly Overruled Woody's Objections to J. Black's Summary Judgment Evidence .....40**

**B.** **The District Court correctly excluded the February 4, 2015 Affidavit of Bob E. Woody, and its exclusion was not material to the award of specific performance in this Case41**

**IV.** **J. BLACK'S ESTABLISHED ITS ENTITLEMENT TO RECOVER ATTORNEY'S FEES AS THE PREVAILING PARTY IN A BREACH OF CONTRACT CASE UNDER CPRC § 38.001............................................43**

**A.** **The Law permits the award of fees under Chapter 38 upon the award of specific performance ..........................................43**

PRAYER ...................................................................................................44

CERTIFICATE OF COMPLIANCE ..................................................................45

CERTIFICATE OF SERVICE ........................................................................46

# INDEX OF AUTHORITIES

## Cases

*Albataineh v. Eshtehardi,*
01-12-00671-CV, 2013 WL 1858864 (Tex. App.—Houston [1st Dist.]
May 2, 2013, no pet.)..................................................................................43

*Allstate Ins. Co. v. Hallman,*
159 S.W.3d 640 (Tex. 2005) ............................................................... 14, 17

*Azad v. Aaron Rents, Inc.*,
No. 14-07-01087-CV, 2009 WL 4842761,
(Tex. App.—Houston [14th Dist.] 2009, no pet.)..........................................34

*Bd. of Trustees of Fire and Police Retiree Health Fund v.*
*Towers, Perrin, Forster & Crosby, Inc.,*
191 S.W.3d 185 (Tex.App.–San Antonio 2005, pet. denied) .......................39

*Burford v. Pounders,*
145 Tex. 460, 199 S.W.2d 141 (1947) .......................................................30

*City of Houston v. Socony Mobil Oil Co.*,
421 S.W.2d 427, 430 (Tex. Civ. App. – Houston [1st Dist.] 1967),
writ refused NRE (Apr. 10, 1968) ......................................................... 13, 24

*DiGiuseppe v. Lawler,*
269 S.W.3d 588 (Tex.2008) .....................................................................29

*Downer v. Aquamarine Operators, Inc.,*
701 S.W.2d 238 (Tex.1985) ......................................................................40

*E.M. Goodwin, Inc. v. Stuart*,
52 S.W.2d 311 (Tex. Civ. App.—San Antonio 1932), *writ granted*
(Dec. 22, 1932), *aff'd,* 125 Tex. 212, 82 S.W.2d 632 (Comm'n App. 1935) 36

*Edwards v. Mid-Continent Office Distribs., L.P.*,
252 S.W.3d 833 (Tex. App.—Dallas 2008, pet. denied) .............................28

*First State Bank of Bishop v. Grebe*,
162 S.W.2d 165 (Tex. Civ. App.—San Antonio1942, writ ref'd w.o.m.)....24

*Fitzsimmons v. Anthony*,
716 S.W.2d 719 (Tex. App.—Corpus Christi 1986, no writ) .......................28

*Frank v. Kuhnreich*,
546 S.W.2d 844 (Tex. App.—San Antonio 1977, writ ref'd n.r.e.)....... 28, 32

*Garner v. Fidelity Bank, N.A.*,
244 S.W.3d 855 (Tex.App.–Dallas 2008, no pet.) ........................................39

*Hayes v. E.TS. Enterprises, Inc.*,
809 S.W.2d 652 (Tex. App.Amarillo 1991 ), *writ denied* (Oct. 9, 1991) .....41

*Henry S. Miller Co. v. Stephens*,
587 S.W.2d 491 (Tex.Civ.App.-Dallas 1979, writ ref'd n.r.e.) ....................29

*Hudson v. Wakefield*,
711 S.W.2d 628 (Tex. 1986) .......................................................................24

*Humble Oil & Refining Co. v. Westside Inv. Corp.*,
428 S.W.2d 92 (Tex. 1968) .........................................................................35

*In re Hecht,*
213 S.W.3d 547 (Tex. Spec. Ct. Rev. 2006) .................................................31

*Jarvis v. Peltier*,
No. 12–12–00180–CV, 2013 Tex.App. Lexis 5017, 2013 WL 1755797
(Tex.App.-Tyler Apr. 24, 2013, n.p.h.) ................................................. 30, 41

*Jones v. Kelley*,
614 S.W.2d 95 (Tex. 1981) .........................................................................43

*Jones v. Pesak Bros. Const.. Inc.*,
416 S.W.3d 618 (Tex. App.—Houston [1st Dist.] 2013, no pet.)................42

*Miller v. Compton*,
185 S.W.2d 754 (Tex. Civ. App.—Eastland 1945, no writ) ........................36

*Norra v. Harris County*,
No. 14-05-01211-CV, 2008 WL 564061,
(Tex. App.—Houston [14[th] Dist.] 2008, no pet.)..........................................34

*Paciwest, Inc. v. Warner Alan Properties*, LLC,
266 S.W.3d 559 (Tex. App.—Fort Worth 2008, pet. denied)......................40

*Parson v. Wolfe*,
676 S.W.2d 689 (Tex. App.—Amarillo 1984, no writ) ................................36

*Perez v. Williams*,
01-14-00504-CV, 2015 WL 5076294
(Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no pet.)............................42

*Rasmusson v. LBC PetroUnited, Inc.*,
124 S.W.3d 283 (Tex. App.—Houston [14th District] 2003, pet. denied) ....44

*Redwine v. Hudman*,
104 Tex. 21, 133 S.W. 426 (1911) ...............................................................38

*Roundville Partners, L.L.C. v. Jones*,
118 S.W.3d 73 (Tex. App.—Austin 2003, pet. denied)................................28

*Rus-Ann Dev., Inc. v. ECGC, Inc.*,
222 S.W.3d 921 (Tex. App.—Tyler 2007, no pet.)......................................31

*S. Plains Switching, Ltd. v. BNSF Ry.*,
255 S.W.3d 690 (Tex.App.-Amarillo 2008, pet. denied)............................37

*San Antonio Joint Stock Land Bank v. Malcher*,
164 S.W.2d 197 (Tex. Civ. App.—San Antonio 1942, writ ref'd w.o.m.)...36

*Smith v. Dass, Inc.*,
283 S.W.3d 537 (Tex. App.—Dallas 2009, no pet.) ....................................28

*Stafford v. S. Vanity Magazine, Inc.*,
231 S.W.3d 530 (Tex. App.—Dallas 2007, pet. denied) .............................28

*Tello v. Bank One, N.A.*,
218 S.W.3d 109 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ..............34

*Trevino & Associates Mech., L.P. v. Frost Nat. Bank*,
400 S.W.3d 139 (Tex. App.—Dallas 2013, no pet.) .............................. 13, 23

*United Coin Meter* Co. *v. Johnson-Campbell Lumber* Co.,
493 S.W.2d 882 (Tex.Civ.App.--Fort Worth 1973, no writ) ........................16

**Statutes**

Tex. Civ. Prac. & Rem. Code § 38.001(8)....................................................43

Tex. R. App. P. 38.1 .......................................................... xiv

Tex. R. App. P. 39.1 .......................................................... xiv

Tex. R. App. P. 43.4.....................................................................45

Tex. R. Civ. P. 139.......................................................................45

# ABBREVIATIONS

For ease of reference, Appellees employ the following abbreviated references to the record and the parties herein:

| Abbreviation | Reference |
|---|---|
| **Woody** | *Appellants/Plaintiffs and Counter-Defendants*, Bob E. Woody and The Ranch, LLC (collectively, unless otherwise noted) |
| **Cárdenas** | *Plaintiffs' Trial Counsel*, Hector H. Cárdenas, Jr. |
| **J. Black's** | *Appellees/Defendants and Counter-Plaintiffs*, J. Black's, L.P. and J. Black's, G.P., L.L.C. (collectively, unless otherwise noted) |
| **11CR** | *Original Clerk's Record*, pgs. 1-959, filed 5/17/12 |
| **12CR** | *Supplemental Clerk's Record "B,"* pgs. 1-1361, filed 5/31/12 |
| **15CR** | *Clerk's Record,* pgs.1–1751, filed 7/20/ 15. |
| **1 RR** | *Reporter's Record from Hearing on Woody's Application for Temporary Restraining Order*, 5/6/09 |
| **2 RR Vol. I-III** | *Reporter's Record from Hearing on Woody's Motion for Temporary Injunction*, 5/14/09; Vol. I: Master Index Vol. II: Transcript Vol. III: Exhibits |
| **3 RR** | *Reporter's Record from Hearing on J. Black's Third/Final Motion for Summary Judgment*, 12/20/10 |

| Abbreviation | Reference |
|---|---|
| **4 RR Vol. I-III** | *Reporter's Record from Hearing on J. Black's Motion for Entry of Final Judgment*, 1/5/12;<br>Vol. I: Master Index<br>Vol. II: Transcript<br>Vol. III: Exhibits |
| **5 RR** | *Reporter's Record from Trial on issue of Attorney's Fees, 3/25/15* |

# STATEMENT OF THE CASE

| | |
|---|---|
| **Nature of the Case** | Appellant Bob Woody (as Sublessor) and The Ranch (Woody's business entity) filed suit against Appellees J. Black's L.P. (as Sublessee) and J. Black's G.P., L.L.C. (its general partner), regarding various disputes over their commercial sublease agreement. (11CR 8-15). J. Black's counter-sued to establish that it had properly exercised its unilateral option to extend the term of the Sublease and that Woody breached the Sublease by falsely accusing J. Black's of default, rejecting the proper exercise of J. Black's option, and demanding that J. Black's vacate the premises or pay holdover rent. (11CR 99-93). |
| **Course of Interlocutory Proceedings** | The trial court granted **J. Black's First Motion for Partial Summary Judgment**, holding that J. Black's had properly exercised its option while in good standing under the Sublease, and Woody breached the Sublease by his improper rejection of that exercise. (11CR 491-492). |
| | The trial court granted **three sanctions orders in J. Black's favor** based on Woody's abuse of discovery. (11CR 493-494; 12CR 1068-1069). Woody and The Ranch did not appeal those orders. |
| | The trial court granted **J. Black's Second Motion for Partial Summary Judgment**, dismissing all of Woody's and The Ranch's claims because J. Black's was not in default of (had not breached) the Sublease and was not liable for conversion, theft, or trespass. (11CR 710-711, 949). Woody and The Ranch do not appeal this order. |
| | The trial court granted **J. Black's Third Motion for Summary Judgment**, and issued a Final Judgment that affirmed the status of the pleadings and the conclusive legal determinations about Woody's liability and J. Black's non-liability, and awarded affirmative relief to J. Black's on that basis. (11CR 946-948). The trial court later vacated only the portion of this order awarding relief to J. Black's, reserving that issue for subsequent trial. (12CR 618). Woody and The Ranch did not appeal these orders. |

| | |
|---|---|
| | The trial court denied **Woody's Motion for Summary Judgment** because all of the arguments made therein had been conclusively decided against them in the previous orders. (11CR 1080-1081).<br><br>The trial court granted **J. Black's Fourth Motion for Sanctions** on the basis that Woody's Motion for Summary Judgment was frivolous and filed for purposes of delay and harassment. (11CR 1080-1081).<br><br>The parties signed a **Stipulation** regarding the reasonable and necessary amount of attorney's fees incurred by J. Black's. (11CR 1164-1165). |
| **Original Trial Court Disposition** | Upon a hearing before the Honorable Steven Yelenosky of the 345th District Court of Travis County on J. Black's Motion for Entry of a Final Judgment, the trial court granted a **Final Judgment**, which incorporated the prior orders and the parties' Stipulation and awarded J. Black's specific performance, attorney's fees, and interest based on Woody's breach of the Sublease. (12CR 1302-1304).<br><br>Woody and The Ranch appealed (1) the orders granting J. Black's First Partial Motion for Summary Judgment and denying Woody's Motion for Summary Judgment, (2) the award of specific performance and attorney's fees in the Final Judgment, and joined by their counsel Hector Cárdenas, (3) the fourth award of sanctions. |
| **Disposition by 7th Circuit Court of Appeals** | The Amarillo Court of Appeals overruled Woody's first, second and third issues on appeal and determined that Woody breached the sublease, finding Woody's contentions to the contrary "meritless." The Court of Appeals reversed the trial court on the issue of J. Black's failure to prove it was "ready, willing and able" to perform its obligations under the Sublease, and on the sanctions levied against Woody and Cardenas. After determining the issue was not moot, the Court of Appeals remanded the case for further proceedings consistent with its opinion. (15CR 881–898; 15 CR 900). |

| | |
|---|---|
| **Subsequent Trial Court Disposition** | After a hearing on the parties' cross-motions for summary judgment before the Honorable Judge Yelenosky of the 345th District Court of Travis County, the Court granted in part **J. Black's Motion for Final Summary Judgment**, excluding only the amount of attorney's fees, and denied the Motion for Summary Judgment of Counter-Defendants Bob E. Woody and the Ranch. (15CR 1639–1640).

Pursuant to the parties' March 19, 2015 stipulation as to reasonable and necessary attorney's fees (15CR 1645–1646), on March 31 2015, the Trial Court entered Final Judgment in this Cause, ordering Woody to specifically perform the entirety of his obligations under the Sublease Agreement dated August 21, 2006 as it has been extended and modified, finding that J. Black's was entitled to recover its attorney's fees under Tex. Civ. Prac. & Rem. Code §38.001, and awarding J. Black's $173,438.85 in attorney's fees (as well as an additional $40,000 in appellate fees conditioned on successfully prevailing on appeal). (15CR 1653–1654).

On May 6, 2015, Judge Yelenosky denied Woody's Motion for New Trial and Alternative Motion to Modify Judgment. (15CR 1707). On May 13, 2015, Woody timely noticed his appeal. (15CR 1708 – 1709). |

# REQUEST FOR ORAL ARGUMENT

Appellees J. Black's L.P. and J. Black's G.P., L.L.C. respectfully request that this Court grant oral argument to aid in the Court's decisional process. Appellants have raised multiple issues on appeal that must be construed in light of the arguments presented and legal rulings made through a series of interlocutory proceedings, covering five years in the trial court, which ultimately resulted in a Final Judgment. Oral argument will assist the Court in synthesizing the substantive merits and procedural status of Appellants' issues on appeal. Tex. R. App. P. 38.1(e), 39.1.

# ISSUES PRESENTED

Appellants have asserted three multifaceted issues, many of which complain about the same decision and/or legal conclusion of the trial court. In response, J. Black's simplifies and restates the operative issues on appeal as follows:

**ISSUE 1** **Summary Judgment Rulings on Liability and Award of Specific Performance of Sublease:**

Did the trial court err in granting summary judgment for J. Black's and not for Woody on J. Black's request for specific performance?

*Responsive to Appellants' Issues 1, 2, and 3.*

**ISSUE 2** **Trial Court's discretion in excluding and considering of evidence:**

Did the trial court abuse its discretion and commit harmful error in excluding certain of Woody's summary judgment evidence and failing to exclude certain of J. Black's summary judgment evidence?

*Responsive to Appellants' Issue 2.*

**ISSUE 3** **Award of fees, interest and costs:**

Did the trial court err in awarding J. Black's attorney's fees, interest, and costs?

*Responsive to Appellants' Issue 1–3.*

## STATEMENT OF FACTS

**I.** **THE SUBSTANTIVE FACTS SHOW THAT WOODY BREACHED THE SUBLEASE, UNDER WHICH J. BLACK'S WAS READY, WILLING AND ABLE TO PERFORM.**

The key dispute in this appeal — framed by the prior appellate court decision issued by the Amarillo Court of Appeals on October 23, 2013. and the otherwise-undisturbed Orders granting J. Black's various Motions for partial Summary Judgment — is whether the evidence shows J. Black's was ready, willing, and able to perform its obligations under the Sublease after Woody had breached the Sublease and J. Black's had given timely notice of the intent to exercise the extension of the terms of the Sublease. As shown by the record, Judge Yelenosky correctly decided this issue in J. Black's favor based on the plain language of the Sublease, the evidence of preparedness and actual performance of the Sublease by J. Black's, and the well-established law of this State.

### A. The Parties Entered a Sublease Agreement in August 2006 for a Three-Year Term with Four Extension Options.

On August 21, 2006, Bob Woody (sublessor) and J. Black's, LP (sublessee) entered a sublease agreement ("the Sublease") to allow J. Black's to sublet the ground floor of a two-story commercial building for the purpose of operating a restaurant and bar in the popular "West 6th Street" entertainment district of Austin, Texas. (11CR 19-52, 621). Woody leased the building (under a Master Lease with Montwalk Holdings, Ltd.). (11CR 19). He used a portion of the building to operate a bar and rooftop patio (called "The Ranch") on the top floor and in part of

1

the ground floor adjacent to the space subleased by J. Black's. (12CR 33–48).[1]

The interest in real property at this location contains intrinsic and intangible value to J. Black's business. (15CR 1199, at ¶ 2).

The original term of the Sublease was for 36 months (three years), from September 1, 2006, to August 31, 2009. (11CR 21). Thereafter, J. Black's was given a unilateral option to extend the Sublease term for four successive periods of 36 months each (the four "Option Periods"), for a total of 144 additional months (twelve additional years, through August 31, 2021). (11CR 21-22).

To exercise its extension option, J. Black's had to be in good standing (*i.e.*, not in default) under the Sublease, and had to send notice to Woody of its intent to exercise the option at least 180 days prior to the expiration of the existing term. (11CR 21, Sublease § 3.01, *Term*).

**B.      J. Black's Properly Exercised its First Extension Option, Woody Improperly Rejected J. Black's Exercise of the Extension Option and thereby Breached the Sublease.**

In compliance with the Sublease, J. Black's sent written notice to Woody, stating its intention to exercise the first extension option on February 23, 2009,

---

[1] Although originally named as a Plaintiff in this lawsuit, The Ranch, L.L.C. was not a party to either the Sublease or the Master Lease. (11CR 19, 33). And although the Sublease named J. Black's, L.P. as the Sublessor, the Sublease was executed by Sean Fric, Manager of J. Black's, G.P., L.L.C., on behalf of J. Black's L.P. (12CR 30, 108).

which was more than 180-days before the expiration of the original sublease term. (11CR 21-22, 162, 164).[2]

Although Woody acknowledged that J. Black's properly and timely mailed its notice of extension to his stated address, Woody unconvincingly contended that the notice did not extend the Sublease term because he claims to have not actually "received" it. Based on this contention, Woody rejected J. Black's timely exercise of its extension option and, instead, demanded that J. Black's vacate the premises and/or pay holdover rent. (11CR 158–159, 171-173). Woody has never repudiated the demand for holdover rent or notice to vacate.

The trial court granted J. Black's November 20, 2009 Motion for Partial Summary Judgment *in full* on its counterclaim for breach of contract related to the rejection of the extension. (15CR 81–84, 95, 478, 769–771). The Amarillo Court of Appeals affirmed the conclusion that the extension notice was properly and timely sent to Woody in full compliance with the Sublease agreement, and did not in any way disturb or reverse the trial Court's December 17, 2009 Order granting summary judgment on the counterclaim for breach of contract. (15CR 887–889).

---

[2] The original term was set to expire on September 1, 2009, meaning that J. Black's 180-day advance deadline to exercise its option was on March 4, 2009. (11CR 184, ¶ 13). J. Black's sent the required notice more than a week ahead of the deadline.

3

**C.   Woody Improperly Accused J. Black's of default and disregarded the default terms of the Sublease.**

In furtherance of his efforts to eject J. Black's from the subleased premises, nine days *after* J. Black's sent its extension notice, Woody for the first time claimed that J. Black's was in default under the Sublease.  (11CR 108, 144–145). Specifically, Woody manufactured claims that J. Black's had "defaulted" by providing "substandard food service" to The Ranch's customers and by installing an "offensive neon sign" outside the premises.  (11CR 144).  Woody later claimed that J. Black's was in default based on its installation of three gas heaters.  (11CR 146-147).  None of these actions were "defaults" contemplated by the Sublease's specific provisions and Woody's "notices" were therefore also outside of the parties' agreement.

The trial court determined that the Sublease contained no requirements regarding the type, quality, or quantity of food service by J. Black's (other than to state that "the only food sold or provided [at The Ranch] will be provided by [J. Black's]"), and J. Black's had worked diligently to provide such service and that J. Black's fully complied with the Sublease when it installed a basic marquee sign  (11CR 28-29, 502–503, 511-515, 613-614, 616-623).  The trial court also determined that J. Black's installation of the heaters did not violate the Sublease but, even if it did, J. Black's promptly cured the issue by removing the heaters and

paying Woody for any increased gas expenditure upon notice. (11CR 500-502, 505-510, 614-615; 15CR 636).

All of these facts were the subject of J. Black's Second Motion for Partial Summary Judgment, which was decided in J. Black's favor, concluding as a matter of law that J. Black's was not in default of the Sublease, and dismissing all of Woody's claims on that basis. (11CR 497, 517, 949; 15CR 636). Woody did not appeal from this Order. Hence, the record is conclusive that J. Black's was not in default (*i.e.*, was in good standing) when it exercised its extension option by sending written notice to Woody, and that it was Woody who in fact was in breach of the Sublease.

**D.  J. Black's was Ready, Willing, and Able to perform each and every one of its Obligations under the Lease.**

Although Woody makes this the focus of his argument, on appeal there is no serious dispute that J. Black's was not at all times relevant to this dispute ready, willing and able to perform its obligations under the lease, and did in fact perform its obligations under the Lease. No evidence controverts J. Black's clear testimony — from Mr. Sean Fric, a manager of J. Black's with full knowledge of J. Black's ability to meet the entirety of its Sublease obligations at all relevant times — of J. Black's readiness, willingness and ability to perform, and Woody's only challenge to such evidence comes through spurious legal objections to the affidavit of Mr. Fric that were properly denied by the trial court.

**II. THE PROCEDURAL HISTORY DEMONSTRATES THAT J. BLACK'S WAS PROPERLY AWARDED SPECIFIC PERFORMANCE AND ITS ATTORNEY'S FEES.**

On appeal, Woody seeks reversal of the relief awarded to J. Black's (specific performance and attorney's fees). The record fully supports these awards, however, and they should be affirmed.

**A. The Parties Counter-Sued against Each Other: Woody Sought to Remove J. Black's as the Tenant, and J. Black's Sought to Remain in the Subleased Space.**

Woody filed his Original Petition in May 2009 alleging causes of action against J. Black's for conversion, breach of contract (based upon alleged contractual provisions that did not even exist), trespass and theft, and seeking injunctive relief, damages, and attorney's fees. (15CR 6–13; *see also* 12CR 921-929). Woody complained about J. Black's refusal to surrender the subleased premises. (15CR 8). His goal was to terminate the Sublease and eject J. Black's.

J. Black's timely answered and counterclaimed, asserting claims for breach of contract and fraud. (11CR 88-93; *see also* 12CR 495-49, 1138-1143). In its answer and counterclaim, J. Black's explained why none of its actions constituted a default and that it had properly extended the Sublease term. (11CR 89-91). J. Black's further pled that, by refusing to acknowledge the extension of the Sublease term and by improperly accusing J. Black's of defaults under terms that did not exist, and seeking a judicial determination that the Sublease was

6

terminated, Woody had breached the Sublease. (11CR 91). On this basis, J. Black's sought specific performance, damages, and attorney's fees. (11CR 91-92). By its pleadings, J. Black's sought to maintain its successful business in the subleased premises and compel Woody's performance of the entirety of his obligations under the Lease.

Following an evidentiary hearing, Woody and The Ranch's request for a temporary injunction was denied. (11CR 95; 1 RR Vol. 2, p. 99).

**B.    J. Black's First Motion for Partial Summary Judgment was Granted, Holding that J. Black's Properly Exercised its Extension Option and that Woody Breached the Sublease.**

J. Black's filed its first Motion for Partial Summary Judgment seeking an affirmative finding on its counterclaim that Woody was liable for breaching the Sublease. The crux of J. Black's argument was that — because it had fully complied with the Sublease's extension notice provisions while in good standing — Woody's refusal to acknowledge the extension and his demand for holdover rent constituted a material breach. (15CR 92-197). Woody filed a response, and both parties filed additional replies. (15CR 163–477).[3]

---

[3] Woody filed a Cross-Motion for Partial Summary Judgment, contained within the same document as his Response. (11CR 174). J. Black's objected to the Cross-Motion because it had been filed just seven days prior to the hearing. (11CR 475). The trial court correctly refused to hear the Cross-Motion, and Appellants have never asserted any error on that basis. Two years later, Woody filed another Motion for Summary Judgment (11 CR 624-645), which was properly denied. (12CR 948).

7

A hearing was conducted, and the district court granted J. Black's Motion "in full" on December 17, 2009. (15CR 478). The impact of this order was to determine, as a matter of law, that because J. Black's had properly exercised its extension option while in good standing, Woody was liable for breach of contract based on his refusal to acknowledge this extension, while reserving all relief to be awarded on that breach for a later date. (15CR 478).

## C. Three Sanctions Orders were Granted in J. Black's Favor

Thereafter, Woody engaged in discovery abuse, requiring J. Black's to file multiple motions for relief between June-August 2010. First, Woody refused to appear for his properly-noticed deposition. (12CR 21-26). The district court granted J. Black's Motion to Compel the deposition, and awarded J. Black's $1,500.00 as sanctions. (11CR 493). Woody failed to appear as ordered by the court, so J. Black's filed a Motion for Contempt and for Sanctions. (12CR 55-57). The district court also granted that motion, awarding J. Black's an additional $3,000.00 as sanctions against Woody. (12CR 494). Finally, the court awarded J. Black's an additional $1,000.00 in sanctions based on Woody's improper motion to compel discovery from J. Black's on matters that had already been dismissed by the prior summary-judgment ruling. (12CR 230-237, 1068-1069).

**D. J. Black's Second Motion for Partial Summary Judgment was Granted, Dismissing all of Woody's Claims.**

J. Black's filed its Second Motion for Partial Summary Judgment in August 2010. (15CR 481-631). That motion requested, on both traditional and no-evidence grounds, that all of Woody's claims be dismissed, including Woody's claim that J. Black's had breached the Sublease. (15CR 501; *see also* 11CR 699-701). Woody failed to respond to J. Black's Second Motion for Summary Judgment. (15CR 636; *see also* 11CR 700, 949).

Following a hearing, the Second Motion for Summary Judgment was originally granted in October 2010, but the order was then twice amended. (15CR 636; 11CR 949). Ultimately, the order held that Woody and The Ranch shall "take nothing by their claims that [J. Black's] defaulted under the Sublease agreement" and "for conversion, trespass to personal property, and theft." (11CR 949). The order also expressly reserved J. Black's ability to seek affirmative relief on its counterclaims at a later date. (11CR 949; 4 RR Vol. II, p. 13).[4] The Plaintiffs did not appeal from this October 13, 2010 Order.

**E. J. Black's Third Motion for Summary Judgment was Granted, Resulting in a Final Judgment, which was then Partially Vacated.**

Having successfully obtained the first summary judgment holding that J. Black's had properly extended the Sublease term and that Woody was in breach

---

[4] Woody and The Ranch attempted an interlocutory appeal of this order. The Third Court of Appeals dismissed that appeal for want of jurisdiction. *See Woody v. J. Black's LP*, No. 03-11-00024-CV (Tex. App.—Austin June 28, 2011, no pet.) (unpublished mem. op.) (12 CR 1073).

9

of the Sublease and a second summary judgment dismissing all of Woody's and The Ranch's claims, J. Black's then sought a third, final summary judgment awarding it specific performance and attorney's fees. (15CR 637-647). This Motion was granted, resulting in entry of a "final" judgment in January 2011. (15CR 769–771). The judgment held, as a matter of law, that (1) J. Black's counterclaims, as set forth in its Original Answer and Counterclaim (including the ability to obtain affirmative relief thereon) remained pending before the court;[5] (2) Woody and The Ranch shall take nothing by their claims; (3) Woody breached the Sublease; (4) J. Black's did not breach the Sublease; (5) J. Black's properly exercised its extension option, resulting in the Sublease continuing in full force and effect; and (6) J. Black's was entitled to specific performance, attorney's fees, and interest as sought in its third and final motion for summary judgment. (15CR 769–771).

Woody filed a Motion to Modify/Motion for New Trial (15CR 772-849), which was "granted only with respect to Defendant's Motion for Final Summary Judgment" in April 2011. (15CR 850). The basis of the court's ruling was that the attorney's fee claim presented fact issues not appropriate for summary disposition. (12 CR 1145; 4 RR Vol. II, p. 17). Hence, the order retained all portions of the

---

[5] The district court determined that Woody had tried J. Black's counterclaims by consent and that J. Black's original counterclaim remained in force and effect, and would be accepted as a trial amendment. Additionally, the court granted J. Black's permission to file an amended counterclaim as a trial amendment, which J. Black's did. (11CR 947-948; 12CR 1138-1143). Appellees have not asserted any error relating to these procedural facts on appeal.

10

January 2011 judgment except for the affirmative relief (specific performance, attorney's fees, and interest) that had been awarded pursuant to J. Black's final motion. (*See* 4 RR Vol. II, p. 15-16, 18-19). Thus, as of April 2011, the final issue pending for decision by the court was the relief to be awarded to J. Black's based on Woody's breach.

**F.    Woody's Motion for Summary Judgment was Denied—and a Fourth Sanctions Order was Granted in J. Black's Favor—because the Court had Already Conclusively Determined that J. Black's Properly Exercised its Extension Option and that Woody was in Breach of the Sublease.**

Despite the fact that the district court had already conclusively ruled that (1) J. Black's properly exercised its extension option and was not in breach, and that (2) Woody breached the Sublease by refusing to acknowledge J. Black's extension and demanding holdover rent, Woody moved for summary judgment in October 2011 asking the court to again decide these same issues, but in the opposite manner. (12CR 625-645). J. Black's responded to this motion and requested sanctions against Woody and Cárdenas based on their filing of a harassing and frivolous motion, which asserted legal arguments that had already been rejected at least three times. (12CR 930-948).

The district court denied Woody's Motion for Summary Judgment and granted J. Black's Fourth Motion for Sanctions on November 21, 2011, awarding

an additional $6,958.00 as sanctions against Woody and Cárdenas. (12CR 1080-1081).

**G.      J. Black's Motion for Entry of a Final Judgment was Granted, and a Final Judgment was Entered in J. Black's Favor.**

J. Black's filed a Motion for Entry of Final Judgment on December 21, 2011. (12CR 1144-1163). This motion incorporated all of the prior, interlocutory rulings (which determined as a matter of law that J. Black's had properly exercised its option to extend the Sublease, that J. Black's had not breached the Sublease and was not liable for any other claim asserted by Woody, and that Woody had breached the Sublease), and the parties' stipulation on J. Black's attorney's fees (which confirmed the reasonable and necessary amount of fees to be awarded to J. Black's). (12CR 1144-1163). Based on these prior orders and the stipulation, there were no remaining fact issues, and the only step remaining was for the court to exercise its discretion to award J. Black's the legal equitable relief to which it had shown itself entitled (specific performance, attorney's fees, and interest). (12CR 1146; 4 RR Vol. II, p. 21, 35-36).

The district court granted J. Black's motion and entered a Final Judgment on January 13, 2012. (15CR 868–870; 4 RR Vol. II, p. 41-45). The Final Judgment specifically incorporated the prior summary-judgment and sanctions orders and awarded J. Black's specific performance, attorney's fees in the exact amounts

stipulated by the parties, and post-judgment interest. (15CR 868–870).[6] Woody, The Ranch, and Cardenas appealed. (12CR 1350).

## H.     Appeal and Remand by Amarillo Court of Appeals

In its decision issued October 18, 2013, the Amarillo Court of Appeals overruled Woody's first three points of error and thereby affirmed this Court's finding that the Sublease was validly extended and that Woody was in breach thereunder.[7] (15CR 887, 889).  Although Woody's procedural (and sanctioned) gamesmanship had lasted throughout nearly the entirety of the First Extension Period, the Court of Appeals also raised *and disposed* of the argument that the issue of whether J. Black's was entitled to attorney's fees might be moot because "before briefing was completed on appeal, the first option period had expired." (15CR 889–890, at note 3).  The Court of Appeals specifically held, *sua sponte*,

---

[6] Woody filed a Motion to Modify/Motion for New Trial (12 CR 1216-1238), which was denied following a response by J. Black's (12CR 1329-1343).

[7] Specifically, Woody sought by its Issues number 1-3 that this Court's grant of J. Black's original Motion for Partial Summary Judgment (and the denial of Woody's First Motion for Summary Judgment), were improper.  J. Black's first Motion for Partial Summary Judgment was granted on the explicit grounds that Woody had breached the Sublease.  The Court of Appeals, by overruling the Appellants issues number 1-3 and thereafter addressing the issue of whether Specific Performance was appropriately granted as a remedy for Woody's breach, therefore upheld the Order granting the first Motion for Partial Summary Judgment and the grounds upon which this Court granted the same. *See Trevino & Associates Mech., L.P. v. Frost Nat. Bank*, 400 S.W.3d 139, 144 (Tex. App.—Dallas 2013, no pet.) ("After an interlocutory, partial summary judgment is granted, the issues it decides cannot be litigated further, unless the trial court sets the partial summary judgment aside or the summary judgment is reversed on appeal"); *City of Houston v. Socony Mobil Oil Co.*, 421 S.W.2d 427 (Tex. Civ. App. – Houston [1st Dist.] 1967), writ refused NRE (Apr. 10, 1968) ("An appeal from a final judgment, in which an interlocutory summary judgment has been merged, presents an opportunity for an appeal from the summary judgment. If the appeal results in a reversal on points not involved in the summary judgment, that portion of the case decided on summary judgment will not be remanded for a new trial").

13

that "[t]he issue whether the trial court's decree of specific performance was correct might thus be moot…But, because J. Black's award of attorney's fees is contested on appeal, and depends on the viability of the trial court's decree of specific performance, **the issue is not moot**." (15 CR 889–890, at note 3) (emphasis added), citing *Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 642–43 (Tex.2005) (appellee's remaining issue in recovering attorney's fees precluded application of mootness doctrine).

On April 29, 2014, the Amarillo Court of Appeals then issued its mandate to the trial court stating "it is ordered, adjudged and decreed that the judgment of the trial court regarding J. Black's timely notice of its intention to carry the sublease into the first option period is affirmed. Otherwise the judgment is reversed and remanded for further proceedings consistent with the opinion." (15CR 900).

I. **Grant of J. Black's Final Summary Judgment and Entry of Final Judgment**

The parties filed dueling motions for summary judgment heard before the Court on March 5, 2015. (15CR 911–1271). In addition, the parties filed a variety of objections to the summary judgment evidence that was heard on that same day. (15 CR 1272–1291; 1570–1602; 1610–1616). On March 11, 2015, the Court issued its Order on Motions for Summary Judgment, Objections and Attendant Motions, thereby sustaining objections to the affidavit of Sean Fric to the extent it offers a legal opinion (and otherwise overruling such objections) and the affidavit

14

regarding attorney's fees of the undersigned counsel, granting in part J. Black's Motion for Summary Judgment (excluding only the amount of attorney's fees) and denying Woody's Motion for Summary Judgment. (15CR 1639-1670). On March 25, 2015, the parties appeared for trial on the issue of attorney's fees, at which time the Court accepted into evidence the stipulation of the parties as to the amount of attorney's fees accrued by J. Black's. (RR. 3.25.15 4–26); 15CR 1644–1646).

On March 31, 2015, the Court again entered Final Judgment in this suit. (15CR 1652–1654). In the Final Judgment, the Court rendered judgment in favor of J. Black's and decreed that "Woody shall specifically perform the entirety of his obligations under that certain Sublease Agreement dated August 21, 2006 as it has been extended and modified and that J. Black's was entitled to recovery of attorney's fees under Tex. Civ. Prac. & Rem. Code §38.001 in the amounts set forth therein. (15CR 1652–1654). The Court then denied Woody's Motion for New Trial and Alternative Motion to Modify Judgment (15CR1658–1667; 1707). On May 13, 2015, Woody noticed this appeal. (15 CR 1708–1710).

## SUMMARY OF THE ARGUMENT

Throughout the history of this long and tortured case, J. Black's has prevailed on four separate summary-judgment motions (and successfully defeated two others filed by Woody), in front of at least four separate district judges. In

ruling on those various summary judgment motions, both the trial courts and the Amarillo Court of Appeals determined that J. Black's had prevailed by proving liability for its counterclaim that Plaintiff Bob Woody had breached the parties' sublease agreement, and the Courts have disposed of all of Plaintiffs' claims for breach.

After upholding the trial court's determination that J. Black's had given timely notice of the intent to exercise the extension of the terms of the Sublease, the Amarillo Court of Appeals remanded to the Trial Court for the presentment of evidence related to whether J. Black's was ready, willing and able to perform its obligations under the Sublease in order to be eligible for the remedy of specific performance and be entitled to the recovery of attorneys' fees. Although the Court of Appeals noted at the time that it rendered its decision the "1st Extension" period of the sublease had expired, it nevertheless specifically refused to hold the claims made by J. Black's had thereby been rendered moot, and instead instructed the District Court to consider proof of whether the decree of specific performance would be proper.[8] The controversy is no less alive and true now that Woody's

---

[8] Woody appears to have retreated from his "mootness" argument in this appeal, however, J. Black's would note that the Amarillo Court of Appeals specifically stated: "The nub of the question concerns extending the sublease into the first option period, that is from August 31, 2009, through August 31, 2012. But before briefing was completed on appeal, the first option period had expired. The issue whether the trial court's decree of specific performance was correct might thus be moot. *See United Coin Meter* Co. *v. Johnson-Campbell Lumber* Co., 493 S.W.2d 882, 890-91 (Tex.Civ.App.--Fort Worth 1973, no writ) (appellate challenge of trial court's refusal to order specific performance of lease dismissed as moot because secondary term of lease

procedural maneuvering has brought the parties through the Second and into the Third Extension period, because the continuing viability of the Sublease depend on the parties' performance of all obligations throughout the original and all extension terms of the Lease.

Mr. Woody has never repudiated or retracted his rejection of the 1st Extension Option or his demand for holdover rent. To the contrary, and through the first appeal, Woody has consistently asserted that the first extension was non-compliant and ineffective, that J. Black's ability to continue to operate in the leased premises had expired, and that J. Black's was subject to the holdover rent provisions of the Sublease. While Woody would have this Court believe that his failure to file a forcible entry and detainer action to exclude J. Black's from the property is significant and somehow insulates him from his breach, Woody maintained throughout the pendency of the district court case and through the first appeal that the Sublease had not been extended, that J. Black's had no right to occupy the property, and that he should be paid contractual hold over rent as a consequence. He also ignored the default provisions of the Sublease and

expired while case was on appeal). But, **because J. Black's award of attorney's fees is contested on appeal, and depends on the viability of the trial court's decree of specific performance, the issue is not moot**. *See Allstate Ins.* Co. *v. Hallman,* 159 S.W.3d 640, 642-43 (Tex. 2005) (appellee's remaining issue in recovering attorney's precluded application of mootness doctrine)") (emphasis added). (15CR 890). J. Black's further noted below that had the Amarillo Court of Appeals believed that J. Black's claims were mooted by operation of the Seventh Circuit Court's decision, it could have reversed and rendered judgment on such claims, rather than reversing and remanding to the district court for a determination of whether J. Black's was ready, willing and able to perform its obligations under the Sublease. (15CR 1010).

17

continuously asserted that J. Black's was in default based on non-existent breaches. Woody never repudiated such claims and required the Court of Appeals to tell him that his demand to vacate or pay holdover rent was improper and in violation of the Sublease. Without the grant of specific performance, and especially in light of Woody's demonstrated intent to improperly terminate the Sublease for non-existent and non-contractual defaults, J. Black's needed a judicial direction entitling it to enforcement of the Sublease going forward.

On remand, the district court determined that J. Black's had shown with competent, uncontroverted summary judgment evidence that it was ready, willing and able to perform its obligations under the Sublease, and that J. Black's had no adequate remedy at law, so as to be eligible for specific performance of that agreement and that as a consequence, J. Black's was therefore entitled to attorneys' fees in connection with its affirmative claim of breach under chapter 38 of the Texas Civil Practice and Remedies Code. Both the trial Court and the Amarillo Court of Appeals thus determined and affirmed that Woody breached the Sublease by, among other things, refusing to acknowledge that the Sublease continues in full force and effect and has been properly extended by J. Black's and by, asserting unsupportable and contractually non-existent defaults and demanding holdover rent.

On December 12, 2014, Woody filed its latest summary judgment motion (the "Woody Motion for Summary Judgment"), seeking summary judgment that specific performance and the granting of attorneys' fees were not available. (15CR 911–995). That Fifth Summary Judgment Motion was merely a re-hash of the same legal arguments that both the Trial and Appellate Courts already found meritless — first when this Court granted J. Black's summary judgment motions and overruled most of the arguments raised in the Counter-Defendants' prior motion for new trial; and subsequently when the Amarillo Court of Appeals determined that J. Black's was entitled to specific performance (and therefore its consequent claim for attorney's fees was not moot), if this Court found that J. Black's was ready, willing and able to perform the sublease. On January 27, 2015, J. Black's filed its own Motion for Final Summary Judgment. (15CR 996–1261). On March 11, 2015, the Court denied Woody's Motion for Summary Judgment, and granted J. Black's Motion for Summary in part, excepting as to the issue of attorney's fees. (15CR1639–1640).

At trial on this case on the issue of attorney's fees, held March 25, 2015, Woody acknowledged that the only issues before the Court on remand were "[J. Black's] requests for relief for specific performance and attorney's fees against us." (5 RR 13). Because the uncontroverted evidence before the Court shows that J. Black's was ready, willing and able to perform, and did in fact perform, its

19

obligations under the Sublease at all times, the district court complied with instructions from the Court of Appeals and awarded J. Black's the Specific Performance of the Sublease and its extensions to which it is entitled, a decision which this Court should affirm.

## ARGUMENT

### I. WOODY BREACHED THE SUBLEASE

### A. Woody's Breach was established by the District Court

On November 20, 2009, J. Black's filed its first Motion for Partial Summary Judgment (the "First Motion for Summary Judgment"), by which it sought "partial summary judgment on its breach of contract counterclaim, which alleges in part that Woody has breached the Sublease by refusing to acknowledge the extension of the Sublease and by demanding holdover rent," and prayed the court grant it relief on the basis of the same request. (15CR 87, 95). On December 17, 2009, the Court granted the First Motion for Partial Summary Judgment "in full." (15CR 478). Subsequently the Court granted J. Black's second Motion for Partial Summary Judgment filed August 27, 2010 (the "Second Motion for Summary Judgment"),[9] and on the basis thereof and upon the basis of J. Black's third Motion for Final Summary Judgment filed November 23, 2010 (the "Third Motion for Summary Judgment"), the Court entered its January 25, 2011 "Amended

---

[9] The Second Motion for Summary Judgment prayed that the Court grant J. Black's Motion for Summary Judgment "(a) J. Black's has not breached the Sublease as alleged by Plaintiffs, (b) **Woody has breached the Sublease by asserting groundless defaults**, and (c) Plaintiffs' claims for conversion, trespass to personal property, and theft fail as a matter of law." (15 CR 482, 501). The subsequent "Corrected Order Granting Defendants' Second Motion for Partial Summary Judgment" and final "Amended Interlocutory Order Granting Defendants' Second Motion for Partial Summary Judgment" *granted* the Second Motion for Partial Summary Judgment without reservation on the issue of breach. (15CR 636). Although Woody emphasizes the fact that one version of the Order crossed through the specific reference to a finding of breach, such a finding was not necessary to the granting in full of the Second Motion for Summary Judgment because Woody's breach of the Sublease *had already been established* by the Court's grant of the First Summary Judgment.

Interlocutory Order Granting Defendants' Second Motion for Partial Summary Judgment" and "Final Judgment on Defendants' Motion for Final Summary Judgment and Granting Defendants' Request for Leave to File Trial Amendment." (15CR 636, 768, 769–771). The January 25, 2011 Judgment incorporated the prior orders on the Defendants' motion for summary judgment, granted the Third Motion for Summary Judgment in all respects, and rendered final judgment. (15CR 769-771).

After the January 25, 2011 Judgment was entered, the Court later granted a new trial "only with respect to Defendants' Motion for Final Summary Judgment" on April 27, 2011, and after a significant delay engendered by Woody's refusal to respond to requests to agree to a trial date, a new "Final Judgment" was entered on January 13, 2013 (15 CR 850, 868-870). The new Final Judgment also incorporated the prior Summary Judgment Orders and decreed that "Plaintiff Bob E. Woody breached the Sublease between the parties," that "Defendants properly exercised their right to extend the Sublease for an additional term and the Sublease continues in full force and effect" and that "specific performance of the contract is equitable and necessary to afford Defendants sufficient relief; the Sublease continues in full force and effect" and that "Defendants are entitled to recover attorney fees under Tex. Civ. Prac. & Rem. Code 38.001."

## B.     Woody's Breach affirmed by the Amarillo Court of Appeals

On Appeal of the original Final Judgment, the Amarillo Court of Appeals overruled Woody's first three issues, in which Woody's "contend[ed] the trial court erred in adjudging Woody breached the sublease by refusing to acknowledge its extension by J. Black's," and in fact found such contentions "meritless." (15CR 885, 887, 889).

Although the Court of Appeals sustained Woody's subissue number 4(c) and remanded for the trial court's consideration of evidence as to whether J. Black's was "ready, willing, and able" to perform its obligations under the Sublease, the court of appeals did not otherwise disturb the Court's Final Judgment or the prior Summary Judgment Orders determining Woody had breached the Sublease.

The issue of Woody's breach was established by the Court's Summary Judgment rulings,[10] which were incorporated and merged into the Final Judgment, and cannot be litigated further absent a reversal of summary judgment on that issue. *See Trevino & Associates Mech., L.P. v. Frost Nat. Bank*, 400 S.W.3d 139 (Tex. App.—Dallas 2013, no pet.) ("After an interlocutory, partial summary judgment is granted, the issues it decides cannot be litigated further, unless the trial court sets the partial summary judgment aside or the summary judgment is reversed on appeal").  The Final Judgment of the District Court was reversed by

---

[10] Woody has admitted this point multiple times. *See e.g,* Appellant's Brief at p. 12–13. ("…J. Black's did obtain a finding from the trial court that Woody breached the sublease by "refusing to acknowledge" J. Black's exercise of its first extension of the sublease…").

the Amarillo Court of Appeals solely on the issue of whether J. Black's was ready, able and willing to perform. Therefore the Court's prior ruling that Woody breached the Sublease remains undisturbed, and Woody should not now be permitted to challenge the determination of his breach for failure to acknowledge the extension of the Sublease Agreement on appeal. *See City of Houston v. Socony Mobil Oil Co.*, 421 S.W.2d 427, 430 (Tex. Civ. App. – Houston [1st Dist.] 1967), writ refused NRE (Apr. 10, 1968) ("An appeal from a final judgment, in which an interlocutory summary judgment has been merged, presents an opportunity for an appeal from the summary judgment. If the appeal results in a reversal on points not involved in the summary judgment, that portion of the case decided on summary judgment will not be remanded for a new trial").

    **C.**    **Woody's new defense that he did not actually "breach" the Sublease, but merely "repudiated" his obligations thereunder, is untimely and unsupported by legal authority or the facts of this case**

Despite acknowledging that the Court had previously found (and the Amarillo Court of Appeals affirmed) that Woody had breached the Sublease, Woody argues the issue should be re-litigated because "the effect of the remand is to re-open the case in its entirety on all factual issues," citing *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986) and *First State Bank of Bishop v. Grebe*, 162 S.W.2d 165 (Tex. Civ. App.—San Antonio 1942, writ ref'd w.o.m.). As shown

above, the Amarillo Court of Appeals did not reverse on the issue of Woody's breach and that issue was not reopened for the District Court.

Even were the issue of breach not already determined by the previous ruling of the trial court and Amarillo Court of Appeals, however, the determination that Woody breached the Sublease is still correct because (a) the issue of breach has been decided as a matter of law and the effect of the district court's granting each of the prior Motions for Summary Judgment necessarily precludes the existence of a material issue of fact; and (b) the Court did not limit its March 25, 2015 Final Judgment solely to those determinations of breach made in the prior Summary Judgment Orders. (5 RR 8). As such, even if this Court of Appeals does not deem the issue of Woody's breach to have been previously decided and affirmed by the Courts before, the entirety of the record and evidence — including the notices of rejection of the 1st Option Extension, the notices of default for non-existent and extra-contractual breach and demand for Holdover Rent made by Woody in October 2009 — before the trial Court was enough to sustain its finding of breach.

By rejecting the Sublease's extension made pursuant to the terms thereunder, Woody breached the agreement of the parties. Without citation to any relevant authority or factual record, however, Woody argues that his actions in fact constituted an "anticipatory repudiation," and not an "actual" breach of the

Sublease.[11] Woody further argues that since J. Black's determined to ignore the repudiation and itself continued to perform its obligations under the Sublease, there was no breach for which specific performance could be ordered. Woody's arguments in this regard are substantively without merit.

In addition to refusing to honor the extension after the necessary time of performance, Woody also sent demands and notices of default based upon non-existent and extra-contractual obligations (*e.g.* bad food quality). These fabricated, and contractually non-existent, defaults were not simply a contemporaneous repudiation of the effectiveness of the contract, but were also assertions of contractual breaches that had no basis in fact or in the contract.

The parties agreed in the Sublease that certain specific activities (or the failure to perform certain actions – *e.g.* timely payment of rent) would constitute defaults. (15 CR 23–24). With respect to the variety of his claims of default,[12] however, Woody did not assert J. Black's committed any act that the parties agreed fit within the Sublease's frame work for determining a "default," but rather made up provisions that were asserted as contractual defaults that are nowhere found in the Sublease. In doing so, Woody further breached the terms of the Sublease by asserting claims that were not within the four corners of the instrument and outside the parties' agreement.

---

[11] Woody's "Anticipatory Repudiation" argument is further refuted in Section II.B.1, below.
[12] *See* 11CR 108, 144–145 158–159, 171-173; 15CR 8–11, 163–164.

Thus, by rejecting the continuing effectiveness of the Sublease before, during and after the time for performance of Woody's obligations, by demanding holdover rent, *and* by asserting that certain factual situations constituted defaults under the agreement (even though the Sublease contained no such terms) the district court found that Woody's acts properly constituted violations of the Sublease found by the district court.

## II. THE TRIAL COURT CORRECTLY ENTERED FINAL JUDGMENT AWARDING SPECIFIC PERFORMANCE AND ATTORNEY'S FEES TO J. BLACK'S ON THE BASIS OF WOODY'S BREACH.

As shown above, on appeal, the Amarillo Court of Appeals overruled Woody's first three points of error and thereby affirmed this Court's finding that Sublease was validly extended and that Woody breached the lease. Then after having determined that the question of Specific Performance *was not moot*, the Court of Appeals reversed and remanded this Court's decision on the sole issue of whether J. Black's had offered proof that it was ready, willing, and able to perform the Sublease and extension, as would be required for specific performance. On March 31, 2015, the district court, accounting for the Amarillo Court of Appeals' decision, the prior Summary Judgment Orders, and the evidence before it, correctly determined that specific performance was an available and equitable remedy and awarded such performance of the Sublease to J. Black's.

27

**A.  J. Black's is entitled to specific performance of the Sublease and its extensions because it was ready, willing and able to perform its own obligations under the Sublease at all relevant times**

Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied).  The decision to award J. Black's specific performance of the Sublease based on Woody's breach of contract was an equitable matter wholly within the trial court's discretion.  *See Roundville Partners, L.L.C. v. Jones,* 118 S.W.3d 73, 79 (Tex. App.—Austin 2003, pet. denied) (whether to award specific performance is left to trial court's discretion).[13] A trial court's award of specific performance is reviewed for an abuse of discretion, giving deference to the trial court's decision.  *Smith v. Dass, Inc.*, 283 S.W.3d 537, 542 (Tex. App.—Dallas 2009, no pet.).  As an equitable remedy, this Court should not disturb the trial court's ruling on specific performance unless it is arbitrary, unreasonable, and unsupported by guiding rules and principles. *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas  2008,  pet.  denied);  *Fitzsimmons  v.  Anthony*, 716 S.W.2d 719, 720 (Tex. App.—Corpus Christi 1986, no writ).  Woody has

---

[13] *See also Stafford v. S. Vanity Magazine, Inc.,* 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied) (equitable remedy of specific performance may be awarded upon showing of breach of contract); *Frank v. Kuhnreich,* 546 S.W.2d 844, 848 (Tex. App.—San Antonio 1977, writ ref'd n.r.e.) (affirming summary judgment awarding plaintiff specific performance of lease upon proof that default claimed by sublessor had been cured by sublessee within time allowed by lease).

failed to establish an abuse of the trial court's discretion in awarding specific performance.

**1.  J. Black's was Ready, Willing and Able to perform its Obligations under the Sublease**

As noted by the Amarillo Court of Appeals, "to obtain specific performance, a party must, among other things, plead and prove it was ready, willing and able to timely perform its obligations under the contract." *See DiGiuseppe v. Lawler,* 269 S.W.3d 588, 593 (Tex.2008). To do so, "a plaintiff must show it could have performed its contractual obligations." *Id.* (citing *Corzelius v. Oliver,* 148 Tex. 76, 220 S.W.2d 632, 635 (1949) ("[T]o be entitled to specific performance, the plaintiff must show that it has substantially performed its part of the contract, and that it is able to continue performing its part of the agreement. The plaintiff's burden of proving readiness, willingness and ability is a continuing one that extends to all times relevant to the contract and thereafter"); *see also Henry S. Miller Co. v. Stephens,* 587 S.W.2d 491, 492 (Tex.Civ.App.-Dallas 1979, writ ref'd n.r.e.) (noting a party seeking specific performance must at all times remain ready, willing and able to perform its contractual responsibilities according to the terms of the contract).

The Amarillo Court of Appeals also took note of a recent case decided by the Tyler Court of Appeals, which determined it was "enough on a seller's breach for a purchaser to merely plead readiness, willingness and ability to perform,"

when the movant for summary judgment in that case "stated his readiness, willingness and ability to perform in his summary judgment affidavit." *Jarvis v. Peltier*, No. 12–12–00180–CV, 2013 Tex.App. Lexis 5017, at *20, 2013 WL 1755797 (Tex.App.-Tyler Apr. 24, 2013, n.p.h.) (citing *Burford v. Pounders,* 145 Tex. 460, 199 S.W.2d 141, 145 (1947). J. Black's proof far exceeded that required by the various Courts of Appeal to address this issue.

The Affidavit of Sean Fric, a manager of J. Black's GP, LLC, the general partner of J. Black's, L.P., attests that J. Black's benefits immeasurably from its downtown location and the brand associations related thereto. (15CR 1199). While the ability, willingness and readiness of J. Black's to perform under the Sublease is not seriously in question, contained in the affidavit of Sean Fric is also uncontroverted and incontrovertible evidence that J. Black's was at all times ready, willing, and able to perform, and did in fact perform, all of its obligations under the Sublease, including without limitation all obligations to pay all rental amounts due and owing and to provide all notices of extension under the terms of the Sublease. (15CR 1199–1120, 1256–1261).

Further, the district court has repeatedly found, and Woody now freely admits, that J. Black's is not now, nor has ever been, in default of its obligations under the Sublease — despite the demands of Woody for performance that was not required, and for the payment of Holdover Rent which would have only been

required as a result of wrongful possession after termination of the Sublease. (15CR 481-631, 636; 11CR 949). As such, J. Black's is entitled to the grant of specific performance of the Sublease and its judgment that Woody be compelled to comply with its obligation to allow J. Black's to peaceably and quietly maintain its right to possess and enjoy the Premises thereunder.

## 2. J. Black's Remedies at Law are inadequate

The district court found that J. Black's had an inadequate remedy at law for Woody's breach of the Sublease as a prerequisite to its award of specific performance. (15CR 869; 1005–1006; 1639–1640). This determination was of course correct insofar as the Sublease granted to J. Black's a unique interest in real estate.[14] The Trial Court considered evidence on this issue from Mr. Fric as part of J. Black's Fourth Motion for Summary Judgment, who proved that J. Black's immeasurably benefits from its location and brand associations related thereto. (15CR 1199). Although Woody has claimed that J. Black's could have been made whole if Woody were permitted to wrongfully and without cause in the Sublease eject it from the premises and simply pay some amount of lost profits, this argument overlooks the unique features of agreements for the use and possession of real estate—location, location, location. *See Rus-Ann Dev., Inc. v. ECGC, Inc.*, 222 S.W.3d 921, 927 (Tex. App.—Tyler 2007, no pet.) (specific performance is

---

[14] *See In re Hecht,* 213 S.W.3d 547, 550 (Tex. Spec. Ct. Rev. 2006) (recognizing "location, location, location" as the "appropriate axiom" in real estate to "capsulize the core of the undertaking").

more readily available as a remedy for the sale of real estate than for the sale of personal property because damages are generally believed to be inadequate in connection with real property). Woody argues (without evidence or any expert opinion in support) that because there was an operating history for the business, J. Black's damages must be calculable. But the existence of an operating history does not negate the uniqueness of the interest in real estate or make the loss of the location any less irreparable. *See e.g.*, *Frank v. Kuhnreich,* 546 S.W.2d 844,848 (Tex. App.—San Antonio 1977, writ ref'd n.r.e.) (affirming summary judgment awarding plaintiff specific performance of lease upon proof that default claimed by sublessor had been cured by sublessee within time allowed by lease, but remanding on issue of calculation of lost profit damage award for same time period and on cross-issue of whether to award specific performance of subsequent option to renew).

The plain fact remains that the Sublease entitles J. Black's to operate a bar and restaurant in a very popular entertainment district of Austin, Texas. The district court below was permitted to find, and did find, that mere damages for lost profits would not adequately compensate J. Black's if it were required to suddenly lose its interest in the Subleased premises or move from this location, where it had established a successful and well-known business. Specific performance is therefore warranted because J. Black's lacked an adequate remedy at law due to the

unique nature of this interest in real estate. In addition, Woody's repeated and continuing assertions of non-existent and contractually absent breaches of the Sublease clearly justified the Court's judicial remedy of specific performance, and was required to preserve the unique interest in real estate possessed by J. Black's by virtue of the terms of the Sublease.

As such, J. Black's is entitled to a grant of specific performance of the Sublease and a judgment that Woody be compelled to comply with its obligation to allow J. Black's to peaceably and quietly maintain its right to possess and enjoy the Premises thereunder.

## B. Woody's arguments against the availability of the award of specific performance are a school of red herrings.

Woody attempts to create his own new legal doctrines related to the law of specific performance, by proffering unsupported arguments and extrapolations from case law that is inapposite to the facts of this dispute. For example, Woody asserts, without support, that there exists a "three way distinction between (1) an actual breach of a performance obligation; (2) an anticipatory repudiation of a performance obligation; and (3) a legal dispute" in the law related to specific performance. *See* Appellant's Brief, at p. 27. Woody's arguments that "an order of specific performance must compel performance by both parties," and that this award requires "continuing supervision" of the parties, and/or "deprives Woody of future rights" are equally unpersuasive. *See* Appellant's Brief at p. 31–32, 34.

33

These are simply a remix of arguments Woody has urged without success below, and this court should not now be swayed by their inclusion again here.

### 1. Woody's "Three-Way Characterization" finds no support in the record, or in the authority

The argument that a "legal dispute" does not constitute a breach of a contract is particularly confusing and unpersuasive with respect to *this* dispute. Even if such an argument was not waived by Woody's failure to raise it before the trial court,[15] however, it finds no support in any authority cited by Woody, and is a mischaracterization of the actual breach found multiple times by the district court, and affirmed by the Court of Appeals.

Similarly, Woody's arguments regarding "anticipatory repudiation" and the district court's failure to find Woody violated "present performance obligations" are equally murky and inapplicable. Not only are the cases he cites regarding anticipatory repudiation and present performance obligations inapposite and inapplicable to cases related to the award of specific performance, either generally

---

[15] *See Norra v. Harris County*, No. 14-05-01211-CV, 2008 WL 564061, *1 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (although appellant labeled challenge as one to legal sufficiency, court "conclude[d] that these complaints are not challenges to the legal sufficiency of the evidence and are instead legal arguments that were not presented to the trial court. As such, [appellant] has failed to preserve error on these challenges, and we therefore affirm the judgment of the trial court."); *see also Azad v. Aaron Rents, Inc*., No. 14-07-01087-CV, 2009 WL 4842761, *6 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (where appellants' response to appellee's motion for summary judgment focused on different issues than were raised in appellants' brief, the appellants' new challenges were not construed as ones to the legal sufficiency of evidence and were deemed waived); *Tello v. Bank One, N.A*., 218 S.W.3d 109, 119 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (appellant's new legal challenge on appeal, claiming damages should be offset, was not a challenge to legal sufficiency, and was not adequately briefed in terms of legal sufficiency, and therefore was waived on appeal).

or to this case, but Woody's undisputed breaches of the Sublease (which he attempts to characterize as "repudiation") were never found to be "anticipatory." Rather, the evidence upon which the district court relied in fact shows that Woody rejected the 1st Extension of the Sublease, fabricated non-existent defaults under the Sublease, and demanded holdover rent *after* his time for performance of the 1st Extension (and subsequent extensions) had come. (15CR 17–28, 1254–1255; *see also* 15CR 6–79). In fact, Woody's attempted termination and unabated demand for holdover rent due to the alleged expiration of the original term has itself never been repudiated or withdrawn, imperiling the *current* viability of the Sublease and requiring the Court's award and enforcement to protect J. Black's' continuing rights. While Woody attempts to make much of his failure to physically expel J. Black's from the location, the fact that Woody refused to acknowledge the extension, asserted multiple factually and contractually non-existent defaults and demanded holdover rent are no less breaches.

### 2. Woody's claim that the decree of specific performance lacks a "mutuality of remedy" is incorrect

To the extent Woody would argue J. Black's be deprived of specific performance on the basis that there is no "mutuality of remedy," or complains that the Judgment entered by the District Court does not "compel performance by both parties" under the Sublease and its extension terms, Woody is plainly wrong. *Humble Oil & Refining Co. v. Westside Inv. Corp.*, 428 S.W.2d 92, 97 (Tex. 1968)

(where buyer of real estate timely communicated its unconditional exercise of option to purchase, it was entitled to specific performance of option by seller); *Parson v. Wolfe*, 676 S.W.2d 689, 692 (Tex. App.—Amarillo 1984, no writ) (in contract for sale of real property, sellers had option to perform or pay damages; thus, there was no lack of mutuality of remedies to bar specific enforcement); *Miller v. Compton*, 185 S.W.2d 754, 757 (Tex. Civ. App.—Eastland 1945, no writ) (option to purchase contained in lease agreement is not subject to attack on ground that it lacks elements of a binding contract; right conferred thereby may be enforced by suit for specific performance to compel seller to execute a conveyance to tenant); *San Antonio Joint Stock Land Bank v. Malcher*,164 S.W.2d 197, 200 (Tex. Civ. App.—San Antonio 1942, writ ref'd w.o.m.) (where optionee tendered money for purchase of realty and optionor refused to accept the tender, optionee was entitled to specific performance). The case cited by Woody to prove otherwise, *E.M. Goodwin, Inc. v. Stuart*,52 S.W.2d 311, 314 (Tex. Civ. App.—San Antonio 1932), *writ granted* (Dec. 22, 1932), *aff'd,* 125 Tex. 212, 82 S.W.2d 632 (Comm'n App. 1935), is completely inapposite, because the Court in *E.M. Goodwin* simply refused to uphold specific performance when the contract required on the one hand the personal services of one of the parties, which personal services can never be compelled  by specific performance because the amount to indentured servitude.

Here, J. Black's is merely asking for the performance of a Sublease for real property, which is entirely capable of performance by each party upon order of the Court. The extension of the Sublease is only one aspect of performance, which merely extends the term of the Sublease, but continues all of the mutual obligations of the parties to it. These further obligations remain mutual and interdependent. Woody's remedies for any future breach by J. Black's under the Sublease (which this Court has determined *did not previously exist*) remain, and the argument that there is lack of mutuality related to the extension fails to contemplate that the Sublease as a whole contains mutual obligations which have not been eradicated by the granting of specific performance.

### 3. The grant of specific performance does not require "continuous supervision" of the parties.

The equitable remedy of specific performance by its very nature operates to compel a party violating a duty under a valid contract to comply with its obligations. *S. Plains Switching, Ltd. v. BNSF Ry.,* 255 S.W.3d 690, 703 (Tex.App.-Amarillo 2008, pet. denied). By its grant of specific performance, the district court required Woody to treat J. Black's as a tenant in good standing, allow it to peacefully exist in the subleased space pursuant to the terms of the Sublease as executed, and not continuously demand holdover rent at an increased rate. Thus, there were obligations of Woody to be "specifically performed" under the agreement. The fact that the Sublease contains more than a single responsibility

Woody is obliged to uphold over the course of the term of the Sublease and its extensions should not prohibit the Court from ordering its performance, nor does it require any onerous supervision on this Court's behalf. In fact, so long as the parties comply with the obligations in the Sublease as they originally agreed to do, this Court's involvement should no longer be required at all.

### 4. The decree of specific performance does not deprive Woody of rights under the Sublease

Woody makes the unsupported allegation that a decree of specific performance of the Sublease might somehow "deprive Woody of future contractual rights under the sublease that might arise on J. Black's defective future performance or non-performance under the sublease."[16] Woody cites a century-old case, *Redwine v. Hudman*, for this proposition, but *Redwine* is clearly inapposite to the facts at issue in this suit. *See* 104 Tex. 21, 26, 133 S.W. 426, 429 (1911). In *Redwine*, the Supreme Court declared it could not decree specific performance of an option contract, because it could not compel the performance of a contract to sell real property on the basis that the non-performing party had the contractual right to make an election of how to perform the contract. In this case, Woody has no election of whether to perform its obligations under the Sublease for so long as J. Black's exercises its sole discretion to extend the terms of the Sublease, and therefore, the Court can and should decree the specific performance of Woody's

---

[16] *See* Plaintiff's Motion for Summary Judgment, at ¶ 6.

obligations under the Sublease and its extensions. Further, as set forth above in sections B(2) and B(3) for so long as the terms of the Sublease are in existence, Woody will maintain all of his rights thereunder.

## III. WOODY'S CHALLENGE TO J. BLACK'S UNCONTROVERTED SUMMARY JUDGMENT EVIDENCE AND THE EXCLUSION OF A PORTION OF HIS OWN AFFIDAVIT IS SPURIOUS

This Court will review a trial court's ruling sustaining or overruling objections to summary judgment evidence for an abuse of discretion. *Garner v. Fidelity Bank, N.A.,* 244 S.W.3d 855, 859 (Tex.App.–Dallas 2008, no pet.); *Bd. of Trustees of Fire and Police Retiree Health Fund v. Towers, Perrin, Forster & Crosby, Inc.,* 191 S.W.3d 185, 192–93 (Tex.App.–San Antonio 2005, pet. denied). Woody complains that the district court abused its discretion in accepting and considering the testimony of Sean Fric, a manager of the general partner in the entities that operate and control the business of J. Black's with knowledge of J. Black's business, and asks this Court to find error with the decision to overrule Woody's objection thereto. (15CR 1288–1291, 1613–1616, 1639). Woody is incorrect, as the affidavit of Mr. Fric was competent evidence of J. Black's readiness, willingness, and ability to perform its obligations under the Sublease, and such evidence as was offered by Mr. Fric has been repeatedly found sufficient to prove the prerequisite conditions to the award of specific performance.

**A.     The District Court Correctly Overruled Woody's Objections to J. Black's Summary Judgment Evidence**

To determine whether a trial court abused its discretion, this Court must find the trial court acted without reference to any guiding rules or principles; in other words, whether the act of the trial court was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). Woody attempts to challenge the affidavit testimony of Sean Fric by arguing about the quantum of the evidence provided about willingness and ability of J. Black's to perform under the Sublease.  Woody suggests that J. Black's could have provided more evidence of ability to perform by providing bank account statements and other operating history, but J. Black's was not required to provide such evidence to demonstrate the effectively undisputed fact that it was ready and able to perform its obligations under the Sublease *and did exactly that*.  Mr. Fric's affidavit provides sufficient factual certainty to the determination that J. Black's was financially capable to perform, and as referenced in other portions of Woody's briefing, did perform the Sublease through and past the first extension of it.

Simply put, the evidence proffered by J. Black's to show it was ready, able, and willing to perform its obligations under the contract, and that J. Black's lacked adequate remedy at law, has been found sufficient in analogous cases. *See Paciwest, Inc. v. Warner Alan Properties*, LLC, 266 S.W.3d 559, 575 at fn 6 (Tex. App.—Fort Worth 2008, pet. denied) (obligor averred additional funds were

available to supplement pre-payment penalty); *Jarvis v. Peltier*, 400 S.W.3d 644, 654 (Tex. App.—Tyler 2013), *review denied* (Aug. 30, 2013)(evidence sufficient for award of specific performance when movant for summary judgment stated he was "ready, able and willing" to perform and "included this language in his first amended petition, in his motion for summary judgment, and in his affidavit submitted as summary judgment evidence"). As such, Woody's point of error number 2 should be overruled.

**B.** **The District Court correctly excluded the February 4, 2015 Affidavit of Bob E. Woody, and its exclusion was not material to the award of specific performance in this Case**

Woody further complains that the district court struck paragraph 3 of Bob E. Woody's February 4, 2015 affidavit ("Woody's February 2015 Affidavit"). In addition to having been filed after the 21-day notice required for affirmative evidence in support of Woody's own Motion for Summary Judgment, Woody's February 2015 Affidavit's statements to the effect that he had, as of February 4, 2015, "accepted, acknowledged and agreed" that J. Black's "timely exercised its third option to extend the Sublease" was a declaration of his own mental state, and inappropriate, self-serving and conclusory testimony made by an interested witness, and was therefore properly struck. *See e.g., Hayes v. E.TS. Enterprises, Inc.,* 809 S.W.2d 652, 657 (Tex. App.Amarillo 1991 ), *writ denied* (Oct. 9, 1991). (15CR 1270, 1610-1612).

In addition to being an improper attempt to introduce incontrovertible testimony of "mental workings of an individual's mind," Woody fails to show how the excluded testimony from paragraph 3 of his February 2015 Affidavit was material to any of the dispositive issues on this case and "probably caused the rendition of an improper judgment," as is required to show the district court abused its discretion. *See e.g, Perez v. Williams*, 01-14-00504-CV, 2015 WL 5076294, at *11 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no pet.), *citing Jones v. Pesak Bros. Const., Inc.*, 416 S.W.3d 618, 632 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The single statement by Woody that he had accepted, acknowledged, and agreed that the 3rd Extension Option had been exercised — in addition to being a complete contradiction of his repeated acts in breach of the parties' agreement throughout five years of legal maneuvering — does not counteract or in any way cure his prior and continuing breaches of the Sublease or vitiate the need and availability of the award of specific performance and attorney's fees). The exclusion was therefore proper, and not an abuse of the district court's discretion.

**IV.   J. BLACK'S ESTABLISHED ITS ENTITLEMENT TO RECOVER ATTORNEY'S FEES AS THE PREVAILING PARTY IN A BREACH OF CONTRACT CASE UNDER CPRC § 38.001.**

**A.   The Law permits the award of fees under Chapter 38 upon the award of specific performance**

Woody claims that J. Black's is not entitled to recover its attorney's fees under Texas Civil Practice and Remedies Code § 38.001, despite J. Black's having fully prevailed on a breach of contract claim, because the affirmative relief awarded to J. Black's was specific performance rather than monetary damages. Like the other arguments that Woody has made over several years of this dispute, Woody's argument is legally untenable. The award of fees to J. Black's must be affirmed.

Chapter 38 of the Texas Civil Practices and Remedies Code provides that a "prevailing party" may recover its attorneys' fees in a suit based upon breach of contract. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8) (allowing recovery of attorney's fees "in addition to the amount of a valid claim" for breach of contract). The law is clear that a "valid claim" for purposes of Section 38.001(8) includes a claim for specific performance. *See Jones v. Kelley*, 614 S.W.2d 95, 96, 100-01 (Tex. 1981) (awarding attorney's fees under predecessor statute to section 38.001 in suit for specific performance of earnest money contract); *See also Albataineh v. Eshtehardi*, 01-12-00671-CV, 2013 WL 1858864, at *2 (Tex. App.—Houston [1st Dist.] May 2, 2013, no pet.) ("A judgment requiring specific performance of a

43

material contract right can support an award of attorney's fees"); *Rasmusson v. LBC PetroUnited, Inc.*, 124 S.W.3d 283, 287 (Tex. App.—Houston [14th District] 2003, pet. denied) (where party sought attorney's fees in addition to claim for specific performance, its failure to recover other money damages did not preclude award of attorney's fees). Because J. Black's prevailed on its breach of contract claim against Woody, it is entitled to recover its attorney's fees — in the amount stipulated to by the parties and awarded in the Final Judgment, in addition to the additional and necessary attorneys fee accrued in further litigating this case upon remand and to protect the Final Judgment during the pendency of this second appeal — pursuant to Section 38.001.

## PRAYER

Based on the foregoing, Appellees J. Blacks, L.P. and J. Black's G.P., L.L.C. respectfully pray that this Court overrule each of the issues presented by Appellant Bob E. Woody, and, on that basis, affirm the relief awarded by the trial court in its entirety, specifically including (1) the trial court's grant of J. Black's Motion for Summary Judgment and its denial of the Appellants' Motion for Summary Judgment; and (2) the specific performance, attorney's fees, and interest awarded to J. Black's in the Final Judgment.

Appellees further pray that this Court tax all costs against Appellants, in this Court and below, and award Appellees any such other relief at law or equity to which they may be justly entitled.  Tex. R. App. P. 43.4; Tex. R. Civ. P. 139.

Respectfully submitted,


By: */s/ Eric J. Taube*
Eric J. Taube
State Bar No. 19679350
etaube@taubesummers.com
Andrew P. Vickers
State Bar No. 24084021
avickers@taubesummers.com
100 Congress Avenue, Suite 1800
Austin, Texas  78701
Telephone: (512) 472-5997
Telecopier: (512) 472-5248

ATTORNEYS FOR APPELLEES


## CERTIFICATE OF COMPLIANCE

I hereby certify that this Appellees' Brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i)(2)(B).  According to the word count tool of the computer program used to prepare this document, this Brief contains 11,093 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).


*/s/ Eric J. Taube*
Eric J. Taube

## CERTIFICATE OF SERVICE

Pursuant to the Texas Rules of Appellate Procedure and Local Rule 4(d), a true and correct copy of the foregoing was served, *via e-filing* and *via email* on counsel listed below, on the 18th day of December, 2015.

Tom C. McCall
tmccall@themccallfirm.com
David B. McCall
dmccall@themccallfirm.com
THE MCCALL FIRM
3660 Stoneridge Road, Suite F-102
Austin, TX 78746-7759
Telephone: (512) 477-4242
Telecopier: (512) 477-2271

Jeremy J. Gaston
jgaston@hmgllp.com
HAWASH, MEADE & GASTON LLP
1221 McKinney Street, Suite 3150
Houston, TX 77010-2034
Telephone: (713) 658-9007
Telecopier: (713) 658-9011

Hector H. Cárdenas, Jr.
hcardenas@cardenas-law.com
THE CÁRDENAS LAW FIRM
2600 Via Fortuna, Suite 200
Austin, TX 78746
Telephone: (512) 477-4242
Telecopier: (512) 477-2271


*/s/ Eric J. Taube*
Eric J. Taube
etaube@taubesummers.com

# AUTHORITIES

2013 WL 1858864
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (1st Dist.).

Mohamed ALBATAINEH, Appellant
v.
Hossein M. ESHTEHARDI, JK & HE Business,
LLC d/b/a Joy of Houston Sports Bar, Appellees.

No. 01–12–00671–CV.  |  May 2, 2013.

On Appeal from the 80 District Court, Harris County, Texas,
Trial Court Cause No.2011–51347.

**Attorneys and Law Firms**

Adolph R. Guerra Jr., for Mohamed Albataineh.

Casey Todd Wallace, Benjamin Allen, for Hossein M.
Eshtehardi, JK & HE Business, LLC d/b/a Joy of Houston
Sports Bar.

Panel consists of Justices JENNINGS, BLAND, and
MASSENGALE.

**MEMORANDUM OPINION**

JANE BLAND, Justice.

**\*1** In this restrictive covenant case, a partner in a strip
club venture sued his former partner, later ousted from
the business, for breach of a settlement agreement and for
declaratory and injunctive relief. After a bench trial, the trial
court found a breach of the agreement. The breach arose
from the former partner's violation of a restrictive covenant
prohibiting residential use of property near the strip club,
property that had been parceled out to the former partner in
the settlement agreement. Although the trial court awarded no
money damages, it enjoined the ousted partner from using the
property as a residence, and it awarded the aggrieved partner
$119,000 in attorney's fees. On appeal, the ousted partner
challenges the award of attorney's fees. We conclude that the
trial court's injunctive relief requiring specific performance of

the restrictive covenant is of value, and affords a recovery of
attorney's fees to the aggrieved partner as a prevailing party.
We affirm.

**Background**

Hossein Eshtehardi and Mohamed Albataineh were partners
in operating the Joy of Houston Sports Bar, a sexually
oriented business. To comply with a Harris County regulation
prohibiting sexually oriented businesses from operating
within 1,500 feet of a residence, they purchased a nearby
property specifically to prevent it from becoming a residence.

In December 2010, the partners had a falling out. As part
of a buy-out settlement agreement, Albataineh received title
to the property. Eshtehardi formed JK & HE Business,
LLC to run the club. In their "Transfer and Settlement
Agreement" the parties prohibited the use of the property
as a residence, because the club's continued operation under
Harris County regulations depended upon this restriction.
A special warranty deed transferring the property contained
a restrictive covenant to the same effect. In May 2011,
Albataineh leased the property to Michael Leo. The lease
agreement expressly required that Leo use the property for
residential purposes only. Eshtehardi and the corporation he
formed sued Albataineh for breach of the agreement and
restrictive covenant.

**Discussion**

*Standard of Review*
We review a trial court's award of attorney's fees based on
breach of contract for an abuse of discretion. *Weaver v.
Jamar,* 383 S.W.3d 805, 813 (Tex.App.-Houston [14th Dist.]
2012, no pet. h.). The test for an abuse of discretion is whether
the trial court's decision was arbitrary or unreasonable. *Id.*

*Analysis*

Albataineh contends that Eshtehardi could not recover
attorney's fees under section 38.001(8) of the Texas Civil
Practice and Remedies Code, because Eshtehardi did not
recover monetary damages. Section 38.001(8) provides for
the recovery of reasonable attorney's fees in a claim on an
oral or written contract "in addition to the amount of a
valid claim and costs." TEX. CIV. PRAC. & REM.CODE

ANN. § 38.001(8) (West 2008). A "Valid claim" under section 38.001(8) is not limited to a claim for monetary damages. *Butler v. Arrow Mirror & Glass,* 51 S.W.3d 787, 797 (Tex.App.-Houston [1st Dist.] 2001, no pet.). Instead, it includes any claims for which the party recovers "at least something of value." *Id.* (quoting *Rogers v. RAB Ins., Ltd.,* 816 S.W.2d 543, 551 (Tex.App.-Dallas 1991, no writ)). An award of an injunction to enforce specific performance under a contract is something of value. *Id.* (holding that injunction enforcing covenant not to compete was something of value); *Williams v. Compressor Eng'g Corp.,* 704 S.W.2d 469, 474 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e) (same); *Rasmusson v. LBC PetroUnited, Inc.,* 124 S.W.3d 283, 287 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (holding that award of specific performance permitted recovery of attorney's fees under section 38.001).

**\*2** Albataineh contends, citing *MBM Financial Corporation v. Woodlands Operating Company, L.P.,* that money damages in particular are required to recover attorney's fees under section 38.001. 292 S.W.3d 660, 670 (Tex.2009).*MBM Financial* held that "a client must gain something before attorney's fees can be awarded."*Id.* at 663.It does not stand for the proposition that injunctive relief awarding specific performance precludes the recovery of attorney's fees under chapter 38. *See id.* at 670.

Eshtehardi obtained a permanent injunction prohibiting Albataineh from using the property as a residence—an award of specific performance of the parties' settlement agreement and of the restrictive covenant in the special warranty deed. The trial court heard evidence that the injunction was necessary, because enforcement of the restrictive covenant has intrinsic value to Eshtehardi's continuing business operations. A judgment requiring specific performance of a material contract right can support an award of attorney's fees. *See Butler,* 51 S.W.3d at 797.

Accordingly, we hold that the trial court did not abuse its discretion in awarding attorney's fees under section 38.001(8) of the Texas Civil Practice and Remedies Code. *See Butler,* 51 S.W.3d at 797.

### Conclusion

We affirm the judgment of the trial court.

### All Citations

Not Reported in S.W.3d, 2013 WL 1858864

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

**Disagreed With by**    ACMAT Corp. v. Greater New York Mut. Ins. Co.,

Conn.,    May 29, 2007

159 S.W.3d 640
Supreme Court of Texas.

ALLSTATE INSURANCE COMPANY, Petitioner,

v.

Ruth HALLMAN, Respondent.

No. 03–0957.    |    Argued Oct. 20,
2004.    |    Decided March 11, 2005.

**Synopsis**

**Background:** Homeowners' insurer brought action against insured for declaratory judgment that policy did not cover her liability to neighbors for property damage and bodily injury caused by limestone mining companies that leased property from insured. Insured counterclaimed for declaratory judgment. The 86th Judicial District Court, Kaufman County, Glen M. Ashworth, J., entered summary judgment in favor of insurer, but denied requests for attorney fees. Insured appealed. The Dallas Court of Appeals, Wright, J., 114 S.W.3d 656, reversed and remanded. Insurer's petition for review was granted.

**[Holding:]** The Supreme Court, Jefferson, C.J., held as a matter of first impression that the insured's lease of her property for limestone mining was a "business pursuit" within the meaning of business pursuits exclusion of liability coverage.

Reversed and rendered.

West Headnotes (7)

**[1]    Declaratory Judgment**

⟜ Appeal and Error

Judgment for insured in underlying tort suit for which liability insurer had provided defense did not render moot a determination whether the insurer owed a duty to defend and indemnify the insured, where she continued to seek attorney

fees in insurer's declaratory judgment action; the controversy remained live because a finding of a duty to defend would necessitate a remand to the trial court to consider an award of attorney fees. V.T.C.A., Civil Practice & Remedies Code § 37.009.

44 Cases that cite this headnote

**[2]    Action**

⟜ Moot, Hypothetical or Abstract Questions

A case becomes moot if a controversy ceases to exist or the parties lack a legally cognizable interest in the outcome.

57 Cases that cite this headnote

**[3]    Insurance**

⟜ Pleadings

To determine liability insurer's duty to defend, courts look at the allegations in the pleadings and the insurance policy's language.

6 Cases that cite this headnote

**[4]    Insurance**

⟜ Pleadings

If the pleadings do not allege facts within the scope of the policy's coverage, a liability insurer does not have a duty to defend.

8 Cases that cite this headnote

**[5]    Insurance**

⟜ Pleadings

In the event of an ambiguity, courts construe the pleadings liberally in the suit against the insured, resolving any doubt in favor of coverage and the liability insurer's duty to defend.

11 Cases that cite this headnote

**[6]    Insurance**

⟜ Business Pursuits

The "business pursuits" inquiry as an exception to liability coverage involves two elements: (1) continuity or regularity of the activity, and (2) a

profit motive, usually as a means of livelihood, gainful employment, earning a living, procuring subsistence or financial gain, a commercial transaction or engagement; the profit need not be realized since the issue is the expectation or anticipation for profit in the future and business ventures often result in a loss.

6 Cases that cite this headnote

**[7]    Insurance**

☞ Business Pursuits

Insured's lease of her property for limestone mining was a "business pursuit" within the meaning of business pursuits exclusion of liability coverage in homeowners' insurance policy; although the insured executed only one lease, she was perpetually engaged in the continuous act of leasing her property to the mining company until the lease expired, and even though the pleadings in the neighbors' suit against the insured did not contain any reference to a pecuniary interest in the lease or expound on insured's motive for leasing her property, a profit motive could be inferred from the nature of the activity.

13 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*641** Roy L. Stacy, Pamela J. Touchstone, Stacy & Condor, LLP, Dallas, for Petitioner.

David Taubenfeld, Erika Lea Blomquist, Matthew Scott Carol, Charles George Orr, Haynes and Boone, LLP, Dallas, for Respondent.

**Opinion**

Chief Justice JEFFERSON delivered the opinion of the Court.

In this case we must determine whether, under a homeowners insurance policy's terms, an insurer has a duty to defend and indemnify an insured's potential liability for damages resulting from limestone mining operations conducted on the insured's property. Neighboring property owners sued Ruth Hallman ("Hallman") for damages related to limestone

mining on her property. Hallman sought coverage under her homeowners insurance policy ("the policy") with Allstate Insurance Company ("Allstate"), requesting that Allstate defend and indemnify her in the lawsuit. Allstate and Hallman both sought a declaratory judgment to determine whether the policy covered the underlying litigation. The trial court granted summary judgment in Allstate's favor. The court of appeals reversed the trial court's judgment and remanded for further proceedings, holding that Allstate had a duty to defend and indemnify Hallman in the limestone mining litigation. 114 S.W.3d 656, 663. Because we conclude that damages to third parties caused by commercial limestone mining conducted on an insured's property fall within the policy's business pursuits exclusion, we reverse the court of appeals' judgment and render judgment for Allstate.

**I**

**Background**

In 1995, Hallman leased property she owns in rural Kaufman County to Norton Crushing, Inc. ("Norton") for limestone mining. [1] In 1996, neighboring landowners sued Hallman, Norton, and all subcontractors involved in the mining project, alleging that the blasting from the mining damaged their property and their health. Hallman filed a claim under the policy requesting defense and indemnification. Allstate agreed to defend Hallman under a reservation of rights but filed this declaratory judgment action seeking a determination that Hallman's claim was not covered under the policy's terms. Hallman counterclaimed seeking a declaration that Allstate had a duty to defend and indemnify her in the underlying litigation. Both parties sought attorney's fees.

Allstate moved for summary judgment, arguing that the injuries and damages relating to the limestone mining did not constitute an "occurrence" as required for coverage under the policy, and alternatively, that the mining operations were excepted from coverage under the policy's business **\*642** pursuits exclusion. Hallman moved for partial summary judgment, asserting that she was entitled to a defense because her neighbors' allegations constituted an "occurrence" as defined in the policy. The trial court granted Allstate's motion, denied Hallman's, and denied both parties' requests for attorney's fees. The court of appeals reversed, concluding that the policy covered Hallman's claim because: (1) the mining damages constituted an "occurrence," and (2) the

business pursuits exclusion did not apply. 114 S.W.3d at 663. The court of appeals remanded the attorney's fees issue to the trial court for further proceedings. *Id.* at 663–64. We granted Allstate's petition for review to determine whether the policy covers potential liability for damages from commercial limestone mining. 47 Tex. Sup.Ct. J. 753 (July 2, 2004).

During oral argument before this Court, the parties announced that the underlying lawsuit between Hallman and her neighbors had recently concluded with a jury verdict in Hallman's favor. Allstate provided Hallman with a defense throughout the trial and does not intend to seek reimbursement for the defense costs.

## II

### Mootness

 **[1]**    As a preliminary matter, we must consider whether the conclusion of the underlying litigation renders this case moot. The main issue here is whether Allstate has a duty to defend and indemnify Hallman in the mining litigation. Allstate, however, has already provided the requested defense, for which it will not seek reimbursement. Additionally, because Hallman was not found liable at trial, there is nothing for Allstate to indemnify. Nevertheless, both parties maintain that a justiciable controversy remains because Hallman continues to seek an award of attorney's fees for expenses incurred in defending against Allstate's declaratory judgment action and in pursuing her own declaratory relief.

 **[2]**    We agree with the parties that this case is not moot. A case becomes moot if a controversy ceases to exist or the parties lack a legally cognizable interest in the outcome. *Bd. of Adjustment of San Antonio v. Wende,* 92 S.W.3d 424, 427 (Tex.2002). In *Camarena v. Texas Employment Commission,* 754 S.W.2d 149, 151 (Tex.1988), we held that a dispute over attorneys fees is a live controversy. In that declaratory judgment action, farm workers sued to challenge the constitutionality of the Texas Unemployment Compensation Act's ("TUCA") agricultural exemption. *Id.* at 150. The trial court held that the act was unconstitutional but found that sovereign immunity barred the farm workers' request for attorney's fees. *Id.* Four months later, the Legislature amended the TUCA, rectifying the offending provision. *Id.* Consequently, the trial court modified its judgment, holding that the amended act was constitutional and enjoining the former act's enforcement. *Id.*

The Texas Employment Commission appealed, arguing that the amendment rendered the case moot. *Id.* The farm workers cross-appealed, contesting the denial of attorney's fees. *Id.* The court of appeals held that the case was moot and that attorney's fees were barred by sovereign immunity. *Id.* at 150–151. We disagreed, holding:

> Clearly, a controversy exists between the farm workers and TEC. The "live" issue in controversy is whether or not the farm workers have a legally cognizable interest in recovering their attorney's fees and costs. The fact that the Legislature wisely undertook action to bring the farm workers within the scope of TUCA does not moot or void the workers' interest in obtaining attorneys **\*643** fees and costs for the successful disposition of their claim. Contrary to the court of appeals' suggestion, the attorney's fees issue need not be severed in order to be considered; it is an integral part of the farm workers' claim and as such breathes life into the appeal. Due to the existence of the "live" issue of attorney's fees and costs, we hold that the suit was not moot.

*Id.* at 151.

Similarly, Hallman's remaining interest in obtaining attorney's fees "breathes life" into this appeal and prevents it from being moot. *See id.* The parties correctly point out that in order to resolve the attorney's fees dispute, we must first determine whether Allstate had a duty to defend and indemnify under the policy. In a declaratory judgment proceeding, the trial court has the discretion to award "equitable and just" attorney's fees. Tex. Civ. Prac. & Rem.Code § 37.009. Here, the trial court, having found against Hallman on the coverage issue, also denied her request for attorney's fees. Because the court of appeals found that Hallman prevailed on the coverage issue, it remanded the attorney's fees question to the trial court. 114 S.W.3d at 663–64. Our decision in this case will resolve whether Allstate had a duty to defend. The controversy is live because an affirmative answer would necessitate a remand to the trial court to consider whether an award of attorney's fees is appropriate in light of the changed status of prevailing parties.

Accordingly, we will address the merits of this coverage dispute.

### III

### Discussion

 [3]    [4]    [5]    To determine an insurer's duty to defend, we look at the allegations in the pleadings and the insurance policy's language. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex.1997); *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.,* 387 S.W.2d 22, 24 (Tex.1965). If the pleadings do not allege facts within the scope of the policy's coverage, an insurer does not have a duty to defend. *Am. Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842, 848 (Tex.1994). However, in the event of an ambiguity, we construe the pleadings liberally, resolving any doubt in favor of coverage. *Merchs. Fast Motor Lines, Inc.,* 939 S.W.2d at 141; *Heyden Newport Chem. Corp.,* 387 S.W.2d at 26.

Under the terms of the policy, Allstate has a duty to defend Hallman against a suit alleging damages caused by an "occurrence." However, the policy specifically excludes from coverage: "bodily injury or property damage arising out of or in connection with a business engaged in by an insured. But this exclusion does not apply to activities which are ordinarily incidental to non-business pursuits." "Business" is defined as "includ[ing] trade, profession or occupation." Allstate argues that Hallman's claim is barred from coverage under this business pursuits exclusion.

 [6]    Although the business pursuits exclusion is a fairly common provision of insurance policies, we have never directly addressed its application. [2] The parties and the court of appeals relied on the standard set forth by the San Antonio Court of Appeals in *United Services Automobile Ass'n v. Pennington,* 810 S.W.2d 777, 778–80 (Tex.App.-San Antonio 1991, writ denied), a case involving a business pursuits exclusion provision substantially **\*644** identical to the one here. The *Pennington* court, after reviewing the dictionary definitions of "trade," "profession," and "occupation," as well as case law from other jurisdictions, defined the "business pursuits" inquiry as involving two elements: "(1) continuity or regularity of the activity, and (2) a profit motive, usually as a means of livelihood, gainful employment, earning a living, procuring subsistence

or financial gain, a commercial transaction or engagement." *Id.* at 780 (citations omitted). Regarding the second element, the court further noted: "The profit need not be realized—the issue is the expectation or anticipation for profit in the future—since often business ventures result in a loss." *Id.*

Most jurisdictions follow similar versions of this two-part inquiry when construing business pursuits exclusions. *See, e.g., Sun Alliance Ins. Co. of P.R., Inc. v. Soto,* 836 F.2d 834, 836 (3d Cir.1988); *Stuart v. Am. States Ins. Co.* 134 Wash.2d 814, 953 P.2d 462, 465 (1998); *Frankenmuth Mut. Ins. Co. v. Kompus,* 135 Mich.App. 667, 354 N.W.2d 303, 307–308 (1984); *see also* Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 128:13 (3d ed. 1997 & Supp.2004). A few jurisdictions, however, limit the exclusion's application to those activities that constitute an insured's principal occupation. *See, e.g., Brown v. Peninsular Fire Ins. Co.,* 171 Ga.App. 507, 320 S.E.2d 208, 209 (1984); *Asbury v. Ind. Union Mut. Ins. Co.,* 441 N.E.2d 232, 239 (Ind.Ct.App.1982). Because the policy's definition of business as "including trade, profession or occupation" encompasses more than an insured's primary occupation, we conclude that the majority approach more accurately describes the exclusion's parameters. Accordingly, we adopt the two-part standard articulated in *Pennington* for determining whether a claim is excluded from coverage under the business pursuits exclusion. *See Pennington,* 810 S.W.2d at 780.

 [7]    Applying the *Pennington* standard, the court of appeals concluded that the underlying petition did not allege continuity of activity because Hallman entered into only one lease agreement, which was executed nearly ten years ago. 114 S.W.3d at 662. The court further noted the petition's failure to allege that Hallman leased her property as a means of livelihood, or earning a living, or that her principal business was leasing property. *Id.* Based on these conclusions, the court of appeals held that the business pursuits exclusion did not apply to Hallman's claim. *See id.* at 662–63.

We disagree. By narrowly limiting its focus to Hallman's initial execution of the lease, the court of appeals misconstrued the nature of commercial leasing activity. The pleadings establish that the mining activity conducted on Hallman's property pursuant to the lease began in 1995, was ongoing at the time the plaintiffs initiated their suit in 1996, and remained ongoing at the time the plaintiffs filed their sixth amended petition in 2001. Although Hallman executed only one lease, until that lease expires, she is perpetually engaged in the continuous act of leasing her property to the

mining company. Thus, the limestone mining lease meets the continuity requirement of the business pursuits exclusion.

Next, we consider whether profit was Hallman's motivation for leasing her property. The court of appeals, noting that courts are limited to the language in the pleadings and the policy when determining an insurer's duty to defend, concluded that the lease failed to meet the profit motive requirement. 114 S.W.3d at 662–63. Admittedly, the pleadings do not contain any reference to Hallman's pecuniary interest in the lease, nor do they expound on her motive for leasing her property. However, **\*645** we conclude that, in this circumstance, a profit motive can be inferred from the nature of the activity. One generally does not allow limestone mining with dynamite blasting to occur on his or her property without some expectation of remuneration or monetary gain. *See* Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 128:13 (3d ed.1997) (noting that courts look "particularly to the nature of the activity" when determining if an activity constitutes a "business pursuit"); *cf. In re San Juan Dupont Plaza Hotel Fire Litig.,* 789 F.Supp. 1212, 1220 (D.P.R.1992) (holding that business pursuits exclusion defeated coverage because "[i]nvestment activities are commercial ventures which, by their very nature, are entered into with the intent to earn profit"); *Vallas v. Cincinnati Ins. Co.,* 624 So.2d 568, 571 (Ala.1993) (finding business pursuits exclusion applicable and noting "we cannot say that the limited partnership, which was formed to buy and sell investment real property for capital gain, was not 'an undertaking ... for gain [or] profit' "); *State Farm Fire & Cas. Co. v. Drasin,* 152 Cal.App.3d 864, 199 Cal.Rptr. 749, 750, 753 (1984) (claims arising from partnership agreement to acquire mining leases fell under business pursuits exclusion where "[t]he purpose of acquiring the mining leases was to enjoy the production of income, profits and write-offs incidental to the mining operations").

Furthermore, as numerous courts have recognized, the purpose of the business pursuits exclusion is to lower homeowners insurance premiums by removing coverage for activities that are not typically associated with the operation and maintenance of one's home. *See, e.g., Buirkle v. Hanover Ins. Cos.,* 832 F.Supp. 469, 486–487 (D.Mass.1993); *Kepner v. W. Fire Ins. Co.,* 109 Ariz. 329, 509 P.2d 222, 223 (1973); *LeBlanc v. Broussard,* 396 So.2d 535, 536 (La.Ct.App.1981). Commercial limestone mining is not an activity typically associated with owning and maintaining a home. Thus, the limestone mining lease at issue here is exactly the type of commercial enterprise that the business pursuits provision was designed to exclude.

We hold that Hallman's lease to Norton constituted a business pursuit and therefore the allegations in the underlying litigation are excluded from coverage under the policy.

## IV

### Conclusion

Therefore, even if the allegations in the underlying lawsuit state an "occurrence,"—a question we do not reach—we nevertheless conclude that the business pursuits exclusion applies and bars coverage. Because the trial court reached the same conclusion and denied Hallman's request for fees, there is no need to remand this case to the trial court for a determination of Hallman's request for attorney's fees. Accordingly, we reverse the court of appeals' judgment and render judgment for Allstate. *See* Tex.R.App. P 60.2(c).

**All Citations**

159 S.W.3d 640, 48 Tex. Sup. Ct. J. 474

Footnotes

1  Meridien Aggregates, Co., L.L.P. ("Meridien") purchased Norton's interest in 1999 and now operates the lease.

2  We have, however, addressed the "activities incidental to non-business pursuits" exception to the exclusion. *See State Farm Fire & Cas. Co. v. Reed,* 873 S.W.2d 698, 698–701 (Tex.1993).

2009 WL 4842761
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**SUBSTITUTE MEMORANDUM
OPINIONON REHEARING**
Court of Appeals of Texas,
Houston (14th Dist.).

Hardam S. AZAD and Manohar S. Mann, Appellants
v.
AARON RENTS, INC., d/b/a Aaron Rents,
Inc., d/b/a Texas Aaron Rents, Inc., Appellee.

No. 14–07–01087–CV.    |    Dec. 17, 2009.

West KeySummary

**1**    **Landlord and Tenant**
👉 Breach by lessor
**Landlord and Tenant**
👉 What constitutes breach of covenant

Landlords committed material breach of commercial lease's quiet-enjoyment provision, and thus tenant was discharged from further performance of lease. The provision required that the tenant be able to enjoy the premises without hindrance. Landlords' failure to follow city's requirements for proper water and sanitation easement prevented tenant from obtaining a certificate of occupancy.

Cases that cite this headnote

On Appeal from the 333rd District Court, Harris County, Texas, Trial Court Cause No.2004–53200.

**Attorneys and Law Firms**

William F. Harmeyer, for Hardam S. Azad and Manohar S. Mann.

Bradley M. Whalen, Stephen H. Lee, N. Kimberly Hoesl, for Aaron Rents, Inc., d/b/a Aaron Rents, Inc., d/b/a Texas Aaron Rents, Inc.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and SEYMORE.

**SUBSTITUTE MEMORANDUM
OPINIONON REHEARING**

CHARLES W. SEYMORE, Justice.

**\*1**  On appellants' motion for rehearing, we deny the requested relief, but withdraw our opinion filed August 13, 2009, and issue this substitute memorandum opinion.

In this commercial lease case, Hardam S. Azad and Manohar S. Mann (collectively, the landlords) appeal a summary judgment in favor of, and an award of attorney's fees to, Aaron Rents, Inc., d/b/a Aaron Rents, Inc., d/b/a Texas Aaron Rents, Inc. ("Aaron"). In three issues, the landlords contend (1) the pleadings and summary judgment proof precluded the trial court from granting summary judgment on Aaron's affirmative defenses of breach of quiet enjoyment and breach of conditions subsequent, (2) the pleadings and summary judgment proof precluded granting summary judgment on an earlier summary judgment motion (which the court, in fact, denied), and (3) the lease contract precluded the trial court from rendering a judgment on attorney's fees. Because all dispositive issues of law are settled, we issue this memorandum opinion and affirm. *See*Tex.R.App. P. 47.4.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

In October 2001, the landlords leased Aaron approximately 7,500 square feet of the South Village Shopping Center. The initial term of the lease was five years, but the lease contained a provision that, if the anchor tenant, Auchan Hypermart, at any time ceased business, Aaron could terminate the lease between the thirty-sixth and the forty-eighth month of the term by giving a ninety-day notice. The lease also contained the following warranty of quiet enjoyment:

> 35.    *Quiet    Enjoyment.*Landlord warrants that it has good and indefeasible fee simple title to the Center, including the premises, and

has the lawful authority to enter into this Lease. Landlord further warrants that Tenant, subject to the terms and conditions of this Lease, will peaceably and quietly hold and enjoy the Premises and use the Common Areas during the Term without hindrance or interruption, so long as no Default by Tenant shall occur.

Additionally, pursuant to Paragraph 37 of the lease, Aaron's performance was conditioned on its ability to obtain the necessary permits and certificates to complete its build-out of the leased premises and to operate its business. Paragraph 37 provided, in relevant part:

37. *Conditions Subsequent.*

a. Landlord and Tenant agree that their obligations under this Lease are expressly contingent upon the following:

(i) The ability of Tenant to secure, through the exercise of due diligence and good faith efforts, ... a Certificate of Occupancy and such use and other permits and approvals from all appropriate zoning and other governmental and quasi-governmental authorities as are necessary to permit Tenant to ... conduct its business ... without any requirement that ... Tenant alter or improve the Premises or any ... sewer ... or other system ... which is contained on or about the Premises ...;

(ii) The ability of Tenant to secure, through the exercise of due diligence and good faith efforts, all building and related permits necessary for Tenant to make its intended Initial Alterations ...;

 **\*2** ...

(iv) The ability of Tenant to secure, through the exercise of due diligence and good faith efforts, ... all necessary permits, ... easements and approvals pertaining to the Building, occupancy ... and any other governmental permits which, in the sole judgment of Tenant, are necessary to permit it to construct the Alterations and operate upon the Premises.... Landlord agrees to execute any applications or other documents requested by Tenant in order to obtain any permits ... and approvals....

b. Landlord will provide Tenant with all reasonable assistance to aid Tenant in obtaining the aforesaid permits and approvals.

c. If any of the aforesaid conditions subsequent is not satisfied ... upon notice to Landlord, Tenant may elect to terminate this Lease....

Finally, the lease provided for attorney's fees in actions to enforce, defend, or interpret the rights under the lease:

30. *Attorney's Fees.*In any action, suit or proceeding to enforce, defend or interpret the rights of either Landlord or Tenant under the terms of this lease or to collect any amount due landlord or Tenant hereunder, the prevailing party, pursuant to a final order of a court having jurisdiction over said matter as to which applicable periods within which to appeal have elapsed, shall be entitled to recover all reasonable costs and expenses incurred by said prevailing party in enforcing, defending or interpreting its rights hereunder, including, without limitation, all collector [sic] and court costs, and reasonable attorney's and paralegal fees, whether incurred out of court, at trial, on appeal, or in any bankruptcy proceeding.

On January 2, 2002, Aaron opened for business in the leased premises although many of the renovations and alterations required under the lease were not complete. Aaron prepared to complete its build-out of the leased premises and applied for building permits from the City of Houston ("the City").

On January 16, 2002, the City's Utility Analysis Section, Water/Wastewater Department sent two letters, addressed to the landlords, describing defects with the landlords' property. In the first letter, the City explained there was no record of an easement connecting the landlords' property to the nearby city sanitary sewer. In the second letter, the City explained the landlords' property was built over an existing water line and an existing storm sewer easement and the City would require documentation allowing the encroachments. In the second letter, the City stated it would issue no building permit until the problems described in the letter

were resolved: "Until such time that proper documentation is presented to this office allowing this encroachment or the water line/easement is abandoned and relocated through the City's Joint Referral Committee, a building permit cannot be issued."The City included an identical statement regarding the storm sewer easement. Milton Wells, the landlords' property manager, immediately went to the City, explained the City's records were in error, and asked the City to withdraw their letters. [1] The City refused to do so.

 **\*3** Willie Chandler, Aaron's construction manager, also met with City personnel. According to Chandler, Wells had given Chandler a "single 8 ½ x 11 inch document plat showing the layout of the shopping center where the lease[d] premises was [sic] located."The City told Chandler the document was insufficient to solve the easement problem and the landlords would have to resolve the problem themselves.

In January and February 2002, the landlords and Aaron exchanged correspondence regarding Aaron's late or non-payment of rent and the landlords' failure to obtain a permit before beginning improvements and their failure to complete the improvements. By letter dated February 7, 2002, Aaron also asked the landlords to resolve the easement issues immediately. According to Wells, in April 2002, he gave Chandler all the surveys he had obtained in his research and Chandler said he would take care of what was needed to obtain a certificate of occupancy.

Without a building permit, Aaron could not complete its build-out of the space and could not obtain a certificate of occupancy. A certificate of occupancy is necessary for a business to operate. According to the landlords' designated expert, if the City learns a business is occupying a building without a certificate of occupancy, the City will give it thirty days to obtain one, and if it cannot do so, the City will lock the premises. The landlords and their designated expert agreed that Aaron would not be allowed to obtain the final building permit or the certificate of occupancy until the easement issues were fully resolved. The landlords also agreed the easement issues affected the landlords' ownership of the entire property, not just the portion leased by Aaron, and knew they had to resolve these issues in order to re-lease the property. The landlords did not fulfill these conditions while Aaron occupied the leased property.

In March 2003, Auchan closed. By letter dated April 29, 2003, Aaron notified the landlords it was vacating the

leased premises the following day and intended to seek reimbursement and damages.

On September 24, 2004, the landlords sued Aaron, alleging claims for breach of the lease. Aaron answered, raising, among other matters, the affirmative defense of prior breach by the landlords based on their failure to (1) obtain a certificate of occupancy, (2) complete all improvements by October 31, 2001, (3) provide electrical, mechanical, plumbing, sewer, and heating and ventilation systems in good order, and (4) secure all necessary permits, licenses, variances, easements and approvals. Aaron also counterclaimed against the landlords for expenses incurred in partially building out the leased space and for its attorney's fees and expenses, pursuant to both the lease and "applicable Texas Code and Statutes."

In May 2005, Aaron filed a traditional motion for summary judgment. It argued the landlords could not enforce a contract they had breached before Aaron vacated the premises. Specifically, Aaron argued the landlords had breached the contract by failing to deliver a certificate of occupancy and to complete the improvements by October 31, 2001. The trial court orally denied the motion and noted the denial on the docket sheet.

 **\*4** In March 2006, Aaron again moved for traditional summary judgment on the grounds of the landlords' prior breach of the lease. In the 2006 motion, Aaron specifically relied on the landlords' obligations under Paragraphs 35 (quiet enjoyment) and 37 (conditions subsequent). After considering the pleadings, the motion, the response, and the summary judgment evidence, the trial court granted the motion. [2] Aaron subsequently non-suited its claims for breach-of-contract damages, but maintained its claims for attorney's fees and expenses.

The landlords filed a motion for a take-nothing judgment on Aaron's claim for attorney's fees. The trial court denied the motion.

Following a non-jury trial on attorney's fees, the trial court rendered final judgment, decreeing that the landlords take nothing on their claims against Aaron. The trial court found Aaron was the prevailing party, and ordered that Aaron recover the following amounts from the landlords: (1) $75,000 attorney's fees for trial, (2) $15,291.77 for costs and expenses of trial, (3) $15,000 if Aaron prevailed in the court of appeals, (4) $5,000 if either landlord filed a petition for

review and the supreme court denied the petition, (5) $10,000 if Aaron prevailed in any appeal to the supreme court by any party, and (6) post-judgment interest. The court further ordered as follows: (1) if no valid appeal were filed, the trial level amounts would become due and owing on dates corresponding to the deadlines set forth in Texas Rule of Appellate Procedure 26.1; and, (2) depending on whether Aaron prevailed on appeal and in any supreme court review, the corresponding appellate level amounts would become due and owing on the dates the mandate issued from the court of appeals or the supreme court.

## II. THE TAKE–NOTHING SUMMARY JUDGMENT

In issue one, the landlords contend "[t]he pleadings and summary judgment evidence precluded" the trial court from rendering summary judgment (1) on Aaron's "breach of quiet enjoyment affirmative defense" and (2) on Aaron's "conditions subsequent affirmative defense." In issue two, the landlords make the same argument regarding Aaron's affirmative defense of the landlords' prior breach for failing to (1) timely complete improvements and (2) obtain a certificate of occupancy. [3]

A party moving for traditional summary judgment must establish that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. See Tex.R. Civ. P. 166a(c); Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215–16 (Tex.2003). To be entitled to traditional summary judgment, a defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex.1997); Brown v. Hearthwood II Owners Ass'n, 201 S.W.3d 153, 159 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). A party conclusively establishes a matter if reasonable people could not differ about the conclusion to be drawn from the evidence. See City of Keller v. Wilson, 168 S.W.3d 802, 816 (Tex.2005).

**\*5** We review de novo both a trial court's grant of traditional summary judgment and its interpretation of an unambiguous contract. See Knott, 128 S.W.3d at 215 (regarding summary judgment); Coker v. Coker, 650 S.W.2d 391, 393 (Tex.1983) (stating, if written instrument is so worded it can be given certain or definite legal meaning or interpretation, it is not ambiguous and court will construe contract as matter of law).

In reviewing a traditional summary judgment, we examine the entire record in the light most favorable to the non-movant, indulging every reasonable inference and resolving any doubts against the motion. Yancy v. United Surgical Partners Int'l, Inc., 236 S.W.3d 778, 782 (Tex.2007). When a trial court's order granting summary judgment does not specify the grounds on which it was granted, we will affirm the judgment if any theory advanced in the motion is meritorious. See Carr v. Brasher, 776 S.W.2d 567, 569 (Tex.1989). Thus, to prevail on appeal, the landlords must show that each of Aaron's theories is meritless. See Star–Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex.1995).

Aaron's summary judgment motion rested on the affirmative defenses that the landlords had first breached the lease in two ways—by violating the quiet-enjoyment provision and by violating the conditions-subsequent provision of the lease. When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. Mustang Pipeline, Inc. v. Driver Pipeline, Inc., 134 S.W.3d 195, 196 (Tex.2004) (per curiam).

In Paragraph 35 of the lease, captioned "Quiet Enjoyment," the landlords warranted they had "good and indefeasible fee simple title" to the shopping center and the premises leased to Aaron. Paragraph 35 also provided, "Landlord further warrants that Tenant, subject to the terms and conditions of this Lease, will peaceably and quietly hold and enjoy the Premises and use the Common Areas during the Term without hindrance or interruption, so long as no Default by Tenant shall occur." Thus, under the plain language of Paragraph 35, breach by the landlords occurred if Aaron could not "enjoy the Premises ... without hindrance."

The record contains the following, undisputed, summary judgment proof:

- Two letters sent January 16, 2002, from the City of Houston to the landlords in response to the landlords' December 20, 2001 applications concerning the availability of city water and waste water facilities to the shopping center;

  in one letter, the City explained there was no record of an easement connecting the landlords' property to the nearby city sanitary sewer;

  in the other letter, the City explained the landlords' property was built over existing water line and existing storm sewer easements, the City required documentation

allowing the encroachments, and the City stated it would issue no building permit until the problems described in the letter were resolved;

**\*6** • Deposition testimony of Milton Wells, the landlords' property manager, that the matters raised in the January 16 letters affected the landlords' entire property, as well as that of the tenants;

• The deposition testimony of Hardam S. Azad that the landlords were responsible for "removing" or "dissolving" the easement problem;

• The affidavit of Willie Chandler, Aaron's construction manager, in which he stated it was important for Aaron to secure a building permit to allow it to finish its build-out of the leased space, and without a permit, Aaron was unable to begin construction;

• The deposition testimony of the landlords' designated expert, Neresh Dham, former Division Manager for the Plan Review Section of the Public Works and Engineering Department, that, until the Department was satisfied an easement existed, a building permit would not issue, "[t]hen, depending on the building permit, the certificate of occupancy would not issue";

• The deposition testimony of Rudolfo Moreno, an engineer in the Department of Public Works, that generally speaking, he believed that, without a building permit, one could not get a certificate of occupancy;

• Dham's deposition testimony that, without a certificate of occupancy, Aaron's occupancy of the premises was illegal and could be terminated after thirty days' notice and failure to correct the problem;

• Moreno's and Azad's testimony the City and landlords did not resolve the easement issue until August, 2004; and

• Wells's testimony the landlords eventually resolved the easement matters because they were considering re-leasing locations and knew the easement matters had to be resolved eventually if the new tenants were to obtain building permits.

Viewing this proof in the light most favorable to the landlords, we conclude, at a minimum, it conclusively establishes Aaron was unable to enjoy the premises without hindrance.[4]

Despite the preceding summary judgment proof, the landlords, on appeal, argue "[t]he pleadings and summary judgment evidence precluded the trial court from entering summary judgment on Aaron Rents' breach of quiet enjoyment affirmative defense." In their response to Aaron's motion for summary judgment, the landlords did not address Aaron's affirmative defense based on the landlords' purported breach of the "quiet enjoyment" provision in the lease. Instead, the landlords focused solely on Aaron's defense based on the landlords' purported breach of conditions subsequent.[5] To the extent the landlords are now presenting an issue other than legal insufficiency of the evidence to support summary judgment in favor of Aaron on its breach-of-quiet-enjoyment defense, they have waived this issue. *See City of Houston v. Clear Creek Basis Authority,* 589 S.W.2d 671, 678 (Tex.1979) ("With the exception of an attack on the legal sufficiency of the grounds expressly raised by the movant in his motion for summary judgment, the non-movant must expressly present to the trial court any reasons seeking to *avoid* movant's entitlement...."); *Augusta Court Co–Owners' Ass'n v. Levin, Roth & Kasner,* 971 S.W.2d 119, 122 (Tex.App.-Houston [14th Dist.] 1998, pet. denied) ("[I]ssues a non-movant contends avoid summary judgment that are not expressly presented to the trial court by written answer or other written response to the summary judgment motion are waived on appeal.").

**\*7** Additionally, in this court, the landlords have only minimally briefed their argument that summary judgment was precluded on Aaron's breach-of-quiet-enjoyment affirmative defense. The landlords' entire argument on the quiet-enjoyment ground comprises (1) quotation of Paragraph 35 of the lease, (2) conclusory statements there was no summary judgment proof the landlords did not have good and indefeasible fee simple title to the shopping center or that Aaron was not in exclusive, peaceful and quiet possession of the premises, and (3) an assertion the summary judgment evidence indicated Aaron had exclusive, continuous, and uninterrupted possession of the premises from the time it accepted possession until it vacated the premises, without any claims or demands by the landlords, City, or any third party, that it cease conducting business or vacate the premises.[6] Other than case law setting forth the general standard of summary judgment review, the landlords cite no law. Their sole record citation comprises twenty consecutive pages of summary judgment proof consisting of Wells's two-page affidavit with the attached documents.[7] They do not direct this court to any specific parts of that proof.

To present an issue on appeal properly, an appellant must provide a clear and concise argument for the contentions made, with appropriate citations to the record and authorities. Tex.R.App. P. 38.1(i). It is not our responsibility to sift the record to find error or evidence in support of an appellant's argument. *Melendez v. Exxon Corp.,* 998 S.W.2d 266, 280 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

In sum, we conclude the landlords have not shown that a fact issue exists that would defeat summary judgment on Aaron's defensive theory of prior breach of the promise of quiet enjoyment in Paragraph 35 of the lease; the landlords have not shown this summary judgment ground is meritless. We therefore affirm summary judgment in favor of Aaron on this ground and need not address the landlords' argument challenging summary judgment on the ground of breach of the conditions-subsequent provision. *See Star–Telegram,* 915 S.W.2d at 473; *Carr,* 776 S.W.2d at 569.

Accordingly, we overrule the landlords' first issue. As noted above, we have overruled the landlords' second issue, directed at an earlier summary judgment motion, as moot. [8]

### III. ATTORNEY'S FEES

In issue three, the landlords argue "the parties' lease contract precluded the trial court from entering a judgment on attorney's fees."The landlords do not dispute the amounts awarded, but challenge the award of any attorney's fees before rendition of a final, nonappealable judgment.

The parties to a contract are free to adopt the standard of their choice for recovery of attorney's fees, and we are bound by that choice. *See One Call Sys., Inc. v. Houston Lighting & Power,* 936 S.W.2d 673, 676 (Tex.App.-Houston [14th Dist.] 1996, writ denied). In construing the parties' contract, we give the language its plain and grammatical meaning unless it would defeat the parties' intentions. *Id.* at 675.In the present case, the landlords rely on Paragraph 30 of the lease, which provided:

> **\*8** *Attorney's Fees.*In any action, suit or proceeding to enforce, defend or interpret the rights of either Landlord or Tenant under the terms of this Lease or to collect any amounts due Landlord or Tenant hereunder, the *prevailing party,* pursuant to a *final order* of a court having jurisdiction over said matter *as to which applicable periods within which to appeal have elapsed,* shall be entitled

to recover all reasonable costs and expenses incurred by said prevailing party in enforcing, defending or interpreting its rights hereunder, including, without limitation, all collector [sic] and court costs, and reasonable attorney's and paralegal fees, whether incurred out of court, at trial, on appeal, or in any bankruptcy proceeding. (Emphasis added.)

The landlords argue that, pursuant to this paragraph, there can be no "prevailing party" until a final court order, which is not subject to further appeal, is in place. Put differently, they argue an unappealable order is a condition precedent to any party's entitlement to, claim for, and recovery of, attorney's fees. The landlords further argue Aaron was required to prove performance of all conditions precedent and failed to do so.

Under Paragraph 30, a party is "entitled" to attorney's fees if it is "the prevailing party, pursuant to a final order ... [for] which applicable periods within which to appeal have elapsed...." Even if one construes this language to mean that all possibilities for appeal must have expired before the ultimately "prevailing" party may receive its attorney's fees, there is no language in Paragraph 30 that precludes a party from making its claim for attorney's fees before that time or that precludes the court from making a conditional award of those fees before disposition of the final appeal. [9]

The court made such a conditional award in the present case. According to the judgment, if the landlords did not file a valid appeal from the judgment, the award for trial attorney's fees would become due and payable to Aaron according to the deadlines set forth in Texas Rule of Appellate Procedure 26.1; and, depending on whether Aaron prevailed on appeal and in any supreme court review, attorney's fees would become due and owing on the dates the mandate issued from the court of appeals or the supreme court.

In short, the trial court's award of attorney's fees is consistent with the attorney's fees provision in the lease. Accordingly, we overrule the landlords' third issue.

### IV. CONCLUSION

Having overruled the landlords' three issues, we affirm the judgment of the trial court.

**All Citations**

Not Reported in S.W.3d, 2009 WL 4842761

Footnotes

1    Wells was unsure whether he spoke with Rodolfo Moreno in the Public Works Department or to someone else.

2    In an initial order granting Aaron's motion for summary judgment, the trial court stated the landlords had not filed a response. The landlords filed a motion for new trial, and the trial court granted the motion and subsequently entered a second order granting Aaron's motion.

3    Aaron asserted these latter two grounds in its May 2005 motion for summary judgment. Both parties agree the trial court denied the May 2005 summary judgment motion and that Aaron did not repeat the May 2005 grounds in its second summary judgment motion. Accordingly, we overrule issue two as moot.

4    We take no position on whether the lack of a sewer easement and encroachments on water and storm sewer easements constituted a defect in the landlords' title.

5    The landlords attached and incorporated by reference their response to Aaron's May 2005 motion for summary judgment. In that response, the landlords addressed Aaron's defense that the landlords had breached the lease by not providing a certificate of occupancy. That defensive ground is not the same as Aaron's 2006 ground based on the landlords having not resolved the easement problems, a breach that led to Aaron's inability to obtain a certificate of occupancy.

6    This third component of the landlords' argument appears to raise an issue other than a "no evidence" issue.

7    The landlords filed the affidavit and documents with their response to Aaron's May 2, 2005 motion for summary judgment, and Wells's statements in the affidavit are responsive to the grounds raised in the May 2, 2005 motion. *See* note 3, *supra.*

8    *See* note 3, *supra.*

9    The landlords' interpretation of Paragraph 30 would result in the necessity of a second lawsuit for the prevailing party in the contract suit to recover its attorney's fees for the contract suit. Such piecemeal litigation is generally disfavored. *See Fid. Mut. Life Ins. Co. v. Kaminsky,* 820 S.W.2d 878, 882 (Tex.App.-Texarkana 1991, writ denied) (stating (1) for policy purposes, allowing separate suit for attorney's fees arising out of a transaction encourages multiplicity of suits and delays in litigation, and (2) facts and complexity of suit is before court at time of initial action, and neither judicial economy nor litigants' and counsels' time is well served by allowing separate suits).

---

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

🟨 KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by** In re Enron Corp. Securities, Derivative & ERISA Litigation, S.D.Tex., June 1, 2009

191 S.W.3d 185
Court of Appeals of Texas,
San Antonio.

BOARD OF TRUSTEES OF THE FIRE AND
POLICE RETIREE HEALTH FUND, San
Antonio and The Fire and Police Retiree
Health Care Fund, San Antonio, Appellants,
v.
TOWERS, PERRIN, FORSTER & CROSBY, INC.,
Gary L. Gross, and Michael Rodriguez, Appellees.

No. 04–04–00027–CV. | Nov. 23,
2005. | Rehearing Overruled Feb. 2, 2006.

**Synopsis**
**Background:** Fire and Police Retiree Health Care Fund and
its Board of Trustees brought actuarial malpractice action
against actuary firm, alleging that inaccurate estimates of
health care costs and inaccurate conclusions regarding the
necessary pre-funding rate proximately caused millions of
dollars of damage to the Fund. The 45th Judicial District
Court, Bexar County, David Peeples, J., granted firm's motion
for summary judgment, and Fund appealed.

**Holdings:** The Court of Appeals, Sarah Duncan, J., held that:

[1] firm did not cause injury to Fund, and

[2] lay testimony by union negotiators that union and
city would have adopted higher rates was speculative and
inadmissible.

Affirmed.

West Headnotes (11)

[1]     **Negligence**
          👉 Trades, Special Skills and Professions

A professional malpractice claim is based on
negligence.

Cases that cite this headnote

[2]     **Negligence**
          👉 Elements in general

In an action for negligence, the plaintiff must
prove that there is a duty owed to him by the
defendant, a breach of that duty, that the breach
proximately caused the plaintiff injury and that
damages occurred.

1 Cases that cite this headnote

[3]     **Negligence**
          👉 Necessity of causation
        **Negligence**
          👉 Substantial factor
        **Negligence**
          👉 Foreseeability

The two elements of proximate cause are cause
in fact, or substantial factor, and foreseeability.

Cases that cite this headnote

[4]     **Negligence**
          👉 In general; degrees of proof

Cause in fact and foreseeability cannot
be satisfied by mere conjecture, guess, or
speculation.

1 Cases that cite this headnote

[5]     **Negligence**
          👉 "But-for" causation; act without which
        event would not have occurred
        **Negligence**
          👉 Substantial factor

"Cause in fact" is established when the act or
omission was a substantial factor in bringing
about the injuries, and without it, the harm would
not have occurred.

1 Cases that cite this headnote

[6]     **Accountants**

🗝 Actions

In an accountant malpractice case, expert testimony is usually necessary to establish the causal link between the plaintiff's damages and the accountant's negligence.

1 Cases that cite this headnote

**[7]** **Insurance**

🗝 Actuaries

**Negligence**

🗝 Miscellaneous particular cases

Actuary firm which provided actuarial report to city and unions did not cause injury to Fire and Police Retiree Health Care Fund, which was underfunded due to inaccurate estimates of health care costs and inaccurate conclusions regarding the necessary pre-funding rate; city and union were not required to raise contribution rates if firm had recommended a higher funding rate, and city and unions had failed to follow firm's previous recommendation for an increase in the contribution rates.

Cases that cite this headnote

**[8]** **Evidence**

🗝 Facts Forming Basis of Opinion

Lay testimony by union negotiators that union and city would have adopted higher rates of contribution to the Fire and Police Retiree Health Care Fund if actuarial firm had recommended higher rate was speculative and inadmissible in professional malpractice action against firm; testimony was based not on their perceptions but on their conclusions regarding what the city's negotiators, the members of the city council, and hundreds of members of the union would have done if firm had recommended a higher pre-funding rate. Rules of Evid., Rule 701.

1 Cases that cite this headnote

**[9]** **Evidence**

🗝 Facts Forming Basis of Opinion

The perception underlying the lay witness's testimony may be what was seen, heard, smelled, tasted, touched or felt. Rules of Evid., Rule 701.

2 Cases that cite this headnote

**[10]** **Evidence**

🗝 Facts Forming Basis of Opinion

The requirement that lay testimony be based on the witness's perception presumes the witness observed or experienced the underlying facts. Rules of Evid., Rule 701.

2 Cases that cite this headnote

**[11]** **Evidence**

🗝 Facts Forming Basis of Opinion

A speculative opinion, such as an opinion on what someone else was thinking at a specific time, does not help the jury to either understand the witness' testimony better, or decide the question of the other person's intent; mere conjecture does not assist the jury.

1 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*187** G. Wade Caldwell, Perry C. Robinson, Martin, Drought & Torres, Inc., San Antonio, for appellants.

George H. Spencer, Jorge E. Canseco, Clemens & Spencer, P.C., San Antonio, for appellees.

Sitting: CATHERINE STONE, Justice, PAUL W. GREEN, Justice (not participating), SARAH B. DUNCAN, Justice.

**OPINION**

SARAH DUNCAN, Justice.

The Fire and Police Retiree Health Care Fund, San Antonio and its Board of Trustees appeal the trial court's take-nothing judgment against them in their actuarial malpractice suit against Towers, Perrin, Forster & Crosby, Inc.; Gary L. Gross; and Michael Rodriguez. We hold the trial court correctly granted Towers Perrin's no-evidence motion for summary judgment on causation and acted within the ambit of its discretion in sustaining Towers Perrin's objections to

the Fund's causation evidence. We therefore affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

"Because of the lasting health consequences associated with the stressful nature of the professions of firefighting and law enforcement," the Texas Legislature created the Fire and Police Retiree Health Care Fund "to provide health care benefits for persons who retired on or after October 1, 1989, from [certain] municipal fire or police department[s]...." TEX.REV.CIV. STAT. ANN.. art. 6243q, § 1.01 (Vernon 2003). An article 6243q fund is a statutory trust, *id.* § 1.04(a), that is administered by a board of trustees, *id.* § 1.04(b), composed of various city officials, two active firefighters and two active police officers, and retiree representatives of the fire and police departments. *Id.* § 2.01(a). Because the board of an article 6243q fund "administer[s] and hold[s] in trust the assets of the fund for the exclusive benefit of the beneficiaries of the fund," *id.* § 1.04(b), its "board has complete authority and power to ... administer the fund for the exclusive benefit of the beneficiaries of the fund; ... order payments from the fund; ... independently control the fund; and ... conduct all litigation on behalf of the fund." *Id.* § 3.01(a). The board also has final responsibility for the investment of the reserve funds, *id.* § 6.04(d), which are defined as all assets other than "a reasonably safe amount of surplus necessary to defray reasonable expenses of the fund." *Id.* § 6.03(a)-(b). So that a board may properly perform its duties, it is given statutory authority to enter into contracts with various professionals, including actuaries. **\*188** [1] *Id.* § 6.05(a). "Membership in the fund," "[c]ontributions to the fund," and "[r]etirement health benefits" are determined in accordance with the collective bargaining agreements. *Id.* §§ 4.01, 4.02(a), 5.01.

The collective bargaining agreements involved in this case are those between the City of San Antonio and the firefighters' and police officers' unions—Local 624 International Association of Firefighters and the San Antonio Police Officers' Association. *See id.* §§ 1.02(4), 1.03 ("This Act applies to a paid fire and police department of a municipality with a population of 750,000 or more that has adopted Chapter 174, Local Government Code."). Accordingly, shortly after passage of article 6243q, these entities adopted collective bargaining agreements establishing the Fire and Police Retiree Health Care Fund,

San Antonio and its governing Board (collectively, "the Fund").

Pursuant to its statutory authority, the Board retained Towers, Perrin, Forster & Crosby, Inc. "to provide ... actuarial valuation[s] to determine the actuarial liability and appropriate pre-funding rate [2] for the Fund." One of these valuations, "conducted as of July 1, 2000," resulted in a report dated November 9, 2000. The 2000 Report is signed by a principal of Towers Perrin, Gary L. Gross. Also working on the project was Michael Rodriguez.

The 2000 Report recommended that, based on "[t]he assumptions outlined in Appendix B ... and agreed upon by the [Board]," the pre-funding rates be 9.4% of the City's payroll and $20 per month for each employee. Based upon these assumptions and recommended pre-funding rates, the 2000 Report concluded it would take twenty-five years to amortize the Fund's $110,640,506 unfunded accrued liability. [3] The recommended pre-funding rate of 9.4% plus $20 was adopted by the City and the unions in their 2002 collective bargaining agreements.

In 2001, after a billing dispute with Towers Perrin, the Board engaged Rudd and Wisdom, Inc. to produce another actuarial evaluation of the Fund; this evaluation, which measured the Fund as of October 1, 2001, resulted in a report dated May 20, 2002. The 2002 Report concludes in part as follows:

1. The Fund will have a long term **inadequate financing arrangement** if monthly contributions remain at the present level of $20 per active participant and 9.4% of covered payroll **\*189** by the City of San Antonio and if present health benefits are left unchanged.

2. In order to have an **adequate financing arrangement,** contributions will have to be significantly increased. Our **best estimate** is that effective October 1, 2002 total contributions should be increased to 13.94% of covered payroll assuming continuation of the active participant contribution of $20 per month.

....

6. The significant increase in the actuarially recommended level of contributions can be attributed primarily to changes in actuarial assumptions for (a) current annual health benefit claims costs, and (b) future annual increases in benefit claims costs (trend).

(emphasis in original). If the 13.94% pre-funding rate were adopted in the 2002 collective bargaining agreements, the City's contribution would increase by approximately $7.9 million. The 2002 Report also concluded that the Fund's unfunded accrued liability was $263,347,529. Although this unfunded accrued liability could be amortized in forty years at the recommended 13.94% pre-funding rate, it would take an "infinite" number of years to amortize the unfunded accrued liability at the present pre-funding rate of 9.4%.

Rudd and Wisdom's 2003 Report, which evaluated the Fund as of October 1, 2002 and which was dated January 21, 2003, presented a yet bleaker picture. According to the 2003 Report, the Fund's estimated liabilities would not be amortized over the long term unless the existing contribution rates were "substantially increased" to "19.93% of covered payroll in addition to the assumed continuation of the active participant contributions that would be made if the collective bargaining agreements in effect October 1, 2002 were to continue indefinitely ($20 per month for police officers and $70 per month for fire fighters after fiscal year 2003–2004)." The recommended pre-funding rate of 19.93% could be accomplished with a ten-year phase-in at 1.38% per year. Without the phase-in, the City's contributions would increase by approximately $20 million the first year. [4]

Alleging Towers Perrin's inaccurate estimates of health care costs and inaccurate conclusions regarding the necessary pre-funding rate proximately caused millions of dollars of damage to the Fund, the Fund filed suit against Towers Perrin, Gross, and Rodriguez (collectively, "Towers Perrin") for professional negligence. On March 17, 2003, in response to Towers Perrin's argument that the Fund lacked standing, the Fund's Board of Trustees intervened. Later that year, Towers Perrin filed a motion for summary judgment alleging there is no evidence on the following elements of the Fund's negligence cause of action:

a. There is no evidence that any Defendant failed to meet the applicable standard of care with regard to the estimated medical cost increases reflected in the Actuarial Study as of July 1, 2000;

 **\*190**  b. There is no evidence that any Defendant failed to meet the applicable standard of care with regard to the estimated claims and administrative expenses reflected in the Actuarial Study as of July 1, 2000;

c. There is no evidence that any claimed failure of any Defendant to meet the applicable standard of care with respect to the sensitivity tests provided for under certain circumstances by Actuarial Standard of Practice 6, and/or with Defendant Towers Perrin's own internal policies relating to one method available for the development of a claims cost assumption was a proximate cause of damage to the Plaintiff or the Intervenor;

d. There is no evidence that any claimed negligent act or omission of any Defendant was a proximate cause or an actual cause of damage to the Plaintiff or the Intervenor;

e. There is no evidence that any Defendant failed to meet the applicable standard of care by failing to include in the Actuarial Study as of July 1, 2000 the recommendation that an increase in the funding to 15.39% was needed to amortize the unfunded actuarial accrued liability of the Plaintiff or the Intervenor;

f. There is no evidence that any Defendant failed to meet the applicable standard of care by failing to conclude in the Actuarial Study as of July 1, 2000 that the Plaintiff or the Intervernor had an unfunded actuarial accrued liability of $263,347,529;

g. There is no evidence that the Plaintiff or the Intervenor [has] sustained any legally recoverable damages as a result of anything any of the things Defendants allegedly did or failed to do; and

h. There is no evidence that the Plaintiff or the Intervenor [has] sustained any damages in connection with the matters in controversy in this case which are not wholly speculative.

After ruling on Towers Perrin's objections to the Fund's and its Board's summary judgment evidence, the trial court granted Towers Perrin's motion for summary judgment on all eight grounds and rendered a take-nothing judgment. The Fund appealed.

### APPLICABLE LAW

 [1]   [2]   [3]   [4]   [5]   [6]  A professional malpractice claim is "based on negligence." *Cosgrove v. Grimes,* 774 S.W.2d 662, 664 (Tex.1989) (attorney malpractice). In an action for negligence, "[t]he plaintiff must prove that there is a duty owed to him by the defendant, a breach of that

duty, that the breach proximately caused the plaintiff injury and that damages occurred." *Id.* at 665. "The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability." *IHS Cedars Treatment Ctr. of Desoto, Texas, Inc. v. Mason* 143 S.W.3d 794, 798 (Tex.2004). "These elements cannot be satisfied by mere conjecture, guess, or speculation." *Id.* at 798–99. "Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* at 799. In an accountant malpractice case, "[e]xpert testimony is usually necessary to establish ... the causal link between the plaintiff's damages and the accountant's negligence." *Greenstein, Logan & Co. v. Burgess Mktg., Inc.,* 744 S.W.2d 170, 185 (Tex.App.-Waco 1987, writ denied) (citing *Kemmerlin v. Wingate,* 274 S.C. 62, 261 S.E.2d 50, 51 (1979)).

## CAUSATION

The Fund argues the trial court erred in granting a summary judgment against it **\*191** on causation because "[t]here is more than a scintilla of evidence from which a jury could reasonably infer the Health Fund was damaged as a result of [Towers Perrin's] negligent 2000 Study." We disagree.

### *Standard of Review*

We review a summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156 (Tex.2004). We will therefore reverse an order granting a "no evidence" motion for summary judgment under Rule 166a(i) only if the respondent produced summary judgment evidence raising a genuine issue of material fact on each challenged element. *See* TEX.R. CIV. P. 166a(i). "When reviewing a summary judgment, we take as true all evidence favorable to the [respondent], and we indulge every reasonable inference and resolve any doubts in the [respondent's] favor." *Joe,* 145 S.W.3d at 157.

### *Discussion*

 [7]    To support its argument, the Fund points to "evidence showing the City and the unions relied on past Towers Perrin studies to determine the contribution rate and that higher pre-funding rates probably would have been adopted if they had been known" and asserts this evidence "is identical to the permissible predicting in *Greenstein* [, *Logan & Co. v.*

*Burgess Mktg., Inc.*, 744 S.W.2d 170 (Tex.App.-Waco 1987, writ denied) ]." Contrary to the Fund's assertions, however, this case is entirely unlike *Greenstein.*

In *Greenstein,* the plaintiffs—Burgess Marketing, its principal owner Jack Burgess, and his wife—sued Burgess Marketing's accounting firm, Greenstein, Logan & Company, for accounting malpractice. *Id.* at 177. The plaintiffs alleged, and the jury found, that Greenstein Logan's negligent failure to discover during its 1984 and 1985 audits that Burgess Marketing had underpaid its federal excise tax proximately caused Burgess Marketing $3.5 million in damages. *Id.* On appeal, the court rejected Greenstein Logan's challenge to the sufficiency of the evidence to support the jury's proximate cause finding, holding "[t]he jury could have reasonably concluded ... that the negligent failure of Greenstein Logan to perform the 1984 and 1985 audits in accordance with generally accepted auditing standards was a substantial factor in bringing about Burgess Marketing's bankruptcy, and that the damage would not have occurred but for such negligence" from evidence that, "as soon as the underpayment was discovered," "Burgess Marketing immediately resumed paying the correct federal excise tax each month"; "Burgess immediately increased prices on non-gasoline items sold at [its] convenience stores"; Burgess "imposed stringent cost controls"; and "[t]hese management decisions resulted in the company's operations again becoming profitable within six months." *Id.* at 186. According to the plaintiffs' experts, "if Greenstein Logan had discovered the underpayment during the 1984 audit when the company's liability was only $287,229, Burgess could have then made the same management decisions which ***he*** later made." *Id.* (emphasis added).

As indicated by the emphasized "he" in the previous sentence, Burgess was the principal owner of Burgess Marketing and thus able to cause the company to "resume[ ] paying the correct federal excise tax each month"; "increase [ ] prices on non-gasoline items sold at [its] convenience stores"; and "impose[ ] stringent cost controls"—unilaterally and immediately. In this case, on the other hand, the City and hundreds of union members must negotiate the pre-funding rate during the collective bargaining process; neither can unilaterally or immediately change the pre- **\*192** funding rate. Indeed, when Towers Perrin recommended a significant increase in the pre-funding contribution rate to 10.6% in 1992, that recommendation was not followed; instead, a contribution rate of 8.5% by October 1997 was adopted. And that 2.1% difference pales in comparison to the difference

between the 9.4% pre-funding rate adopted in the 2002 collective bargaining agreements and the 13.94% and 19.93% rates recommended in the 2002 and 2003 Reports, which represented increases for the City of $7.9 million and $20 million, respectively. As a result, as Towers Perrin points out, any "evidence that [the] City and the Firefighters Union *previously* followed Towers Perrin's recommendations is not competent evidence that these entities ... would have agreed in the collective bargaining process to ... raise contribution rates." Towers Perrin also points out yet another significant distinction between *Greenstein* and this case: Unlike Burgess Marketing, which was legally required to pay its excise taxes, the City and the unions were not required to raise contribution rates, legally or otherwise; they had simply "agreed in principle, in 1995, that, once an actuarially sound fund was established by current contribution levels, the responsibility for future contributions ... would be jointly shared by the parties, and would be quantified and allocated by negotiation in future agreements, as necessary." In short, this case is entirely unlike *Greenstein.*

The Fund also cites *The Orthopaedic Clinic of Monroe v. Ruhl,* 34,700 (La.App. 2 Cir. 5/11/01), 786 So.2d 323, writ denied, 2001–1727 (La.10/5/01), 798 So.2d 970. Again, however, the evidence in *Ruhl* was held to be sufficient to establish causation because the record included testimony from both the plaintiffs' and the defendants' experts "that [the] plaintiffs suffered financially *as a result* of the failure to terminate," which was caused by the defendant actuary's failure to timely provide the needed actuarial calculations. 786 So.2d at 331 (emphasis added). No such testimony appears in this summary judgment record.

The Fund also argues there is "expert evidence of causation" and points to the affidavits of Dr. Carl M. Hubbard and Lawrence Mitchell and the deposition testimony of Robert May. Hubbard authored a report that concluded the economic loss to the Fund of using the contribution rates recommended by Towers Perrin and agreed to in the 2002 Firefighters' Collective Bargaining Agreement instead of the rate recommended in the Rudd and Wisdom 2002 report is $16.5 million. Mitchell and May concluded that Towers Perrin's conduct fell below the standard of care and resulted in a recommended pre-funding rate in the 2000 Report that was too low. As evidenced by their conclusions, however, Hubbard, Mitchell, and May testified on the issues of breach and damages. None even purported to testify on causation, *i.e.,* if Towers Perrin had recommended a higher pre-funding rate, it would have been adopted by the City and the unions

in collective bargaining agreements. Because the summary judgment record does not contain even a scintilla of evidence on this issue, we hold the trial court correctly granted a no-evidence summary judgment against the Fund on causation.

## OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

The causation issue was addressed in the affidavits of George Suther and John Anderson Jr.; but Towers Perrin's objections to this evidence were sustained. Accordingly, in its final issue, the Fund argues the trial court abused its discretion in sustaining Towers Perrin's objections to certain of the Fund's summary judgment evidence. In light of our holding that the **\*193** trial court correctly granted a no-evidence summary judgment against the Fund on causation, we address only the propriety of the trial court's rulings on the objections to the affidavit testimony of the two witnesses offered by the Fund to establish causation—George Suther and John Anderson Jr.

### *Standard of Review*

We review a trial court's evidentiary rulings under the abuse of discretion standard. *See United Blood Servs. v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997).

### *Discussion*

**[8]** Anderson was the firefighters' union's chief negotiator in the 2002 collective bargaining process. He testified that he is "familiar with the history of the negotiations with the City of San Antonio over the funding of the ... Fund;" both the union and the City "relied on the recommendations of Towers Perrin" in negotiating the 1999 and 2002 collective bargaining agreements; and, "given the long history of relying on the Towers Perrin recommended contribution rates, and the history of [the union] and the City of San Antonio adopting these rates, it is my opinion, which I believe is well founded, that there is a reasonable certainty that [the union] and the City of San Antonio would have adopted higher contribution rates in the 2002 Firefighters CBA if it had been known that the contribution rates recommended in the 2000 Towers Perrin study were too low." Suther, president of the firefighters' union and one it's the lead negotiators in the negotiations leading up to the firefighters' 2002 collective bargaining agreement, testified to the same

effect. The trial court sustained Towers Perrin's objection that this testimony was "opinion testimony by a person never designated as an expert witness on this topic by the [Fund] under the controlling provisions of [the] Court's Scheduling Order entered on April 23, 2003." The Fund does not argue that it designated Anderson and Suther as expert witnesses; rather, the Fund argues it was not required to designate them "as experts in order [for them] to give [their] opinion on matters which involve lay testimony." In support of its argument, the Fund cites Texas Rule of Evidence 701.

**[9]** **[10]** **[11]** Rule 701 provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

TEX.R. EVID. 701. "The perception underlying the lay witness's testimony may be what was seen, heard, smelled, tasted, touched or felt." *State v. Brainard,* 968 S.W.2d 403, 412 (Tex.App.-Amarillo 1998) (citing HULEN D. WENDORF, ET AL., TEXAS RULES OF EVIDENCE MANUAL VII–5 (3d ed.1991)), *aff'd in part and rev'd in part on other grounds,* 12 S.W.3d 6 (Tex.1999). Thus, "Rule 701's requirement that the testimony be based on the witness's perception presumes the witness observed or experienced the underlying facts, thus meeting the personal-knowledge requirement of [R]ule 602." *Turro v. State,* 950 S.W.2d 390, 403 (Tex.App.-Fort Worth 1997, pet. ref'd) (citing *Bigby v. State,* 892 S.W.2d 864, 889 (Tex.Crim.App.1994), *cert. denied,* 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995)). "A *speculative opinion,*

such as an opinion on what someone else was thinking at a specific time, does not help the jury to either (1) understand the witness' testimony better, or (2) decide the question of the other person's intent. Mere conjecture does not assist the jury." **\*194** *Fairow v. State,* 920 S.W.2d 357, 361 (Tex.App.-Houston [1st Dist.] 1996), *aff'd,* 943 S.W.2d 895 (Tex.Crim.App.1997). "Speculate" means "to take to be true on the basis of insufficient evidence." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1133 (Merriam–Webster Inc.1988).

We hold the Rule 701 test is not met by Anderson's and Suther's causation testimony. This testimony was based not on their perceptions but on their speculative conclusions regarding what the City's negotiators, the members of the San Antonio City Council, and hundreds of members of the firefighters' union would have done if Towers Perrin had recommended a higher pre-funding rate. Accordingly, we hold the trial court did not abuse its discretion in sustaining Towers Perrin's objections to this testimony.

## CONCLUSION

Because the summary judgment evidence fails to raise a genuine issue of material fact on causation, the trial court correctly granted Towers Perrin's motion for a no-evidence summary judgment on this ground. And the trial court properly sustained Towers Perrin's objections to the only evidence tendered by the Fund on the causation issue because it is based not on perception but speculation. We therefore affirm the trial court's judgment.

**All Citations**

191 S.W.3d 185

Footnotes

1   An actuary is "[a] statistician who computes insurance and pension rates and premiums on the basis of experience tables." BLACK'S LAW DICTIONARY 34 (5th ed.1979).

2   The pre-funding or contribution rate is the amount contributed by the City and the police officers and firefighters to "pre-fund" their expected retiree health care benefits; the pre-funding rate is expressed in the collective bargaining agreements as a percentage of the City's payroll and a monthly contribution for an employee.

3   The Fund's unfunded accrued liability was explained in the 2000 Report:
    Prior to 1992, $117 per month was contributed for each active police officer and fire fighter to prefund the postretirement medical benefits for the members and their spouses. An actuarial valuation of the liabilities performed as of October 1, 1992 indicated that a prefunding rate of $341 (or 10.6% of payroll) was necessary to adequately fund the retireee medical liability. Because this was such a large increase, the parties involved agreed to gradually

increase the contribution levels reaching the rate of 8.5% of payroll for police officers and $234 per active per month for fire fighters for the fiscal year beginning October 1, 1997. In 1997 Towers Perrin updated the valuation results and determined that a funding rate of 9.4% was appropriate.

4    According to the 2003 Report, this "significant increase" "can be attributed primarily to these changes: (a) the change in the amortization period from 40 years to 30 years, (b) the change in the payroll increase assumption from 7% to 6% per year, (c) the 1% increase in assumed annual increases in future benefit claims costs (trend) for the first 9 fiscal years after the valuation date, (d) the 5% increase in assumed benefit claims costs for the fiscal year ending September 30, 2002, and (e) the change in the investment return assumption from 8.5% to 8.25% per year." "Another source of increase in the recommended contribution rate was adverse experience (worse than assumed) during fiscal year 2001–2002, including both adverse investment experience and adverse claims costs."

---

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

145 Tex. 460
Supreme Court of Texas.

BURFORD

v.

POUNDERS et al.

No. A-862. | Jan. 22, 1947.

Error to Court of Civil Appeals of Sixth Supreme Judicial District.

Trespass to try title suit by W. R. Pounders against S. O. Burford, wherein defendant cross-complained against plaintiff and R. E. Beaird for specific performance of an option to purchase contained in a lease and in the alternative for damages against R. E. Beaird for alleged breach of contract. To review a judgment of the Court of Civil Appeals, 192 S.W.2d 914, affirming a judgment for the plaintiffs, the defendant brings error.

Reversed and remanded.

West Headnotes (6)

**[1]** **Specific Performance**
⚷ Bona Fide Purchasers

**Vendor and Purchaser**
⚷ By Tenant

Where lease contract was not filed for record but tenant was in visible physical possession of premises at time of sale thereof by landlord, purchaser had constructive notice of lease and was not innocent purchaser for value, and was in no better position than landlord to defend tenant's suit for specific performance of option to purchase contained in lease.

9 Cases that cite this headnote

**[2]** **Evidence**
⚷ Sufficiency of Description to Admit Parol Evidence

**Frauds, Statute Of**
⚷ Contents of Instrument

Where lease referred to premises as "being block No. 10 of a subdivision of a $66\,{}^{3}/_{10}$ acres of the Archer Survey located about 2½ miles West of the City of Tyler on the Dallas Highway", although no plat showing block No. 10 was of record in the county deed records, description in lease was sufficient to authorize admission of extrinsic evidence to explain the terms used therein, and, where extrinsic evidence identified land, lease was not void under the statute of frauds for want of sufficient description of land. Vernon's Ann.Civ.St. art. 3995.

Cases that cite this headnote

**[3]** **Specific Performance**
⚷ Necessity

Where promissor openly refuses to perform contract or declares his intention not to perform, promisee need not make tender of payment of consideration before suing for specific performance, but it is sufficient if promisee is ready and willing and offers to perform in his pleadings.

17 Cases that cite this headnote

**[4]** **Vendor and Purchaser**
⚷ Questions for Jury

Whether time is of essence of contract giving option to purchase realty is ordinarily a question of fact.

1 Cases that cite this headnote

**[5]** **Appeal and Error**
⚷ Implied Findings in General

The rule that supplemental findings necessary to support judgment are presumed is not applicable when findings and conclusions disclose the basis for judgment, and the court does not find such necessary supplemental facts.

10 Cases that cite this headnote

**[6]** **Specific Performance**
⚷ Necessity

## Specific Performance

👉 Payment of Consideration Into Court

A tenant offering in his pleadings to do equity could maintain suit for specific performance of option to purchase contained in lease without tendering the agreed price to landlord who repudiated option by selling to third person without notice to tenant as required by option, and tenant would be awarded land on paying into court the agreed price as tendered in his pleadings.

20 Cases that cite this headnote

**Attorneys and Law Firms**

**\*461** **\*\*141** Lasseter, Spruiell, Lowry, Potter & Lasater and Wilbert Lasater, all of Tyler, for petitioner.

John Y. Lawhon, of Tyler, for respondents.

**Opinion**

TAYLOR, Justice.

W. R. Pounders filed this suit against S. O. Burford in trespass to try title to a small tract of land, the last remaining unsold of 11 similar tracts of the R. E. Beaird Subdivision located about two and a half miles west of the City of Tyler on the Dallas highway. Burford duly answered and filed a cross action against Pounders, joining R. E. Beaird as codefendant, seeking primarily specific performance of contract; and in the alternative, recovery of damages. No question of defective pleadings is urged by any of the parties. Upon trial without a jury judgment was for Pounders and Beaird, and against Burford on his cross action. The Court of Civil Appeals affirmed the judgment. 192 S.W.2d 914, 915.

**\*462** The controversy arose out of a two-year lease contract made on March 5, 1943, **\*\*142** whereby Beaird as lessor (also the owner) gave Burford, the lessee, a 'refusal to purchase' the land for an agreed price of $1,000. The contract is copied in the Court of Civil Appeals opinion. The trial court's findings of fact and conclusions of law, the statement of facts, and also certain stipulations made by the parties upon the trial, constitute a part of the record before us.

[1] [2] It appears that Beaird, about five months before the lease expired, and while Burford was in possession of the land using it for garden and pasture, deeded it to Pounders, who

was engaged in the real estate business and had sold some of the other tracts of the subdivision. In the interest of brevity it is stated here that the Court of Civil Appeals held (and we are in accord with its holding) that constructive notice of the contents of the lease contract was visited upon Pounders at the time he received the deed; and that as pointed out by the Court in its opinion, 'Under the pleadings supported by the above facts and other evidence not necessary to detail, Pounders was not an innocent purchaser for value.' Ramirez v. Smith, 94 Tex. 184, 59 S.W. 258; 43 T. J., Vendor-Purchaser, Sec. 389. He knew some one was in possession and Beaird told him it was Burford. There were visible circumstances indicating that Burford was in possession. It is well to note here also that Pounders (not being an innocent purchaser) was in no better position that his grantor (Beaird) to defend Burford's suit for specific performance. Langley v. Norris, 141 Tex. 405, 173 S.W.2d 454, 148 A.L.R. 555. See also in this connection the well considered case of Driebe v. Fort Penn Realty Co., 331 Pa. 314, 200 A. 62, 117 A.L.R. 1091. Pounders, with notice, involved himself in the lease contract relations of Beaird an Burford. It makes for brevity also to note at this point our agreement with the Court of Civil Appeals that the description of the land given in the lease contract was sufficient to authorize the admission of the extrinsic evidence referred to in the opinion 'to explain the terms' used in the lease, and to make feasible the identification of the land; and that 'under such status, the lease contract was not afoul of the statute of frauds (Vernon's Ann.Civ.St. art. 3995).' See discussion in the opinion and authorities there cited. At Beaird's home on March 5, 1943, Beaird and Burford agreed upon the terms of the lease. After writing and signing it, Beaird sent it to Burford. Burford signed it, and, according to a stipulation of the parties, attached his check for $25 and on March 12, 1943, mailed both the contract and the check to Beaird. There were no further negotiations between them and there is no question of mutual mistake, accident or fraud, in the case. For convenience we **\*463** set out at this point the body of the lease contract without paragraphing: 'The lease is for two years. Consideration Twenty-five dollars per year payable in advance each year. This lease is for the purpose of pasturing and gardening * * *. R. E. Beaird, Lessor, agrees to permit the lessee, S. O. Burford, to remove from the premises any improvements, that may be put there by the Lessee, when this lease expires. * * * Burford, lessee, agrees to vacate the premises on notice of the sale,-at any time-of the above described acreage, on the return of whatever unearned portion of the rent money by R. E. Beaird or by any one to whom he may sell the same. * * * Beaird agrees to give S. O. Burford the refusal of purchase of the above described land before he

sells the same to any one else. Also, that whatever amount of rent money having been paid will apply on purchase price of same. The price agreed upon by this contract shall be One Thousand Dollars for the 6 1/3 acres.' (Italic ours.)

Beaird testified that Burford duly paid him the $50 called for in the contract, $25 a year in advance, and that he told Pounders that Burford had a written lease contract. It was admitted by Beaird that he deeded the property to Pounders without letting Burford know he contemplated selling it and without giving him an opportunity to buy it, and the trial court found that Burford knew sometime before Christmas, 1944, that Beaird had sold the land. On February 20, 1945, Burford wrote Beaird that he was formalizing (by means of the letter) the prior verbal notice of his desire to exercise his option to purchase the land; and that he was therewith tendering the consideration provided in the contract, **143 'to wit, the sum of $1000.00 less the $50.00 I have paid you in rent.' Burford stated in the letter that he would be within his legal rights to remain in possession after the expiration of the lease contract, that he was sending Pounders a copy of the letter, and finally, that 'you will consider this a formal notice that I do now claim, and shall continue to claim, the exclusive right of possession.' Beaird testified that Burford brought a check to the house 'and handed it to me, and I didn't even look at it'; that he told him he had already sold the place to Pounders 'would have nothing further to do with that part of it.' Before stating the remaining pertinent facts we quote from a recent general statement, 49 American Jurisprudence, Special Performance, the following general statement of the applicable law: 'Whatever difference of opinion there may be as to the necessity of tender of performance before suit when the defendant *464 is not in default, it is clear that a tender is unnecessary if the defendant repudiates the contract before suit, or it appears that he would have refused the tender if it had been made. * * * If the defendant puts himself in an attitude of default, resists the performance, and insists that he is not bound by the contract, tender to him is unnecessary. * * * Consequently, all that is required in such case is that the plaintiff place himself in favor with the court, and this may be done by a proper offer in the pleadings.' (Italics ours.)

Burford, it appears from the following pleading contained in his trial cross-petition, made such proper offer: 'That said lease contract contained a provision giving the cross-plaintiff an option to purchase the above described property at any time during the term of the lease for the sum of * * *. $1000.00 * * *, less whatever * * * cross-plaintiff might have previously paid as rent for the property. * * * That in violation of the

option * * * Beaird purported to sell such property to cross-defendant, W. R. Pounders, on or about October 18, 1944, while said lease contract was in * * * effect and without giving cross-plaintiff an opportunity to exercise his option * * *. That on or about February 20, 1945, cross-plaintiff gave notice to * * * Beaird of his election to exercise said option * * *. At that time cross-plaintiff had paid * * * as rent under the * * * lease; and on or about February 20, 1945, * * * tendered * * * $950.00 * * * in cash to * * * Beaird, and requested a conveyance of said property in compliance with the terms of said contract. That * * * Beaird refused to accept said money and * * * Beaird and Pounders have refused to make conveyance of said property * * *, and still refuse to do so. That cross-plaintiff * * * tenders * * * $950.00 * * * in court, and asks that cross-defendants perform said contract.'

The trial court found that when Beaird sold the land to Pounders, Burford (not having 'sold his property in Houston') 'was not then in position to have bought and paid for the land at that time.' Beaird testified it was his intention all along to sell the land for.$1000.00 only in event 'of an emergency'; that while he wrote and signed the above contract, it was not the contract he and Burford entered into; that he put in the 'refusal-to-purchase' clause not as an option, but 'as a matter of courtesy to a young man * * * he was trying to do something for'; and that the reason behind his adding 'that clause' was to give Burford 'the first shot at it' if he had to sell for $1,000. Beaird was straight-forward in his statement that he harbored such mental reservation, in that when questioned further as *465 to why he put in the option clause he replied: 'I just made a mistake, that's all.' The date mentioned, it will be noted, was well within the two-year contract period.

The trial court's conclusions of law on which he predicated his judgment against Burford were as follows:

'III. The 'Option', not specifying any time within which it might, or should, be exercised, and the land being for sale at all times while rented by Burford, time was necessarily of the essence of such an 'option', and the same was invalid for lack of a provision of time for the exercise thereof.

'IV. Burford, not being in position to have purchased the land at the time it was **144 sold to Pounders, and it being subject to sale all of the time since it was rented to Burford, the failure to notify Burford to then exercise his option if he wanted to, would have been a futile thing, as under his own testimony he could not then have performed by then buying the land, and there being no provision binding Beaird to hold the sale of the land for him to any particular time, Burford suffered no injury by the sale to Pounders without notice to

him (Burford) of the sale, and, therefore cannot recover either specific performance or damages.' (Italics ours.)

It will be observed that the trial court concluded as matters of law as a basis for his judgment, (1) and that the option was invalid because the contract contained no provision fixing a time for its exercise, (2) that Beaird repudiated his contract by selling the land without giving Burford the refusal to purchase, and (3) that Burford suffered an injury for the reason he was not in position at the time the land was sold to exercise his option. It will be observed also that he was careful not to hold that the date upon which he found Burford had the money (February 21, 1945) was not within a reasonable time for exercising the option.

 [3]    The Court of Civil Appeals affirmed the judgment based on the above holdings as matters of law, and Burford applied for writ of error. He alleged among other points of error in his application, that the Court of Civil Appeals erred in upholding the trial court's conclusions stated in No. IV, supra, and urged in support of the point that under the circumstances of this case it was not incumbent on Burford to make a tender in the matter  **\*466**  of exercising his option within a reasonable time after learning of the sale, but that it was sufficient for him to offer to do equity in his pleadings. This contention is in exact accordance with the statement of the law quoted above, 199 S.W.2d 143, and with the settled law of Texas. The Court of Civil Appeals was in error in rendering judgment against Burford. The applicable law has been definitely settled in this state. Regester v. Lang, Tex.Com.App., 49 S.W.2d 715; Kalklosh v. Haney, opinion by Judge Tarlton, 4 Tex.Civ.App. 118, 23 S.W. 420; Babcock v. Lewis, 52 Tex.Civ.App. 8, 113 S.W. 584 (wr. ref.); Taylor v. Kaufman, Tex.Civ.App., 267 S.W. 526; Lockwood v. Frost, Tex.Civ.App., 285 S.W. 874; San Antonio Joint Stock Land Bank v. Malcher, Tex.Civ.App., 164 S.W.2d 197 (ref. want merit); 58 C.J., Specific Performance, Secs. 348-350. In the case first cited (in which the promissor denied he had ever made the contract under consideration) the court pointed out that a tender 'would have been a vain and useless thing,' (49 S.W.2d 717) and said: 'It is thoroughly settled that where a defendant has openly and avowedly refused to perform his part of a contract, or declared his intention not to perform it, a plaintiff need not make tender of payment of the consideration before bringing suit. It is sufficient if he is ready and willing and offers to perform in his pleadings.' See in this connection the following well considered cases in other jurisdictions: Cummings v. Nielson, 42 Utah 157, 129 P. 619; Casto v. Cook, 91 W.Va. 209, 112 S.E. 502; and Driebe v. Fort Penn Realty Co., supra.

The Court of Civil Appeals recognized in the concluding paragraph of its opinion that 'Beaird was in default in failing to give Burford the refusal to purchase,' but excused his default on the authority of a statement quoted from 58 C.J., Specific Performance, Sec. 316 (sound law but not applicable here). The law applicable to the present case is pointed out by subsequent statement in the same section that 'on the contrary, complainant ordinarily is entitled to specific performance where he alleges and proves that he * * * is ready, able and willing to perform.' The author, in addition to stating the law as just quoted, points by footnote references to subsequent sections (342 and 348-350) dealing with the specific subjects of 'Tender Excused' and 'Tender or Offer Excused,' respectively. In a footnote (2, f) under section 342 dealing with specific performance in 'Suit by Purchaser,' it is stated that 'In Texas' an actual tender 'is not necessary where the purchaser pleads and proves a willingness to pay, but is entitled to relief provided that, within a time fixed in the decree, he shall pay the amount due,' citing among other **\*\*145** cases, Kalklosh v. Haney, and Lockwood v. Frost, supra. **\*467** In section 348 it is stated that 'whatever difference of opinion may exist as to the original necessity of a tender of the consideration before suit, * * * it appears to be quite well settled that a formal tender is excused where a tender would be a useless and idle ceremony'; and that a 'tender is also excused where defendant repudiates the contract'; and further that 'tender in pleadings (is) sufficient' where plaintiff sets forth that he is ready, able and willing 'or * * * pays the consideration into court.' In section 349 dealing with 'Repudiation of Contract,' it is stated that 'the necessity of a tender is dispensed with where defendant repudiates the contract, or makes any declaration which amounts to a repudiation, * * *,' citing the Texas cases, Taylor v. Kaufman and Babcock v. Lewis, supra. In the following section (350) it is stated that 'if a tender of the purchase price or other sums before suit is necessary, it is excused where the vendor or seller has put it out of his power to perform, as where he has conveyed the property * * * to a third person.'

The assignment under which it was urged that it was not incumbent on Burford to make tender of the amount due as therein set out, is sustained. It appears from the trial court's conclusions of law that he not only did not find as a fact that Burford did not make such offer within a reasonable time before suit and within a reasonable time under the circumstances, but that he was careful not to so hold. He merely held, as appears from the court's concluding finding of fact, that Burford, 'took no action then (when he learned

Beaird had sold the property) * * * because he had not sold' his Houston property and did not have the money 'until about February 21, 1945.'

There was no question that the value of the land materially changed. The court's finding was that the market value was the same at the time of the sale in October, at the time of the trial, and at the time Burford tendered his check. While the Court of Civil Appeals apparently held that Burford had a reasonable time within which to make tender it did so, not upon a fact finding of the court below, but as a matter of law, saying (in conclusion III) that the contract was invalid. This was incorrect. The material consideration is that Burford offered in his pleadings to do equity. Cases and authorities cited 199 S.W.2d 144, and authority quoted 199 S.W.2d 143, both supra.

[4]    [5]    It conclusively appears that whether time was of the essence of the contract (ordinarily a question of fact) was taken out of the case by Beaird's testimony, and that it would have been an idle ceremony to tender the agreed price at any time, since **\*468** he made it clear that it was his intention to sell at that price only in the event of an emergency. The rule that supplemental findings necessary to support the judgment are presumed, has no application when the findings and conclusions disclose the basis therefor, and that the court did not find such necessary supplemental facts.

[6]    Since Beaird put himself in an attitude of default, and repudiated the contract by selling to Pounders, a tender to Beaird was unnecessary. It was sufficient for Burford to offer in his pleadings to do equity. This Burford has done. The only matter remaining to be done by the trial court is to direct that payment be made into court by Burford forthwith as tendered in his pleadings; and that upon the making of such payment into court, judgment be entered denying Pounders recovery of the land and awarding Burford judgment for title and writ of possession.

The judgments of the courts below are reversed and set aside and the cause is remanded for further proceedings in accordance herewith. It is so ordered.

SIMPSON, J., not sitting.

**All Citations**

145 Tex. 460, 199 S.W.2d 141

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

421 S.W.2d 427
Court of Civil Appeals of Texas.
Houston (1st Dist.).

The CITY OF HOUSTON, Appellant,

v.

SOCONY MOBIL OIL COMPANY, Inc., Appellee.

No. 15118. | Nov. 16, 1967.
| Rehearing Denied Dec. 7, 1967.

Action for damage resulting to realty from lowering of grade of street by defendant. The District Court, Harris County, W. Sears McGee, J., entered judgment in favor of plaintiff and defendant appealed. The Court of Civil Appeals, Coleman, J., held that grant of summary judgment establishing liability of city for damage to real estate resulting from lowering of grade was properly entered based on unsworn pleadings of the parties, and defendant's answer was insufficient to raise issues of fact precluding summary judgment in view of fact matter sought to be raised constituted affirmative defenses and defendant failed to carry burden of submitting evidence in support thereof.

Judgment affirmed.

West Headnotes (9)

**[1]** **Judgment**
 Partial Summary Judgment

Purport of rule providing for an interlocutory summary judgment on issue of liability although there is a genuine issue as to amount of damages is to make issues determined on such motion for partial summary judgment final. Rules of Civil Procedure, rule 166–A.

3 Cases that cite this headnote

**[2]** **Judgment**
 Construction and Operation

Once an interlocutory summary judgment is entered, the issues decided cannot be further litigated unless the judgment is set aside by the trial court, or unless the summary judgment is

reversed on appeal. Rules of Civil Procedure, rule 166–A.

12 Cases that cite this headnote

**[3]** **Appeal and Error**
 On Motion for Judgment

An interlocutory summary judgment is not appealable until a final judgment is entered disposing of all parties and issues in the cause. Rules of Civil Procedure, rule 166–A.

6 Cases that cite this headnote

**[4]** **Appeal and Error**
 Ordering New Trial of Certain Issues Only

An appeal from a final judgment, in which an interlocutory summary judgment has been merged, presents an opportunity for an appeal from the summary judgment, and if the appeal results in a reversal on points not involved in the summary judgment, that portion of the case decided on summary judgment will not be remanded for a new trial.

9 Cases that cite this headnote

**[5]** **Appeal and Error**
 Specification of Errors

A question not presented in a point of error or by argument under points of error in appellant's brief cannot be considered.

3 Cases that cite this headnote

**[6]** **Judgment**
 Presumptions and Burden of Proof

Burden is on movant for summary judgment to demonstrate by evidence that there is no material factual issue upon elements of his claim, and upon going forward with such evidence he is entitled to such judgment unless his opponent comes forward with a showing that there is a disputed fact issue.

2 Cases that cite this headnote

**[7] Pleading**

☞ Anticipating Defenses

It is not incumbent upon plaintiff to incorporate in his pleading allegations which negative an affirmative defense.

1 Cases that cite this headnote

**[8] Appeal and Error**

☞ Matters Occurring After Judgment

Admissions of fact and response to interrogatories and evidence introduced at trial on a bill of exceptions could not be considered in determining propriety of grant of a partial summary judgment which was entered prior to filing of admissions of fact and prior to trial on bill of exceptions.

Cases that cite this headnote

**[9] Judgment**

☞ Evidence and Affidavits in Particular Cases

Grant of summary judgment establishing liability of a city for damage to real estate resulting from lowering of grade was properly entered based on unsworn pleadings of the parties, and defendant's answer was insufficient to raise issues of fact precluding summary judgment in view of fact matter sought to be raised constituted affirmative defenses and defendant failed to carry burden of submitting evidence in support thereof.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*428** William A. Olson, City Atty., Homer T. Bouldin, Trial Supervisor, Joseph G. Rollins, Senior Asst. City Atty ., Houston, for appellant.

William H. Tabb, John A. Berke, Jr., David R. Latchford, Jerome, E . Dawkins, Dallas, for appellee.

**Opinion**

COLEMAN, Justice.

This is a suit for the damage resulting to real estate from the lowering of the grade of Long Point and Foley Streets by the City of Houston. After appellee secured an interlocutory summary judgment decreeing **\*429** liability, the cause was tried to a jury on the question of damages. Based on the jury verdict and the interlocutory summary judgment, the trial court entered a final judgment in favor of appellee.

Appellant contends that the trial court erred in overruling its motion for judgment non obstante veredicto because the evidence established that the City of Houston levied a paving assessment on the property in question and appellee failed to appeal from such assessment in the manner provided by law, and, further, estopped itself from denying that the property was enhanced in value by the paving by paying the assessment, which was based on the enhanced value of the property. By its other point appellant contends that the trial court erred in entering judgment for appellee for the same reasons.

The summary judgment establishing liability was based on the unsworn pleadings of the parties and the answers made to certain requests for admissions of fact. In its petition appellee alleged ownership of certain real property fronting 125 feet on Long Point Road and 125 feet on Old Campbell Road (Foley Street) within the City of Houston. This property was improved by the construction of a modern gasoline service station. In connection with a street improvement program the City of Houston lowered the grade on Long Point Road and Foley Street from two to three feet, thereby destroying all approaches to and entries upon the plaintiff's premises. It was alleged that as a result of the steep grades between the plaintiff's lot and the streets resulting from this work, it is impossible to construct suitable driveways to the filling station and that in order to restore the premises to a suitable condition for use as a filling station it would be necessary to remove all improvements and lower the grade of the lot. The petition alleged damage in the sum of $21,205.00.

In its answer the City of Houston alleged that by Ordinance No. 61—1982 enacted by the City on November 1, 1961, the City Council of the City of Houston determined the necessity for the paving of Long Point Road and of assessing the various abutting property owners, including plaintiff, for this work; that thereafter, and in compliance with law, due notice was given to plaintiff of this paving assessment and opportunity

was afforded and plaintiff to protest same and present any claims for damages but, instead, on April 4, 1963 it did voluntarily pay the full amount of the paving assessment assessed against it for net benefits and enhancements to plaintiff's property resulting from such paving; hence, any claim for diminution in market value to its premises which plaintiff might otherwise have had has been expressly waived by said plaintiff.

The plaintiff's unsworn motion for summary judgment was filed on October 21, 1965, and alleged that the attached interrogatories and admissions show that, except for the amount of damages, there is no genuine issue as to any material fact. This motion was set for hearing on November 8, 1965. On this date the City filed its unsworn answer to the motion for summary judgment in which it stated that in addition to the question of damages there remained to be proved other facts in order to establish the liability of the City, and that the burden of proving such facts rested on the plaintiff.

The trial court proceeded to hear the motion and, on November 8, 1965, entered a decree sustaining the motion and ordering that the cause proceed to trial on the sole issue of damages.

After the entry of this decree the plaintiff filed a supplemental petition in answer to certain special exceptions contained in the City's answer. On the 6th day of June, 1966, the special exceptions were heard and the trial court entered an order overruling them with the exception of one bearing on the issue of damages.

The cause proceeded to trial on the issue of damages on November 14, 1966, and a judgment was entered on the 19th day of **\*430** December, 1966, reciting the fact that the issue of liability had been established by the order of the 113th Judicial District Court on November 8, 1965, and setting out the issues on damages together with the answers of the jury. The judgment then decreed that the plaintiff recover the sum of $7,750.00, representing the difference in the market value of the property immediately before and immediately after the damage.

Appellant presented the matters it relies on for reversal in its motion for judgment non obstante veredicto and in its motion for new trial. In its motion for judgment it alleged that it was entitled to an instructed verdict by reason of the failure to appeal from the special assessment and the subsequent payment thereof. There was no mention of the summary judgment and, of course, no motion to set it aside. In the motion for new trial appellant complained of the failure to grant an instructed verdict; alleged error in submitting the case to the jury, and alleged error in that the court refused its motion for judgment non obstante veredicto. There was no complaint made to the court entering the final judgment that the 113th District Court had erred in entering the partial summary judgment at any stage of the proceeding, unless such complaint can be implied from the recitation in the judgment that the defendant duly excepted and gave notice of appeal.

Appellant has no point in its brief in this Court specifically complaining of the action of the trial court in granting the partial summary judgment. The summary judgment is not mentioned by appellant in its argument under either of the points presented.

During the trial of the damage issue before the jury, the trial court sustained appellee's objection to appellant's proffered evidence concerning the paving assessment. The final judgment incorporated the partial summary judgment and was based thereon.

Rule 166—a, Texas Rules of Civil Procedure, specifically provides that a summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages. It is provided that the judgment shall be rendered on the pleadings, depositions, admissions, and affidavits on file, and that no oral testimony shall be received at the hearing . If there is no genuine issue as to a material fact developed on the basis of this evidence, the movant is entitled to a judgment. The rule also provides that when judgment is not rendered on the whole case or for all the relief asked, the trial court shall ascertain if practicable, what material facts exist without substantial controversy and shall set out such facts in an order. On the final trial such facts shall be deemed established and the trial shall be conducted accordingly.

**[1] [2] [3]** It is the clear purport of this rule to make the issues determined on the motion for summary judgment final. Once an interlocutory summary judgment is entered, the issues decided cannot be further litigated unless the judgment is set aside by the trial court, or unless the summary judgment is reversed on appeal. An interlocutory summary judgment is not appealable until a final judgment is entered disposing of all parties and issues in the cause. Maples v. Klimist, 377 S.W.2d 774 (Tex.Civ.App., Texarkana, 1964).

**[4]** An appeal from a final judgment, in which an interlocutory summary judgment has been merged, presents

an opportunity for an appeal from the summary judgment. If the appeal results in a reversal on points not involved in the summary judgment, that portion of the case decided on summary judgment will not be remanded for a new trial. Coleman v. Hudson Gas & Oil Corporation, 403 S.W.2d 482 (Tex.Civ.App ., Beaumont, 1966, ref. n.r.e.).

 **[5]**    A question not presented in a point of error, or by argument under the points of error, in appellant's brief, cannot be considered. Lott v. Lott, 370 S.W.2d 463 (Tex.Sup., 1963).

 **\*431**  If by liberal construction we may hold that the question of waiver of damages by reason of failure to appeal from the action of the City Council in finding that the street improvements enhanced the value of the property of appellee and levying an assessment, which was paid by appellant, was presented to this Court by appellant's points, we find no merit in the points.

 **[6]**    **[7]**    The propriety of the action of the trial court in granting the summary judgment depends on the facts properly before the Court at the time the judgment was entered. The burden was on the movant for a summary judgment, in an action in which the defendant has pleaded an affirmative defense, to demonstrate by evidence that there is no material factual issue upon elements of his claim. He is then entitled to his judgment unless his opponent comes forward with a showing that there is such a disputed fact issue upon his affirmative defense. It is not incumbent upon the plaintiff to incorporate in his pleading allegations which negative the affirmative defense. Gulf, Colorado & Santa Fe Railway Co. v. McBride, 159 Tex. 442, 322 S.W.2d 492 (1959).

Appellant's points do not challenge the propriety of the summary judgment except insofar as a material question of fact is raised as to the failure of appellee to appeal from the order levying the special assessment and finding that the property was enhanced in value by the street improvements, and insofar as a question of waiver of damage was raised by appellee's action in voluntarily paying the assessment.

 **[8]**    **[9]**    There were no affidavits, depositions, or admissions on file as of November 8, 1965, tending to raise issues of fact as to any of these matters. Plaintiff's supplemental petition and brief in support of the petition, filed April 26, 1966, and the admissions of fact filed on March 19, 1966, in response to interrogatories, cannot be considered since the summary judgment was entered prior thereto. For the same reason the evidence introduced at the trial on the bill of exceptions cannot be considered. There was no summary judgment evidence to support the allegations in appellant's answer. Since we are of the opinion that the matters sought to be raised constituted affirmative defenses, appellant had the burden of submitting evidence raising issues of fact with reference thereto. Gulf, Colorado & Santa Fe Railway Co. v. McBride, supra.

The judgment of the Trial Court is affirmed.

**All Citations**

421 S.W.2d 427

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Bishop v. Miller, Tex.App.-Hous. (14 Dist.), September 12, 2013

269 S.W.3d 588
Supreme Court of Texas.

Nick DiGIUSEPPE d/b/a Southbrook Development Co. and Frisco Master Plan, Petitioners,
v.
Roger LAWLER, Respondent.

No. 04–0641. | Argued Oct. 20, 2005. | Decided Oct. 17, 2008. | Rehearing Denied Dec. 19, 2008.

**Synopsis**

**Background:** Vendor brought action against purchaser of real property for a declaration that the parties' land sale contract was terminated, and requested damages for breach of contract and also sought to quiet title. Purchaser counterclaimed for breach of contract, among other claims, and sought specific performance. After jury determined that vendor breached contract, the 219th Judicial District Court, Collin County, granted judgment in favor of purchaser and ordered specific performance. Vendor appealed. The Dallas Court of Appeals, 2004 WL 1209569, affirmed in part and reversed in part. Purchaser appealed. The Supreme Court initially declined review, but then granted motion for rehearing and petition for review.

**Holdings:** Sitting en banc, the Supreme Court, G. Alan Waldrop, J., sitting by assignment, held that:

[1] remedy provision in contract did not eliminate or waive purchaser's burden to prove all essential common law elements for obtaining specific performance;

[2] purchaser was not entitled to a deemed jury finding that he was ready, willing, and able to perform under the contract;

[3] purchaser's pleaded allegations did not satisfy his burden to prove that he was ready, willing, and able to perform his obligations when they came due; but

[4] purchaser did not waive for appellate review his request for a refund of earnest money.

Affirmed in part, reversed in part, and remanded.

Paul W. Green, J., filed a dissenting opinion in which Jefferson, C.J., O'Neill and Johnson, JJ., joined.

West Headnotes (14)

**[1]** **Specific Performance**
 Nature and grounds of duty of plaintiff

An essential element in obtaining the equitable remedy of specific performance is that the party seeking such relief must plead and prove he was ready, willing, and able to timely perform his obligations under the contract.

12 Cases that cite this headnote

**[2]** **Specific Performance**
 Nature and grounds of duty of plaintiff

It is a general rule of equity jurisprudence in Texas that a party must show that he has complied with his obligations under contract to be entitled to specific performance of the contract, and as a consequence, a plaintiff seeking specific performance, as a general rule, must actually tender performance as a prerequisite to obtaining specific performance.

16 Cases that cite this headnote

**[3]** **Specific Performance**
 Nature and grounds of duty of plaintiff

When a defendant refuses to perform or repudiates a contract, the plaintiff may be excused from actually tendering his or her performance to the repudiating party before filing suit for specific performance.

1 Cases that cite this headnote

**[4]** **Specific Performance**
 Nature and grounds of duty of plaintiff

When a defendant refuses to perform or repudiates a contract, a plaintiff seeking

specific performance is excused from tendering performance pre-suit and may simply plead that performance would have been tendered but for the defendant's breach or repudiation; this exception to the general rule requiring actual tender is grounded in the notion that actual pre-suit tender of performance should be excused when it would be a useless act, an idle ceremony, or wholly nugatory.

4 Cases that cite this headnote

**[5]    Specific Performance**
&#128229; Nature and grounds of duty of plaintiff

Even when pre-suit tender of performance is excused, a plaintiff is still obligated to plead and prove his readiness, willingness, and ability to perform at relevant times before specific performance of contract may be awarded.

10 Cases that cite this headnote

**[6]    Jury**
&#128229; Issues of Fact in Equitable Actions

When contested fact issues must be resolved before a court can determine the expediency, necessity, or propriety of equitable relief, a party is entitled to have a jury resolve the disputed fact issues.

3 Cases that cite this headnote

**[7]    Specific Performance**
&#128229; Enforcement by purchaser

**Specific Performance**
&#128229; Nature and grounds of duty of plaintiff

Provision in land sale contract which set forth that one of purchaser's available remedies for breach of contract would be to seek to enforce specific performance did not create an automatic right to specific performance upon a finding of breach on the part of vendor, and did not eliminate or waive purchaser's burden to prove all essential elements under common law for obtaining specific performance, including that he was ready, willing, and able to perform under the contract.

6 Cases that cite this headnote

**[8]    Appeal and Error**
&#128229; Failure to Urge Objections

Ordinarily, failure to brief an argument on appeal waives the claimed error, but this rule is relaxed when fact issues are not germane to the resolution of the issue and the issue is a question of law involving constitutional ramifications or fundamental error.

1 Cases that cite this headnote

**[9]    Specific Performance**
&#128229; Trial or hearing

Purchaser was not entitled to a deemed jury finding that he was ready, willing, and able to perform under land sale contract with vendor so as to permit him to obtain specific performance despite submission of a jury question on such claim, even though jury question had been submitted as to whether purchaser complied with land sale contract and jury returned a verdict finding that vendor had breached the contract; whether purchaser complied with contract or was excused from complying with contract, remedy of specific performance still required proof that he was ready, willing, and able to perform, and existence of jury question relating to vendor's breach of contract claim did not provide fair notice of purchaser's claim for specific performance. Vernon's Ann.Texas Rules Civ.Proc., Rule 279.

1 Cases that cite this headnote

**[10]    Specific Performance**
&#128229; Nature and grounds of duty of plaintiff

Offering to perform on a contract does not establish the ability to perform, nor does having the ability to perform demonstrate a tender of that ability, and the law requires a demonstration of both before specific performance may be awarded, unless the requirement of tender is excused.

1 Cases that cite this headnote

**[11]** **Specific Performance**

 Nature and grounds of duty of plaintiff

In order to obtain specific performance of a contract, a plaintiff must prove that he was ready, willing, and able to perform his obligations when they came due, and pleading an offer to perform at the time the lawsuit is filed does not satisfy or replace the need to demonstrate the ability to perform at the relevant time.

8 Cases that cite this headnote

**[12]** **Specific Performance**

 Necessity

Purchaser's pleaded allegation, that he was ready, willing and able to fund the purchase of land from vendor on a given date of zoning approval, did not satisfy his burden to prove that he was ready, willing, and able to perform his obligations when they came due as was required to obtain specific performance of the land sale contract, where evidence on the question of whether the said zoning approval date triggered purchaser's obligation to perform was conflicting, and the jury was not asked to resolve the dispute.

5 Cases that cite this headnote

**[13]** **Pleading**

 Denials

A fact cannot be proved by a controverted pleading; the pleading simply puts the matter at issue.

Cases that cite this headnote

**[14]** **Appeal and Error**

 Nature or form of remedy

Purchaser did not waive for appellate review his request for a refund of earnest money, as an alternative theory of recovery to his request for specific performance of land sale contract, even though he did not file notice of appeal from trial court judgment against him on the issue, where purchaser had obtained favorable judgment from trial court on his request for

specific performance, and raised the earnest money issue as soon as he was aware of the reversal of the trial court's judgment by the Court of Appeals.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*590** Craig T. Enoch, Melissa Prentice Lorber, Winstead PC, Austin, James Robert Krause, Lawrence J. Friedman, Jeffrey Thomas Hall, Friedman & Feiger, L.L.P., Dallas, TX, for Petitioner.

Hilaree A. Casada, Hermes Sargent Bates, L.L.P., Julia F. Pendery, Attorney At Law, David W. Shuford, Law Office of David W. Shuford, Daon M. Ward, Godwin Pappas Langley Ronquillo, LLP, Dallas, TX, for Respondent.

Douglas Laycock, University of Michigan Law School, Ann Arbor, MI, for Amicus Curiae.

**Opinion**

Justice WALDROP [1] delivered the opinion of the Court, in which Justice HECHT, Justice WAINWRIGHT, Justice BRISTER, and Justice WILLETT joined.

This case involves a claim for specific performance of a real estate purchase contract. After a trial in which the jury found that the seller breached the contract, the trial court rendered judgment in favor of the buyer and ordered specific performance. The court of appeals reversed on the basis that the buyer did not obtain a finding of fact or prove that he was ready, willing, and able to perform. The court of appeals also concluded that the buyer had waived an alternative claim for refund of his earnest money by failing to file a notice of appeal as to that alternative basis for relief. We affirm the judgment of the court of appeals with respect to the claim for specific performance, reverse with respect to the finding of waiver on the alternative claim for refund of earnest money, and remand the case to the trial court for further proceedings.

**I. Factual and Procedural Background**

In October 1998, Nick DiGiuseppe d/b/a Southbrook Development Co. entered into a contract with Richard Lawler to purchase approximately 756 acres of Lawler's land near

Frisco, Texas, for $40,000 an acre.[2] The contract made closing of the **\*591** purchase contingent on obtaining acceptable rezoning of the property from the City of Frisco to accommodate DiGiuseppe's development plans, and provided that closing that would occur on the fifteenth day after successful completion of rezoning. The purchase contract also provided for a three-stage deposit of earnest money with the title company: (1) $100,000 upon the signing of the contract; (2) $100,000 upon the submission to the City of Frisco of the application to rezone the property; and (3) $400,000 upon "approval by the planning and zoning commission of the City of Frisco of zoning acceptable to Purchaser of the 'Land' as applied for." DiGiuseppe made the first two earnest money deposits. However, a dispute arose as to whether the events that would trigger the requirement for the third deposit had occurred.

In late November 1999, after numerous meetings and a number of revisions to the rezoning application, the Planning and Zoning Commission approved new zoning for the property at issue. This new zoning was approved by the City Council on January 4, 2000. Although the new zoning differed from the zoning that the parties had applied for in their original application, it was acceptable to DiGiuseppe.

On January 12, 2000, Lawler faxed a letter to DiGiuseppe notifying him that Lawler considered DiGiuseppe in default of the purchase contract for failing to make the third earnest money deposit. Lawler took the position that the requirement for the third ($400,000) earnest money deposit had been triggered when the Planning and Zoning Commission had approved zoning that DiGiuseppe found acceptable. The January 12 letter also declared the contract "cancelled" and demanded release of the earnest money on deposit to Lawler. DiGiuseppe objected to Lawler's notification that the contract was terminated, taking the position that the third earnest money installment had not been triggered because the new zoning was not approved "as applied for." He also declared that he was moving forward with the transaction and demanded that Lawler continue to move toward closing.

Acting on the belief that the contract with DiGiuseppe was terminated, Lawler signed a new purchase contract for the property with DRHI, Inc.—the parent company of DR Horton—on February 1, 2000. DiGiuseppe, acting on the belief that the contract was not terminated, proceeded with finalizing his side of the transaction and demanded that Lawler close. The transaction did not close. Both parties alleged the other was responsible for the failure to close. DiGiuseppe then

filed the purchase contract in the deed records.[3] On April 14, 2000, Lawler filed suit against DiGiuseppe in Collin County District Court seeking a declaration that the purchase contract was terminated, requesting damages for breach of contract, and also seeking to quiet title as a result of the filing of the purchase contract in the deed records. DiGiuseppe counterclaimed for breach of contract, quantum meruit, breach of a duty of good faith and fair dealing, statutory fraud, promissory estoppel, **\*592** and specific performance.[4]

The purchase contract limited the remedies available to the parties in the event of a breach. In the event DiGiuseppe failed to close, Lawler's "sole and exclusive" remedy was to retain the earnest money as liquidated damages, and he expressly waived any right to claim any other damages or specific performance from DiGiuseppe. In the event Lawler defaulted in performing his obligations under the contract for any reason other than DiGiuseppe's default or a proper termination of the contract under its provisions, DiGiuseppe could choose between two remedies: (1) terminate the contract and receive a full and immediate refund of the earnest money, or (2) "seek to enforce" specific performance of the contract. DiGiuseppe also expressly waived any right to claim damages.

The case was ultimately tried to a jury and the parties' breach of contract claims were submitted on broad-form questions inquiring as to whether either party failed to comply with the contract. The jury answered favorably to DiGiuseppe that Lawler had failed to comply with the contract and that DiGiuseppe had not failed to comply. A damages question was also submitted and the jury found that DiGiuseppe had suffered $295,696.93 in damages.[5] Although disputed at trial, no question was requested by either party or submitted to the jury with respect to specific performance or whether DiGiuseppe was ready, willing, and able to perform under the contract at the time he alleged the transaction should have closed.

On DiGiuseppe's post-verdict motion, the trial court rendered a take-nothing judgment against Lawler and granted DiGiuseppe specific performance of the purchase contract together with an award of attorneys' fees in the amount of $75,000. The trial court also appointed a receiver to take possession of the property and effectuate a closing of the purchase contract in accordance with its terms.

The court of appeals reversed the trial court's order granting specific performance, holding that DiGiuseppe had failed to

conclusively establish, or to request and obtain a finding of fact on, an essential element of his claim for specific performance—that he was ready, willing, and able to perform under the terms of the purchase contract. *Lawler v. DiGiuseppe,* 2004 WL 1209569 (Tex.App.-Dallas 2004) (mem.op.). The court of appeals also held that the omitted fact finding on specific performance was not necessarily referable to a submitted theory and declined to imply a finding that DiGiuseppe was ready, willing, and able to perform. The court of appeals upheld the award of attorneys' fees, however, on the theory that Lawler **\*593** had pursued a Declaratory Judgment Act claim, and that statute allows the trial court to award fees as are just and equitable.[6] The court of appeals declined to render judgment for the $295,696.93 in damages found by the jury on the basis that there was no evidence to support the finding.[7] The court also declined to award DiGiuseppe any portion of the $200,000 in earnest money that he had deposited on the basis that he had waived this claim by not filing a notice of appeal on that issue.

DiGiuseppe sought review in this Court on two grounds: (1) the purchase contract provided for the remedy of specific performance in the event of a breach by Lawler regardless of whether DiGiuseppe obtained a finding of fact that he was ready, willing, and able to perform; and, (2) in the alternative, if he is not entitled to specific performance, the court of appeals erred in failing either to award the damages found by the jury or to allow DiGiuseppe to recover the $200,000 in earnest money he paid. In his briefing on the merits, DiGiuseppe included a related point that he had also argued in the court of appeals: that a finding relating to the omitted jury question on his being ready, willing, and able to perform should be deemed found pursuant to Texas Rule of Civil Procedure 279 as an omitted element "necessarily referable" to a theory submitted without objection. After considering briefing on the merits, this Court initially declined review. 48 TEX. SUP. CT. J. 440 (Mar. 14, 2005).

DiGiuseppe then filed a motion for rehearing stressing that the purchase contract gave him the option to obtain at least one of two potential remedies in the event of a breach by Lawler— either seeking to enforce specific performance *or* terminating the contract and receiving a refund of the earnest money deposited. DiGiuseppe adamantly contended on rehearing that, even if this Court declined to review the court of appeals judgment with respect to specific performance, the Court should grant relief with respect to the $200,000 in earnest money paid to Lawler because the jury had found that Lawler breached the contract and DiGiuseppe did not. Having

obtained a favorable judgment as to specific performance in the trial court, DiGiuseppe argues he was not obligated to file a notice of appeal in the court of appeals to preserve the option of pursuing a refund of his earnest money in the event an appellate court reversed the trial court's award of specific performance. We granted the motion for rehearing and the petition for review. 48 TEX. SUP.CT. J. 878 (June 17, 2005).

## II. Specific Performance

[1]    An essential element in obtaining the equitable remedy of specific performance is that the party seeking such relief must plead and prove he was ready, willing, and able to timely perform his obligations under the contract. In 1938, we stated: " 'The doctrine is fundamental that a party seeking the remedy of specific performance ... must show himself to have been ready, desirous, prompt, and eager.' These principles have been long recognized and respected by the Courts of Texas." *Ratcliffe v. Mahres,* 122 S.W.2d 718, 721–22 (Tex.Civ.App.-El Paso 1938, writ ref'd) (quoting 4 JOHN NORTON POMEROY, JR., A TREATISE ON EQUITY JURISPRUDENCE § 1408, at 2779 (3d ed.1905)); *see also DeCordova v. Smith's Adm'x,* 9 Tex. 129, 146 (1852); *cf. Gober v. Hart,* 36 Tex. 139, 140 (1871–1872). We reaffirmed **\*594** the rule in *Corzelius v. Oliver,* 148 Tex. 76, 220 S.W.2d 632, 635 (1949) (notwithstanding defendant's refusal to perform her obligations under contract, plaintiff was required to show that he could have performed his contractual obligations to obtain specific performance), and it has been followed by other courts of appeals in reported decisions in addition to the court of appeals in this case. *17090 Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 257–59 (Tex.App.-Dallas 2002, pet. denied); *Chessher v. McNabb,* 619 S.W.2d 420, 421 (Tex.Civ.App.-Houston [14th Dist.] 1981, no writ); *Hendershot v. Amarillo Nat'l Bank,* 476 S.W.2d 919, 920–21 (Tex.Civ.App.-Amarillo 1972, no writ). "[T]o be entitled to specific performance, the plaintiff must show that it has substantially performed its part of the contract, and that it is able to continue performing its part of the agreement. The plaintiff's burden of proving readiness, willingness and ability is a continuing one that extends to all times relevant to the contract and thereafter." 25 RICHARD A. LORD, WILLISTON ON CONTRACTS § 67:15, at 236–37 (4th ed.2002) (citations omitted).

[2]    It is also a general rule of equity jurisprudence in Texas that a party must show that he has complied with his obligations under the contract to be entitled to specific

performance. *Glass v. Anderson,* 596 S.W.2d 507, 513 (Tex.1980) ("A party who asks a court of equity to compel specific performance of a contract must show his own compliance with the contract."); *Bell v. Rudd,* 144 Tex. 491, 191 S.W.2d 841, 844 (1946); *see also Wilson v. Klein,* 715 S.W.2d 814, 822 (Tex.App.-Austin 1986, writ ref'd n.r.e.) ("Generally speaking, it is a prerequisite to the equitable remedy of specific performance that the buyer of land shall have made an actual tender of the purchase price ... [unless] actual tender would have been a *useless act* .... " (citation omitted)). As a consequence, a plaintiff seeking specific performance, as a general rule, must actually tender performance as a prerequisite to obtaining specific performance. *McMillan v. Smith,* 363 S.W.2d 437, 442–43 (Tex.1962).

 [3]    [4]    A corollary to this rule is that when a defendant refuses to perform or repudiates a contract, the plaintiff may be excused from actually tendering his or her performance to the repudiating party before filing suit for specific performance. In such a circumstance, a plaintiff seeking specific performance is excused from tendering performance pre-suit and may simply plead that performance would have been tendered but for the defendant's breach or repudiation. *Id.; Corzelius v. Oliver,* 220 S.W.2d at 632, 634; *Burford v. Pounders,* 145 Tex. 460, 199 S.W.2d 141, 143–44 (1947). This exception to the general rule—that actual tender of performance is a prerequisite to obtaining specific performance—is grounded in the notion that actual pre-suit tender of performance should be excused when it would be a "*useless act,* an *idle ceremony,* or *wholly nugatory." Wilson,* 715 S.W.2d at 822 (*citing POMEROY, supra* ). This Court acknowledged this reasoning in *Burford:* "[I]t appears to be quite well settled that a formal tender is excused where a tender would be a useless and idle ceremony; and that a tender is also excused where defendant repudiates the contract...." 199 S.W.2d at 145 (citation and internal quotation marks omitted); *see also Regester v. Lang,* 49 S.W.2d 715, 717 (Tex. Comm'n App.1932, holding approved) (holding that tender of performance before bringing suit is not required when it would be a "vain and useless thing" given defendant's open repudiation of the contract).

 [5]    The concept of excusing pre-suit tender of performance when such tender **\*595** would be useless or futile has been recognized in Texas equity jurisprudence for over one hundred years. *Ward v. Worsham,* 78 Tex. 180, 14 S.W. 453, 453 (1890) (excusing actual tender of payment by a settler with a right to purchase school land when land at issue had already been sold to a third party and the lawsuit was a suit by the third party for possession of the land). However, even when pre-suit tender of performance is excused, a plaintiff is still obligated to plead and prove his readiness, willingness, and ability to perform at relevant times before specific performance may be awarded. *Corzelius,* 220 S.W.2d at 635; *Burford,* 199 S.W.2d at 144; *17090 Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 256 (Tex.App.-Dallas 2002, pet. denied); *Chessher v. McNabb,* 619 S.W.2d 420, 421 (Tex.Civ.App.-Houston [14th Dist.] 1981, no writ); *Hendershot v. Amarillo Nat'l Bank,* 476 S.W.2d 919, 920 (Tex.Civ.App.-Amarillo 1972, no writ). The rule relating to excusing pre-suit tender of performance together with its corollary that a plaintiff must plead and prove readiness, willingness, and ability to timely perform before specific performance may be awarded was succinctly stated in *Hendershot v. Amarillo National Bank:* "One of the essential equitable elements in obtaining a decree of specific performance is that the party seeking the decree must plead and prove that he is ready, willing and able to perform, even though a tender of the purchase price may be excused." 476 S.W.2d at 920 (citing *Corzelius,* 220 S.W.2d at 635; *Burford,* 199 S.W.2d at 143–44). As one treatise explains, "[a]lthough a repudiation [by the defendant] usually will excuse the plaintiff from actually tendering performance, courts require that the plaintiff demonstrate his own readiness, willingness, and ability to perform on the date set by the contract before ordering the defendant to perform." EDWARD YORIO, CONTRACT ENFORCEMENT: SPECIFIC PERFORMANCE AND INJUNCTIONS § 6.4, at 144–45 (1989) (citation omitted).

In this case, the only questions submitted to the jury relating to the breach of the purchase contract were:

 (1) Did Lawler fail to comply with the contract?

 (2) Did Di[G]iuseppe fail to comply with the contract?

The jury answered "Yes" as to Lawler and "No" as to DiGiuseppe. Neither party requested a question as to whether DiGiuseppe was ready, willing, and able to perform at the relevant time. Nor did either party object to the omission of such a question. Consequently, there is no finding of fact in this case or objection to a lack of a finding of fact with respect an essential element of specific performance —that DiGiuseppe was ready, willing, and able to perform at relevant times. Notably, the evidence on DiGiuseppe's readiness and ability to perform—all from the testimony of DiGiuseppe—was equivocal and conflicting. DiGiuseppe

testified that he did not have the funds to close at the time originally specified by the purchase contract, or any written commitments from third parties to fund the closing at that time, and that he could not close. [8] He later testified that he "had the **\*596** means to close the contract." [9]

[6] When contested fact issues must be resolved before a court can determine the expediency, necessity, or propriety of equitable relief, a party is entitled to have a jury resolve the disputed fact issues. *See State v. Tex. Pet Foods, Inc.,* 591 S.W.2d 800, 803 (Tex.1979) (holding that litigant has a right to have ultimate issues of fact submitted to a jury in an equitable action); see also *Hollywood Park Humane Soc'y v. Town of Hollywood Park,* 261 S.W.3d 135, 139 (Tex.App.-San Antonio 2008, no pet.) ("[W]e recognize that the right to a jury trial extends to material, disputed issues of fact in equitable proceedings."); *Casa El Sol–Acapulco, S.A. v. Fontenot,* 919 S.W.2d 709, 715–16 (Tex.App.-Houston [14th Dist.] 1996, writ dism'd by agr.); *see also* WILLISTON ON CONTRACTS, *supra,* § 67:15, at 237 ("A trial court's finding in a specific performance action regarding a purchaser's financial inability to purchase involves a factual issue."). Lawler did not concede or stipulate in the trial court that DiGiuseppe was ready, willing, and able to perform. The issue was disputed and it was an issue on which DiGiuseppe —as the party seeking specific performance—had the burden of proof. *Corzelius v. Oliver,* 148 Tex. 76, 220 S.W.2d 632, 634 (1949); *17090 Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 256 (Tex.App.-Dallas 2002, pet. denied); *Hendershot v. Amarillo Nat'l Bank,* 476 S.W.2d 919, 920 (Tex.Civ.App.-Amarillo 1972, no writ).

[7] [8] DiGiuseppe does not raise an issue with respect to the state of the applicable law, but contends that the parties' contract alters the manner in which the law applies to this case. He concedes that he did not request a finding by the jury on the issue of whether he was ready, willing, **\*597** and able to perform under the terms of the purchase contract. He complains that the court of appeals misinterpreted and misapplied the remedy provisions of the purchase contract. He argues that, because the parties had agreed in the purchase contract that one of his available remedies would be to seek to enforce specific performance, he had a right to specific performance in the event Lawler breached or defaulted on the contract without the need for any further proof. According to DiGiuseppe, the only *material* disputed fact issue—by virtue of the language of the remedy provision in the contract —is whether Lawler failed to comply with the contract. Consequently, the finding by the jury against Lawler on this point is sufficient, DiGiuseppe contends, to trigger his right to specific performance regardless of whether he had shown that he was ready, willing, and able to perform. DiGiuseppe's basic contention is that the remedy provisions of the purchase contract negate or waive the requirement under Texas law that he prove his readiness, willingness, and ability to perform as a condition to obtaining specific performance. [10]

Lawler responds that specific performance was not automatic under the purchase contract in the event he defaulted. He asserts that the purchase contract's reference to DiGiuseppe having the right to "seek to enforce" specific performance does not equate to a right to automatically receive specific performance. Rather, he argues, the remedy provision is no more than a contractual acknowledgment between the parties that specific performance would be an available remedy for DiGiuseppe in the event of a default by Lawler, and it did not eliminate or waive the requirement that DiGiuseppe demonstrate that he is entitled to specific performance under the law. Lawler contends that the "may ... seek to enforce" language expresses the parties' intent that specific performance would be an available remedy in the event of breach—as distinct from an action for damages, recission, or other remedy—*if* DiGiuseppe can show that he meets the requirements for the grant of specific performance.

We agree with Lawler and the court of appeals that the remedy provision at issue here does not entitle DiGiuseppe to obtain specific performance merely upon a showing of a breach or default by Lawler. The provision at issue limits the available remedies to either (1) terminating the contract and receiving a refund of earnest money, or (2) seeking to enforce specific performance. It does not in any way alter the requirements for obtaining specific performance in the event DiGiuseppe decides **\*598** to seek such a remedy. The provision states only that DiGiuseppe "may, at [his] option, ... seek to enforce specific performance of [the] Contract." This language does not speak to altering the legal requirements for obtaining specific performance. Nor does it purport to make obtaining specific performance automatic in the event of a default or breach by Lawler.

To the contrary, the provision plainly grants DiGiuseppe only the right to "seek to enforce" specific performance, leaving open the possibility that he may seek to enforce it, but be unable to do so. The unambiguous language of the provision makes two remedies available to DiGiuseppe in the event of a default by Lawler, and in effect excludes all others. One of those remedies is specific performance.

It is available as a remedy, but nothing in the provision suggests DiGiuseppe is relieved of his obligation to prove he is entitled to it under the law. Therefore, we construe the provision in the purchase contract limiting DiGiuseppe's remedies in the event of a default by Lawler to neither waive nor negate DiGiuseppe's obligation to plead and prove all essential elements under Texas common law for obtaining specific performance, including that he was and is ready, willing, and able to perform under the contract.

 **[9]**   As an alternative basis for relief, DiGiuseppe argues that the omitted jury finding as to his readiness, willingness, and ability to perform may be deemed found in his favor pursuant to Texas Rule of Civil Procedure 279. His theory is that specific performance was at least partially submitted to the jury in the form of a question regarding his compliance with the contract, and Lawler failed to object to the omission of a "ready, willing, and able" question. We agree with the court of appeals that a deemed finding under Rule 279 is not available here.

If no element of an independent ground of recovery that is not conclusively established by the evidence is included in the charge without request or objection, the ground of recovery is waived. TEX. R. CIV. P. 279. As we have noted, DiGiuseppe did not conclusively establish his claim for specific performance from an evidentiary standpoint. Under Rule 279, if at least one element of an independent ground of recovery was submitted to the jury and is "necessarily referable" to that ground of recovery, an omitted finding that is supported by some evidence shall be deemed found by the court in such a manner as to support the judgment. *Id.* DiGiuseppe contends that the submission of a question as to whether he complied with the contract is the submission of at least one of the elements of a claim for specific performance and is necessarily referable to that ground of recovery. However, as the court of appeals pointed out, DiGiuseppe's compliance with the contract is neither essential nor necessarily referable to his request for specific performance. As discussed previously, DiGiuseppe's tender of performance under the contract could have been excused due to Lawler's breach without altering in any way DiGiuseppe's obligation to prove that he was and is ready, willing, and able to perform. Whether DiGiuseppe complied with the contract or was excused from complying with the contract, he would still be required to prove that he was ready, willing, and able to perform to obtain specific performance. Therefore, the question as to his compliance

with the contract, without more, is not "necessarily referable" to specific performance as a ground of recovery.

Moreover, the question submitted to the jury as to DiGiuseppe's compliance with the contract addressed Lawler's breach of **\*599** contract claim against DiGiuseppe. As the Houston Court of Appeals articulated in *Superior Trucks, Inc. v. Allen*:

> The purpose of the "necessarily referable" requirement in Rule 279 is to give parties, against whom issues are to be deemed, fair notice of a partial submission, so that they have an opportunity to object to the charge or request submission of the missing issues to the ground of recovery or defense. Once a party is on notice of the independent ground of recovery or defense due to the existence of an issue "necessarily referable" thereto, if that party fails to object or request submission of the missing issues, he cannot be heard to complain on appeal, as he is said to have consented to the court's findings on the missing issues.

664 S.W.2d 136, 144 (Tex.App.-Houston [1st Dist.] 1983, writ ref'd n.r.e.). The existence of the question relating to Lawler's claim for breach of contract, standing alone, did not give Lawler fair notice of a partial submission of a claim by DiGiuseppe for specific performance such that Lawler should have known to object to a missing question regarding DiGiuseppe's readiness, willingness, and ability to perform. Pursuant to Rule 279, the question regarding DiGiuseppe's compliance with the contract, therefore, is not necessarily referable to an omitted question relating to DiGiuseppe's readiness, willingness, and ability to perform. DiGiuseppe had the burden to prove that he was ready, willing, and able to perform. He also had the obligation to request a question on this issue. He did not. Rule 279 does not operate to shift the burden to Lawler to request such a jury question regarding specific performance or to object to its absence under these circumstances.

### III. Tender of Performance vs. Readiness, Willingness, and Ability to Perform

[10] The dissent argues that a non-breaching plaintiff seeking specific performance satisfies the requirement of showing he is ready, willing, and able to perform by simply offering to perform in his pleadings as opposed to actually proving to the finder of fact that he is and was—in fact—ready, willing, and able to perform. [11] This conflates two distinct concepts: (1) the tender (or offer) of performance and (2) the proof that one has actually been ready, willing, and able to perform. As noted above, in circumstances where a defendant has not repudiated or refused to perform, the law requires a plaintiff seeking specific performance to show both that he was ready, willing, and able to perform at the relevant time *and* that he tendered that performance. These two requirements are not the same thing. One can be perfectly capable of performing contractual obligations and yet not tender or offer that performance. Likewise, a party could very well tender or offer performance, but not be capable of performing. Offering to perform does not establish the ability to perform, nor does having the ability to perform demonstrate a tender of that ability. The law requires a demonstration of both before specific performance may be awarded unless the requirement of tender is excused.

It is entirely reasonable for the law to distinguish between tender of performance and ability to perform when providing the remedy of specific performance. For example, it is sensible to excuse pre-suit tender of performance if it would be useless or if it has been frustrated by the **\*600** defendant, such as in cases of repudiation by the defendant or an open declaration of a refusal to honor the contract by the defendant. A plaintiff need not actually tender performance when the defendant has repudiated his own obligations. Otherwise, the plaintiff would be required to go further than the defaulting defendant to obtain specific performance. On the other hand, ordering specific performance without requiring the plaintiff to show that he was capable and willing to perform at the time required by the contract grants the plaintiff more than he is entitled to under the contract. A plaintiff's pleading that he *is* ready, willing, and able to perform at the time the lawsuit is filed says nothing about whether he *was* ready, willing, and able to perform at the time required by the contract. A plaintiff who could not arrange funding in time for closing may be able to marshal all the funds he needs by the time he files pleadings in a lawsuit for specific performance.

[11] The dissent's view that merely pleading an offer to perform at the time the lawsuit is filed satisfies or replaces the need to demonstrate the ability to perform at the relevant time would essentially rewrite the parties' contract. It would,

in effect, eliminate the plaintiff's contractual obligation to be capable of performance at the time the contract required, and grant the plaintiff the option to enforce the contract at any time he might become capable of performing before limitations runs. A defendant's breach or repudiation should not alter the contract and give the non-breaching party a contract different from what he had. The plaintiff must prove that he was ready, willing, and able to perform his obligations when they came due. Otherwise, he would be able to take unfair advantage of the defendant by requiring the defendant's performance without showing that he also could and would have performed as required by the contract.

[12] [13] A standard requiring proof of ability to perform, rather than a mere pleading to that effect, is essential to serving the interest of equity underlying the remedy of specific performance. Allowing a plaintiff to simply plead a willingness to tender is no substitute for requiring him to produce evidence showing that he was ready, willing, and able to perform his contractual obligations at the relevant time. Whether a plaintiff was ready, willing, and able to perform his contractual obligations when they came due, and would have done so but for the defendant's breach or repudiation is a question of fact. A fact cannot be proved by a controverted pleading. The pleading simply puts the matter at issue. [12] In this case, DiGiuseppe alleged in pleadings that he "was ready, willing and able to [fund the purchase of property from Lawler] on March 3, 2000," the date DiGiuseppe says his obligation to do so was triggered. The evidence on the subject was conflicting, and the jury was not asked to resolve the dispute. The dissent would hold that DiGiuseppe's pleading was all he needed, that a plaintiff satisfies the need to establish a relevant fact by alleging the truth of the fact. If allegations were the equivalent of proof, there would be no need for trials. The equivocal and conflicting evidence as to DiGiuseppe's ability to close illustrates one of the problems with the dissent's view. What if the evidence establishes that a plaintiff could not and cannot perform? Under the dissent's theory, such a plaintiff would be awarded specific performance based solely on his pleading even if he, in **\*601** fact, could not and cannot perform. Without proof that he could perform as required by the contract, the plaintiff gets more than he bargained for—an inequitable result. Without proof that he can perform at the time of the award, the award is pointless.

By combining the pleading and proof requirements, the dissent would nullify the proof requirement and encourage gamesmanship. A purchaser who lacked funds to close a

transaction when called for in a contract could later compel performance by a seller who balked. A seller who is unable to deliver title at the agreed time for closing could later compel performance by a remorseful buyer. If a plaintiff was, in fact, unable to perform at the relevant time, a defendant's breach or repudiation is harmless and equity should not provide a remedy in such a situation. The law does not and should not allow pleading readiness, willingness, and ability to perform to substitute for proof of that fact.

The dissent's view is unique. There is no Texas case that has adopted such a rule and we have found none in any other jurisdiction. The dissent's discussion of the Texas cases that have addressed the issue raised by the dissent —*Burford, Corzelius, Parkway, Chessher,* and *Hendershot*— fails to distinguish between pleading tender of performance and proving readiness, willingness, and ability to perform. This distinction is crucial. In each of these cases, *pre-suit tender of performance* was excused due to a repudiation or breach by the party against whom specific performance was sought. None of the cases hold that the repudiation or breach relieved the party seeking specific performance from the obligation to prove readiness, willingness, and ability to perform. Each of these cases is entirely consistent with the rule that a plaintiff seeking specific performance must plead and prove (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation, and (2) the readiness, willingness, and ability to perform at relevant times. [13]

The seminal case of *Burford v. Pounders,* upon which later cases rely, illustrates the point. 145 Tex. 460, 199 S.W.2d 141, 141–42 (1947). Beaird leased land to Burford, with an option allowing Burford to purchase the property for $ 1000, less the rent paid. Beaird ignored the option to purchase and, five months before the lease expired, sold the property to Pounders, who was aware of Burford's lease. *Id.* at 142. According to an undisputed finding by the trial court, Burford was not in a position at the time of the sale to Pounders to exercise his option to purchase the property. *Id.* at 143. Neither Beaird nor Pounders told Burford of the sale. Two months before the lease expired, Burford attempted to exercise his option and tendered $950 to Beaird, which Beaird refused. *Id.* at 142–43. Burford sued for specific performance and the case was tried to the bench. Because he did not know of the sale, Burford did not make any tender of performance on the option at the time of the sale. However, the lease **\*602** did not specify when the option was to be exercised and the trial court did not find that Burford had failed to invoke

his purchase right within a reasonable time. *Id.* at 145. The Court in *Burford* noted with approval the accepted general rules of equity relating to specific performance, stating that a plaintiff "ordinarily is entitled to specific performance where he alleges *and proves* that he ... is ready, able and willing to perform." *Id.* at 144 (emphasis added). The Court agreed that "it was not incumbent on Burford *to make a tender* in the matter of exercising his option within a reasonable time after learning of the sale, but that *it was sufficient for him to offer to do equity in this pleadings." Id.*(emphasis added). The Court then held that since Beaird had repudiated the purchase option by selling to Pounders, *a tender* to Beaird by Burford was unnecessary. *Id.* at 145. At no point did the Court hold or suggest that proof by Burford of readiness, willingness, and ability to perform was unnecessary or waived by Beaird's actions. Burford was required to prove that he was ready, willing, and able to exercise his option to purchase, but because the parties had not specified a deadline for exercising the option, Burford was not required to prove his ability to perform at the time of the illicit sale to Pounders.

*Burford* makes two things clear: (1) pleading an offer to perform is in lieu of tender; and (2) adducing proof that a plaintiff was ready, willing, and able to perform, as required by the pertinent authorities constitutes an entirely separate requirement from tender. This distinction is consistent with available authorities on the subject and has been consistently followed by Texas courts. The dissent reads the statements in Burford as confusing, but we do not. *Burford* was required to prove he was ready, willing, and able to perform, and he did so. The issue in the case was whether Burford would have to show he was ready, willing, and able to perform at the time of the sale to Pounders, or within a reasonable time. The lower courts held that Burford was required to show his capacity to perform at as of the time of the sale to Pounders—a point at which it was undisputed Burford was not in a position to perform. This Court held that, because there was no deadline in the lease for the purchase option, Burford could meet his burden by showing the ability and willingness to perform within a reasonable time for exercising his option. Burford made this showing.

The dissent also reads *Corzelius* as confusing and seeks to distinguish its holding by reference to the contractual period for performance in the contract at issue in the case. We view *Corzelius* as completely consistent with *Burford* and the other authorities cited above which point out the distinction between tender of performance and proof of ability to perform. The fact that Corzelius needed to show the ability

to perform at any point in a contractually agreed time frame does not alter the fact that he needed to show the ability to perform as required by the contract. How such proof could be made rather than whether it must be made was at issue in *Corzelius.* The Court rejected the claim that Corzelius was obliged to produce binding commitments for financing in order to raise an issue of fact. The Court was careful to note other competent evidence in the record, including evidence showing the value of the property he sought to purchase via a mortgage and testimony from a bank officer and his brother on their willingness to lend money for the purchase, as evidence supporting a finding that Corzelius was in a position to perform per the contract. *Corzelius v. Oliver,* 148 Tex. 76, 220 S.W.2d 632, 635–36 (1949).

 **\*603**  The dissent also argues that policy considerations weigh in favor of its view because non-breaching buyers would be put at a disadvantage by having to demonstrate at the time of the lawsuit that they were capable of performing as called for by the contract. However, this overlooks the fact that if the buyer was not able to perform his obligations as required by the contract, the breach by the seller did no harm. From an equitable standpoint, it would be unfair to reward the buyer with a result that he could not have achieved—specific performance at a later date based on later acquired capability —simply because of a breach by the seller.

All of the language relied on by the dissent from *Parkway, Chessher, Hendershot,* and *Regester v. Lang,* as suggesting that a pleading alone is sufficient to satisfy part of the plaintiff's burden, refers to tender of performance when the defendant has repudiated. None of the cases stand for the proposition that merely pleading readiness, willingness, and ability to perform is sufficient to obtain an award of specific performance. The dissent's theory merges the concepts of tender of performance and proof of ability to perform. The cases do not. The dissent's view is inconsistent with established case law and would be unique to equity jurisprudence.

### IV. Refund of Earnest Money

 **[14]**   DiGiuseppe argues that if the judgment in his favor for specific performance is reversed, he should be allowed to seek recovery on his alternative remedy under the purchase contract of termination and recovery of earnest money he paid. We agree. The court of appeals held that DiGiuseppe waived this option by failing to file a notice of appeal on the

issue. However, this Court has held that a litigant who has obtained a favorable judgment and has no reason to complain in the trial court is not required to raise an issue regarding an alternate ground of recovery until an appellate court reverses the judgment. *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex.1988). Consequently, DiGiuseppe was not required to raise his alternate theory of recovery until the judgment in his favor about which he had no complaint was reversed. *Id.* As soon as he was aware of the reversal of the judgment by the court of appeals, DiGiuseppe raised the issue of his alternative ground for recovery both in the court of appeals and in this Court. The issue is not waived. Since it has been determined on appeal that DiGiuseppe is not entitled to specific performance as awarded by the trial court, he should be allowed to present his alternative ground for recovery to the trial court for a determination in the first instance as to whether he should recover under that alternative theory.

### V. Conclusion

We affirm the holding of the court of appeals that the contract at issue in this case does not alter DiGiuseppe's obligation to prove and secure a finding of fact that he was ready, willing, and able to perform his obligations under the purchase contract as a prerequisite to obtaining the equitable relief of specific performance. In affirming this part of the court of appeals' judgment, we hold that an essential element in obtaining the equitable remedy of specific performance is that the party seeking such relief must plead and prove he is ready, willing, and able to timely perform his obligations under the contract. We also affirm the holding of the court of appeals that such a finding cannot be deemed based on the jury charge as submitted under Rule 279. Finally, we reverse the court of appeals's holding that DiGiuseppe waived his claim to the alternate ground of recovery under the purchase contract relating  **\*604**  to refund of the earnest money, and hold that he should have an opportunity to present this claim to the trial court for disposition. Accordingly, we affirm the judgment of the court of appeals in part, reverse in part, and remand the cause to the trial court for further proceedings consistent with this opinion.

Justice GREEN filed a dissenting opinion, in which Chief Justice JEFFERSON, Justice O'NEILL, and Justice JOHNSON joined.

Justice MEDINA took no part in the decision of the case.

Justice GREEN, joined by Chief Justice JEFFERSON, Justice O'NEILL, and Justice JOHNSON, dissenting.

The Court requires an innocent buyer, otherwise excused from his contractual obligations by the seller's breach, to nevertheless prove, in a suit for specific performance, that he could have fully performed those obligations had the seller not breached. 269 S.W.3d at 590. This makes no sense for at least two reasons. First, it provides the breaching seller information he was not entitled to under the contract. A seller entering into a real estate transaction is rarely entitled to know the details of how the buyer intends to finance the transaction. At closing, the buyer will either perform or not, and in the latter event, the contract will provide remedies for the breach. But if the seller breaches the contract before closing and the buyer sues to enforce the deal, the Court now says the buyer must prove to a fact-finder, at a trial many months or years after the sale was originally supposed to close, that he was, at the time specified by the contract, "ready, willing, and able" to perform. *Id.* at 590. To do this, the innocent buyer will necessarily be required to reveal his plan for financing the transaction—information a seller generally would not be privy to under agreed contract terms.

Second, and perhaps most important, the Court's holding makes no sense because a finding that the buyer was ready, willing, and able to perform at the closing time specified in the contract is irrelevant. Although the Court does not say what the trial court is supposed to do with such a finding, presumably it would order a date for the transaction to close within a reasonable time. But what if the buyer was able to close on the original contract date and is unable to close on the court-appointed date? The whole exercise is rendered meaningless. The only thing that makes sense is to do precisely what the trial court did in this case, which is to set a closing date within a reasonable time after a finding that the seller breached. While it is true that the buyer might gain some benefit by getting a reprieve from the original contract closing date, it is just as likely, particularly in light of today's troubled financial times, that he will be worse off and be unable to close. But at least this has the virtue of being meaningful and of not placing impractical burdens on an innocent party, both features that are lacking in the Court's rule.

The Court's holding will also tend to severely limit or eliminate specific performance as a viable remedy for a seller's breach of a real estate contract. In large transactions, it is doubtful that many non-breaching buyers would be willing to subject themselves and/or their investors to open discovery of financial portfolios on the question of whether the buyer was sufficiently capable of purchasing the property at the time required by the contract. Unscrupulous sellers will be virtually immunized from the penalty of specific performance, the most severe consequence of breaching a contract of sale, and disorder will be the order of the day in volatile real **\*605** estate markets. Because the Court's holding lacks common sense and adheres to a misreading of our precedents, I respectfully dissent. [1]

I agree with the Court that it has long been part of the jurisprudence of this state that, to obtain the equitable remedy of specific performance, a party must show himself to have been "ready, willing, and able" to timely perform his obligations under the contract being enforced. *See* 269 S.W.3d at 593; *see also Ratcliffe v. Mahres,* 122 S.W.2d 718, 721–22 (Tex.Civ.App.-El Paso 1938, writ ref'd) (quoting 4 JOHN NORTON POMEROY, JR., A TREATISE ON EQUITY JURISPRUDENCE § 1408, at 2779 (3d ed.1905)). But it has likewise been a long-standing Texas rule that a non-breaching plaintiff seeking specific performance need only make such a showing by offering to perform in his pleadings. *Burford v. Pounders,* 145 Tex. 460, 199 S.W.2d 141, 144 (1947). The Court's insistence that a party seek and obtain a jury finding that he is ready, willing, and able to perform before being entitled to the remedy departs from that rule.

Specific performance is an equitable remedy that rests in the sound discretion of the trial court. *Kress v. Soules,* 152 Tex. 595, 261 S.W.2d 703, 704 (1953); *Am. Apparel Prods., Inc. v. Brabs, Inc.,* 880 S.W.2d 267, 269 (Tex.App.-Houston [14th Dist.] 1994, no writ). Generally, to be entitled to specific performance, a party must prove that it has complied with all the contract's terms. *Glass v. Anderson,* 596 S.W.2d 507, 513 (Tex.1980). When a seller breaches a real estate contract, however, we have long held that the buyer need not actually tender the purchase price in order to seek specific performance. *Ward v. Worsham,* 78 Tex. 180, 14 S.W. 453, 453 (1890).

> The practice in equity in similar cases is not to require a tender or a payment into court of the purchase money.... When [the buyer] pleads his right he should offer to pay, and the court, if judgment should be given for him, should decree a payment within a reasonable time, and that, in default of

a compliance, his right should cease and be determined.

*Id.* This has remained the law in Texas for well over 100 years, as the Court recognizes. *See* 269 S.W.3d at 594. Until today, however, the Court has not required a non-breaching buyer to make the "useless and idle" showing of proof of ability to complete the transaction when the seller's repudiation of the contract excused the buyer from tendering the purchase price. *See Burford,* 199 S.W.2d at 145.

The issue of a party's own performance as a condition to obtaining specific performance is a matter to be contemplated by the trial court's judgment, not the jury's verdict. *See Regester v. Lang,* 49 S.W.2d 715, 716–17 (Tex. Comm'n App.1932, holding approved) (holding it was reversible error for a defendant to argue to the jury that the plaintiff had not paid the purchase money into the court registry, and that specific performance might result in the defendant delivering his property **\*606** without being paid). "It is sufficient if [the party seeking specific performance] is ready and willing and offers to perform in his pleadings." *Id.* at 717. To require anything more would be futile because, as this Court recognized in *Regester,* the buyer "would be required under a proper decree of specific performance to pay this sum before he could obtain any interest" in the property. *Id.*

We reiterated these principles in *Burford v. Pounders,* instructing that when a seller has refused to perform and the buyer's tender would be futile, "the material consideration is that [the buyer] offered in his pleadings to do equity," and nothing more is required. 199 S.W.2d at 145. The plaintiff Burford was a tenant in possession with an option to buy under a right of first refusal. *Id.* at 141–42. The lessor, ignoring Burford's option, conveyed the property to defendant Pounders. *Id.* at 142. Two months after the sale, Burford attempted to exercise his option, eventually seeking specific performance. *Id.* at 142–43. Burford would not have been able to make payment at the time of the sale to Pounders, but would have been able to pay two months later. *Id.* at 143–44. Because Burford had to exercise the option to buy within a "reasonable time," the issue in the case was whether Burford was required to tender performance within a reasonable time of learning of the sale to Pounders, or whether it was sufficient for Burford to later offer to perform in his pleadings. *Id.* at 144–45. Citing *Regester,* we again emphasized that all that was necessary in such a case is that the party seeking specific performance be ready and willing and offers to perform *in his pleadings. Id.* at 144 (citing *Regester,* 49 S.W.2d at 717). And when a party offers in his pleadings to do equity, "[t]he *only*

matter remaining to be done by the trial court is to direct that payment be made" and that the sale be completed, awarding the purchaser judgment for title. *Id.* at 145 (emphasis added).

One statement in *Burford,* however, appears to have given rise to the confusion of the lower courts on this issue. Quoting from Corpus Juris, the Court in *Burford* stated that a "complainant ordinarily is entitled to specific performance where he alleges *and proves* that he ... is ready, able, and willing to perform." *Id.* at 144 (quoting 58 C.J. *Specific Performance* § 316 (1932)) (emphasis added). After citing that general rule, though, the Court went on to explain the exception that excuses tender for non-breaching buyers, citing additional Corpus Juris sections and comments:

> [Regarding a specific performance suit brought by a purchaser, under a footnote to section 342], it is stated that "In Texas" an actual tender "is not necessary where the purchaser pleads and proves a willingness to pay, but is entitled to relief provided that, within a time fixed in the decree, he shall pay the amount due".... In section 348 it is stated that "whatever difference of opinion may exist as to the original necessity of a tender of the consideration before suit, ... it appears to be quite well settled that a formal tender is excused where a tender would be useless and idle ceremony"; and that a "tender is also excused where defendant repudiates the contract"; and further that "tender in pleadings (is) sufficient" where plaintiff sets forth that he is ready, able and willing "or ... pays the consideration into the court." In section 349, ... it is stated that "the necessity of tender is dispensed with where defendant repudiates the contract, or makes any declaration which amounts to a repudiation...." In the following section (350) it is stated that "if a tender of the purchase price or other sums before suit **\*607** is necessary, it is excused where the vendor or seller has put it out of his power to perform, as where he has conveyed the property ... to a third person."

*Id.* at 144–45 (emphasis removed). The Court never returned to any discussion of the general rule that requires proof of ability to pay, instead holding that the seller defaulted and repudiated by selling the property to Pounders. *Id.* at 145. For a non-breaching buyer, "[t]he material consideration is that [he] offer[s] in his pleadings to do equity." *Id.* The court emphasized this rule with italics: "[A]ll that is required in such case is that the plaintiff place himself in favor with the court, *and this may be done by a proper offer in the pleadings.*" *Id.* at 143 (quoting 49 Am.Jur. *Specific Performance* § 144, at 167 (1943)) (italics in original). Because Burford had made the sufficient showing by offering

in his pleadings to do equity, the Court held that Burford was entitled to specific performance. *Id.* at 145. The Court later confirmed that holding, saying that *Burford* adopted the substance of the rule that "if, because of defects in the vendor's title, which he fails or refuses to cure, ... a tender of performance by the vendee would be a useless act ..., his failure to make such tender will not preclude in his behalf the equitable relief of specific performance, at least where he tenders performance in his bill or petition." *McMillan v. Smith,* 363 S.W.2d 437, 442–43 (Tex.1962) (quoting 79 A.L.R. 1240).

Although the Court claims *Burford* holds that a non-breaching plaintiff is required to prove he was ready, willing, and able to perform, and somehow distinguishes between tender and proof of ability to pay, the Court misrepresents the rule in that case. In *Burford,* the Court held that when a seller repudiates the contract, tender is excused and "all that is required" is that the plaintiff offer to do equity, which can be done in the pleadings. 199 S.W.2d at 143. *Burford* does not support the Court's new rule, and neither do the other cases relied on by the Court.

The Court cites *Corzelius v. Oliver,* another case involving the buyer's ability to pay within a contractual time limit for exercising an option. 148 Tex. 76, 220 S.W.2d 632, 633 (1949). In *Corzelius,* the plaintiff had a one-year option to reacquire lands conveyed to his ex-wife as part of a divorce settlement. *Id.* Although the plaintiff attempted to exercise the option, his ex-wife (the defendant) refused because she objected to his source of financing, and eventually a jury found for the plaintiff. *Id.* at 633–34. At trial, one of the issues before the jury was whether the plaintiff could have made payment within the one-year time limit contemplated by the contract. *Id.* at 634. The jury found that, but for the defendant's actions, such a payment could have been timely made. *Id.* On appeal, the only issue was the defendant's contention that "there was no evidence to show that Corzelius was ready and able to perform within the time limit of the option." *Id.* In addressing that point, the Court noted that "it would appear but reasonable" for Corzelius to show that he could have performed under the agreement, *id.* at 635, and then detailed the evidence to conclude that there was at least some evidence to support the jury's finding in that regard. *Id.* Certainly, taken alone, this part of *Corzelius* could arguably support an interpretation that proof of the ability to pay is an appropriate subject for a fact-finder's consideration in a specific performance case. But such a reading is not accurate and has given rise to confusion in the lower courts.

Contrary to the Court's conclusion, *see* 269 S.W.3d at 693, nowhere does *Corzelius* indicate that a non-breaching buyer, under a non- **\*608** option contract, must prove ability to perform at the time specified in the contract when tender of payment is excused. *Corzelius* is distinct from the non-option contract case because the timing of the buyer's ability to pay was relevant to whether the buyer had exercised his option to purchase and therefore the seller had an obligation to convey the property. Even when a buyer must show ability to pay, a buyer need not show a firm financing commitment to be entitled to specific performance, but need only put on evidence of his financial capacity and creditworthiness. *Corzelius,* 220 S.W.2d at 635 (recognizing that financing sources would probably be reluctant to execute a commitment for financing to complete a sale of lands the owner had decided not to convey). Notwithstanding the evidence offered at trial and the jury's finding, "Corzelius [was not] bound to do more here than make the tender which was contained in his pleadings." *Id.*

It appears that misreading of the brief statements in *Burford* and *Corzelius* led courts of appeals to rule erroneously that a plaintiff seeking specific performance must always prove to a fact-finder that he is ready, willing, and able to perform under the contract. *See 17090 Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 256 (Tex.App.-Dallas 2002, pet. denied); *Chessher v. McNabb,* 619 S.W.2d 420, 421 (Tex.Civ.App.-Houston [14th Dist.] 1981, no writ); *Hendershot v. Amarillo Nat'l Bank,* 476 S.W.2d 919, 920 (Tex.Civ.App.-Amarillo 1972, no writ). Those cases did not offer any reasoning as to why proof before a fact-finder is necessary even though actual tender is excused when a seller has breached. On this point, *17090 Parkway* simply cites *Chessher* and *Hendershot.* 80 S.W.3d at 256. *Chessher* cites only *Hendershot.* 619 S.W.2d at 421. *Hendershot* cites only this Court's decisions in *Burford* and *Corzelius* without any analysis and without recognizing that those cases involved option contracts containing conditions precedent to the seller's obligation to convey the property. *See* 476 S.W.2d at 920. *Hendershot's* misreading of *Burford* and *Corzelius* therefore resulted in repeated error in the courts of appeals, which now repeats itself in this Court, eclipsing the long-standing rule that a party seeking specific performance need only offer to perform in its pleadings.

Lawler cites a number of cases in support of his position that ability to pay must be proven at trial, but I am not persuaded that such a rule exists in Texas. [2] As already discussed, the cases requiring proof of ability to pay at trial are perpetuating *Hendershot's* erroneous reading of our opinions in *Burford*

and *Corzelius,* which did not distinguish, as the Court does, between an excused tender requirement and an unexcused requirement to prove ability to pay. The Court contends that such a distinction is "entirely reasonable," noting that a party could well offer performance but not be capable of performing. **\*609** 269 S.W.3d at 599. But when the seller's breach relieved the buyer of his obligation to appear at closing and perform as required under the contract, it may be impossible for anyone to know whether the buyer could have performed. Continued efforts to perform such as arranging financing or appearing at the scheduled closing would be useless, just as the Court recognizes that tendering payment would be. The Court erroneously concludes that ordering specific performance without requiring the non-breaching buyer to prove ability to pay at the time required by the contract "grants the plaintiff more than he is entitled to under the contract." *Id.* at 600. In fact, the opposite is true. When a contract provides for simultaneous performance by both seller and buyer, the seller must give the buyer the full opportunity to perform as provided by the contract, or face remedies for breach in cutting off that opportunity. Requiring a buyer to prove that it could have performed at a time when the seller's breach eliminated that obligation and when the subject property was under contract for sale to a third party imposes a much higher burden on the buyer than the contract requires. The seller's own breach cannot impose an extra-contractual obligation on the buyer to prove useless financing commitments. The Court contends that my view would "essentially rewrite the parties' contract" and "eliminate the plaintiff's contractual obligation to be capable of performance at the time the contract required." 269 S.W.3d at 600. In fact, it is actually the breaching seller who altered those contractual obligations when he breached the contract by agreeing to sell the property to a third party.

The Court relies on contracts treatises as support for its claim that requiring a non-breaching buyer to prove ability to pay is an entrenched rule in Texas jurisprudence. 269 S.W.3d at 593. The author of the primary treatise relied on by the Court cites law from various jurisdictions, seemingly favoring Montana and Connecticut, but the only citation to Texas law is to a case that does not mention or discuss the showing a plaintiff must make to obtain specific performance. 25 RICHARD A. LORD, WILLISTON ON CONTRACTS § 67:15, at 236–38) (4th ed.2002); *see Shuler v. Gordin,* 644 S.W.2d 446, 447–49 (Tex.1982). Edward Yorio's treatise, which states the general rule that a plaintiff must show readiness, willingness, and ability to perform, is silent on whether or how a non-breaching buyer

must make that showing. EDWARD YORIO, CONTRACT ENFORCEMENT: SPECIFIC PERFORMANCE AND INJUNCTIONS § 6.4, at 145 (1989 & Supp.2004). Yorio acknowledges the Texas rule in a footnote, however, by quoting a Seventh Court of Appeals case holding that "when the seller has conspicuously breached the contract, it is only necessary that the purchaser be ready and willing, and offers to perform within his pleadings." *Id.* at n. 10 (quoting *Abraham Inv. Co. v. Payne Ranch, Inc.,* 968 S.W.2d 518, 527 (Tex.App.-Amarillo 1998, pet. denied),* which relied on *Burford,* and also citing *17090 Parkway* ). Comment b to section 363 of the Restatement (Second) of Contracts, which addresses securing performance for an agreed exchange and states that specific performance may be refused if "performance is not secured to the satisfaction of the court," supports the long-standing Texas rule:

> The desired security can often be afforded by the terms of the order itself. If performance by the injured party is already due or will be due simultaneously with the performance of the party in breach, the order may be made conditional on the injured party's rendition of his performance....
>
>  **\*610** The question of security does not arise until the time for issuance of an order. At the pleading stage, a mere allegation by the plaintiff that he is ready and willing to perform is usually sufficient in a suit for specific performance or an injunction. Actual performance or tender is generally not required.

Restatement (Second) of Contracts § 363 cmt. b (1981). Because DiGiuseppe need only offer to perform in his pleadings to establish his entitlement to specific performance, the only disputed fact issue to be resolved by the jury was whether Lawler breached the contract. *See White v. Sw. Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983) (holding that only disputed factual issues are presented to the jury).

Aside from the doctrinal reasons for this rule, there are important policy considerations at stake here. Requiring advance proof of an ability to pay puts the breaching seller in a better position than he would have been if the deal had gone through as contemplated in the contract by allowing him greater security in the solvency of the transaction. Unless the contract provides otherwise, sellers must wait until closing to find out whether the buyer can and will actually go through with the deal. If a seller suspects that a buyer cannot perform, the seller faces a choice: (1) wait until closing to see if the buyer tenders the required payment, or (2) breach the

contract and face remedies for breach. The Court introduces the concept of harmless breach, concluding that a seller's breach "does no harm" when the seller, in advance of closing, believes a buyer will not be capable of performing under the contract and prematurely eliminates the buyer's opportunity to complete the transaction. 269 S.W.3d at 603. But such a breach, which cuts off a buyer's opportunity to show that he is in fact capable of performing at the time performance is due, is inherently harmful.

Requiring a non-breaching buyer to demonstrate ability to pay imposes a burden on buyers to secure firm funding commitments well in advance of closing and disclose funding sources, a burden that typically would not exist in transactions performed under a property sales contract. Until today, we have never required a non-breaching purchaser to put on such proof. *Cf. Corzelius,* 220 S.W.2d at 635 (explaining that it would not be necessary for a purchaser "to produce a firm commitment for an adequate loan" and recognizing that "[b]anks, insurance companies, and others loaning money would probably be reluctant to execute a commitment for a loan to complete a sale of lands which the owner had declared she would not convey"). The sale of property often becomes a complex transaction that may involve developers with many properties, numerous lenders, investors who may wish to remain confidential until closing, and other sources of cash flow that may not come together until the last minute. Sellers find out at closing whether a buyer can pay, and buyers need not choose a source of financing or secure a financing commitment until shortly before closing. *See Shuler,* 644 S.W.2d at 448 (indicating that the time for buyer and seller to show their ability to perform is at closing). I see no reason to change this state of affairs simply because a seller has, for whatever reason, breached his agreement and forced a non-breaching plaintiff to seek judicial enforcement. And, in a case such as this, in which the buyer testified that he was ready and able to close when acceptable zoning was approved and continued to be ready and able to close, equity demands no more of a non-breaching buyer.

Finally, it is entirely possible that a buyer who is ready, willing, and able to perform at the time of trial may find his **\*611** fortunes diminished by the time the closing date arrives such that he is no longer able to make payment. Just as we do not require tender of payment when it would be a "useless and idle ceremony," we cannot require a showing of ability to perform at the time of trial when it, in many cases, would be equally meaningless. *See Burford,* 199 S.W.2d at 145. The most efficient way to ensure DiGiuseppe's payment

is not to burden the fact-finder with a speculative inquiry into the buyer's finances and potential financing prospects, but rather for the trial court to set a prompt closing date, supervised by the court, during which DiGiuseppe may tender performance. Only then must DiGiuseppe prove ability to pay, by tendering the payment due. If DiGiuseppe is unable to close, Lawler will then be entitled to remedies the contract provides.

In my view, once a party has pled the remedy of specific performance with sufficient specificity, nothing else is required with regard to ability to pay. It is understood that by bringing the action (and undertaking the costs and risk involved in such litigation), the party is ready and willing to consummate the transaction should the court render judgment in its favor. Here, DiGiuseppe has done all that is required.[3] His first pleading in the trial court and his cross-petition requested the remedy of specific performance and stated that, as soon as acceptable zoning was approved, he was ready, willing, and able to satisfy his funding obligations under the contract. DiGiuseppe's pleadings indicated that he "possessed the necessary capital to move forward with the acquisition of the Property." Moreover, during trial, he testified that he was ready and able to close after March 7, 2000, the date the city council approved acceptable zoning.[4] DiGiuseppe stated that he had three homebuilders who would have funded the purchase and that "if there hadn't been another contract in place, [they] would have closed the deal." Though the Court finds DiGiuseppe's testimony "equivocal and conflicting" because DiGiuseppe did not demonstrate that would not have been able to close the transaction on his own, 269 S.W.3d at 600, I am satisfied that DiGiuseppe presented at least some evidence of his ability, with the help of investors he had secured, to tender the money required under the contract.[5] *See Corzelius,* **\*612** 220 S.W.2d at 635 (holding that a buyer is obligated to do no more than offer to perform in his pleadings, but a buyer who put on some evidence of creditworthiness and willing funding sources sufficiently established ability to pay). Contrary to the Court's suggestion, DiGiuseppe was not required to prove that he had cash in hand or that a written financing agreement was in place. DiGiuseppe offered to do equity in his pleadings, and he presented some evidence of his willingness and ability to perform under the contract. When a seller's repudiation of a contract makes the buyer's tender of payment useless and excuses that requirement, there is no principled reason to impose on the innocent buyer an obligation to establish pre-closing funding arrangements, which is not required by the contract and has never been required by this Court.

DiGiuseppe did all that is required to show that he is entitled to the remedy of specific performance. I believe that, upon the jury's finding that Lawler breached the contract and DiGiuseppe did not, the trial judge had authority to order specific performance. Because the Court holds otherwise, I respectfully dissent.

**All Citations**

269 S.W.3d 588, 52 Tex. Sup. Ct. J. 29

Footnotes

1    Hon. G. Alan Waldrop, Justice, Court of Appeals for the Third District of Texas at Austin, sitting for JUSTICE MEDINA by commission of Hon. Rick Perry, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

2    The parties contemplated a final purchase price of approximately $28 million. The written contract was initially prepared by DiGiuseppe. The signed version included a typewritten main body with a few handwritten deletions and interlineations initialed by the parties, a typewritten addendum with additional handwritten deletions and interlineations, and a two-page, handwritten addition to the addendum relating to earnest money. The contract also included an August 1999 amendment as well as exhibits describing the property and the development plans.

3    Lawler also did not close with DRHI. The failure of that transaction was the subject of separate litigation.

4    After the dispute arose, but before he counterclaimed in the lawsuit, DiGiuseppe transferred his interest in the purchase contract to a Texas limited partnership called Frisco Master Plan LP. The parties do not dispute the validity of the assignment to Frisco Master Plan LP or that Frisco Master Plan is controlled by DiGiuseppe. Therefore, for simplicity, we refer to DiGiuseppe, Southbrook Development, and Frisco Master Plan LP collectively as "DiGiuseppe."

5    The jury charge consisted of eight questions, none of which dealt with fact issues related to specific performance. In addition to the two questions on breach of the contract, Question 3 inquired as to damages for Lawler's failure to comply with the contract. Question 4 was a waiver question as to Lawler's claims (unanswered). Question 5 was the liability question on DiGiuseppe's promissory estoppel claim. Question 6 inquired as to damages relating to the promissory estoppel claim. Question 7 inquired whether DiGiuseppe performed compensable work for Lawler. Question 8 inquired as to the value of any compensable work performed by DiGiuseppe (also unanswered).

6    Lawler has not challenged this ruling.

7    The court did not address the purchase contract language whereby each of the parties expressly waived any claims for damages.

8    The following exchange occurred during examination by Lawler's counsel:

Q. Mr. DiGiuseppe, you personally did not have the money to close this contract, did you?
A. I did not.
Q. When you assigned—when you entered into this contract, you had a right to assign it, right?
A. That's right.
Q. And so you were going to have to find a third party or parties to assign this contract in order for it to close, correct?
A. That's exactly what [Lawler] was saying.
Q. I'm just asking you. That's what had to happen, isn't it?
A. Yes.
Q. You couldn't close the contract?
A. No.
Q. How did you intend for [Lawler], then, to close this contract?
A. For [Lawler]—
Q. For you to close the contract, for you to make the purchase or for somebody to make the purchase of this contract?
A. Well, normally what I do is—dealing with a piece of property like this, I'll put it under contract, do the work, do the zoning. And through that process, I usually put together parties to be the investors in the deal. And they, then, close on the contract, and they would fund the development of the property and so on. And I would be the development arm of that entity usually.
Q. You never had any written agreement from any third parties to close this contract, did you?
A. I haven't gotten a written agreement with the parties that were going to close it with me, no. That's not the way I do business.
Q. You don't use contracts?

A. No. What I mean is if somebody tells me they are going to do something, I expect them to do it.

Q. Well, in your deposition, didn't you tell me that you felt that there would be three different home builders that might participate and provide that money to close this deal?

* * *

A. Three different home builders were going to close the deal with me, yes.

Q. But you didn't have any written agreement from them that they were going to close the deal?

A. Not a written agreement, no.

* * *

Q. When you sent the letter that said you were ready, willing and able to close this contract, you, individually, couldn't close that contract, could you?

A. I, individually, never intended to close that contract.

Q. You didn't have the funds to close the contract, did you?

A. Not personally, no.

The following exchange occurred during examination by DiGiuseppe's counsel:

Q. Mr. DiGiuseppe, you had the means to close the contract, didn't you?

A. Yes. In fact, a month later, we closed one that was $24 million.

We note that DiGiuseppe's argument on this point is not that the law does not normally require proof of readiness, willingness, and ability to perform before specific performance will be awarded, but that his contract with Lawler negated or waived this requirement by agreement. The dissent argues that DiGiuseppe was not required to prove and obtain a finding of fact that he was ready, willing, and able to perform because Texas law does not require such proof where the defendant has repudiated or breached the contract. However, this argument was not raised or briefed because it is not the position DiGiuseppe takes in the case. Ordinarily, failure to brief an argument waives the claimed error. *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 410 (Tex.1997). This rule is relaxed when fact issues are not germane to the resolution of the issue and the issue is a question of law involving constitutional ramifications. *Id.* The rule may also be relaxed where the issue is one involving fundamental error. *W.J. McCauley v. Consol. Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (1957) ("[T]he Supreme Court is authorized to and will consider fundamental error even though not assigned by the parties."). The dissent's argument is not of constitutional dimension, and, even if we agreed with this analysis, we would not view it as raising a point of fundamental error.

As noted above, *supra* footnote 10, this issue was not raised by DiGiuseppe as a point of error nor briefed by the parties.

TEX.R. CIV. P. 92 ("A general denial of matters pleaded by the adverse party which are not required to be denied under oath, shall be sufficient to put the same in issue.").

The dissent also points to the comments to section 363 of the Restatement (Second) of Contracts as supporting its position. However, section 363 deals with the issue of securing the ability to perform by a party seeking specific performance *at the time of the order granting specific performance.* RESTATEMENT (SECOND) OF CONTRACTS § 363 (1981). This section of the Restatement notes that if performance by the injured party cannot be secured to the satisfaction of the court at the time of the requested order of specific performance, specific performance may be refused. Section 363 does not address the question of whether proof of the willingness and ability to perform at the time required by the contract is a prerequisite to obtaining specific performance in any way.

In footnote 10, the Court takes the position that DiGiuseppe did not raise or argue that he was not required to prove or obtain a finding of fact that he was ready, willing, and able to perform, suggesting that such an argument should not be addressed in this dissent. 269 S.W.3d at 597. Yet that is the basis for the court of appeals' decision, ——S.W.3d ——, ——, and the Court provides exhaustive discussion on this very issue in its opinion. *Id.* at 593. In the first issue raised in his petition for review, DiGiuseppe claims that "[t]he court of appeals erred in reversing the trial court's award of specific performance to DiGiuseppe." I believe, as the Court appears to, that DiGiuseppe's issue sufficiently raised the question of whether Texas law requires such proof from a non-breaching buyer.

See *Kress,* 261 S.W.2d at 704 (recognizing that specific performance is an equitable remedy); *17090 Parkway,* 80 S.W.3d at 256 (relying on erroneous and distinguishable courts of appeals' cases, as explained above); *Lazy M. Ranch, Ltd. v. TXI Operations, LP,* 978 S.W.2d 678, 683 (Tex.App.-Austin 1998, pet. denied) (rejecting specific performance because the buyer breached the contract and had unclean hands); *Am. Apparel Prods.,* 880 S.W.2d at 269–70 (rejecting specific performance because the buyer unilaterally rescinded the contract); *Gordin v. Shuler,* 704 S.W.2d 403, 408 (Tex.App.-Dallas 1985, writ ref 'd n.r.e.) (rejecting specific performance because the buyer failed to comply with the contract terms and failed to disclose material information); *Chessher,* 619 S.W.2d at 421 (same); *Hendershot,* 476 S.W.2d at 920 (erroneously interpreting *Burford* and *Corzelius,* as explained above).

Strictly speaking, the pleadings filed by DiGiuseppe did not request the remedy of specific performance. Frisco Master Plan, the limited partnership to which DiGiuseppe transferred his interest under the contract, requested specific performance as a third-party plaintiff to the suit between DiGiuseppe and Lawler. Accordingly, the trial court's judgment granted specific performance in favor of Frisco Master Plan, not DiGiuseppe. Because DiGiuseppe was acting on behalf of Frisco Master Plan and Southbrook Development Company, I have not distinguished between these three parties for the purposes of this opinion.

DiGiuseppe testified as follows:

Q. Could you close after March 7th [the date DiGiuseppe accepted the zoning changes]?

A. Absolutely.

Q. Could Mr. Lawler close after March 7th?

A. No.

Q. Were you ready and able to close after March 7th?

A. We were.

Q. Are you ready and able to close today?

A. We are.

* * *

Q. You want to close this contract in accordance with its terms, don't you?

A. Yes, I do.

Though, as the Court points out, DiGiuseppe did not have cash in hand to personally tender payment under the contract, DiGiuseppe testified that he had secured financing sources.

Q. Now, you had no ability to close this transaction yourself, did you?

A. I, personally, was not going to close the deal myself, no.

Q. You were going to get some investors to do it, weren't you?

A. I had them.

* * *

Q.... Is there any question—I want you to tell the jury—is there any question that you have the commitments and have the money to close this deal?

A. Not at all—

* * *

Q. And can you close this deal now?

A. Yes.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Holding Limited by** [TransAmerican Natural Gas Corp. v. Powell,](#) Tex., June 19, 1991

701 S.W.2d 238
Supreme Court of Texas.

Ida E. <mark>DOWNER</mark>, Petitioner,

v.

<mark>AQUAMARINE</mark> OPERATORS, INC., Respondent.

No. C–4141. | Dec. 4, 1985.
| Rehearing Denied Jan. 15, 1986.

Wife of deceased seaman brought action for damages against shipowner. Trial court struck shipowner's answer as discovery abuse sanction and signed interlocutory default judgment as to liability. Jury trial on issue of damages was had in the 334th District Court, Harris County, Ken Harrison, J. Shipowner appealed. The Court of Appeals, [689 S.W.2d 472,](#) reversed judgment of trial court. Wife appealed. The Supreme Court, Wallace, J., held that: (1) trial court had authority under rule regarding failure of party to appear at oral deposition to strike answer of shipowner; (2) trial court correctly imposed discovery sanction of striking shipowner's answer; and (3) trial court correctly refused to admit evidence of contributory negligence.

Judgment of Court of Appeals reversed and judgment of trial court affirmed.

West Headnotes (8)

**[1]** **Pretrial Procedure**
Corporate officers, agents, and employees

President of company which was party to action was a "party" within meaning of Rule 215a(c) regarding failure of party to appear at oral deposition, where president testified he was in complete charge of all operations of the company. [Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).](#)

[27 Cases that cite this headnote](#)

**[2]** **Pretrial Procedure**

Amendment or modification

Trial court's plenary jurisdiction gives it not only authority but responsibility to review any pretrial order upon proper motion, and in doing so, it is presumed that court is familiar with entire record of case up to and including motion to be considered.

[8 Cases that cite this headnote](#)

**[3]** **Pretrial Procedure**
Striking pleadings
**Pretrial Procedure**
Dismissal or default judgment

In refusing to grant new trial and reinstate party's answer which had been struck at prior hearing on Motion for Sanctions as discovery sanction, trial court could consider evidence introduced subsequent to original sanctions hearing. [Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).](#)

[35 Cases that cite this headnote](#)

**[4]** **Appeal and Error**
Abuse of discretion

Test for whether trial court abused its discretion is whether court acted without reference to any guiding rules and principles, i.e., whether the act was arbitrary or unreasonable, and mere fact that trial judge may decide matter within his discretionary authority in different manner than appellate judge in similar circumstance does not demonstrate that an abuse of discretion has occurred.

[3513 Cases that cite this headnote](#)

**[5]** **Pretrial Procedure**
Striking pleadings
**Pretrial Procedure**
Dismissal or default judgment

Trial court correctly imposed discovery sanction of striking defendant's answer and signing interlocutory default judgment as to liability under [Rule 215a(c)(Repealed)](#) regarding failure of party to appear at oral deposition, where

shipowner voluntarily sent crew to sea rather than producing them for depositions as agreed on two occasions, attorney for wife of deceased seaman stated shipowner's attorney waited until one hour past deposition time to advise wife's attorney that wife's attorney would have to fly to another city to take depositions on following day, and shipowner failed to produce president of shipowner and immediate supervisor of captain for deposition and did not explain this failure. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

17 Cases that cite this headnote

[6] **Appeal and Error**
Sustaining challenge or excusing juror

Alleged error of trial court in refusing to strike a juror for cause did not result in harm, where challenged juror was a spare.

1 Cases that cite this headnote

[7] **Damages**
Scope of issues and questions considered

Trial court correctly refused to admit evidence of contributory negligence in trial to determine damages, where defendant's answer had been struck and default judgment rendered as to liability and defendant had no pleading to support contributory negligence.

14 Cases that cite this headnote

[8] **Appeal and Error**
Amount of recovery or extent of relief

Alleged error of trial court in awarding prejudgment interest was not presented to trial court and was thus waived on appeal.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*239** John O'Quinn, Frank M. Staggs, Jr., O'Quinn & Hagans, Houston, for petitioner.

Terry P. Ayre and Thomas A. Brown, Brown, Sims, Wise & White, Houston, for respondent.

**Opinion**

WALLACE, Justice.

This is an appeal from a judgment for damages in a suit brought under the Jones Act and under admiralty law. The trial dealt only with damages because the trial court struck the defendant's answer as a discovery abuse sanction and signed an interlocutory default judgment as to liability. The court of appeals reversed the trial court judgment, holding that the action of **\*240** that court was an error of law and an abuse of discretion. 689 S.W.2d 472. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

The issues before us are whether TEX.R.CIV.P. 215a(c), as it existed prior to the amendment effective August 1, 1984, authorized the trial court to strike defendant's answer, and, if so, whether the exercise of that authority constituted an abuse of discretion.

Edward P. Downer was a seaman aboard the vessel Four Point IV. He drowned while attempting to free a line that had fouled the vessel's propeller. Ida E. Downer, his widow, brought this action against Aquamarine Operators, Inc., the owner and operator of the vessel. The case was filed in the 151st District Court of Harris County. Both Downer and Aquamarine are residents of Harris County, Texas.

Downer filed Notice of Intent to Take the Depositions of All Members of The Crew on June 1. The notice identified each crew member, including the captain, Chester P. Dalfrey, by name only. Downer also requested depositions of the immediate supervisor of Chester Dalfrey and the custodian of Edward Downer's personnel file. On June 1, Aquamarine notified Downer that the crew was at sea and would not appear. Aquamarine at that time agreed to produce the requested persons on June 22. On June 21, Aquamarine again notified Downer that the crew was at sea and would not appear. It agreed to produce them on July 5.

Downer filed written Notice of Intent to Take Depositions of the same individuals for July 5. On that date, the requested deponents did not appear, whereupon Downer filed a Motion for Sanctions. A hearing on the Motion for Sanctions was set for August 22. Aquamarine made no appearance at the

hearing; the trial court granted the Motion for Sanctions and signed an Order Striking Aquamarine's Answer.

Downer filed a Motion for Interlocutory Default Judgment to which Aquamarine responded. The response contained Aquamarine's reasons for not producing the requested individuals for depositions and its failure to appear at the sanctions hearing.

The reason offered for the first two occasions was that work for the FOUR POINT IV was scarce and, when work was available, it was necessary to send the vessel and crew to sea rather than produce them for depositions. On the third occasion, the vessel was in port at New Iberia, Louisiana, but Coast Guard regulations required a skeleton crew to be kept aboard at all times. Aquamarine's attorney stated that he notified Downer's attorney on July 1 of the necessity to take the depositions in New Iberia. Downer's attorney stated that he first learned that the individuals would not appear as noticed when Aquamarine's attorney called him an hour after the depositions were scheduled to commence. Both agreed that Aquamarine requested that the depositions be taken in New Iberia on July 6. However, Downer's attorney stated that he could not do so because he was preferentially set for trial in Houston starting at 9:00 a.m. on July 6.

The reason given by Aquamarine for not appearing at the sanctions hearing was that Hurricane Alicia had struck La Porte, the residence of Mr. Ayres, Aquamarine's lead counsel, four days previously. Mr. Ayres was involved in cleaning up after the hurricane and mitigating the damages to his home. Also, he had a hearing set in federal court in Beaumont on the following day and was directing all of his available attention to that matter.

To his Motion to Reconsider the Sanctions, Mr. Ayres attached an affidavit from his secretary, which stated that she had called the clerk of the court on July 7, and had advised her that Mr. Ayres had to make a docket call in Angleton on August 22. She understood the clerk to say that the sanctions hearing would be reset for September 6. In response to this motion, Downer's attorney advised the court by letter of his version of the circumstances leading up to the non-appearance on July 5, and the time when he was first advised *241 that the named individuals would not appear. Attached to this letter to the court was a copy of a letter dated July 28, written by Mr. Bales, an associate of Mr. Ayres, which confirmed that the sanctions hearing was set for August 22.

With the above information before it, the trial court overruled Aquamarine's Motion to Reconsider the Sanctions and to reinstate its answer. The court signed an order granting an interlocutory default judgment as to liability. Aquamarine filed a Motion to Set Aside the Default Judgment. The motion contained practically the same information as the Motion to Reconsider Sanctions set out above. The trial court considered this motion and overruled it. On April 16, 1984, the case was preferentially set for trial for June 4, and the trial court refused to consider Aquamarine's Second Motion to Set Aside the Interlocutory Default Judgment and Reinstate Defendant's Pleadings.

A jury trial was had in a different court, the 334th District, on the issue of damages. At the trial, Chester Dalfrey testified that he was captain of the FOUR POINT IV and as such he was in complete charge of the vessel with authority over all of its operations. Mr. Clark Ivans testified that he was president of Aquamarine at all times pertinent to this case, and that as such, he was the immediate supervisor of Chester Dalfrey.

[1] We now address the issue of whether the trial court had authority under Rule 215a(c) to strike Aquamarine's answer. That rule stated in pertinent part:

> If a party or an officer or managing agent of a party, except for good cause shown, fails to appear before the officer who is to take his oral deposition ... the court in which the action is pending on motion and notice may strike out all or any part of the pleading of that party or dismiss the action or proceeding or any part thereof....

As noted above, Ivans testified that as president of Aquamarine he was in complete charge of all operations of the company. Thus he was a party as contemplated by Rule 215a(c).

[2] [3] The next question is whether the trial court, in refusing to grant a new trial and reinstate Aquamarine's answer, could consider the evidence introduced subsequent to the original sanctions hearing. Aquamarine contends that the trial court, in imposing sanctions, could consider only the evidence before it at the time of the sanctions hearing, and not any evidence subsequently produced. A trial court's plenary jurisdiction gives it not only the authority but the responsibility to review any pre-trial order upon proper

motion. In doing so, it is presumed that the court is familiar with the entire record of the case up to and including the motion to be considered. The plenary jurisdiction of the trial court in this case continued through the final judgment and overruling of Aquamarine's motion for new trial. When considering the motion for new trial, the court had before it the reasons advanced by Aquamarine for not appearing for depositions or the sanctions hearing; Downer's response to Aquamarine's motions; and the evidence produced at the trial on damages. Thus, the court of appeals erred in holding that the trial court did not have authority under Rule 215a(c) to strike Aquamarine's answer.

We now turn to the court of appeals holding that the trial court abused its discretion in striking Aquamarine's answer. The court of appeals concluded its review of the abuse of discretion issue by stating: "The facts of the case simply do not, in our opinion, show this to be an appropriate case to impose the ultimate sanctions of striking the pleadings and entering default judgment." We interpret that statement to mean that the court of appeals disagreed with the decision of the two trial judges who reviewed the matter.

 [4]    The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. Rather, it is a question of whether the court acted without reference to any guiding rules and **\*242** principles. *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Comm.App.—1939, opinion adopted). Another way of stating the test is whether the act was arbitrary or unreasonable. *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984); *Landry v. Travelers Insurance Co.,* 458 S.W.2d 649, 651 (Tex.1970). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965); *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (Tex.1959).

To determine the trial judge's guiding rules and principles in imposing sanctions for discovery abuse, we must look to the Texas Rules of Civil Procedure as promulgated and amended by this Court as well as the decisions of appellate courts of this State and of the United States. The Texas Rules of Civil Procedure pertaining to discovery and sanctions for noncompliance have been amended several times, culminating in Rule 215a as it existed at the time of this

case, and now embodied in Rule 215. The use of sanctions by trial courts to prevent discovery abuse has developed steadily over the past several years. These changes reflect the continuing pattern both to broaden the discovery process and to encourage sanctions for failure to comply.

The United States Supreme Court in *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) approved the use of sanctions not only to assure compliance with the discovery process but also to deter those who might be tempted to abuse discovery in the absence of a deterrent.

This court and various courts of appeals have also followed this progression. *See, e.g., Dyson v. Olin Corp.,* 692 S.W.2d 456 (Tex.1985), (Kilgarlin, J., concurring) (unnamed witness not permitted to testify); *Jarrett v. Warhola,* 695 S.W.2d 8 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd), (plaintiff's cause of action dismissed); *City of Houston v. Arney,* 680 S.W.2d 867 (Tex.App.—Houston [1st Dist.] 1984, no writ) (defendant's answer struck for failure to answer interrogatories); *Southern Pacific Transportation v. Evans,* 590 S.W.2d 515 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (defendant's answer struck and interlocutory default judgment rendered as to liability), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980).

In various speeches and law review articles, different members of this court have encouraged trial judges to use sanctions to the degree necessary to assure compliance with discovery procedures and deter abuse of the process. Barrow and Henderson, *1984 Amendments to the Texas Rules of Civil Procedure Affecting Discovery,* 15 ST. MARY'S L.J. 713 (1984) (presented to the Texas College of the Judiciary Nov. 29, 1984); Kilgarlin and Jackson, *Sanctions for Discovery Abuse Under New Rule 215,* 15 ST. MARY'S L.J. 767 (1984); Pope and McConnico, *Practicing Law With the 1981 Texas Rules,* 32 BAYLOR L.REV. 457 (1981); Spears, *The Rules of Civil Procedure: 1981 Changes In Pretrial Discovery,* 12 ST. MARY'S L.J. 633 (1981).

The trial court in this case was free to examine the factors before it to determine whether to levy sanctions. Among these were the following: (1) whether voluntarily sending the crew to sea rather than producing them for depositions as agreed on two occasions was in conscious disregard of this court's rules; (2) whether the contradictory statements of both attorneys indicated that Aquamarine's attorney did in fact wait until one hour past the scheduled time for depositions on July 5,

to advise **Downer's** attorney that he would have to fly to New Iberia and take depositions on the following day; (3) whether **Aquamarine's** attorney consciously disregarded the sanctions hearing in preference to his personal needs and the federal court case set the following day; (4) whether the information contained in the secretary's affidavit as to the date of the sanctions hearing conflicted with the letter from an attorney **\*243** in that law firm confirming that the hearing was set on August 22; and (5) the unexplained failure of **Aquamarine** to produce for depositions on any of the occasions in question Clark Ivans, the immediate supervisor of Chester Dalfrey and the president of **Aquamarine**.

 **[5]**    The record contains no indication that the trial court was capricious, arbitrary, or unreasonable. Thus, the court of appeals erred in holding that the trial court abused its discretion.

In determining whether to reverse and render this cause or to remand it to the court of appeals, we must look to the four points of error raised by **Aquamarine** before the court of appeals but not addressed by that court. If those points raise questions of law, as opposed to questions of fact, they can be addressed by this court.

The first point was that **Downer's** First Amended Original Petition was insufficient to support the judgment. The contention is that the facts supporting the cause of action were not pleaded. TEX.R.CIV.P. 47 requires that a petition contain a short statement of the cause of action sufficient to give fair notice of the claim involved. Our rules do not require pleadings to contain evidence or factual detail. That point is overruled.

 **[6]**    The second point was that the trial court improperly refused to strike a juror for cause. After the court had ruled on challenges for cause, there were 26 names left on the jury list. Each party was given six jury strikes, so, after making those strikes, 14 names remained on the list. The challenged juror was Number 14 and was thus a spare. There was no harm in refusing to dismiss him for cause.

 **[7]**    The third point was that the trial court improperly refused to admit evidence of **Downer's** contributory negligence. Contributory negligence is an affirmative defense which must be pleaded. **Aquamarine's** answer had been struck and default judgment rendered as to liability. Thus, defendant had no pleading to support contributory negligence, so the court did not err in refusing to admit the requested evidence.

 **[8]**    **Aquamarine's** remaining point before the court of appeals was that the trial court erred in awarding prejudgment interest in a Jones Act case tried to a jury. This point was not presented to the trial court and was thus waived.

**Aquamarine's** points of error presented to the court of appeals but not considered by that court concerned questions of law over which we have jurisdiction. There is no merit to these points so it is not necessary for this cause to be remanded to the court of appeals.

The judgment of the court of appeals is reversed and the judgment of the trial court is affirmed.

### All Citations

701 S.W.2d 238

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

252 S.W.3d 833
Court of Appeals of Texas,
Dallas.

W.R. EDWARDS, Jr., Appellant

v.

MID–CONTINENT OFFICE DISTRIBUTORS,
L.P. and Inwood Office Furniture, Inc., Appellees.

No. 05–06–01421–CV.    |    April 25, 2008.

**Synopsis**

**Background:** Lender, a member of an informal lending cartel, brought action for money had and received against office furniture supply company for damages in its failure to repay money used by furniture store to purchase receivables. The 95th Judicial District Court, Dallas County, Karen Gren Johnson, J., entered take-nothing judgment in favor of supply company. Lender appealed.

**[Holding:]** The Court of Appeals, Lang-Miers, J., held that money fronted to furniture supply did not in equity and good conscience belong to lender.

Affirmed.

West Headnotes (9)

**[1]**　**Implied and Constructive Contracts**
　　 Money Received

The claim for money had and received seeks equitable relief, and a trial court exercises broad discretion in balancing the equities involved in a case seeking equitable relief.

9 Cases that cite this headnote

**[2]**　**Appeal and Error**
　　 Trial in Equitable Actions

**Appeal and Error**
　　 Effect in Equitable Actions

The Court of Appeals will not disturb a trial court's ruling on a claim seeking equitable

relief unless it is arbitrary, unreasonable, and unsupported by guiding rules and principles.

4 Cases that cite this headnote

**[3]**　**Appeal and Error**
　　 Consideration and effect of findings or failure to make findings

When a trial court makes written findings of fact following a non-jury trial, these assist in appellate court's review of the trial court's exercise of its discretion by revealing the trial court's reasoning and analysis and help assure both the reviewing court and the litigants that the trial court's decision resulted from thoughtful deliberation.

Cases that cite this headnote

**[4]**　**Appeal and Error**
　　 Allowance of remedy and matters of procedure in general

If the evidence is sufficient to support the trial court's findings and conclusions, the trial court did not abuse its discretion.

11 Cases that cite this headnote

**[5]**　**Implied and Constructive Contracts**
　　 Nature of right

The claim for money had and received belongs conceptually to the doctrine of unjust enrichment.

23 Cases that cite this headnote

**[6]**　**Implied and Constructive Contracts**
　　 Restitution

The doctrine of unjust enrichment applies the principles of restitution to disputes that are not governed by a contract between the parties; it characterizes the result of a failure to make restitution under circumstances that give rise to an implied or quasi-contractual obligation to return those benefits.

11 Cases that cite this headnote

**[7]** **Implied and Constructive Contracts**
👈 Nature of right

**Implied and Constructive Contracts**
👈 Defenses

To prove a claim for money had and received, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him; a defendant may present any facts or raise any defenses that would deny a claimant's right to recover under this theory.

25 Cases that cite this headnote

**[8]** **Implied and Constructive Contracts**
👈 Consideration or Purpose for Which Money Was Received

Money fronted to furniture supply company on behalf of furniture store by lender, a member of an informal lending cartel, as a means to allowing store to obtain furniture orders, did not, in equity and good conscience, belong to lender, thus precluding lender's claim against company for money had and received; transaction represented a high-risk scheme whereby store proposed to assign the value of the furniture to lender and sell the furniture on lender's behalf, if lender agreed to pay off the suppliers so the furniture could be delivered.

Cases that cite this headnote

**[9]** **Implied and Constructive Contracts**
👈 Nature of right

In an action for money had and received, the absence of proof of detrimental reliance by a defendant does not assure the plaintiff of recovery; instead, detrimental reliance is one of the factors that a trial court considers in balancing the equities in a claim for money had and received.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*834** Kent Frank Brooks, Dallas, for Appellant.

Darrell G. Noga, Elizabeth Flora, Fee, Smith, Sharp, Vitullo, LLP, Robert H. Renneker, Dallas, for Appellees.

Before Justices LANG, LANG–MIERS, and MAZZANT.

**OPINION**

Opinion by Justice LANG–MIERS.

W.R. Edwards, Jr. appeals the trial court's judgment for appellees, Mid–Continent Office Distributors, L.P. and Inwood Office Furniture, Inc., following a bench trial on a claim for money had and received. For the reasons that follow, we affirm.

**BACKGROUND**

The trial testimony showed that Edwards was a member of an informal lending cartel. He met Matthews through a mutual cartel acquaintance and subsequently loaned him $10,000. Matthews repaid that loan on time. A few months later, Matthews approached Edwards seeking another loan. He told Edwards that his company, MAC Group, L.L.C. (collectively Matthews or MAC), a furniture broker, needed to borrow money in connection with three of its customer orders. He explained that three customers placed furniture orders with MAC, each gave MAC a fifty percent deposit, but his suppliers would not deliver the furniture until MAC paid them the full amount. Matthews proposed to sell the receivables for these customers to Edwards at a discounted value if Edwards would agree to pay off the suppliers so the furniture could be delivered. Together, Matthews and Edwards drafted a "Factoring Agreement" which reflected the terms of their agreement. It listed the three customers, with total payments owed to MAC of approximately $70,000.00; and seven suppliers to whom MAC owed a total of $62,052.93, including $28,272.22 to Mid–Continent, a furniture wholesaler, and $15,292.34 to Inwood, a furniture manufacturer.

At Matthews' request, Edwards called Pat Henin, an operations manager at Mid–Continent, to verify the amount MAC owed. The telephone conversation lasted five minutes or less, and there is conflicting testimony about what was said. However, Edwards testified that Henin confirmed the balance MAC owed and that he understood her to say Mid–Continent was holding orders for these MAC customers until it received

full payment.[1] Based on this conversation, Edwards did not think he needed to call Inwood or the other suppliers to confirm that they were also holding orders for these MAC customers,[2] **\*835** and he signed the Factoring Agreement, agreeing to purchase MAC's receivables. He obtained a cashier's check for $28,272.22 payable to Mid–Continent and authorized Matthews to pick up the cashier's check and hand deliver it to Mid–Continent. The cashier's check contains the notation "MAC 908."[3] Edwards also wrote personal checks on his Schwab account to the remaining suppliers, including a check to Inwood for $15,292.22.[4] All of those checks contained the notation, "MAC Group Payment," in the "For" line.

Matthews wrote letters to the three MAC customers advising them that their accounts had been sold to Edwards and to forward their payments to Edwards. When Edwards did not receive their payments, he called them to find out why they had not paid him. The customers told him they never received the furniture. Edwards then called Matthews. Matthews admitted he deceived Edwards and told him the payments Edwards made to the vendors were for past-due balances on orders for other customers, not the customers whose receivables Edwards purchased.

Edwards sued Mid–Continent and Inwood for damages.[5] The parties waived a jury and tried the case to the court. Edwards contended that he paid the money to Mid–Continent and Inwood by mistake "based [on] a fraudulent representation of another party" and appellees owed him the money he had paid them. The trial court disagreed and entered a take-nothing judgment in favor of Mid–Continent and Inwood. It subsequently issued findings of fact and conclusions of law. In two issues on appeal, Edwards specifically challenges the legal and factual sufficiency of certain of the trial court's findings of fact. He contends that he proved the claim for money had and received against appellees and the trial court erred by granting a take-nothing judgment against him.

## STANDARD OF REVIEW

Appellant complains about the findings of fact issued by the court to support its judgment denying his claim for money had and received. However, a review of the findings of fact in this case does not end our inquiry. Instead, we review those findings in the context of whether they support the judgment denying him relief. Those reviews involve overlapping standards of review.[6]

 **\*836** **[1]** **[2]** **[3]** **[4]** The claim for money had and received seeks equitable relief. *See Stonebridge Life Ins. Co. v. Pitts,* 236 S.W.3d 201, 203 n. 1 (Tex.2007) (per curiam); *Acoustical Screens in Color, Inc. v. T.C. Lordon Co., Inc.,* 524 S.W.2d 346, 350 (Tex.Civ.App.-Dallas 1975, writ ref'd n.r.e.). And a trial court exercises broad discretion in balancing the equities involved in a case seeking equitable relief. *See In re Gamble,* 71 S.W.3d 313, 317 (Tex.2002) (orig.proceeding); *Craddock v. Sunshine Bus Lines, Inc.,* 134 Tex. 388, 393, 133 S.W.2d 124, 126 (1939). We will not disturb a trial court's ruling on a claim seeking equitable relief unless it is arbitrary, unreasonable, and unsupported by guiding rules and principles. *See Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex.2004). When a trial court makes written findings of fact following a non-jury trial, these assist in our review of the trial court's exercise of its discretion by revealing the trial court's reasoning and analysis and help assure both the reviewing court and the litigants that the trial court's decision resulted from thoughtful deliberation. *See Williams v. Chisolm,* 111 S.W.3d 811, 815 (Tex.App.-Houston [1st Dist.] 2003, no pet.). If the evidence is sufficient to support the trial court's findings and conclusions, the trial court did not abuse its discretion. *See Reese v. Duncan,* 80 S.W.3d 650, 659 (Tex.App.-Dallas 2002, pet. denied); *El Paso County Hosp. Dist. v. Gilbert,* 64 S.W.3d 200, 203–04 (Tex.App.-El Paso 2001, pet. denied).

We review challenges to the sufficiency of the evidence to support findings of fact under the same standards for reviewing evidence to support a jury's verdict. *Walker v. Cotter Prop., Inc.,* 181 S.W.3d 895, 899 (Tex.App.-Dallas 2006, no pet.). In evaluating the legal sufficiency of the evidence to support a finding, we must determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Columbia Med. Ctr. Subsidiary, L.P. v. Meier,* 198 S.W.3d 408, 414 (Tex.App.-Dallas 2006, pet. denied) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005)). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Walker,* 181 S.W.3d at 899. When we review a finding for factual sufficiency, we consider all of the evidence and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (per curiam); *Cain v. Bain,* 709 S.W.2d 175, 176

(Tex.1986) (per curiam). And we review a trial court's legal conclusions de novo. *See Walker v. Anderson,* 232 S.W.3d 899, 908 (Tex.App.-Dallas 2007, no pet.). We evaluate those conclusions independently to determine whether the trial court correctly drew the conclusion from the facts. *Id.* Unchallenged findings of fact are conclusive on appeal unless the contrary is established as a matter or law or there is no evidence to support the findings. *Toles v. Toles,* 45 S.W.3d 252, 265 n. 6 (Tex.App.-Dallas 2001, pet. denied) (citing *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex.1986)).

Consequently, we first determine whether the evidence is sufficient to support the challenged findings and then determine whether the trial court's judgment—as a decision of a claim seeking equitable relief—is arbitrary, unreasonable, or unsupported by guiding rules and principles.

## *837   CLAIM FOR MONEY HAD AND RECEIVED

 [5]     [6]     Edwards contends that he established each element of his claim for money had and received. As we noted, a cause of action for money had and received is equitable in nature. *Stonebridge Life Ins. Co.,* 236 S.W.3d at 203 n. 1; *Acoustical Screens in Color, Inc.,* 524 S.W.2d at 350. The claim "belongs conceptually to the doctrine of unjust enrichment." *Amoco Prod. Co. v. Smith,* 946 S.W.2d 162, 164 (Tex.App.-El Paso 1997, no writ). [7] The doctrine of unjust enrichment applies the principles of restitution to disputes that are not governed by a contract between the parties. *Id.* It characterizes the result of a failure to make restitution under circumstances that give rise to an implied or quasi-contractual obligation to return those benefits. *Id.*

 [7]     The courts describe this claim in general principles. For example, courts have stated that a claim for money had and received seeks to restore money where equity and good conscience require restitution, *see id.;* it is not premised on wrongdoing, but seeks to determine to which party, in equity, justice, and law, the money belongs, *Staats v. Miller,* 150 Tex. 581, 584, 243 S.W.2d 686, 687 (1951); and it seeks to prevent unconscionable loss to the payor and unjust enrichment to the payee. *Bryan v. Citizens Nat'l Bank in Abilene,* 628 S.W.2d 761, 763 (Tex.1982). As these broad and general descriptions demonstrate, a cause of action for money had and received is "less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which ... belongs to the plaintiff." *Staats,* 150 Tex. at 584, 243 S.W.2d at 687–88 (internal quotations and citations omitted). To prove the claim, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him. *See Best Buy Co. v. Barrera,* 248 S.W.3d 160, at 162–63 (Tex. 2007) (per curiam) (citing *Staats,* 150 Tex. at 584, 243 S.W.2d at 687). A defendant may present any facts or raise any defenses that would deny a claimant's right to recover under this theory. *Id.* at 162–63 (citing *Stonebridge,* 236 S.W.3d at 205–06 and *Staats,* 150 Tex. at 584, 243 S.W.2d at 687).

Texas courts have allowed restitution for these types of claims in a variety of cases: by a defrauded party against the party who committed the fraud, *see Staats,* 150 Tex. at 583–85, 243 S.W.2d at 686–88; *Wiseman v. Baylor,* 69 Tex. 63, 64–66, 6 S.W. 743, 743–44 (Tex.1887); by a party that made an overpayment, *Benson v. Travelers Ins. Co.,* 464 S.W.2d 709, 710–13 (Tex.Civ.App.-Dallas 1971, no writ); and by a party that paid or credited money to the wrong person or account, *see Amoco Prod. Co.,* 946 S.W.2d at 163–65 (payment to wrong person); *Doss v. Homecomings Fin. Network, Inc.,* 210 S.W.3d 706, 710–11 (Tex.App.-Corpus Christi 2006, pet. denied) (payment applied to wrong account); **\*838** *Lyman D. Robinson Family Ltd. P'ship v. McWilliams & Thompson, P.L.L.C.,* 143 S.W.3d 518, 520 (Tex.App.-Dallas 2004, pet. denied) (earnest money released to wrong client).

Conversely, some Texas courts have rejected a claim for restitution and held that money paid under a unilateral mistake of fact cannot be recovered. *See, e.g., Pacific Molasses Co. v. Graves,* 451 S.W.2d 294, 298 (Tex.Civ.App.-San Antonio 1970, writ ref'd n.r.e.); *Sellman v. Am. Nat'l Ins. Co.,* 281 S.W.2d 150, 154 (Tex.Civ.App.-Texarkana 1955, writ dism'd). And other courts have held that as between two innocent parties, the party that must suffer the loss is the one that mistakenly created the situation and was in the best position to have avoided it. *See Holden Bus. Forms Co. v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.,* 83 S.W.3d 274, 278 (Tex.App.-Fort Worth 2002, no pet.) (self-insured employer denied restitution of insurance benefits paid to hospital before employer discovered claim not covered by plan); *Lincoln Nat'l Life Ins. Co. v. Rittman,* 790 S.W.2d 791, 794 (Tex.App.-Houston [14th Dist.] 1990, no writ) (insurer denied restitution of benefits paid to hospital after coverage terminated); *Lincoln Nat'l Life Ins. Co. v. Brown Schools, Inc.,* 757 S.W.2d 411, 415 (Tex.App.-Houston [14th Dist.] 1988, no writ) (same).

In some cases, the trial court's ruling was reversed because the intermediate court of appeals concluded that the trial court abused its discretion in affording equitable relief. *See, e.g., London v. London,* 192 S.W.3d 6, 13–14 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (trial court's order denying father's claim for money had and received reversed on ground that evidence sufficient to support claim for equitable restitution because child support payments were made pursuant to court order later reversed on appeal); *Austin v. Duval,* 735 S.W.2d 647, 649–50 (Tex.App.-Austin 1987, writ denied) (trial court's judgment that holders of lapsed option contract entitled to restitution of earnest money reversed because earnest money forfeited under express terms of option contract); *Singer v. St. Paul Mercury Ins. Co.,* 478 S.W.2d 579, 583 (Tex.Civ.App.-San Antonio 1972, writ ref'd n.r.e.) (trial court's judgment in favor of insured reversed because insurer issued stop-payment order on check when determined no coverage). *See also Pope v. Garrett,* 147 Tex. 18, 24–25, 211 S.W.2d 559, 561–62 (1948) (court of appeals' judgment that constructive trust should not be impressed upon interests of defendants who did not participate in wrongful act reversed by supreme court because, but for wrongful acts, innocent defendants would not have inherited property).

The common thread in these decisions is that they are all dependent upon a balancing of the equities in each unique case.

## DISCUSSION

 **[8]** In two issues, Edwards contends that he established each element of his claim for money had and received. The first issue addresses the evidence relating to Inwood, and the second issue addresses the evidence relating to Mid–Continent.

He first contends that the evidence is insufficient to support factual findings 17, 18, 19, and 23 [8] insofar as those findings state that Inwood shipped furniture orders **\*839** to MAC after it received Edwards's check. He also contends that the evidence is insufficient to support factual finding 24, which states, "The time delay of over four months from Plaintiff's payment to his claim for return of the funds caused Defendant Inwood to be deprived of other possible remedies to its detriment." And in his second issue, Edwards challenges the sufficiency of the evidence to support finding of fact 5, a similar finding insofar as it finds that Mid–Continent received product for the third order on July 29, 2003, but would not

deliver this order until Matthews paid all outstanding sums owed to Mid–Continent. Edwards contends that the lack of evidence to support the challenged findings shows that Mid–Continent and Inwood did not prove that they detrimentally relied on his payments. Edwards also appears to argue that without sufficient evidence to support these factual findings, there is no evidence to support the trial court's conclusion that he did not meet his burden of proof.

We have reviewed the record and agree with Edwards that the evidence is legally insufficient to show that Inwood shipped furniture orders to MAC after Inwood received Edwards's check; that Inwood was deprived of other possible remedies by the delay in Edwards seeking a refund; and that Mid–Continent received product for the third order in July 2003, but would not ship the order until Matthews made payment in full. However, we disagree that the insufficient evidentiary support for these findings leads to the determination that there is no support for the trial court's conclusion that Edwards did not meet his burden of proof.

 **[9]** First, Edwards does not cite, and we have not found, a case stating that a defendant must show detrimental reliance to defeat recovery. And the cases he cites do not apply in an action for money had and received, or are distinguishable. *See, e.g., Bryan,* 628 S.W.2d at 761–64 (reconciling common law right to restitution with provisions of business and commerce code to lawsuit by bank to recover funds paid over stop-payment order); *Monarch Marking Sys. Co. v. Reed's Photo Mart, Inc.,* 485 S.W.2d 905, 905–07 (Tex.1972) (action for rescission of contract based on unilateral mistake); *Nat'l Indem. Co. v. Spring Branch State Bank,* 162 Tex. 521, 522–27, 348 S.W.2d 528, 528–31 (Tex.1961) (adopting "federal" or "equitable" rule relating to bank's use of depositor's funds); *Am. Nat'l Ins. Co. v. Gifford–Hill & Co., Inc.,* 673 S.W.2d 915, 916–22 (Tex.App.-Dallas 1984, writ ref'd n.r.e.) (interpretation of loan agreement relating to allegation of unilateral mistake). [9] Consequently, the absence of proof of detrimental reliance by appellees does not assure Edwards's recovery. Instead, detrimental reliance **\*840** is one of the factors that a trial court considers in balancing the equities in a claim for money had and received. *See Best Buy Co.,* 248 S.W.3d at 162–63 (concluding that defenses of actual knowledge and unclean hands are not matters of avoidance but instead relate to equities necessary to determine liability in the first instance).

Additionally, as the claimant, it was Edwards's burden to prove that appellees held money which in equity and

good conscience belonged to him. *See id.* Because the court concluded that he did not fulfill his burden, we must determine whether the court abused its discretion in making that decision.

It is undisputed that appellees held money. But the issue is whether Edwards also proved that the money, in equity and good conscience, belonged to him. To determine whether the court abused its discretion in deciding that he did not, we first determine whether there was sufficient evidence to support the unchallenged findings that explain the court's reasoning and analysis. Then we determine, based on the evidence, whether the decision was arbitrary, unreasonable or unsupported by guiding rules and principles. We conclude that there was and it was not.

The undisputed evidence shows that MAC owed money to Mid–Continent and Inwood for furniture orders; Edwards knew MAC owed money to Mid–Continent and Inwood for furniture orders; Edwards agreed to purchase certain of MAC's receivables even though he knew it was a high-risk transaction; Edwards confirmed the amount owed to Mid–Continent and issued a cashier's check payable to Mid–Continent for that amount; Edwards did not confirm the amounts owed to Inwood or the other suppliers, but instead paid the suppliers the amounts listed in the agreement he had with MAC; Edwards did not request copies of invoices or orders to compare to MAC's receivables; Edwards paid Inwood $15,292.22; the check to Inwood contained the notation that it was for "MAC Group Payment"; and Edwards advised Mid–Continent and Inwood to credit the payments to MAC's accounts without specifying which invoices the payments were intended to cover. This evidence is legally and factually sufficient to support the trial court's unchallenged findings of fact. [10] And these unchallenged findings **\*841** also demonstrate that, unlike some cases where the claimant was awarded restitution, Edwards unconditionally paid the amounts he intended to pay to the parties he actually paid in order to satisfy debts owed by Matthews. He did not overpay Mid–Continent and Inwood. *See Benson,* 464 S.W.2d at 712–13 (restitution allowed for overpayment of automobile repair

bill). He did not pay the wrong suppliers. *See Lyman D. Robinson Family Ltd. P'ship,* 143 S.W.3d at 520 (restitution allowed when earnest money released to wrong client); *Doss,* 210 S.W.3d at 710–11 (restitution authorized when financial institution applied note payment to wrong note); *Amoco Prod. Co.,* 946 S.W.2d at 165 (restitution allowed when company paid royalty interests to wrong person). And he was not defrauded by Mid–Continent or Inwood. *See Staats,* 150 Tex. at 584–85, 243 S.W.2d at 687–88 (recovery authorized when creditor refused to return surplus arising on sale of security for debt); *Wiseman,* 69 Tex. at 65, 6 S.W. at 743–44 (same).

Nevertheless, Edwards argues that the trial court erred by not balancing the equities in his favor for several reasons: Mid–Continent and Inwood engaged in business practices whereby they shipped merchandise to MAC before they knew whether or not MAC's check was covered by sufficient funds; MAC had these unpaid account balances with Mid–Continent and Inwood before Edwards sent his payments to them; requiring Mid–Continent and Inwood to refund Edwards's money would put them in the position they were in before they received Edwards's payments; the payments were not used for Edwards's benefit; Mid–Continent and Inwood did not contact Edwards about how the payments should be applied; Edwards's check to Inwood was not for the full amount of the account balance, as Inwood had been told it would be; and Edwards was deceived by Matthews. We conclude that, although these are some of several types of factors courts may consider in balancing the equities, they are not determinative of the outcome in this case.

We conclude that the trial court's decision was not arbitrary, unreasonable or unsupported by guiding rules and principles and, as a result, the court did not abuse its discretion.

We affirm the trial court's judgment.

**All Citations**

252 S.W.3d 833

Footnotes

1    Henin testified that she would not know the names of MAC's customers because furniture orders were typically shipped to an installer, not directly to the customer.

2    Edwards also reviewed a copy of MAC's invoices to these customers, but Matthews did not provide, and Edwards did not ask to see, the orders MAC placed with Mid–Continent, Inwood, and the other furniture suppliers to compare to MAC's

customer invoices. Matthews also provided a copy of "MAC Group's Income History & Projections" from 2002 through December 2003 but Edwards testified that he did nothing to verify the numbers contained in that report.

3 The evidence shows that "908" is Mid–Continent's customer number for MAC.

4 Although the check to Inwood was twelve cents less than the amount listed in the agreement, Edwards testified that the check he wrote to Inwood corresponded to the same payable in the agreement.

5 Edwards did not sue Matthews, MAC, or the other five suppliers. He sued both Inwood and Mid–Continent for money had and received. He also sued Mid–Continent for breach of contract, fraud, negligent misrepresentation and unjust enrichment. This appeal involves only the claim for money had and received.

6 In cases involving overlapping standards of review, Texas courts have held that a reviewing court must first determine whether the trial court had sufficient information upon which to exercise its discretion and then whether the trial court erred in applying that discretion. *See, e.g., Reese v. Duncan,* 80 S.W.3d 650, 659 (Tex.App.-Dallas 2002, pet. denied) (trial court does not abuse discretion if evidence is sufficient to support findings of fact); *In re C.A.M.M.,* 243 S.W.3d 211, 220–21 (Tex.App.-Houston [14th Dist.] 2007, no pet. h.) (legal and factual insufficiency are not independent grounds for reversal but instead are factors to be considered in determining whether trial court abused discretion); *Sotelo v. Gonzales,* 170 S.W.3d 783, 787 (Tex.App.-El Paso 2005, no pet.) (once reviewing court determines whether sufficient evidence exists upon which trial court could exercise its discretion, then must decide whether trial court made reasonable decision); *El Paso County Hosp. Dist. v. Gilbert,* 64 S.W.3d 200, 203–04 (Tex.App.-El Paso 2001, pet. denied) (after analyzing legal and factual sufficiency issues, reviewing court then determines whether, based on evidence, trial court made reasonable decision or whether it is arbitrary and unreasonable).

7 In fact, many courts use the term "money had and received" interchangeably with other terms for similar claims. *See Friberg–Cooper Water Supply Corp. v. Elledge,* 197 S.W.3d 826, 832 & n. 38 (Tex.App.-Fort Worth 2006) (recognizing that courts focus on facts alleged and recovery sought to categorize action as one for money had and received or for restitution), *rev'd on other grounds,* 240 S.W.3d 869 (Tex.2007) (per curiam); *see also Tri–State Chemicals, Inc. v. Western Organics, Inc.,* 83 S.W.3d 189, 193–95 (Tex.App.-Amarillo 2002, pet. denied) (assumpsit); *Amoco Prod. Co.,* 946 S.W.2d at 164–65 (unjust enrichment, implied and constructive contracts and trusts); *Greer v. White Oak State Bank,* 673 S.W.2d 326, 329–30 (Tex.App.-Texarkana 1984, no writ) (restitution).

8 These factual findings state:

17. On or about August 22, 2003, Edwards issued six other checks to Matthews's creditors:
No. 123 to Inwood Office Furniture for $15,292.22
No. 124 to HBF for $3,075.60
No. 125 to Shelby Williams for $2,659.43
No. 126 to Nienkamper ICF for $1,250.00
No. 127 to Bratrud Furniture for $4,143.40
No. 128 to Mai Space for $7,359.95
None of the foregoing checks were delivered with transmittal letters or letters of instruction.

18. The check Plaintiff sent to Inwood Office Furniture in the amount of $15,292.22, which was the amount (less 12 cents) owed by Hal Matthews d/b/a/ the MAC Group for one of two invoices that Inwood shipped after receiving the payment.

19. Inwood Office Furniture was never paid for the second invoice shipped that date, in the amount of $1,960.92, and that amount was written off in December of 2003, so that Inwood remains unpaid for that invoice.

* * *

23. Defendant Inwood manufactured and properly shipped by common carrier the one shipment of two invoices ordered by Hal Matthews d/b/a/ the MAC Group, and it was delivered by Nancy Baer Trucking and accepted.

9 Edwards also cites cases from other jurisdictions and an unpublished 1980 Tyler court of appeals case. *See Pickett v. Republic Nat'l Bank of Dallas, Trustee,* No. 1303, 1980 Tex.App. LEXIS 3119 (Tex.App.-Tyler Feb. 28, 1980). The opinion in that case was withdrawn and a new opinion substituted at *Pickett v. Republic Nat'l Bank of Dallas, Trustee,* 601 S.W.2d 405 (Tex.Civ.App.-Tyler 1980), *aff'd,* 619 S.W.2d 399 (Tex.1981). Edwards does not cite to or state how the substituted opinion supports his argument.

10 This evidence supports the following unchallenged findings of fact:

9. The transaction between [Edwards] and Matthews was a high-risk transaction through which [Edwards] hoped to make a significant profit. Although the transaction was high-risk, [Edwards] neither requested copies of purchase orders that Matthews had submitted to any of his vendors nor did he compare any purchase orders with the accounts that he was purchasing from Matthews.

* * *

13. On August 18, 2003, Matthews and [Edwards] entered into an agreement entitled "Factoring Agreement" whereby Matthews sold the Billingsley, Hance Scarborough, and Senior Management invoices to [Edwards] for the sum of $62,052.81. Matthews did not provide Edwards—nor did Edwards request—copies of Matthews's purchase orders to or the invoices from Mid–Continent, Inwood Office Furniture, or other vendors. [Edwards] drafted and prepared the Factoring Agreement himself.

* * *

15. On August 18, 2003, [Edwards] telephoned Mid–Continent's office in Houston and spoke with Pat Henin to inquire whether certain furniture had been shipped. [Edwards] did not request copies of the purchase orders submitted by Matthews or the invoices Mid–Continent had submitted to Matthews to compare the items included in those documents with the accounts he was purchasing from Matthews. [Edwards] did not ask for any written verification or detail concerning the items remaining to be shipped, nor did he specifically ask Henin where the items were being shipped. Other than placing this one call, [Edwards] took no other steps to confirm or verify the accuracy of the accounts that he was purchasing from Matthews.

16. On August 18, 2003, [Edwards] caused a cashier's check payable to "Mid Continent Furniture Distributors, Inc." in the amount of $28,272.22 to be issued and delivered to Matthews....

* * *

20. These were the only two invoices Inwood had with the MAC Group. [Edwards] paid Inwood Office Furniture in the amount of $15,292.22 representing that he was paying Inwood on Hal Matthews or the MAC Group's behalf for the merchandise order placed by the MAC Group. The payment sent by [Edwards] stated on the face of the check that it was a "MAC Group Payment." No cover letter or instructions were sent accompanying the check sent by [Edwards] to Inwood Office Furniture.

21. Inwood Office Furniture did not represent to [Edwards] that they were holding furniture for shipment, or for a particular destination.

22. [Edwards] knew the amount owed Defendant Inwood by the MAC Group and he asked no questions about any other accounts or invoices.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

52 S.W.2d 311
Court of Civil Appeals of Texas, San Antonio.

E. M. GOODWIN, INC.,

v.

STUART ET AL.

No. 8791.  |  April 6, 1932.  |
Rehearing Granted June 22, 1932.
|  Rehearing Overruled July 20, 1932.

Appeal from District Court, Hidalgo County; Chas. E. Thompson, Judge.

Suit by E. M. Goodwin, Inc., against R. T. Stuart and others. From a judgment dismissing the cause, plaintiff appeals.

Affirmed.

West Headnotes (4)

**[1]    Pleading**
☞ Statement of Cause of Action in General

Petition must be tested on its own allegations.

Cases that cite this headnote

**[2]    Pleading**
☞ Hearing and Determination on Demurrer

When assailed through general demurrer, every reasonable intendment must be indulged and read into petition.

Cases that cite this headnote

**[3]    Specific Performance**
☞ Mutuality of Remedy

Where remedy of specific performance is unavailable to one party because of nature of contract, it is unavailable to the other party.

3 Cases that cite this headnote

**[4]    Specific Performance**
☞ Mutuality of Remedy

One who contracted to develop and sell another's land and who had not performed his part of contract could not have specific performance, since contract called for his personal services and could not be specifically enforced against him.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*311**  Hill & Greer, of Mission, and James R. Dougherty, of Beeville, for appellant.

Strickland, Ewers & Wilkins, of Mission, Davenport, West & Ransome, of Brownsville, and Bonner & Childress, of Wichita Falls, for appellees.

**Opinion**

FLY, C. J.

This is an appeal from the judgment of the district court sustaining a general demurrer to the petition and dismissing the cause. This is a second appeal of this cause; the opinion given by this court on the former appeal being found in Stuart et al. v. E. M. Goodwin, Inc., 25 S.W.(2d) 166, 167. An attempt was made to obtain a writ of error in the Supreme Court, but the application was dismissed for want of jurisdiction. The former appeal was prosecuted by Stuart and others from an order appointing a receiver to take charge of certain land and a temporary injunction to restrain interference with the receiver in the discharge of his duties. We copy the following statement from the former opinion:

"Appellee [E. M. Goodwin, Inc.] claims an interest in the land subject to the deed of trust under a conveyance from E. M. Goodwin, which was executed on the _____ day of _____, 1928. The deed of trust on the land was executed on November 3, 1918, by the owner, Eloisa Vela Dougherty, to secure a debt due by her to F. G. Oppenheimer and Ben F. Levy. The debt and deed of trust were kept alive by extensions, so that the debt amounting to $21,811.69 would not be barred by limitations until December 3, 1929. The debt and lien are now owned by R. T. Stuart & Co. The land in question, after the extension of the debt, was sold by the owner to J. C. Marks and George Hartnagel, nonresidents, subject to the lien and debt. On February 3, 1926, a written contract was entered into between Marks and Hartnagel, and it is through that instrument that E. M. Goodwin claims an

interest. On June 7, 1929, Marks and Hartnagel conveyed the land to Edward L. Stallcamp, and he conveyed it to the American Land & Development Company, one of the appellants herein."

It is stated by appellant in its brief that "the record on this appeal is a little out of the ordinary," but an inspection of the record by this court leads to the conclusion that it is one of the most extraordinary records that has ever been brought to its attention. Appellant has inserted in the record a bill of exceptions taken in a proceeding involving the vacating of a receivership and the discharge **\*312** of the receiver. The bill of exceptions proper contains 116 pages of the record, and attached thereto are exhibits of the transcript on the former trial containing 123 pages, and the statement of facts used on the former appeal containing 254 pages. The bill of exceptions, with monstrous exhibits, has no pertinency to nor connection with the case on appeal, as fully admitted by appellant in its brief. No reason is given for including the bill of exceptions in the record. The order vacating the receivership is not before this court.

This appeal is not prosecuted from any order in regard to the receiver, but only from a judgment sustaining a general demurrer and special exceptions to the petition. Nine of the twelve assignments of error assail the action of the court in vacating the receivership, and are all overruled because that matter is not before this court through the appeal bond. The order in regard to the receivership was separate and distinct from the final judgment, and is not mentioned therein. The other three assignments of error assail the action of the court in sustaining the general demurrer and a special exception with six subdivisions.

This suit is based, as on the former appeal, on a certain contract, and of which a full analysis was given on that appeal. We adopt that analysis, and it is copied and made a part of this opinion:

"The first paragraph of the contract asserts ownership in Marks and Hartnagel, gives the reasons for making the contract with E. M. Goodwin, agrees to furnish him the land for the purposes and on the terms thereinafter set out, and gives a full description of the land. The second paragraph binds the owners to have made a survey of the land and maps and other data in view of irrigation. The third paragraph binds the owners to survey the land into 40-acre tracts and lay out all necessary roads and plat the same and furnish other necessary means to sell the land, and pay for such improvements. In the fourth paragraph the owners agreed to

furnish each purchaser an abstract of title, and all deeds, notes, and deeds of trust necessary to be used in the sale of the land, and that all contracts of sale should be furnished by Goodwin. The fifth paragraph is an obligation upon the part of Goodwin to use diligence in the sale of the land, to give the necessary advertising and conduct excursions. By the sixth clause Goodwin is given exclusive control of the sale of the land for five years, and it provides for his remuneration and for the sums to be paid the owners, and in clause 7 all money over and above a certain sum per acre was made a trust fund to be used as therein directed. The eighth clause gives Goodwin power to sell the land upon the terms and conditions he may elect, providing that no tract smaller than 5 acres shall be sold, and that vendor's lien notes shall not run for a longer period than ten years, and that notes should be made payable to a trustee to be named, and that all damages received for failure to enter into contracts should be the property of Goodwin. The ninth clause is as to the time limit given Goodwin to make sales, and stipulates the amount of land to be sold each year. The tenth clause disclaims the agency of Goodwin in the sale of land, and the eleventh section grants the privilege to Goodwin to acquire and develop lands contiguous to the 5,600-acre tract.

"As some stress is placed on paragraph 12, we copy as follows: '12. Said parties of the first part hereby obligate and bind themselves to convey to a trustee to be selected by said parties of the first part and approved by said party of the second part, all of the lands described in this contract not later than thirty days prior to the time when said lands are prepared and ready for placing on the market, and shall furnish to said party of the second part a complete abstract of title to said lands, showing said trustee to be vested with a good merchantable title thereto, and said parties of the first part shall also furnish with said abstract of title the opinion of an attorney to be approved by party of the second part, showing said trustee to be vested with an unencumbered and merchantable title to said lands. It is further provided that said trustee shall be a resident of Hidalgo County, and shall maintain his office at Mission, Texas, and all remuneration received by him for his services shall be determined and paid for by parties of the first part.'

"The thirteenth clause provides for the laying out of 50 acres, in 10-acre tracts, by the owners, at different points on the tract, and the fourteenth for the execution of all deeds by the trustee of the owners to the different purchasers."

 **[1]** **[2]** The contract is not on its face incapable of specific performance sought through the petition, and appellant had the right to have his petition tried on its own merits. The

petition was not to be tested by testimony that had been given or might be presented, but on its own allegations. In so testing it, when assailed through a general demurrer, every reasonable intendment must be indulged and read into it. The petition was not subject to attack from the general or the special demurrer, and the facts alleged should have been tried before the court or jury on the merits of the case.

We are asked to test the sufficiency of the petition by facts heard by the judge in a trial had on a plea theretofore filed by appellees seeking to vacate and set aside a receivership granted in the case. In other words, the petition is to be declared in conflict with the **\*313** facts developed on the hearing of a question growing out of and subject to the facts on the merits. We recognize the existence of cases in which it has been held that, if the allegations in a petition are in conflict with the facts brought out on a former trial of the cause, the judge may in view of such conflict hold that the petition does not state a cause of action and consequently is subject to a general demurrer. This rule has not been more forcefully or clearly stated in any case than in the case of Snow v. Cook, 278 S. W. 520, which was written for this court by Associate Justice Smith. In that case the action was to set aside a judgment theretofore rendered in the case on a full hearing of the facts, and it was held that in determining the sufficiency of the petition in the second suit the court could take cognizance of the record in the case in which the assailed judgment was rendered, and from that record could determine whether there was basis in fact for destroying the former judgment. That case had been fully developed and a judgment rendered on facts offered by the opposing parties. While we are not disposed to question the decision in the case cited, still the rule therein enunciated has been carried to its limit, and we do not believe that the rights of appellant should be determined on facts offered in a hearing on an affair merely appurtenant to the main case. The question in the motion to vacate the receivership was not presented to try the right of appellant to recover, but to set aside a receivership not deemed necessary to be continued in the case. We are unwilling to sustain the contention that sustaining the motion denied to appellant the right to recover on his demand against appellees. There is no such conflict shown between the facts in that proceeding and the allegations in the petition as would destroy the latter.

The costs of including transcript and statement of facts connected with the former appeal would be assessed against appellant but for the fact that appellees insist that they are properly included and state they would have brought them up if appellant had not. They seem well satisfied with the increased cost of the record, and no one has the right to complain.

The judgment is reversed, and the cause remanded.

## On Motion for Rehearing.

PER CURIAM.

 **[3]**   **[4]**   Upon a full reconsideration of the facts in the case, we have reached the conclusion that it was erroneously held that the pleadings or evidence disclosed a contract capable of being specifically enforced in a judicial proceeding. Appellant had not performed his part of the contract, but had allowed the limit for the existence of the contract to be reached. Appellant had not performed services for which he could demand payment, and the contract was executory and incapable of specific performance. We have considered a number of authorities on the subject, and some of them have been fully reviewed and quoted from herein.

There is a full statement of the allegations of the petition in the former opinion, which is retained, and it is therefore unnecessary to make another statement.

It is perfectly obvious that Hartnagel and Marks selected and employed Goodwin as their agent to sell their land because of his experience, training, and presumed skill in such projects. He was to use diligence in the sale of the land, to advertise it, to locate and interest prospective buyers in northern states who were disposed and financially able to purchase the lands in small tracts; he was to assemble these prospects into trainloads, move them to the site of the lands, convert them into buyers at prices which would net Hartnagel and Marx $62.50 per acre. He was to perform innumerable personal services which could be efficiently performed only by those trained and skilled in such matters. The contract is purely executory, since Goodwin has sold none of the land.

Let us suppose, now, that Goodwin should lose interest in the project, or was diverted into other fields of activity more to his liking, or which promised greater or quicker or more pleasing returns. What, in such case, could Hartnagel and Marks do to prevent him from abandoning the project for the new venture? Certainly they could not exact specific performance of any of his obligations. They would be utterly helpless before his inaction or indifference or refusal or failure, for any reasons, to perform.

The remedy of specific performance being therefore unavailable to one of the parties, because of the nature of the contract, it is not available to the other party.

This rule is specifically applicable to a contract of agency to sell land, which "could not be specifically enforced by either party against the other"-- it was an employment of Goodwin "as agent to sell the land," and therefore "specific performance could not be had." Chief Justice Brown in Ansley Realty Co. v. Pope & Smith, 105 Tex. 440, 151 S. W. 525, 527.

The contract being for the personal services of Goodwin, upon whose personal will the performance thereof rests, it cannot be specifically enforced against him; and, since it cannot be enforced against him, it lacks essential mutuality and cannot be enforced against the other party. 4 Pom. Eq. Jur. pp. 2760, 2765, §§ 1401, 1402, note 1; 6 Pom. Eq. Jur. §§ 759, 769; 36 Cyc. pp. 581, 621, 629; 25 R. C. L. pp. 232, 305; Rutland Marble Co. v. Ripley, 10 Wall. 339, 359, 19 L. Ed. 955; **\*314** Ansley Realty Co. v. Pope & Smith, 105 Tex. 440, 151 S. W. 525; Prusiecke v. Ramzinski (Tex. Civ. App.) 81 S. W. 771, 773; Carrico v. Stevenson (Tex. Civ. App.) 135 S. W. 260, 261; Galbreath v. Farrell (Tex. Civ. App.) 249 S. W. 277, 280; Parrish v. Weber (Tex. Civ. App.) 17 S.W.(2d) 106.

It is said by Mr. Pomeroy that "as an almost universal rule contracts for personal acts will not be directly enforced" (4 Pom. Eq. Jur. note 1, § 1402); that courts "cannot enforce a decree" of specific performance in "contracts for personal services, where the full performance rests upon the personal will of the contracting party" (note 10, § 1406); that it "follows, therefore, that the remedial right" of specific performance, "if it exists at all, must be mutual; each party must be able to enforce the remedy against the other" (note 1, § 1401); that "if for any reason" either of the parties to a contract "is not bound, he cannot compel performance by the other" (note 3, § 1405).

Mr. Pomeroy says, further, on this point: "It is a familiar rule that contracts for personal services, where the full performance rests upon the personal will of the contracting party, will not be specifically enforced against him. It is also generally true that they will not be enforced where the plaintiff is the one who has contracted to render the services, and there has been no full performance on his part, since mutuality in the equitable remedy is then lacking." 6 Pom. Eq. Jur. § 759.

And again: "If, at the time of the filing of the bill in equity, the contract being yet executory on both sides, the defendant, himself free from fraud or other personal bar, could not have the remedy of specific performance against the plaintiff, then the contract is so lacking in mutuality that equity will not compel the defendant to perform but will leave the plaintiff to his remedy at law." Id. § 769.

The rule is thus stated in 36 Cyc. 581: "Although the contract may be one that is otherwise proper to be specifically enforced, if, at the time of the decree, there remain to be done, on plaintiff's side, personal services or other acts of a kind which, in accordance with the general rule, the court cannot compel to be done, specific performance is usually refused on the principle that the remedies in equity must be mutual."

And again (36 Cyc. 629) it is said that "relief (of specific performance) is refused where * * * the contract calls for * * * business services, such as agent, manager * * * etc."

Further (36 Cyc. 579) the rule is more elaborately stated:

"*Personal Services or Business Employment*--a. *In General.* In cases of this character a decree for specific performance is open not only to the objection that it calls for an undue amount of supervision by the court, but to still graver objections, which are well stated in a very recent case: 'Any system or plan by which the court could order or direct the physical coercion of the laborer would be wholly out of harmony with the spirit of our institutions, and his imprisonment would take away his power to make specific performance. Even if such authority existed its exercise would be undesirable. If the relation of employer and employee is to be of value or profit to either it must be marked by some degree of mutual confidence and satisfaction, and when these are gone and their places usurped by dislike and distrust, it is to the advantage of all concerned that their relations be severed.' "

And: "On the same principle the direct specific performance has been refused of contracts to act as agent, manager, or superintendent, or in other business capacity, although the employment may not be one calling for skill and judgment."

In 25 R. C. L. (p. 303) it is said that "Chancery will not as a rule enter an affirmative decree directing the performance of personal services by an adult. Nor will it in this manner enforce contracts requiring either continuous acts involving skill, judgment and technical knowledge, or, as the rule is sometimes stated, those which require special skill, judgment and discretion. This is especially true where the contracts are

continuous in their nature and run through a number of years or an indefinite period of time. This rule is based on the futility of the attempt by a court to command one person to render personal services to another, or to direct the performance of duties which it is impossible for the court to superintend."

And that (page 305) "By reason of the doctrine of mutuality, a court of equity will refuse to decree the specific performance of an executory contract wherever it creates a duty from the plaintiff of such confidential or personal nature that the court could not have enforced it at the instance of the defendant."

Again (Id. p. 232): "It is frequently stated as a general principle of equity that a contract will not be specifically enforced unless it has such mutuality that it may be enforced by either party, and the language adopted by numerous courts is to the effect that equity will grant a decree of specific performance only in cases where there is a mutuality of obligation and of remedy. In accordance with this doctrine of mutuality it is held that when a contract for any reason cannot be enforced against one of the parties such party will not be permitted to enforce it specifically against the other party, although except for this particular rule the contract would otherwise have been enforceable."

In the case of **\*315** Rutland Marble Co. v. Ripley, supra, the Supreme Court of the United States said that: "It is a general principle that when, from personal incapacity, the nature of the contract, or any other cause, a contract is incapable of being enforced against one party, that party is equally incapable of enforcing it specifically against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former."

It was said by Judge Neill, of this court, in Prusiecke v. Ramzinski, supra: "When a contract is of such a character that a court of equity is without power to enforce it as against one or the other of the parties, the party against whom it cannot be enforced cannot, until he has fully performed his part of the agreement, though the other party could be forced to perform his, obtain a decree of specific performance. Ikerd v. Beavers, 106 Ind. 483, 7 N. E. 326, 328. For a court of equity will not attempt to enforce a contract specifically unless it can be done mutually and completely, and so as to secure substantially beyond question all that the parties contemplate. If this is impracticable, the remedy, if any exists, is to be found elsewhere."

We quote from the opinion in Carrico v. Stevenson, supra: "But we think it is an insuperable objection to the relief by specific performance prayed for by appellant that, on account

of the nature of the work required by the contract to be done by him, the court could not properly compel him to perform it. It is entirely clear that the court could not properly compel appellant to perform his part of the contract. It involved, not only personal service by him, but, independent of this, the character of the work to be done, that is, the clearing of a large body of land, about 25,000 acres, as stated in the contract, which by the terms of the contract was to extend over a considerable period of time, with many complicated provisions regarding the details of the work, would require of the court such supervision of the work to be done by appellant as it could not properly undertake. We think that it is universally held that a court of equity will not undertake to decree specific performance of contracts of this nature. 6 Pom. Eq. Juris. (3d Ed.) §§ 757-760. This is not controverted by appellant, but he seeks to avoid the application of this principle upon the ground that he is ready, able, and willing and offers to perform. This is not sufficient for appellee's protection. If the contract on the part of a plaintiff who seeks this remedy is not such as he can be compelled to perform, if he has in fact done so, he would be in a position to require specific performance on the part of the defendant, who would not be allowed to defend on the ground that plaintiff could not, on account of the nature thereof, be compelled to perform his part, but that is as far as the plaintiff's rights extend on this point. 'Before plaintiff has performed the personal service, he could not have specific performance, but after his part is executed he can get the land.' 6 Pom. Eq. Juris. (3d Ed.) § 771. That equity will not compel one party to a contract to perform, where it cannot also compel specific performance by the other party, is, we think, well settled. 6 Pom. Eq. Juris. § 769 et seq.; Waterman, Sp. Perf. § 198; Redwine v. Hudman [104 Tex. 21], 133 S. W. 426; [Rutland] Marble Co. v. Ripley, 77 U. S. [10 Wall.] 359, 19 L. Ed. 955."

The rule is thus stated in Galbreath v. Farrell, supra: "As we understand the rule under the authorities in cases of this kind, before a court of equity will enforce affirmative promises made by defendant in behalf of the plaintiff, it must also be able to enforce the affirmative promises made by plaintiff in behalf of the defendant. Such court never deems it wise or just to enforce one or more of the promises in a contract until it can enforce all of the contract outstanding at the time of the suit, including the promises of the plaintiff as well as those of the defendant. Northern Texas Realty & Construction Co. v. Lary (Tex. Civ. App.) 136 S. W. 843; Williston on Contracts, vol. 3, § 1430."

Being fully convinced that our judgment of reversal is not sustained by the authorities, it is set aside, and the judgment of the trial court will be affirmed.

**All Citations**

52 S.W.2d 311

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**WestlawNext** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** [Town House Dept. Stores, Inc. v. Ahn,](#) Guam Terr., March 7, 2003

162 S.W.2d 165
Court of Civil Appeals of Texas, San Antonio.

FIRST STATE BANK OF BISHOP

v.

GREBE.

No. 11110.  |  March 18, 1942.
|  Rehearing Denied May 20, 1942.

Appeal from District Court, Nueces County, 117th District; Cullen W. Briggs, Judge.

Suit by Florine Ella Grebe, a minor, by her next friend, Louis Hauptreif, against the First State Bank of Bishop, to recover a sum equal to one-half of the deposit in defendant bank of the community funds of plaintiff's deceased father and her mother. On return of mandate of Supreme Court reversing judgment for defendant and remanding cause for further proceedings consistent with its opinion, plaintiff moved for judgment and defendant filed, inter alia, amended answer setting up matters not adjudicated and demanded jury. From a judgment entered on plaintiff's motion without a retrial, defendant appeals.

Reversed and remanded for another trial in consonance with opinion of Supreme Court.

See, also, [Tex.Civ.App., 106 S.W.2d 382](#); [136 Tex. 226, 150 S.W.2d 64](#).

West Headnotes (5)

**[1]** **Appeal and Error**

  Authority to Find Facts

It is not the prerogative of the Supreme Court to make findings of fact upon disputed issues appearing in the record before them but it is within their province to take notice of undisputed facts of record and, if material, give them effect in their decision.

Cases that cite this headnote

**[2]** **Appeal and Error**

  Effect of Decision of Higher Court on Subsequent Appeal to Intermediate Court

Where Supreme court in former appeal found an additional fact which the trial court expressly refused to find, in the absence of the statement of facts in the former appeal, the Court of Civil Appeals, on appeal from judgment entered by trial court on return of mandate from Supreme Court, was required to assume that the record before the Supreme Court in the former appeal conclusively disclosed the fact found.

Cases that cite this headnote

**[3]** **Appeal and Error**

  Compliance with Mandate or Directions

Order of an appellate court reversing and remanding a cause to the trial court carries with it the necessary instruction, whether express or not, that all further proceedings in the case in the trial court must be consistent with the opinion of the reversing court.

5 Cases that cite this headnote

**[4]** **Appeal and Error**

  Compliance with Mandate or Directions

Where Supreme Court remanded cause to trial court for "further proceedings consistent with this opinion" but refused to render judgment or direct trial court to do so, the order to the trial court was, in effect, that the trial judge proceed with a new trial and render judgment upon the new record in accordance with the principles announced in the opinion of the Supreme Court.

4 Cases that cite this headnote

**[5]** **Appeal and Error**

  Granting New Trial or Rehearing

Where Supreme Court remanded cause to trial court for further proceedings consistent with the opinion of the Supreme Court, but refused to render judgment for plaintiff or direct trial

court to do so and defendant interposed amended answer, setting up new matter not previously litigated, reversal of defendant's demand for a retrial on the merits was error.

[2 Cases that cite this headnote](#)

**Attorneys and Law Firms**

**\*166** Boone, Henderson, Boone & Davis, of Corpus Christi, for appellant.

Kleberg, Eckhardt & Lowe, of Corpus Christi, and Fuchs & Fuchs, of New Braunfels, for appellee.

**Opinion**

SMITH, Chief Justice.

This action was brought by appellee, Florine Ella Grebe, a minor, by her next friend and stepfather, Louis Hauptreif, against appellant, First State Bank of Bishop. The case has been twice tried and appealed. The first trial resulted in judgment in favor of the Bank and on appeal that judgment was affirmed by this Court. Grebe v. First State Bank, 106 S.W.2d 382. On writ of error the Supreme Court reversed the judgment of this and the trial court, and remanded the cause, Mr. Justice Critz dissenting. 136 Tex. 226, 150 S.W.2d 64, 65.

On the return of the mandate of the Supreme Court to the trial court, appellee filed a motion for judgment in the latter court. Appellant filed a plea in abatement, an amended answer including prayer that additional parties be made defendants in the suit, and set up various additional matters not adjudicated in prior proceedings. The trial judge overruled appellant's plea in abatement, disregarded its amended answer, refused to allow its demand for a jury and thereupon, refusing to hear any testimony and granting appellee's motion, rendered judgment for appellee for the amount of her claim plus interest computed at the time by the trial judge. The original trial of the cause was before the then district judge, Honorable Birge Holt, who subsequently retired, whereas, the judgment here in question was rendered by Honorable Cullen W. Briggs, his successor in office.

The controlling question for decision here is that of whether the trial court erred in refusing to retry the case upon the return of the mandate of the Supreme Court, reversing and remanding the cause, and in rendering judgment upon the opinion of the Supreme Court without any further proceedings following the return of the mandate.

We quote from the majority opinion of the Supreme Court:

**\*167** "We shall designate the parties as plaintiff and defendant, as they were designated in the trial court.

"Plaintiff seeks a reversal of the judgments of the trial court and of the Court of Civil Appeals mainly upon two principal grounds. The first ground is as follows: That the funds on deposit in the bank in the name of W. F. Grebe were community property of W. F. Grebe and his surviving wife, and that one-half belonged to plaintiff and the other half belonged to her mother, as the sole surviving heirs of the deceased W. F. Grebe; and that after all the community debts were paid, the bank had no authority to transfer the minor's share of such deposit to her mother, without requiring the mother to qualify as survivor in community, administratrix, or guardian, when it had knowledge of the status of the parties and the nature of the fund.

"The trial court filed findings of fact, among which are the following:

"(1) That W. F. Grebe died intestate on March 1, 1924, leaving surviving him as his heirs at law his wife, Mrs. W. F. Grebe, and a minor child, the plaintiff in this suit, and that no administration of any kind was had on his estate or on the estate of said minor; which facts the officers of the bank knew.

"(2) That at the time of his death W. F. Grebe had $3,956.47 on deposit with the bank. That on April 2, 1924, Mrs. W. F. Grebe had deposited to her account in the bank the sum of $1,242.37, proceeds from the sale of cotton made by her deceased husband before his death, and that the officers of the bank knew the source of said money and knew it to be community property.

"(3) That on May 14, 1924, Mrs. Grebe, having paid the funeral expenses and all debts of the deceased from the deposit in the name of W. F. Grebe, transferred, or directed the transfer of, the balance of $3,791.65 remaining in the account of W. F. Grebe to her account. All of said money was community property, which fact the bank then knew. The bank also then knew that W. F. Grebe left a minor daughter.

"(4) That on June 30, 1924, Mrs. Grebe made a loan of $6,000 to her brother-in-law, H. W. Grebe, and transferred that amount from her account to him; after which $377.68 remained in her account.

"(5) That the officers of the bank knew that the loan was made by Mrs. Grebe to H. W. Grebe, and knew that it was used by H. W. Grebe to buy land, and that the vice president of the bank took the acknowledgment to the deed to H. W. Grebe. Neither the bank nor any of its officers participated in the loan transaction or in the land purchase, except as above stated."

 **[1]**    **[2]**    It appears that the Supreme Court made an additional finding of fact which was not included in the findings made by the trial judge or this Court, and which the trial court had expressly refused to find, to-wit: that the bank knew that all the community debts of the Grebes had been fully paid at the time it paid over the community funds to Mrs. Grebe. As we interpret the opinion of the Supreme Court their decision of the case was based at least in part upon this additional finding, and it is inferable that but for this additional finding that decision might have been different, since the fact so found was incorporated into each statement of the hypothesis upon which the decision rested. Appellant complains bitterly against the action of the Supreme Court in making this additional finding, upon the familiar theory that trial courts and Courts of Civil Appeals alone have power to determine facts, and that the Supreme Court is without such power. It is elemental, of course, that it is not a prerogative of the Supreme Court to make findings of fact upon disputed issues appearing in the record before them. But it is clearly within their province, and it is their duty, to take notice of undisputed facts of record, and if material give them effect in their decision. We must assume, then, at least in the absence of the statement of facts in the former appeal, that the record before the Supreme Court in the former appeal conclusively disclosed the fact found by that Court in the majority opinion, but which the trial court not only failed but expressly refused to find, that the bank did know, at the time it paid over the community funds to Mrs. Grebe, that all the community debts of the Grebes had been paid. We make these observations in deference to appellant's earnest complaint of the additional, and apparently material, finding made by the Supreme Court.

After announcing the rules of law deemed by them as applicable to the case made, and upon which they based their ultimate decision of the case, the Supreme **\*168** Court, in the majority opinion by Mr. Justice Sharp, concluded:

"* * * It therefore follows, in view of the undisputed facts in this case, that after all the community debts had been paid, one-half of the community funds belonged to the plaintiff, and that plaintiff is entitled to recover from the bank one-half of all community funds of the deceased and his wife that had

been placed to the credit of the mother in such bank with full knowledge on the part of the officials of the bank of the nature of the account and the minor's interest therein.

"Therefore the judgments of the Court of Civil Appeals and of the trial court are reversed, and this cause is remanded to the trial court *for further proceedings consistent with this opinion."* (Emphasis ours.)

The mandate sent down from the Supreme Court to the trial court embraced the same order.

The record shows that in response to the judgment of the Supreme Court appellee filed her motion in that court praying that judgment be there rendered for appellee, but, in the alternative, if that relief be denied, then that the Supreme Court direct the trial court to render judgment for appellee. The Supreme Court, however, denied both prayers, and let the order stand reversing the judgments of this and the trial court, and remanding the cause "for further proceedings consistent with this opinion."

Appellant urges with much force and persuasiveness that by these rulings the Supreme Court declined to return the case to the trial court for the sole purpose of having that court render judgment on the record as thus made, but remanded the cause for a new trial upon the whole case in accordance with the principles enunciated in the opinion of the Supreme Court. The question thus posed is by no means without its serious difficulties.

 **[3]**    The decision here seems to turn on the interpretation to be given to the qualification appended by the Supreme Court to their order reversing the judgments rendered below and remanding the cause "to the trial court for further proceedings consistent with this opinion." The inquiry is narrowed to the question of the effect to be given the clause "for further proceedings consistent with this opinion." We say that every order of an appellate court reversing and remanding a cause to the trial court carries with it the necessary instruction, whether expressed or not, that all further proceedings in the case in the trial court must be "consistent with the opinion" of the reversing court; that qualification is understood, is implied by necessity, so that, at least usually, it adds nothing to the result to write it into the opinion or include it in the mandate.

Appellee's contention is that the qualification that the cause be remanded to the trial court for further proceedings consistent with the opinion of the Supreme Court amounted to an instruction to the trial court to proceed and render judgment for appellee without a new trial or any other proceedings in

that court. In support of this contention appellee relies chiefly upon the decision of the Supreme Court in Wells v. Littlefield, 62 Tex. 28, 29, but in addition cites numerous other cases as well. None of the cases cited are deemed in point here, since in each of them the cause was remanded with instructions to the trial court to do a specified thing, or enter a specific judgment, or limit its proceedings to a particular inquiry, whereas, in this case the order and mandate of the Supreme Court was, only, that the judgment of the trial court be "reversed, and this cause is remanded to the trial court for further proceedings consistent with this opinion."

As stated, appellee relies chiefly upon the case of Wells v. Littlefield, 62 Tex. 28, in which the Supreme Court issued a writ of mandamus requiring the trial judge to render judgment for Wells in pursuance of specific directions given by the Supreme Court in their opinion handed down and mandate issued in Wells v. Littlefield, 59 Tex. 556, as follows:

"* * * The judgment below will be reversed and the cause remanded, with directions to the court below to enter up such judgment in favor of the appellant, Marshall Wells, as under the law as announced by this opinion he was entitled to obtain upon the former trial of the cause, from the result of which this appeal was taken; and to allow him such recovery as he had a right to in the state of the record below, had the decision there been in his favor upon the trial of the right to the property in controversy."

Upon a retrial of that case in the District Court, Littlefield amended his pleadings setting up matters diclosed in newly discovered testimony, and the trial court heard evidence in a new trial and again rendered judgment thereon for Littlefield **\*169** against Wells. As the Supreme Court in reversing the judgment and remanding the cause had plainly directed the trial court to proceed to render judgment for Wells against Littlefield, writ of mandamus was issued directing the trial judge to render judgment as before directed. 62 Tex. 28.

 [4]   No such case as that is presented here, for here the Supreme Court, in ordering a remand, not only did not render judgment or direct the trial court to render judgment for appellee, but by implication held that it was not a case for rendition or authorizing or directing the trial court to render that or any other particular judgment. This was evidenced by the refusal of the Supreme Court to grant judgment for appellee. The Supreme Court simply reversed the judgment of the trial court in favor of appellant, and remanded the cause to the trial court for further proceedings consistent with the opinion of the Supreme Court. The order to the trial court was in effect, simply, that the trial judge proceed

with a new trial and render judgment upon the new record in accordance with the principles and holdings announced in the opinion of the Supreme Court. Roberts v. Armstrong, Tex.Com.App., 231 S.W. 371, in which the "holdings" of the Commission of Appeals were expressly approved by the Supreme Court. The decision in that case grew out of the opinion of this Court in the first appeal in the same case (Armstrong v. Gifford, 196 S.W. 723) and opinion of the Galveston Court in the second appeal. 212 S.W. 227. In its mandate in that case this Court reversed the judgment and "remanded the cause for further proceedings in accordance with" the reversing opinion. Following this remand the trial court in that case, as was done in this case, refused to hear any evidence or consider or submit any issue except that upon the amount of rents involved in the case. The losing party again appealed, and the Galveston Court affirmed the judgment. Writ of error was granted and the Supreme Court, according to its reported opinion, ordered that judgments of the trial court and Court of Civil Appeals be reversed and remanded "for further proceedings in accordance with this opinion." 231 S.W. 371, 375. On a subsequent appeal, however, it was stated that the Supreme Court had reversed the judgment "and remanded the cause to be tried upon" a sole issue therein indicated, Tex.Civ.App., 269 S.W. 452, 453. The specific instruction must have been embraced in the mandate of the Supreme Court, for it is not disclosed in the opinion. But the point is immaterial here. The point in issue here is that the Supreme Court held (231 S.W. 371, 375) that upon an opinion and mandate remanding a cause for further proceedings "in accordance [consistent] with this opinion," when not modified by more specific instructions, has the effect of remanding the cause for a new trial on all issues of fact. It was so held by the Supreme Court, as we construe their opinion, in the cited case. 231 S.W. 371.

Now, in this case, on return of the mandate of the Supreme Court to the trial court, appellant demanded a jury and paid the jury fee, and filed an amended answer, including a plea to abate the suit until the recently appointed legal guardian of appellee's estate was made a party in lieu of her stepfather, Hauptreif, who had brought the suit for appellee as her next friend; followed by general demurrer and general denial and special answer, to the effect, as stated in appellant's brief, of "setting up numerous defenses not pleaded at the time of the trial from which the original appeal was taken, including an allegation that taxes in the sum of $21.60, owed by the community estate for 1924 State and County taxes, were paid October 30th, 1924, which was four months after the date of the transactions with the bank involved in this suit

and alleging that therefore indebtedness of the community estate did exist when the bank paid the money to plaintiff's mother, and that other indebtedness existed. By said amended answer, appellant further set up that the plaintiff's parents owned no homestead at the time of her father's death and that her father was a farmer, and that the community estate did not have other exempt property allowed by our exemption laws, and that the plaintiff's mother had no separate property for her maintenance, and that plaintiff's mother was therefore entitled to allowances for a year's support and in lieu of homestead and in lieu of other exemptions; that the money loaned by plaintiff's mother was used to purchase a farm by the borrower on which a lien was retained and which farm was conveyed to plaintiff's mother as trustee for the minor plaintiff in this case, and as such trustee owned and held by plaintiff's said mother for the plaintiff from 1928 until after the filing of this suit in 1932, during which time rents and revenues **\*170** were collected by plaintiff's said mother as trustee; that plaintiff's mother and the next friend herein, the plaintiff's stepfather, had conspired to deprive defendant of its legal right and that there had never been any accounting between the minor plaintiff and her mother and that the minor plaintiff was entitled to recover no more from the bank than she could recover from her mother in a legal accounting and that defendant, appellant herein, was entitled to be subrogated to the rights of plaintiff's mother and to set up all of the defenses and equities which plaintiff's mother could set up against the plaintiff in an accounting, and that the amount expended by the plaintiff's mother for payment of debts and the amounts to which she would have been entitled as allowances for a year's support and in lieu of homestead and other exemptions should be treated as applied for, and were applied for by defendant bank, and should be adjudicated. Appellant then prayed that the plaintiff's mother, joined pro forma by her husband, Louis Hauptreif, and J. D. Howard, the guardian of the estate of the minor plaintiff, be cited, and that the suit be abated until the guardian had appeared, and that upon trial a full accounting be required between the minor plaintiff and her said mother and that the debts and charges against the community estate which were paid by the plaintiff's mother, together with a reasonable amount as allowances for a year's support and in lieu of homestead and other exempt property, be ascertained and allowed as credits and deductions and that defendant be subrogated to the rights of the minor plaintiff's mother, and that there be a full and fair adjustment of the equities between the parties."

On the other hand, appellee filed no other pleading than a formal motion for judgment "in favor of Plaintiffs on the undisputed facts as found by the Supreme Court of Texas in its opinion of March 12, 1941, reversing and remanding this cause for further proceedings consistent with said opinion, \* \* \*."

The trial court overruled appellant's general demurrer to that motion, refused appellant's demand for jury, refused to allow appellant to introduce any evidence, heard no evidence from either party on the merits or on appellee's motion for judgment, and, granting that motion, rendered judgment for appellee for $2,517.01, with interest, thereupon computed, from the date of the filing of the suit.

**[5]** On the authority of Roberts v. Armstrong, Tex.Com.App., 231 S.W. 371, supra, we hold that the trial court erred in refusing appellant's demand for retrial on the merits.

The judgment is reversed and the cause remanded for another trial in consonance with the opinion of the Supreme Court in the case.

**All Citations**

162 S.W.2d 165

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

716 S.W.2d 719
Court of Appeals of Texas,
Corpus Christi.

Burton M. FITZSIMMONS, et ux., Appellants,

v.

Alvin E. ANTHONY, et al., Appellees.

No. 13–86–089–CV. | Aug. 29,
1986. | Rehearing Denied Sept. 30, 1986.

Purchasers brought suit for specific performance against vendors of property. The 81st District Court, Wilson County, Robert Lee Eschenburg, II, J., granted specific performance to purchasers. Vendors appealed. The Court of Appeals, Nye, C.J., held that purchasers were entitled to specific performance where vendors attempted to cancel the sale after purchasers had already demonstrated willingness to perform.

Affirmed.

West Headnotes (4)

**[1]** **Specific Performance**
 🗝 Appeal

Appellate court will uphold trial court's findings of fact in specific performance action unless they are manifestly erroneous and without evidence to support them or are so against great weight and preponderance of evidence as to be manifestly wrong.

Cases that cite this headnote

**[2]** **Vendor and Purchaser**
 🗝 Time of Performance and Payment

Purchasers were entitled to reasonable time to perform under contract for sale of property, where contract did not specify date for performance or state that time was of the essence; fact that contract precluded termination for 120 days except on written mutual consent did not mean that vendor could unilaterally cancel after 120 days, nor did such provision set 120 days as reasonable time for performance.

5 Cases that cite this headnote

**[3]** **Contracts**
 🗝 Time for Performance Where No Time Is Specified

Generally, where no time for performance of contract is expressly stated in contract, law will imply reasonable time for performance.

5 Cases that cite this headnote

**[4]** **Contracts**
 🗝 Excuses for Nonperformance or Defects

Where third party's approval is required as condition to performance of contract, it is reasonable to delay performance until approval is received.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*719** Per Hardy, San Antonio, for appellants.

Bruce W. Bodner, San Antonio, for appellees.

**OPINION**

NYE, Chief Justice.

Appellants, Burton M. and Fannie Lee Fitzsimmons, challenge the judgments of the trial court, which ordered specific performance **\*720** of their contracts to convey land to the appellees. We affirm.

The appellees' suits for specific performance were consolidated for trial. Appellees, Alvin E. Anthony, Errol Ray Warren, and Milven D. Warren, Jr., had each entered into a contract of sale with the appellants. The three contracts were executed on May 24, 1983. Attached to each contract was a metes and bounds description of the three contiguous tracts which the appellees were purchasing. Each of the contracts was a standard Texas Veterans Land Program "Application and Contract of Sale." Each contained the following provision:

14. In no event shall this contract be terminated by the veteran or seller before the expiration of 120 days from the date hereof except by written consent of both parties and written notice thereof to the Veterans Land Board of the State of Texas. The Veterans' Land Board of the State of Texas reserves the right to cancel after acceptance of the assignment of the contract if the seller or veteran fails to put forth reasonable efforts to comply with the terms hereof.

The parties agreed that the one hundred twentieth day was September 21, 1983. Ms. Louceyette Voges, owner of the Wilson County Abstract Company at the time in question, testified that, after examining the title to the land and receiving approvals of loans to the appellees, she sent the appellees' three commitments to the Veterans Land Board sometime in the middle of August 1983. The Veterans Land Board sent letters notifying the appellees that it had approved the transactions on September 8, 13, and 14, 1983. It was waiting for the comptroller's office to issue state warrants (checks) for the amounts approved. By letters of September 20, 21, and 23, 1983, the Board notified the appellees that the purchases were ready to be closed, and that they should contact the title company to set a date for closing.

Appellant Burton Fitzsimmons admitted that he received copies of these letters, knew of their contents, and knew that the deal was proceeding to a point that the closing date was near. Nevertheless, on either Friday, September 23, or Monday, September 26, he wrote the Veterans Land Board and informed them that he and his wife wished to cancel the sale.

 **[1]**    In ordering specific performance, the trial court filed findings of fact and conclusions of law. An appellate court will uphold a trial court's findings of fact unless they are manifestly erroneous and without evidence to support them or are so against the great weight and preponderance of the evidence as to be manifestly wrong. *Trevino v. Castellow Chevrolet-Oldsmobile, Inc.,* 680 S.W.2d 71, 75 (Tex.App.—Corpus Christi 1984, no writ); *Hinojosa v. Castellow Chevrolet Oldsmobile, Inc.,* 678 S.W.2d 707, 713 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.).

 **[2]**    Here, the trial court found that the contract neither specified a date for performance nor stated that time was of the essence. It concluded that, in the absence of "time of the essence" provisions and stipulated performance dates, parties are entitled to a reasonable time to perform their part of a contract. The court further concluded that the parties had demonstrated their willingness to perform before the appellants' attempt to cancel the sales on September 26, 1983. The conclusion of law filed by the trial court was correct.

 **[3]**    Generally, where no time for performance is stated, the law will imply a reasonable time. *Moore v. Dilworth,* 142 Tex. 538, 179 S.W.2d 940, 942 (1944); *Joines v. Burke,* 540 S.W.2d 798, 801 (Tex.Civ.App.—Corpus Christi 1976, no writ). Appellants contend that the 120–day period referred to in paragraph fourteen of the contracts, set out above, either 1) caused the contracts to expire after 120 days; or 2) gave either party the right to unilaterally cancel after 120 days; or 3) set 120 days as a reasonable time for performance. We disagree. The language of paragraph fourteen merely states the proper method of cancellation of the contract within the **\*721** 120–day period. It is silent about whether a party may cancel after that time.

 **[4]**    The delay in closing in this case was occasioned by waiting for the Board's approval, and no evidence was introduced that appellees were in any way responsible for the delay. In fact, all of the evidence was to the contrary. All three of the appellees were in touch with the title company on or before September 26, inquiring about setting a closing date. No closing date was set because the title company had already been notified that the appellants would not perform. Where a third party's approval is required as a condition of performance, it is reasonable to delay performance until the approval is received. *See Hubler v. Oshman,* 700 S.W.2d 694, 698 (Tex.App.—Corpus Christi 1985, no writ); *Carter v. Gerald,* 577 S.W.2d 797, 799–800 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.).

The judgment of the trial court is affirmed.

**All Citations**

716 S.W.2d 719

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

546 S.W.2d 844
Court of Civil Appeals of Texas,
San Antonio.

Mauricio FRANK, Appellant,

v.

Paul KUHNREICH and Belinda, Inc., Appellees.

No. 15641. | Jan. 5, 1977. |
Rehearing Denied Feb. 16, 1977.

Lessee and sublessee brought action against lessor for specific performance of lease agreement and for damages, and lessor filed cross action seeking forfeiture and termination of lease. The 111th District Court, Webb County, E. D. Salinas, J., entered summary judgment for plaintiffs, and lessor appealed. The Court of Civil Appeals, Klingeman, J., held that evidence of profits made by lessee in operation of entirely different type of business from that carried on in leased premises, at entirely different locations, was insufficient to establish amount of damages, if any, sustained by lessee at leased premises; and that lessor was not liable to lessee for damages in amount of $550 per month, the difference in amount paid by sublessee to lessee and amount paid by lessee to lessor.

Reversed and remanded.

Cadena, J., did not agree that it was error to award $550.00 per month.

West Headnotes (9)

**[1]**    **Judgment**
         Form and requisites of judgment

         Letter from trial judge addressed to attorneys of record was not proper method for entry of summary judgment; however, final judgment, which did not mention parties' motions for summary judgment, which did not dispose of such summary judgments by direct language, but which awarded damages to plaintiff, impliedly made all findings necessary to support the judgment, including liability issues.

         5 Cases that cite this headnote

**[2]**    **Contracts**
         Discharge of contract by breach

         Courts do not favor forfeitures, and unless compelled to do so by language that will admit no other construction, forfeiture will not be enforced.

         Cases that cite this headnote

**[3]**    **Contracts**
         Construction as a whole

         A written contract must be considered and construed together and various provisions or parts of lease are to be construed as a unified whole unless they are so repugnant and inconsistent as to nullify each other.

         Cases that cite this headnote

**[4]**    **Landlord and Tenant**
         Intention of parties

         **Landlord and Tenant**
         Reasonable construction

         A lease, like other written agreement, should be given reasonable construction that will carry out intention of parties as expressed by language of contract.

         2 Cases that cite this headnote

**[5]**    **Landlord and Tenant**
         Construction and Operation

         **Landlord and Tenant**
         Construction against drafter

         A lease is governed by general rule of construction of written instruments; any doubts as to meaning of language of lease are to be resolved most strongly against lessor who prepared it.

         3 Cases that cite this headnote

**[6]**    **Landlord and Tenant**
         Insurance

         **Specific Performance**
         Contracts Relating to Real Property

Where lease agreement required lessee to carry fire and liability insurance on leased premises, and further provided for written notice of default to be given lessee, with specified time to cure such default and to avoid forfeiture of lease, and leased premises were not covered by liability insurance for certain periods of time, but within 15 days after notification of such insurance defaults the defaults were remedied, lessor was not entitled to forfeiture and termination of lease, and lessee was entitled to specific performance and possession under lease.

2 Cases that cite this headnote

**[7]**    **Landlord and Tenant**
 Damages

In action brought by lessee against lessor to recover damages for lost profits allegedly caused by lessor's failure to turn over leased premises in tenantable condition within reasonable time after fire at leased premises, evidence of profits made by lessee in operation of entirely different type of business from that carried on in leased premises, at entirely different locations, was insufficient to establish amount of damages, if any, sustained by lessee at leased premises.

1 Cases that cite this headnote

**[8]**    **Landlord and Tenant**
 Damages

Lessee has duty to mitigate damages, if possible.

3 Cases that cite this headnote

**[9]**    **Landlord and Tenant**
 Damages

Where sublease between lessee and sublessee was signed after fire at leased premises, at time when lessee was sole shareholder and owner of sublessee, and sublease called for rental payments from sublessee in an amount $550 per month greater than paid by lessee under lease, lessor, who allegedly failed to turn over leased premises in tenantable condition within reasonable time after fire, was not liable to lessee for damages in amount of $550 per month, the

difference in amount paid by sublessee to lessee and amount paid by lessee to lessor.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*845**  J. G. Hornberger, J. G. Hornberger, Jr., Laredo, for appellant.

Roy J. True, True & Zable, Dallas, for appellees.

**Opinion**

KLINGEMAN, Justice.

This is a suit by Paul Kuhnreich and Belinda, Inc. against Mauricio Frank for specific performance of a lease agreement and for damages. Frank answered by general denial and a cross-action seeking a forfeiture and termination of the lease because of the failure of the lessee to comply with the terms of the lease. Both parties filed motions for summary judgment on the question of liability, and on December 20, 1973, the court found that a forfeiture and termination of the lease was not warranted; and based on this finding, the court granted plaintiffs' motion for summary judgment and denied defendant's motion. Trial on the damage issues was to a jury, and in response to the jury's answers on the special issues submitted, judgment was rendered on January 22, 1976, awarding damages to the plaintiffs.

The lease agreement, between Paul Kuhnreich as lessee and Mauricio Frank as lessor, was entered into on February 15, 1969, covering certain property in Laredo, Webb County, Texas, herein referred to as the Iturbide Street property. This lease was for a period of five years, with an option to extend for an additional three years.

The pertinent portions of the lease here involved may be summarized as follows:

Paragraph 7. It is specifically understood and agreed that lessor will carry Fire and Extended Coverage Insurance on the building located on said leased premises. The lessee, however, shall carry liability insurance on the leased premises to protect both the lessee and the lessor with limits of not less than $100,000/$200,000 and the premium for said liability insurance shall be paid by lessee . In addition, the lessee shall carry plate glass insurance on the front windows and the premium for such insurance shall be paid by lessee.

Paragraph 13. It is understood and agreed that if rent or other monies remain unpaid for a period of ten days after mailing of notice by the lessor stating that same is unpaid, then failure to pay such rent by registered mail forthwith shall operate as a forfeiture under this lease at the option of the lessor and in the event that any default shall remain unremedied for fifteen days after written notice by registered mail, then the lessor may at his option declare this lease forfeited and the terms shall **\*846** thereupon end and he may proceed as hereinafter provided .

Paragraph 15. The lessee covenants and agrees that if at any time there should be any default in the payment of any rent or any other consideration herein contained or neglect to perform and observe any or either of the covenants contained in this instrument, which on his part is to be performed, or the performance of any of the terms and conditions of this lease, then upon such default, the entire rent for the balance of the term shall, at the option of the lessor at once become due and payable, as if by the terms of this lease they were all payable in advance, or at the option of the lessor the tenancy hereby created may be terminated, and the said lessor, his heirs, representatives or assigns may cancel this lease forthwith at his option and may recover the possession of the demised premises and may dispossess all persons therefrom.

Paragraph 17. Should the premises herein be destroyed or rendered untenantable by fire or the elements, lessor agrees to cause to be rebuilt or repaired the improvements on said premises in essentially the same condition as they are at the inception of this lease. It is specifically understood and agreed that such replacement or repairs of such improvements shall be made within a reasonable time from the time that said premises become untenantable, and it is further agreed that during the time that such premises remain untenantable, the rent provided for herein shall be abated.

Paragraph 23. Lessee is hereby given the right and option to extend this lease for an additional three (3) years from and after March 31, 1974, upon the same terms and conditions as are contained in this lease, EXCEPT that the rental shall be as follows: (here follows schedule of monthly rentals). Should the lessee desire to exercise this option he shall give written notice to the lessor of his intention to so exercise such option on or before October 31, 1973. Failure of lessee to give such notice, as herein provided, shall operate to nullify and destroy the option herein granted.

Kuhnreich opened his business, known as Belinda's, in the leased premises on April 14, 1969. It was operated as a ladies and men's ready-to-wear store. A fire occurred on the premises on or about January 12, 1972, causing substantial damages. A fire sale was thereafter conducted by plaintiffs until about May 31, 1972, and possession was not relinquished by plaintiffs until on or about June 7, 1972.

On July 1, 1972, Kuhnreich subleased to Belinda, Inc. (all the stock of Belinda, Inc. was owned by Kuhnreich). Thereafter, LeBaron, Inc., successor to Belinda, Inc., took over such operations in the latter part of 1972 or early 1973. Kuhnreich owns 50% Of the stock of LeBaron.

Repair work on the premises started in September of 1972. There is some testimony that the lessee was getting apprehensive during this period and complained to the lessor about delay in the repair work, and there is also some testimony that the lessor attempted to negotiate for more favorable rentals under the contract. Frank contends that the premises wee substantially completed by December 1972, but there is some dispute as to this. On January 4, 1973, Frank, through his attorney, wrote to plaintiffs making certain inquiries about compliance with the provisions for carrying liability insurance, [1] and on January 12, 1973, the attorney for Frank wrote to plaintiff and advised him that because of his failure to comply with the terms of the lease agreement, the lease was being terminated. On January 22, 1973, plaintiffs filed suit against defendant seeking specific performance and damages, as hereinbefore stated.

Frank asserts 43 points of error, some of which seek rendition while the others seek a remand.

A number of points of error complain that the trial court erred in granting plaintiffs' motions for summary judgment.

**\*847** There appears in this transcript a letter dated December 20, 1973 from the trial judge addressed to the attorneys of record, which is filed in the record of such cause and which purports to be the order granting plaintiffs' motion for summary judgment and denying defendant's motion for summary judgment .

The pertinent portions of such letter may be summarized as follows:

(a) Both parties filed motions for summary judgment, plaintiffs' seeking specific performance and possession under the lease contract, and defendant seeking forfeiture and termination of the lease.

(b) There is no genuine issue of material fact.

(c) Defendant contends that the lease terminated because of failure to comply with the lease provision pertaining to insurance coverage, and that paragraph 15 of the lease is controlling.

(d) Plaintiffs contend that paragraph 13 of the lease is controlling, that they fully complied with the provisions thereof.

(e) The premises were not covered by liability insurance for certain periods of time, but it is undisputed that within 15 days after notification of such insurance default, such defaults were remedied.

(f) The motion for summary judgment of defendant is denied, and the motion for summary judgment of plaintiffs is sustained.

 [1]    The letter contained in the records is not a proper method for entry of a judgment and we do not approve this kind of procedure. The letter contains statements and other material not ordinarily contained in a judgment and a letter of this sort addressed to the attorneys for purposes of appellate procedure is ordinarily a nullity. Benedict v. Benedict, 542 S.W.2d 692 (Tex.Civ.App.—Fort Worth 1976, no writ); Tejas Trail Property Owners Association v. Holt, 516 S.W.2d 441 (Tex.Civ.App.—Fort Worth 1974, no writ).

The final judgment, dated January 22, 1976, does not mention the motions for summary judgment and such summary judgments are not disposed of by direct language in such judgment. In North East Independent School District v. Aldridge, 400 S.W.2d 893 (Tex.1966), the Court, in discussing the finality of judgments for appellate purpose, stated:

> When a judgment, not intrinsically interlocutory in character, is rendered and entered in a case regularly set for a conventional trial on the merits, no order for a separate trial of issues having been entered pursuant to Rule 174, Texas Rules of Civil Procedure, it will be presumed for appeal purposes that the Court intended to, and did, dispose of all parties legally before it and of all issues made by the pleadings between such parties.

Under such rule, the judgment, dated January 22, 1976, awarding damages to plaintiff, impliedly made all findings necessary to support the judgment, including the liability issues. The points of error are properly before us by virtue of defendant's points of error pertaining to the motions for summary judgment, hereinbefore set forth, ald also by points of error of defendant in which he complains that the trial court erred as a matter of law in granting judgment for plaintiffs and in not granting judgment for defendant, and in failing to grant defendant's motions for judgment non obstante veredicto.

Frank makes no contention that there are any disputed issues of material fact as to the question of liability. His points of error as to liability assert: (a) it is undisputed that plaintiffs were in violation of the insurance provisions contained in the lease; (b) since plaintiffs clearly violated the provisions of the lease, under the terms of the lease no notice was required, and that the lease was effectively terminated by the letter of January 12, 1973; (c) the trial court erred in granting plaintiffs' motion for summary judgment and in overruling defendant's motion for summary judgment; (d) the trial court erred as a matter of law in granting judgment for plaintiffs' and in not granting judgment for defendant; (e) the trial court erred in not granting defendant's **\*848**  motion for judgment non obstante veredicto; (f) this case should be reversed and judgment here rendered in favor of defendant that plaintiffs take nothing.

We have concluded that the trial court did not err in granting plaintiffs' motion for summary judgment and in refusing to grant defendant's motion for summary judgment because of the following reasons:

 [2]    (1) The courts do not favor forfeitures and unless compelled to do so by language that will admit no other construction, forfeiture will not be enforced. G. C. Murphy Company v. Lack, 404 S.W.2d 853 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n.r.e.); Henshaw v. Texas Natural Resources Foundation, 147 Tex. 436, 216 S.W.2d 566 (Tex. 1949); 36 Tex.Jur.2d Landlord & Tenants ss 253, 254 (1962).

 [3]   [4]    (2) A written contract must be considered and construed together and various provisions or parts of the lease are to be construed as a unified whole unless they are so repugnant and inconsistent as to nullify each other. A lease, like other written agreement, should be given a reasonable construction that will carry out the intention of the parties as expressed by the language of the contract.

 [5]    (3) A lease is governed by the general rule of construction of written instruments. Any doubts as to the

meaning of the language of the lease are to be resolved most strongly against the lessor who prepared it. 35 Tex.Jur.2d Jury s 20 (1962); Fisher v. Tempco Aircraft Corporation, 324 S.W.2d 571 (Tex.Civ.App.—Texarkana 1959, no writ); Dedear v. Wilson, 220 S.W.2d 534 (Tex.Civ.App.—Austin 1949, writ ref'd); Pickrell v. Buckler, 293 S.W. 667 (Tex.Civ.App.—El Paso 1927, no writ).

 [6]   We have examined and considered the entire lease, including specifically, paragraphs 13 and 15 of the lease. Paragraph 13 of the lease clearly provides for written notice of default to be given lessee, with a specified time to cure such default and avoid forfeiture of the lease. We see no purpose for such provision in the lease if the parties intended that the lessor could terminate the lease without notice. The parties did not intend to do a useless thing.

A reasonable construction of the two provisions, taken together, is that after a particular default, the party in default was to be given written notice of such default with the right to cure such default within the time therein provided. The lease did not give the lessor the right to terminate the lease without notice, under the complete terms and provisions of the lease.

We have concluded that the trial court did not err in refusing to grant defendant's motion for summary judgment and in granting plaintiffs' motion.

 [7]   We will next consider those points of error which, if sustained, will require a reversal and remand of this case. These points of error pertain to the jury answers on the damage issues. The jury found, in answer to special issues submitted, that (1) defendant could have turned over the leased premises in a tenantable condition on October 7, 1972; (2) defendant failed in turn over the leased premises to plaintiffs in a tenantable condition; (3) plaintiff, LeBaron, as successor to Belinda, Inc., suffered loss of profits as a result of defendant's failure to turn over the leased premises to plaintiffs; (4) the sum of $3,500.00 per month would reasonably compensate plaintiff LeBaron for its loss of profits. Based upon such jury findings, judgment was entered that Kuhnreich recover judgment against defendant for $550.00 a month commencing October 7, 1972, and continuing through March 31, 1974, an aggregate amount of $9,900.00; LeBaron recover judgment for $3,500.00 a month commencing on October 7, 1972, aggregating $63,000.00. The court refused to award damages for the three year option period. Defendant alone excepted to the judgment and gave notice of appeal to this court.

By a number of points of error, defendant asserts that the jury's answers to Special Issues 1, 2, 4, and 5 are supported by no evidence, insufficient evidence, and that the jury's answers thereto are against the great weight and preponderance of the evidence. **\*849** We will first consider the special issues which pertain to lost profits in which defendant asserts that the evidence concerning lost profits is too uncertain or speculative to support any recovery for lost profits; that the jury answers to these issues are insufficiently supported by the evidence; and are against the great weight and preponderance of the evidence.

The leased premises involved, sometimes referred to as the Iturbide Street Store, contains an area of 4,500 square feet. Such lease was prepared by Frank's lawyer. In April of 1969 Kuhnreich established a business at such leased premises under the name of Belinda. Kuhnreich was the sole owner and the business carried on was a ladies and men's ready-to-wear store. This operation continued until the fire occurred on January 12, 1972, causing substantial damage to the leased premises. A fire sale was thereafter conducted until about May 31, 1972, and on June 7, 1972 the premises were delivered back to Frank.

Kuhnreich testified that he intended to go back into business in this location when the premises were repaired. Kuhnreich further testified that it was his intention to operate therein a business which would include men's wear, electronics, crystal, porcelain, gifts, and novelties. On the first day of July 1972, Kuhnreich made a sublease of the premises to Belinda, Inc., wherein Belinda, Inc. was to pay Kuhnreich $550.00 a month more rental than Kuhnreich was paying Frank. Kuhnreich was the sole owner of Belinda, Inc. Sometime after the fire, Belinda, Inc. leased 1,200 square feet of space known as El Lider at an entirely different location. This store was operated from March 1973 until October 31, 1974. The El Lider store sold televisions, stereos, calculators, crystal, porcelain, china, gifts, and novelties. Kuhnreich testified that the average monthly profit at the El Lider store was between $7,000.00 and $8,000.00 a month, but on cross examination he was unable to give specific information in regard thereto and stated that his accountant, Arthur Rossi, knew the details thereof. However, he did testify that for the first year of operation there was a loss of $14,985.87, including a carryover loss of $29,413.97.

There is testimony that the El Lider location was a temporary location, and Kuhnreich testified that he intended to open another location at 1006 Grant, which was a larger store

containing between 3,000 and 3,500 square feet. Plaintiffs continued to operate in the El Lider location until October 31, 1974, when they moved into the Grant location. This business is primarily an electronics business with much of the electronics equipment being sold into Mexico.

The only other witness who testified as to profits was Arthur Rossi, a C.P.A. who handles Belinda's and LeBaron's books. He stated that LeBaron's was a business that sells electronics and a variety of other goods. He testified that LeBaron's profits ranged from a high of $6,812.00 a month for a particular period (March 1974 to March 1975) to a low of $5,337.68 a year for the fiscal year which ended February 28, 1974, depending on whether or not officers' salaries were included in computing such figures. It is seen that the supposed profits vary greatly depending on whether or not officers' salaries are included. Moreover, there is testimony that plaintiffs had a income tax loss for some of the years involved. The figures are rather meaningless. The officers could, either by raising or decreasing their salaries, materially change the amount of profits.

He was then asked what the profits would have been if it would have been operating at Iturbide Street and stated that he did not have a positive opinion. He further testified that most of the sales made by plaintiffs were made into Mexico and that the amount of volume and the amount of profits would depend on whether the Mexican government permitted electronics devices to be taken into Mexico without payment of duty.

In Southwest Battery Corporation v. Owen, 131 Tex. 423, 115 S.W.2d 1097 (1938), the Court stated:
 **\*850**  In the early decisions a rigid rule affecting the right of recovery for lost profits was announced. Modern business methods have caused a relaxation of that hard rule. . . .

The rule denying a recovery where the facts show that such profits claimed are too uncertain or speculative, or where the enterprise is new or unestablished, is still enforced, on the ground that the profits which might have been made from such business are not susceptible of being established by proof to that degree of certainty which the law demands * * *

It is impossible to announce with exact certainty any rule measuring the profits the loss for which recovery may be had. The courts draw a distinction between uncertainty merely as to the amount and uncertainty as to the fact of legal damages. Cases may be cited which hold that uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery. A party who breaks his

contract cannot escape liability because it is impossible to state or prove a perfect measure of damages. . . . Where, . . . it is shown that the business was a going concern, and was making a profit, when the contract was breached, such pre-existing profit, together with other facts and circumstances, may be considered in arriving at a just estimate of the amount of profit which would have been made if plaintiff had not breached its contract.

In 17 Tex.Jur.2d Damages s 149 (1960), it is stated:

> To substantiate his claim of lost profits the plaintiff must bring forward convincing evidence; opinions and mere estimates will not suffice. And lost profits will not be considered sufficiently proved in the absence of factual data offered to show prospective income, predicated on such factors as previous experience, past earnings of the same or a similar business, the competitive relationship of the business, and the prospects of continued public acceptance of the product or service offered.

The testimony as to lost profits may be summarized as follows:

(a) Plaintiff operated a ladies and men's ready-to-wear store at the leased premises (1205 Iturbide). This covered the period from April 1969 to June 1972. The only evidence as to profits earned in such store was testimony that there was a $29,413.97 carryover loss in the years 1973 and 1974.

(b) All the other testimony as to profits pertains to the operation of an entirely different type of business (electronics, novelties, giftware, etc.) at entirely different locations. Even this testimony is conflicting with different figures as to taxable income and as to average monthly profits. The amount of such profits differ greatly depending on whether the profit includes the salaries of the officers of the corporation or whether it was exclusive of salaries.

(c) Plaintiffs' accountant, when asked what plaintiffs' monthly profits would have been if it was operated as Iturbide Street, stated that he had no positive opinion. There is no evidence whatsoever of any profits are the established business at the leased premises, 1205 Iturbide Street.

(d) Moreover, there is no testimony as to the desirability of the various locations involved. There is absolutely no evidence in the record as to the location of the stores, customer availability, the probability that the business will remain stable over a period of years, or the probability of increased business. There is no factual data which would show what profits, if any, would have been made at the leased premises.

The thrust of plaintiffs' contention is that since there is testimony that he made 'X' profits at a new and different location in an entirely different type of business, then, therefore, he is entitled to 'X' profits. This does not necessarily follow.

Under the record before us, it is a matter of some conjecture and speculation as to whether plaintiffs suffered any damages. Their claim for damages is based on testimony that they were making 'X' amount of profit as an electronics, novelties, and gifts business at two locations in Laredo, El **\*851** Lider and Grant Street, but there is no testimony as to what effect the opening of another store selling these same type of items on the leased premises (Iturbide Street) would have had on the total amount of profits made; whether they would have been the same, less, or more.

In our opinion, plaintiffs failed to establish by competent evidence the amount of the damages, if any, that they sustained at the leased premises with that degree of certainty which the law requires.

Defendant also asserts that the trial court erred in holding Frank liable to Kuhnreich for damages in the amount of $550.00 a month, which is the difference in the amount Belinda, Inc., as sublessee, was to pay him as rent and the amount he was to pay Frank. The sublease between Kuhnreich and Belinda, Inc. was signed on July 1, 1973, after the fire and at the time Kuhnreich owned all the stock of Belinda and was the sole owner thereof. Kuhnreich admitted that he was basically leasing to himself.

 **[8]** **[9]** A lessee has a duty to mitigate the damages, if possible, and the sublease, which Kuhnreich made, in effect artifically increased the amount of damages. There is no showing that the sublease agreement Kuhnreich made with Belinda, Inc. had any relationship to market value, and there is no showing that Kuhnreich suffered any real damages by virtue of this sublease. The court erred in awarding Kuhnreich damages in the amount of $550.00 per month.

Because of the errors hereinabove discussed, we have concluded that the judgment must be reversed and remanded.

By a cross-point, appellees urge that the trial court erred in not granting specific performance of the lease for the period covered in the option to extend the lease and that they are entitled to a calculation of their monthly damages so as to cover the three year additional period covered in such option. They ask for a modification or reformation of the judgment in this respect. Even if we were inclined to agree that the profits, if any, would be applicable also to this period, which we specifically do not herein pass on, there is no evidence in the record as to anticipated profits for such period of time. In view of our general remand, we will not consider such cross-point.

We have concluded that the judgment of January 22, 1976 must be reversed, and that the interest of justice would best be served by a general remand.

The judgment is reversed and remanded to the trial court for a new trial.

CADENA, Justice.

I do not agree it was error to award $550.00 per month.

**All Citations**

546 S.W.2d 844

Footnotes

1 Demand is hereby made for you to present to me or Mr. Frank immediately competent evidence that the insurance referred to in such paragraph has been in force since inception of the lease.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

End of Document

244 S.W.3d 855
Court of Appeals of Texas,
Dallas.

Vernon Lee GARNER, Appellant

v.

FIDELITY BANK, N. A., f/
k/a Parkway Bank, Appellee.

No. 05–07–00360–CV.    |    Jan. 31, 2008.

**Synopsis**
**Background:** Lender filed lawsuit against borrower, seeking to collect debt from borrower after borrower failed to pay promissory note on its maturity date or surrender collateral secured via commercial security agreement. Lender filed motion for summary judgment. Borrower responded and requested a continuance. The 296th District Court, Collin County, Betty Caton, J., denied borrower a continuance and granted summary judgment to lender, and granted a foreclosure of security interest in the collateral. Borrower appealed.

**Holdings:** The Court of Appeals, Richter, J., held that:

[1] trial court did not abuse its discretion in denying borrower's motion for continuance of hearing on lender's motion for summary judgment;

[2] statements set forth in borrower's responsive summary judgment affidavit that were allegedly made before promissory note was signed constituted impermissible parol evidence;

[3] exception to parol evidence rule for evidence of a collateral agreement did not apply to permit statements set forth in borrower's responsive summary judgment affidavit that were allegedly made after note was signed; and

[4] evidence of payment as an affirmative defense was inadmissible.

Affirmed.

West Headnotes (19)

**[1]** **Pretrial Procedure**
 Affidavits and Evidence

Trial court did not abuse its discretion in denying borrower's motion for continuance of hearing on lender's motion for summary judgment, in lender's action against borrower seeking to collect debt from borrower, as borrower's motion did not include an affidavit stating sufficient cause, as required by rule. Vernon's Ann.Texas Rules Civ.Proc., Rule 251.

1 Cases that cite this headnote

**[2]** **Appeal and Error**
 Continuance

The denial of a motion for continuance is reviewed under an abuse of discretion standard.

9 Cases that cite this headnote

**[3]** **Appeal and Error**
 Proceedings Preliminary to Trial

The denial of a motion for continuance will only be reversed on appeal if the trial court's action was arbitrary, unreasonable, or without reference to any guiding rules and principles.

7 Cases that cite this headnote

**[4]** **Appeal and Error**
 Dockets, Calendars, and Continuance

If a motion for continuance is not verified or supported by affidavit, appellate court will presume the trial court did not abuse its discretion in denying the motion. Vernon's Ann.Texas Rules Civ.Proc., Rule 251.

7 Cases that cite this headnote

**[5]** **Pretrial Procedure**
 Affidavits and Evidence

Rule requiring that a motion for continuance include an affidavit stating sufficient cause does

not require the party opposing a motion for continuance to lodge an objection with the trial court under any circumstances. Vernon's Ann.Texas Rules Civ.Proc., Rule 251.

1 Cases that cite this headnote

**[6]** **Evidence**
    Bills and Notes
**Judgment**
    Negotiable Instruments

Statements set forth in borrower's affidavit in response to lender's summary judgment motion that were allegedly made by lender to borrower before promissory note was signed constituted impermissible parol evidence, in context of lender's action against borrower to recover unpaid debt from borrower, as parties had executed a valid integrated agreement.

Cases that cite this headnote

**[7]** **Appeal and Error**
    Allowance of Remedy and Matters of Procedure in General

Appellate court reviews a trial court's ruling sustaining objections to summary judgment evidence for an abuse of discretion.

6 Cases that cite this headnote

**[8]** **Evidence**
    Contracts in General

When the parties have concluded a valid integrated agreement, the parol evidence rule precludes enforcement of a prior or contemporaneous inconsistent agreement.

1 Cases that cite this headnote

**[9]** **Evidence**
    Evidence Improperly Admitted

Evidence that violates the parol evidence rule is incompetent and without probative force, and cannot properly be given legal effect.

Cases that cite this headnote

**[10]** **Evidence**
    Bills and Notes or Indorsement Thereof
**Judgment**
    Negotiable Instruments

Exception to parol evidence rule for evidence of a collateral agreement did not apply to permit statements set forth in borrower's affidavit in response to lender's summary judgment motion that were allegedly made by lender to borrower after promissory note was signed, in context of lender's action against borrower to recover unpaid debt from borrower, as statements contradicted the express terms of parties' written agreement.

1 Cases that cite this headnote

**[11]** **Evidence**
    Prior and Contemporaneous Collateral Agreements

The parol evidence rule does not bar evidence of a collateral agreement.

Cases that cite this headnote

**[12]** **Evidence**
    Prior and Contemporaneous Collateral Agreements

A "collateral agreement," evidence of which is not barred by parol evidence rule, is one the parties might naturally make separately, i.e. one not ordinarily expected to be embodied in, or integrated with the written agreement and not so clearly connected with the principal transaction as to be part and parcel of it.

1 Cases that cite this headnote

**[13]** **Evidence**
    Contracts in General

Exception to parol evidence rule that exists with respect to evidence of a collateral agreement does not permit parol evidence that varies or contradicts the express or implied terms of the written agreement.

1 Cases that cite this headnote

**[14]** **Contracts**
👉 Application to Contracts in General

**Evidence**
👉 Completeness of Writing and Presumption in Relation Thereto; Integration

A written agreement will be enforced as written and cannot be added to, varied, or contradicted by parol testimony; this is particularly true where the written contract contains a recital that it contains the entire agreement between the parties or a similarly worded merger provision.

1 Cases that cite this headnote

**[15]** **Appeal and Error**
👉 Cases Triable in Appellate Court

Appellate court reviews the granting of a summary judgment motion de novo.

2 Cases that cite this headnote

**[16]** **Bills and Notes**
👉 Renewal, and Agreements to Renew

Fact that lender, in a letter to borrower, offered to renew promissory note that borrower failed to pay on its maturity date did not establish existence of an oral agreement between parties outside the express terms of the loan agreement the parties had executed, for purposes of lender's action against borrower to recover unpaid debt from borrower.

Cases that cite this headnote

**[17]** **Bills and Notes**
👉 Evidence Admissible Under Plea or Answer in General

Borrower's failure to properly plead an account or otherwise provide requisite notice for payment as affirmative defense to lender's action against him to recover unpaid balance of note rendered evidence as to payment inadmissible. Vernon's Ann.Texas Rules Civ.Proc., Rules 94, 95.

1 Cases that cite this headnote

**[18]** **Evidence**
👉 Matters of Defense and Rebuttal

Party asserting an affirmative defense bears the burden of proving its elements. Vernon's Ann.Texas Rules Civ.Proc., Rule 94.

6 Cases that cite this headnote

**[19]** **Bills and Notes**
👉 Evidence Admissible Under Plea or Answer in General

Absence of a proper plea of payment renders evidence as to payment inadmissible in action to recover unpaid balance of notes. Vernon's Ann.Texas Rules Civ.Proc., Rule 95.

Cases that cite this headnote

## Attorneys and Law Firms

**\*857** Cecil R. Miskin, Burleson, Susan Bleil, Sondrea King, Bleil & King, Fort Worth, for Appellant.

Greg Gutman, Dallas, Edward L. Rice, Capelle & Burdette, L.L.P., Dallas, for Appellee.

Before Justices O'NEILL, RICHTER, and LANG.

## OPINION

Opinion by Justice RICHTER.

This appeal arises from a suit on a promissory note. Vernon Lee Garner challenges the entry of a traditional summary judgment in favor of Fidelity Bank, N.A., f/k/a/ Parkway Bank. In six issues, Garner argues: (1) the trial court abused its discretion when it denied Garner's motion for continuance; (2) the trial court erred when it granted summary judgment because there was a material issue of fact as to whether the note at issue constituted the complete agreement of the parties; (3) the court erred in granting summary judgment because Garner raised a material issue of fact concerning payment; (4) the trial court abused its discretion when it sustained Fidelity's objections to Garner's testimony about

statements and acts that occurred after the note was signed; (5) the trial court awarded Fidelity more relief than it requested; and (6) the trial court erred by awarding attorney's fees. Finding no reversible error, we affirm the trial court's judgment.

## I. BACKGROUND

Garner is in the used car business. Prior to the lawsuit, Garner had an ongoing **\*858** business relationship with Fidelity and entered into various loan agreements to finance the purchase of his vehicle inventory. On December 15, 2005, Garner and Fidelity entered into the loan agreement at issue in this case. To memorialize the agreement, the parties executed a promissory note with a June 15, 2005 maturity date and a commercial security agreement granting Fidelity a security interest in three specified vehicles. The parties also executed a "Notice of Final Agreement" which provided that the loan agreement, promissory note, and security agreement constituted the final agreement of the parties. When Garner did not pay the note on the maturity date or surrender the collateral, Fidelity offered to extend the note with a new note in the same principal amount. Garner refused. After demanding payment, Fidelity filed suit against Garner. Garner generally denied the allegations in a document entitled "Plea in Abatement, Special Exceptions, Special Denials, Affirmative Defense and Original Answer Subject Thereto" (the Answer). The Answer did not assert "payment" as an affirmative defense. On October 30, 2006 Fidelity moved for summary judgment on Garner's liability on the note. The motion was set for hearing on December 14, 2006. Garner responded on December 7, 2006 and requested a continuance. The crux of Garner's response was that the parties had agreed to terms other than what was stated in the note. At the same time he filed the response, Garner served his first request for production of documents on Fidelity. The trial court granted the summary judgment on December 26, 2006 and awarded Fidelity the amount due under the note with interest, costs, and attorney's fees. The final judgment also granted a foreclosure of the security interest in the collateral. This appeal followed.

## II. DISCUSSION

### Motion for Continuance

Garner's response to Fidelity's motion for summary judgment included a motion for continuance that consisted of a paragraph stating "[t]his case has not been on file for any appreciable length of time, certainly not sufficient to allow for adequate discovery." In his first issue, Garner argues the trial court erred by denying the motion for continuance. We disagree.

 **[1]  [2]  [3]  [4]  [5]**  The denial of a motion for continuance is reviewed under an abuse of discretion standard. *General Motors v. Gayle,* 951 S.W.2d 469, 476 (Tex.1997) (orig.proceeding). The denial will only be reversed if the trial court's action was arbitrary, unreasonable, or without reference to any guiding rules and principles. *See BMC Software Belg. N.V. v. Marchand,* 83 S.W.3d 789, 800 (Tex.2002). Garner gave no reason why he needed discovery to oppose summary judgment on the note, nor did he specify the discovery required. Although Garner now asserts the discovery was essential to plead or prove a payment defense, this argument was not presented to the trial court until after the summary judgment was granted and Garner filed a motion for new trial. Garner admits the request for a continuance was not verified, but maintains Fidelity's failure to object to the lack of verification precludes it from raising the issue on appeal. A motion for continuance must include an affidavit stating sufficient cause. TEX.R. CIV. P. 251; *Rabe v. Guaranty Nat'l Ins. Co.,* 787 S.W.2d 575, 578 (Tex.App.-Houston [1st Dist.] 1990, writ denied). If a motion for continuance is not verified or supported by affidavit, we will presume the trial court did not abuse its discretion in denying the motion. *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986); **\*859** *Hamm v. Millennium Income Fund, L.L.C.,* 178 S.W.3d 256, 270 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). The rule does not require the party opposing a motion for continuance to lodge an objection with the trial court under any circumstances. *See Daugherty v. Jacobs,* 187 S.W.3d 607, 620 (Tex.App.-Houston [14th Dist.] 2006, no pet.). Because Garner's motion did not include an affidavit stating sufficient cause, we conclude the trial court's ruling was neither arbitrary nor unreasonable. Garner's first issue is overruled.

### Objections to Summary Judgment Evidence

Garner submitted an affidavit in response to the motion for summary judgment. The affidavit described representations allegedly made by Fidelity to Garner and attached numerous prior notes between the parties. Fidelity objected to paragraphs 3–16 and 22 of the affidavit and argued the merger clause in the loan documents prohibited the use of parol evidence to show any other agreements of the parties. The trial court sustained the objection. In his third issue, Garner

maintains the trial court erred because the representations described in the affidavit were made after the date of the note. In Garner's view, this demonstrates the statements were not barred by the parol evidence rule.

 **[6]** **[7]** **[8]** **[9]** We review a trial court's ruling sustaining objections to summary judgment evidence for an abuse of discretion. *See Bradford Partners II, L.P. v. Fahning,* 231 S.W.3d 513, 521 (Tex.App.-Dallas 2007, no pet.). The portion of the affidavit Garner argues should have been allowed stated in pertinent part:

> I took that to mean that **when the note came due,** that I would pay the interest, plus pay for the cars sold during that period, and, just as before, the note would be renewed. [The bank officer] told me this both **before and after I signed the note** in question.

(Emphasis added). Contrary to Garner's assertion, the affidavit does not refer exclusively to representations alleged to have been made after the note was signed. The affidavit also refers to a statement made prior to the signing of the note. When, as here, the parties have concluded a valid integrated agreement, the parol evidence rule precludes enforcement of a prior or contemporaneous inconsistent agreement. *See Ledig v. Duke Energy Corp.,* 193 S.W.3d 167, 178 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Evidence that violates the rule is incompetent and without probative force, and cannot properly be given legal effect. *See Johnson v. Driver,* 198 S.W.3d 359, 364 (Tex.App.-Tyler 2006, no pet.). The statements made before the note was signed were inadmissible parol evidence.

 **[10]** **[11]** **[12]** **[13]** With regard to statements made after the note was signed, we recognize that the parol evidence rule does not bar evidence of a collateral agreement. *See Transit Enter. v. Addicks Tire & Auto Supply, Inc.,* 725 S.W.2d 459, 461 (Tex.App.-Houston [1st Dist.] 1987, no writ). A collateral agreement is one the parties might naturally make separately, i.e. one not ordinarily expected to be embodied in, or integrated with the written agreement and not so clearly connected with the principal transaction as to be part and parcel of it. *Boy Scouts of Am. v. Responsive Terminal Sys., Inc.,* 790 S.W.2d 738, 745 (Tex.App.-Dallas 1990, writ withdrawn). This exception, however, does not permit parol evidence that varies or contradicts the express or implied terms of the written agreement. *See Loe v. Murphy,* 611

S.W.2d 449, 451–52 (Tex.Civ.App.-Dallas 1980, writ ref'd n.r.e.). In addition, the notice of final agreement provides:

> **\*860** THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

 **[14]** A written agreement will be enforced as written and cannot be added to, varied, or contradicted by parol testimony. *See Smith v. Smith,* 794 S.W.2d 823, 827 (Tex.App.-Dallas 1990, writ withdrawn). This is particularly true where the written contract contains a recital that it contains the entire agreement between the parties or a similarly-worded merger provision. *See Weinacht v. Phillips Coal Co.,* 673 S.W.2d 677, 679 (Tex.App.-Dallas 1984, no writ). Because the evidence Garner sought to admit contradicted the express terms of the written agreement, the trial court did not err in excluding it. Garner's third issue is overruled.

### The Summary Judgment

 **[15]** In his fourth and fifth issues, Garner complains about the entry of summary judgment. We review the granting of a summary judgment motion de novo. *AIG Life Ins. Co. v. Federated Mut. Ins. Co.,* 200 S.W.3d 280, 284 (Tex.App.-Dallas 2006, pet. denied). When reviewing a traditional summary judgment, we determine whether the movant met its burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law. TEX.R. CIV. PROC. 166a; *AIG Life,* 200 S.W.3d at 284. We take the non-movant's evidence as true, indulge every reasonable inference in favor of the non-movant, and resolve all doubts in the non-movant's favor. TEX.R. CIV PROC. 166a; *AIG Life,* 200 S.W.3d at 284.

Garner first argues the summary judgment evidence raised a question of material fact about whether the note constituted the complete agreement of the parties. In support of his argument, Garner points to the portions of his affidavit

in which he describes how Fidelity allegedly agreed to an arrangement other than what is described in the loan documents and the prior notes he provided to demonstrate the parties previously executed notes with no maturity dates. We have already concluded the trial court did not err by sustaining Fidelity's objections to this evidence. Accordingly, Garner failed to produce competent summary judgment evidence to raise a disputed issue of material fact as to the agreement of the parties.

[16]    Garner's summary judgment evidence also included the letter from Fidelity offering to renew the note. Garner claims this uncontroverted evidence established the debt was being renewed and evidenced an ongoing floor planning arrangement that did not require Garner to pay for vehicles that had not been sold. The fact that Fidelity offered to renew the debt, however, does not establish the existence of an oral agreement outside the express terms of the contract. Garner's fourth issue is overruled.

[17]    Garner also contends he raised a material fact question on the issue of payment. Garner's affidavit stated he made $300 payments each month, but did not specify that the payments were on the note at issue. Garner did not quantify the total amount of payments allegedly made or provide any supporting documentation. Fidelity objected that there were no pleadings to support a payment defense and the trial court sustained the objection.

**\*861**  [18]    [19]    Payment is an affirmative defense that must be specifically pleaded. *See* TEX.R. CIV. P. 94; *Tarrant County Hosp. Dist. v. GE Automotive Serv., Inc.,* 156 S.W.3d 885, 896 n. 13 (Tex.App.-Fort Worth 2005, no pet.). The party asserting an affirmative defense bears the burden of proving its elements. *See Compass Bank v. MFP Financial Serv., Inc.,* 152 S.W.3d 844, 850 (Tex.App.-Dallas 2005, pet. denied). Rule 95 requires the party claiming the defense of payment to "file with his plea an account stating distinctly the nature of such payment, ... failing to do so, he shall not be allowed to prove the same, unless it be so plainly and particularly described in the plea as to give the plaintiff full notice of the character thereof." TEX.R. CIV. P. 95; *Mays v. Bank One, N.A.,* 150 S.W.3d 897, 899 (Tex.App.-Dallas 2004, no pet.).

Garner admits he did not file an account, but maintains it was impossible to do so because he did not have the discovery he required. As we noted earlier, Garner did not inform the trial court that he needed discovery to plead or prove payment until after the summary judgment had been determined. Although there was more than adequate time between the filing of the motion for summary judgment and the date on which it was set for hearing, Garner did not amend his answer to assert a payment defense. Because Garner failed to properly plead an account or otherwise provide the requisite notice for an affirmative defense of payment, the trial court did not err when it sustained Fidelity's objections to Garner's affidavit. Absence of a proper plea of payment renders evidence as to payment inadmissible. *See Rea v. Sunbelt Sav.,* 822 S.W.2d 370, 372 (Tex.App.-Dallas 1991, no writ). Garner's fifth issue is overruled.

### *The Relief Awarded*

In his second issue, Garner argues the trial court awarded Fidelity more relief than the motion for summary judgment requested. Specifically, Garner claims there is no support for the order of sale on the collateral or for "assistance to take the money or any balance thereof remaining unpaid out of any other property of the defendant." The motion for summary judgment requested foreclosure. Rule 309 establishes what a judgment for foreclosure is to be. *See* TEX.R. CIV. P. 309. The trial court's order tracks the language of Rule 309. Garner's second issue is overruled.

In his sixth issue, Garner argues the attorney's fees award was improper because summary judgment should not have been granted. Because we have concluded the trial court did not err in granting the summary judgment, we need not reach this remaining issue. Garner's sixth issue is overruled.

Having resolved all of Garner's issues against him, we affirm the judgment of the trial court.

### All Citations

244 S.W.3d 855

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

809 S.W.2d 652
Court of Appeals of Texas,
Amarillo.

Joe W. HAYES, Ty M. Sparks, Cecil
Meadows, and Susan Krehbiel, Appellants,

v.

E.T.S. ENTERPRISES, INC., Appellee.

No. 07–90–0073–CV.  |  May 9, 1991.
|  Rehearing Overruled June 5, 1991.

Party to which owner of oil and gas lease had executed "farm out" agreement obligating party to drill test well upon pooled unit brought declaratory judgment action seeking declaration that owner's release of oil and gas lease was ineffective as result of mistake. The 31st Judicial District Court of Hemphill County, Grainger W. McIlhany, J., entered summary judgment in favor of party. Mineral interest owners appealed. The Court of Appeals, Boyd, J., held that: (1) summary judgment evidence was sufficient to establish that execution of release was result of mistake, and (2) owners of mineral interests did not detrimentally change their position in innocent reliance upon mistaken release executed by owner of oil and gas lease.

Affirmed.

Poff, J., dissented and issued an opinion.

West Headnotes (7)

[1]    **Appeal and Error**
        👉 Reasons for Decision

        Where trial court did not specify which of plaintiff's theories was relied upon for grant of summary judgment, summary judgment would be affirmed on appeal if any of theories advanced were meritorious. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a.

        2 Cases that cite this headnote

[2]    **Judgment**
        👉 Landlord and tenant

Testimony of employees of owner of oil and gas lease would be treated as that of interested witnesses for purposes of summary judgment motion, even though owner was not party to suit brought by company to which owner had executed "farm out" agreement obligating company to drill test well upon pooled unit seeking declaration that release executed by owner was result of mistake; interests of owner and of company were similar. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a.

1 Cases that cite this headnote

[3]    **Judgment**
        👉 Weight and sufficiency

In case in which summary judgment is sought, conditions authorizing consideration of, and decision upon, testimony of interested witness require that such evidence be uncontradicted, clear, direct and positive, free of circumstances tending to discredit or impeach, readily controverted, and such testimony is especially entitled to reliance where party opposing summary judgment had means and opportunity of disproving testimony but did not do so.

8 Cases that cite this headnote

[4]    **Judgment**
        👉 Weight and sufficiency

Testimony of interested party as to what that witness knew or intended to do or as to witness' state of mind does no more than raise issue of fact and does not support summary judgment.

3 Cases that cite this headnote

[5]    **Judgment**
        👉 Landlord and tenant

Testimony of employees of owner of oil and gas lease was sufficient summary judgment evidence to support finding that owner mistakenly and inadvertently prepared, executed and sent for filing release of oil and gas leases; employee of owner testified that he would not have signed release had he known of farm out agreement and that this was only such mistake

during employee's employ with owner. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a.

Cases that cite this headnote

**[6]** **Contracts**
 Mistake

To be entitled to equitable relief on ground of unilateral mistake in contract action, party must show that mistake was of so great consequence that to enforce contract as made would be unconscionable, that mistake related to material feature of contract, that mistake was made regardless of exercise of ordinary care, and that parties could be placed in status quo in equity sense that rescission would not result in prejudice to other party except for loss of bargain.

3 Cases that cite this headnote

**[7]** **Release**
 Mistake

Owners of mineral interests did not detrimentally change their position in innocent reliance upon mistaken release executed by owner of oil and gas leases, and thus owner of oil and gas leases was entitled to revoke the release.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*653** Robert L. Templeton & Associates, Amarillo, Joe W. Hayes, Ty M. Sparks, Canadian, for appellants.

Nickum and Naylor, Ronald D. Nickum, Amarillo, for appellee.

**\*654** Before REYNOLDS, C.J., and BOYD and POFF, JJ.

**Opinion**

BOYD, Justice.

In one point, appellants Joe W. Hayes, Ty M. Sparks, Cecil Meadows and Susan Krehbiel say the trial court erred in granting a summary judgment in favor of appellee E.T.S.

Enterprises, Inc. We disagree and affirm the judgment of the trial court.

Appellants own an undivided mineral interest in the west one-half (W/2) of Section 4, Block Z–1, ACH & B Survey in Hemphill County, Texas (the Property). On April 2, 1982, Cecil Meadows and wife Emma Jean Meadows, executed an oil and gas lease to Tom L. Scott, Inc., covering the Property. On May 14, 1982, this lease was conveyed to the Pogo Producing Company (Pogo).

On November 30, 1983, the Meadows conveyed a 1.5/320 mineral interest to appellant Joe W. Hayes, and a like interest to appellant Ty M. Sparks. On September 11, 1986, Hayes conveyed a .75/320 mineral interest to appellant Susan Krehbiel (nee Martha Susan Hayes).

On February 20, 1985, Pogo executed a "farm out" agreement to appellee by the terms of which appellee was obligated to drill a test well upon a pooled unit which included all of Section 4. Appellee commenced drilling operations upon the tract on or about April 5, 1985, and completed a producing well on December 27, 1985.

On May 14, 1985, during the course of appellee's drilling operations, Pogo executed a release of the oil and gas lease. Subsequently, on June 24, 1985, by an instrument denominated as a "Revocation and Rescission of Release of Oil and Gas Leases," which recited it had not been its intent to release its oil and gas lease, Pogo sought to revoke and rescind the release. By an instrument dated March 19, 1986, but which recited its effective date as of October 2, 1985, and which recited it was made without express or implied warranty of title, Pogo assigned the lease to appellee. In the transfer, Pogo retained an overriding royalty interest equal to the difference between all existing leasehold burdens of record and 25% of 8/8 production.

In the action giving rise to this appeal, appellee sought a declaratory judgment that Pogo's release was ineffective because it was the result of a mistake. They further alleged even if Pogo's release was effective, appellee had obtained a limitation title to an oil and gas leasehold estate pursuant to Texas Civil Practice & Remedies Code Annotated § 16.024 (Vernon 1986) (three year statute). Appellee's successful motion for summary judgment was also based upon these grounds.

Appellants contend the summary judgment should not have been granted on either ground. Initially, they contend that any mistake in the execution of the release was a unilateral one on Pogo's part and cannot support either cancellation or rescission. Alternatively, they say, if such a unilateral mistake is to be the basis of the relief sought, it must meet the requirements of a "remedial mistake." Those requirements do not exist, they continue, because (a) there exists a genuine issue of material fact whether the execution and filing of the release was in fact a mistake, (b) appellee offered no summary judgment proof that to enforce the release would be unconscionable, and (c) there exists a genuine issue of material fact whether Pogo exercised ordinary care in the execution and filing of the release.

With regard to the limitation contention, appellants contend that appellee did not prove the unbroken chain of title from the sovereign to appellee which is a requisite of the three year limitation statute. They also contend that the effect of the release was to make appellee and appellants co-tenants, and a fact question exists as to whether appellee repudiated appellants' title.

 **[1]**    The rules governing the decision of appeals from summary judgments are well established. Under Rule 166a of the Texas Rules of Civil Procedure, [1] the summary **\*655** judgment movant must establish there is no genuine issue of fact and the movant is entitled to judgment as a matter of law. *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986); *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979). We are required to view summary judgment evidence in the light most favorable to the non-movant and resolve any doubt of the existence of a genuine issue of material fact against the movant. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985); *Montgomery v. Kennedy,* 669 S.W.2d 309, 311 (Tex.1984). Since the trial court did not specify which of appellee's theories was relied upon for summary judgment, it will be affirmed on appeal if any of the theories advanced are meritorious. *Rogers v. Ricane Enterprises, Inc.,* 772 S.W.2d 76, 79 (Tex.1989); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989).

Another case styled *Pogo Producing Company v. Cecil Meadows et al.,* No. 32,319–A in the 47th District Court of Randall County, involved the same facts and legal issues in controversy in this case. Although appellee was not a party to that suit, the trial court allowed depositions taken in that case to be used in this one.

As summary judgment evidence and pertinent to its mistake ground, appellee attached excerpts from the deposition of Kenneth Good, an employee of Pogo, taken in the instant case. In that deposition, Good testified that, although he intended to sign the release at the time he did so, he would not have signed it had he known of the farm-out agreement to appellee and that well drilling operations were proceeding upon the tract in question. He recited the preliminary procedures that were standard in his company and said that, by the time a release was submitted to him, his signature was a mere formality as the release had been cleared by those below him responsible for its accuracy.

He also stated this was the only time such a mistake had been made by Pogo in the twelve years of his employment, and it was made because the information about the farm-out and the well drilling was not included. Had he known about this missing information, he would not have signed and "would also determine how the error occurred and have the situation corrected." He averred that there was absolutely nothing to be gained by Pogo by executing the release where a farm-out existed and drilling had commenced. He characterized the signing of the release as a "mistake. A clerical error. A fluke."

The summary judgment motion was also supported by the affidavit of John W. Chisholm, appellee's senior vice president in charge of administration of oil and gas leases, production, marketing and well operations. He averred that the well on the premises was spudded on April 5, 1985, and was completed on December 27, 1985, with an absolute open flow potential of 17,500,000 cubic feet of gas per day.

In opposition to appellee's motion, and relevant to the mistake contention, appellants advanced deposition testimony of Gina Gresham taken in the Randall County case. Ms. Gresham was also an employee of Pogo. In that testimony, she recounted in some detail the procedures followed by Pogo in the preparation of releases of oil and gas leases and the company's endeavors to ensure their accuracy. She said the farm-out agreement was not in Pogo's file on the premises at the time it was checked by Cathy Zella, the employee designated to do so, nor was it there at the time the release was executed.

Under Pogo's standard operating procedure at the time, had the information about the agreement been in the file, no release would have been prepared. She said the release "was an error, 'big time.' You don't prepare a release on a producing lease." After the execution of the release was

discovered, she discussed the mistake with everyone in her department, "and built up better procedures." She also said, "We just don't prepare releases like we used to." In addition, she told Bruce May, another employee of Pogo, that he was partly responsible for the error, because "the obligation dates on these instruments (the farm-out agreements) were such that he should have taken immediate action to **\*656** note the files with this information. And I'm sure I made him aware of that."

Appellants also presented excerpts from deposition testimony of Bruce May taken in the other suit. In that testimony, May said that Ms. Gresham had told him he was partially responsible for the execution of the release and that Cathy Zella was also responsible because she prepared the release. He said that "HBP" was the code placed in files held by production but it had not been placed in the file in question. That code should have been inserted in files where a lease had been farmed out and a well spudded. However, May did not feel responsible because he felt Pogo should not rely exclusively upon code symbols in the files but should consult with the district land office to determine lease activity.

In their response, appellants also referred to portions of deposition testimony of Good taken in the suit to which Pogo was a party. In those portions, Good said he was the only person who signed releases for Pogo. When a release was put on his desk, he did not make an independent investigation to determine if it should be executed since he had given that responsibility to the manager of land administration. When he received releases to be executed, they were accompanied by a memorandum that "basically explains to me that the lease has expired and that it's an order to execute the release." Whenever Good received such a memorandum, he assumed that whatever steps that needed to have been taken to verify the correctness of the release had been taken. At the time in question, that verification would have been the responsibility of Sherri Mills, Cathy Zella, or Bruce May. He also stated that when he signed the release, he intended to do so.

In asserting the evidence is insufficient to support summary judgment, appellants place particular reliance upon Good's testimony. They argue that the testimony indicates that Good's execution of the release was an intentional act, not a mistake for which relief might lie. In support of that position, they especially point out, and rely upon, testimony that no one tricked Good into signing the release and when he signed it, he intended to surrender Pogo's interest in the lease. In the alternative, they posit that, even viewed in a light most favorable to appellee, Good's testimony creates a fact

question whether the execution and filing of the release was a mistake.

**[2]** Parenthetically, appellants contend specifically that Good's testimony and inferentially, the testimony of the other employees of Pogo should be considered as that of an interested witness and judged by that standard. Although Pogo is not a party to this suit, it is a party to another suit which will, apparently, determine the effect of the release insofar as its interests are concerned. However, because of the similarity of Pogo's interests to those of appellee, we will consider the testimony of its employees in this case as that of interested witnesses. *See Martin v. Cloth World of Texas, Inc., 692 S.W.2d 134, 135–36 (Tex.App.—Dallas 1985, writ ref'd n.r.e.); Hunsucker v. Omega Industries, 659 S.W.2d 692, 697 (Tex.App.—Dallas 1983, no writ).*

In pertinent part, Rule 166a(c) provides that a summary judgment may be based upon the testimony of an interested witness, "if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted."

Prior to an amendment effective January 1, 1978, the rule governing summary judgments did not expressly authorize consideration of the testimonial evidence of an interested witness. However, the Supreme Court's construction of the rule had authorized use of the interested witness' evidence, under certain conditions. *Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex.1970); Great American R. Ins. Co. v. San Antonio Pl. Sup. Co., 391 S.W.2d 41, 47 (Tex.1965).*

**[3]** In the *Great American* case, the Court set out the conditions authorizing consideration of, and decision upon, the testimony of an interested witness. Those conditions require that such evidence be uncontradicted, clear, direct and positive, free of circumstances tending to discredit **\*657** or impeach, and readily controverted. *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co., 391 S.W.2d at 47.* The Court also commented that such testimony was especially entitled to reliance where the opposite party had the means and opportunity of disproving the testimony but did not do so. *Id.*

**[4]** Parenthetically, it was also established as a general rule that the testimony of an interested party as to what that witness knew or intended to do or as to the witness' state of mind does no more than raise an issue of fact and would not support

summary judgment. The rationale for that qualification is obvious, *i.e.,* the mental workings of an individual's mind are matters about which adversaries have no knowledge or ready means of confirming or controverting. *See Lewisville State Bank v. Blanton,* 525 S.W.2d 696 (Tex.1975); *James T. Taylor, Etc. v. Arlington Ind. School Dist.,* 160 Tex. 617, 335 S.W.2d 371, 376 (1960); *Northrup v. O'Brien,* 474 S.W.2d 614, 618 (Tex.Civ.App.—Dallas 1971, no writ).

Those conditions and qualifications are the tests which Texas courts have traditionally applied to an interested witness' testimony in determining whether a fact is established or negated as a matter of law, whether in summary judgment proceedings or in jury or non-jury trials. *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co., supra; Valley Stockyards Co. v. Kinsel,* 369 S.W.2d 19, 20 (Tex.1963); *James T. Taylor, Etc., v. Arlington Ind. School Dist.,* 335 S.W.2d at 376; *Owen Development Company v. Calvert,* 157 Tex. 212, 302 S.W.2d 640, 642 (1957); *McGuire v. City of Dallas,* 141 Tex. 170, 170 S.W.2d 722, 728 (1943); *Simonds v. Stanolind Oil & Gas Co.,* 134 Tex. 332, 136 S.W.2d 207, 208 (1940).

The present rule formally recognizes the admissibility of the testimony of an interested witness and carries forward the same qualifications and conditions previously explicated by court decisions. *See Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989); *Beaumont Enterprise & Journal v. Smith,* 687 S.W.2d 729, 730 (Tex.1985); *Allied Chemical Corp. v. DeHaven,* 752 S.W.2d 155, 157–58 (Tex.App.—Houston [14th Dist.] 1988, writ denied).

The decision of the sufficiency of the testimony of interested witnesses to support a summary judgment, of necessity, must be decided on a case-by-case basis bearing in mind the requirement of the rule and the teachings of the above cases. In this case, appellants assert and appellee does not challenge, that Good understood he was executing a release at the time he signed it. Thus, the question of his intent or mental process in actually executing the instrument is not in issue here.

What is in issue, in the words of appellee's motion, is whether:

> E. Subsequent to the execution of the farmout agreement from Pogo to E.T.S., and while ETS was in the process of drilling a test well on Section 4, an employee of Pogo mistakenly and inadvertently prepared, executed and sent for filing a document entitled "Release of Oil and Gas Leases"....

**[5]** That question is one involving matters susceptible of objective proof or disproof, such, among others, as whether a release was properly due under the lease, whether the typing and forwarding of the release for signature, if a release was not properly due, was the result of a breakdown in standard operating procedures, and if so, what was the defect in those procedures that caused the forwarding of the release for execution.

It is true that the only testimony bearing upon these matters comes from employees of Pogo. However, that testimony is clear, direct, and positive. It is uncontroverted and there are no circumstances in evidence tending to discredit or impeach their testimony. In sum, these proofs, in the words of the Court in the seminal case of *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939, 942 (Tex.1988) when it upheld the sufficiency of similar summary proof, "go far beyond state of mind to establish an objective explanation for the mistake." *See also Republic Nat. Leasing Corp. v. Schindler,* 717 S.W.2d 606, 607 (Tex.1986); **\*658** *Americana Motel, Inc. v. Johnson,* 610 S.W.2d 143 (Tex.1980); *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co., supra; American Quality Roofing, Inc. v. Ipock,* 730 S.W.2d 470, 472 (Tex.App.—Fort Worth 1987, no writ); *Amara v. Lain,* 725 S.W.2d 734, 736 (Tex.App.—Fort Worth 1986, no writ); *Metro Siding Distributors v. Master Shield, Inc.,* 717 S.W.2d 455, 457 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.); *Duncan v. Horning,* 587 S.W.2d 471, 474 (Tex.Civ.App.—Dallas 1979, no writ); *Longoria v. Texaco, Inc.,* 649 S.W.2d 332, 335–36 (Tex.App.—Corpus Christi 1983, no writ).

In support of their proposition that the evidence was insufficient to establish mistake as a matter of law, appellants place considerable reliance upon *Ladd Petroleum Corp. v. Eagle Oil & Gas Co.,* 695 S.W.2d 99 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.). In that case, as relevant here, the court was considering a contention that the testimony of Ladd's witnesses, in a jury trial, was sufficient to establish as a matter of law that the release of the oil and gas lease involved there was filed by mistake. In that respect, admittedly in dictum, the court said the jury in the case was entitled to weigh the testimony of the witness and made the blanket statement that "[t]he testimony of an interested witness does no more than raise a fact issue." *Id.* at 107.

That general statement, as applied in a summary judgment proceeding is not only in derogation of the express provision of Rule 166a(c) set out above, but is also in derogation of the well established law prior to the inclusion of the provision in

Rule 166a. As such, the case cannot be considered as authority on that point. Parenthetically, the *Ladd* case is the only Texas case cited by either party which, even peripherally, deals with a release of an oil and gas lease because of a unilateral mistake and that case is not sufficiently analogous to be helpful in our decision.

The summary judgment evidence was sufficient to establish that Good's admitted execution of the release was the result of a mistake. Having made that determination, we must next consider the viability of appellants' invocation of what they denominate as the rule of "remedial mistake." Concomitantly with that invocation, appellants argue even if the release was executed by unilateral mistake, appellee is not entitled to relief because it has not satisfied the requirements of that rule.

In support of their position that appellee is not entitled to relief, appellants place primary reliance upon the case of *Roland v. McCullough,* 561 S.W.2d 207 (Tex.Civ.App.—San Antonio 1977, writ ref'd n.r.e.). In that case, Roland had purchased a 200–acre tract from McCullough. The appeal arose from a summary judgment granting McCullough recovery on two promissory notes as well as foreclosure of a deed of trust on the 200–acre tract.

The land purchased by Roland apparently had no access to an interstate highway (IH 10) close by. Roland contended that although McCullough did not tell him there was access to IH 10, he did not tell him there was *no* such access. He also contended that McCullough furnished him with a map of the land from which it could be reasonably inferred access existed; and, at the time Roland originally inspected the property, while IH 10 was under construction, he entered the property from IH 10.

 **[6]**   Relevant to this case, the court held that Roland was not entitled to equitable relief on the ground of unilateral mistake. To be entitled to such relief, said the court, a party must show: (1) the mistake is of so great consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense, *i.e.,* rescission must not result in prejudice to the other party except for the loss of his bargain. *Id.* at 213.

In assuming the applicability of this doctrine to the instant case, appellants argue the summary judgment evidence is insufficient to show the unconscionability of enforcing the release and to show that the mistake would have been made regardless of the exercise of ordinary care.

 **\*659**  We do not think the elements set out in the *Roland* case, particularly the one requiring a showing that the mistake would have occurred regardless of the exercise of ordinary care, are applicable here. Indeed, in *James T. Taylor, Etc. v. Arlington Ind. School Dist., supra,* the Court had occasion to discuss at some length the effect of negligence on the part of one claiming equitable relief for his own mistake. After surveying relevant contract cases, the Court concluded, "We think the authorities, both from this state and from other jurisdictions, clearly indicate that in cases of this kind (contract cases) ordinary negligence will not necessarily bar the granting of equitable relief." *James T. Taylor, Etc. v. Arlington Ind. School Dist.,* 335 S.W.2d at 375.

In additional explication the Court stated that it is only when negligence amounts to such carelessness or lack of good faith as to amount to a violation of a positive duty will equitable relief be denied the supplicating party. *Id.* En route to that conclusion, the Court quoted with approval a statement from *Edwards v. Trinity & B.V. Ry. Co.,* 54 Tex.Civ.App. 334, 118 S.W. 572 (1909, writ ref'd), that "[e]ven a clearly established negligence may not of itself be a sufficient ground for refusing relief, if it appears that the other party has not been prejudiced thereby." *Id.* The Court also commented that the elements to show entitlement to relief were generally fact questions unless they "can be resolved by the court under the undisputed evidence." *Id.* 335 S.W.2d at 376. Although the *Taylor* decision resulted from a suit involving a construction contract, its teachings are also applicable to a case such as this one.

A study of *Roland,* in which all of the elements set out in that case have been strictly applied, as well as other similar cases, reveals that these are instances arising out of contracts based upon an offer and acceptance, a negotiation, mutuality of consideration, and performance. Once a bargain has been reached in those instances, it would clearly be inequitable to allow one party relief on the basis of a unilateral mistake without the necessity of pleading and proving each of the enumerated elements. This cause, of course, does not arise from a suit in which a party is suing another party seeking relief from such a negotiated contract.

In this instance, we think the proper rule to apply is that stated in *Armbruster v. Thetis Energy Corp.,* 675 P.2d 476 (Okl.App.1983). In that case, a lessee sought cancellation of a

release of an oil and gas lease executed by the lessee under the mistaken belief that the lease had expired. In such a situation, the court held the lessee was entitled to cancellation of the release unless (1) the cancellation would offend the rights of an innocent purchaser for value or (2) another party in good faith and in innocent reliance, *i.e.,* reliance without notice or knowledge of facts which would suggest the probability of an invalid release, had made a position alteration that could not be reversed without significant prejudice. *Id.* at 478. *See also Mobil Oil Corp. v. Flag–Redfern Oil Co.,* 522 P.2d 651 (Okl.App.1973).

 **[7]**    In our case, appellants admit they did not learn of the existence of the release until sometime during the summer of 1985, which would be after Pogo filed the "Revocation and Rescission of Oil and Gas Leases." In deposition testimony, appellant Hayes said he could not recall if he relied on the release; however, he did not try to lease, sell, or develop his interest. When asked if he had suffered any detriment by the release, he answered, "I would have to think about that." Appellant Meadows said he did not rely on the release, or lease or develop his interest. Appellant Sparks said he did not "tout" his mineral interest to third parties to lease, was not contacted by third parties to lease, and did not attempt to drill on the acreage himself. Appellant Susan Krehbiel's interest was not conveyed to her by appellant Hayes until September 11, 1986. The summary judgment evidence is sufficient to show that appellants made no detrimental position change in innocent reliance upon the Pogo release.

In *Mobil Oil Corp. v. Flag–Redfern Oil Co.,* 522 P.2d at 656, the court ruminated, **\*660** "In the instant case, a mistake of fact has occurred, which was simple human error. The principle of equity can allow this to be rectified, as the defendant Flag–Redfern Oil Co. was not damaged by such mistake and would receive a great advantage if the results were otherwise." That summation is applicable to this case, particularly since the negligence, if any, in preparing and executing the release was that of a third party and not that of appellee.

Since we have held that appellee is entitled to its judgment on the basis discussed above, and since one of its theories supports the judgment, the necessity of discussing appellee's limitation theory is obviated. Appellants' point of error is overruled and the trial court judgment is affirmed.

POFF, J., dissents.

POFF, Justice, dissenting.

I respectfully dissent from the affirmance of the granting of the summary judgment. I cannot agree with the majority's determination that the evidence offered by the employees of Pogo was readily controvertible. I do agree that the Pogo employees are interested witnesses, for Pogo, as the owner of an overriding royalty in the Meadows lease, has a direct interest in the outcome of this suit. If the contested release is held to be a valid release, Pogo will lose its overriding royalty interest.

I also agree with the majority that the question to be resolved is not the knowledge or intent of Mr. Good, the signator of the release, but rather the question to be resolved is "did an employer of Pogo mistakenly and inadvertently prepare the release for Good's signature." I disagree that the question is susceptible of objective proof or disproof.

In explaining the basis for preparing the release, Pogo's employees stated in their depositions that the Meadows lease file did not contain the Pogo assignment to E.T.S. Enterprises, nor did the file contain any information concerning the commencement of drilling on the Meadows lease. The sum of Pogo's evidence was that the Meadows lease file indicated a dormant lease, which was subject to being released. Pogo's employees also deposed that the failure to file an assignment, and the failure to note in a lease file drilling activity or production was a departure from Pogo's standard operating procedure.

The majority opines that, whether the release was properly due, whether the preparation of the release was the result of a breakdown in standard operating procedures and what defect in those procedures caused the release to be signed, are matters susceptible of objective proof or disproof. I do not agree, for I fail to see how Hayes *et al.* could have objectively disproved what knowledge Pogo's employees possessed at the time of the preparation of the release, nor do I envision any manner in which Hayes could recreate the status of the Meadows lease file as it existed at the time in question. The basis for the preparation of the release and the facts upon which these actions were taken lies solely within the knowledge of the actors, the interested witnesses. The truth or falsity of E.T.S. Inc.'s evidence stands solely on the credibility of the interested witnesses. An affidavit by an interested witness to a matter which the adversaries have no knowledge or real means of confirmation does no more than raise an issue

of fact. *Lewisville State Bank v. Blanton,* 525 S.W.2d 696, (Tex.1975).

Not being present at Pogo's office at the time of the preparation of the release and not having access to what facts and knowledge was possessed by Pogo's employees when they prepared the release, Hayes had no basis upon which to dispute their story. The only eyewitnesses are Pogo employees. All physical or documentary evidence was under the exclusive control of Pogo. In this case, I can envision no outside or independent source Hayes could have mustered to controvert Pogo's explanation for the preparation of the release. The facts presented by Pogo's employees were not subject to outside objective verification nor was there a basis upon which to offer opinion or expert testimony. I envision Hayes' only option to have been the filing of a counter affidavit disputing E.T.S. **\*661** Inc.'s evidence. Such a counter affidavit would have at best been based on assumptions and conjecture and at worst it would have been perjurious.

The majority finds E.T.S.'s summary judgment evidence similar to that summary judgment proof offered in *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939 (Tex.1988), and concludes that the evidence goes far beyond state of mind to establish an objective explanation for the mistake. In *Briggs,* which was a libel suit, the Supreme Court found the technical procedures for the production of the telecast (such procedures being claimed by Channel 4 to be the basis for the technical mistake) to be subject to investigation. The technical process (by which Channel 4 alleged the news special was dubbed over a political file tape from which Briggs' image had not

been completely erased) was such that it could have been disputed by third parties testifying on Briggs' behalf.

I do not find the actions of Pogo's employees in allegedly failing to file or note the E.T.S. assignment, to be a technical mistake subject to investigation, or possible disproof by extraneous sources. I find the mistake and the explanation to be more similar to the mistake made in *James T. Taylor, Etc. v. Arlington Ind. School Dist.,* 160 Tex. 617, 335 S.W.2d 371 (1960); wherein a contractor attempted to explain that his bid was incorrect, due to his failure to properly carry a digit while adding his cost and preparing his bid. Taylor's employee's affidavit setting out the mistake was held not to be sufficient summary judgment proof. The court opined the affidavit was evidence from an interested party which could not be readily controverted if untrue. In such cases, the credibility of the witness is presented and a summary judgment is improper. Evidence resting solely on the credibility of the interested witness is more effectively tested in court at trial than by sterile affidavits at a summary judgment hearing. The trier of fact is uniquely qualified to observe the demeanor of the witnesses as well as his responses, and to test the credibility of the witnesses.

I therefore cannot agree that the evidence offered by the interested witnesses was sufficient evidence upon which to grant the summary judgment. I therefore cannot join in the majority opinion.

**All Citations**

809 S.W.2d 652

Footnotes

1    Unless otherwise specified, future reference to rule numbers are to those rules contained in the Texas Rules of Civil Procedure.

---

**End of Document**                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

587 S.W.2d 491
Court of Civil Appeals of Texas, Dallas.

HENRY S. MILLER CO., Appellant,
v.
Walter H. STEPHENS, Appellee.

No. 19951. | Aug. 14, 1979.
| Rehearing Denied Sept. 19, 1979.

Vendor brought suit for specific performance of a real estate contract of sale. The 101st District Court, Dallas County, E. H. Griffin, J., granted specific performance and purchaser appealed. The Court of Civil Appeals, Akin, J., held that as contract did not contain any provision obligating the purchaser to satisfy vendor's creditors or otherwise prevent the vendor's loss of title, vendor was not relieved of the requirement that he hold title at the time of the trial of his specific performance action; thus, the trial court's judgment for specific performance was erroneous.

Reversed and remanded.

West Headnotes (3)

**[1]** **Specific Performance**
&#128273; Nature and Grounds of Duty of Plaintiff

When a party seeks specific performance, he is required at all times to remain ready, willing and able to perform his contractual responsibilities according to terms of contract.

3 Cases that cite this headnote

**[2]** **Specific Performance**
&#128273; Sufficiency of Title of Vendor

Specific performance will not usually be ordered for vendor unless he has legal title to property at time of trial.

1 Cases that cite this headnote

**[3]** **Specific Performance**
&#128273; Sufficiency of Title of Vendor

Where contract for sale of real estate did not contain any provision obligating the purchaser to satisfy the vendor's creditors or otherwise prevent the vendor's loss of title, vendor was not relieved of requirement that he hold title at time of trial of his specific performance action.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*491** Harold Hoffman, Donald C. McCleary, Wynne & Jaffe, Dallas, for appellant.

Bill C. Hunter, Hunter, Stewart, Salzberger & Vineyard, Dallas, for appellee.

Before AKIN, ROBERTSON and HUMPHREYS, JJ.

**Opinion**

AKIN, Justice.

This is an appeal by Henry S. Miller Company, the vendee, from a judgment granting specific performance of a real estate contract of sale in favor of the vendor, appellee Walter H. Stephens. Appellant Henry S. Miller Company contends that the trial court erred in granting specific performance because the vendor did not hold title to the land at the time of trial. We agree with appellant and reverse the trial court's judgment.

The contract in question was for the sale of approximately 490 acres of land in Travis County, Texas, between Stephens as vendor and Henry S. Miller Company as vendee. **\*492** The contract was executed on September 13, 1973, and the sale was to close on or before July 1, 1974. Henry S. Miller Company refused to close, however, and appellee Stephens brought suit for specific performance. Appellee held the land for approximately two years after the closing date. Six weeks prior to trial, however, appellee lost title to the land through a foreclosure sale and title was transferred to Travis Lake Properties, Ltd. Travis Lake Properties was not a party to this lawsuit. Despite appellee's lack of title and the absence of Travis Lake Properties as a party to the suit, the trial court granted specific performance of the land sale contract and ordered appellant Henry S. Miller Company to pay the contract purchase price of $1,446,531.00.

 **[1]** **[2]** When a party seeks specific performance, he is required at all times to remain ready, willing and able to perform his contractual responsibilities according to the terms of the contract. Kluck v. Leuschner, 70 S.W.2d 768, 769 (Tex.Civ.App. Waco 1934, writ ref'd) (Per Alexander, J.). Both parties agree that specific performance will not usually be ordered for the vendor unless he has legal title to the property at the time of trial. E. g., Buhler v. McIntire, 365 S.W.2d 237, 239 (Tex.Civ.App. Austin 1963, writ ref'd n.r.e.); Clifton v. Charles, 53 Tex.Civ.App. 448, 116 S.W. 120, 122 (1909, writ ref'd). Appellee maintains, however, that an exception to these rules applies if the vendor loses title after the closing date but prior to trial and the vendor's loss was due to a contingency, known to both parties at the time of contract, which the vendee caused or could have prevented. In this respect, appellee argues that Henry S. Miller Company failed to close the sale and refused to make a cash payment to appellees which was due at the closing. Appellee claims that this payment was designed to provide the funds required to prevent foreclosure and that Miller also failed to take any other steps to prevent the foreclosure. Thus, appellee argues that these failures on appellant's part directly caused the foreclosure, and therefore appellee falls within the exception to the requirement that a vendor seeking specific performance must hold title at the time of trial. In support of its position, appellee relies on Fant v. Howell, 410 S.W.2d 294 (Tex.Civ.App. Austin 1966, writ dismd.), and Manley v. Holt, 161 S.W.2d 857 (Tex.Civ.App. Amarillo 1942, writ ref'd w.o.m.).

These cases do not support the proposition that a vendor seeking specific performance will be excused from holding title at the time of trial if the vendee Could have prevented the vendor's loss of title. They stand for the significantly different proposition that the vendor will be excused if the loss of title occurred as a result of a contingency or obligation assumed directly by the vendee. In Fant v. Howell, supra, both parties knew at the time of contract that third parties were holding adverse possession to the land. After the vendee took possession of the land, the third parties' title by adverse possession ripened. The court held that the vendor was not precluded from bringing an action for specific performance, despite the loss of title to the land, because the vendee was responsible for the loss of title through adverse possession. In Manley v. Holt, supra, the vendee expressly assumed the obligation to pay the vendor's creditors. Foreclosure resulted when the vendee failed to make these payments. The Holt court also held that the vendor was not precluded from bringing an action for specific performance because the loss of title was caused by the vendee's failure to carry out his obligations.

 **[3]** The contract before us in this case does not contain any provision obligating the vendee to satisfy the vendor's creditors or otherwise prevent the vendor's loss of title. Consequently, vendor was not relieved of the requirement that he hold title at the time of the trial of his specific performance action. Since appellee did not hold title, the trial court's judgment for specific performance was error. Accordingly, the judgment of the trial court is reversed. In the interest of justice, we remand rather than render, so that plaintiff may plead and prove whatever damages **\*493** that he may have. Morrow v. Shotwell, 477 S.W.2d 538, 542 (Tex.1972).

**All Citations**

587 S.W.2d 491

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

711 S.W.2d 628
Supreme Court of Texas.

Robert HUDSON, et al., Petitioners,
v.
Marion WAKEFIELD, et al., Respondents.

No. C–4463. | June 25, 1986.
| Rehearing Denied July 16, 1986.

Purchaser sought specific performance of contract for sale of property. Following judgment in favor of vendors, the Court of Appeals, 635 S.W.2d 216, affirmed. The Supreme Court, 645 S.W.2d 427, reversed and remanded. The District Court, Freestone County, Bournais, J., entered judgment in favor of vendors after allowing trial amendment. The Waco Court of Appeals, Tenth Supreme Judicial District, affirmed. The Supreme Court, Gonzalez, J., held that Supreme Court's reversal of initial summary judgment had not precluded amendment to assert additional defense.

Affirmed.

West Headnotes (5)

[1]     **Appeal and Error**
          Former Decision as Law of the Case in General

        **Appeal and Error**
          As Law of the Case

        "Law of the case" doctrine is principle under which questions of law decided on appeal to court of last resort will govern case throughout its subsequent stages.

        184 Cases that cite this headnote

[2]     **Appeal and Error**
          Former Decision as Law of the Case in General

        Doctrine of law of the case only applies to questions of law, to questions of fact, and does not necessarily apply when either issues or facts presented at successive appeals are not substantially the same as those involved in the first appeal.

        125 Cases that cite this headnote

[3]     **Appeal and Error**
          Scope and Extent of Review

        **Appeal and Error**
          Directions in Remittitur

        When Supreme Court remands case and limits subsequent trial to particular issue, trial court is restricted to determination of that particular issue, and, in subsequent appeal, instructions given to trial court in former appeal will be adhered to and enforced.

        53 Cases that cite this headnote

[4]     **Appeal and Error**
          Extent of Review Dependent on Nature of Decision Appealed from

        **Appeal and Error**
          Nature or Subject-Matter in General

        On review of summary judgment, appellate courts are limited in consideration of issues and facts; movant is not required to assert every theory upon which he may recover or defend, but nonmovants are required, in written answer or response to motion, to expressly present to trial court all issues that would defeat movants' rights to summary judgment, and, failing to do so, nonmovants cannot later assign the issues as error on appeal.

        12 Cases that cite this headnote

[5]     **Appeal and Error**
          Amendments as to Pleadings and Parties

        Reversal of summary judgment granted in favor of vendors on the basis of breach of contract by purchasers did not preclude vendors from making trial amendment on remand in order to assert defense of fraud in the inducement.

        28 Cases that cite this headnote

**Attorneys and Law Firms**

**\*629** John W. Berkel, Houston, for petitioners.

Keils and Fulcher, W.A. Keils, Jr., Teague, for respondents.

## OPINION

GONZALEZ, Justice.

This case involves the refusal of a bank to honor a check given as earnest money under a contract for the sale of land. The issue presented is whether, under the doctrine of the "law of the case," our "limited remand" of this cause precluded the assertion of additional related legal theories or defenses.

Robert Hudson and Andy Wright (Purchasers) sued to enforce specific performance of a contract for the sale of real property owned by Marion and Jean Wakefield (Sellers). In the original proceeding, the trial court granted sellers' motion for summary judgment on the grounds that the instrument on which specific performance was sought never attained the status of a contract because the check for earnest money was returned due to insufficient funds. The court of appeals affirmed, holding that a condition precedent under the contract was that purchasers fulfill the requirements of the earnest-money provision. 635 S.W.2d 216. We reversed the judgments of the lower courts and remanded, holding that, as a matter of law, the earnest-money provision was only a covenant. We then remanded the cause to the trial court to determine whether "the return of the earnest money check because of insufficient funds was such a material breach of the contract as to warrant sellers' repudiation of same." 645 S.W.2d 427, 431 (Tex.1983).

On remand, the case was fully litigated to a jury. Prior to submission of the charge, the trial court allowed sellers to file a trial amendment which asserted fraud in the inducement. Purchasers objected to the trial amendment and to the court's submission of issues thereon. The record, however, fails to contain a statement of facts so that we cannot determine if purchasers objected to evidence of fraudulent inducement or if it was tried by consent. That court also allowed purchasers to file a trial amendment alleging a new theory dealing with ratification. The trial court then submitted several issues to the jury. Upon motion, the trial court disregarded two of the jury's findings: one, that sellers had ratified the contract; and two, that there had been no breach of contract by the purchasers.

The trial court then rendered judgment *non obstante veredicto* for the sellers. In an unpublished opinion, the court of appeals affirmed the judgment of the trial court. We affirm the judgment of the court of appeals.

The question is whether, under the "law of the case" doctrine, our remand of the cause to the trial court to determine whether "the return of the earnest money check because of insufficient funds was such a material breach of the contract as to warrant sellers' repudiation of the same" precludes sellers' trial amendment and submission of issues on a theory of fraudulent inducement which would defeat the existence of a valid contract. Purchasers argue that when we remanded the case, the existence **\*630** of a valid contract became the "law of the case;" therefore, the only issue which could be decided on remand was whether the contract breach was material.

### Law of the Case

[1] The "law of the case" doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages. *Trevino v. Turcotte,* 564 S.W.2d 682, 685 (Tex.1978); *Governing Bd. v. Pannill,* 659 S.W.2d 670, 680 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.); *Kropp v. Prather,* 526 S.W.2d 283 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.). By narrowing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency. *Dessommes v. Dessommes,* 543 S.W.2d 165, 169 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.). The doctrine is based on public policy and is aimed at putting an end to litigation. *See Barrows v. Ezer,* 624 S.W.2d 613, 617 (Tex.App.—Houston [14th Dist.] 1981, no writ); *Elliott v. Moffett,* 165 S.W.2d 911 (Tex.Civ.App.—Texarkana 1942, writ ref'd w.o.m.).

[2] The doctrine of the law of the case only applies to questions of law and does not apply to questions of fact. *Barrows,* 624 S.W.2d at 617; *Kropp,* 526 S.W.2d at 285. *Missouri K. & T. Ry. Co. v. Redus,* 55 Tex.Civ.App. 205, 118 S.W. 208 (Dallas 1909, writ ref'd). Further, the doctrine does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved on the first trial. *Barrows,* 624 S.W.2d at 617; *Kropp,* 526 S.W.2d at 285; *Ralph Williams Gulfgate Chrysler Plymouth, Inc. v. State,* 466 S.W.2d 639 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.).

Thus, when in the second trial or proceeding, one or both of the parties amend their pleadings, it may be that the issues or facts have sufficiently changed so that the law of the case no longer applies. *See Rose v. Baker,* 143 Tex. 202, 183 S.W.2d 438 (1944); *Seydler v. Keuper,* 133 S.W.2d 189 (Tex.Civ.App.—Austin 1939, writ ref'd); *Kropp,* 526 S.W.2d at 286.

### Limited Remand

 **[3]** When this court remands a case and limits a subsequent trial to a particular issue, the trial court is restricted to a determination of that particular issue. *Wall v. East Texas Teachers Credit Union,* 549 S.W.2d 232 (Tex.Civ.App.—Texarkana 1977, writ ref'd); *McConnell v. Wall,* 67 Tex. 352, 5 S.W. 681 (1887). Thus, in a subsequent appeal, instructions given to a trial court in the former appeal will be adhered to and enforced. *Wall v. Wall,* 143 Tex. 418, 186 S.W.2d 57 (1945, opinion adopted); *Dessommes,* 543 S.W.2d at 169. In interpreting the mandate of an appellate court, however, the courts should look not only to the mandate itself, but also to the opinion of the court. *Wells v. Littlefield,* 62 Tex. 28 (1884); *Seale v. Click,* 556 S.W.2d 95, 96 (Tex.Civ.App.—Eastland 1977, writ ref'd n.r.e.). In this regard, we have observed that "the cases are rare and very exceptional in which this court is warranted in limiting the issues of fact, in reversing and remanding a case where the trial has been by jury; and to authorize such interpretation, it must clearly appear from the decision that it was so intended." *Cole v. Estell,* 6 S.W. 175, 177 (Tex.1887). *See Price v. Gulf Atlantic Life Ins.,* 621 S.W.2d 185, 187 (Tex.Civ.App.—Texarkana 1981, writ ref'd n.r.e.).

 **[4]** A critical factor in our determination of this case is that in the first appeal we reviewed a summary judgment. On review of summary judgments, the appellate courts are limited in their considerations of issues and facts. In such a proceeding, the *movant* is not required to assert every theory upon which he may recover or defend. [1] Thus, when a case comes **\*631** up for a trial on the merits, the parties may be different, the pleadings may be different, and other causes of action may have been consolidated. *See Governing Bd. v. Pannill,* 659 S.W.2d 670, 680–81 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.). Other distinctions may be drawn; for instance, in reviewing the evidence to determine whether there are any fact issues in dispute, the appellate court must review the evidence in the light most favorable to the party opposing the motion for summary judgment. *Gaines v. Hamman,* 163

Tex. 618, 358 S.W.2d 557, 562 (1962). Thus, the context of a summary judgment proceeding is distinguishable from a full trial on the merits.

The distinction between a summary judgment and a trial on the merits in regard to the law of the case doctrine was made in *Pannill,* where the court noted:

> Also, it is apparent that the record presented on this third appeal, being an appeal after a full and lengthy trial on the merits with the jury acting as a finder of facts, differs in a very material sense from the prior limited appeal. There is no error in the action of the trial court in declining to follow the "law of the case" as pronounced by another Court of Civil Appeals on a vastly different record.

659 S.W.2d at 681. In the case at hand, the trial amendments by purchasers and sellers changed both the scope and nature of the lawsuit.

Purchasers argue that our remand language established the law of the case as to the existence of a valid contract. Therefore, they contend the trial court erred in allowing seller's trial amendment and issues asserting fraud in the inducement. We disagree.

 **[5]** In this case, sellers moved for summary judgment, asserting breach of contract by purchasers as a defense. In summary judgment proceedings, the movant must conclusively establish the essential elements of his asserted theories of recovery or defense. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979). Breach of contract may have been the only theory which sellers believed they could conclusively establish. In regard to this theory, we held, on a single question of law (condition or covenant), that one of the terms of the contract was a covenant; therefore, a fact question existed and summary judgment was improper. Our holding in the first appeal, however, did not preclude sellers from asserting other defensive theories, including those attacking the validity of the contract, at a subsequent trial on the merits. Therefore, in light of the proceeding in which the question first arose, the trial court properly allowed sellers to assert the defense of fraud in the inducement.

The court of appeals correctly determined purchaser's remaining points of error dealing with conflicting jury findings and the propriety of submitting certain issues on fraud.

The judgment of the court of appeals is affirmed.

**All Citations**

711 S.W.2d 628

Footnotes

1    It is important to note, that non-movants are required, in a written answer or response to motion, to expressly present to the trial court all issues that would defeat the movants right to a summary judgment, and failing to do so, they cannot later assign them as error on appeal. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 679 (Tex.1979).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

428 S.W.2d 92
Supreme Court of Texas.

HUMBLE OIL & REFINING
COMPANY et al., Petitioners,
v.
WESTSIDE INVESTMENT
CORPORATION, Respondent.

No. B—572. | May, 1, 1968.
| Rehearing Denied May 1, 1968.

Action for specific performance of real estate contract. The 37th District Court, Bexar County, Eugene C. Williams, J., granted defendant's motion for summary judgment and plaintiff appealed. The San Antonio Court of Civil Appeals of the Fourth Supreme Judicial District, 419 S.W.2d 448, affirmed and error was brought. The Supreme Court, Smith, J., held that where optionee, prior to expiration of option, communicated its unconditional exercise of option to optionor, it was entitled to specific performance, even though it had previously advised optionor of additional inducements to its exercise of the option.

Specific performance action severed and judgments of trial court and Court of Civil Appeals reversed and judgment rendered; judgments of trial court and Court of Civil Appeals in agent's action for commission reversed and cause remanded.

West Headnotes (4)

[1] **Vendor and Purchaser**
 👉 Revocation, rescission, or other termination

Mere fact that parties may choose to negotiate before accepting an option does not mean that option contract is repudiated.

6 Cases that cite this headnote

[2] **Vendor and Purchaser**
 👉 Revocation, rescission, or other termination

Letter which was written by optionee who had paid valuable consideration for option and which recited that optionor had agreed to some additional terms as inducement for optionee to exercise option did not terminate option.

5 Cases that cite this headnote

[3] **Specific Performance**
 👉 Options

Where optionee, prior to expiration of option, communicated its unconditional exercise of option to optionor, it was entitled to specific performance of option and contract for sale even though it had previously advised optionor of additional terms which it claimed optionor had agreed to as inducements to optionee exercising options.

1 Cases that cite this headnote

[4] **Judgment**
 👉 Brokers or agents, cases involving

Where option contract provided that landowner was to pay all brokerage fees and designated certain realty company which was not party to litigation as broker, claim of employee of realty company that he was procuring cause of sale and entitled to 60% of commission created issues of fact precluding grant of summary judgment.

1 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*92** Frank L. Heard, Jr., Houston, Lagerquist, Shaw & Davis, San Antonio, for petitioners.

Pat Legan Johnson & Christopher, San Antonio, for respondent.

**Opinion**

SMITH, Justice.

Petitioner, Humble Oil & Refining Company, [1] filed this suit on February 10, 1965, against Westside Investment Corporation [2] seeking a judgment commanding specific performance based on a written option and contract for the sale of real estate. Petitioner, Marvin H. Mann, [3] a realtor, as

a third-party plaintiff, filed a plea in intervention, seeking a judgment for $1260.00 against Westside as brokerage charges in connection with the transaction. Westside, Humble and Mann each filed a motion for **\*93** summary judgment. The court granted Westside's motion and overruled the motions of Humble and Mann. The court of civil appeals affirmed. [419 S.W.2d 448.](#) We reverse the judgments of the courts below. We hold that Humble is entitled to specific performance of the option contract and render judgment for Humble. We hold that a material issue of fact exists as to whether Mann is entitled to a brokerage commission and remand that portion of the case to the district court for trial.

The facts, most of which are either stipulated or established by affidavits, are these:

On April 5, 1963, Westside as seller and Humble as buyer agreed and entered into a written contract whereby Westside gave and granted to Humble an exclusive and irrevocable option to purchase for a consideration of $35,000.00 a tract of land situated outside of the city limits of San Antonio, Bexar County, Texas, being all of lots 19, 20, 21, 22 and 23 of Block 2, Lackland Heights Subdivision.

The option contract was supported by a consideration. The contract provided that Humble might exercise the option by giving notice at any time prior to 9:00 p.m. on the 4th day of June, 1963, and by paying to Westside at the time of such notice or within ten (10) days following such notice the sum of $1750.00 as earnest money. This sum of money, together with the sum of Fifty Dollars ($50.00) as consideration paid at the time of the execution of the option contract, made a total of $1800.00 paid by Humble, leaving a balance of $33,200.00 yet to be paid as purchase money in accordance with the option contract.

On May 14, 1963, within the time period provided for in the option contract, Humble paid the above mentioned sum of $1750.00 to the designated escrow agent, Commercial Abstract & Title Company.

Westside admits in its pleadings that it entered into the option contract with Humble, but contends that the option agreement was 'rejected, repudiated, and terminated by Humble.' Westside contends that summary judgment proof of rejection of the option contract is contained in letters written by Humble to Westside on May 2, 1963, and May 14, 1963. The pertinent portion of the May 2nd letter reads:
'Humble Oil & Refining Company hereby exercises its option to purchase Lots 19, 20, 21, 22 and 23, Block 2, Lackland Heights Subdivision, in or near the City of San Antonio,

Bexar County, Texas, granted in Option and Purchase Contract dated April 5, 1963. As additional inducement for Humble to exercise its option to purchase, you have agreed that all utilities (gas, water, sewer and electricity) will be extended to the property prior to the closing of the transaction. The contract of sale is hereby amended to provide that Seller shall extend all utility lines to the property before the date of closing.

'Please sign and return one copy of this letter in the space indicated below to signify your agreement to the amendment to the purchase contract.'

The May 14th communication provided, in part, as follows:
'Humble * * * hereby notifies you of its intention to exercise the option granted in option and purchase contract dated April 5, 1963, covering Lots 19, 20, 21, 22 and 23, Block 2, Lackland Heights Subdivision in or near the City of San Antonio, Bexar County, Texas. The exercise of said option is not qualified and you may disregard the proposed amendment to the contract suggested in letter of May 2, 1963. * * *' (Emphasis added.)

We conclude from this record that the parties are in agreement that Humble's letter of May 14, 1963, and the payment of earnest money within 10 days thereof was in law a timely exercise of the option to purchase Unless Humble's letter of May 2, 1963, terminated and rendered unenforceable **\*94** the option contract. The narrow question to be determined is whether or not the letter of May 2, 1963, constitutes a rejection of the option contract. If it does, the trial court properly granted Westside's motion for summary judgment and the court of civil appeals correctly affirmed such judgment.

Westside contends that Humble's letter of May 2nd was a conditional acceptance which amounted in law to a rejection of the option contract. Westside argues that the letter of May 2nd 'clearly evidences Humble's intent to accept the offer Only if Westside would agree to an amendment to the terms of its original offer.' (Emphasis added.) It further argues that Humble's letter of May 14, 1963, reflects that Humble itself understood that its letter of May 2, 1963, contained a qualified acceptance, and did not form a contract. The basis for this conclusion is the sentence in the May 14 letter which reads: 'The exercise of said option is not qualified and you may disregard the proposed amendment to the contract suggested

in letter dated May 2, 1963, from the undersigned. * * *' We cannot agree with Westside's contentions.

 [1]    The mere fact that the parties may choose to negotiate before accepting an option does not mean that the option contract is repudiated. As stated in James on Option Contracts s 838:

'It is laid down in the law of offers that a qualified or conditional acceptance is a rejection of the offer. It is clearly established by the decisions that a qualified or conditional acceptance of an offer does not raise a contract because the minds of the parties do not meet in agreement upon the same terms. It is said that such an acceptance is a counter-proposal for a new contract, to give legal life to which requires the assent or acceptance of the other party. It is in this sense that a qualified or conditional acceptance is a rejection of the offer first made because the original negotiations are dropped and negotiations for a new and different contract begun.

'An option is a contract, the negotiations for the making of which are concluded by the execution and delivery of the option. The minds of the parties have met in agreement, the distinctive feature of which is that the optionor, for a consideration, binds himself to keep the option open for election by the optionee, for and during the time stipulated, or implied by law.

'Under an option, the act necessary to raise a binding promise to sell, is not, therefore, an acceptance of the offer, but rather the performance of the condition of the option contract. If this is true, then the rule peculiar to offers to the effect that a conditional acceptance is, in itself, in every case, a rejection of the offer, is not applicable to an option contract, supported by a consideration and fixing a time limit for election.'

The case of Cerbo v. Carabello, 376 Pa. 571, 103 A.2d 908 (1954), is to the same effect. It involved an option contract supported by a consideration wherein a lessor granted a lessee an option to purchase real estate for $11,500.00 during a stated term. Before the expiration of the term, the lessee sought unsuccessfully to obtain a reduction of the proposed sale price to $11,000.00; however, prior to the expiration date, the lessee exercised the option. The Court, in overruling lessor's contention that the negotiations instituted by lessee resulted in a termination of the option, said:

'It is true that parties to a written contract may abandon, modify or change it by words or conduct, Elliott v. Linquist, 356 Pa. 385, 388, 52 A.2d 180, 169 A.L.R. 1369. But the difficulty with defendants' position is that neither the words

nor conduct establish an intention to rescind or abandon the rights under the option. * * * At most it was a non-acceptance of an offer to enter into a new contract on the same terms except for a reduction in price. * * * Nowhere **\*95** does it appear that the lessee waived his rights under the option to purchase.' Supra at 909.

 [2]    [3]    We hold that Humble's letter of May 2, 1963, did not terminate the option contract. Humble, for a valuable consideration, purchased the right to keep the option contract open for the time specified, and the right to create a contract of purchase. Although Humble did have the right to Accept or Reject the option in the sense that it was free to take the action required to close the transaction, Humble was not foreclosed from negotiating relative to the contract of sale as distinguished from the option. The option, considered as an independent completed agreement, gave the optionee the right to purchase the property within the time specified. The option contract bound Humble to do nothing but granted it the right to accept or reject the option in accordance with its terms within the time and in the manner specified in the option. Westside was bound to keep the option open and could not act in derogation of the terms of the option. By the letter of May 2, 1963, Humble did not surrender or reject the option. The option to purchase was still a binding obligation between the parties when Humble exercised it on May 14, 1963. See Best Building Co. v. Sikes, 394 S.W.2d 57 (Tex.Civ.App.—1965, writ ref'd n.r.e.); Harper v. Runner, 85 Neb. 343, 123 N.W. 313 (1909); McCormick v. Stephany, 61 N.J.Eq. 208, 48 A. 25 (1900); Cerbo v. Carabello, 376 Pa. 571, 103 A.2d 908 (1954); James on Option Contracts s 838; 8A Thompson on Real Property s 4446; 1 Corbin on Contracts s 91; 1A Corbin on Contracts s 264.

Our holding falls within the rule stated in 1 Corbin on Contracts s 91. According to Corbin:

> 'If the original offer is an irrevocable offer, creating in the offeree a 'binding option,' the rule that a counter offer terminates the power of acceptance does not apply. Even if it is reasonable to hold that it terminates a revocable power, it should not be held to terminate rights and powers created by a contract. A 'binding option' is such a contract (usually unilateral); and an offer in writing, that allows a time for acceptance (either definite or reasonable) and that is

irrevocable by virtue of a statute, is itself a unilateral contract. A counter offer by such an offeree, or other negotiation not resulting in a contract, does not terminate the power of acceptance.'

Westside relies upon such cases as Beaumont v. Prieto, 249 U.S. 554, 39 S.Ct. 383, 63 L.Ed. 770 (1919); State v. Clevenger, 384 S.W.2d 207 (Tex.Civ.App.—1964, writ ref'd n.r.e.); Liquids Dispatch Line v. Texas Power & Light Co., 6 S.W.2d 169 (Tex.Civ.App.—1928, writ ref'd); and Seeburg v. El Royale Corporation, 54 Cal.App.2d 1, 128 P.2d 362 (1942). These cases are distinguishable in that they are factually different. They either show a mere offer, no stated term for the option to remain open, or no consideration for the option.

 [4]    On the basis of the undisputed facts herein discussed, we hold that Humble's motion for summary judgment praying for specific performance of the contract should have been granted. We turn now to a consideration of Mann's motion for summary judgment. The option contract contains a provision whereby Westside agreed to pay all brokerage fees in connection with the transaction and to indemnify and save Humble harmless against any and all claims for such charges. Clarence Jones Realty was designated as the broker and not Mann. Westside agreed to pay Clarence Jones Realty a 6% Commission of the gross sales price when and if the sale should be finally completed. Clarence Jones Realty is not a party to this suit. Mann alleged in his petition and in his affidavit in support of his motion for summary judgment that he was the procuring cause of the execution of the contract; he was a licensed real estate salesman; he was associated with Clarence Jones Realty and participated in the negotiations leading to the execution of the option **\*96** contract between Westside and Humble; he was no longer associated with Clarence Jones Realty, however, he had, at all time an agreement with Jones that he was to receive and was entitled to '60% Of the real estate agent's commission provided for in the contract of April 5, 1963.' Although

Westside does not deny these facts, the summary judgment proofs on Mann's claim for commissions do not establish that he is entitled to a summary judgment. Westside has agreed to pay only 6% Commission of the gross sales price. Since Clarence Jones Realty is not a party to this suit, we cannot hold in this Court that an issue of fact does not exist relative to Mann's entitlement to 60% Of the real estate commission.

The parties have stipulated that Ray Ellison and Boyce Gaskin are the successors in interest to all rights of Westside Investment Corporation and are subject to the duties and obligations of Westside under the contract here involved. Therefore, for all of the reasons herein stated, we enter the following judgment:

(1) The cause of action between Humble and Westside is severed from the cause of action between Mann and Westside. The judgments of the trial court and the court of civil appeals as to Westside and Humble are reversed and judgment is here rendered that Westside and its successors specifically perform the contract of sale and that Westside and its successors properly execute and deliver to Humble a general warranty deed conveying the land involved to Humble and, further that Westside and its successors deliver to Humble an owner's policy of insurance for the sum of $35,000.00 as provided in the contract, such delivery to be made contemporaneously with the payment of $33,200.00, the balance of the purchase money provided for in the contract of sale.

(2) We reverse the judgments of the trial court and the court of civil appeals in favor of Westside against Mann and remand the cause of action between Mann and Westside to the district court for a new trial.

(3) All costs are adjudged against Westside Investment Corporation and its successors.

**All Citations**

428 S.W.2d 92

Footnotes

1    Humble Oil & Refining Company, Petitioner, herein referred to as Humble.
2    Westside Investment Corporation, Respondent, herein referred to as Westside.
3    Marvin H. Mann, Petitioner, herein referred to as Mann.

213 S.W.3d 547
Special Court of Review
Appointed by the Supreme Court.

In re Honorable Nathan HECHT,
Texas Supreme Court Justice.

No. A–2006–1.  |  Oct. 20, 2006.

**Synopsis**
**Background:** The State Commission on Judicial Conduct issued public admonition of Supreme Court justice for statements in support of United States Supreme Court nominee.

**Holdings:** A Special Court of Review appointed by the Supreme Court, Fitzgerald and Mazzant, JJ., held as a matter of first impression that:

[1] Commission failed to prove that justice authorized the public use of his name endorsing nominee when justice spoke to media about nominee;

[2] to violate prohibition against authorizing the public use of name endorsing another candidate for any public office, the judge must give permission for others to publicly use the judge's name in endorsements of the candidate;

[3] justice's statements about nominee did not amount to endorsing her;

[4] canon that prohibited a judge from lending the prestige of judicial office to advance the private interests of others did not apply.

Dismissed.

Ann Crawford McClure, J., concurred in judgment and filed opinion.

West Headnotes (25)

[1]     **Judges**
 Reference and review

Supreme Court performs a de novo review of decision by State Commission on Judicial Conduct.

1 Cases that cite this headnote

[2]     **Judges**
 Evidence

State Commission on Judicial Conduct has the burden of proof by a preponderance of the evidence, as is applicable to the trial of civil actions generally. V.T.C.A., Government Code § 33.034(f).

2 Cases that cite this headnote

[3]     **Judges**
 Evidence

State Commission on Judicial Conduct must prove each element of a charge by a preponderance of the evidence.

1 Cases that cite this headnote

[4]     **Judges**
 Standards, canons, or codes of conduct, in general

State Commission on Judicial Conduct failed to prove that Supreme Court justice authorized the public use of his name endorsing United States Supreme Court nominee when justice spoke to media about nominee; justice had no control or authority over what the media broadcast or printed, and Commission presented no evidence that justice authorized the media to use his name publicly endorsing nominee. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 5(2).

Cases that cite this headnote

[5]     **Judges**
 Standards, canons, or codes of conduct, in general

Canon that prohibits a judge from authorizing the public use of his or her name endorsing another candidate for any public office does not prohibit a judge from endorsing another candidate;

modification of the canon by deleting "endorse" and inserting "authorize" and the concomitant shift in meaning signaled that the Texas Supreme Court intended to confine the restriction to a prohibition of a judge's authorization of the public use of his or her name endorsing a candidate. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 5(2).

Cases that cite this headnote

**[6]     Judges**
 Standards, canons, or codes of conduct, in general

In discharging judicial responsibilities, a judge must be governed by the rule of law, conduct a fair and impartial hearing, and dispense justice as well as equity under the law, according to the particular facts and circumstances presented in each individual case.

Cases that cite this headnote

**[7]     Statutes**
 Questions of law or fact

Statutory construction is a question of law for the court.

Cases that cite this headnote

**[8]     Statutes**
 Intent

The primary rule in statutory interpretation is that a court must give effect to legislative intent.

1 Cases that cite this headnote

**[9]     Statutes**
 Construction based on multiple factors
**Statutes**
 Legislative History
**Statutes**
 Construction in View of Effects, Consequences, or Results

When determining legislative intent, courts look to the language of the statute, as well as its legislative history, the objective sought, and the consequences that would flow from alternate constructions.

Cases that cite this headnote

**[10]    Statutes**
 Grammar, spelling, and punctuation
**Statutes**
 Context

When interpreting a statute, courts read words and phrases in context and construe them according to the rules of grammar and common usage. V.T.C.A., Government Code § 311.011(a).

Cases that cite this headnote

**[11]    Statutes**
 Plain Language; Plain, Ordinary, or Common Meaning

Statutory words are given their ordinary meaning.

Cases that cite this headnote

**[12]    Statutes**
 Dictionaries

Legal or other well-accepted dictionaries are a method of determining the ordinary meaning of certain words in a statute.

Cases that cite this headnote

**[13]    Statutes**
 Superfluousness

In construing a statute, courts give effect to all its words and, if possible, do not treat any statutory language as mere surplusage.

Cases that cite this headnote

**[14]    Judges**
 Standards, canons, or codes of conduct, in general

To violate canon that prohibits a judge from authorizing the public use of his or her name

endorsing another candidate for any public office, the judge must give permission for others to publicly use the judge's name in endorsements of the candidate. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 5(2).

Cases that cite this headnote

**[15]  Statutes**
  ☞ Language
**Statutes**
  ☞ Construction in View of Effects, Consequences, or Results

The language and legal effect of a statute may require a court to construe it strictly.

Cases that cite this headnote

**[16]  Statutes**
  ☞ Liberal or strict construction

To construe a statute strictly means applying a limited, narrow, or inflexible reading and application of the statute.

Cases that cite this headnote

**[17]  Constitutional Law**
  ☞ Certainty and definiteness;  vagueness
**Constitutional Law**
  ☞ Penalties, fines, and sanctions in general
**Statutes**
  ☞ Liberal or strict construction;  rule of lenity

A strict construction of a statute must be applied to two classes of statutes: (1) those that authorize a penalty and (2) those that infringe upon private property or liberty interests; thus, a statute that falls within one of these categories must be couched in such explicit terms that the party upon whom the statute is to operate may, with reasonable certainty, ascertain what the statute requires to be done and when it must be done.

1 Cases that cite this headnote

**[18]  Constitutional Law**
  ☞ Speech, press, assembly, and petition

When the liberty interest is the right to core political speech, construction of a statute must be quite strict.

2 Cases that cite this headnote

**[19]  Judges**
  ☞ Standards, canons, or codes of conduct, in general

Canon that prohibits a judge from authorizing the public use of his or her name endorsing another candidate for any public office must be strictly construed in favor of judge since it implicates liberty interest of free expression. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 5(2).

Cases that cite this headnote

**[20]  Judges**
  ☞ Standards, canons, or codes of conduct, in general

Endorsing in canon that prohibits a judge from authorizing the public use of his or her name endorsing another candidate for any public office meant more than support, that is, more than spoken praise as applied to Supreme Court justice's statements in support of United States Supreme Court nominee. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 5(2).

Cases that cite this headnote

**[21]  Judges**
  ☞ Standards, canons, or codes of conduct, in general

Supreme Court justice's statements that United States Supreme Court nominee "would make a good justice" and had a "sterling character," and that her nomination was "good" and "solid" did not amount to endorsing within the meaning of canon that prohibits a judge from authorizing the public use of his or her name endorsing another candidate for any public office; the statements reflected descriptions of nominee's background, justice's perception of nominee's personal views on various subjects, and his favorable opinions

about nomination to the bench, they were no more than support or praise, and they did not constitute a request or appeal for others to support nomination and were consistent with right to respond to misrepresentations. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 5(2).

Cases that cite this headnote

**[22]** **Judges**
  Standards, canons, or codes of conduct, in general

Canon that prohibits a judge from authorizing the public use of his or her name endorsing another candidate for any public office should permit a judge to respond to any untruthful or inaccurate statements, thereby affording a judge able and willing to do so an effective and timely avenue of recourse to correct misrepresentations in a public forum; a construction of this provision that bars a judge from publicly responding to misrepresentations absent express permission to do so leaves a judge vulnerable to potentially inaccurate and untruthful attacks without any effective remedy and deprives the public of correct and accurate background information on judicial candidates and nominees. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 5(2).

Cases that cite this headnote

**[23]** **Judges**
  Standards, canons, or codes of conduct, in general

Canon that prohibited a judge from lending the prestige of judicial office to advance the private interests of others did not apply to Supreme Court justice's support for United States Supreme Court nominee; life tenure and the power and prestige of the office were public interests, rather than private interests. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 2(B).

Cases that cite this headnote

**[24]** **Judges**
  Standards, canons, or codes of conduct, in general

A "private interest" within the meaning of canon that prohibits a judge from lending the prestige of judicial office to advance the private interests of the judge or others is a personal or individual advantage or benefit gained by use of judicial office. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canon 2(B).

Cases that cite this headnote

**[25]** **Judges**
  Standards, canons, or codes of conduct, in general

Supreme Court justice's public statements in support of United States Supreme Court nominee were permitted by canons as legitimate responses to misrepresentations, expressions of views on political matters, statements that promoted public confidence in the competence of the judiciary, and statements which involved the law, the legal system, and the administration of justice. V.T.C.A., Government Code Title 2, Subtitle G App. B, Code of Jud.Conduct, Canons 2, 4, 5(1)(ii), (2),.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*550** Jackson Walker, L.L.P., Charles L. BabCock, Houston, for Petitioner.

Seana Willing, Executive Director, State Com'n on Judicial Conduct of Austin, TX, Mark Greenwald, San Antonio, for The Commission.

Before Justices FITZGERALD,[1] McCLURE,[2] and MAZZANT[3].

**OPINION**

Opinion by Justices FITZGERALD and MAZZANT.

**I.**

This case focuses on whether the Texas Code of Judicial Conduct, the judicial "rules of the road," so to speak, prohibit a Texas state judge from speaking out favorably in behalf of a close friend nominated to the United States Supreme Court. This case hinges on the meaning of words in this Code and what words were spoken by the judge. This case involves a composite of two different political systems for the selection of judges. In Texas, we have an elective process, whereas in the federal system, we have a nomination-confirmation process.

We recognize at the outset a considerable hurdle must be overcome: the Texas Code is decidedly deficient in a pivotal area important in this case, that is, providing definitive meanings to words in the political arena, words such as "authorized," "endorsing," and "private interests." We are all familiar with certain axioms in particular disciplines, some of which capsulize the core of the undertaking. For example, in real estate, the appropriate axiom is "location, location, location." In music, "practice." In law, "definitions." The relevant provisions of the Texas Code, Canons 5(2) and 2B, quite candidly, lack definitive meaning.

The political processes offer a unique twist. The state judge is up for re-election **\*551** and is in a political campaign. The state judge speaks of his friend, the nominee, whose nomination is pending before the Senate Judicial Committee of the United States Congress. In this federal process, the public expects a thorough examination of the background, qualifications, and experience of the nominee in public, and most assuredly, at the Senate committee hearings. The Senate committee fully intended to call the state judge as a witness during the confirmation hearings, and the state judge fully intended to testify to the same statements before the committee which are at issue here. No one claims such statements would have violated the Texas Code of Judicial Conduct. Had the confirmation proceeded as scheduled and the state judge testified, it is highly doubtful we would be considering any of these matters, anonymous complaint or not.

 **[1]**    We also recognize the commission's approach and this Court's approach are substantially different. The commission, according to the evidence, assumed the Code prohibited

endorsing and supporting, terms it used interchangeably, and proceeded to devote substantially all of its efforts to determining the penalty to be imposed. This Court performs a de novo review. We consider the evidence presented before us (which differs markedly in some respects from evidence presented to the commission), we review Canons 5(2) and 2B, with our starting point being the determination of the meaning of pivotal terms, such as "authorized," "endorsing," and "private interests" (rather than assuming certain of these terms can be used interchangeably), [4] and we decide whether the judge's public statements violated Canons 5(2) and 2B.

**II.**

The Preamble to the Texas Code of Judicial Conduct provides:

> Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of this Code of Judicial Conduct are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law....

> The Code [of Judicial Conduct] is intended ... to state basic standards which should govern the conduct of all judges and to provide guidance to assist judges in establishing and maintaining high standards of judicial and personal conduct.

TEX.CODE JUD. CONDUCT, Preamble, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. B (Vernon 2005). The Preamble reminds us of the high ideals and noble principles this Court is called upon to apply. This case presents substantial issues of first impression. First, we must determine whether public statements of a judge supporting a nominee to the United States Supreme Court violate the Texas Code of Judicial Conduct, specifically Canons 2B and 5(2). If so, we must determine whether the Texas Code abridges the Petitioner's freedom of speech guaranteed by the First Amendment to the United States Constitution. However, because we conclude Petitioner did not violate the Canons, **\*552** we do not address the constitutional question. [5]

## III.

The events leading to the public admonition revolve around President George W. Bush's nomination of Harriet Miers to the United States Supreme Court in October 2005 and statements of the Honorable Nathan Hecht, Texas Supreme Court Justice, (hereafter "Petitioner") to the news media concerning her nomination.

On October 14, the commission voted to initiate an investigation of Petitioner based on the October 12 complaint and, on its own motion, an article published on October 6 in *The New York Times.* On October 17, 2005, the State Commission on Judicial Conduct received a confidential complaint about Petitioner based on the October 10 article in the *Texas Lawyer* newspaper. The commission informed Petitioner of the investigation and requested that he answer a questionnaire about the news articles and his actions preceding and during Miers' nomination. Petitioner cooperated with the commission and provided detailed responses to the questions. Petitioner voluntarily appeared at a hearing before eight [6] members of the commission. The commission voted [7] and issued its Public Admonition, containing its findings of fact and conclusions of law. [8] The commission determined Petitioner violated **\*553** Canons 2B and 5(2) of the Texas Code of Judicial Conduct. *See* TEX.CODE JUD. CONDUCT, Canon 2B ("A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others...."), & Canon 5(2) ("A judge shall not authorize the public use of his or her name endorsing another candidate for any public office...."). [9]

Petitioner requested de novo review of the public admonition rendered by the commission. Texas Supreme Court Chief Justice Wallace Jefferson appointed, by random selection, this panel to the Special Court of Review to review the commission's decision. *See* TEX. GOV'T CODE ANN. § 33.034(c) (Vernon 2004). This Court subsequently conducted an evidentiary hearing. *See id.* § 33.034(e) (review "is by trial de novo as that term is used in the appeal of cases from justice to county court"). Following the presentation of evidence and arguments, the commission sought a public admonition, and Petitioner requested dismissal of the sanction imposed on him.

## IV.

The parties entered into a written "Parties' Stipulations of Fact" (hereafter "Stipulation"). At the hearing before this Special Court of Review, the commission called one witness, Petitioner; the remainder of its presentation centered around documentary evidence, including news stories, public admonishments relative to other judges bearing generally on the two Canons at issue, several volumes of committee hearings involving the current Task Force on the Code of Judicial Conduct and its recommendations, several videos, and the Stipulation. The commission presented no expert testimony related to whether Petitioner violated the Code or whether the Code was constitutional under *Republican Party v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

Petitioner's testimony will be detailed below. In addition, Petitioner presented, without objection by the commission, the expert testimony of former Chief Justice Tom Phillips through his affidavit; the testimony of Judge Jim Parsons and Judge Monica Gonzalez; the expert testimony of Professor Geoffrey Hazard and Blake Tartt by stipulation; Senator Arlen Specter's oral deposition; official transcripts from numerous Senate confirmation hearings **\*554** of past United States Supreme Court Justices; and copies of the Codes of Judicial Conduct from many states.

The evidence shows Petitioner and Miers became close friends beginning in 1976 when they practiced in the same law firm, Locke Purnell. Petitioner left the firm in 1981 to become a district court judge. He subsequently served on the appellate bench, first on the Fifth District Court of Appeals at Dallas, and then the Texas Supreme Court, his current position. It is undisputed that Petitioner's record is unblemished. [10] The Stipulation recites that Petitioner "has never been sanctioned by the State Commission on Judicial Conduct."

Miers became head partner of Locke Purnell, and eventually became White House Counsel to President Bush. She also served as president of the State Bar of Texas and as a member of the Dallas City Council. Petitioner and Miers have remained close friends through the succeeding thirty-five years, including regularly attending the same church and going to dinners and social occasions together.

Besides being a long-time, close friend of Miers, Petitioner was also a friend of White House Deputy Chief of

Staff, Karl Rove. On October 1, 2005, two days before Miers' nomination, Rove and Petitioner had a telephone conversation, and Rove told him Miers might be nominated to fill **\*555** retiring Justice Sandra Day O'Connor's place on the Supreme Court. Rove asked Petitioner if he would agree to speak with Dr. James Dobson (the founder of Focus on the Family, a conservative religious organization that emphasizes family values) about Miers' faith. Petitioner agreed to speak to Dr. Dobson, and he told Rove he was willing to speak to the media about Miers as he considered himself one of the most knowledgeable people, if not the most knowledgeable person, about Miers' personal and professional beliefs and accomplishments.

Out of an abundance of caution, Petitioner consulted first with former Texas Supreme Court Chief Justice Tom Phillips, considered a legal scholar and knowledgeable and experienced with respect to the Code of Judicial Conduct. Petitioner also consulted with former Texas Supreme Court Justice Priscilla Owen, [11] a friend with similar experience involving the Code of Judicial Conduct. Both assured Petitioner that the statements in question did not violate the Code.

Between Miers' nomination on October 3 and the announcement of her withdrawal on October 27, Petitioner responded to more than 120 requests for media interviews. Petitioner appeared on television news programs, and he was quoted or referenced in many newspaper and internet news articles. Petitioner's comments included discussions of his personal relationship with Miers, her professional background and accomplishments, her conservative political philosophy, her attendance and participation at an evangelical Christian church, and her pro-life and anti-abortion views. He expressed his opinion in a variety of ways that she would be a "great" Justice of the Supreme Court. Some news articles also reported that Petitioner said President Bush had known Miers for many years and that conservatives had no need to be concerned that she was an unknown entity. Petitioner was continuously identified as a close personal friend of Miers and as a Justice of the Texas Supreme Court.

Much of the commission's evidence consisted of media reports between October 3 and 27. The *Texas Lawyer* published an article on October 10, 2005 about Petitioner's and other present and former Texas Supreme Court Justices' participation in supporting the Miers nomination. [12] Although **\*556** Petitioner was never interviewed, [13] *The New York Times* published an article on October 6,

2005. [14] These were the only news articles presented at the commission's **\*557** hearing. Evidence of additional articles and interviews were presented before this Court. Rather than selecting "representative statements" from these sources, which are often redundant, and quoting them verbatim, we choose a more succinct method, excerpting from the commission's brief the primary statements it asserts violate Canons 2B and 5(2):

> For the most part, Petitioner provided reporters and interviewers with factual information about Miers' background and experience, including information about her views on religion and abortion and his own personal relationship with her. However, beyond the factual information, Petitioner repeatedly expressed his opinion that the Miers' appointment was "great," "solid," "strong," and that after the American people had been given a chance to review her record, they were "going to herald this nomination as a good one." When asked about the opposition to Miers' nomination during an interview reported by the Washington Post, Petitioner replied that he believed that Miers' detractors were "going to be happy as clams" after they learned more about her. When asked by another interviewer about the need to prove the President's "case" in favor of the Miers' nomination, Petitioner agreed that a "case has to be made," but went on to claim that a "case has been made in Texas for the last 30–plus years. We think of her as a hero down here already." Petitioner went on to predict that during the confirmation process, Senators would be "convinced that this is the right person for the job." Tellingly, in one interview with an ABC news reporter, Petitioner expressly opined that Miers would be a "great justice."

> On a more personal note, Petitioner acknowledged publicly that he had a close personal relationship with Miers, and frequently spoke of his "admiration" for Miers, describing her in various interviews as being "remarkable," "charming," "gracious," "solid," "strong," "sterling," and "stellar."

Former Chief Justice Phillips, whose extensive curriculum vitae was admitted, furnished an affidavit in support of Petitioner's position. [15]

**\*559** Judge Jim Parsons testified he was a district judge in Palestine and a long time Democrat. He did not believe Canon 5(2)'s restrictions on endorsements applied outside partisan electoral politics, and he viewed the public statements about

Miers' nomination as "an administration of justice issue," particularly at the level involving a nominee to the United States Supreme Court, not a matter of partisan politics. [16]

Senator Arlen Specter, the Chairman of the Senate Judiciary Committee of the United States Congress, testified by deposition that the committee would have considered Miers' nomination to the United States Supreme Court had it not been withdrawn. If the Miers nomination had gone forward, his chief counsel would have recommended asking Petitioner to testify before the committee and the Senator would have honored this recommendation. Senator Specter testified that frequently, judges appear and testify voluntarily in hearings involving nominees to the United States Supreme Court. The Senator saw no difference between speaking at the committee hearing and speaking informally to the press. He also stated that had Miers' nomination gone forward, his interest in Petitioner's testimony would have been based on Petitioner's personal and deep knowledge of Miers' background, not his position as a Texas Supreme Court Justice.

The parties stipulated that Geoffrey C. Hazard, Jr., Professor of Law at the University of Pennsylvania Law School, would testify Petitioner's speech

> **\*560** did not violate Canon 2B or 5(2) of the Texas Code of Judicial Conduct, and that [Petitioner] had a First Amendment right to engage in the speech which is subject of the censure by the State Commission on Judicial Conduct.

> He would further say that judges talk to the media and public about nominees to the federal bench, and he is not aware of any judge who has been sanctioned by a state or federal committee or by a court for making comments to the press or public about a nominee to the federal bench.

The commission further stipulated that Blake Tartt would testify:

> [H]e is a former member of the Commission on Judicial Conduct, and a former president of the State Bar of Texas, and he has served on numerous ABA committees, which have vetted nominees for the federal bench, and in performing those tasks has frequently sought the comments of judges about the nominees. Many of these judges

have made favorable comments in support of the nominees....

## V.

**[2]** **[3]** The Texas Constitution and Government Code do not set forth expressly the commission's burden of proof. The parties assert and we agree that the commission has the burden of proof and that the standard is by a preponderance of the evidence, as is applicable "to the trial of civil actions generally." TEX. GOV'T CODE ANN. § 33.034(f) (Vernon 2004); *In re Davis,* 82 S.W.3d 140, 142 (Tex.Spec.Ct.Rev.2002); *In re Bell,* 894 S.W.2d 119, 123 (Tex.Spec.Ct.Rev.1995); *In re Jimenez,* 841 S.W.2d 572, 579 (Tex.Spec.Ct.Rev.1992). Thus, the commission must prove each element of a charge by a preponderance of the evidence.

## VI.

**[4]** The commission's first charge alleges that Petitioner violated Canon 5(2) when he "authorized the public use of his name and title to endorse his close friend, Harriet Miers, a candidate for public office." The question presented is whether the commission proved by a preponderance of the evidence that Petitioner authorized the public use of his name endorsing another candidate, Miers, for public office. We hold the commission did not.

Until 1974, there was no Code of Judicial Conduct in Texas. In 1974, the Texas Supreme Court enacted the initial Code of Judicial Conduct, which contained an "endorsement" prohibition:

> A judge or candidate for election to judicial office should not: ... (b) make political speeches for a political organization or candidate or publicly *endorse* a candidate for public office.

TEX.CODE JUD. CONDUCT, Canon 7A(1)(b), 37 TEX. B.J. 853 (1974).

In 1976, the Texas Supreme Court removed the endorsement prohibition from the Code. [17] In 1980, the Committee on Judicial Ethics [18] issued an opinion in answer to the question: "May a judge endorse a specific candidate or candidates?" **\*561** The opinion stated the Code did not "specifically

prohibit a judge from supporting a candidate or candidates." After reviewing the provisions of Canon 2, the opinion concluded:

> The Committee is of the opinion that endorsing a candidate or candidates is within the discretion of a judge provided the nature and type of endorsement does not contravene Canon 1, Canon 2A and Canon 2B of the Code of Judicial Conduct.

Comm. on Jud. Ethics, State Bar of Tex., Op. 53A (1980). In 1990, the Texas Supreme Court amended Canon 7(3) as follows:

> A judge or judicial candidate shall not *authorize* the public use of his or her name endorsing another candidate for any public office, except that a candidate may indicate support for a political party.

TEX.CODE JUD. CONDUCT, Canon 7(3), 53 TEX. B.J. 240–41 (1990) (emphasis added). [19] Today, this provision (hereafter, "authorization" provision) is found in Canon 5(2) and provides in pertinent part: "A judge or judicial candidate shall not authorize the public use of his or her name endorsing another candidate for any public office, except that either may indicate support for a political party." TEX.CODE JUD. CONDUCT, Canon 5(2). Petitioner, who was on the Texas Supreme Court in 1990, testified that the "authorization" provision was generated at the request of the judges. In response to questions by the commission, Petitioner provided significant insights about the circumstances leading to the creation of the "authorization" provision: [20]

> **\*562** The problem, the reason that 5(2) was proposed in the first place, the judges were concerned that county officials were muscling them into endorsements that they didn't want to make. And they said, look, you've got to endorse me for, let's say a district judge, you have to endorse me for County Commissioner. The district judge didn't want to do it, but he didn't have any way of saying no. If he said no, then he was afraid of what was going to happen to him in the budgeting process. So he wanted cover for that. So that's why the judges came to us back in '88 and said, we're tired of getting hammered on here, and we want an excuse that we can hold up and say, we don't have to do this any more.

In essence, Petitioner explained that the purpose of inserting the "authorization" language into Canon 5(2) was to provide "cover" for judges to refuse to authorize endorsements of partisan elected candidates. [21]

A Task Force has proposed certain amendments to the Code of Judicial Conduct. One proposed amendment to the language at issue in Canon 5(2) provides:

> In order for a judge or judicial candidate to both appear to be and, in fact, be independent of political influence, a judge or judicial candidate shall not *endorse* another candidate for any public office and shall not *authorize* his or her name to be used in a manner where it **\*563** reasonably appears that the judge has endorsed another candidate for public office, except that either may indicate support for a political party. A judge or judicial candidate may attend political events and express his or her views on political matters in accord with this Canon, Canon 2 and Canon 3B(10).

*Final Report and Recommendations of the Supreme Court's Task Force on the Code of Judicial Conduct,* p. 21 (Jan.2005) (emphasis added). However, the Task Force's recommendation does not contain definitions of "endorse" and "authorize." [22]

We recognize it is integral to the commission's position that the "authorization" provision of Canon 5(2) be read and interpreted to prohibit a judge from "endorsing" or "supporting" another candidate. The commission's first charge contains no factual allegations Petitioner "authorized" the public use of his name endorsing Miers' nomination to the United States Supreme Court. The commission's evidence focused exclusively on establishing Petitioner had supported Miers' nomination. The commission urged this Court to hold that as Petitioner was a sitting Justice on the Texas Supreme Court and made public statements to the news media supporting Miers' nomination, Petitioner was guilty of endorsing another candidate, in violation of the "authorization" provision of Canon 5(2).

The commission primarily relies upon its own Public Statement PS–2000–2. [23] This Public Statement firmly

espoused a broad view of the term "authorize." *See* PUBLIC STATEMENT, No. PS–2000–2 (Comm'n Jud. Conduct Mar. 24, 2000). The commission essentially declared "personally publishing an endorsement of another candidate for public office" was synonymous with "giving permission to or 'authorizing' the candidate or a third party to use the judge's name in such a public endorsement." *Id.* The commission took the position that no distinction was to be made "between acting on one's own behalf and empowering another to act on one's behalf as [Canon 5(2) ] necessarily encompasses the broadest definition of the term 'authorize.' " *Id.* The commission cited no legal precedent.

 [5]   Thus, according to this Public Statement, the commission concluded that the "authorization" provision of Canon 5(2) prohibited a judge from "endorsing" another candidate. Before this Court, the commission took the additional step *564 of defining "endorse" as "support." [24] Its pleadings and evidence demonstrate the commission uses these terms interchangeably and treats them as being synonymous. In effect, the commission has reinserted the heretofore rejected "endorsement" prohibition into Canon 5(2), thereby recasting the meaning of the "authorization" provision. In so doing, the commission has entirely ignored, if not dismissed, the importance of the pivotal term "authorized" in its pleadings, its evidence, and its arguments.

The issue before us is the construction of the "authorization" provision of Canon 5(2), including examining the meaning of "authorize." In our analysis of this issue, this Court recognizes the wisdom and value of the cautionary mandate incorporated within Canon 8A:

> The Sections are *rules of reason,* which should be applied consistent with constitutional requirements, statutes, other court rules and decisional law and in the context of all relevant circumstances.

TEX.CODE OF JUD. CONDUCT, Canon 8A (emphasis added). This provision also encourages "reasonable and reasoned application of the text." *Id.* Accordingly, we endeavor to construe Canon 5(2) as written, in accordance with the rules of reason.

 [6]   We also recognize our judicial system is based upon the cornerstones of integrity, impartiality, fairness, and independence. In discharging judicial responsibilities, the judge must be governed by the Rule of Law, conduct a fair and impartial hearing, and dispense justice as well as equity under the law, according to the particular facts and circumstances presented in each individual case. [25]

We therefore undertake to construe and apply the language in dispute in Canon 5(2) consistent with "rules of reason" to the facts presented. Our analysis should focus upon key language and its relationship to the entire Code.

 [7]   [8]   [9]   [10]   [11]   [12]   [13]   Statutory construction is a question of law for the court. *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989). The primary rule in statutory interpretation is that a court must give effect to legislative intent. *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 383 (Tex.2000). When determining legislative intent, we look to the language of the **\*565** statute, as well as its legislative history, the objective sought, and the consequences that would flow from alternate constructions. *Id.* When interpreting a statute, we read words and phrases in context and construe them according to the rules of grammar and common usage. TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 2005). Words are given their ordinary meaning. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 866 (Tex.1999). Legal or other well-accepted dictionaries are a method of determining the ordinary meaning of certain words. *See Pratt–Shaw v. Pilgrim's Pride Corp.,* 122 S.W.3d 825, 833 (Tex.App.-Dallas 2003, pet. denied). In construing a statute, we give effect to all its words and, if possible, do not treat any statutory language as mere surplusage. *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.,* 19 S.W.3d 393, 402 (Tex.2000). This Court must give effect to the word "authorize" to prevent it from being surplusage. *See Meritor Auto., Inc. v. Ruan Leasing Co.,* 44 S.W.3d 86, 89 (Tex.2001). We may not disregard, discount, or dismiss this language and its impact.

If the supreme court had intended by its 1990 amendments to reinstate the 1974 "endorsement" prohibition, it would have done so, but it did not. Instead, it used substantially different language by adding the "authorization" provision. We conclude the Texas Supreme Court intended for the 1990 amendment inserting the "authorization" provision into the Canon governing political activity to effect a substantial change, not simply a technical refinement, from the "endorsement" prohibition. *See Gold v. City of Coll. Station,* 40 S.W.3d 637, 649 (Tex.App.-Houston [1st Dist.] 2001, pet. granted, judgm't vacated w.r.m. by agr.) ("Moreover, the fact that the legislature enacts an amendment

indicates that it thereby intended to change the original act by creating a new right or withdrawing an old one."). Such a significant modification in terminology (deleting "endorse" and inserting "authorize") and the concomitant shift in meaning certainly signals that the Texas Supreme Court intended to confine the restriction to a prohibition of a judge's *authorization* of the public use of his or her name endorsing a candidate.

 [14]  In determining what constitutes a judge's *authorizing* the public use of his or her name endorsing a candidate for any public office, we examine a recent incident involving such conduct. A judge's act of giving a candidate express permission to include the judge's name on a publicly distributed list of persons endorsing the candidate would violate Canon 5(2). *See Public Admonition of Justice of the Peace Torres,* No. 00–0689–JP (Comm'n Jud. Conduct Aug. 16, 2000). Any other fact scenario must be analogous to this situation to constitute a violation of Canon 5(2). That is, the facts must show the judge gave permission for others to publicly use the judge's name in endorsements of the candidate.

Several other states' Code provisions treat the use of a judge's name separately from endorsing or making public statements. In the Oregon Code of Judicial Conduct, JR 4–101(1) and (3) of Oregon's Code provide, in part, that:

> [a] judge shall not knowingly (1) make a public statement in support of the election or defeat of any candidate for a nonjudicial public office ..., or (3) lend the judge's name in support of an action, by any person or group, to elect or defeat any candidate for a nonjudicial public office.... [26]

OR.CODE JUD. CONDUCT JR 4–101(1), (3). Oregon's Code provisions, which apply to **\*566** candidates for nonjudicial offices, distinguish between public statements supporting or opposing a candidate and lending the judge's name supporting such candidates. The "authorization" provision of the Texas Code and the "lending" provision of the Oregon Code address the same conduct, albeit in different words.

In *In re Raab,* 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287 (2003), [27] several sections of the New York Code of Judicial Conduct related to prohibited political activity were at issue. One prohibited "permitting his or her name to be used in connection with any activity of a political organization"; the other prohibited "publicly endorsing or publicly opposing (other than by running against) another candidate for public office." *Id.* at 1289 n. 2. The New York Code clearly distinguished between a judge permitting the use of his name and a judge endorsing another candidate. The plain language of the New York Code provisions shows that one relates only to the use of the judge's name and the other to "endorsing." The former provision, however, does not encompass the latter. The New York Code's prohibition relating to the use of a judge's name is similar to the Texas Code's "authorization" provision.

 **\*567**  In 1989, the Committee on Judicial Ethics recommended to the Texas Supreme Court that the Code be amended to specifically prohibit a judge or a candidate for election to judicial office from publicly endorsing a candidate for public office. As previously noted, in 1990, the Texas Supreme Court amended the Texas Code to add the "authorization" provision but did not add a prohibition on "endorsing" per se.

The recommendation of the recent Task Force proposes amending Canon 5(2) by prohibiting "authorizing" and "endorsing" as separate acts. The recommendation does not equate "authorize" and "endorse." It does not propose to subsume the meaning of "authorize" into the meaning of "endorse." It does not eliminate the former in favor of the latter. Instead, it clearly identifies each as a separate act, and it prohibits each act. Thus, the recommendation of the recent Task Force reinforces our interpretation of Canon 5(2).

The Texas Supreme Court defines "authorized" as follows: "The primary meaning of 'authorize' is to empower, or give a right to act." *Caller Times Publ'g Co. v. Chandler,* 134 Tex. 1, 7, 130 S.W.2d 853, 856 (1939); *see Cox, Inc. v. Humble Oil & Ref. Co.,* 16 S.W.2d 285, 286 (Tex. Comm'n App.1929, judgm't adopted) (same). Other courts have defined the empowerment of authorization as referring to future conduct. For example, in *Gray v. Gill,* 125 Misc. 70, 210 N.Y.S. 658, 660 (N.Y.Sup.Ct.1925), "authorize" was defined as "to permit a thing to be done in the future." The court contrasted the term with "approve," which it defined as "to ratify or confirm a thing already done, or to sanction a thing that *may* be done in the future...." *Id.* (emphasis added). Thus, as the *Gray* court observed, "After the act, one may not authorize it, although he may approve it." *Id.* "Authorize," therefore, has an accepted legal meaning. The term "authorize" is

also defined to mean "to give legal authority; to empower" and "to formally approve, to sanction." BLACK'S LAW DICTIONARY 143 (8th ed.2004). These legal definitions of "authorize" essentially require that the authorization be express and refer to conduct or actions to be taken in the future. The language of giving legal authority, empowering, formally approving, requiring, and sanctioning all necessitate affirmative actions on the part of the authorizor. Thus, it is not sufficient under Canon 5(2) for a judge simply to speak; the judge must affirmatively "authorize the use of his name," that is, expressly permitting the use of his name in the future. The commission's interpretation has deviated from the plain meaning of the "authorization" provision in Canon 5(2). The commission's interpretation does not merely take a broad view of "authorize," it eliminates this element entirely.

When the commission called Petitioner as its only witness, the commission never asked Petitioner if he "authorize[d] the public use of his ... name endorsing" Miers' nomination. In addition, the commission failed to question Petitioner about this matter at the hearing before the commission. The commission's questions to Petitioner recognized he had no control or authority over what the media broadcast or printed. [28] In the media interviews, Petitioner could anticipate the use of his **\*568** name as the person being interviewed, if the media chose to identify him. However, having reviewed Petitioner's statements, we do not find any evidence that he authorized the media to use his name publicly endorsing Miers. [29] Any argument that Petitioner impliedly authorized the public use of his name endorsing Miers would be futile and unavailing. [30] We therefore conclude the commission failed to prove by a preponderance of the evidence that Petitioner *authorized* the public use of his name endorsing Miers.

## VII.

While we have rejected the commission's argument that Canon 5(2) prohibits "endorsing," we conclude that, even under its construction, the commission failed to prove by a preponderance of evidence that Petitioner's public statements endorsed Miers.

Again, the first task is to define the key term. We, therefore, focus on a definition of "endorsing." The Code provides no definition. The commission concedes there is no definition or consensus as to the meaning of "endorse"

in Canon 5. The Code of Judicial Conduct in its past and present forms, the Task Force Recommendations, [31] and the relevant statutes fail to define "endorse." The commission's judicial disciplinary proceedings, the advisory opinions of the Committee on Judicial Ethics, and the few available decisions of the Texas courts also fail to define "endorse" under Canon 5(2). Absent any definition of the term "endorsing," we are presented with the task of statutory interpretation.

The commission's brief [32] essentially contends Petitioner's public statements provided more than "factual information about Miers' background and experience." Specifically, the commission stated: "[Petitioner's] praise of Miers' 'sterling' character and his opinion that she would make 'a great justice,' and his repeated public statements that her nomination was 'good' and 'solid,' certainly sound like approval and support of the President's nomination." In a footnote, the commission refers us Merriam–Webster OnLine Dictionary's definition of "endorse": "[T]o approve openly, especially: to express support or approval of publicly and definitely [as in] endors[ing] a mayoral candidate." The commission's ultimate argument is that "endorsement" is equivalent to "support," and it is undisputed that Petitioner supported Miers.

Petitioner served the commission with an interrogatory asking the commission to explain what constitutes an "endorsement." In its response, the commission stated the term was not defined in the Code and should be given its "ordinary and reasonable meaning" as contained in the American Heritage Dictionary of the **\*569** English Language, Fourth Edition, 2000, "which defines 'endorse' " as: "to give approval of or support to, especially by public statement; sanction: endorse a political candidate."

With respect to the commission's position equating "support" and "endorse" and its assertion that Canon 5(2) embraces a blanket prohibition of endorsing, we consider two advisory opinion from the Committee on Judicial Ethics. The committee's opinion No. 2 contain the following question and answer:

> **QUESTION:** May a Texas judge privately introduce candidates for judicial office to his friends and recommend that such friends vote for such candidates?

> **ANSWER:** It is the opinion of the Committee on Judicial Ethics that a Texas judge would not violate the Code of Judicial Conduct by privately introducing candidates for

judicial office to his friends and recommending that such friends vote for such candidates.

Comm. on Jud. Ethics, State Bar of Tex., Op. 2 (1975). In its opinion No. 13, the committee stated,

> **QUESTION:** May a district judge introduce a candidate for the state Legislature to his personal friends and recommend that such friends vote for such candidate?
>
> **ANSWER:** The Committee on Judicial Ethics is of the opinion that the question should be answered in the affirmative. In Opinion Number 2 this Committee held that a Texas judge would not violate the Code of Judicial Conduct by privately introducing candidates for judicial office to his friends and recommending that such friends vote for such candidates. The Committee now reaffirms that opinion and extends its scope so that henceforth it will be applicable to all candidates for public office.

Comm. on Jud. Ethics, State Bar of Tex., Op. 13 (1976).

These ethics opinions are noteworthy for several reasons. These opinions do not conclude that "endorsing," as a matter of principle, is evil, corrupt, ill-advised, undignified, or inherently injudicious. Both opinions hold "endorsing" is acceptable conduct within certain boundaries. These holdings are consistent with, if not as expansive as, the new draft rules of the American Bar Association's joint commission [33] and a significant number of state Codes throughout the country that expressly permit judges to endorse other candidates in certain circumstances [34] or **\*570** which have no express prohibitions. [35]

In addition, these ethics opinions contradict the assertion that the "authorization" provision of Canon 5(2) constitutes a blanket prohibition, banning a judge from endorsing another candidate. These opinions only limit "endorsing" in scope. In effect, these opinions approve the practice of "endorsing" by allowing a judge to introduce a candidate to personal friends **\*571** and recommend to friends that they vote for the candidate. [36]

The text of Canon 5(2), the lack of any definition of the term "endorse," and the problematic ethical opinions provide marginal guidance. A survey of the respective Codes of a majority of states shows that they prohibit either "endorsing" [37] or "endorsing and opposing," [38] but for the most part these state Codes fail to define "endorse."

Ohio's Canon 7(B)(2)(b) prohibits a judge or judicial candidate from publicly endorsing or opposing a candidate for another public office. OHIO CODE JUD. CONDUCT, Canon 7(B)(2)(b). The Ohio Board of Commissioners referred to a dictionary for broad direction in defining the term "endorsing." The Ohio Board ultimately defined "endorsement" as: "to give approval of or support to." Ohio Bd. of Comm'rs on Grievances & Discipline, Op. 89–15 (Apr. 10, 1992) (citing WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY (1984)).

The definitions provided by two leading dictionaries, however, require more than mere support. Webster's International Dictionary defines "endorse" as "to express definite approval or acceptance of," "support or aid explicitly by or as if by a signed statement," "vouch for," and "underwrite." WEBSTER'S THIRD NEW INT'L DICTIONARY 749 (1981). The Oxford English Dictionary defines "endorse" as "[t]o write on the back of something," "[t]o confirm, sanction, countenance, or vouch for (statements, opinions, acts, etc.; occasionally persons) as by an endorsement," and "[t]o declare one's approval of." 5 THE OXFORD ENGLISH DICTIONARY 233 (2d ed.1989). Even the commission's proffered definition of "endorse" from the Merriam–Webster's Online Dictionary indicates the term involves more than mere support: "to express support or approval of publicly and definitely <*endorse a mayoral candidate*>." MERRIAM–WEBSTER ONLINE DICTIONARY, http://www.m-w.com/dictionary/endorse.

North Carolina's definition of "endorse"—requiring more than mere support—is consistent with these definitions. North Carolina's Code of Judicial Conduct, the only Code that we determined actually defined "endorsing," provides that a judge who is a candidate may endorse a candidate for judicial office. N.C.CODE JUD. CONDUCT, Canon 7B(2). The North Carolina Code of Judicial Conduct defines "endorse" as follows:

> *knowingly and expressly request, appeal or announce publicly,* orally or in writing, whether in person or through the press, radio, television, telephone, Internet, billboard or distribution and circulation of printed materials, *that other persons should support a specific individual in his efforts to be elected to public office.*

N.C.CODE JUD. CONDUCT, Canon 7A(3) (emphasis added). [39] North Carolina has recognized **\*572** "endorsing" as a term of art within the political process.

Although *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), is frequently relied upon in First Amendment cases for a number of significant principles, it is important in this case because of the basis for its decision, a statutory provision of an election code. The former provision of the California Elections Code at issue in *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), stated in part that the official governing bodies of the political parties "shall not *endorse, support,* or oppose, any candidate for nomination by that party for partisan office in the direct primary election." *Id.* at 217, 109 S.Ct. 1013 (emphasis added). This election code clearly distinguished between "endorse" and "support" because the use of both terms would be redundant.

 **[15]**   **[16]**   **[17]**   **[18]**   The language and legal effect of a statute may require a court to construe it "strictly." To construe a statute strictly means applying a limited, narrow, or inflexible reading and application of the statute. *Cain v. State,* 882 S.W.2d 515, 519 (Tex.App.-Austin 1994, no writ). A strict construction of a statute must be applied to two classes of statutes: those that authorize a penalty and those that infringe upon private property or *liberty interests. Id.* A statute that falls within one of these categories must be couched in such explicit terms that the party upon whom the statute is to operate may, with reasonable certainty, ascertain what the statute requires to be done and when it must be done. *Mo., K. & T. Ry. Co. v. State,* 100 Tex. 420, 424, 100 S.W. 766, 767 (1907). If such explicit terms are not present, there is no opportunity for a person charged with the duty to protect himself by the performance of it according to the law. *Id.* When the liberty interest is the right to core political speech, that construction must be quite strict.

 **[19]**   The commission alleged that Petitioner violated Canon 5(2) when he made certain statements in support of Harriet Miers, a United States Supreme Court nominee at the time. Debate on the qualifications of candidates for public office is at the core of our electoral process and of First Amendment freedoms. *Eu,* 489 U.S. at 223, 109 S.Ct. 1013. The Supreme Court has recognized repeatedly that debate on the qualifications of candidates is integral to the operation of the system of government established by the Constitution. *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Because the authorization provision of Canon 5(2) implicates the liberty interest of free expression,

the Canon must be strictly construed in favor of Petitioner. *See Mo., K. & T. Ry. Co.,* 100 Tex. at 424, 100 S.W. at 767.

The commission and the Ohio Board define "endorsing" as meaning "support"; other prominent dictionary definitions and the North Carolina Code of Judicial Conduct define "endorsing" as meaning more than just support. This latter definition constitutes a "limited, narrow, and inflexible reading and application" of the term "endorsing" in Canon 5(2) of the Code. The former interpretation encompasses Petitioner's statements; the latter does not. We do not propose to construct our own definition of "endorsing." We do, however, recognize the necessity of first establishing **\*573** the meaning of "endorsing" before we can proceed to determine whether Petitioner's statements constitute "endorsing." This step is fundamental, particularly when the only definition specifically mandated by a state Code, that of North Carolina, which in turn is based upon the American Bar Association's Model Code of Judicial Conduct, would not prohibit Petitioner's statements.

 **[20]**   Accordingly, we interpret "endorsing" under the circumstances of this case to mean more than support, that is, more than spoken praise.

Petitioner testified his public statements, while obviously supportive, principally dealt with factual background and did not urge the public to "get behind" the nominee, particularly because the situation involved a nomination to the federal bench, not a candidate running in a contested election.

The federal judicial-selection process focuses only on the individual nominated for the judicial position. The inquiry carefully examines the nominee's character, credentials, qualifications, and experience. The process encourages and invites public comment from prominent members of the community, including the judiciary. Public statements made about the nominee are not intended to give an individual an advantage over another because there is only one nominee. Senator Specter testified that the Senate Judiciary Committee would have requested Petitioner to appear and testify at hearings on Miers' nomination. Petitioner testified he would have repeated the same public statements at issue here at such a hearing. [40]

Petitioner touched on this aspect again when he testified that "of course you're endorsing in the sense that you're supportive, but that's not what the canon means." He stated his intent was to get the truth out because much of the information

being published about Miers was negative and untrue. He declined the commission's invitation to describe his support as "go, Harriet, go, she is my pick," instead emphasizing he predominantly conveyed information **\*574** about her personal and professional background, the type of cases she handled (general business litigation from contracting disputes to antitrust and securities), and the positions she took when a Dallas City Council member or State Bar of Texas President. He stressed that he intended to accurately relate her qualifications.

Petitioner further testified he was present during the discussions that took place when the Canons were amended in 1990: "[T]here was not the slightest thought that it would ever apply to comments made in respect to a nomination to the United States Supreme Court. That was not a concern, it never crossed anybody's mind, and it hasn't since until this case." The amendment concerned providing "cover" for the judges under totally different circumstances.

 **[21]**    The commission highlights statements by Petitioner that Harriet Miers "would make a good justice," has a "sterling character," and her nomination was "good" and "solid." These and other statements reflect that Petitioner provided descriptions of Miers' background, his perception of her personal views on various subjects, and his favorable opinions about Miers' nomination to the bench. They do not constitute "endorsing" in that they are no more than support or praise, and they do not constitute a request or appeal for others to support her nomination.

Our conclusion is reinforced by examining Petitioner's public statements in the context of several relevant provisions of the Canons. [41] The Preamble and Canon 2 stress the need for a competent judiciary and maintaining public confidence. Petitioner made a number of remarks which asserted Miers' character, experience, and career reflected the type of competence necessary on the bench. His remarks were designed to instill public confidence in the Miers nomination.

Canons 3B(10), 4B(1), and 5(2) encourage participation by judges in the legal system, the administration of justice, and the political process. Petitioner's public **\*575** statements concerning Miers' nomination detailed her personal life, her positions on various sensitive issues, her professional career, her character, and her work ethic. It is undisputed that Canon 5(2) permits a judge to speak out "on political matters." Petitioner's statements were within the boundaries of these Canons. The commission's interpretation and application of

the authorization provision minimizes Canon 5(2)'s provision empowering a judge to speak on political matters.

Canon 5(1)(ii) prohibits misrepresentations. Petitioner took the position that he "was uniquely situated to get the truth out about Harriet [Miers]." He described the times as truly "chaotic" and that "the publicity coming out about Harriet Miers [was] negative," "false," and "untrue." He perceived that "more information" needed to be developed about her background. His public statements were "truthful" on matters "of enormous concern to the American public." Petitioner was also "worried" that if he did not speak up, it could be perceived that he knew something that would hurt her nomination, which was false.

 **[22]**    Canon 5(2) should permit a judge to respond to any untruthful or inaccurate statements, thereby affording a judge able and willing to do so an effective and timely avenue of recourse to correct misrepresentations in a public forum. Otherwise, this provision provides minimal utility at such a critical juncture. A construction of this provision that bars a judge from publicly responding to misrepresentations absent express permission to do so leaves a judge vulnerable to potentially inaccurate and untruthful attacks without any effective remedy and deprives the public of correct and accurate background information on judicial candidates and nominees. A reasonable construction of this provision affords an immediate and practical method to counter public attacks and criticisms and protects the public's right to truthful and important information, particularly as to a nominee to the United States Supreme Court. In addition, the purposes of the Code are promoted and enhanced, not hindered and frustrated. This provision should not censor or silence a judge.

The American Bar Association Model Code of Judicial Conduct and other state Codes make ample provision enabling a judicial candidate to respond to misrepresentations. The ABA Model Code of Judicial Conduct includes a comment addressing "false information" stating, "Where false information concerning a judicial candidate is made public, a judge or another judicial candidate having knowledge of the facts is not prohibited by Section 5A(1) from making the facts public." ABA MODEL CODE JUD. CONDUCT, Canon 5A(1), Commentary (2004). This comment or a variation of this comment has been included in the Codes of Judicial Conduct of several states including Alaska, Florida, Idaho, Indiana, Kansas, Kentucky, Mississippi, Nebraska, Nevada, North Dakota, South Carolina, South Dakota, and Tennessee. We

conclude Petitioner's public statements are consistent with a judge's right, if not his responsibility, to respond to misrepresentations.

We conclude the commission's efforts to postulate judicial misconduct by showing a state appellate judge made public statements about a pending nominee to the United States Supreme Court, in the commission's words, "endorsing," under the particular facts and circumstances of this case, severely strain a reasonable construction of the Texas Code and are without merit.

We conclude the commission has failed to prove by a preponderance of the evidence that Petitioner endorsed Miers. We conclude under the particular circumstances **\*576** presented that Petitioner complied with the spirit and letter of the Texas Code of Judicial Conduct. Accordingly, we conclude Petitioner is not guilty of violating Canon 5(2).

### VIII.

 **[23]**    The commission's second charge alleges: "[Petitioner] lent the prestige of his judicial office to advance the private interests of his close friend, Harriet Miers in violation of Canon 2B of the Texas Code of Judicial Conduct." We conclude Canon 2B is inapplicable to the conduct at issue.

Canon 2 is entitled: "Avoiding Impropriety and the Appearance if Impropriety in All of the Judge's Activities." TEX.CODE JUD. CONDUCT, Canon 2. Canon 2B of the Code provides, in relevant part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others...." TEX.CODE JUD. CONDUCT, 2B. [42] The second charge was limited to the private interests of "others," namely, Miers.

We first address whether Canon 2B applies to the conduct at issue in this case. In so doing, our inquiry focuses again on a definition, this time, of the term "private interests." The Code of Judicial Conduct does not contain a definition of "private interests."

*In re Jimenez,* 841 S.W.2d 572 (Tex.Spec.Ct.Rev.1992), provides some guidance. In that case, the commission, after finding the judge had a private interest in retaliating against a policeman, privately admonished the judge for violating Canon 2B for making statements accusing a policeman of perjuring himself and selectively prosecuting Hispanic

males for DWI. The judge's communications followed a telephone conversation in which the policeman criticized the judge's dismissal of a suit against an Hispanic male for DWI as a "[expletive deleted] ... decision." *Id.* at 573–74. The Special Court of Review determined that the judge's actions, including one of the letters and later "media interviews" stemming from the letters and the judge's testimony in a lawsuit as to the truthfulness of the policeman, were to advance the public interest. *Id.* at 579. The court reasoned that all these communications dealt with the policeman's "alleged crimes," not with his "private insulting remarks," and were, therefore, motivated by public interest. *Id.* at 580. The court considered a "matter of public interest" to be "one that affected his [i.e., the policeman's] performance of duty." *Id.* at 580. In considering a second letter in which the judge did not mention possible crimes and public misconduct but instead referred to the judge taking "particular offense" to the comment, the court concluded the letter was not written to retaliate. *Id.* at 581. Instead, the court concluded that, even if the judge had a "personal motive of retaliation," it was not convinced by a preponderance of the evidence that his personal motive "exceeded the public motive of disciplining a police officer reasonably suspected of major crimes and minor bad manners." *Id.*

Thus, the focus of the *Jimenez* court was on the public interest of the policeman's performance of his duties as a police officer, not the judge's private interest in retaliating against an ill-mannered individual. **\*577** *See id.* at 580. The *Jimenez* court also recognized a balancing between private and public motivation. *See id.* at 581. Finally, the *Jimenez* court stressed the commission never alleged any of the judge's statements were false in any respect.

 **[24]**    A legal dictionary defines "private" in part as "[r]elating to or belonging to an individual, as opposed to the public or the government.... Confidential; secret." BLACK'S LAW DICTIONARY 1233 (8th ed.2004). [43] While not defining "private interests," the Texas Attorney General has decided that the phrase "does not include candidacy." Op. Tex. Att'y Gen. No. LO–89–21 (1989). In addition, the Supreme Court of Washington, reviewing the same language, discussed the type of conduct to which Canon 2B is directed, emphasizing "the judge's use of his or her office to obtain a financial or other advantage, either for himself or herself personally or for a third party." *In re Sanders,* 135 Wash.2d 175, 955 P.2d 369, 376 (1998). We conclude that a private interest pursuant to Canon 2B is a personal or individual advantage or benefit gained by use of judicial office.

The commission asserts that a benefit of office, life tenure, as well as power and prestige, constitute "private interests" under Canon 2B. We disagree. Although the position of Supreme Court Justice comes with life tenure and as well as a guaranteed salary, *see* U.S. CONST. art. III, § 1, those factors are not necessarily private interests. Rather, they are the perquisites of the public office. Lifetime tenure and guaranteed salary safeguard the judiciary from interference from the other branches of government and promote judicial independence; thus, they are public, rather than private, interests.

The argument that the benefits of public office are private interests presumes that candidates seek office for selfish reasons rather than from a noble sense of duty. The suggestion that a public office is a private interest implies that all public officers, whether legislative, executive, or judicial, are corrupt. This Court soundly rejects any such suggestion.

The evidence before us, including numerous transcriptions of congressional hearings, clearly demonstrates candidates seeking federal judicial positions are driven by the desire and passion to engage in public service and promote the rule of law in a meaningful capacity. Furthermore, all of the expert witness testimony, most of which was stipulated to by the commission, opined that Petitioner's conduct did not advance the private interests of Miers. Under the facts presented, we are convinced this level of dedication and commitment is best described as one of public, not private, interest. [44]

 **\*578** Moreover, the view that seeking these perquisites as a private interest, that is, viewing candidacy for this office as a private interest, contradicts the Attorney General's decision in LO–89–21 and would equate a judge's promotion of his or her own candidacy as a violation of Canon 2B. This interpretation would also prohibit a judge from appearing on his or her own behalf at a political event, conduct expressly permitted under Canon 5(2). [45] In short, we agree that "private interests ... do not include candidacy." Op. Tex. Att'y Gen. No. LO–89–21.

Petitioner testified about the purpose of Canon 2B:

> [T]he purpose for 2B is to keep judges from calling the district attorney, trying to get him to go easy on their kid, or the neighbor's kid, or trying to get the county commissioners to give a contract to somebody that's more

friendly or less friendly, or those kinds of things. It's not—the idea that by speaking in favor of someone who is trying to get confirmed, and has already been nominated to the U.S. Supreme Court, that that somehow advances a private interest, no one would have ever thought that. If you made a list—this canon is old, so if you made a list a long time ago and said, check off the ten things this is supposed to stop, and one of them was keeping people from promoting nominees to the U.S. Supreme Court, nobody would check that off....

Canon 2B prohibits a judge from using the prestige of judicial office to pursue "private interests" such as using the position of judge to extort a financial benefit, to retaliate against another, or to obtain preferential treatment for the judge or another person. [46] Such conduct is **\*579** generally perpetrated in secret or in a clandestine manner. The conduct at issue, however, is the public dissemination of information about Miers in a political context. The record does not even intimate that Petitioner engaged in any surreptitious conduct.

We hold Canon 2B was not intended to apply and does not apply to the conduct at issue in the political environment described. [47] Under these circumstances, we can hardly conclude that Petitioner's public statements would have constituted an advancement of Miers' "private interests." Accordingly, we find Petitioner not guilty of the charge of violating Canon 2B by lending the prestige of his judicial office to advance Miers' private interests.

## IX.

Analysis of the public statements in relation to the Texas Code of Judicial Conduct has been seriously hampered by the complete lack of definitions of critical terms in the Code. Terms such as "authorized," "endorsing," and "private interests" are pivotal to the provisions in which they appear, but the Code does not provide a specific meaning for the terms. This void fosters ambiguity and confusion in interpretation and application. There is no bright line of demarcation between acceptable and prohibited conduct. We decline to come down on the side of condemnation

in the face of what we perceive as undeniably obvious: the ambiguity, confusion, and apparent contradictions in the content, interpretation, and application of the Canons. Perhaps an event such as the case before us will precipitate a fresh approach and renewed efforts to clearly delineate the meaning of such key terms and thereby clearly define what conduct is acceptable and what is not.

We have resolved the meaning of "authorized" by referring to the Webster's International and the Oxford English dictionaries. We conclude Canon 5(2), the "authorization" provision, does not prohibit "endorsing"; rather, the words mean what they say: the "authorization" provision prohibits a judge from authorizing the public use of his name endorsing another candidate. We cannot conclude a violation of the "authorization" provision occurred without any evidence Petitioner "authorized" **\*580** the use of his name "endorsing" "another candidate for any public office," Harriet Miers.

Although we have not resolved the meaning of "endorsing," we conclude there are alternative, reasonable definitions of "endorsing" and that, even if we accepted the commission's interpretation of Canon 5(2) as prohibiting "endorsing," a strict construction of "endorsing" means a narrower construction than just broad support, and, therefore, does not encompass Petitioner's public statements. The commission failed to prove Petitioner's public statements "endorsed" Miers. Thus, we cannot conclude Petitioner violated Canon 5(2) by "endorsing."

 **[25]**  We also conclude Petitioner's public statements are, under the particular facts presented, permitted by the Canons because they qualify as legitimate responses to misrepresentations (Canon 5(1)(ii)), expressions of views on political matters (Canon 5(2)), statements that promote public confidence in the competence of the judiciary, and statements which involve the law, the legal system, and the administration of justice (Preamble, Canons 2 & 4).

Finally, we conclude Canon 2B does not apply to the political conduct at issue, and, therefore, no violation can be found.

Accordingly, we conclude the commission has failed to meet its burden of proving Petitioner violated the Canons, we dismiss the commission's public admonition, and we find him not guilty of the charges.

McCLURE, J., concurring.

ANN CRAWFORD McCLURE, Justice, concurring.
"Thirty-seven hundred judges want to know what to do." With these words, the Examiner for the Commission has asked us to clearly draw the lines and articulate the boundaries of the Texas Code of Judicial Conduct. At the outset, let me dispel any notion that this court of review is about politics. Politics may well have initiated the debate. It plays no role in the resolution. The three members of this panel are not affiliated with the same political party. But as judges, we unanimously agree that we must preserve the independence, integrity, and impartiality of the judiciary. I don't believe that Justice Hecht, a well-respected member of the state's highest civil court, would contend otherwise. How we do that within the confines of the canons and the constitution is the issue. If we as judges do not honor and respect the office and the public trust, we can hardly expect lawyers and litigants to do so. Nor can we expect the recurrent attacks on the judiciary to subside.

The majority perceives no violation of either Canon 5(2) or Canon 2B. I disagree. But because I believe the canons in issue are unconstitutional, I concur in the judgment.

### CHARGE I

### THE "ENDORSE" CLAUSE

Charge I alleges that Justice Hecht authorized the public use of his name and title to support [1] or endorse his close friend, Harriet Miers, a candidate for public office, which actions constituted willful and/or persistent violations of Article V, Section 1–a(6) of the Texas Constitution and Canon 5(2) of the Texas Code of Judicial Conduct. Canon 5(2) provides:

> A judge or judicial candidate shall not authorize the public use of his or her **\*581** name endorsing another candidate for any public office, except that either may indicate support for a political party. A judge or judicial candidate may attend political events and express his or her views on political matters in accord with this Canon and Canon 3B(10).
> TEX.CODE JUD. CONDUCT, Canon 5(2), *reprinted in* TEX. GOV'T.CODE ANN., tit. 2, subtit G, app. B (Vernon

2005). We must determine (1) whether Miers was "a candidate;" (2) whether Justice Hecht "endorsed" her; and (3) whether he authorized the public use of his name and office in doing so. The answer to all three of these inquiries is a resounding, "Yes."

### *Was Miers a Candidate?*

Justice Hecht argues that while Miers was a nominee for a lifetime appointment to the United States Supreme Court, she was not a candidate for a public office within the meaning of Canon 5(2). He contends that the prohibition relates only to endorsement of a political candidate for an elected office and does not prohibit him from expressing his support of a person seeking an appointed judicial position. The Code of Judicial Conduct does not define the term "candidate" and it does not have a specialized meaning; therefore, it should be given its ordinary meaning. TEX.GOV'T CODE ANN. § 312.002 (Vernon 2005). Webster defines "candidate" as "one that aspires to or is nominated or qualified for an office, membership, or award." *Webster's Ninth New Collegiate Dictionary* 201 (9th ed.1987). The Examiner references the Merriam–Webster Online Dictionary, which defines "candidate" as "[o]ne that aspires to or is nominated or qualified for an office, membership, or award." *See* http://www. merriamwebster.com/dictionary/candidate. Even the current version of the Texas Election Code makes no distinction between persons who take affirmative action for the purpose of gaining nomination to public office and those who take affirmative action for the purpose of election to public office. TEX.ELEC.CODE ANN. § 251.001 (Vernon Supp.2006). More *à propos* to our discussion, however, is the definition contained in the American Bar Association Model Code of Judicial Conduct. "Candidate" is defined as "a person seeking selection for or retention in judicial office by election or appointment." MODEL CODE OF JUDICIAL CONDUCT, Preamble and Canons 5A, 5B, 5C, and 5E. Finally, the record reveals that Justice Hecht himself has referred to nominees for various federal courts, including the United States Supreme Court, as "candidates," just as he considers a position on the United States Supreme Court to be "a public office."

### *Did Justice Hecht's Comments Constitute An "Endorsement"?*

Justice Hecht contends that just as "candidate" refers to the elective process, so does "endorsing" as used in the same

context. He concedes that although a "judge commenting favorably on the proposed appointment may be said to be 'endorsing' the person in the dictionary sense of 'giving support,' the judge is not engaging in the electoral political process that Canon 5(2) is aimed at." Petitioner's Brief at 18. I must conclude that Justice Hecht "endorsed" for the same reasons I conclude that Miers was a "candidate." And in his brief, even he candidly admits:

> The information [Justice Hecht] provided about Miers' experience and qualifications certainly supported and thus 'endorsed' her nomination among those who valued the kind of background she had, although the information was undoubtedly received negatively among those who did not.

Petitioner's Brief at 19.

Justice Hecht gave numerous media interviews in which he was identified as a **\*582** justice on the Texas Supreme Court. He provided factual information about Miers' experience and background. In some of the interviews, he offered his personal opinion that Miers' nomination would be "good for the country," that she would make a "good justice," that she would be "a conservative judge" and "a strict constructionist." He also described her as "pro-life." Reasonable minds could differ as to whether these comments constitute an endorsement. The majority concludes that "endorsing" must mean more than "spoken praise." It suggests that Justice Hecht's comments did not constitute a request or an appeal to others to support her nomination. I respectfully disagree.

The Stipulation of Facts reveals that Former White House Deputy Chief of Staff Karl Rove spoke with Justice Hecht on Saturday, October 1, 2005, and asked whether he [Justice Hecht] would be willing to provide factual information to Dr. James Dobson [2] and "others who might ask" about Miers' background in general and her religious views in particular. Justice Hecht agreed to do so. In a later conversation, Justice Hecht agreed to respond to media calls referred to him by the White House, and he agreed to make daily reports to White House staff concerning the types of questions he had been asked.

President Bush announced Miers' nomination on Monday morning, October 3. That afternoon, someone from Rove's office called Justice Hecht to advise him that he had been

invited to participate in a conference call of the Arlington Group. Justice Hecht had not heard of the group but learned that it was composed of conservative religious leaders. He agreed to participate, and called in at the appointed time. Dr. Dobson, who participated in the call, later told the press that he had been assured by Rove that Miers was an evangelical Christian but that he did not get reassurances about how she would vote on Supreme Court issues. Examiner's Exhibit 17.

Within the first two days following the announcement, Justice. received nearly 100 media calls and within a week, by his own count, he had responded to some 120 requests for interviews. Included in the record are videotapes, DVDs, and transcripts from various networks, including *Supreme Court Watch* [C–SPAN], *FOX News Sunday* [FOX], *Hardball with Chris Matthews* [MSNBC], and *The Situation Room* [CNN]. *The New York Times* hailed Justice Hecht as Miers' "Spokesman" in an October 6 article. [3] Examiner's Exhibit 2. And he himself joked during an interview that he was a "PR office for the White House." Examiner's Exhibit 1.

On October 10, *Texas Lawyer* reported that Justice Hecht categorized his "mission" as filling in the gaps about Miers' background and countering "some conservatives' skepticism about her qualifications." Examiner's Exhibit 1. [4] He told **\*583** reporters that conservatives should "rest easy" about Miers' nomination. *Id.* Examiner's Exhibit 3 is a story from *The Dallas Morning News.* It begins:

> Like an author on a radio talk-show blitz, Texas Supreme Court Justice Nathan Hecht worked the phones Tuesday on a mission authorized at the highest levels of the White House: lending his conservative stamp of approval to Harriet Miers, his long time friend, churchmate and fellow Dallas lawyer.
> Justice Hecht never sought a retraction of these or other media reports. He voluntarily participated in rallying public support for Miers' nomination and in convincing conservative religious leaders that she was an acceptable candidate. He spoke about her religious beliefs and convictions, her faith, and her pursuit of deeper meaning and greater purpose through evangelical Christian teachings. In responding to a media report that he had "embarked on a media blitz," Justice Hecht quipped that he "embarked, the same way a fishing boat embarks into a tsunami." Little wonder that he characterized his experience as "seismic." Based upon the record before us,

and even applying the interpretation that the majority has adopted, I conclude that Justice Hecht endorsed Miers. [5]

### Did Justice Hecht Authorize the Public Use of His Name and Office?

I also disagree with the majority as to whether Justice Hecht authorized the public use of his name and office. As I have already mentioned, the White House sought his help in reassuring Dr. Dobson, the Arlington Group, and other religious conservatives that Miers was pro-life and a strict constructionist. The White House wanted to refer media calls to him and asked him to report daily on the types of questions he was asked. He expressly agreed. These are facts to which Justice Hecht has stipulated. Examiner's Exhibit 2, *The New York Times* article, reported that "[t]he Republican National Committee put him on at least one conference call with evangelical pastors and conservative organizers. Progress for America, a group that promotes President Bush's agenda, has also been working to make Justice Hecht available for interviews." While Justice Hecht complained to another reporter that the *Times* article was misleading, he sought no retraction.

**\*584** The majority contends that a violation of Canon 5(2) requires proof that the judge gave permission for others to publicly use the judge's name in endorsements of the candidate. The record shows precisely that. Justice Hecht appeared on several television programs to debate conservatives who opposed Miers' nomination, clearly articulating the difference between legal issues and personal viewpoints [6]. The following exchange occurred during an interview with Chris Wallace of *FOX News Sunday:*

> Chris Wallace: Does she regard abortion as murder?
>
> > Justice Hecht: Well, I don't know that we've ever talked in exactly those terms. But she is pro-life. I mean, you press around it all you can, but she is pro-life, and she has been for 25 years.
> >
> > Q: If she does believe that, Justice, how could she possibly vote to uphold *Roe v. Wade* [7], if she believes that abortion is murder?
>
> A: Because it's easy. Legal issues and personal issues are just two different things. Judges do it all the time. In fact, a judge is going to take an oath that says I'm going to judge

rightly in cases, which means that you have to set aside your personal views in deciding the case. And if you don't do that, you're either a bad believer in your views, a bad judge or both. [8]

Gary Bauer [9]: Look, I'm confused here. I can't tell whether Judge Hecht is arguing that [Miers] is going to overturn *Roe* or she's not going to overturn *Roe.* If he wants to reassure his fellow pro-life conservatives, that's the last argument he should be making, the argument that he just made.

Examiner's Exhibit 10. Justice Hecht responded similarly to Chris Matthews and Pat Buchanan [10] on MSNBC's *Hardball with Chris Matthews:*

Chris Matthews: Karl Rove gave you the OK to begin giving interviews like this. And we very much appreciate, Justice, you coming on, because no one else can talk about her from that Texas perspective, that longtime perspective. Are you surprised Karl Rove has basically unleashed people to come out and talk about her, that they're not more careful about making sure there's less talked about her than more?

Justice Hecht: You know, I really don't know the history on that. And I don't know what their usual policies are....But I'm happy that people are, because I think there is going to be a **\*585** pretty solid consensus of view from people talking about her.

\* \* \* \* \*

Pat Buchanan: The president has asked us to elevate a blank slate to the Supreme Court to sit opposite people like Roberts and Scalia, when we have outstanding jurists who have taken a stand, been cut and blooded for their beliefs. And so, I think this is why she has got to sell herself to the country, to the conservative movement and Republican Party. And if she does not, Chris, I would urge conservatives to recommend a no-vote on this, if she does not persuade that committee that she is Supreme Court material.

Examiner's Exhibit 13. *The New York Times* article reported that "[w]hen the White House named Harriet E. Miers for a seat on the United States Supreme Court this week, Republicans turned to Justice Nathan L. Hecht of the Texas Supreme Court to make her case." Examiner's Exhibit 2. Following suit, *The Dallas Morning News* wrote:

"If you have somebody like Nathan Hecht, whose anti-choice, right-wing credentials are so solid, and he says you're going to like her, she's one of us, that sends a pretty clear signal to that wing of the Republican Party," said Sarah Wheat, executive director of NARAL Pro–Choice Texas.

Examiner's Exhibit 3. All of this evidence leads me to conclude that Justice Hecht expressly and quite affirmatively authorized the public use of his name and office to sell the Miers' nomination.

## CHARGE II

### THE "PROMOTE" CLAUSE

Charge II alleges that Justice Hecht lent the prestige of his judicial office to advance the private interests of his close friend, Harriet Miers, which actions constituted willful and/or persistent violations of Article V, Section 1–a(6) of the Texas Constitution and Canon 2B of the Texas Code of Judicial Conduct. Canon 2B states in pertinent part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others...." TEX.CODE JUD. CONDUCT, Canon 2B, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit G, app. B (Vernon 2005).

### *Did Justice Hecht's Conduct Promote a Private Interest?*

Justice Hecht contends, and the Examiner concedes, that the nomination of Harriet Miers to the United States Supreme Court and the ensuing debate over her qualifications were matters of public concern. But the sanction imposed requires a finding that Justice Hecht's very public conduct promoted Miers' very private interests. The Examiner counters that there is a real and personal private interest at stake—that of political ambition—including a candidate's desire for lifetime tenure, prestige, and power, which motivates a candidate to seek a life-time appointment to the federal bench in the first place. Examiner's Brief at 9.

The Commentary to the ABA Model Code indicates that a judge may participate in only a limited fashion in the process of judicial selection. "Judges may participate in the process of judicial selection by cooperating with appointing authorities and screening committees seeking names for consideration, and by responding to official inquiries concerning a person

being considered for a judgeship." MODEL CODE OF JUDICIAL CONDUCT, Canon 2B, cmt. Justice Hecht could have answered inquiries from the White House regarding his knowledge of Miers, and he could have testified at the Senate confirmation hearing, **\*586** since that proceeding obviously constitutes an official inquiry about the person being considered for a judgeship. [11] But his activities went beyond the limited participation contemplated by the canon and its commentary. I do not question Justice Hecht's loyalty to and friendship with Miers. He considered himself a "central repository of information" about her. That's precisely the point. He spoke because of his personal and private relationship with her. He spoke because the candidate was "Harriet," not former State Bar of Texas President Miers, not former Locke Liddell & Sapp managing partner Miers, not former Dallas City Councilwoman Miers. If the candidate had been a different former bar president or a different firm leader or a different city representative whom he had known in years past, he may well have spoken privately to individuals vetting the candidate or agreed to testify during Senate confirmation proceedings. But he would have been more circumscribed in his comments. He wouldn't have jumped on board the "media train" and he wouldn't have joked about running "PR for the White House." These events happened because they involved "Harriet."

### Did Justice Hecht Lend the Prestige of His Office to Promote that Interest?

The evidence supports a finding that Justice Hecht lent the prestige of his judicial office to advance Miers' private interests in violation of Canon 2B. I must reject his argument that he was contacted by the media not because of his position as a justice on the Texas Supreme Court but because of his thirty-year relationship with Miers. That may well have been the motivation behind press inquiries. But every time the media carried the story, the "source" was clearly identified, captioned, and addressed as "Justice Hecht."

In a public statement issued in 2000, the Commission cautioned Texas judges that "it is virtually impossible for a judge, at least in the eyes of the public, to separate himself or herself from the judicial office; therefore it is immaterial to the issue of misconduct that a judge does not use his judicial title or refer to his judicial position in a public endorsement of a candidate for public office." Public Statement PS–2000–2. The Examiner argues in its brief that contrary to his claims, Justice Hecht used, and allowed others

to use, his position as a judge, and a Texas Supreme Court justice in particular, to influence, sway, and convince public opinion and conservatives who questioned the President's decision to nominate Miers. Examiner's Brief at 14. Because the Examiner proved these facts by a preponderance of the evidence, I agree.

### WERE THE VIOLATIONS WILLFUL?

The Commission must prove by a preponderance of the evidence that Justice Hecht willfully committed the charged violations. *In re Davis,* 82 S.W.3d 140, 142 (Tex.Spec.Ct.Rev.2002); *see* TEX GOV'T CODE ANN. § 33.001(b)(2)(Vernon 2004); *see also In re Bell,* 894 S.W.2d 119, 131 (Tex.Spec.Ct.Rev.1995). Willful conduct requires a showing of intentional or grossly indifferent misuse of judicial office, involving more than an error of judgment or lack of diligence. *Davis,* 82 S.W.3d at 148; *Bell,* 894 S.W.2d at 126. A judge need not have formed the specific intent to violate the Code; as long as he intended to engage **\*587** in the conduct for which he is disciplined, he is guilty of a willful violation of the Code. *See In re Barr,* 13 S.W.3d 525, 539 (Tex.Rev.Trib.1998, pet.denied). There is no dispute whatsoever that Justice 2 intended to engage in the conduct for which he is disciplined. Although he defines willful as, "you know it's wrong and you do it anyway," he also testified that "if I had it to do over again, I'd do it again." In my view, the evidence supports a finding that Justice Hecht willfully violated the canons.

### ARE THE CANONS CONSTITUTIONAL?

I turn now to the broader constitutional concerns. Justice Hecht challenges the constitutionality of Canon 5(2) (the endorse clause), both facially and as applied to him. Similarly, he challenges Canon 2B (the promote clause) as applied. Both complaints allege the canons violate the First Amendment. Citing *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (*White I* ), he argues that these provisions do not withstand strict scrutiny analysis. The first issue is whether strict scrutiny analysis applies.

### Does Strict Scrutiny Apply?

In *White I,* the Supreme Court applied the strict scrutiny analysis because the intermediate court of appeals had done

so and the parties did not dispute the issue. *White I,* 536 U.S. at 774, 122 S.Ct. 2528. Some legal scholars suggest that the political activity canons should not be subjected to a strict scrutiny analysis. *See* J.J. Gass, *After White: Defending and Amending Canons of Judicial Ethics,* Judicial Independence Series, Brennan Center for Justice at NYU School of Law at p. 18 (2004). The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Texas Department of Transportation v. Barber,* 111 S.W.3d 86, 92 (Tex.2003). But the Supreme Court also has recognized that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Barber,* 111 S.W.3d at 92. Both written and oral expression may be subject to reasonable time, place, and manner restrictions. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Barber,* 111 S.W.3d at 92. When reviewing regulations on speech, we engage in a two-tier analysis. *Barber,* 111 S.W.3d at 92.

For the higher tier, "regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content," the court applies "the most exacting scrutiny." *Barber,* 111 S.W.3d at 92, *quoting Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Such content-based regulations are presumptively invalid, *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and they can withstand strict scrutiny only if precisely drawn to serve a compelling state interest. *Consolidated Edison Company of N.Y., Inc. v. Public Service Commission,* 447 U.S. 530, 540, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Barber,* 111 S.W.3d at 92–93. For the lower tier, "regulations that are unrelated to the content of speech," the court applies an "intermediate level of scrutiny." *Barber,* 111 S.W.3d at 93, *quoting Turner Broadcasting,* 512 U.S. at 642, 114 S.Ct. 2445. Content-neutral regulations are valid provided they are narrowly tailored to **\*588** serve a substantial governmental interest, and they do not unreasonably limit alternative channels for communicating the information. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Clark,* 468 U.S. at 293, 104 S.Ct. 3065; *Taxpayers for Vincent,* 466 U.S. at 808, 104 S.Ct. 2118; *Heffron,* 452 U.S. at 647–48, 101 S.Ct. 2559; *Barber,* 111 S.W.3d at 93.

Determining which tier applies requires a court to determine whether a regulation is content-neutral or content-based. *See Barber,* 111 S.W.3d at 93. This is often not a simple task. *Id.* A content-neutral regulation generally must be both viewpoint neutral and subject-matter neutral. *Id., see Hill v. Colorado,* 530 U.S. 703, 722–23, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). As the Supreme Court has stated, "[r]egulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based regulation." *Barber,* 111 S.W.3d at 93, quoting *Hill,* 530 U.S. at 723, 120 S.Ct. 2480.

To be viewpoint neutral, a regulation must not be based on the ideology of the message. *Barber,* 111 S.W.3d at 93. The prohibitions contained in the canons are not based on ideology since they restrict all speech by a judge or judicial candidate endorsing another candidate. To be subject-matter neutral, a regulation must not be based on the topic of the message. While viewpoint neutral, the canons are not subject-matter neutral as they are certainly based on topic.

I thus conclude that the proper test to determine the constitutionality of the canons is strict scrutiny. Under the strict scrutiny analysis, any restriction on the right of political speech requires a three-pronged analysis: (1) were the statements core political speech? (2) is there a compelling state interest to prohibit that speech? and (3) is the canon narrowly tailored to serve that interest? *White I,* 536 U.S. at 775, 122 S.Ct. 2528 *Brown v. Hartlage,* 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982).

### *What Does White Really Say?*

In *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (*White I* ), the United States Supreme Court considered whether the Minnesota Code of Judicial Conduct violated a judicial candidate's First Amendment rights by prohibiting him from announcing his views on disputed legal or political issues. [12] Many states, including Texas, had canons which are generically referred to as "announce" clauses:

> [I]t is clear that the announce clause prohibits a judicial candidate from stating his views on any specific nonfanciful legal question within the province of the court for which he is running, except in the context of discussing

past decisions—and in the latter context as well, if he expresses the view that he is not bound by *stare decisis.* *White I,* 536 U.S. at 773, 122 S.Ct. 2528.

### The Facts

Gregory Wersal first ran for the Minnesota Supreme Court in 1996. He identified himself as a member of the Republican Party, attended and spoke at party meetings, sought its endorsement, and personally solicited campaign contributions. He distributed literature criticizing **\*589** several decisions of the court on issues such as crime, welfare, and abortion. As a result of this literature, a complaint was filed with the Minnesota Lawyers Professional Responsibility Board. The Board ultimately dismissed the complaint, but Wersal withdrew as a candidate because he feared that other complaints might jeopardize his law license.

Wersal ran again in 1998. This time, he asked the Board for an advisory opinion regarding the announce clause. The Board expressed significant doubts about the constitutionality of the canon, but it did not specifically answer his questions because he had not submitted a list of the "announcements" he wished to make. Wersal responded with a lawsuit against the Board and Suzanne White in her capacity as chair, seeking a declaration that the announce clause violates the First Amendment. Other plaintiffs, including the Republican Party of Minnesota, alleged that the announce clause prevented their membership from learning Wersal's views on various legal issues. The district court determined that the announce clause did not violate the First Amendment and the Eighth Circuit affirmed.

### White I

The Supreme Court swiftly determined that a candidate's statements regarding his or her own views on political or legal issues is protected speech. The court struggled a bit with an analysis of Minnesota's compelling state interest. Minnesota purportedly enacted the announce clause to promote the impartiality of the judiciary and the appearance of impartiality. The Eighth Circuit agreed that these were sufficiently compelling. The same justifications were argued to the Supreme Court. Although "impartiality" was used throughout the Eighth Circuit's opinion, the briefs, the Minnesota Code of Judicial Conduct and the ABA Model Code, the high court pointedly noted that "none of these sources bothers to define it." *Id.* at 775, 122 S.Ct. 2528.

The majority concluded that the goal of "impartiality" could be compelling depending upon the definition assigned. While it rejected a definition of "impartiality" as meaning a lack of preconception regarding legal matters [13], it accepted the definition of promoting the state's interest in electing judges who are not biased against or in favor of a particular party. Because Minnesota had not demonstrated that the announce clause served that interest, the canon was not narrowly tailored to achieve that goal. "*[E]ven if* the First Amendment allows greater regulation of judicial election campaigns than legislative election campaigns, the announce clause still fails strict scrutiny because it is woefully underinclusive, prohibiting announcements by judges (and would-be judges) only at certain times and in certain forms." *Id.* at 783, 122 S.Ct. 2528 (Emphasis in original). The court left unanswered whether the definition could include the characteristic of open-mindedness [14], but other courts have found that open-mindedness can be a **\*590** compelling state interest. *See Kansas Judicial Watch v. Stout,* 440 F.Supp.2d 1209, 1230 (D.Kan.2006), *citing North Dakota Family Alliance, Inc. v. Bader,* 361 F.Supp.2d 1021, 1040 (D.N.D.2005); *Family Trust Foundation of Ky., Inc. v. Wolnitzek,* 345 F.Supp.2d 672, 695 (E.D.Ky.2004); *In re Watson,* 100 N.Y.2d 290, 794 N.E.2d 1, 763 N.Y.S.2d 219 (N.Y.2003).

*White I* caught the judiciary off guard. Justice Hecht captured the sentiment when he testified, "I would say that *White* case was a bombshell when it hit and that I certainly wasn't expecting it." Few of us were.

### White II

The Supreme Court remanded to the Eighth Circuit for consideration of the constitutional viability of the "partisan activities" clause and the "solicitation" clause. *Republican Party of Minnesota v. White,* 416 F.3d 738 (8th Cir.2005) (*White II* ). Pursuant to the Minnesota Code of Judicial Conduct, a judge or judicial candidate may not identify himself or herself as a member of a political organization; attend political gatherings; or seek, accept, or use endorsements from a political organization. The solicitation clause prohibits a candidate from personally soliciting or accepting campaign contributions, although the candidate may establish committees to conduct campaigns, and solicit contributions and public support from attorneys. The committees shall not seek, accept, or use political endorsements or disclose to the candidate the identity of

contributors. Relying heavily upon *White I,* the Eighth Circuit held both clauses to be constitutionally infirm.

The court first addressed the partisan activities clause, focusing upon the fact that the canon treated political parties differently than special interest groups. *Id.* at 753 n. 7. The court viewed the clause in the context of the state's interest in ensuring unbiased judges. "[T]he underlying rationale for the partisan-activities clause—that *associating with a particular group* will destroy a judge's impartiality—differs only in form from that which purportedly supports the announce clause— that *expressing one's self on particular issues* will destroy a judge's impartiality." *Id.* at 754 (Emphasis in original). In other words, "the Supreme Court's analysis of the announce clause ... is squarely applicable to the partisan-activities clause." *Id.* While a judicial candidate could not consort with a political party, the candidate could align with a special interest group, such as the National Rifle Association, the National Association for Women, the Christian Coalition, the NAACP, or the AFL–CIO.

> A judicial candidate's stand, for example, on the importance of the right to keep and bear arms may not be obvious from her choice of political party. But, there can be little doubt about her views if she is a member of or endorsed by the NRA. Yet Canon 5 is completely devoid of any restriction on a judicial candidate attending or speaking to a gathering of an interest group; identifying herself as a member of an interest group; or seeking, accepting, or using an endorsement from an interest group.

*White II,* 416 F.3d at 760. Consequently, the partisan activities clause was underinclusive.

The solicitation clause suffered the same fate. Minnesota argued that keeping judicial candidates from soliciting campaign funds served its interest in an impartial judiciary by preventing undue influence. But a number of other scenarios would allow a candidate "to stumble onto the names of contributors" since campaign finances are reported, publicly available, and widely disseminated. *Id.* at 766.

**\*591** Bearing in mind the teachings of *White I,* look now to the three prongs of a strict scrutiny analysis with regard to Justice Hecht's statements.

### *Were Justice Hecht's Statements Core Political Speech?*

The Examiner contends that the canons do not encroach on Justice Hecht's right to engage in core political speech. It claims that *White I* extends only to a judge's comments or opinions in connection with his or her own campaign. Because Justice Hecht was speaking about Miers' beliefs and values rather than his own, the Examiner argues that no political speech was abridged:

> It is not disputed that [Justice Hecht] shared with reporters and interviewers some of his own personal views on issues such as abortion and gay marriage while discussing the Miers' nomination. However, [Justice Hecht] has never been sanctioned for making those statements, nor has he been charged in this proceeding with violating any provision of the Texas Code of Judicial Conduct by telling reporters those views. To the contrary ... [Justice Hecht] was sanctioned for assisting *Miers* and *her* candidacy by publicly expressing what he believed were *Miers'* views on disputed political and legal matters.

Examiner's Brief at 18 (Emphasis in original). Applying this analytical construct, the Examiner then concludes that Justice Hecht's oratory "was simply the expression of a personal opinion for which he was not entitled to any heightened First Amendment protection." *Id., citing Scott v. Flowers,* 910 F.2d 201 (5th Cir.1990).

In *Scott,* the Fifth Circuit addressed the First Amendment in the context of a civil rights action brought by a Texas justice of the peace challenging a public reprimand by the Commission. The reprimand stemmed from an open letter written by Judge Scott to county officials attacking the district attorney's office and the county court at law for dismissing the majority of traffic ticket appeals. Characterizing the communications as "insensitive," the Commission found the judge's conduct to be inconsistent with the proper performance of his duties as a justice of the peace and served to cast public discredit upon the judiciary. He was warned to be more restrained and temperate in the future.

Judge Scott ultimately filed suit against the members of the Commission, both individually and in their official capacities, claiming that his letter and comments to the press were protected speech for which he could not constitutionally be subjected to discipline. The district court granted summary judgment in favor of the Commission.

The Fifth Circuit began by noting that public employees occupy a unique position in First Amendment jurisprudence. *Scott,* 910 F.2d at 210. While they do not shed constitutional protections when they enter the workplace, their rights must be balanced against the interests of the state in promoting the efficiency of the public services it performs through its employees. *Id., citing Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In *Pickering,* the court adopted a two-step approach to evaluate claims of First Amendment violations by public employees. First, the court must determine in light of the content, form, and context of the speech in question, whether it addresses a matter of legitimate public concern. *Scott,* 910 F.2d at 211, *citing Pickering,* 391 U.S. at 571, 88 S.Ct. 1731. If so, the court must then "balance the employee's first amendment rights against the governmental employer's countervailing interest in promoting the efficient performance of its normal **\*592** functions." *Scott,* 910 F.2d at 211. If not, the inquiry must end. The court ultimately determined that Scott's letters and comments were not simply an expression of the judge's personal opinion, but addressed matters of legitimate public concern. *Id.*

I first question the continued viability of *Scott* inasmuch as a judge's ability to offer personal opinions or viewpoints has since been found to be protected speech. Nevertheless, like the Fifth Circuit, I find the content, form, and context of Justice Hecht's speech to be a matter of legitimate public concern and accordingly, I move to the balancing test, which requires that we balance his First Amendment rights against the state's countervailing interest.

### *Is There a Compelling State Interest?*

Justice Hecht maintains that the Examiner has failed to articulate that compelling interest. He refers to discovery requests which the Examiner pointedly refused to answer. Yet I believe that the canons themselves identify the compelling state interests:

### Preamble

Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us....

### Canon 1. Upholding the Integrity and Independence of the Judiciary

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary is preserved.
TEX.CODE JUD. CONDUCT, Preamble and Canon 1, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit G, app. B (Vernon 2005).

In the wake of *White I,* the Texas Supreme Court created the Task Force of the Code of Judicial Conduct to "review [the Texas Code of Judicial Conduct] to ensure that the integrity and independence of our judiciary is preserved." *Order Creating Task Force on Code of Judicial Conduct,* Misc. Docket No. 03–9148 (August 22, 2003). The court asked the Task Force to "make recommendations to th[e] Court for revisions required by law, to make suggestions on improving the effectiveness of existing cannons [sic] and to suggest other modifications consistent with the Code's broad purpose of upholding the integrity, independence and competence of the judiciary." *Id.* The final report and recommendations were delivered in January 2005. The Task Force recommended adding the word "impartial" to both the Preamble and Canon 1 "to underscore the compelling state interest of judicial impartiality." [15] This recommendation has yet to be adopted, although the Texas "announce clause" was repealed. [16]

**\*593** Nevertheless, the state has a compelling interest in preserving the independence and integrity of the Texas judiciary and in maintaining public confidence in our court system. *White I,* 536 U.S. at 793, 122 S.Ct. 2528 (Kennedy, J., concurring)(nothing in the court's opinion should be read to cast doubt on the fact that judicial integrity is a "state interest of the highest order"); *In re Raab,* 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287, 1290 (N.Y.2003) (preserving the impartiality and independence of the judiciary and maintaining public confidence in the courts are compelling state interests).

### *Are the Canons Narrowly Tailored?*

A narrowly tailored restriction is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative). *White II,* 416 F.3d at 751. "In short, the seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as *precisely* tailored as possible." *Id.* (Emphasis in original).

### *Canon 5(2)*

### *(The Endorse Clause)*

The Examiner argues that *White I* addressed only the issue of a judicial candidate's right to announce his or her own views on disputed legal or political issues. The opinion "did not concern itself with whether the First Amendment protects a judicial candidate's right to endorse other candidates for public office" and consequently, does not apply to this case. Examiner's Brief at 16. Cautioning that the opinion is now four years old, the Examiner explains that in the intervening period, no court has held that a canon prohibiting endorsements violates the First Amendment. Instead, it continues, the only court to address the issue concluded that an endorsement prohibition is constitutional. *See In re Raab,* 793 N.E.2d at 1289.

State District Judge Ira Rabb admittedly called prospective voters urging their support for a legislative candidate, although he did not give his name or identify himself as a judge. His purpose was to garner goodwill with the Working Families Party in hopes that the party would endorse him as a judicial candidate in his own campaign for the Supreme Court later that year. Three months later, he attended a party candidate screening meeting. He was not scheduled to be interviewed, but he sat with members of the party, participated in the interviews, and asked candidates for both judicial and non-judicial offices if they would publicize the party's endorsement in their campaign literature. Judge Rabb was ultimately nominated by the Democratic Party, endorsed by the Working Families Party, and elected to the Supreme

Court. He was censured by the New York Judicial Conduct Commission for engaging in improper political activity in the course of a judicial campaign. The New York Code of Judicial Conduct prohibits judges and judicial candidates from (1) participating in any political campaign for any office or permitting his or her name to be used in connection with any activity of a political organization; (2) publicly endorsing or publicly opposing (other than by running against) another candidate for public office; **\*594** (3) making speeches on behalf of a political organization or another candidate; (4) attending political gatherings; and (5) soliciting funds for, paying an assessment to, or making a contribution to a political organization or candidate. *Raab,* 793 N.E.2d at 1290, *citing* 22 NYCRR 100.5(A)(1)(c), (d), (e), (f), (g), (h). The Code allows an incumbent or candidate to participate in his or her own campaign for elective judicial office.

Judge Rabb complained that the rules were both underinclusive and overinclusive. The court rejected his argument, focusing on the "critical" difference between conduct integral to a judicial candidate's own campaign and activity in support of other candidates or party objectives. *Raab,* 793 N.E.2d at 1292. The court concluded that by participating in the phone bank and candidate screening, Judge Rabb "went beyond what was necessary or integral to his own judicial races." *Id.* at 1293.

In response to the Examiner's argument that *Raab* is controlling, Justice Hecht recounts the differences between the New York and Texas canons. Texas judges can (1) affiliate with a political party; (2) attend political events; (3) express views on political matters; (4) contribute to political campaigns of other candidates; and (5) criticize a candidate for public office. He points to the ability of Texas judges to criticize other candidates and compares Canon 5(2) with the New York Code of Judicial Conduct and the ABA Model Code. Both New York and the ABA prohibit a judge from *either* publicly endorsing *or* publicly opposing another candidate. The Examiner responds:

> As a matter of clarification, Examiner would point out that [Justice Hecht] is mistaken in his view that a judge would not be sanctioned under Canon 5(2) for criticizing another candidate. There is simply no authority to support his belief that statements that are critical of another candidate for office, aside from the judge's own opponent, would be treated differently

than statements in favor of another candidate for office.

Examiner's Brief at 26. But the canons do *not* make that distinction, and the Examiner offers no support for the commentary. I suspect the 3700 judges who await this decision would be disquieted to learn that one could be sanctioned for conduct not delineated in the Code. Nevertheless, the Texas canons differ in other material respects.

Members of the Texas judiciary are permitted to provide factual information or favorable comments, either formally or informally, to screening committees, appointing authorities, and members of the Senate Judiciary Committee. The Examiner concedes this is true. Examiner's Brief at 8, 11. A judge may privately introduce judicial candidates to friends and recommend that the friends vote for the candidates. *See* OP. TEX. ETHICS COMM'N No. 2 (1975). This liberty of private introduction and recommendation has been extended to all candidates for public office. *See* OP. TEX. ETHICS COMM'N No. 13 (1976).

Most significant in my view is the fact that, unlike a member of the New York judiciary, a Texas judge may put his money where his mouth can't go. Simply stated, a judge may make campaign contributions to other candidates—including presidential candidates, congressional candidates, gubernatorial candidates, legislative candidates, county and municipal candidates, and other judicial candidates. In turn, we may accept contributions from these same sources as well as special interest groups. In his brief, Justice Hecht points to several members of the Commission who have routinely contributed to political campaigns, and he bitingly reveals **\*595** that one member contributed to Hillary Clinton's campaign only a month before he [Justice Hecht] was sanctioned:

> One wonders how it can be reconciled that a political candidate can be supported by a judge with money, but not words. What's good for Hillary should be good for Harriet. One would think.

Petitioner's Brief at 6. His remark is right on the money—it cannot be reconciled. From this, I conclude that Canon 5(2) is underinclusive, and "woefully" so. Because it cannot survive strict scrutiny, it is unconstitutional, both facially and as applied. If the purpose of the endorsement clause

is to preserve and protect judicial independence, integrity, and impartiality, it must protect these values from attacks on all fronts. From the standpoint of public perception, one thousand dollars is every bit as compromising as one thousand words.

> If the concern is that a judge's endorsement or support of a candidate for public office will damage that judge's impartiality apparently because she is seen as aligning herself with the candidate's view or ideology, that is no less so when a judge contributes to a candidate's political campaign, which is not prohibited.

Petitioner's Brief at 34. I agree.

## Canon 2B

### (The Promote Clause)

Finally, Justice Hecht challenges the constitutionality of Canon 2B as applied. Quoting *White I,* he begins by defining terminology. The canon prohibits a judge from lending the prestige of his office to advance the private interests of another. He defines "prestige" as:

1. the power to impress or influence, as because of success, wealth, etc.

2. reputation based on brilliance of achievement, character, etc.

*Webster's New World Dictionary of the American Language,* Second College Edition (1980). He contends that the comments of a Texas Supreme Court jurist would hold little sway with the members of the Senate Judiciary Committee. Petitioner's Brief at 39. But Justice Hecht's assistance was not solicited by Karl Rove and the White House to influence the committee. His help was needed to shore up the conservative base of the Republican Party to whom many committee members owed allegiance. The idea was to have a well-respected, influential and conservative jurist reassure the committee members' constituents as a means to obtain Senate confirmation. In this context, the promote clause cannot be said to serve the state's interest in preserving judicial independence, integrity and impartiality. Whether Justice Hecht's national interviews persuaded individual senators or

swayed public opinion, his independence and impartiality would be called into question only if the individuals, entities, or affiliates appeared in a case before him. In that instance, recusal would be the least restrictive alternative. Because Canon 2B is not narrowly tailored to serve the compelling state interests, it is unconstitutional as applied to Justice Hecht.

## CONCLUSION

I have previously served as the presiding justice of a formal review tribunal. In upholding the Commission sanction, I wrote for the majority:

> Does the Code of Judicial Conduct intrude into a judge's private life? Most definitely. But that is a path chosen when the decision to seek office is made. A judge must observe the high standards promulgated by the Code of Judicial Conduct both on and off the bench in order to maintain the integrity of the judiciary.

**\*596** *In re Lowery,* 999 S.W.2d 639, 657 (Tex.Rev.Trib.1998, pet.denied). Though today I strike down the enforcement of portions of the Code, the aspirations live on. Judicial accountability arises in part from a justifiable

concern for the relationship between judicial conduct and public perception. *Lowery,* 999 S.W.2d at 647. "While the legal profession has historically been considered a noble one, modern-day portrayals paint a picture of scorn and ridicule. In the courtroom called the media, in the trial by public perception, the image of the judicial system is at an all-time low." *Id.*

I offer two caveats before I close. First, the Commission is charged with enforcing the provisions of the Code of Judicial Conduct as promulgated by the Texas Supreme Court. I believe it has endeavored to do so in good faith while awaiting action by the Supreme Court on the remainder of the Task Force's recommendations. Second, the robe means something to me. Every time I slip it on, I remember my oath—a vow "to preserve, protect and defend the constitution and laws of the United States and of this state." If ever I look in the mirror and see a judge who has ruled on the basis of politics, expediency, or personal gain rather than the rule of law, it is time to remove the robe and leave the bench. The citizens of this state deserve nothing less. As for the 3700 judges who want to know what to do, it is my fervent hope that each one will pause to consider this: Our *ability* to speak does not mean that we *should* speak. I haven't, and I won't.

**All Citations**

213 S.W.3d 547

---

Footnotes

1   The Honorable Kerry FitzGerald, Justice, Court of Appeals, Fifth District of Texas at Dallas: Presiding Justice of the Special Court of Review, appointed by Chief Justice Wallace B. Jefferson, Texas Supreme Court, by a process of random selection.

2   The Honorable Ann McClure, Justice, Court of Appeals, Eighth District of Texas at El Paso: Justice of the Special Court of Review, appointed by Chief Justice Wallace B. Jefferson, Texas Supreme Court, by a process of random selection.

3   The Honorable Amos Mazzant, Justice, Court of Appeals, Fifth District of Texas at Dallas: Justice of the Special Court of Review, appointed by Chief Justice Wallace B. Jefferson, Texas Supreme Court, by a process of random selection.

4   If we had determined Petitioner violated the Canons, we would have undertaken a constitutional analysis. The commission assumed the Canons were constitutional and proceeded accordingly.

5   We are mindful of the Supreme Court's principle of avoiding constitutional questions where possible. *See Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Two iterations of this principle apply here: "It is not the habit of the [C]ourt to decide questions of a constitutional nature unless absolutely necessary to a decision of the case" and "The Court will not pass upon a constitutional question although properly presented by the record if there is also present some other ground upon which the case may be disposed of." *Id.* at 347, 56 S.Ct. 466. These principles apply to federal courts. *See Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 972, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (citing *Ashwander,* 297 U.S. at 346, 56 S.Ct. 466, for constitutional decision-avoidance principles, and stating "We may require federal courts to follow those rules, but we have no power to impose them on state courts."). But our Texas Supreme Court applies the same principle of avoiding constitutional questions where possible as expressed in *Ashwander. See, e.g., In re B.L.D.,* 113 S.W.3d 340, 349 (Tex.2003) ("As a rule, we only

decide constitutional questions when we cannot resolve issues on nonconstitutional grounds."), *Bradley v. State ex rel. White,* 990 S.W.2d 245, 247 (Tex.1999) (same). The constitutional decision-avoidance principle is a "traditional policy" of the courts and "was conceived out of considerations of sound judicial administration." *Alma Motor Co. v. Timken–Detroit Axle Co.,* 329 U.S. 129, 142, 67 S.Ct. 231, 91 L.Ed. 128 (1946). Thus, in view of our disposition of the issues relative to Canons 5(2) and 2B, we do not analyze or decide Petitioner's constitutional arguments based upon content and viewpoint restrictions. *See Republican Party v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002); *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

6   The Texas Constitution states that the commission consists of thirteen members. TEX. CONST. art. V, § 1–a(2). Judge Monica Gonzales, the chairman of the commission during these events, testified that three of the positions were vacant and two members recused themselves from the proceedings.

7   Judge Gonzales testified she could not remember the vote tally for finding Petitioner violated the Canons and imposing the admonition. She testified that the commission's deliberations were concerned with the level of sanction to impose, not whether Petitioner violated the Canons. "All I remember, if there was any discussion at all, it had more to do with what level of sanction, not whether or not there was a violation of the canon. I don't remember that being a major discussion at all."

8   The commission's conclusions and findings were based on *The New York Times* and the *Texas Lawyer* articles only.

9   The commission's conclusion stated:

> The Commission concludes from the facts and evidence presented that [Petitioner] allowed his name and title to be used by the press and the White House in support of his close friend, Harriet Miers, a nominee for the office of United States Supreme Court Justice. Such public support by a judicial official elected to the highest court in Texas, in the eyes of the public and the rest of the judiciary, would be construed as an endorsement of Miers' candidacy, as those terms are commonly used and understood. Because the Commission views Miers' desire for a lifetime appointment to the United States Supreme Court to be a private interest, the efforts of Petitioner in promoting his friend's candidacy by responding to media inquiries and assisting the White House in its efforts to convince powerful special interest groups to support her candidacy, constituted an improper use of his office and position to promote Miers' private interest.

> Citing *Republican Party v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), and *In Re Raab,* 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287, 1291 (2003), the commission rejected Petitioner's argument that the application of Canons 2B and 5(2) infringed his First Amendment right to freedom of speech. The commission then stated,

> Based on the circumstances surrounding this matter, the Commission concludes that [Petitioner's] actions on behalf of Harriet Miers constituted persistent and willful violations of Canons 2B and 5(2) of the Texas Code of Judicial Conduct.

10   The Stipulation and Petitioner's Trial Exhibit No. 1 reflect Petitioner's service record in more detail:

> [Petitioner] is the Senior Justice of the Supreme Court of Texas, having been elected in 1988 and re-elected in 1994 and 2000. He is the senior Texas appellate judge in active service.

> Throughout his service on the Court, [Petitioner] has overseen revisions to the rules of administration, practice, and procedure in Texas courts. In 2000, he was appointed by the Chief Justice of the United States to the Advisory Committee on Civil Rules for the Judicial Conference in the United States.

> [Petitioner] began his judicial service in 1981, when he was appointed to the 95th District Court in Dallas County. He was elected to that bench in 1982 and re-elected in 1984. In 1986 he was elected to the Court of Appeals for the Fifth District of Texas at Dallas, where he served until he was elected to the Supreme Court.

> Before taking the bench, [Petitioner] was a partner in the Dallas law firm of Locke Purnell Boren Laney & Neely (now Locke Liddell & Sapp). He joined that firm in 1976 and practiced mainly in the area of general business and commercial litigation.

> [Petitioner] received a B.A. degree with honors in philosophy from Yale University in 1971. He attended Southern Methodist University School of Law as a Hatton W. Sumners Scholar, and received his J.D. degree *cum laude* in 1974. He was elected to Order of the Coif and served as an editor for the *Southwestern Law Journal.* Following law school, he served as a law clerk to the Hon. Roger Robb, Circuit Judge, U.S. Court of Appeals for the District of Columbia Circuit. He also served in the U.S. Naval Reserve Judge Advocate General Corps, achieving the rank of Lieutenant. He was honorably discharged from military service in 1979.

> [Petitioner] is licensed to practice in Texas and the District of Columbia. He is a member of the American Bar Association, the District of Columbia Bar Association, the State Bar of Texas, the Dallas Bar Association, and the Austin Bar Association. He is also a member of the American Law Institute, a fellow in the American Bar Foundation,

a life fellow in the Texas Bar Foundation, and a founding fellow of the Dallas Bar Foundation. He received the Outstanding Young Lawyer Award from the Dallas Association of Young Lawyers in 1984, the Southern Methodist University School of Law Distinguished Alumni Award for Judicial Service in 2000, and the Hatton W. Sumners Foundation Distguished Public Service Award in 2004. He has taught as an Adjunct Professor at the University of Texas School of Law.

[Petitioner] is a member of the Texas Philosophical Society. He attends the Cornerstone Christian Church of Dallas, where he is a pianist, organist, and teacher.

Justice Owen now sits on the United States Court of Appeals for the Fifth Circuit.

The *Texas Lawyer* article states, in part:

"I'm a PR office for the White House," [Petitioner] says jokingly about the 120 press interviews he estimates he did the week of October 3 to discuss Miers....

Media outlets reported that [Petitioner] and Miers dated on and off over the years, but [Petitioner] doesn't like that characterization. "Dating to me sounds like what you did in high school," [Petitioner] says. "We saw one another and went to dinner. We were good, closely connected friends then, and we are now."

[Petitioner] says he called White House Deputy Chief of Staff Karl Rove ... to see if it was OK for him to speak with the media. [Petitioner] says his mission is clear: to fill in the gaps about Miers' background and to counter some conservatives' skepticism about her qualifications to be a U.S. Supreme Court justice.

[Petitioner] ... relays an anecdote about Miers and himself from the 1980s: One evening, he and Miers had attended a lecture together at the Valley View Christian Church in North Dallas, where they were members. After that lecture, Miers shared with [Petitioner] her belief that life begins at conception and abortion is wrong. By repeating that story to reporters nationwide, [Petitioner] ... says he's not saying that he knows how Miers would decide any particular case that might come before her as a justice. But he says he knows she opposes abortion.

[Petitioner] says conservatives should rest easy about Miers' nomination and should not draw comparisons between Bush's nomination of Miers and President George H.W. Bush's 1990 nomination of Justice David Souter, whose slim record held no indication of his eventual liberal leanings on the court. "I have the utmost respect for President Bush No. 41, but I doubt he could have picked Justice Souter out of a lineup the day before he appointed the man," [Petitioner] says. "By contrast, Harriet and the president have worked together hand and glove for 10 years. He's called her for legal advice, he's called her for campaign advice, he's called her to vet judicial appointments. And he knows her as well as you could know anybody. And he's stood there and watched. You can never be totally sure, particularly concerning someone who has been given a lifetime appointment. But the difference between that situation and this one is night and day."

Petitioner testified he was not interviewed for the story and that it was written without any input from him.

The *New York Times* article states:

But she [Miers] still felt something was missing in her life, and it was after a series of long discussions—rambling conversations about family and religion and other matters that typically stretched from early evening into the night —with [Petitioner], a junior colleague at the law firm, that she made a decision that many of the people around her say changed her life.

"She decided that she wanted faith to be a bigger part of her life," [Petitioner], who now serves on the Texas Supreme Court, said in an interview. "One evening she called me to her office and said she was ready to make a commitment" to accept Jesus Christ as her savior and be born again, he said. He walked down the hallway from his office to hers, and there amid the legal briefs and court papers, Ms. Miers and Petitioner "prayed and talked," he said.

To persuade the right to embrace Ms. Miers's selection despite her lack of a clear record on social issues, representatives of the White House put [Petitioner] on at least one conference call with influential social conservative organizers on Monday to talk about her faith and character.

Ms. Miers sometimes attended Mass at St. Jude Chapel in downtown Dallas, but before embracing evangelical Protestantism, her experience with religion was lukewarm and her attendance sporadic, [Petitioner] said.

A close relationship with [Petitioner]—also a longtime member of Valley View—who frequently appears with Ms. Miers at social functions in Washington and in Texas, has been a steady feature of her life for nearly 30 years. [Petitioner] is known as one of the most conservative members of the Republican-dominated Texas Supreme Court. Newspapers in Texas have reported that [Petitioner] and Ms. Miers were romantically involved, and when asked in an interview whether that was still the case, [Petitioner] responded that they were close, without going into great detail. "She works in Washington, I work in Austin," [Petitioner] said. "We have dinner when she's here; if she invites me to Washington I happily go. We talk on the phone all the time."

[Petitioner] and Ms. Miers spoke on Sunday evening, but she did not tell him about the pending announcement that she had been offered the nomination, he said. "She's a stickler for the rules," he said. He never asked Ms. Miers how she would vote on the issue of abortion if it came before the Supreme Court, he said. "She probably wouldn't answer, she wouldn't view it as appropriate."

"Yes, she goes to a pro-life church," [Petitioner] said, adding, "I know Harriet is, too." The two attended "two or three" anti-abortion fund-raising dinners in the early 1990's, he said, but added that she had not otherwise been active in the anti-abortion movement. "You can be just as pro-life as the day is long and can decide the Constitution requires Roe" to be upheld, he said.

Apart from the questions about abortion and other issues Ms. Miers will face in confirmation hearings, the strong tie she and [Petitioner] have to their church is undergoing a test. The congregation at Valley View is in the middle of a schism, and Mr. [Petitioner] said he and Ms. Miers are siding with the splinter groups that are forming a new church under Valley View's longtime pastor, Ron Key.

Affidavit of Thomas R. Phillips:

My name is Thomas R. Phillips. I have personal knowledge of the facts stated in this affidavit.

I served as Chief Justice of the Supreme Court of Texas from January 4, 1988, until I retired on September 3, 2004. One of the administrative duties of the Supreme Court is the promulgation of the Code of Judicial Conduct. While I was Chief Justice, the Supreme Court completely revised the Texas Code of Judicial Conduct on one occasion and made discrete changes and additions several additional times. In each instance, I presided over that process and took a very active role in the Court's efforts.

Over the years, I believe that I have developed an expertise in the Code. I have spoken on judicial speech under the ABA Model Code and various state Codes on many occasions including to the Washington Judicial Conference in Tacoma and to the entire Conference of Chief Justices. As a part of my efforts to reform judicial selection and enhance judicial independence, I frequently participated in commissions and task forces that explored, among other things, the balance between a judge's right (and occasionally obligation) to speak on matters of public concern versus the public's right to a court system which is and is seen as being impartial and unbiased. I explored such issues in some detail in the 2001 National Summit on Judicial selection, of which I was one of two co-convenors, and in my service on the American Bar Association's Commission on 21st Century Judiciary in 2002–03 and its Judicial Selection and Judicial Campaign Committee in 2001–03.

Even though I have now returned to private practice, I remain interested in and involved in issues of judicial speech. Most significantly, I am counsel of record for the State of Minnesota on petition to the United States Supreme Court for writ of certiorari in *Republican Party v. White,* 416 F.3d 738 (8th Cir.2005), a case involving the constitutionality of certain restrictions on political speech by judges and judicial candidates. I am also a lifetime member of the Conference of Chief Justices, a member of the National Advisory Counsel of the American Judicature Society, and will soon begin serving on the Lawyers' Committee of the National Center for State Courts. Each of these groups is particularly interested in judicial speech issues.

I have read the response of [Petitioner] to the Letter of Inquiry in Nos. 06–0129–AP and 06–0130–AP before the Texas Commission on Judicial Conduct. In my opinion, his actions referred to in the Letter of Inquiry and described in the response, taken in connection with the nomination of Harriet Miers to be an Associate Justice of the United States Supreme Court, did not violate Canon 2(B) or Canon 5(2) of the Texas Code of Judicial Conduct. This affidavit is based on the Letter of Inquiry and [Petitioner's] response.

Canon 5(2) states in relevant part: "A judge or judicial candidate shall not authorize the public use of his or her name endorsing another candidate for any public office...." In my opinion, Harriet Miers was not "another candidate for ... public office" within the meaning of Canon 5(2). By "another candidate," the Canon refers to a candidate like "[a] judge or judicial candidate," that is, a political candidate for elected office. Ms. Miers was President Bush's nominee for a judicial position subject only to confirmation by the United States Senate. Furthermore, in commenting on Ms. Miers's background and experience, [Petitioner] was not "endorsing" her but was responding to legitimate press inquiries about her background and qualifications, matters of intense national interest and importance.

Canon 2(B) states in relevant part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others ..." In my opinion, in commenting on Harriet Miers's qualifications to sit on the Supreme Court of the United States, [Petitioner] was not lending the prestige of his office in any respect. He was asked to comment, not because he is a judge, but because he has a long, close, public relationship with Ms. Miers. This is demonstrated, I think, by the fact that none of [Petitioner's] current colleagues on the Court were asked to make any comments about Ms. Miers during the confirmation process. The issue was not whether a judge [Petitioner] thought Ms. Miers

was qualified for the position to which the President had nominated her, but whether [Petitioner], Harriet's friend, had unique information that would help the American public and, ultimately, the nation's 100 Senators decide whether she was qualified.

In legal parlance, [Petitioner] did not "thrust himself into the vortex" of this controversy. His extremely close relationship with Ms. Miers was well known in legal circles throughout Texas and in Washington, D.C. When reporters began searching for photographs of the significant milestones in Ms. Miers' professional career, [Petitioner] was invariably accompanying her or pictured very close by. There is simply no way he could have avoided being deluged with questions, and no way that his failure to cooperate with the press and with others could have been construed an anything other that a deliberate obstruction of the public's right to know about the President's appointee.

Nor was [Petitioner] in any way advancing his own private interests. His comments were about Ms. Miers, not himself. He never identified himself as a candidate for elected office or otherwise sought to draw attention to his own credentials and talents, as considerable as those are.

Moreover, because [Petitioner's] unique position, his statements about Ms. Miers' background and qualifications were not necessarily made to advance Ms. Miers' interests. As I have stated, his long and close friendship with Ms. Miers gave him an overriding responsibility to help the American public become better acquainted with her. What he said in his various interviews was no doubt viewed favorably by some and unfavorably by others; his comments worked to help her nomination in some quarters and worked to hinder it in others.

Thus, the circumstances in which [Petitioner] found himself were highly unusual, perhaps unique in the history of the American judiciary. After all, [Petitioner] has not made a single public statement about Judge Alito or any prior Supreme Court nominee, nor, I suspect has he ever been asked to do so. But even if he had not been so close to Ms. Miers, and even if she had not been a nominee for perhaps the most powerful governmental body in the world, I do not believe that his actions in speaking frankly and favorably about someone he knew would violate the Code of Judicial Conduct. Judges are frequently asked to introduce speakers or help present awards to people. In so doing, they inevitably must detail the subject's accomplishments and extol their virtues. I gave dozens of such speeches during my judicial service, sometimes in praise of individuals who were at the time candidates for higher office. For example, I gave farewell tributes in public ceremonies in the House of Representatives Chamber when Justices Cornyn and Abbott resigned from the Texas Supreme Court to stand for election as Attorney General. I did not endorse either person, but my remarks were intended to be laudatory and might have swayed a voter who chanced to be present. [Petitioner], as the senior justice of the state's highest court and as a gifted speaker, is frequently asked to make public remarks about a judge, a lawyer, or a community leader. I suspect that every judge in Texas has done likewise at some point or another during their tenure in office. As long as the judge does not make such remarks with the primary purpose of political gain for himself or the honoree, I do not think such conduct can be taken to violate the Texas Code of Judicial Conduct.

Finally, regardless of how the literal words of our Code might be interpreted, there are also larger constitutional questions at stake. In my opinion, [Petitioner's] actions described in the Letter of Inquiry and his response were protected by the First Amendment to the United States Constitution and by article I, section 8 of the Texas Constitution. His comments were directed to core issues of public importance. As such, his speech was protected under the rational set forth by the Supreme Court in *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

16  Judge Parsons was also aware of the amicus curiae briefs filed by parties which he perceived might normally have competing interests. We have been assisted by briefs filed by the following: Texans for Lawsuit Reform; Donna G. Davidson and Tina J. Benkiser, Chairman of the Republican Party of Texas, on behalf of the Republican Party of Texas; a group of Texas lawyers including Travis E. Vanderpool, William Stephen Boyd, Orrin L. Harrison, Robert W. Jordan, Timothy W. Mountz, Joseph D. Jamail, Jr., Charles W. Schwartz, George E. Bowles, Jerry K. Clements, Michael M. Boone, Brian D. Melton, John L. Estes, Robert A. Wooldridge, George W. Bramblett, Jr., S. Michael McColloch, Wayne Fisher, Larry P. Boyd, and R. Jack Ayres; and The ACLU Foundation of Texas.

17  40 TEX. B.J. 131 (1977); *see* Op. Tex. Att'y Gen. No. LO–89–21 (1989).

18  The Judicial Section of the State Bar of Texas created the Committee on Judicial Ethics in 1974. ROBERT P. SCHUWERK & LILLIAN B. HARDWICK. HANDBOOK OF TEXAS LAWYER AND JUDICIAL ETHICS S § 21.02 (Tex. Practice Series 2005). The committee issues advisory opinions. Both the committee and the commission agree the advisory opinions are not binding. *Id.* The commission rigidly adheres to the committee's advisory opinions. *Id.* The committee also does not knowingly make comments on pending or impending proceedings before the commission. *Id.*

This provision was relocated twice, first in 1994 to Canon 5(3) and then in 2002 to Canon 5(2). TEX.CODE JUD. CONDUCT, Canon 5(3), 57 TEX. B.J. 1080 (1994); 65 TEX. B.J. 798 (2002). The language of this provision, however, remains unchanged from 1990.

Petitioner was the only witness called to testify about this provision. During his testimony, he responded to the suggestion of the commission's attorney that Canon 5(2)'s purpose was to eliminate corruption.

Q. In canon 5(2) part of the reason that was created, Canon 5(2), you were talking earlier about being muscled or hustled into cross endorsing each other. It sounds to me like that's some sort of an anti corruption statute that goes to corruption.... [I]sn't there a quid pro quo problem that 5(2) addresses, where you do me a favor, and then one day I'll come to you and I'll ask a favor, and I better get it paid back. Isn't that part of what 5(2) was trying to address when it was created?

A.... [T]hat may have been a small part of it, the cross, but this canon was brought to the Court by the judges, which is a very unusual thing, because judges don't like the canons, generally speaking, not for more of them, but for less of them, but they were for this one because they wanted—the principal reason was they wanted an excuse to give the mayor of the City Council person, mostly the county commissioners, so that they didn't get tangled up in politics.

But it wasn't really corruption, it was just that the commissioners said, you know, I expect your endorsement. If you didn't give it, you were afraid what was going to happen to you at budget time. You're always fearful of what's going to happen to you at budget time. So it was not a corruption thing.

I'm not aware of a corruption problem. I'm just not aware.

Q. It's just a question I have regarding how the—how this was tailored. The question was, there does appear to be a fear about quid pro quo stopping this type of pressure on the judges regarding quid pro quo endorsements.

A. I'm just not aware of the trading part. It was more, you give it to me or else I'm not going to give you what you want, your telephone budget, or your pencil budget is not—it's just what the Court is trying to use to operate. But there were problems, primarily it was in the country, although occasionally there would be problems in the more urban areas.

But that was principally what—that's one of the problems. People bring you language, and it's aimed at a particular circumstance, or even class of circumstances, but then the language can be used in circumstances that you don't immediately envision in ways that were never intended, and that's the problem you have there.

Petitioner testified further on this subject on examination by the commission:

Q. Do you believe that Ms. Miers was a candidate for public office in the sense of—that it was intended by the Texas Supreme Court in this canon?

A. No.

Q. And why not?

A. Well, because this canon, again as I said earlier, and Judge Parsons reiterated, is getting at the kind of entanglements, I wouldn't call it corruption, I suppose maybe there could be a case like that, but mostly it's the entanglements that you get into when you're getting involved in other people's elections.

And especially, well, no, not especially. I was going to say especially when they're in another branch. But the whole problem here was that judges were being asked to get involved in other people's races, and there was no way that you can get tangled up in endorsing a nominee for the Supreme Court of the United States. There's no entanglement to get into. There is no question. I'm not likely to be partial or impartial because of that endorsement, or any statement made in connection with that nomination. It just doesn't have any application in that situation.

In effect, in 1990, members of the judiciary sought relief from a pressing political quagmire. On occasions, politically connected candidates would flex their "muscle" in order to "persuade" or pressure a judge to let the candidates show the judge as an endorser in an unrelated political contest. According to the conventional wisdom at the time, who better to show on a list of prominent endorsements than "the respected local judge." The supreme court acceded to the request, creating the "authorization" prohibition. The amendment addressed the specific problem head on by providing a safe harbor for the judge. The judge could now "reluctantly" decline to let a politically connected candidate use his name endorsing the candidate without fear of reprisal. The judge need only cite the "authorization" prohibition in the Code to resolve what could otherwise become a delicate and politically sensitive dilemma. Thus, the "authorization" prohibition had absolutely nothing to do with "endorsing," that is, making supportive political statements. Rather, it addressed a different situation: "cover." The provision centered on customary "endorsements" so familiar to the voting public, that is, a compilation of well-known and respected persons who consented to the use of their names supporting a particular candidate.

Petitioner's testimony went unchallenged by the commission.

The Task Force members' statements, while not precedential, are enlightening because they addressed—and failed to resolve—the very issues facing the Court today. They expressed grave concern that there is no definition for "endorsing" within the Texas canons and case law.

The commission was established by the Texas Constitution, article V, section 1–a(2). The constitution empowered the commission, inter alia, to discipline or censure any Justice or Judge for "willful or persistent violation of rules promulgated by the Supreme Court of Texas, incompetence in performing the duties of the office, willful violation of the Code of Judicial Conduct, or willful or persistent conduct that is clearly inconsistent with the proper performance of his duties or casts public discredit upon the judiciary or administration of justice." TEX. CONST. art. V, § 1–a(6). Clearly, the commission is the entity charged with enforcement of the Code. In addition, article V, section 1–a(10) provides:

> [T]he Commission may issue a *public statement* through its executive director or its Chairman at any time during any of its proceedings under this Section when sources other than the Commission cause notoriety concerning a Judge or the Commission itself and the Commission determines that the best interests of a Judge or of the public will be served by issuing the statement.

TEX. CONST. art. V, § 1–a(10) (emphasis added).

The commission filed a First Amended Charging Document, stricken by this Court on other grounds, which alleged in part that Petitioner "authorized the public use of his name and title to 'support or endorse' his close friend, Harriet Miers, a candidate for public office...."

The commission, during its closing presentation, inexplicably injected the concept of "assembly line justice." The commission initially argued this Court should find Petitioner violated the Code. While skeptical of Petitioner's challenges of the Code, the commission acknowledged lurking problems and sought judicial assistance in interpreting the Code provisions at issue. The commission then argued: "The sad reality of this case is Petitioner, at the day of his hearing, was merely next. The worst thing you can be in a government proceeding is next, merely next in a series of others that were prosecuted for similar violations." The commission asked this Court to give it guidance, and, in the event it found the Code unconstitutional, to strike it down, in order that the commission could "get on with the business of regulating the rest of the conduct of the judges in the State." Counsel for Petitioner replied that Petitioner should not be treated as "merely next" as if within an "assembly line." He asserted that the commission totally ignored Canon 8 and the rules of reason, and that Petitioner was "being sanctioned for speaking truthful speech on a matter of public importance that is core speech in our democracy...." Assembly line justice is a close cousin to no justice at all, and is, in reality, an absurd oxymoron. Assembly line justice should be foreign to a judge's vocabulary and an extinct concept in our democracy.

In its entirety, JR 4–101 provides:

> A judge shall not knowingly (1) make a public statement in support of the election or defeat of any candidate for a nonjudicial public office or to promote or influence the passage or defeat of laws or regulations at any level of government, or (2) contribute or solicit funds services or property to elect or defeat any candidate for a nonjudicial public office or to promote or influence the passage or defeat of laws or regulations at any level of government, or (3) lend the judge's name in support of an action, by any person or group, to elect or defeat any candidate for a nonjudicial public office or to promote or influence the passage or defeat of laws or regulations at any level of government,
> if in doing (1), (2) or (3) above, the judge:
> (A) Creates a reasonable doubt about the judge's impartiality toward persons, organizations or factual issues that would likely come before the court on which the judge serves, including, but not limited to, circumstances that require the judge's disqualification under JR2–106.
> (B) Supports in the judge's official capacity, a cause other than one pertaining to the legal system, legal education, the improvement of the law, the integrity of the judicial process, the administration of justice, or court administration, including judicial benefits. This subsection does not limit the ability of a judge to join, pay dues to, and participate in activities of any professional association or organization, which activities may include lobbying for judicial benefits such as salary and retirement.
> (C) Represents that the judge making the public statement speaks on behalf of the judicial branch of government unless the judge has been authorized to do so.

OR.CODE JUD. CONDUCT JR 4–101.

The conduct in question included "an improper contribution" and "actively campaign[ing] for a legislative candidate by participating in a phone bank and assist[ing] Working Families Party officials at a candidate screening meeting by questioning other judicial and nonjudicial candidates on behalf of the party." *Raab,* 763 N.Y.S.2d 213, 793 N.E.2d at 1293. Several of the relevant canons included: "Prohibited political activity shall include: ... (c) engaging in any partisan political activity (except as to own campaign); (d) participating in any political campaign for any office or permitting his or her name

to be used in connection with any activity of a political organization; (e) publicly endorsing or publicly opposing (other than by running against) another candidate for public office; (f) making speeches on behalf of a political organization or another candidate; and (g) attending political gatherings." *Id.* at 1289 n. 2. Both the conduct and the relevant provisions of the New York Code are clearly distinguishable from Petitioner's conduct and the Texas Code. The commission extracted from this case an excerpt referring to political corruption. We observe that there is not even a hint of corruption in the case before us. In fact, the commission admitted that it did not contend the statements at issue were false or deceptive.

The commission's attorney asked Petitioner,

Q. Now, when you were giving these interviews, you knew you couldn't control what they would write about?

A. Absolutely.

* * *

Q....When it goes out, it's out, you cannot control the media, right?

A. Absolutely.

While the commission listed members of the news media as potential witnesses, none were called. The commission called no witnesses other than Petitioner.

We do not suggest the commission advanced this position. As previously noted, the commission cast a blind eye to the "authorized" requirement and never proffered any argument or evidence on this subject.

The Task Force hearings on the Code also reflect some insightful remarks and observations of distinguished Professor Laycock and Dean Attanasio as to the broad nature of the term "endorse" and what, if any, distinctions can be drawn between "support" and "endorse." Their concerns, shared by other members of the committee, related to interpreting the language in order to conform to the rules, and to determining whether the terminology would pass constitutional muster.

The commission's brief provides this Court with approximately one page of analysis on its position.

We take notice that "[i]n late January 2005, the American Bar Association's joint commission released new draft rules on political activity by judges and judicial candidates which is covered in Canon 5 of the existing code. The draft revisions specifically address the activities of candidates seeking judicial office in partisan public elections." The new draft rules permit candidates to "publicly endorse or oppose candidates running for other judgeships in the same judicial office." *N.D. Family Alliance, Inc. v. Bader,* 361 F.Supp.2d 1021, 1041 n. 2 (D.N.D.2005).

The Code of Judicial Conduct in a number of states permit endorsing. For example,

In California, Canon 5A(2) provides:

5A. Judges and candidates for judicial office shall not ... (2) make speeches for a political organization or candidate for nonjudicial office or publicly endorse or publicly oppose a candidate for nonjudicial office;

the comment to Canon 5A states that:

*Under this Canon, a judge may publicly endorse another judicial candidate.* Such endorsements are permitted because judicial officers have a special obligation to uphold the integrity and impartiality of the judiciary and are in a unique position to know the qualifications necessary to serve as a competent judicial officer.

In addition, Canon 5C states:

Candidates for judicial office may speak to political gatherings only on their own behalf or on behalf of another candidate for judicial office.

CAL.CODE JUD. CONDUCT, Canons 5A(2) & cmt., 5C.

Idaho's Code of Judicial Conduct states:

(1) A judge or a candidate subject to public election may, except as prohibited by law:

(a) when a candidate for election ...

(iv) publicly endorse or publicly oppose other candidates for the same judicial office in a public election in which the judge or judicial candidate is running.

IDAHO CODE JUD. CONDUCT, Canon 5C(1)(a)(iv).

In Illinois, Canon 7B states:

(1) A judge or candidate may, except as prohibited by law: ...

(b) when a candidate for public election ...

(iv) publicly endorse or publicly oppose other candidates in a public election in which the judge or judicial candidate is running.

ILL.CODE OF JUD. CONDUCT, Canon 7B(1)(b)(iv).

In Kansas, Canon 5C states:

(1) A judge or a candidate subject to public election may, except as prohibited by law: ...

(b) when a candidate for election ...

(iv) publicly endorse or publicly oppose other candidates for the same judicial office in a public election in which the judge or judicial candidate is running.

KAN.CODE JUD. CONDUCT, Canon 5C(1)(b)(iv).

In Maine, Canon 5(C)(2)(d) states:

A candidate for election or reelection as judge of probate may, while a candidate, publicly endorse or publicly oppose any candidate for public office.

ME.CODE JUD. CONDUCT, Canon 5(C)(2)(d).

Michigan's Code of Judicial Conduct provides that:

(2) A judge or candidate for judicial office may: ...

(a) attend political gatherings;

(b) speak to such gatherings on the judge's own behalf or on behalf of other judicial candidates....

MICH.CODE OF JUD. CONDUCT, Canon, 7A(2)(a), (b).

In North Carolina, a judge or judicial candidate may:

(2) if [a judge] is a candidate, endorse any individual seeking election to any office or conduct a joint campaign with and endorse other individuals seeking election to judicial office, including the solicitation of funds for a joint judicial campaign....

N.C.CODE JUD. CONDUCT, Canon 7B(2).

In North Dakota, the commentary to Canon 5 states that the "canons do not prohibit candidates from campaigning on their own behalf or from endorsing or opposing candidates for a position on the same court for which they are running." N.D.CODE OF JUD. CONDUCT, Canon 5A, Commentary, para. 4.

In Pennsylvania, Canon 7A states:

(2) Judges holding an office filled by public election between competing candidates, or a candidate for such office, *may,* only insofar as permitted by law, *attend political gatherings, speak to such gatherings on their own behalf when they are a candidate for election or reelection, or speak on behalf of any judicial candidate for the same office,* identify themselves as a member of a political party, and contribute to a political party or organization.

PA.CODE JUD. CONDUCT, Canon 7A(2) (emphasis added).

In Tennessee,

[a] judge, subject to retention election, may, at any time, publicly endorse or oppose a judge standing for retention or a candidate for appointment to the court of which the judge is a member.

TENN.CODE OF JUD. CONDUCT, Canon 5D.

Vermont has a similar provision which states that a candidate for election or reelection as judge of probate or assistant judge may, while a candidate "publicly endorse or publicly oppose any candidate for the same office." VT.CODE OF JUD. CONDUCT, Canon 5C(2).

35  For example: Alabama and Oregon. The Oregon Code prohibits a judge from making public statements and lending the judge's name in relation to other candidates who are running for nonjudicial office, but makes no mention of a similar prohibition with respect to candidates for judicial office. OR.CODE OF JUD. CONDUCT, JR 4–101 to 4–104.

36  In a less populated area, everyone in the community may qualify as the judge's "friend." In a larger area, even given that the audience may initially be limited to several thousand persons, the post-endorsement wave of activity by the judge's friends generated by the initial endorsement may well increase exponentially to very sizeable numbers.

37  For example, Arizona, Colorado, Connecticut, Georgia, Massachusetts, New Hampshire, New Jersey, New Mexico, North Carolina, Pennsylvania, and Utah.

38  For example, Arkansas, Delaware, Florida, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Minnesota, Nebraska, Nevada, New York, Ohio, Rhode Island, South Carolina, Vermont, Virginia, West Virginia, and Wyoming.

39  North Carolina's Code of Judicial Conduct also defines "candidate," limiting its meaning to "a person actively and publicly seeking election to judicial office." N.C.CODE JUD. CONDUCT, Canon 7A(1). Had the Texas Supreme Court defined "candidate," "endorse," and other terms in the Texas Code of Judicial Conduct, many of the questions before us would not have arisen.

40  Our review of a portion of the evidence shows numerous statements made by prominent jurists before the Senate Judiciary Committee supporting previous judicial nominees to the United States Supreme Court. Utah State Judge Lindberg described her "enthusiastic support" for Judge Roberts nomination as Chief Justice and went into detail about his "towering intellectual skills and engaging personality." Judge Klein, Presiding Justice of the California Court of Appeals, spoke in behalf of Judge O'Connor, whom she found "exceptionally well qualified" as well as "brilliant, fair, pragmatic...." She described her integrity as being "above reproach," and emphasized she was moderate and "gracious" and had "every

potential for becoming an outstanding Supreme Court Justice." United States District Judge Jack Tanner described Judge Thomas as "well qualified to become an Associate Justice" and "the best man for the job." United States District Judge "endorse[d] wholeheartedly the nomination[s]" of Judge Powell and William Rehnquist. He praised Mr. Rehnquist for his academic achievements and professional skills and "could find no one that [he] would recommend more highly." United States Court of Appeals Judge Barry, of the Third Circuit in Pennsylvania, said Judge Alito was "a man of remarkable intellectual gifts" and "impeccable legal credentials" who would make a "marvelous and distinguished" Associate Justice.

A careful review of the public statements of judges who appeared before a Senate Judiciary Committee shows each witness' testimony more often than not "endorsed," by any definition, the nominee.

According to Professor Hazard, whose testimony was stipulated to by the commission: "[J]udges talk to the media and public about nominees to the federal bench, and he is not aware of any judge who has been sanctioned by a state or federal committee or by a court for making comments to the press or public about a nominee to the federal bench."

The Preamble of the Code stresses the principle that "an independent, fair and competent judiciary will interpret and apply the laws that govern us." It also emphasizes judges "must respect and "the judicial office as a "public trust." TEX.CODE JUD. CONDUCT, Preamble.

Canon 1 states: "A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and should personally observe those standards so that the integrity and independence of the judiciary is preserved. The provisions of this Code are to be construed and applied to further that objective." TEX.CODE JUD. CONDUCT, Canon 1.

Canon 2 states a judge must "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Id. Canon 2. Canon 3B(10) states in part that a judge is not prohibited from "making public statements in the course of their official duties or from explaining for public information the procedures of the court." TEX.CODE JUD. CONDUCT, Canon 3B(10).

Canon 4B(1) states that a judge may "speak, write, lecture, teach and participate in extra-judicial activities concerning the law, the legal system, the administration of justice and non-legal subjects, subject to the requirements of this Code...." TEX.CODE JUD. CONDUCT, Canon 4B(1).

Canon 5(1)(ii) states: "A judge ... shall not: ... knowingly or recklessly misrepresent the identity, qualifications, present position, or other fact concerning the candidate or an opponent...." TEX.CODE JUD. CONDUCT, Canon 5(1)(ii). Canon 5(2), in its entirety, states:

A judge or judicial candidate shall not authorize the public use of his or her name endorsing another candidate for any public office, except that either may indicate support for a political party. A judge or judicial candidate may attend political events and express his or her views on political matters in accord with this Canon and Canon 3B(10).

TEX.CODE JUD. CONDUCT, Canon 5(2).

In its entirety, Canon 2B provides:

A judge shall not allow any relationship to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.

TEX.CODE JUD. CONDUCT, Canon 2B.

Rather than focusing on a definition of "private interest," the commission argues from the position that Canon 2B, like Canon 5(2), prohibits a judge from publicly endorsing other candidates. However, we have already concluded Petitioner's conduct did not violate the "authorization" provision of Canon 5(2).

We are aware the commission, in its brief identified Miers' "private interests" under Canon 2B as:

political ambition, including but not limited to a candidate's desire for lifetime tenure, prestige, and power, which motivates a candidate to seek a life-time appointment to the federal bench in the first place and there is no position more prestigious, more powerful, or more remarkable and exclusive than justice of the United States Supreme Court.

The commission must prove, not just allege or argue, Petitioner lent the prestige of his judicial office "to advance the private interests" of Harriet Miers. Even if we assumed Canon 2B applied, we would reject the commission's position. The United States Constitution sets forth the length of the term of a Justice of the United States Supreme Court life tenure. In essence, the commission singled out part of a constitutional provision and, without any evidentiary support, argues it politically motivated Miers to seek the nomination. The commission further argues the power and prestige of the judicial position drove Miers to seek the nomination. This argument is likewise unsubstantiated by any evidence and is entirely speculative. We conclude it is spurious. The uncontroverted evidence shows Miers never sought, suggested, aspired to, or requested the nomination. She "dreaded" the idea but acceded to the President's request. Miers was

prompted to accept the nomination in the public interest, in effect, to further serve. The flaw in the commission's position is that it assumes but does not prove political ambition. The commission has failed to even attempt to provide a scintilla of evidence of Miers' political ambition, and thus, failed to prove Petitioner advanced Miers' "private interests."

Even if pursuing the nomination at the President's request is some evidence Miers' political ambition to a seat on the Supreme Court, *Jimenez* recognizes a balancing between such private motivation and the public interest. *See Jimenez,* 841 S.W.2d at 581. The commission offered no argument or evidence that Miers' private interest, that is, her "political ambition," outweighed the public interest under *Jimenez,* and our review of the evidence shows no such imbalance.

45  The North Carolina Code recognizes this inherent problem and permits the judge to endorse his own candidacy. The North Carolina Code specifically excepts the judge "so long as he does not expressly endorse a candidate (*other than himself* ) for a specific office...." N.C.CODE JUD. CONDUCT, Canon 7B(1) (emphasis added).

46  *See In re Davis,* 82 S.W.3d 140, 150 (Tex.Spec.Ct.Rev.2002) (using position of judge to retaliate against an assistant district attorney); *Public Reprimand of Ken Reilly, Municipal Court Judge,* No. 04–0360–MU (Comm'n Jud. Conduct Nov. 2, 2004) (part-time municipal judge who served one-half day per month advertised his public-speaking private business, which was his primary occupation, with statements like "Bring 'The Judge' to your next meeting as a keynoter"); *Public Reprimand and Order of Additional Education of Santos Benevides, Justice of the Peace,* No. 04–0513–JP (Comm'n Jud. Conduct Nov. 2, 2004) (judge ordered felon arrestee released on personal recognizance bond because arrestee was son of 25–year acquaintance of judge); *Public Admonition of Alonzo Villarreal, Justice of the Peace,* No. 04–0285–JP (Comm'n Jud. Conduct June 25, 2004) (judge contacted municipal judge about another person's traffic ticket; when municipal judge said that was inappropriate use of judicial office, judge said "we judges help each other"); *Public Admonition of Jose Canales, Justice of the Peace* (Comm'n Jud. Conduct June 27, 2003) (judged telephoned another judge to obtain favorable treatment for county official's daughter on traffic citation pending in other judge's court); *Public Admonition of Frederick Edwards, District Court Judge* (Comm'n Jud. Conduct Apr. 12, 2001) (using position as judge in attempt to avoid arrest and prosecution for driving while intoxicated); *Public Reprimand of Marvin Mitchell, Former Justice of the Peace* (Comm'n Jud. Conduct Aug. 18, 2000) (judge telephoned girls on probation in his court for truancy and engaged in explicit sexual conversations); *Public Admonition of Don Jarvis, County Court at Law Judge* (Comm'n Jud. Conduct Oct. 22, 1999) (judge became romantically involved with married woman who had matters pending in the judge's court); *Private Admonition of a County Court at Law Judge,* (Comm'n Jud. Conduct Mar. 6, 2006) (state judge used official court letterhead to write letter to federal judge requesting leniency in sentencing state judge's relatives); *Private Reprimand of a Justice of the Peace,* (Comm'n Jud. Conduct July 14, 2004) (judge instigated groundless criminal investigation of constable who tried to serve papers on judge's son).

47  We note Canon 5 is entitled: "Refraining From Inappropriate Political Activity" and does specifically apply to political statements. *See* TEX.CODE JUD. CONDUCT, Canon 5.

1  Canon 5(2) does not expressly utilize the term "support" but "endorse" is commonly defined as meaning "to give support or approval to; sanction". *Webster's New Universal Unabridged Dictionary* 600 (2nd Ed.1972).

2  James C. Dobson, Ph.D., is founder and chairman of *Focus on the Family,* a non-profit conservative religious organization that emphasizes family values.

3  The *Times* article is captioned, "Texas Justice, With Ties to Bush and His Supreme Court Choice, Serves as Her Spokesman." It offers the following reason: "For the right audiences, Justice Hecht, 55, is known as one of the most conservative jurists on the Texas Supreme Court....He has become so well known in his home state that this year he was named by Texas Monthly as one of 25 most powerful people in Texas politics."

4  Exhibit 1 is the *Texas Lawyer* article that formed the basis for the complaint received by the Commission. The majority correctly explains that the Commission's conclusions and findings were based on the *Texas Lawyer* and *The New York Times* articles only. Since this Special Court of Review is a *de novo* proceeding, additional media reports were introduced into evidence and are part of the record before us.

5  Justice Hecht also takes issue with the fact that other members of the judiciary spoke publicly about Miers without facing judicial sanctions. It is true that United States Supreme Court Justice Antonin Scalia, United States District Judge Ed Kinkeade of the Northern District of Texas, Justice Elizabeth Lang–Miers of the Court of Appeals for the Fifth District of Texas, and State District Judge Jim Parsons all publicly supported Miers and spoke well of her credentials and qualifications. Of course, the Texas Canons of Judicial Conduct do not apply to federal judges. TEX.CODE JUD. CONDUCT, Canon 6A, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit G, app. B (Vernon 2005). And the mere fact that other state judges felt unencumbered by the canons neither justifies nor condones their conduct, nor does it lead me to the conclusion that Justice Hecht did not violate them. *Sardino v. State Commission on Judicial Conduct,* 58 N.Y.2d 286, 291, 448 N.E.2d 83, 85, 461 N.Y.S.2d 229, 231 (N.Y.1983) (each judge is personally obligated to act in accordance

with the standards of judicial conduct; if a judge disregards or fails to meet these obligations, the fact that others may be similarly derelict can provide no defense). I offer no opinion on the stipulated fact that the Commission has filed no charges against any of these individuals. Nor do I address the apparently contested issue of whether the Commission could *sua sponte* investigate their conduct in the absence of a complaint.

6    "[E]very good judge is fully aware of the distinction between the law and a personal point of view." *Republican Party of Minnesota v. White,* 536 U.S. 765, 798 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (Kennedy, J., concurring).

7    *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

8    In a separate interview with *The Dallas Morning News,* Justice Hecht explained the distinction further. "The mistake is trying to extrapolate from those personal principles, even if they're extremely important to a person, into how you're going to decide a case." According to the article, Justice Hecht "noted that Justice Antonin Scalia, one of the Supreme Court's most conservative justices, wrote an opinion declaring a free-speech right to burn an American Flag. 'Can you imaging [sic] Justice Scalia burning a flag? It's not going to happen,' he said. 'But what does the Constitution say, can you do it or not? Yes, the Constitution says you can do it.' " Examiner's Exhibit 3.

9    Gary Bauer is the president of the American Values Group and is a former presidential candidate.

10   Pat Buchanan is an NBC political analyst and a former presidential candidate.

11   Justice Hecht was, in fact, contacted by staff attorneys for the Senate Judiciary Committee, who asked him to testify at Miers' confirmation hearing. He was out of the office at the time of the call, and Miers had withdrawn her nomination before he could return it.

12   The court emphasized that the "announce" clause is much broader than the "pledges or promises" clause, which separately prohibits judicial candidates from making pledges or promises of conduct other than the faithful and impartial performance of judicial duties, a prohibition on which it expressed no view. *White I,* 536 U.S. at 770, 122 S.Ct. 2528.

13   Writing for the majority, Justice Scalia opined that when a case turns on a legal issue on which the judge as a judicial candidate has taken a particular stand, the party advocating the opposing viewpoint is likely to lose, but not because of bias against that party or favoritism toward the other. "*Any* party taking that position is just as likely to lose." *White I,* 536 U.S. at 776–77, 122 S.Ct. 2528 (Emphasis in original).

14   "Open-mindedness" demands that a judge be willing to consider views that oppose his preconceptions and remain open to persuasion. This seeks to guarantee each litigant "not an *equal* chance to win the legal points in the case, but at least *some* chance of doing so." *White I,* 536 U.S. at 778, 122 S.Ct. 2528 (Emphasis in original).

15   In both *White I* and *White II,* the term "impartiality" was used interchangeably with "independence." *See White I,* 536 U.S. at 775 n. 6, 122 S.Ct. 2528; *White II,* 416 F.3d at 753.

16   As a member of the Supreme Court, Justice Hecht participates in decisions concerning amendments to the Code of Judicial Conduct. For many years, he served as the court's liaison to the Supreme Court Rules Advisory Committee. After *White I,* he concurred in the repeal of the Texas announce clause. Writing separately, he predicted the instant debate: "It is less clear whether other Code provisions relating to judicial speech—Canon 3(B)(10) and the remainder of Canon 5—are likewise infirm.... Therefore I join in the code amendments approved today although I remain in doubt whether they are sufficient to comply with the First Amendment." *Statement of Justice Hecht Concurring in the Amendments to the Texas Code of Judicial Conduct Approved August 21, 2002,* Misc. Docket No. 02–9167.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

400 S.W.3d 644
Court of Appeals of Texas,
Tyler.

Ben JARVIS, Appellant

v.

Robert J. PELTIER, and Calvin C. Smith, Appellees.

No. 12–12–00180–CV.    |    April 24, 2013.

**Synopsis**

**Background:** Owner of middle tract of land brought action against owner of neighboring eastern- and western-tracts who sold his tracts to purchaser despite agreement between middle-tract owner and eastern- and western-tracts owner that was labeled an option agreement. The District Court, Smith County, Jack Skeen, J., entered summary judgment in favor of eastern- and western-tract owner and purchaser. Middle-tract owner appealed.

**Holdings:** The Court of Appeals, James T. Worthen, C.J., held that:

[1] ownership of tracts in severalty and right of first refusal were consideration for partition;

[2] agreement did not violate the rule against perpetuities;

[3] failure of holder of right of first refusal to exercise the right within 30 days after he learned of sale was excused by his inability to obtain reasonable disclosure of sale; and

[4] holder established right to judgment as a matter of law.

Reversed, rendered, and remanded.

West Headnotes (31)

[1]     **Contracts**
       👉 Options;  rights of first refusal

A right of first refusal or preemptive right to purchase requires the owner of the subject property to offer the property first to the holder

of the right on the same terms and conditions offered by or to a bona fide purchaser.

Cases that cite this headnote

[2]     **Contracts**
       👉 Options;  rights of first refusal

The holder of a right of first refusal has no right to compel or prevent a sale.

Cases that cite this headnote

[3]     **Contracts**
       👉 Options;  rights of first refusal

An "option" is a privilege or right that the owner of the property gives another to buy certain property at a fixed price within a certain time.

Cases that cite this headnote

[4]     **Contracts**
       👉 Options;  rights of first refusal

By acquiring an option to purchase property, the holder of the option purchases the right to compel a sale of the property on stated terms before the expiration of the option.

Cases that cite this headnote

[5]     **Appeal and Error**
       👉 Cases Triable in Appellate Court

Court of Appeals reviews the trial court's summary judgment de novo.

Cases that cite this headnote

[6]     **Appeal and Error**
       👉 Judgment

Court of Appeals reviews the evidence presented in motion for traditional summary judgment and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.

Cases that cite this headnote

**[7]    Appeal and Error**
⚷ Particular orders or rulings reviewable in general

**Appeal and Error**
⚷ Rendering Final Judgment

When both sides move for summary judgment and the trial court grants one side's motions and denies the other side's, Court of Appeals reviews the summary judgment evidence presented by both sides and determines all questions presented; Court then renders the judgment that the trial court should have rendered.

Cases that cite this headnote

**[8]    Contracts**
⚷ Necessity in general

Consideration is a fundamental element of every valid contract.

Cases that cite this headnote

**[9]    Contracts**
⚷ Nature and Elements

"Consideration" is defined as either a benefit to the promisor or a loss or detriment to the promisee.

Cases that cite this headnote

**[10]    Partition**
⚷ Operation and Effect

**Partition**
⚷ Actual Partition

In a partition, each cotenant receives a specific share of property and holds it to the exclusion of the other cotenants who formerly had equal rights to possession with him.

Cases that cite this headnote

**[11]    Partition**
⚷ Agreements as to partition

The resultant holding in severalty of each party to a partition is a benefit accruing to each, and alone constitutes sufficient consideration for the partition.

Cases that cite this headnote

**[12]    Partition**
⚷ Agreements as to partition

**Vendor and Purchaser**
⚷ Requisites and validity

The consideration for the privilege of purchasing property under a right of first refusal is not separate from the consideration for the partition of real property.

Cases that cite this headnote

**[13]    Partition**
⚷ Agreements as to partition

**Vendor and Purchaser**
⚷ Requisites and validity

Where an agreement to partition real property and a right of first refusal constitute one contract, the provisions of which are interdependent, the consideration for the partition will also support the right of first refusal.

Cases that cite this headnote

**[14]    Partition**
⚷ Agreements as to partition

Ownership of tracts of real property in severalty and right of first refusal in agreement, which was labeled an option agreement, constituted consideration for partition.

Cases that cite this headnote

**[15]    Perpetuities**
⚷ Creation of Future Estates in General

Agreement between neighboring landowners that was labeled an option agreement, but was actually an agreement for the right of first refusal, did not violate the rule against perpetuities.

Cases that cite this headnote

**[16]** **Contracts**

    Options; rights of first refusal

A right of first refusal is essentially a dormant option.

Cases that cite this headnote

**[17]** **Contracts**

    Options; rights of first refusal

A right of first refusal requires the owner, before selling the property to another, to offer the property to the rightholder on the same terms or conditions specified in the offer by or to a bona fide purchaser.

Cases that cite this headnote

**[18]** **Contracts**

    Alternative stipulations and options

A property owner who grants a right of first refusal has an initial duty to make a reasonable disclosure of the offer's terms.

Cases that cite this headnote

**[19]** **Contracts**

    Options; rights of first refusal

When the property owner expresses its intention to sell, the owner of right of first refusal must, in compliance with the terms of the right, elect to either purchase the property or decline to purchase it and allow the owner to sell it to another.

Cases that cite this headnote

**[20]** **Contracts**

    Alternative stipulations and options

A purchaser from a seller who has given a right of first refusal to buy takes the property subject to that right.

Cases that cite this headnote

**[21]** **Contracts**

    Options; rights of first refusal

A transfer in violation of the preemptive right to purchase is equivalent to a declaration by the owner that he intends to sell the property; consequently, when the rightholder learns of a sale in violation of his right, he again has the opportunity to elect to purchase or decline to purchase within the time frame specified in the contract creating the right of first refusal.

Cases that cite this headnote

**[22]** **Contracts**

    Options; rights of first refusal

The holder of right of first refusal does not have a duty to act in order to exercise his preferential purchase right unless and until he receives a reasonable disclosure of the terms of the sale.

Cases that cite this headnote

**[23]** **Vendor and Purchaser**

    Requisites and validity

The new property owner who has purchased the property from a vendor, despite vendor having given right of first refusal, has a duty to make reasonable disclosure of the terms of the purchase to holder of right.

Cases that cite this headnote

**[24]** **Specific Performance**

    Necessity

Where a defendant has openly and avowedly refused to perform his part of the contract for right of first refusal or declared his intention not to perform it, the rightholder need not make tender of payment of the consideration before bringing suit for specific performance.

Cases that cite this headnote

**[25]** **Specific Performance**

    Necessity

Where a defendant has openly and avowedly refused to perform his part of the contract for

right of first refusal or declared his intention not to perform it, a tender of consideration is excused in action for specific performance where the property owner intentionally avoids giving the rightholder an opportunity of making it.

Cases that cite this headnote

**[26]    Vendor and Purchaser**

 Exercise

Failure of holder of right of first refusal to exercise the right with 30 days after he learned of sale was excused by his inability to obtain reasonable disclosure of the terms under which vendor sold the property.

Cases that cite this headnote

**[27]    Contracts**

 Grounds of action

To prove a breach of contract claim, the following elements must be satisfied: (1) there was a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff was damaged as a result of the breach.

Cases that cite this headnote

**[28]    Specific Performance**

 Nature and grounds of duty of plaintiff

**Specific Performance**

 Necessity

To prove that plaintiff performed or tendered performance as required to recover for breach of contract, a party seeking specific performance of a contract for the sale of real property must prove only that he is ready, willing, and able to pay the agreed price for the property and perform the essence of the agreement and offer to do so.

Cases that cite this headnote

**[29]    Specific Performance**

 Options

A sale or transfer of property burdened by a right of first refusal without making an offer to

the holder of the right is a breach of contract for which the remedy of specific performance is available.

Cases that cite this headnote

**[30]    Specific Performance**

 Purchasers in general

When a purchaser who has knowledge of the right of first refusal purchases real property, he stands in the shoes of the original seller when specific performance is sought and may be compelled to convey title to the first purchaser.

Cases that cite this headnote

**[31]    Judgment**

 Sales cases in general

Holder of right of first refusal established right to judgment as a matter of law as required for summary judgment in action against vendor and purchaser, where holder and vendor had a valid option agreement that required vendor to first offer the property to holder upon receiving an offer that vendor would accept, vendor received an offer and sold the property to purchaser, holder was ready, willing, and able to purchase the property under the same terms, purchaser brought the property with notice of the recorded option agreement, and holder attempted to learn the terms of the sale from vendor and purchaser, but neither provided him with the requested information prior to the suit.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*647**  M. Keith Dollahite, Tyler, for Ben E. Jarvis.

Gregory S. Porter, Houston, Charles H. Clark, Tyler, for Robert J. Peltier.

Vance L. Metcalf, Billy D. Anderson, Tyler, for Calvin C. Smith.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

### OPINION

[JAMES T. WORTHEN](), Chief Justice.

 **\*\*1** Ben Jarvis appeals the summary judgment granted in favor of Robert J. Peltier, Sr. and Calvin C. Smith. In two issues, Jarvis contends the trial court improperly granted Peltier's and Smith's motions for summary judgment and denied Jarvis's competing motion for summary judgment. We reverse, render in part, and remand in part.

### BACKGROUND

Jarvis and Smith were cotenants in a twelve acre tract in Smith County, with Jarvis owning an undivided two-thirds interest **\*648** and Smith owning an undivided one-third interest. Jarvis owned two acres in fee simple adjoining the east side of the twelve acre tract that he and Smith jointly owned. Jarvis proposed to Smith that they partition the twelve acre tract, with Jarvis receiving the eight contiguous acres adjoining his two acre tract, and Smith receiving the four westernmost acres. Jarvis also informed Smith that if they could not reach an agreement, he planned to ask the court to divide the property for them.

Smith made a counterproposal to Jarvis that he would partition the twelve acre tract without going to court if he could have the middle four acres of the tract. Jarvis would then have the western four acres as well as the eastern four acres of the tract. Smith explained that he wanted the middle four acres because he had already been farming that tract. Jarvis accepted Smith's proposal with the condition that he be given an "option" to purchase Smith's four acre tract if and when Smith decided to sell it.

On March 11, 1998, Jarvis and Smith exchanged deeds to carry out their partition agreement. Additionally, on the same day, Smith signed the following document: [1]

### OPTION

THE STATE OF TEXAS

COUNTY OF SMITH

For and in consideration of the premises and a part of the consideration of the partition deed this date executed by Ben E. Jarvis and myself, [sic] I have granted and do hereby gran[t] unto Ben E. Jarvis an option to purchase the 4.041 acre tract in the T. Coulter Survey, Smith County, Texas which was set aside to me by deed from Ben E. Jarvis.

The terms of the option are that if I desire to sell the property and I have an offer I would accept, I will submit the offer to Ben E. Jarvis, who shall have thirty days from the date of the submission of the offer to accept. If he does not accept within said 30 day period, I will complete the sale to the other party who made the offer. Dated this the 11th day of March 1998.

*/s/ Calvin C. Smith*

CALVIN C. SMITH

THE STATE OF TEXAS

COUNTY OF SMITH

This instrument was acknowledged before me on this the *11th* day of March, 1998 by CALVIN C. SMITH.

(NOTARY SEAL)

*/s/ Tara L. Nowlin*

Notary of Public, State of Texas

On December 17, 2007, Smith entered into a contract of sale with Peltier in which he agreed to sell his four acre tract to Peltier for $80,000.00. Peltier received a title policy commitment issued by First American Title Insurance showing on its Schedule B as an exception from coverage the "[t]erms of that certain option by and between Calvin C. Smith and Ben E. Jarvis as recorded in volume 5039, page 22, Official Public Records, Smith County, Texas." On January 17, 2008, Smith executed a deed conveying the property to Peltier for $80,000.00.

 **\*\*2** In late January 2010, Jarvis learned that Smith had sold the four acre tract to Peltier. He immediately sent both the following letter:

January 29, 2010

 **\*649** Mr. Calvin C. Smith

819 Lyons Ave.

Tyler, Texas 75701

Mr. Robert J. Peltier, Sr.

P.O. Box 7028

Tyler, Texas 75711

    Re: 4.037 acres, Tobias Coulter Survey

Gentlemen:

This last week we discovered that Calvin C. Smith and wife, Jimmye Ruth Smith executed a deed to Robert J. Peltier, Sr. dated January 14, 2008, covering 4.037 acres in the Tobias Coulter Survey, A–199 Smith County, Texas.

Attached hereto is a copy of the Option from Calvin C. Smith to me dated March 11, 1998 as recorded in Volume 5039, Page 22 of the Smith County Official Records.

This was the first notice I have had of the above mentioned deed.

I have talked to Mr. Peltier regarding the price he paid to Mr. Smith. He declined to tell me the sales price.

It would be appreciated of [sic] both of you would contact me regarding this matter. At this time, I would like to exorcise [sic] the option.

I will need a copy of the cancelled check, closing statement and title policy before declining or accepting any offer.

If I do not receive the information requested within 10 days from your receipt of this letter, I will forward this to my attorney with instructions to file suit to enforce my option.

    Yours very truly,

    */s/ Ben E. Jarvis*

    Ben E. Jarvis

Neither Smith nor Peltier provided the requested information on the 2008 sale of the four acres. Consequently, Jarvis filed suit against both of them.

Peltier filed a traditional motion for summary judgment asserting three affirmative defenses, and Smith adopted Peltier's motion. Later, Smith filed his own traditional motion for summary judgment in which he asserted the same affirmative defenses, but added a claim against Jarvis

for attorney's fees. Jarvis filed a traditional motion for summary judgment in which he argued that, as a matter of law, his option was enforceable and he was entitled to summary judgment enforcing the option and awarding him attorney's fees from Peltier and Smith. In the same motion, he argued that Peltier and Smith were not entitled to summary judgment on their affirmative defenses. Without specifying its reasons, the trial court granted Peltier's and Smith's summary judgment motions, including Smith's claim for attorney's fees, and denied Jarvis's motion. This appeal followed.

## THE "OPTION"

Initially, we note that the parties disagree about the effect of the document (the "option agreement") Smith signed on March 11, 1998. Jarvis contends it gave him a "right of first refusal" if Smith decided to sell his four acre tract. Peltier and Smith contend that, according to the plain language of the document, Jarvis acquired an ordinary option to purchase the four acre tract. Because "right of first refusal" and "option" have distinct meanings, we must first decide which applies in this case.

**\*\*3** **[1]** **[2]** A right of first refusal or preemptive right to purchase requires the owner of the subject property to offer the property first to the holder of the right on the same terms and conditions offered by or to a bona fide purchaser. *Tenneco, Inc. v. Enterprise Prods. Co.,* 925 S.W.2d 640, 644 (Tex.1996);  **\*650** *City of Brownsville v. Golden Spread Elec. Co-op., Inc.,* 192 S.W.3d 876, 880 (Tex.App.-Dallas 2006, pet. denied). The holder of a right of first refusal has no right to compel or prevent a sale. *Hicks v. Castille,* 313 S.W.3d 874, 881 (Tex.App.-Amarillo 2010, pet. denied).

**[3]** **[4]** An option, on the other hand, is a privilege or right that the owner of the property gives another to buy certain property at a fixed price within a certain time. *Casa El Sol–Acapulco, S.A. v. Fontenot,* 919 S.W.2d 709, 717 n. 9 (Tex.App.-Houston [14th Dist.] 1996, writ dism'd). By acquiring an option to purchase property, the holder of the option purchases the right to compel a sale of the property on stated terms before the expiration of the option. *Id.; Riley v. Campeau Homes (Tex.), Inc.,* 808 S.W.2d 184, 188 (Tex.App.-Houston [14th Dist.] 1991, writ dism'd).

In this case, the option agreement states that Jarvis is granted an "option to purchase" the four acre tract. But the option

agreement does not give Jarvis a right to compel Smith to sell the property and does not state a fixed purchase price for the property. *See Fontenot,* 919 S.W.2d at 717 n. 9; *Riley,* 808 S.W.2d at 188. Nor does it specify a fixed expiration date. *See Fontenot,* 919 S.W.2d at 717 n. 9; *Riley,* 808 S.W.2d at 188. Instead, the option agreement states that if Smith desires to sell the property and has an offer he would accept, he will submit the offer to Jarvis, who would then have thirty days "to accept." This language creates a preemptive right to purchase in the event Smith should decide to sell. *See Tenneco, Inc.,* 925 S.W.2d at 644. Accordingly, we conclude that the option agreement is, in substance, a right of first refusal. *See id.; Sanchez v. Dickinson,* 551 S.W.2d 481, 483, 484 (Tex.Civ.App.-San Antonio 1977, no writ) (holding that, based on language, "Option Contract of Purchase" was right of first refusal).

### SUMMARY JUDGMENT—OPTION AGREEMENT

In his first issue, Jarvis contends the trial court improperly granted Peltier's and Smith's summary judgment motions, and should have granted Jarvis's summary judgment motion. Peltier and Smith contend that summary judgment in their favor was proper. In their motions, Peltier and Smith raised affirmative defenses asserting that (1) the option agreement was not supported by consideration, (2) the option agreement violated the rule against perpetuities, and (3) Jarvis failed to comply with the option agreement. However, their arguments in their summary judgment motions and on appeal are based on their contention that Jarvis acquired an ordinary option to purchase the property. We have concluded that Jarvis acquired a right of first refusal. Therefore, we resolve Peltier's and Smith's issues on appeal by applying the law pertaining to rights of first refusal.

### Standard of Review

**\*\*4** The standard for reviewing a traditional summary judgment is well established. *See Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003); *Sysco Food Servs. v. Trapnell,* 890 S.W.2d 796, 800 (Tex.1994); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Nixon,* 690 S.W.2d at 548. A defendant must establish each element of an affirmative defense when it moves for summary judgment based on

that affirmative defense. *See Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). Once the movant has established a right to summary judgment, the burden shifts to the nonmovant to respond to the motion **\*651** and present to the trial court any issues that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979).

[5] [6] We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). We review the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

[7] When, as here, both sides move for summary judgment and the trial court grants one side's motions and denies the other side's, we review the summary judgment evidence presented by both sides and determine all questions presented. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009). We then render the judgment that the trial court should have rendered. *Id.*

### Lack of Consideration

Peltier and Smith first contend that the trial court correctly granted summary judgment in their favor because they established that the option agreement between Smith and Jarvis was not supported by consideration.

[8] [9] [10] [11] Consideration is a fundamental element of every valid contract. *Critchfield v. Smith,* 151 S.W.3d 225, 233 (Tex.App.-Tyler 2004, pet. denied). Consideration is defined as either a benefit to the promisor or a loss or detriment to the promisee. *N. Natural Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 607 (Tex.1998). In a partition, each cotenant receives a specific share of property and holds it to the exclusion of the other cotenants who formerly had equal rights to possession with him. *Garza v. Cavazos,* 148 Tex. 138, 221 S.W.2d 549, 552 (1949). The resultant holding of each in severalty is a benefit accruing to each, and alone constitutes sufficient consideration for the partition. *Hamilton v. Keller,* 148 S.W.2d 1011, 1014 (Tex.Civ.App.-Eastland 1941, no writ).

[12] [13] The consideration for the privilege of purchasing property under a right of first refusal is not separate from

the consideration for the partition of real property. *See Riley, 808 S.W.2d at 188.* Where an agreement to partition real property and a right of first refusal constitute one contract, the provisions of which are interdependent, the consideration for the partition will also support the right of first refusal. *See Henderson v. Nitschke,* 470 S.W.2d 410, 414 (Tex.Civ.App.-Eastland 1971, writ ref'd n.r.e.).

 **\*\*5** **[14]** In this case, Jarvis told Smith that he wanted the eight contiguous acres adjoining his two acre tract, and would file a partition suit if he and Smith could not reach an agreement. Smith wanted the middle four acres because he farmed it. Jarvis agreed to Smith's proposal on the condition that he be granted an "option" to purchase the middle four acres. The option agreement states that it is a part of the consideration for the partition. Thus, the agreement to partition real property and the option agreement constitute one contract, and its provisions are interdependent. *See id.* As such, the resulting ownership of the tracts in severalty constituted consideration for partition as well as the March 11, 1998 option agreement. *See Hamilton,* 148 S.W.2d at 1014. Accordingly, we hold that Peltier and Smith failed to establish their right to summary judgment on their affirmative defense of lack of consideration. Therefore, summary judgment in their favor on this ground was improper.

**\*652** *Rule Against Perpetuities*

 **[15]** Peltier and Smith next contend that the trial court correctly granted summary judgment in their favor because they established that the option agreement violated the rule against perpetuities. We have concluded, however, that the option agreement is, in substance, a right of first refusal. In Texas, a preferential right to purchase or a right of first refusal does not violate the rule against perpetuities. *Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522, 526 (Tex.1982). Therefore, the option agreement in this case does not violate the rule against perpetuities. *See id.* Consequently, Peltier and Smith failed to establish their right to summary judgment on their affirmative defense that the option agreement violates the rule against perpetuities. Thus, summary judgment in their favor on this ground was improper.

*Noncompliance with Option Agreement*

Finally, Peltier and Smith argue that the trial court correctly granted summary judgment in their favor because Jarvis failed to comply with the terms of the option agreement when he attempted to enforce it. Jarvis responds that because Peltier

and Smith refused to provide him with the terms of their sale, he never had the opportunity to comply. He also argues that his duty to strictly comply with the option agreement was excused.

 **[16]** **[17]** **[18]** **[19]** A right of first refusal is essentially a dormant option. *A.G.E., Inc. v. Buford,* 105 S.W.3d 667, 673 (Tex.App.-Austin 2003, pet. denied). It requires the owner, before selling the property to another, to offer the property to the rightholder on the same terms or conditions specified in the offer by or to a bona fide purchaser. *See Tenneco, Inc.,* 925 S.W.2d at 644; *City of Brownsville,* 192 S.W.3d at 880. The property owner has an initial duty to make a reasonable disclosure of the offer's terms. *McMillan v. Dooley,* 144 S.W.3d 159, 174 (Tex.App.-Eastland 2004, pet. denied). When the property owner expresses its intention to sell, the rightholder must, in compliance with the terms of the right, elect to either purchase the property or decline to purchase it and allow the owner to sell it to another. *See Buford,* 105 S.W.3d at 673.

 **\*\*6** **[20]** **[21]** **[22]** **[23]** A purchaser from a seller who has given a right of first refusal to buy takes the property subject to that right. *See Sanchez,* 551 S.W.2d at 485. A transfer in violation of the preemptive right is equivalent to a declaration by the owner that he intends to sell the property. *Martin v. Lott,* 482 S.W.2d 917, 922 (Tex.Civ.App.-Dallas 1972, no writ). Consequently, when the rightholder learns of a sale in violation of his right, he again has the opportunity to elect to purchase or decline to purchase within the time frame specified in the contract creating the right of first refusal. *See Buford,* 105 S.W.3d at 673. The rightholder does not have a duty to act in order to exercise his preferential purchase right unless and until he receives a reasonable disclosure of the terms of the sale. *See McMillan,* 144 S.W.3d at 174. The new property owner has a duty to make reasonable disclosure of the terms of the purchase to the rightholder. *See Buford,* 105 S.W.3d at 673.

 **[24]** **[25]** Where a defendant has openly and avowedly refused to perform his part of the contract or declared his intention not to perform it, the rightholder need not make tender of payment of the consideration before bringing suit. *SeeChambers v. Hunt Petroleum Corp.,* 320 S.W.3d 578, 583 (Tex.App.-Tyler 2010, no pet.). Moreover, a tender of consideration is excused where the property owner intentionally avoids giving the rightholder an opportunity of making it. *Id.*

**\*653** Here, Smith failed to comply with the option agreement by not informing Jarvis of Peltier's offer and then selling the property to Peltier. Once Jarvis learned of the sale, which was approximately two years after it was completed, he contacted Peltier and Smith in an attempt to learn the terms of the sale and exercise his right of first refusal. Neither Peltier nor Smith provided Jarvis with the information he requested, and he filed suit against them. Ultimately, Jarvis learned the terms of the sale by conducting discovery in his suit.

[26]     Nevertheless, Peltier and Smith argue that Jarvis is not entitled to enforce his right of first refusal because he did not exercise it within thirty days after he learned of the sale. They assert that Jarvis's right matured into an enforceable option once he learned of the sale and that he was then required to act in strict compliance with its terms. However, upon learning of the sale, Jarvis was unable to obtain reasonable disclosure of the terms under which Peltier purchased the property. Therefore, he was prevented from exercising his right of first refusal within thirty days after he learned of the sale. *See Chambers,* 320 S.W.3d at 583. This excused his failure to act. *See id.* Accordingly, we hold that Peltier and Smith did not establish their right to summary judgment on their affirmative defense that Jarvis failed to comply with the option agreement. Thus, summary judgment in their favor on that ground was improper.

### *Jarvis's Motion for Summary Judgment*

**\*\*7** [27]     [28]     [29]     To prove a breach of contract claim, the following elements must be satisfied: (1) there was a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff was damaged as a result of the breach. *Critchfield,* 151 S.W.3d at 233. Regarding the second element, a party seeking specific performance of a contract for the sale of real property must prove only that he is ready, willing, and able to pay the agreed price for the property and perform the essence of the agreement and offer to do so. *Riley,* 808 S.W.2d at 188. A sale or transfer of property burdened by a right of first refusal without making an offer to the holder of the right is a breach of contract for which the remedy of specific performance is available. *Id.*

[30]     When a purchaser who has knowledge of the right of first refusal purchases real property, he stands in the shoes of the original seller when specific performance is sought and may be compelled to convey title to the first purchaser. *Abraham Inv. Co. v. Payne Ranch, Inc.,* 968 S.W.2d 518, 527 (Tex.App.-Amarillo 1998, pet. denied).

Here, Jarvis argued that he was entitled to summary judgment enforcing the option agreement as a matter of law. Specifically, he argued that Smith breached the option agreement by selling the four acre tract to Peltier without first submitting Peltier's offer to Jarvis. He contended further that the right of first refusal was enforceable against Peltier because the four acre tract was burdened by the option agreement, which created a right of first refusal, when Peltier acquired the property.

[31]     Jarvis's summary judgment evidence consists of Jarvis's correspondence with Smith relating to the proposed partition; the deeds partitioning the original twelve acre tract between Jarvis and Smith; the option agreement; the real estate contract, title policy commitment, closing documents, and warranty deed relating to Smith's sale of the four acre tract to Peltier; Jarvis's letter to Peltier and Smith after he learned of the sale of the property to Peltier; excerpts from the depositions **\*654** of Jarvis and Smith; and Jarvis's affidavit. This evidence conclusively shows that (1) Smith and Jarvis had a valid option agreement, which required Smith to first offer the property to Jarvis upon receiving an offer Smith would accept; (2) Smith received an offer to purchase from Peltier and sold the property to Peltier without first offering the property to Jarvis on the same terms; (3) Jarvis has at all times been ready, willing, and able to purchase the property on the same terms under which Smith sold it to Peltier; (4) Peltier acquired the property from Smith with notice of the recorded option agreement; and (5) Jarvis attempted to learn the terms of the sale from both Peltier and Smith, but neither Peltier nor Smith provided him with the requested information prior to his filing suit. Therefore, we conclude that Jarvis established a right to summary judgment as a matter of law that the option agreement was enforceable against Peltier and Smith. Thus, the burden shifted to Peltier and Smith to present to the trial court any issues that would preclude summary judgment. *See City of Houston,* 589 S.W.2d at 678–79.

**\*\*8** In their responses to Jarvis's summary judgment motion, Peltier and Smith raised the three affirmative defenses that they relied on in their motions for summary judgment. We have held that Peltier and Smith did not establish their affirmative defenses and therefore were not entitled to summary judgment as a matter of law. We also hold that the assertion of these same affirmative defenses was insufficient to preclude summary judgment in Jarvis's favor.

Peltier refers us to his argument in the trial court that Jarvis failed to comply with the terms of the option agreement when he attempted to exercise it and requested documentation for the terms of the sale that was not mentioned in the option agreement. He argues that this "called into question" whether Jarvis was in fact "ready, willing, and able to perform" the option agreement and created a fact issue for the jury. We have already addressed Peltier's argument regarding Jarvis's noncompliance with the option agreement and concluded that strict compliance was excused. And we do not agree that Jarvis's request for documentation of the terms of the sale creates a fact issue for the jury. Moreover, "[w]hen the seller has conspicuously breached the contract, it is only necessary that the purchaser be ready and willing, and offers to perform within his pleadings." *Abraham Inv. Co.,* 968 S.W.2d at 527. It is sufficient for the purchaser to plead that he "is ready, able and willing" to perform. *Burford v. Pounders,* 145 Tex. 460, 199 S.W.2d 141, 145 (1947). Jarvis included this language in his first amended petition, in his motion for summary judgment, and in his affidavit submitted as summary judgment evidence. Therefore, he has satisfied this requirement.

### Conclusion

Peltier and Smith failed to establish their right to summary judgment on their affirmative defenses as a matter of law. They also failed to include any matters in their responses to Jarvis's motion for summary judgment that would preclude summary judgment in Jarvis's favor. Therefore, the trial court erred in granting Peltier's and Smith's motions for summary judgment and denying Jarvis's motion. Jarvis's first issue is sustained.

### SUMMARY JUDGMENT—ATTORNEY'S FEES

In his second issue, Jarvis contends that the trial court erred in awarding Smith his attorney's fees from Jarvis, and denying Jarvis his attorney's fees from Peltier and Smith.

### *655 Applicable Law

A person may recover reasonable attorney's fees, in addition to the amount of a valid claim and costs, if the claim is "for an oral or written contract." TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (West 2008). A "valid claim" under this statute is not limited to an action for monetary damages and may include an action for specific performance. *Rasmusson v. LBC PetroUnited, Inc.,* 124 S.W.3d 283, 287

(Tex.App.-Houston [14th Dist.] 2003, pet. denied). An award of reasonable attorney's fees to a party recovering on a claim founded on a written or oral contract is mandatory under Texas law. *Jackson Law Office, P.C. v. Chappell,* 37 S.W.3d 15, 23 (Tex.App.-Tyler 2000, pet. denied). But Section 38.001(8) does not authorize recovery of attorney's fees by a defendant who only defends against a plaintiff's claim and presents no claim of his own. *Thottumkal v. McDougal,* 251 S.W.3d 715, 719 (Tex.App.-Houston [14th Dist.] 2008, pet. denied).

**9 The Declaratory Judgment Act provides in pertinent part that "[a] person ... whose rights, status, or other legal relations are affected by a ... contract ... may have determined any question of construction or validity arising under the ... contract ... and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(a) (West 2008). The court may award costs and reasonable and necessary attorney's fees as are equitable and just in a declaratory judgment action. TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (West 2008).

### Analysis

Jarvis sought a summary judgment for attorney's fees against Peltier and Smith. Peltier responded that Jarvis was not entitled to recover attorney's fees against him because the lawsuit was a breach of contract suit between Jarvis and Smith. Therefore, Peltier urged, any claim for declaratory relief was an impermissible attempt to recover attorney's fees. Smith filed his own response that did not address attorney's fees, and also adopted Peltier's response to the extent it did not "conflict with [Smith's] position." He later filed a supplemental motion for summary judgment in which he sought attorney's fees from Jarvis. The trial court granted summary judgment for Smith's attorney's fees, denied Jarvis's summary judgment motion for attorney's fees, and ordered Jarvis to pay $32,800 to Smith for attorney's fees through trial and on appeal.

### 1. Breach of Contract

Smith cited Texas Civil Practice and Remedies Code Section 38.001 in support of his request for attorney's fees. But Smith only defended against Jarvis's breach of contract claim; he did not present his own breach of contract claim. Section 38.001(8) does not authorize recovery of attorney's fees by a defendant who only defends against a plaintiff's claim. *Thottumkal,* 251 S.W.3d at 719. And even if attorney's fees were available for successfully defending against a breach of

contract claim, we have held that the trial court erroneously granted Smith's motion for summary judgment against Jarvis. Therefore, Smith is no longer a prevailing party. Because Smith did not establish that he was entitled to summary judgment as a matter of law for attorney's fees under Section 38.001(8), summary judgment for attorney's fees based on that section was improper.

### 2. *Declaratory Judgment*

Smith also asserted that Texas Civil Practice and Remedies Code Section 37.009 supports summary judgment for his attorney's fees. Jarvis contended in the trial court, and continues to argue here, **\*656** that he did not sue Smith under the Declaratory Judgment Act. Smith maintains that paragraph 9 in Jarvis's first amended petition and the prayer for relief, when read together, mandate a contrary conclusion. To resolve the question, we consider Jarvis's prayer for relief in the context of the language in the entire body of the petition, rather than along with paragraph 9 only. *See Denver City Indep. Sch. Dist. v. Moses,* 51 S.W.3d 386, 391–92 (Tex.App.-Amarillo 2001, no pet.); *In re City of Dallas,* 977 S.W.2d 798, 804 (Tex.App.-Fort Worth 1998, orig. proceeding).

 **\*\*10** In paragraphs 1 through 7 of his petition, Jarvis alleged a breach of contract claim against Smith for selling the four acre tract to Peltier without first offering it to Jarvis as required by the option agreement. As part of paragraph 7, Jarvis alleged that he "does not have an adequate remedy at law and is entitled to the equitable remedy of specific performance. Accordingly, Jarvis requests an order compelling Smith to specifically perform his obligations as provided in the Option."

Peltier was not a party to the option agreement, but Jarvis sought to enforce the option agreement against him as well. Accordingly, in paragraph 8, Jarvis alleged that (1) his duty to act under the option agreement was never triggered because Smith never submitted Peltier's offer to Jarvis as required by the terms of the option agreement; (2) after discovering Smith's sale to Peltier, Jarvis wrote a letter to Smith and Peltier attempting to learn the terms on which Peltier purchased the property; (3) Smith and Peltier did not provide the terms of sale; and (4) Smith's failure to comply with the option agreement by submitting the offer to Jarvis excused any alleged noncompliance by Jarvis. By these allegations, Jarvis in effect asserts that, even though he did not exercise his right of first refusal within the time frame provided in the option agreement, he was prevented from

doing so, and therefore his failure to act was excused. He also implicitly argues that he still has an opportunity to exercise his right of first refusal. *See Buford,* 105 S.W.3d at 673. These allegations relate to the enforceability of the option agreement against Peltier.

In paragraph 9, Jarvis requested a declaratory judgment "that the Option is valid and enforceable; that Peltier acquired the property from [Smith] subject to the Option; that Jarvis is entitled to enforce the Option; and that Peltier must convey the property to Jarvis on the same terms as Peltier acquired the property." This request for relief also relates to the enforceability of the option against Peltier and is consistent with the allegations in paragraph 8.

In Jarvis's prayer, he requested "declaratory relief as specified [in paragraph 9]." Based upon our reading of paragraphs 1 through 9 and our consideration of the prayer in that context, we hold that Jarvis's request for declaratory relief pertains to Peltier only and that the only claim Jarvis alleged against Smith was for breach of contract. Accordingly, we further hold that Smith did not establish that he was entitled to summary judgment as a matter of law for attorney's fees under Section 37.009, and summary judgment for attorney's fees under that section was improper.

### *Jarvis's Attorney's Fees*

We have held that the trial court should have denied Smith's motion for summary judgment on his affirmative defenses and granted Jarvis's motion for summary judgment on his breach of contract claim against Smith. Therefore, Jarvis was successful on his breach of contract claim against Smith and is entitled to recover attorney's fees from Smith. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8); **\*657** *Chappell,* 37 S.W.3d at 21. Because the award of Jarvis's attorney's fees against Smith is mandatory, we conclude that remand is appropriate. *See Chappell,* 37 S.W.3d at 21.

 **\*\*11** Peltier argues that Jarvis cannot recover attorney's fees against him because Jarvis "simply [added] a claim for declaratory relief to a breach-of-contract claim for which fees would not otherwise be permitted." In *MBM Financial Corp. v. Woodlands Operating Co., L.P.,* 292 S.W.3d 660 (Tex.2009), cited by Peltier, the appellee asserted claims for breach of contract, fraud, and declaratory relief against the appellant. *Id.* at 663. After a bench trial, the appellee was awarded money damages on its breach of contract claim and attorney's fees under Section 38.001. *Id.* Ultimately, the supreme court rendered judgment that the appellee take

nothing as damages on its breach of contract claim and held that the attorney's fee award could not be affirmed based on Chapter 38 of the civil practice and remedies code. *Id.* at 666. The court further concluded that attorney's fees could not be awarded under the Declaratory Judgment Act because the declarations in the judgment duplicated issues already before the court. *Id.* at 671. That is not the case here.

Jarvis's breach of contract claim was based on Smith's failure to offer the four acre tract to Jarvis, as required by the option agreement, before selling it to Peltier. A favorable judgment on this claim allows Jarvis to enforce the option agreement against Smith. Peltier correctly points out that "a subsequent purchaser stands in the shoes of the original seller when specific performance is sought and may be compelled to convey title to the first purchaser." *Abraham Inv. Co.,* 968 S.W.2d at 527. But specific performance against Peltier is available only upon Jarvis's showing that Peltier purchased the property from Smith with knowledge of Jarvis's right of first refusal and that Jarvis's right is enforceable against Peltier despite his failure to exercise it in accordance with the terms of the option agreement. This proof was not necessary for Jarvis to prevail on his breach of contract claim against Smith. Therefore, unlike the appellee in *MBM Financial Corp.,* Jarvis's declaratory judgment claim does not merely duplicate issues already before the court. *See MBM Fin. Corp.,* 292 S.W.3d at 671.

A declaratory judgment was an appropriate vehicle for establishing the enforceability of the option agreement against Peltier. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009; *MBM Fin. Corp.,* 292 S.W.3d at 671. Because we have held that Jarvis was entitled to summary judgment on his claim for declaratory relief against Peltier, an award of attorney's fees in Jarvis's favor may be equitable and just. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009.

When declaratory relief is requested and the trial court awards attorney's fees to the party who prevailed in the trial court, we may remand upon reversal of the trial court's judgment for reconsideration of attorney's fees in light of our disposition on appeal. *See Coghill v. Griffith,* 358 S.W.3d 834, 841 (Tex.App.-Tyler 2012, pet. denied). Under the facts presented here, we conclude that remand is appropriate. *See id.*

**\*\*12** Jarvis's second issue is sustained.

## DISPOSITION

Because we have sustained Jarvis's two issues against both Smith and Peltier, we *reverse* the judgment against Jarvis. We *render* judgment granting Jarvis's request for specific performance of the option agreement against Smith and Peltier. Specifically, with respect to Peltier, we *render* judgment declaring that (1) the **\*658** option agreement dated March 11, 1998, between Calvin C. Smith and Ben E. Jarvis is enforceable against Peltier; (2) Peltier acquired the four acre tract subject to the option agreement; (3) Jarvis is entitled to enforce the option agreement; and (4) Peltier must convey the property to Jarvis on the same terms as Peltier acquired the property from Smith. We *render* judgment that Smith take nothing for his claim of attorney's fees against Jarvis. And finally, we *sever* the issue of Jarvis's attorney's fees and *remand* this cause to the trial court for further proceedings to determine the amount of attorney's fees Jarvis is entitled to recover from Peltier and Smith under Texas Civil Practice and Remedies Code Sections 37.009 and 38.001(8) and 37.009.

### All Citations

400 S.W.3d 644, 2013 WL 1755797

### Footnotes

1    After Jarvis filed suit, Smith stated that he did not specifically recall signing the option, but he did not deny that he signed it.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Speedemissions, Inc. v. Bear Gate, L.P., Tex.App.-Hous. (1 Dist.), April 4, 2013

614 S.W.2d 95
Supreme Court of Texas.

Eugene C. JONES et ux., Petitioners,

v.

Jared L. KELLEY, Sr. et al., Respondents.

No. B-9739. | March 4, 1981.
| Rehearing Denied April 15, 1981.

Vendors of land appealed from judgment entered in the District Court, Jefferson County, Thomas A. Thomas, J., decreeing specific performance of certain earnest money contract for sale of vendor's land. The Court of Civil Appeals, 602 S.W.2d 573, affirmed, and vendor appealed judgment requiring specific performance, and purchaser appealed denial of attorney fees. The Supreme Court, Spears, J., held that: (1) two earnest money contracts, financing agent's application and contract for sale, and vendor's affidavit could be construed together as one contract; (2) four instruments construed together satisfied statute of frauds; (3) there were pleadings to support jury's award of attorney fees; and (4) letter sent by financing agent to vendor and telephone conversation between vendor and purchaser establish presentment entitling purchaser to attorney fees.

Judgment affirmed as reformed.

Campbell, J., dissented and filed opinion in which Greenhill, C. J., and Pope, J., joined.

West Headnotes (10)

**[1]** **Contracts**
⚷ Construing Instruments Together

Separate instruments or contracts executed at the same time, for same purpose, and in course of same transaction are to be considered as one instrument, and are to be read and construed together.

72 Cases that cite this headnote

**[2]** **Frauds, Statute Of**
⚷ Separate Writings

Where property was listed by real estate agent as one tract, where purchasers intended to purchase entire tract, and where both earnest money contracts referred to financing agent which was involved in transaction only as means of achieving financing of purchase, two earnest money contracts, application and contract for sale of financing agent, and vendor's affidavit could be construed together as one contract for conveying entire tract of land and to provide description sufficient to satisfy statute of frauds. V.T.C.A. Bus. & C. § 26.01(b)(4).

14 Cases that cite this headnote

**[3]** **Frauds, Statute Of**
⚷ Sufficiency in General

**Frauds, Statute Of**
⚷ Writings Connected by Internal Reference

For conveyance or contract of sale to meet requirements of statute of frauds, it must, insofar as property description is concerned, furnish within itself or by reference to other identified writings then in existence, means or data by which particular land to be conveyed may be identified with specific certainty. V.T.C.A., Bus. & C. § 26.01(b)(4).

22 Cases that cite this headnote

**[4]** **Frauds, Statute Of**
⚷ Sufficiency in General

Where vendors intended to sell entire 116 acre tract which was all land vendor owned in specified county, where vendors recited in affidavit, which was one document consummating transaction, that they were owners of such property conveyed by deed to them, and metes and bounds description of property was in evidence, and where plat showing location within larger 116 acre tract of 36 acres to be conveyed to financing agent was in evidence, 36 acres from larger tract was sufficiently located at time of signing, and description of entire property to be conveyed was

sufficient to satisfy statute of frauds. V.T.C.A., Bus. & C. § 26.01(b)(4).

6 Cases that cite this headnote

**[5]    Reformation of Instruments**

 Matter of Description

Where there was no mutual mistake as to identity of subject property, only as to acreage, reformation of number of acres involved, which was supported by jury finding, was proper.

Cases that cite this headnote

**[6]    Costs**

 Form and Requisites of Application in General

Where purchasers' amended petition in specific performance suit specifically plead that purchasers made demand on vendors to convey subject property more than 30 days preceding the filing of action, but that said land was not conveyed, pleadings supported jury's award of attorney fees. Vernon's Ann.Civ.St. art. 2226.

8 Cases that cite this headnote

**[7]    Costs**

 Contracts

Necessary requisite for recovery of attorney fees in suit on written contract is presentment of contract claim to opposing party and failure of that party to tender performance. Vernon's Ann.Civ.St. art. 2226.

38 Cases that cite this headnote

**[8]    Costs**

 Contracts

Purpose of requirement in suit based on written contract for presentation of claim is to allow person against whom it is asserted an opportunity to pay claim within 30 days after they have notice of claim without incurring obligation for attorney fees. Vernon's Ann.Civ.St. art. 2226.

61 Cases that cite this headnote

**[9]    Costs**

 Contracts

Under statute requiring presentation of claim to opposing party prior to recovery of attorney fees in suit on written contract, no particular form of presentment is required. Vernon's Ann.Civ.St. art. 2226.

84 Cases that cite this headnote

**[10]   Specific Performance**

 Costs

Where vendor admitted he received letter from purchaser's financing agent stating that purchaser intended to go through with transaction, and where telephone conversation between vendor and purchaser made it clear that purchasers were insisting that sale go through and were in process of contacting attorney, necessary presentment to recovery of attorney fees was established in suit for specific performance of written contract for sale of land. Vernon's Ann.Civ.St. art. 2226.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*96**  Provost, Umphrey, Doyle & McPherson, Steven M. Rienstra, Port Arthur, for petitioners.

Hebinck & Associates, Bernard L. Hebinck, Houston, for respondents.

**Opinion**

SPEARS, Justice.

This is a suit for specific performance to convey real estate. Buyers, Jared L. Kelley and Olga Kelley and the Texas Veterans Land Board, brought suit against sellers, Eugene Jones and Della Mae Jones, for specific performance of two earnest money contracts for the sale of a tract of land in Shelby County. Trial was to a jury, and based upon its findings, judgment was entered for the Kelleys decreeing specific performance. The trial court, however, granted that portion of the Joneses' motion for judgment notwithstanding the verdict denying the Kelleys recovery of attorney's fees. The court

of civil appeals affirmed the judgment of the trial court. 602 S.W.2d 573. Both parties have filed applications in this court. The Joneses' application attacks the judgment requiring specific performance. The Kelleys' application complains of the failure of the court of civil appeals to hold that presentment of their claim was made, entitling them to the attorney's fees found by the jury.

We reform the judgment of the court of civil appeals to provide for the recovery by the Kelleys of attorney's fees in the amount determined by the jury. In all other respects the judgment is affirmed.

Three issues are presented: (1) whether the four documents consummating the sale of the subject property may be construed together as one contract; (2) whether the description of the property contained in the four documents if they are construed together is sufficient to satisfy the statute of frauds, Tex.Bus. & Com.Code Ann. s 26.01(b)(4); and (3) whether presentment of the Kelleys' claim was established as a matter of law entitling the Kelleys to the jury's award of attorney's fees.

The Joneses owned a 116 acre tract of land in Shelby County. [1] They listed the tract for sale with a real estate agency specifying that the purchase price was to be paid either in "cash or G.I.". Mr. Kelley, a veteran, secured the aid of the Texas Veterans **\*97** Land Board to assist him in purchasing the property. The Joneses cooperated with the Kelleys in the financing arrangements with the Veterans Land Board.

Their agreement was to sell the entire 127.55 acre tract and consisted of two earnest money contracts between the Joneses and the Kelleys, the Veterans Land Board Application and Contract for Sale, and the Joneses' affidavit. Under one of the earnest money contracts, the parties agreed that the contract was assignable by the Kelleys to the Veterans Land Board which would take title to 36 acres of the Joneses' property in its name for cash. The Board would then resell that 36 acres to the Kelleys under the provisions of the Texas Veterans Land Act, art. 5421m Tex.Rev.Civ.Stat.Ann. The Joneses would sell the remainder of the property, 91.55 acres, directly to the Kelleys for cash plus a note executed by the Kelleys, the note to be secured by a Deed of Trust lien on the 91 acres. The Joneses would not retain any title or security interest in the land conveyed directly to the Veterans Land Board.

The Kelleys were the grantees in both earnest money contracts in which the Joneses agreed to convey the entire

tract they owned in Shelby County to the Kelleys. The relevant portions of the documents may be summarized as follows:

1. An earnest money contract wherein Jones agrees to sell to Kelley, for the sum of $400 per acre, in cash, the premises described as the property "(l)ying and situated in the State of Texas, County of Shelby, and described as follows:"

> "36 acres out of the W. W. Wagstaff
> Survey, A-796 in Shelby County,
> Texas."

This contract acknowledged that the "(p)urchaser has made application to purchase through Texas Veteran Land Board and has been assigned # 03147."

This contract also provides "(s)eller to furnish current survey by registered Surveyor as required by Veteran Land Board."

2. An earnest money contract wherein Jones agrees to sell to Kelley the premises described as:

> "91.55 Acres out of the W. W. Wagstaff Survey A-796 and D. G. Green Survey A-263, in Shelby County, Texas" for a consideration of $400 per acre, with a cash payment of $5,493, and "(p)urchaser to make Note and Deed of Trust in favor of Seller" for the balance of the purchase price.

This contract provides that "(s)eller to furnish current survey by certified Surveyor," and further that "(t)his contract to be closed in conjunction with 36 Ac Vet Land Bd contract # 03147."

3. "Application and Contract of Sale Texas Veterans' Land Program," providing that, with reference to the 36 acre tract, Jones "shall attach hereto a field note description of the above referenced property ...."

4. "Affidavit of Seller Veterans Land Board of Texas" wherein Jones aver that they were the sellers of the described 36 acre tract, and that such tract "is a part of 127.55 acres that I purchased from C. Balsimo on May 1970 for a total consideration of $10,000.00 .... A surveyor field note description of an access easement is being furnished."

The Kelleys, in relying upon their agreement with the Joneses, expended $6,181.40 for survey fees, escrow payments, and fees and payments to the Veterans Land Board.

The Jones couple later refused to convey the property. On September 7, 1977, the Joneses sent a letter to the Veterans Land Board advising them that they would not go through with the sale. The Veterans Land Board replied, by letter to the Joneses, that the Kelleys intended to go through with the sale. Further, an uncontroverted transcript of a telephone conversation appears in the record between Mrs. Kelley and Mr. Jones in which Mrs. Kelley repeatedly told Mr. Jones of her determination to go through with the sale.

The Joneses contend that the description of the acreage in the earnest money contracts does not satisfy the statute of frauds, Tex.Bus. & Com.Code Ann. s 26.01(b)(4). **\*98** Specifically, they argue that there were two separate and distinct conveyances involved, and neither the 36 acre tract to be conveyed to the Veterans Land Board nor the remaining acreage were sufficiently described. It is conceded, however, that if the documents are construed together as one contract there is an adequate description of the property. [2] If the transaction consisted of two separate transactions, the property description is inadequate as to both tracts and the transaction fails.

 **[1]**    We hold that the four instruments may be construed together and thus the description satisfies the statute of frauds. The general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together. Miles v. Martin, 159 Tex. 336, 321 S.W.2d 62, 65 (1959); Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, 475 (1942); Braniff Inv. Co. v. Robertson, 124 Tex. 524, 81 S.W.2d 45, 50 (1935); Libby v. Noel, 581 S.W.2d 761, 764 (Tex.Civ.App. El Paso 1979, writ ref'd n. r. e.).

The courts have construed contracts and instruments together in various situations in order to ascertain the intent of the parties. Several decisions indicate that instruments may be construed together or treated as one contract even though they are not between the same parties. See Miles v. Martin, supra. In Board of Insurance Commissioners v. Great Southern Life Ins. Co., 150 Tex. 258, 239 S.W.2d 803 (1951), Texas Bankers Association entered into a trust agreement with Houston Bank and Trust Company. The agreement provided for the establishment of a pension trust and retirement plan

for member banks' employees. The trustee was to acquire life insurance on each participant from participating bank funds. Southern Life issued individual life insurance policies on each employee. Southern Life asserted that it had not violated any group insurance law because individual policies had been issued. This court held that the insurance policies, the trust agreement, and the agreement between Great Southern and the Bankers Association must be construed together. We stated: "All of the instruments were a necessary part of the same transaction, without any one of which the transaction was not complete." In the present suit the transaction is the sale of the entire tract. Without the Veterans Land Board financing referred to in the contracts, the sale of the entire tract would not be complete.

In Veal v. Thomason, supra, separate oil and gas leases were involved covering a group of contiguous tracts of land owned by the various lessors in severalty. Each instrument contained recitals showing that the execution of similar leases by other lessors was contemplated by the parties, and the several leases were held to constitute but one contract just as though all of the lessors had signed the same piece of paper.

Although admitting that the documents were executed as part of one transaction, the Joneses argue that the purpose in executing the documents was not the same. The Joneses urge a distinction in that the 36 acre tract was to be sold for cash while as to the remaining acreage, the Joneses were to retain a substantial security interest **\*99** in the property. In Miles v. Martin, supra, we said that the principle of construing contracts together was a "device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation." Id. 321 S.W.2d at p. 65.

 **[2]**    Looking at the complete transaction it was the clear intent of both the Joneses and the Kelleys that the execution of the four documents was for the primary purpose of conveying all the subject property to the Kelleys. The property was listed by the real estate agent as one tract and the Kelleys intended to purchase the entire tract. Financing through the Veterans Land Board was only a means of achieving this objective. The Veterans Land Board was only interested in aiding Kelley, a veteran, in his purchase of the property and not in any acquisition of its own. The Joneses and Mr. Kelley executed the Veterans Land Board documents at the Joneses' daughter's home in Sheldon. Both of the earnest money contracts refer to the Veterans Land Board. The execution of four documents in this instance was only a means of accomplishing the singular

and primary purpose of conveying the Joneses' entire tract to the Kelleys.

Since we have determined that the four documents must be construed together as one contract we need to determine whether the property description contained in these four documents satisfies the statute of frauds.

 [3]  For a conveyance or contract of sale to meet the requirements of the statute of frauds, it must, insofar as the property description is concerned, furnish within itself or by reference to other identified writings then in existence, the means or data by which the particular land to be conveyed may be identified with specific certainty. Morrow v. Shotwell, 477 S.W.2d 538, 539 (Tex.1972); Wilson v. Fisher, 144 Tex. 53, 188 S.W.2d 150, 152 (1945).

In Kmiec v. Reagan, 556 S.W.2d 567 (Tex.1977), this court stated: "(w)hen the grantor is stated to be the owner of the property to be conveyed and it is proved that the grantor owns only a single tract answering the description, the land is identified with reasonable certainty." Id. at 569. In Pickett v. Bishop, 148 Tex. 207, 223 S.W.2d 222 (1949), the question concerned the sufficiency of a property description contained in a memorandum. The body of the memorandum describes the land as "my property described on the opposite side hereof." The reverse side of the memo contained an inadequate description. This court held that phrases such as "my property," "my land," or "owned by me," are sufficient when it is shown by extrinsic evidence that the party owns only one tract of land answering the description. We explained this holding by stating:

> The stated ownership of the property is in itself a matter of description which leads to the certain identification of the property and brings the description within the terms of the rule that the writing must furnish within itself, or by reference to some other extrinsic writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty. Id. at 224.

 [4]   [5]  It is undisputed that the jury found that the Joneses intended to sell the entire 116 acre tract which the evidence shows was all the land the Joneses owned in Shelby County. In the Joneses' affidavit to the Veterans Land Board, one of the four documents consummating this transaction, the Joneses recited that they were the owners of the property conveyed by deed from C. Balsimo to Jones and the metes and bounds description of this property is in evidence. There is direct evidence that the Joneses actually chose the 36 acres to be conveyed to the Veterans Land Board. Both Kelley and Harmon, the real estate agent, testified that Jones aided in outlining with a yellow pen marker the 36 acres and placing the easements on a plat at the time of the signing of the Veterans Land Board documents on May 1, 1977. This plat showing the location of the 36 acres within the larger 116 acre tract and containing calls for course and distance of the 36 acres, **\*100** is in evidence and clearly and easily locates the exact 36 acres referred to. A complete and accurate survey of the 36 acres with minor changes and field notes was made a week later on May 8, 1977 and was sent in attached to the Veterans Land Board Contract and Application, document No. 3 above. As mentioned, the Joneses signed this document along with all the others. Thus, it is clear the 36 acres from the larger tract was sufficiently located by the plat before the parties at the time of signing. When the instruments are construed together, the description of the entire property to be conveyed is sufficient to satisfy the statute of frauds. Further, the reformation of the number of acres involved, being supported by the jury finding, was proper. There was no mutual mistake as to the identity of the subject property, only in the acreage.

 [6]  We turn now to the third issue involved in this case attorney's fees. The court of civil appeals held that the Kelleys did not plead or point to any evidence of presentment. The Kelleys' Third Amended Petition specifically pleads: "plaintiffs Kelley made demand on defendants to convey the property made the subject of this lawsuit more than 30 days preceding the filing of this action, but said land was not conveyed ...." Thus, there were pleadings to support the jury's award of attorney's fees.

 [7]  We turn now to the question concerning presentment of the contract claim. Article 2226, Tex.Rev.Civ.Stat.Ann., as amended in 1979, provides for the recovery of a reasonable amount as attorney's fees in addition to one's claim and costs, for the successful prosecution of a suit founded on a written contract. [3] A necessary requisite for the recovery of attorney's fees is the presentment of the contract claim to the opposing party and the failure of that party to tender performance. The statute further provides that it is to "be liberally construed to promote its underlying purposes."

[8] [9] The purpose of the requirement for presentation of a claim is to allow the person against whom it is asserted an opportunity to pay a claim within 30 days after they have notice of the claim without incurring an obligation for attorney's fees. No particular form of presentment is required. Huff v. Fidelity Union Life Ins. Co., 158 Tex. 433, 312 S.W.2d 493, 500 (1958); Hudson v. Smith, 391 S.W.2d 441, 452 (Tex.Civ.App. Houston 1965, writ ref'd n. r. e.).

Various forms of presentment have been held to be sufficient to support an award of attorney's fees under art. 2226. In Huff v. Fidelity Union Life Ins. Co., supra, both oral and written demands were held to be sufficient. In Welch v. Gammage, 545 S.W.2d 223, 226 (Tex.Civ.App. Austin 1977, writ ref'd n. r. e.), the court held that the request for admission and its response in which the party admitted he refused to pay a claim were sufficient as presentment. Finally, in King Optical v. Auto. Data Processing, etc., 542 S.W.2d 213, 217 (Tex.Civ.App. Waco 1976, writ ref'd n. r. e.), the court held that an oral request for payment met the presentment requirement of art. 2226.

[10] The letter sent by the Veterans Land Board to the Joneses and the transcript of the telephone conversation between Mrs. Kelley and Mr. Jones establish presentment as a matter of law. Mr. Jones admitted he received the letter, and the contents of the letter and the telephone transcript were never controverted. During the telephone conversation Mrs. Kelley made it very clear that the Kelleys were insisting that the sale go through and were in the process of contacting an attorney. [4]

*101 The judgment of the court of civil appeals is reformed to provide for attorney's fees in the amount found by the jury, and as reformed is affirmed.

Dissenting opinion by CAMPBELL, J., in which GREENHILL, C. J., and POPE and BARROW, JJ., join.

CAMPBELL, Justice, dissenting.
I dissent.

The facts of this case are a classic example of what the Statute of Frauds was intended to prevent. The problem is whether the cumulative property descriptions in the four separate instruments are sufficient to enforce the two earnest money contracts.

The first contract, summarized in the Court's opinion, is to convey 36 acres for cash to the Veterans Land Board. The second is to convey 91.55 acres to the Kelleys. In this transaction the Kelleys were to make a $5,493.00 down payment and the balance was to be evidenced by a promissory note secured by a Deed of Trust.

A Veterans Land Board sale is not a method of financing as to the Joneses. It is a cash sale, conveyed to the Veterans Land Board of Texas (VLB) by general warranty deed. The VLB enters into a contract for deed with the veteran purchaser. We have two contracts to convey two tracts of land to two purchasers with two deeds, one to the VLB and one to the Kelleys. We must determine if the property descriptions are sufficient to enforce each of these conveyances.

The Statute of Frauds, Section 26.01 of the Business and Commerce Code, provides:

Section 26.01. Promise or Agreement Must be in Writing.

(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

(b) Subsection (a) of this section applies to

....

(4) a contract for the sale of real estate;

This Court has held that the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty. U. S. Enterprises, Inc. v. Dauley, 535 S.W.2d 623 (Tex.1976); Williams v. Ellison, 493 S.W.2d 734 (Tex.1973); Morrow v. Shotwell, 477 S.W.2d 538 (Tex.1972); Wilson v. Fisher, 144 Tex. 53, 188 S.W.2d 150 (1945).

The two earnest money contracts provide: "Seller to furnish current survey by registered surveyor ...." It is undisputed that a current survey did not exist when these contracts were signed. The field note description, subsequently attached

to Instrument No. 3, cannot be considered because it was not "some other existing writing" as required by U. S. Enterprises, Inc. v. Dauley, supra, Williams v. Ellison, supra, Morrow v. Shotwell, supra, Wilson v. Fisher, supra, and Hobbs v. Bass, 279 S.W.2d 480 (Tex.Civ.App. Texarkana 1955, writ ref'd n. r. e.).

Instruments 1, 3 and 4 refer only to the VLB sale. The third instrument, the application and contract for sale, provides no assistance. The only description is "36 acres located in W. W. Wagstaff survey, A-796 Shelby County, Texas 12 miles N. (direction) from Center (County Seat), Texas ...." The fourth instrument, Affidavit of Seller Veterans Land Board, states that the 36 acres is a part of 127.55 acres that the Joneses purchased from C. Balsimo in May 1970. This Court has held such a description to be insufficient. In Smith v. Sorelle, 126 Tex. 353, 87 S.W.2d 703 (1935), we held that a deed purporting to convey **\*102** land, which describes it only by quantity and as being part of a larger tract, with nothing to identify what specific portion of the larger tract is intended to be conveyed, is invalid for uncertainty of description. In Pfeiffer v. Lindsay, 66 Tex. 123, 1 S.W. 264 (1886), this Court held the following description to be insufficient:

> "(F)ifty acres of the J. M. Moss survey, abstract No. 462, situated near the town of Burlington, in Montague county, Texas."

The second contract, the earnest money contract between the Joneses and the Kelleys, described the land to be conveyed to the Kelleys as follows:

> "91.55 acres out of the W. W. Wagstaff survey A-796 and D. G.

Green survey A-263 in Shelby County, Texas."

This contract is lacking for the same reason as the 36 acre contract. Additionally, this 91.55 acre tract lies in two surveys, Wagstaff and Green, and the 36 acre tract was to be taken only from the Wagstaff survey.

As evidenced by the two earnest money contracts, the Joneses and Kelleys contracted for two separate conveyances. There is no way to determine which 36 acres will go to the VLB without lien or to which portion the Joneses are to retain their lien. These factors are highly significant to the VLB and to the Joneses. The VLB application and contract of sale provide that if the 36 acres does not abut on a public road the seller will provide a usable easement to a public road. The Kelleys attempted to show that the 36 acres was to have been at the back side of the farm and not abutting on a public road. However, no attempt was made to provide a description of the easement. Whether the land on which the Joneses were to retain a lien abutted on a public road and whether the land was to be encumbered with an easement would be decisive to them.

The four instruments fail to provide sufficient description to comply with the Statute of Frauds.

GREENHILL, C. J., and POPE and BARROW, JJ., join in this dissenting opinion.

**All Citations**

614 S.W.2d 95

## Footnotes

1     The land was originally thought to contain 127.55 acres, but was determined by the jury to contain 116 acres. There is no dispute over the actual acreage found by the jury nor over the reformation of the contract by the trial court.

2     During oral argument, counsel for the Joneses acknowledged that if the four instruments were construed as one transaction, the property description of the entire tract was legally sufficient:

JUDGE : Would you agree that the court of civil appeals was correct, or would say they were incorrect, in their conclusion that you can tell where the property is and what the property is from examination of all four instruments with the field notes attached?

COUNSEL : I concede that if you take their initial conclusion that this is one transaction yes, I concede that the law is that that being all the land that my clients owned in Shelby County yes, you can determine from that what land you are talking about in total, but you still cannot distinguish what any one of these instruments refers to and I still contend .... which 36 or which remainder where it is. And that the terms of the sales are simply different; it's simply on its face not a single contract. No, I concede once you reach that point and say, "yes, it's one contract to sell the whole farm," yes, they are absolutely correct on that point.

3    Section 2 of the 1979 amendatory act provides that the act is remedial in character and is intended to apply to all pending actions regardless of the time of institution of the suit. 1979 Tex.Gen.Laws, ch. 314, s 2 at 718.

4    The following is an excerpt from the transcript of the telephone conversation:

Mrs. Kelley: Well, sir, we are not in anyway going to sell that land to anyone else when we so desparately want it for ourselves. Now I am going to tell you, we have contacted a lawyer and you will be hearing from him. The Land Board is notified of the facts that you are trying to back out of the deal, and we will not in any way give up this piece of land. We have too much money invested in it now.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

416 S.W.3d 618
Court of Appeals of Texas,
Houston (1st Dist.).

Gary JONES and Carolyn Jones, Appellants
v.
PESAK BROTHERS
CONSTRUCTION, INC., Appellee.

No. 01–12–00535–CV. | Sept. 10, 2013.

**Synopsis**
**Background:** Homeowners sued their builder for breach of a construction contract, express and implied warranties, negligent construction of the home, and for violations of the Texas Deceptive Trade Practices Act. The 2nd 25th District Court, Colorado County, William C. Kirkendall, J., entered a take-nothing judgment, in accordance with the jury's verdict, and homeowners appealed.

**Holdings:** The Court of Appeals, Jane Bland, J., held that:

[1] evidence supported jury's verdict for builder on homeowners' breach-of-contract and breach-of-warranty claims stemming from improper grading;

[2] jury's decision not to assign fault to builder for homeowners' Deceptive Trade Practices Act (DTPA) claims, stemming from improper grading, was not against the great weight and preponderance of the evidence;

[3] builder owed no independent legal duty not to negligently inflict emotional distress in performing under the construction contract with homeowners; and

[4] trial court did not err in refusing to submit homeowners' negligent undertaking claim to the jury as a separate cause of action against builder.

Affirmed.

West Headnotes (22)

**[1]** **Contracts**

**Presumptions and burden of proof**
Statutory presumption under Texas Residential Construction Commission Act (TRCCA) that recommendation of a third-party inspector constitutes a rebuttable presumption of the existence or nonexistence of a construction defect did not relieve homeowners of their burden, as plaintiffs, to prove that builder should be held liable for the substandard grading and the resulting damage; presumption established only that the grading was defective, not that builder had assumed responsibility to perform the grading. V.T.C.A., Property Code § 426.008.

Cases that cite this headnote

**[2]** **Contracts**
**Presumptions and burden of proof**
Under Texas Residential Construction Commission Act (TRCCA), statutory presumption regarding the existence of a construction defect does not have the same meaning as the existence of a defendant's liability for a construction defect. V.T.C.A., Property Code § 426.008.

Cases that cite this headnote

**[3]** **Appeal and Error**
**Great or overwhelming weight or preponderance**
When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.

1 Cases that cite this headnote

**[4]** **Contracts**
**Express warranties**
**Contracts**
**Nature and Form of Remedy**
Although breach of warranty and breach of contract are distinct causes of action, an express warranty comprises part of the basis of the bargain and thus is contractual in nature.

Cases that cite this headnote

**[5]    Contracts**
🔑 Acts or Omissions Constituting Breach in General

**Contracts**
🔑 Warranties

Both breach-of-contract and breach-of-warranty claims involve a party seeking damages based on an opponent's failure to uphold its end of the bargain.

Cases that cite this headnote

**[6]    Contracts**
🔑 Sufficiency of evidence as to building contracts

**Contracts**
🔑 Building contracts

Evidence supported jury's verdict for builder on homeowners' breach-of-contract and breach-of-warranty claims stemming from improper grading; homeowner told builder that he would take responsibility for grading the property, as well as for installing the sidewalks, patio, driveway, and landscaping, builder's willingness to repair the grading defects did not constitute an admission of liability, and task of resolving the conflicting evidence as to who should have graded the land belonged to the jury.

Cases that cite this headnote

**[7]    Contracts**
🔑 Matters annexed or referred to as part of contract

Documents incorporated into a contract by reference become part of that contract.

1 Cases that cite this headnote

**[8]    Contracts**
🔑 Matters annexed or referred to as part of contract

Unsigned paper may be incorporated by reference into a paper signed by the person to be charged, but the document signed by the person to be charged must plainly refer to the other writing.

Cases that cite this headnote

**[9]    Antitrust and Trade Regulation**
🔑 Construction, renovation, improvement, and repair

**Antitrust and Trade Regulation**
🔑 Weight and sufficiency

Jury's decision not to assign fault to builder for homeowners' Deceptive Trade Practices Act (DTPA) claims, stemming from improper grading, was not against the great weight and preponderance of the evidence; reference to compliance with building codes did not appear in the construction agreement and, as a result, could not be attributed to builder so as to impose liability as a matter of law, certificate of completion did not specifically address the grading work, disclaimer at the bottom of the house plans, stating that any engineering aspects to be specified to actual site and construction conditions, was from the plan designer and meant only that the home was not designed for any particular lot or its conditions. V.T.C.A., Bus. & C. § 17.50(a)(1, 3).

Cases that cite this headnote

**[10]   Action**
🔑 Nature of Action

If the defendant's conduct gives rise to liability because it breaches an agreement between the parties, the plaintiff's claim ordinarily sounds only in contract.

1 Cases that cite this headnote

**[11]   Action**
🔑 Nature of Action

In determining whether the plaintiff may recover on a tort theory, if the damages sought are only loss or damage to the subject matter of the contract, the cause of action is ordinarily on the contract.

1 Cases that cite this headnote

**[12]    Negligence**

 Voluntarily Assumed Duty

Absent a duty to act independently of the promise made, failure to perform on a promise will not give rise to a cause of action for negligence.

1 Cases that cite this headnote

**[13]    Negligence**

 Necessity and Existence of Duty

If no legal duty exists, neither does a cause of action for negligence.

1 Cases that cite this headnote

**[14]    Damages**

 Breach of Contract or Warranty

**Dead Bodies**

 Civil liabilities

Certain "special relationships," including a very limited number of contracts dealing with intensely emotional noncommercial subjects such as preparing a corpse for burial, may give rise to a legal duty to avoid causing mental anguish.

Cases that cite this headnote

**[15]    Damages**

 Particular cases

Builder owed no independent legal duty not to negligently inflict emotional distress in performing under the construction contract with homeowners, and homeowner's heart attack was not a foreseeable result of any allegedly defective performance of the construction contract that would otherwise give rise to a legal duty.

Cases that cite this headnote

**[16]    Negligence**

 Voluntarily Assumed Duty

**Negligence**

 Voluntarily assumed duties

Negligent undertaking liability requires the presence of the following specific duty predicates: (1) defendant undertook to perform services that it knew or should have known were necessary for the plaintiffs' protection, (2) defendant failed to exercise reasonable care in performing those services, and either (3) third party charged with protecting the plaintiffs relied upon the defendant's performance, or (4) the defendant's performance increased the plaintiffs' risk of harm.

Cases that cite this headnote

**[17]    Negligence**

 Voluntarily Assumed Duty

**Negligence**

 Breach of Duty

As with a simple negligence claim, a negligent undertaking claim requires proof that the defendant owed the plaintiff a legal duty and violated it.

1 Cases that cite this headnote

**[18]    Negligence**

 Liabilities relating to construction, demolition and repair

Because homeowners did not show a separate undertaking from the construction contract itself, or any increased risk of harm separate from the performance under the contract, the trial court did not err in refusing to submit homeowners' negligent undertaking claim to the jury as a separate cause of action against builder.

1 Cases that cite this headnote

**[19]    Evidence**

 Cause

Because builder owed homeowners only the contractual duties arising under the construction agreement, the trial court acted within its discretion in excluding causation testimony from homeowner's treating cardiologist, stating that stress from the foundation problems caused homeowner to suffer a heart attack, insofar as it purported to support a negligence cause of

action; however, trial court allowed the jury to consider evidence that homeowner suffered a heart attack in connection with the homeowner's mental anguish claim.

Cases that cite this headnote

[20] **Evidence**
   🔑 Physical facts

**Evidence**
   🔑 Sources of Data

In homeowners' action against builder for construction defects, expert, who had general engineering experience, was qualified to render an opinion relating to the foundation, and although expert did not specifically refer to any building code provision or address the concrete's compressive strength in his testimony, those issues went to the weight of the evidence, not its admissibility.

Cases that cite this headnote

[21] **Appeal and Error**
   🔑 Particular types of evidence

Absent a showing that the trial court's exclusion of homeowner's notes of his conversations with builder, probably caused the rendition of an improper judgment, appellate court would not disturb the trial court's evidentiary ruling in homeowner's action against builder for construction defects.

1 Cases that cite this headnote

[22] **Pleading**
   🔑 Necessity

**Pleading**
   🔑 Affected by time of application in general

If an amended pleading is filed within seven days of trial, leave of court is required, and trial court does not abuse its discretion by refusing to consider an amended petition filed fewer than seven days before trial if the party fails to seek leave of court. Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*620** Thomas J. Pearson, Attorney at Law, Houston, TX, Donna C. Kline, Attorney at Law, Montgomery, TX, for Appellants.

Britton B. Harris, Brett J. Sileo, Harris, Hilburn & Sherer, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, BLAND, and MASSENGALE.

## OPINION

JANE BLAND, Justice.

When their newly-constructed house showed signs of foundation distress, Gary and Carolyn Jones sued their builder, Pesak Brothers Construction Company (Pesak Brothers), for breach of a construction contract, express and implied warranties, negligent construction of the home, and for violations of the Texas Deceptive Trade **\*621** Practices Act. After a jury trial on the Joneses' claims, the trial court entered a take-nothing judgment, in accordance with the jury's verdict.

On appeal, the Joneses challenge the legal and factual sufficiency of the evidence supporting the jury's findings. They also contend that the trial court erred in refusing to submit their negligence claim to the jury and by striking their sixth amended petition, and they raise challenges to certain of the trial court's evidentiary rulings. We hold that sufficient evidence supports the jury's verdict, and the trial court did not err in deciding the other challenged rulings. We therefore affirm.

## Background

In 2006, the Joneses hired Pesak Brothers to build a house for them on the Joneses' seventy-eight-acre property near Columbus, Texas. Pesak Brothers referred the Joneses to Steven Kieschnick, of Kieschnick's Designs in Wood, to select a floor plan from several blueprints that he had

available. After selecting a plan, the Joneses returned to Pesak Brothers and signed a two-page construction agreement. The agreement specifies the square footage of the living area, garages, and porches, as well as the materials that Pesak Brothers would use in constructing the home. It itemizes the specifications for the foundation, framing, roofing, electrical wiring, insulation, exterior finish, painting, plumbing, floors, doors, windows, interiors, gas outlets, and air conditioning and heating. Pesak Brothers bid $310,000 for the total construction cost, but the agreement explains that the Pesak Brothers would calculate the amount due based "on a cost plus 10% for operating expenses and liability insurance." The agreement does not address grading of the land surrounding the construction site.

Kieschnick provided a list entitled "[s]pecifications for the home of Mr. & Mrs. Gary Jones." The list identifies Kieschnick as a "draftsman and craftsman," and it reiterates and elaborates on the construction tasks and items identified in the Pesak agreement. Pertinent to this appeal, the list recites that "[g]eneral notes, all materials and workmanship should meet or exceed local building code and also the Universal Building Code Book. Any changes made should be cleared with the homeowner." Among other things, Kieschnick's list specifies: "Excavation—virgin soil"; "Gutters and Downspouts—none"; and "Landscaping—by owner." Kieschnick's list is otherwise silent with respect to the diversion of water outside the home or the grading or other improvements to the land. Kieschnick's list is unsigned, and neither the Pesak agreement nor Kieschnick's list refers to or acknowledges the existence of the other.

Before Pesak Brothers completed its construction, Robert Pesak and Mr. Jones discussed who would take responsibility for completing the grading near the house and hardscaping on the lot. Pesak asked Mr. Jones "if he wanted [Pesak Brothers] to do the grading and he said no, that he was going to." Mr. Jones owned three pieces of earth-moving equipment—a tractor, a front-end loader, and an excavator. He had gained experience using them to clear over 200 fallen trees on his Louisiana property following Hurricane Katrina, and he enjoyed moving soil around on his property with them. Mr. Jones told Pesak that he would contract directly with Sanchez Construction to install the concrete driveway, patio, and sidewalks surrounding the house. Mr. Jones acknowledged that, by contracting with Sanchez directly for the hardscaping, the Joneses avoided the "cost plus ten percent" that Pesak Brothers **\*622** would have charged

under the construction agreement, and that the Joneses also saved money by choosing to grade the property themselves.

Pesak Brothers completed construction, and the Joneses closed on the house in December 2006. Pesak presented the Joneses with a final invoice in the amount of $334,839.96. Pesak explained that the amount due exceeded the estimate contained in the agreement because of additional items not accounted for in the original estimate that Pesak Brothers provided, at the Joneses' request, during construction. Mr. Jones protested that final amount and insisted that he had agreed to pay no more than $300,000 for the house. Mr. Jones told the jury that he suspected that Pesak Brothers had added the "cost plus ten percent" provision after the Joneses signed the agreement. The parties negotiated the claimed overage. Pesak Brothers ultimately agreed with the Joneses to split the difference in the claimed overage amount and accepted $20,000 in exchange for signing the certificate of completion. In the certificate, the parties averred:

1. Improvements Debts or Liens. Except as indicated below, Contractor states that there are no unpaid debts and OWNER states that he has not received any notices from any contractors or subcontractors with respect to the Project or with respect to any of the following items which may be remaining on the Property: *Mirror, shutters on the front of house, Home Warranty Policy, concrete steps and bonus room as per plans and specifications dated as of March 22, 2006*

    ....

3. Certificate of Completion. The project has been completed in a good and workman-like manner and in accordance with the plans and specifications approved by the Owner. The Contractor has duly paid all bills and invoices for any labor and/or materials furnished in connection with the Project and has not received notices of any claim of mechanic's or materialman's liens against the property. The OWNER has fully accepted the completed Project and has not received notices of any kind of any claim of mechanic's or materialman's liens against the property.

The evidence is uncontested that, other than the typical grading that builders perform in the course of constructing the home, neither Pesak Brothers nor its subcontractors graded the site before the parties executed the certificate of completion.

In January 2007, around the same time that the Joneses moved into the house, Sanchez added a sidewalk on the north side of the house, a driveway on the east side, and a patio on the south side. Mr. Jones used his front-end loader to contour the land around the house. Mr. Jones also attempted to divert water from the house's foundation by cutting three terraces on the west side, and he built a stone wall uphill from the house. He conceded that he did not know any particular grading requirements, such as the degree of slope, to use.

In February, Mr. Jones called Pesak to report that he had found cracks in the exterior mortar. Pesak told Mr. Jones to add soil around the foundation. Eventually, cracks appeared in the inside walls, and windows and doors began to stick. According to Pesak, Mr. Jones's failure to grade the foundation soon after Pesak Brothers completed construction caused this damage. Pesak also testified that the placement of the sidewalks, patio, and driveway prevented adequate grading around the home. He explained that the **\*623** hardscaping around the house acted like a dam: instead of diverting rainwater away from the foundation, it detoured the water flow around the foundation until it settled underneath the west side.

The Joneses hired engineer Gary Boyd, who prepared a report in January 2008 concluding that the foundation slab was tilting, or "heaving," and stating that it was his "professional recommendation that proper drainage be established adjacent to the foundation sufficient to satisfy the International Residential Code [IRC] Building Requirements."

The Joneses initiated an administrative complaint against Pesak Brothers with the now-defunct Texas Residential Construction Commission (TRCC). [1] TRCC sent its own inspector, John Brown, to investigate. He concluded in April 2008 that the surrounding soil had not been properly graded and that, as a result, the foundation had experienced post-construction differential movement that had damaged the house.

Brown also opined that the areas enclosed by the sidewalk should be "filled and graded to provide a drainage slope away from the foundation." Brown identified nineteen construction defects in the house. These included wiring problems and a leak in the septic tank fill line, but of paramount concern was the failure to provide an adequate slope around the foundation away from the house to protect the foundation from damage due to surface drainage. He concurred with Boyd that the lack of proper grading resulted in heaving, which caused the

windows and doors to stick or drag and cracks in the sheetrock and brick veneer.

In a July 7, 2008 letter to the Joneses' attorneys, Pesak Brothers offered to make Brown's suggested repairs without additional charge and explained how it would remedy each defect identified in Brown's report. With respect to the foundation issues identified in Brown's report, Pesak Brothers proposed to grade the area on the west side of the home to the proper five percent slope to divert the water from the foundation and repair cracks and other cosmetic distress. The Joneses, who had instituted this lawsuit several days before receiving the letter, did not accept Pesak Brothers' offer.

Mr. Jones suffered a heart attack in December 2008. The Joneses amended their pleadings to include, as part of their DTPA claim, allegations that Pesak Brothers' conduct caused Mr. Jones's heart attack and that he was entitled to damages for his physical injury and mental anguish.

At the close of the Joneses' case in chief, Pesak Brothers moved for a directed verdict on the Joneses' negligence claim. The trial court took the motion under advisement, telling the parties it would decide the issue before submitting the charge to the jury. At the charge conference, the trial court declined the Joneses' proposed submission of a negligence claim. The jury found that Pesak Brothers was not liable for the Joneses' remaining contract, DTPA, and breach of warranty claims.

### Discussion

#### I. Evidentiary Sufficiency

**A. Legal sufficiency of the evidence supporting the jury's adverse findings \*624 on the Joneses' breach-of-contract and breach-of-warranty claims**
According to the Joneses, the TRCC inspector's report created a presumption that Pesak Brothers had breached both the contract and warranties of good and workmanlike construction, and thereby shifted the burden of proof to Pesak Brothers to show that the inspector's findings were inconsistent with applicable building and performance standards. Because of the inspector's report, the Joneses contend, the evidence conclusively established Pesak Brothers' liability. Though the jury found to the contrary, the Joneses are entitled to reversal and rendition of the judgment in their favor if they have established Pesak Brother's liability as a matter of law. *See Dow Chem. Co. v. Francis, 46*

S.W.3d 237, 241 (Tex.2001) (explaining that a party attacking legal sufficiency of adverse finding on an issue on which party bears burden of proof "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue," and that party may prevail on appeal only if no evidence supports finding and "the contrary proposition is conclusively established"); *see also City of Keller v. Wilson,* 168 S.W.3d 802, 815–16 (Tex.2005) (explaining nature of conclusive evidence).

 **[1]** In the trial court, the parties agreed that a presumption created by the TRCCA applied to their dispute.[2] The court therefore instructed the jury, congruent with the former statute, that

> in any action involving a construction defect brought after a recommendation of a third-party inspector or ruling by a panel of state inspectors on the existence of the construction defect or its appropriate repair, the recommendation or ruling shall constitute a rebuttable presumption of the existence or nonexistence of a construction defect or the reasonable manner of repair of the construction defect.

 **[2]** The Joneses point to the instruction, coupled with the inspector's report, as conclusively establishing liability. We disagree with the Joneses' interpretation. "[T]he existence ... of a construction defect" does not have the same meaning as "the existence of a defendant's liability for a construction defect." No party disputed the existence of the construction defect at issue in this case; Pesak Brothers agreed with the Joneses that the soil around the house was not properly graded. Their dispute turned not on whether the grading was substandard, but instead, on whether Pesak Brothers had agreed to grade the Joneses' property in the first place. The presumption relied on by the Joneses does not relieve them of their burden, as plaintiffs, to prove that Pesak Brothers should be held liable for the substandard grading and the resulting damage. The presumption established only that the grading was defective, not that Pesak Brothers had assumed responsibility to perform the grading. We hold that the Joneses do not prevail as a matter of law on their breach of contract and breach of warranty claims, so as to require reversal of the jury's verdict.

**\*625 B. Factual insufficiency challenge**

### 1. Standard of review

 **[3]** The Joneses next challenge the factual sufficiency of the evidence supporting the jury's findings in response to the Joneses' breach of contract, breach of warranty, and DTPA liability issues. "When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.,* 46 S.W.3d at 242. In reviewing the record under this standard, we consider and weigh all of the evidence; we set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.* We must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Id.* (quoting *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986)). The jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *City of Keller,* 168 S.W.3d at 819. Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in harmony with their verdict. *Id.* at 820.

**2. Analysis** All of the Joneses' causes of action turn on whether Pesak Brothers was responsible for the improper grading and, consequently, for the damage to the foundation and other parts of the home.[3] The Joneses' live petition alleged that Pesak Brothers:

- failed to prepare grading and drainage around the foundation as required by the TRCC;
  - represented that the house would be built in a workmanlike manner in compliance with accepted building standards and methods and that it was habitable when it had not graded the site to provide appropriate drainage "that was essential to the structural integrity of the foundation"; and
  - failed to disclose that the "landscaping" referred to in the agreement was actually finish grading that was essential to proper drainage.

Each of their claims required the Joneses to prove that Pesak Brothers had a duty—whether derived from the contract or imposed by law—to grade the site after

constructing the house. We consider this issue in the context of each claim below.

### a. Breach-of-contract and breach-of-warranty claims

[4]   [5]   [6]   Although breach of warranty and breach of contract are distinct causes of action, an express warranty comprises part of the basis of the bargain and thus is contractual in nature. *Med. City Dall., Ltd. v. Carlisle Corp.,* 251 S.W.3d 55, 60 (Tex.2008). Both breach-of-contract and breach-of-warranty claims "involve[ ] a party seeking damages based on an opponent's failure to uphold its end of the bargain." *Id.* (citing *U.S. Pipe & Foundry Co. v. City of Waco,* 130 Tex. 126, 108 S.W.2d 432, 434 (1937)). We therefore consider the Joneses' factual-sufficiency challenges on these issues together.

Charge question 1 asked the jury:

**\*626** Did Pesak Brothers Construction, Inc. fail to comply with the material terms of the agreement with Gary and Carolyn Jones?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The charge defined an express warranty as "any affirmation of fact or promise made by Pesak Brothers Construction, Inc. that relates to the construction of the home and becomes part of the basis of the bargain." The charge explained that an implied warranty includes "failing to perform services in a good and workmanlike manner" or "[s]elling a home that was not suitable for human habitation." The jury found no breach of a material term of the agreement, and no failure to comply with a warranty that was producing cause of any damage to the Joneses.

[7]   [8]   The written construction agreement does not mention grading. The Joneses assert that Kieschnick's list was part of their agreement with Pesak Brothers through the doctrine of incorporation by reference. We disagree. "Documents incorporated into a contract by reference become part of that contract." *In re 24R, Inc.,* 324 S.W.3d 564, 567 (Tex.2010) (orig. proceeding) (citing *In re Bank One, N.A.,* 216 S.W.3d 825, 826 (Tex.2007) (orig. proceeding) (per curiam)). "[A]n unsigned paper may be incorporated by reference into a paper signed by the person to be charged."

*Trico Marine Servs., Inc. v. Stewart & Stevenson Tech. Servs., Inc.,* 73 S.W.3d 545, 549 (Tex.App.-Houston [1st Dist.] 2002, orig. proceeding) (quoting *Owen v. Hendricks,* 433 S.W.2d 164, 166 (Tex.1968)). The document signed by the defendant, however, must plainly refer to the other writing. *Id.* No reference to Kieschnick's list appears in the Pesak Brothers agreement.

At trial Pesak testified that he had offered to provide the grading work at the cost-plus-ten-percent rate set forth in the agreement, but Mr. Jones declined the offer. Mr. Jones told Pesak that he would take responsibility for grading the property, as well as for installing the sidewalks, patio, driveway, and landscaping. The record shows that Mr. Jones complained that Pesak Brother's final invoice on the home was excessive, even though his complaint was inconsistent with the agreement's financial terms. The jury could have considered the evidence concerning the parties' financial discussions to find that the additional cost the Joneses would have incurred by having the work performed under the written agreement led to their decision to assume the responsibility for the grading, hardscaping and landscaping, which, the jury heard, also involves grading the soil around the house to protect the foundation.

The Joneses contend that Pesak Brothers' July 2008 letter offering to repair defects identified by the state inspector is tantamount to an admission that Pesak Brothers had assumed the responsibility to grade at least the western side of the property surrounding the house. The relevant contents of that letter follow:

We have reviewed the inspection report filed by John Brown as part of the TRCC SIRP process. As we have stated before, we are very aware of the problems that exist with the Jones home and are still willing to fix them, with the cooperation of the Jones[es].

We have listed each alleged defect from the inspection report and the suggested method of repair:

*# 1 Alleged Defect:* Improper grading and drainage around foundation.

**\*627** *Repair Method:* Pesak Brothers Construction will grade the area on the west side of the home to the proper 5% slope to defer water from the foundation. Pesak Brothers Construction did not construct the sidewalks, the driveway, nor the back porch patio area surrounding the remainder

of the home. Therefore, we should not be responsible for those areas.

...

*# 11 Alleged Defect:* Cracks in brick on front and west side of house.

*Repair Method:* We agree with [the Boyd's engineer and the TRCC inspector's] observations of the ground "heaving" around the foundation. We also agree to slope the area around the foundation on the west side of the house to satisfy the IRC [International Residential Code] Building Code requirements (5% grade slope for the first 10 feet around foundation)....

We are anxious to make these repairs upon the okay by the homeowner, Mr. Gary Jones. We are and have been very cooperative throughout this whole ordeal and area ready to settle these problems.

This letter does not render the jury's no-breach findings against the great weight and preponderance of the evidence. Pesak Brothers sent the letter, albeit untimely, in connection with the dispute resolution process available under the TRCCA. Former section 27.004 of the Texas Property Code gave Pesak Brothers the option to respond to the Joneses' claim with an offer to repair any claimed construction defect and describe in reasonable detail the repairs it would make. If the claimants received a compliant offer to repair, the statute required them either to accept the offer or refuse the offer in writing and explain in reasonable detail why they considered the offer unreasonable. Act of June 15, 2007, 80th Leg., R.S., ch. 843 § 3, 2007 Tex. Gen. Laws 1753 (formerly codified at TEX. PROP.CODE ANN. § 27.004(d)).

Pesak Brothers' letter explained that it was in response to the TRCC's inspection report, and it expressly declared that it "was ready to settle these problems." Pesak testified that, when he made the offer to repair, the grading work would have cost approximately $2,000. Viewed in this context, the jury reasonably could have rejected the Joneses' contention that Pesak Brother's willingness to repair the defects constituted an admission of liability.

Next, the Joneses cite the testimony of their engineering expert, Thomas Gessner, opining that: (1) under the standard of care for local builders, Pesak Brothers should have had an engineer design the foundation; (2) a properly designed foundation would not have been damaged by soil heaving when it got wet; and (3) the standard of care required the

builder to grade the soil to establish a proper slope. Gessner criticized the quality of the foundation, but he did not attribute the foundation's movement to any of the particular flaws he identified relating to its construction; in fact, Gessner specified that he had no opinion about the cause of the foundation's movement. Further, although Gessner included grading among the requirements for a stable foundation, he testified that he did not know who had taken responsibility for the grading around the house and that he did not offer any opinion about that issue.

The remaining evidence supports a finding that the lack of proper grading caused the damage to the home. The TRCC inspector agreed with Boyd's report that the foundation movement resulted directly from the poor drainage around the home, and that the resulting heaving caused the problems with the windows and doors, as **\*628** well as the cracks in the sheetrock and brick veneer.

The Joneses also direct us to Mr. Jones's testimony, in which he recounted a conversation with Pesak:

Q. During the conversations you had with the Pesak Brothers personnel on the west wall, on the west end of your house, did it become apparent to you, without saying what they said, that they knew that that place needed to be graded?

A. Yes.

Q. And did you ask them to do it?

A. I believe I did.

This testimony contradicts Pesak's testimony that Mr. Jones had refused Pesak's offer to perform the grading. The jury reasonably could choose to credit Pesak's testimony over Mr. Jones's testimony on this issue. *See Figueroa v. Davis,* 318 S.W.3d 53, 60 (Tex.App.-Houston [1st Dist.] 2010, no pet.).

Pesak Brothers' implied warranty obligations to the Joneses extended to the work within its control. *Cf. Centex Homes v. Buecher,* 95 S.W.3d 266, 274–75 (Tex.2002) (holding that implied warranty of good workmanship can be disclaimed when agreement expressly provides for manner of performance or quality of construction). The Joneses point to Pesak's lack of familiarity with the IRC provisions addressing grading requirements. Whether Pesak knew the IRC, however, does not bear on whether Pesak Brothers had the responsibility to perform the grading work.

The task of resolving the conflicting evidence as to who should have graded the land belonged to the jury. Because some evidence supports the jury's findings, we hold that the trial court properly entered judgment on the jury's verdict and denied the Joneses' motion for new trial on their breach-of-contract and breach-of-warranty claims.

### b. DTPA claims

 **[9]**    A consumer may bring a DTPA cause of action for either a violation of section 17.46(b) of the DTPA (the "laundry list") or for an unconscionable action or course of action if the violation "constitute[s] a producing cause of economic damages or damages for mental anguish." TEX. BUS. & COM.CODE ANN. § 17.50(a)(1), (3) (West 2011). The Joneses brought both types of claims, which the jury considered under charge questions 2 and 3.

Charge question 2 asked the jury to find whether Pesak Brothers "engage[d] in any false, misleading, or deceptive act or practice that Gary or Carolyn Jones relied on to their detriment" and was a producing cause of their damages. The charge asked the jury to consider whether Pesak Brothers:

> a. Represent[ed] that the home as completed had or would not have had the characteristics that the home did not have, or

> b.  Represent[ed] that the home was or would be of a particular quality when it was of another, or

> c. Fail[ed] to disclose information about the home that was known at the time of the transaction with the intention to induce Gary or Carolyn Jones into a transaction that they otherwise would not have entered into if the information had been disclosed.

The jury answered "no."

The Joneses first point to the construction agreement as evidence supporting their DTPA claim because the home did not comply with any applicable building code. The reference to compliance with building codes, however, appears in **\*629** Kieschnick's list, not in the construction agreement and, as a result, cannot be attributed to Pesak Brothers so as to impose liability as a matter of law. The Joneses further contend that the statement in the certificate of completion that Pesak Brothers had completed its work "in

a good and workmanlike manner" constitutes an actionable misrepresentation, because Pesak failed to complete the grading around the foundation. Before Pesak executed the certificate, the parties had discussed the final grading work, and the jury resolved the conflicting evidence on that issue in favor of Pesak Brothers. The certificate of completion does not specifically address the grading work, and the jury's resolution of the conflicting evidence on that issue supports the conclusion that the certificate of completion does not contain any actionable misrepresentation.

Third, the Joneses contend that Pesak Brothers committed a DTPA violation as a matter of law by concealing other foundation problems with the home. This record, however, does not support that contention. The Joneses' own foundation expert, Daniel Wick, testified that he did not observe any issues with the slab other than a slight wave in one area that was not unusual in construction, and that the issue was so insignificant that he did not bother to mention it to Pesak Brothers.

Fourth, the Joneses claim that Pesak Brothers deviated from a disclaimer at the bottom of the house plans, stating that "any engineering aspects to be specified to actual site and construction conditions," which, they contend, committed Pesak Brothers to hire a foundation engineer. The jury reasonably could have rejected the interpretation that this language required the builder to hire an engineer. Pesak Brothers explained that the disclaimer is from the plan designer and meant only that the home was not designed for any particular lot or its conditions. The jury was entitled to credit that explanation and find that the disclaimer did not constitute an actionable misrepresentation under the DTPA.

Charge question 3 tasked the jury with finding whether Pesak Brothers' conduct violated the provision of the DTPA that prohibits unconscionable conduct. *See* TEX. BUS. & COM.CODE ANN. § 17.50(a)(3). In accordance with the statute, the charge defined "unconscionable action or course of action" as "an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of a consumer to a grossly unfair degree." The jury found that Pesak Brothers did not engage in any unconscionable action or course of action that was a producing cause of damages to either Mr. or Mrs. Jones. The Joneses' complaints, in the main, are problems that arose from the lack of proper grading. The evidence does not support the conclusion that Pesak Brothers failed to comply with any code requirement that produced the foundation's heaving and

movement. We hold that the jury's decision not to assign fault to Pesak Brothers for Joneses' DTPA claims is not against the great weight and preponderance of the evidence.

## II. Refusal to Submit Negligence Claim

The Joneses contend that the trial court erred in refusing to submit their negligence claim to the jury, effectively granting Pesak Brothers' motion for directed verdict on that claim. The Joneses premised their negligence claim on allegations that Pesak Brothers failed to act with due care by selecting a construction site for the house that had serious drainage problems, which it then failed to remedy. In addition to seeking economic damages, the Joneses sought damages for Mr. Jones's **\*630** physical injuries, alleging that the Pesak Brothers' negligence caused Jones to suffer his heart attack.

The issue of whether the evidence at trial gives rise to a fact issue for jury determination on the existence of a legal duty, and for granting or denying a directed verdict, is one of legal sufficiency. *See City of Keller,* 168 S.W.3d at 809, 827. We consider whether there the record contains any evidence of probative force to raise a fact issue on the question presented. *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004). We will credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 827. "A directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to a judgment." *Byrd v. Delasancha,* 195 S.W.3d 834, 836 (Tex.App.-Dallas 2006, no pet.).

The Joneses rely on the Texas Supreme Court's 1949 decision in *Montgomery Ward & Co. v. Scharrenbeck* in asserting that Pesak Brothers' negligent performance of the construction contract caused their damages. 146 Tex. 153, 204 S.W.2d 508 (1947). In *Scharrenbeck*, the defendant contracted to repair a water heater, but improper installation caused a fire that destroyed the plaintiff's home. *Id.* at 509. The Court held that the defendant breached its contract by failing to repair the water heater properly, but, because the defendant's error caused the destruction of the plaintiff's home, the defendant breached a common-law duty as well, allowing for recovery in tort. *Id.* at 510 (discussed in *Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991)).

In *Jim Walter Homes, Inc. v. Reed*, the Texas Supreme Court distanced itself from *Scharrenbeck* by reversing an award for punitive damages made in connection with the Reeds'

claim for negligent construction of their home, holding that when the injury is only to the economic loss to the subject of the contract itself, the action sounds in contract alone. 711 S.W.2d 617, 618 (Tex.1986).

**[10]** **[11]** **[12]** **[13]** To distinguish between contract and tort causes of action, we analyze the source of the duty and the nature of the remedy. *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 45 (Tex.1998) (citing *DeLanney,* 809 S.W.2d at 494–95). If the defendant's conduct gives rise to liability because it breaches an agreement between the parties, the plaintiff's claim ordinarily sounds only in contract. *Id.* at 494. In determining whether the plaintiff may recover on a tort theory, if the damages sought are only loss or damage to the subject matter of the contract, the cause of action is ordinarily on the contract. *Id.; Jim Walter Homes,* 711 S.W.2d at 618. In other words, absent a duty to act independently of the promise made, failure to perform on a promise will not give rise to a cause of action for negligence. *DeLanney,* 809 S.W.2d at 495 n. 2 (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, PROSSER AND KEETON ON THE LAW OF TORTS § 92 at 655 (5th ed. 1984)). If no legal duty exists, neither does a cause of action for negligence. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995).

**[14]** **[15]** The Joneses have not identified any duty that Pesak Brothers purportedly owed other than the duties connected with construction of the home, the subject matter of the contract. Pesak Brothers owed no independent legal duty "not to negligently inflict emotional distress" **\*631** in performing under the contract. [4] *See Temple–Inland Forest Prods. Corp. v. Carter,* 993 S.W.2d 88, 91 (Tex.1999); *City of Tyler v. Likes,* 962 S.W.2d 489, 500 (Tex.1997). Mr. Jones's heart attack was not a foreseeable result of any allegedly defective performance of the construction contract that would otherwise give rise to a legal duty. *See Snellenberger v. Rodriguez,* 760 S.W.2d 237, 237–38 (Tex.1988) (holding that person who ran over child was not liable in negligence for death of police officer who suffered heart attack after controlling crowd around injured child).

**[16]** **[17]** **[18]** The Joneses also sought to hold Pesak Brothers liable for negligence under a voluntary undertaking theory, because they had taken Pesak's suggestion to build the home on a site downhill from the location they originally considered. The Texas Supreme Court has stated that "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care

that the other's person or property will not be injured thereby." *Colonial Savs. Ass'n v. Taylor,* 544 S.W.2d 116, 119–20 & n. 2 (Tex.1976) (citing RESTATEMENT (SECOND) OF TORTS § 323 (1965)); *Tex. Woman's Univ. v. Methodist Hosp.,* 221 S.W.3d 267, 283–84 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Undertaking liability requires the presence of the following specific duty predicates:

> (1) [the defendant] undertook to perform services that it knew or should have known were necessary for the plaintiffs' protection, (2) [the defendant] failed to exercise reasonable care in performing those services, and either (3) [a third party charged with protecting the plaintiffs] relied upon [the defendant's] performance, or (4) [the defendant's] performance increased the plaintiffs' risk of harm.

*Torrington Co. v. Stutzman,* 46 S.W.3d 829, 838 (Tex.2000). As with a simple negligence claim, a negligent undertaking claim still requires proof that the defendant owed the plaintiff a legal duty and violated it. *Id.* at 837; *see Entergy Gulf States, Inc. v. Akrotex, Inc.,* 40 S.W.3d 201, 206 (Tex.App.-Beaumont 2001, no pet.). In arguing for a negligent undertaking claim, the Joneses rely solely on Mrs. Jones's testimony that the downhill site presented more problems for the house's foundation than the uphill site would have presented, and do not point to an injury separate from the claims arising from the construction of the home. The Joneses did not present any testimony to support a finding that proper final grading would not have corrected for any difference in drainage between the two sites. Because the Joneses have not shown a separate undertaking from the construction contract itself, or any increased risk of harm separate from the performance under the contract, the trial court did not err in refusing to submit the Joneses' negligent undertaking claim to the jury as a separate cause of action.

### III. Evidentiary Complaints

The Joneses complain that the trial court erred in excluding the testimony of Dr. Jon Heine, Mr. Jones's treating cardiologist and the Joneses' medical expert, and in admitting certain testimony of **\*632** Mark Kubena, Pesak Brothers' engineering expert. [5] They also contend that the trial court should have admitted Mr. Jones's notes of his conversations with Pesak. We review a trial court's decision to exclude or

admit evidence for an abuse of discretion. *In re J.P.B.,* 180 S.W.3d 570, 575 (Tex.2005). A court abuses its discretion if it acts without reference to any guiding rules or principles. *Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). To show the trial court abused its discretion, an appellant must demonstrate that: (1) the court erred in not admitting the evidence; (2) the excluded evidence was controlling on a material issue dispositive of the case and was not cumulative; and (3) the error probably caused rendition of an improper judgment in the case. *See* TEX.R.APP. P. 44.1(a) *Tex. Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000); *Sharma v. Vinmar Int'l, Ltd.,* 231 S.W.3d 405, 422 (Tex.App.-Houston [14th Dist.] 2007, no pet.). We uphold the trial court's evidentiary ruling if we discern a legitimate basis for it. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998).

 **[19]**   The Joneses proffered Dr. Heine's testimony to show that the stress from the foundation problems caused Mr. Jones to suffer a heart attack in December 2008. Because Pesak Brothers owed the Joneses only the contractual duties arising under the agreement, the trial court acted within its discretion in excluding Dr. Heine's causation testimony insofar as it purported to support a negligence cause of action. The trial court allowed the jury to consider evidence that Mr. Jones suffered a heart attack in connection with the Joneses' mental anguish claim. As a result, the trial court's ruling had little, if any, impact on the judgment. *See* TEX.R.APP. P. 44.1(a).

 **[20]**   The Joneses contend that the trial court erred in admitting Kubena's testimony about the effect of trees and tree roots on the home's foundation, because Pesak Brothers failed to establish that Kubena was qualified to render an opinion on that subject matter. The record, however, shows that Kubena had general engineering experience that qualified him to render an opinion relating to the foundation, and he testified on that issue in his deposition, relying on soil boring reports showing the presence of tree roots near the foundation. Kubena did not specifically refer to any building code provision or address the concrete's compressive strength in his testimony, but those issues go to the weight of the evidence, not its admissibility.

 **[21]**   With respect to the trial court's exclusion of Mr. Jones's notes of his conversations with Pesak, the Joneses do not contend that the notes contain evidence that they were not able to convey through Mr. Jones's testimony, or that the trial court prevented Mr. Jones from using the notes to refresh his

recollection. Absent a showing that the trial court's exclusion of the notes probably caused the rendition of an improper judgment, we will not disturb the trial court's evidentiary ruling. *See* TEX.R.APP. P. 44.1(a).

## IV. Propriety of the Trial Court's Decision to Strike the Joneses' Sixth Amended Petition

 [22]   Finally, the Joneses contend that the trial court erred in denying leave to file their sixth amended petition. The record **\*633** shows that the Joneses filed their sixth amended petition within seven days before the date of trial and did not seek leave of court. If an amended pleading is filed within seven days of trial, leave of court is **required.** *See Houtex Ready Mix Concrete & Materials v. Eagle Constr. & Envt'l Servs., L.P.,* 226 S.W.3d 514, 520 (Tex.App.-Houston [1st Dist.] 2006, no pet.).* A trial court does not abuse its discretion by refusing to consider an amended petition filed fewer than seven days before trial if the party fails to seek leave of court.

*See* TEX.R. CIV. P. 63; *Mensa–Wilmot v. Smith Int'l,* 312 S.W.3d 771, 778–79 (Tex.App.-Houston [1st Dist.] 2009, no pet.)

### Conclusion

Because legally and factually sufficient evidence supports the jury's verdict, we hold that the trial court properly rendered judgment on it. We further hold that the trial court did not err in refusing to submit a negligence claim, or in deciding the other challenged rulings. We therefore affirm the judgment of the trial court.

### All Citations

416 S.W.3d 618

Footnotes

1      The Texas Residential Construction Commission Act expired September 1, 2009, through application of the Texas Sunset Act, when the Legislature abolished the Residential Construction Commission. *See* Act of June 20, 2003, 78th Leg., R.S., ch. 458, § 1.01, 2003 TEX. GEN. LAWS 1703, 1705 (former TEX. PROP.CODE ANN. § 401.006). During its existence, the Commission administered a state-sponsored inspection and dispute resolution process, which a homeowner or builder had to invoke before filing suit on an action for damages or other relief arising from a "construction defect." *See* Act of June 20, 2003, 78th Leg., R.S., ch. 458, § 1.01 (former TEX. PROP.CODE ANN. § 426.005(a)).

2      We express no opinion about the applicability of the TRCCA—in particular, of former section 426.008(a)—to this case. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Res. Co.,* 299 S.W.3d 106, 112 (Tex.2009) ("Because there was no objection to the charge as submitted, we assume, without deciding, that the instruction was correct and measure the evidence by the charge as given.") (citing *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (holding that court's charge measures sufficiency of evidence in absence of objection)).

3      The Joneses also alleged that Pesak Brothers made errors in constructing the foundation itself, but the evidence at trial did not prove as a matter of law either that Pesak Brothers constructed a faulty foundation or that any error in constructing the foundation caused the damages claimed by the Joneses.

4      Certain "special relationships," including "a very limited number of contracts dealing with intensely emotional noncommercial subjects such as preparing a corpse for burial," may give rise to a legal duty to avoid causing mental anguish. *City of Tyler v. Likes,* 962 S.W.2d 489, 496 (Tex.1997); *Noah v. UTMB at Galveston,* 176 S.W.3d 350, 356 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). The Joneses do not contend that any such duty existed here.

5      The Joneses also complain about the trial court's evidentiary rulings relating to the testimony of the parties' damages experts. Because the record supports the jury's no-liability findings, we do not reach those issues.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    Comeaux v. Suderman,    Tex.App.-Hous. (14 Dist.), July 18, 2002

185 S.W.2d 754

Court of Civil Appeals of Texas, Eastland.

MILLER

v.

COMPTON.

No. 2495.   |   Feb. 9, 1945.

Appeal from District Court, Knox County; Lewis M. Williams, Judge.

Suit by J. E. Miller against Bob Compton to recover rent under a written lease, wherein the defendant filed a cross-action to recover damages accruing by reason of having to surrender possession of leased land. Judgment for the defendant, and the plaintiff appeals.

Judgment reversed and rendered.

West Headnotes (11)

**[1]**     **Landlord and Tenant**
    👉 Surrender, forfeiture, or waiver

    **Landlord and Tenant**
    👉 Effect

    **Landlord and Tenant**
    👉 Sufficiency

    **Landlord and Tenant**
    👉 Transfer or Termination of Landlord's Estate

    **Landlord and Tenant**
    👉 Vacation, Surrender, or Abandonment of Premises

Where lease prohibited sale of land by landlord unless tenant had been given opportunity to purchase and gave tenant 30 days to vacate after receipt of written notice of sale, information obtained by tenant from third person that third person had bought leased land and desired possession did not justify tenant in surrendering

possession to third person and in refusing to pay balance of rent, but tenant was entitled to remain in possession until lease was terminated as provided therein.

1 Cases that cite this headnote

**[2]**     **Landlord and Tenant**
    👉 Attornment to third person

    **Landlord and Tenant**
    👉 Transfer or Termination of Landlord's Estate

A sale of reversion by landlord does not terminate tenancy or affect tenant's rights or obligations, but tenant becomes in contemplation of law the tenant of purchaser, and may attorn to him.

Cases that cite this headnote

**[3]**     **Vendor and Purchaser**
    👉 By tenant

Where tenant was in actual possession of land for grazing purposes, purchaser thereof was deemed to have notice of tenant's rights under lease and could not claim standing of an innocent purchaser.

Cases that cite this headnote

**[4]**     **Landlord and Tenant**
    👉 Tenant's Notice of Intention to Quit

    **Landlord and Tenant**
    👉 Transfer or Termination of Landlord's Estate

A provision of lease requiring tenant to give possession within 30 days after sale of land and receipt of written notice thereof was for benefit of landlord and could not be availed of by tenant as authority for terminating lease upon being informed by purchaser that land had been sold.

Cases that cite this headnote

**[5]**     **Landlord and Tenant**
    👉 Existence, scope, and validity

    **Specific Performance**

☞ Options

A provision of lease giving tenant option to purchase demised property is not subject to attack on ground that it lacks elements of a binding contract, but right conferred thereby may be enforced by suit for specific performance, and purchaser of premises may be compelled to execute a conveyance to tenant.

Cases that cite this headnote

**[6]** **Landlord and Tenant**
☞ Conditions precedent

Under lease reserving to landlord right to sell land and terminate lease at end of any rental year on six months' notice, and giving tenant privilege of buying land, option to buy is conditional upon landlord's election to terminate lease by making a sale, and does not apply to sale made subject to tenant's rights.

1 Cases that cite this headnote

**[7]** **Landlord and Tenant**
☞ Presumptions and burden of proof

A tenant desiring to escape liability for rent must show facts leading to conclusion that he has been released of his obligation.

1 Cases that cite this headnote

**[8]** **Landlord and Tenant**
☞ Cancellation of lease

Where lease has been abrogated by agreement, tenant may not be held liable thereon because he has occupied the premises.

Cases that cite this headnote

**[9]** **Landlord and Tenant**
☞ Failure to give or take possession

The failure of tenant to enter into possession of leased premises does not relieve him of liability for stipulated rental.

Cases that cite this headnote

**[10]** **Landlord and Tenant**
☞ Continued liability for rent

A tenant's voluntary abandonment of possession of leased premises before expiration of term will not defeat landlord's right to rental.

1 Cases that cite this headnote

**[11]** **Landlord and Tenant**
☞ Particular Grounds of Discharge from Liability

Where lease required that landlord before selling leased premises give tenant an opportunity to purchase, but tenant relinquished possession to third person, who claimed to have purchased premises, before tenant was given opportunity to exercise option to purchase land and failed to do so, tenant was liable for unpaid rent under lease.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*754** C. F. Sentell and John E. Sentell, both of Snyder, for appellant.

M. F. Billingsley, of Munday, and D. J. Brookreson, of Benjamin, for appellee.

**Opinion**

LESLIE, Chief Justice.

J. E. Miller instituted this suit against Bob Compton to recover rent under a written contract whereby Miller leased **\*755** for grazing purposes to Compton for a term of five years 4,160 acres of land in Knox and Foard Counties. The defendant Compton denied liability and alleged the plaintiff breached the lease contract, thereby relieving him from any further payments of rent. By way of cross-action defendant Compton sought to recover damages accruing to him by reason of having to surrender possession of the leased land and dispose of many of his cattle at a loss. Further, by way of cross-action, he charged Plaintiff Miller with wrongfully causing a writ of attachment to be levied on his property, resulting in both actual and exemplary damages. That the affidavit, etc., for the writ was false and the proceeding unlawful.

The trial before the court without a jury resulted in a judgment for Compton on the ground that said Miller breached the contract, relieving him, Compton, from the further payment of rents, but the judgment denied Compton any recovery for damages by reason of having to dispose of his stock on account of the loss of pasturage and also denied him any recovery of actual or exemplary damages by reason of wrongful attachment. The plaintiff appeals.

There are no assignments of error challenging the action of the court with reference to any phase of Compton's cross-action and no appeal is prosecuted from that part of the judgment denying him recovery of damages. The rights of the litigants are believed to turn upon the meaning and legal effect of the following provision in the lease contract as applied to the other undisputed facts and testimony in the case:

'This lease is made subject to sale at any time during the life of this lease, and in case of sale lessee agrees to give complete possession within thirty days after sale has been completed and receipt of written notice of such sale and demand for possession; however, it is understood and agreed that no sale of the above described land can be made by lessor, unless and until lessee has been given an opportunity to purchase the same at the same price and terms, and has refused to so purchase, or failed to so purchase, within ten days after offer has been submitted;

'In case of sale, lessee is to be reimbursed for all unearned rental previously paid.'

It is the appellant's contention that said 30 day provision contained in the lease contract was for the exclusive use and benefit of the lessor and owner of the land, and that it could not be used by the lessee as an excuse for terminating the lease as hereinafter stated. That the trial court erred in concluding that J. E. Miller breached the lease contract in such way as to relieve Compton of the further payment of rents under the original lease contract. Points 1, 4 and 9 are briefed together, specifically presenting such contention from different angles.

The lease was for a definite term of five years from November 6, 1939, to November 6, 1944, for the sum of $1700 for the first year and $1456 each year thereafter, payable in semi-annual installments of $728 each in advance. The $1700 payment and the two $728 payments satisfied the rents under the contract until November 6, 1941.

July 6, 1940, J. E. Miller conveyed said land to his father, R. N. Miller. That conveyance was in form a warranty deed and

placed of record July 21, 1941, in Foard County. J. E. Miller testified the transaction was a mortgage to enable him to procure financial assistance through his father, but the finding of the court is in effect that same was a conveyance of the title to the land. Be that as it may, the testimony is undisputed that insofar as that transaction (of July 6th) is concerned, neither of the Millers ever gave any notice nor took any steps to dispossess Compton and regain possession of the land as in the lease provided. Both J. E. Miller and Compton so testify. Later the lands, etc., were returned to J. E. Miller.

Compton testified that just before the November 6, 1941, installment of rent fell due he was told by a party named Davis that J. E. Miller had conveyed the land to his father, R. N. Miller, and that prompted by such statement he investigated and found such deed on the records in Foard County. That immediately thereafter he received from R. N. Miller a letter —postmarked November 8, 1941—confirming the July 6th conveyance and stating that he desired to sell the land, and further saying in that letter to Compton:

'If you would be interested in buying it get in touch with me right away. I want to give you the first chance to buy, being you have it leased * * *.'

**\*756** Compton further testified that after finding said deed of record and receiving the above letter from R. N. Miller he did not pay the installment of rent falling due November 6, 1941, and thereafter. When asked about his failure to pay said installments of rent, Compton testified:

'Q. Did you pay him (J. E. Miller) then? If you didn't, why didn't you? A. Because it was deeded over to his Daddy (R. N. Miller.)'

Further on in his testimony and in response to questions by his own attorney Compton testified:

'Q. Would you have given the pasture up down there at all if you hadn't thought this fellow Davis had the right to demand possession of it? A. I sure wouldn't.

'Q. Did that cause you the loss you have alleged in your petition here? A. It sure did.

'Q. He told you he had bought it (the leased land) and you turned it over to him? A. Yes, sir.

'Q. You didn't deal with him until he showed you a written contract? A. That is right.'

Compton also testified that when Davis informed him about the Miller deed of July 6th, he, Davis, also told him that 'he bought the place from Miller's dad.' That Davis at that time demanded possession of the land and he yielded same to him (Davis) about November 25, 1941, for a consideration of $200, which was about twice as much as the unearned rental paid in advance. For other reasons for his action in doing so, see Compton's testimony above. Compton also testified that Davis showed him a contract with R. N. Miller for the purchase of the land. That he did not know what became of the contract, and that he saw no deed whatever from R. N. Miller to Davis. That he did not know R. N. Miller's hand writing.

Davis did not appear and testify. His whereabouts were not definitely known, but possibly Mineral Wells. There is no competent evidence that R. N. Miller ever executed a deed to Davis and neither is there any statement, other than that above and properly objected to, that there was any contract by which R. N. Miller, or anyone else, was to convey said lands to Davis. Henry v. Phillips, 105 Tex. 459, 151 S.W. 533, pt. 6. Davis' interest in the matter is otherwise unexplained, but, as shown by the record, Compton apparently acted in material respects on Davis' representations.

Compton does not claim that he attempted to communicate with either R. N. or J. E. Miller concerning such claims and representations as were made by Davis, or that he otherwise endeavored to verify the same.

 [1]     Obviously the transactions with Davis and the representations by the latter did not, under the circumstances of this case, justify Compton in surrendering the possession of the ranch to Davis or in his refusing to pay the balance of the rent to J. E. Miller, or his order.

The original lease was made subject to sale of the land at any time during the life of the lease. The lessee Compton agreed to give 'complete possession within 30 days after the sale has been completed and receipt of written notice of such sale, and demand for possession.'

The manner for terminating the lease by the lessor or owner is thus clearly expressed and is mandatory and in no other way could the lessor or owner terminate the lease. Until terminated in the way provided, the lessee was not legally disturbed in his right of occupancy and use of the premises for grazing purposes.

 [2]     It is undisputed that no 30 day notice of sale, written notice, or demand for possession based on the conveyance by J. E. Miller to R. N. Miller was ever given lessee Compton. He

affirms such fact. Therefore, as effecting his right to terminate the lease on any such ground, or violation thereof, the rule of law is:

'In the absence of any provision to the contrary in the lease, the established rule is that a sale of the reversion by the landlord does not terminate the tenancy or affect the tenant's rights or obligations. The tenant being in possession at the time of the sale, the purchaser is deemed to have had notice of his rights under the lease, and hence may not claim the standing of an innocent purchaser. The lessee or tenant becomes in contemplation of law the tenant of the purchaser, and may attorn to the latter. The purchaser is entitled to enforce the covenants of the lease—or, at any rate, covenants which 'run with the land.' Thus the grantee of the reversion has a right to declare a forfeiture of the leasehold on proof of a breach of a covenant which was incorporated in the lease contract **757** and which in character is a covenant 'running with the land." 27 T.J. p. 67, sec. 18; Wilson v. Beck, Tex.Civ.App., 286 S.W. 315, 321; O'Neil v. Davis, 1 White & W.Civ.Cas.Ct.App. § 415; Davidson v. Wallingford, 88 Tex. 619, 32 S.W. 1030; 16 R.C.L. p. 633, sec. 118, et seq.; 35 C.J. p. 1214, sec. 544; p. 1224, sec. 565; p. 1231, sec. 573.

From O'Neil v. Davis, supra, we take the following:

'Where D. leased the pasture from P. for the year, he had a legal right to use it during the year, and a sale by P. of the pasture or a portion of it would not destroy or affect D.'s rights under the lease. Such sale would pass the land subject to the right of pasturage in D., and D. being on the land at the time of such sale, and using it for pasturage, the purchaser would be charged with notice of his rights, and would take the land subject to such rights.'

 [3]     [4]     Without doubt Compton was in actual and visible possession and use of said land for grazing purposes at the date of conveyance to R. N. Miller, regardless of whether that was an outright sale by warranty deed or a mortgage in form of such, as claimed by J. E. Miller. Conceding it to be an outright conveyance to R. N. Miller, then he is deemed to have had notice of Compton's rights under the lease, and he, Miller, could not claim the standing of an innocent purchaser at any time during which the rents are sought to be recovered in this suit. Lester v. Zink, Tex.Civ.App., 154 S.W. 1161. However, it conclusively appears that R. N. Miller had at no time made any such claim or that he in any way manifested a wish or desire that Compton relinquish to him the possession of the land. To the contrary he sought to interest Compton in the purchase of the same, extending him a preference

right, as indicated in his above letter. In fact, neither of the Millers at any time sought possession of the land by pursuing the method stated in the lease and providing a way in which the lessor or owner could do so; and it follows that no such provision therein for the benefit of the lessor or owner was available to the lessee Compton. Martin Weiss Co. v. Schwartz, Tex.Civ.App., 295 S.W. 197; Morris v. DeWolf, 11 Tex.Civ.App. 701, 33 S.W. 556; Brady v. Nagle, Tex.Civ.App., 29 S.W. 943; Collier v. Wages, Tex.Civ.App., 246 S.W. 743.

'Not infrequently, the duration of the lessee's tenure is in effect declared to be dependent upon the giving of notice by one of the parties. Where the lease provides for notice to vacate by the lessor to the lessee, the lessee may not terminate the contract by the giving of notice; the provision is for the lessor's benefit exclusively. 'There is no authority in law authorizing the lessee to take advantage of such a stipulation and appropriate it to his own use in terminating a lease contract which he had agreed to and had omitted to have inserted therein a like provision in his own interest.' Again, where a lease contract contains a proviso that on nonpayment of rent the term shall cease, the lessor, and not the lessee, has the elective right of determining it upon breach. 'The principle that no man is permitted to take advantage of his own wrong, prevents the lessee from doing so.'' 27 T.J. p. 297, sec. 170, 171.

[5] [6] Further, the following rules of law have application under the fact of Compton's undisputed possession of the land until he abandoned same:

'A provision which is occasionally embodied in leases confers upon the lessee an option to purchase the demised property. Such a provision is not open to attack on the ground that it lacks the elements of a binding contract; and the right conferred thereby may be enforced by a suit for specific performance. One who has purchased the premises from the lessor may be compelled to execute a conveyance to the lessee; nor can the defendant claim the standing of an innocent purchaser, it seems, the lessee's possession of the property being notice of the state of the title and the option conferred by the lease.

'And where a lease contained a proviso reserving to the lessor the right to sell the land and terminate the lease at the end of any rental year on six months' notice and giving the lessee the privilege of buying the land at a price to be fixed by the lessor, and which might be bona fide offered by any other party, the court held that the option to buy was conditional upon the lessor's electing to terminate the lease by making a sale, and that it did not apply to a sale which was made subject to the lessee's rights to the end of his term.' 27 T.J. p. 65, sec. 16.

Applying these rules of law to the undisputed facts of the case, Compton's possession **\*758** and rights under the lease were never legally impaired or threatened by anything done by the Millers, or either of them, and his abandonment of possession of the premises was voluntary on his part and wholly unwarranted in fact or in law. The law afforded him ample means and methods for asserting and establishing his rights under the terms of the lease if he was longer interested in them. Compton does not seek specific performance or otherwise affirmatively assert any rights under the option in his favor.

[7] [8] [9] [10] Under the established facts Compton's liability for the unpaid rents, regardless of the owner at any particular time, is reflected by specific rules of law in such cases:

'In the case of a dispute as to the liability of the tenant to pay rental, the primary implication is that he is bound by his agreement to make payment; and, in order to escape liability, he must show facts which lead to the conclusion that he has been released of his obligation. It has been observed: 'Where the rental contract exists by which the tenant is entitled to occupy the leased premises for a given term, and by which the landlord is entitled to receive a fixed rent for the entire term, the tenant cannot resist the demand for rent unless he shows evidence under paramount title, or that for some reason, recognized by law as sufficient, he was entitled to and did quit the possession.' If he relies upon an offer by the landlord to cancel the lease and release him of liability for the payment of the stipulated rentals, he must establish that the offer was accepted. Of course, the obligation of the lessee to pay rental may be contingent.

'If the contract of renting has been abrogated by agreement of the parties, the lessee may not be held liable thereon by reason of the fact that he has occupied the premises. The circumstance that he has never entered into possession of the premises does not relieve the lessee of liability for the stipulated rental. 'It requires no argument to show that a tenant is not released from liability upon his express covenant to pay rent by mere failure upon his part to accept possession of the leased premises.' Nor may he claim any deduction by reason of the fact that he has not occupied the property during the whole period of the agreed term. *And, by abandoning*

*possession of the premises before the expiration of the term, the tenant cannot prejudice the landlord's right to recover the full amount of the rental. 'He cannot defeat the right of the landlord to have the rent become due under the terms of the contract by his own voluntary abandonment of the leased premises.*'' 27 T.J. p. 85, sec. 28. (Italics ours.) Sellers v. Radford, Tex.Civ.App., 265 S.W. 413; Ramsey v. Odiorine, Tex.Civ.App., 210 S.W. 615; Goldman v. Broyles, Tex.Civ.App., 141 S.W. 283.

The testimony further discloses that Miller did not re-enter and take possession of the lands when Compton abandoned them, and what has been said demonstrates Compton had no right to abandon same and did so at his own risk.

 [11]    From the record it appears that R. N. Miller reconveyed said land to J. E. Miller, and on August 23, 1943, also assigned and relinquished to him the unpaid rents provided for in the original lease. Thereafter, J. E. Miller, finding a bona fide purchaser for the land and consummating a sale thereof at $5.50 per acre gave Compton notice of such prospective sale to enable him to exercise his option and purchase the land as stipulated for in the original lease. Compton did not exercise his option to then purchase the land, and the same was sold by J. E. Miller to Tom Proctor Hughes, who received a deed therefor from J. E. Miller on February 15, 1944.

No right to avoid the payment of rent accrues to Compton by reason of this transaction and he asserts no such rights by reason of the same. Further notice will not be given to this transaction.

If we are correct in the foregoing conclusions, the evidence establishes Compton's liability for the unpaid rents in suit, with interest thereon from the due date of each installment, and the evidence has been fully developed on said issue. The judgment of the trial court will, therefore, be reversed and judgment here rendered in favor of J. E. Miller for said amounts, and also establishing his rights under the attachment proceeding and replevy bond therein.

For the reasons assigned, the judgment of the trial court is reversed and here rendered for plaintiff J. E. Miller as above indicated and left undisturbed in all other respects. It is so ordered.

**All Citations**

185 S.W.2d 754

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 564061
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**

Court of Appeals of Texas,
Houston (14th Dist.).

Carol Ann NORRA, Appellant

v.

HARRIS COUNTY, Texas; Texas Commission
on Environmental Quality; and Texas
Department of Health, Appellees.

No. 14-05-01211-CV.   |   March 4, 2008.

West KeySummary

**1**    **Appeal and Error**

    Amount of Recovery or Extent of Relief

The owner of mobile home parks failed to preserve challenge to civil penalties for 15,387 wastewater and drinking water violations as exemplary damages subject to the cap in the Texas Civil Practice & Remedies Code or due process. She failed to make this challenge to the trial court in a bench trial, and it was thus an entirely new legal argument. U.S.C.A. Const.Amend. 14; Rules App.Proc., Rule 33.1(d).

Cases that cite this headnote

On Appeal from the 55th District Court, Harris County, Texas, Trial Court Cause No.2003-10164.

**Attorneys and Law Firms**

Daniel K. Craddock and Darryl Wayne Pruett, for Carol Ann Nora.

Grant T. Gurley, Michael R. Hull and Mary Elizabeth Smith, for Harris County, Texas.

Panel consists of Justices YATES, FOWLER, and GUZMAN.

**MEMORANDUM OPINION**

EVA M. GUZMAN, Justice.

**\*1** This is an appeal from the trial court's award of civil penalties, injunctive relief and attorney's fees in a civil enforcement proceeding filed by the State of Texas and Harris County against the owner of two mobile home parks in Harris County. In two issues, appellant, Carol Ann Norra, argues that the civil penalties assessed against her for numerous and repeated violations of the State's public health laws are exemplary damages subject to Chapter 41 of the Texas Civil Practice & Remedies Code. She further argues that her United States constitutional right to due process was violated by the imposition of these penalties. She frames these arguments as legal sufficiency challenges to the evidence. But we conclude that these complaints are not challenges to the legal sufficiency of the evidence and are instead legal arguments that were not presented to the trial court. As such, she has failed to preserve error on these challenges, and we therefore affirm the judgment of the trial court.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

In 2003, appellant Carol Ann Norra owned two mobile home parks in Harris County: (1) North Fork or Reidland Road Mobile Home Park, and (2) Lauder Road Mobile Home Park. She has owned both properties continuously since at least January 1, 1990, with the exception of a brief period of time from January 27 to July 6, 2004 when she did not own the Lauder Road property. She also owned the drinking water and wastewater treatment systems serving these two properties during the same time period. On February 27, 2003, Harris County filed suit against Norra for numerous violations of the State's drinking water and sanitation statutes. The Texas Commission on Environmental Quality ("TCEQ") and the Texas Department of Health ("TDH") were joined as necessary parties.

At her bench trial conducted on December 12-13, 2003, Norra stipulated to over 15,330 violations regarding the maintenance and upkeep of the water systems at both properties. [1] She disputed various other alleged sanitation and

illegal discharge violations. The State and County presented testimony and exhibits supporting these violations. Norra has conceded the sufficiency of the evidence supporting fifty-seven of these sewage and wastewater violations. [2]

On August 25, 2005, the trial court rendered judgment awarding civil penalties of $384,460.00 to Harris County and $384,460.00 to the State. The trial court also awarded the State $4,969.00 as an administrative penalty, and awarded attorneys' fees of $30,000.00 to Harris County and $114,200.00 to the State, as well as costs and post judgment interest. The trial court further entered a permanent injunction against Norra with respect to the drinking water and wastewater treatment systems at both properties. Norra requested findings of fact and conclusions of law on September 12, 2005, which the trial court entered on February 8, 2006. Norra timely filed notice of appeal on November 23, 2005.

### II. ISSUES PRESENTED

**\*2** In her first issue, Norra asserts that the $768,920 awarded to Harris County and the State as civil penalties are actually exemplary damages under Texas law. She further contends that Chapter 41 of the Texas Civil Practice & Remedies Code precludes the award of these "exemplary damages" because no actual damages were awarded in this case as required for such an award. In her second issue, Norra asserts that because no actual damages were awarded, the award of "civil penalties, *i.e.,* exemplary damages" necessarily exceeds any constitutionally permissible ratio between actual and exemplary damages. This lack of a reasonable ratio between actual and exemplary damages, according to Norra, violates her right to due process of law under the 14th Amendment to the United States Constitution. The State responds *inter alia* that Norra failed to preserve these complaints for appeal because she did not assert these legal arguments in the trial court. [3]

### III. ANALYSIS

Norra frames her challenges to the civil penalties awarded against her as challenges to the legal sufficiency of the evidence. She argues that, because this is an appeal from a non-jury case, her complaints may be made for the first time on appeal under Texas Rule of Appellate Procedure

33.1(d). The State responds that her complaints are not legal sufficiency issues, but instead unpreserved legal challenges that were not asserted in the trial court. We agree.

Generally, to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection or motion. Tex.R.App. P. 33.1(a). Subsection (d) of this rule, however, permits a legal or factual sufficiency claim, including complaints that damages are excessive or inadequate, to be made for the first time on appeal in non-jury cases. Tex.R.App. P. 33.1(d). In a legal sufficiency challenge, the party bringing the challenge asserts that there is no evidence to support the trial court's findings. *See City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005) (noting that "no evidence" points challenge the evidence of a "vital fact").

Here, to the contrary, Norra does not challenge the trial court's findings. As noted above, Norra stipulated to approximately 15,330 drinking water violations and admits in her briefing that at least fifty-seven sewage and wastewater violations were supported by the evidence. At a minimum, the uncontested evidence supports at least 15,387 violations. [4] Each of these violations is punishable by a $50 to $1,000 fine. *See* TEX. HEALTH & SAFETY CODE ANN. § 341.048. Under the statute, the trial court could have imposed a penalty of between $769,350.00 and $15,387,000. *See id.* Thus, the trial court's award of $768,920.00 in civil penalties is actually less than that which it could have properly awarded, considering simply the number of violations. Legally sufficient evidence therefore supports the award.

**\*3** Instead of challenging the *legal sufficiency* of the evidence to support the civil penalties, Norra asserts a novel *legal basis* for avoiding the penalties assessed. She asserts that, although the penalties assessed against her were within the scope of those permitted by statute, these civil penalties are exemplary damages, subject to either the cap on exemplary damages in Chapter 41 of the Civil Practice & Remedies Code or a due process challenge. For example, in her briefing, Norra states:

> Ms. Norra contends that the civil penalties awarded against her are actually exemplary damages, and that Chapter 41 of the Texas Civil Practice and Remedies Code applies to

preclude the award of any exemplary damages against her. *This is a legal sufficiency issue....*

...

*Ms. Norra's argument involves the interpretation of a statute.*

...

*Ms. Norra contends that the civil penalties awarded against her are exemplary damages....*

...

*This record shows statutory violations,* but no physical harm, no injury and no property damage to any actual human being. Since the trial court did not award compensatory damages, and the record contains no evidence of any actual damage which could be a basis for an award of compensatory damages, it was error for the trial court to award $384,460.00 in civil penalties to Harris County and also error to award $384,460.00 in civil penalties to the State of Texas.

(emphasis added). In support of her contention that her due process rights were violated by the assessment of these penalties, Norra repeatedly refers to the civil penalties as "punitive damages ." Thus, her second issue is premised on her argument that the civil penalties assessed in this case are exemplary or punitive damages. [5]

Norra has not directed this court to any part of the record in which she notified the trial court of her contention that the civil penalties imposed in this case are actually exemplary damages subject to (a) the cap provided in the Texas Civil Practice & Remedies Code or (b) a due process analysis. Further, she has not provided any argument or authority suggesting we may review these issues absent such preservation. [6] *See* Tex.R.App. P. 33.1(a). Accordingly, we conclude that, because Norra did not raise her complaints in the trial court, we may not properly address them on appeal.

## IV. CONCLUSION

Norra has not established that her challenges to the civil penalties assessed against her are based on the sufficiency of the evidence. Further, she has stipulated to over 15,330 drinking water violations and admits in her brief that the evidence is sufficient to support an additional fifty-seven sewage and wastewater violations in this case. The penalty imposed by the trial court is within the range allowed by statute; Norra therefore has no basis to claim that the evidence is insufficient. Her challenges to the "legal sufficiency" of the evidence are instead entirely new legal arguments for avoiding the civil penalties she was assessed. These legal arguments were not presented to the trial court, and thus have not been preserved for our review. Under these circumstances, we affirm the judgment of the trial court.

## All Citations

Not Reported in S.W.3d, 2008 WL 564061

## Footnotes

1    The civil penalty range for each violation is between $50 and $1,000 per day, per violation. *See* TEX. HEALTH & SAFETY CODE ANN. § 341.048(b) (Vernon 2001).

2    The civil penalty range for these violations is the same as that for drinking water violations. *Id.*

3    The State also argues that Chapter 41 of the Civil Practice & Remedies Code is inapplicable in a situation such as Norra's, in which penalties and fines have been imposed for statutory violations. The State suggests that the legislative history and findings make clear that "Chapter 41 was intended as a tort reform measure and not as a *sub silentio* repeal of penalty statutes."The State further indicates that Chapter 41 implicates only damages, and "statutory penalties and fines are not, and have never been, considered damages."Additionally, the State emphasizes that the Legislature has continued to amend and add new statutes including statutory penalties and fines since Chapter 41 was enacted; thus, "reading Chapter 41 to countermand statutes permitting or ordering statutory penalties and fines would be an absurd result."Finally, the State points out that Norra's due process challenge must fail because the seminal case examining this issue explicitly applies only to cases involving punitive damages. Indeed, comparing a punitive damages award and civil or criminal penalties that could be imposed for comparable misconduct provides an indicium of the excessiveness of the punitive damages award because a reviewing court should "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue."*BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 583, 116 S.Ct.

1589, 1603, 134 L.Ed.2d 809 (1996) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219 (1989); *see also* *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 428, 123 S.Ct. 1513, 1526, 155 L.Ed.2d 585 (2003) ("The third guidepost in *Gore* is the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.' "). Regardless of the persuasiveness of the State's arguments, however, we need not determine whether Chapter 41 applies to an award of civil penalties and fines or whether a due process analysis of the ratio of actual to punitive damages is appropriate in this case, because, as discussed *supra,* Norra failed to preserve these complaints for our review.

4 Norra acknowledges as much in her briefing:

> In the trial court, the parties stipulated to in excess of 15,000 drinking water violations by Ms. Norra, that is, violations of Chapter 341 of the Texas Health & Safety Code, and the regulations promulgated thereto. *The trial court was authorized to assess a civil penalty of not less than $50 nor more than $1,000 for each violation.* Each day of a continuing violation is a separate violation.
>
> The evidence will also support an inference of approximately fifty-seven sewage and wastewater violations by Ms. Norra, for which the trial court was authorized to assess a civil penalty of not less than $50 nor more than $1,000 for each violation. *The civil penalties awarded by the trial court were thus within the scope of the penalties awarded by statute.*

> (citations omitted, emphasis added).

5 At best, Norra challenges the excessiveness of the award against her. But the standard of review for an excessive damages complaint is factual sufficiency of the evidence. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998); *see also* *Healthcare Ctrs. of Tex., Inc. v. Rigby,* 97 S.W.3d 610, 623 (Tex.App.-Houston [14th Dist.] 2002), *disapproved of on other grounds, Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 853 (Tex.2005). Norra has provided no argument or authority regarding the factual sufficiency of the evidence and has thus waived any such challenge. *See* Tex.R.App. P. 38.1(h); *San Saba Energy, L.P. v. Crawford,* 171 S.W.3d 323, 338 (Tex.App.-Houston [14th Dist.] 2005, no pet.) Moreover, as noted *supra,* Norra has admitted to sufficient violations to justify the civil penalties assessed in this case.

6 "[A]bsent fundamental error, an appellate court has no discretion to reverse an otherwise error-free judgment based on a new argument raised for the first time on appeal." *Coleman v. Klöckner & Co. AG,* 180 S.W.3d 577, 587 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

266 S.W.3d 559
Court of Appeals of Texas,
Fort Worth.

PACIWEST, INC., Appellant and Cross–Appellee,

v.

WARNER ALAN PROPERTIES, LLC,
and Warner Alan/Westcliff, Ltd.,
Appellees and Cross–Appellants.

No. 2–07–443–CV. | Sept. 11, 2008.
| Rehearing Overruled Oct. 2, 2008.

**Synopsis**
**Background:** Purchaser of commercial real estate brought suit for specific performance and breach of sales contract when vendor refused to close transaction. The 96th District Court of Tarrant County, Jeff Walker, J., 2007 WL 5472774, granted purchaser summary judgment of specific performance. Vendor appealed. Purchaser appealed denial of damages.

**Holdings:** The Court of Appeals, Terrie Livingston, J., held that:

[1] statements contained in vendor's affidavit were legal conclusions rather than statements of fact;

[2] parties agreed to amendment of contract;

[3] purchaser waived provision allowing assumption of existing loan;

[4] purchaser was not barred by clean hands doctrine from seeking specific performance;

[5] specific performance was appropriate remedy;

[6] contract was supported by adequate consideration; and

[7] election of remedies did not preclude award of damages to purchaser.

Affirmed in part, reversed and remanded in part.

West Headnotes (28)

**[1]** **Appeal and Error**
 Allowance of Remedy and Matters of Procedure in General

Court of Appeals reviews a trial court's ruling sustaining or overruling objections to summary judgment evidence for an abuse of discretion.

15 Cases that cite this headnote

**[2]** **Appeal and Error**
 Abuse of Discretion

To determine whether a trial court abused its discretion, Court of Appeals must decides whether trial court acted without reference to any guiding rules or principles; in other words, Court of Appeals decides whether the act was arbitrary or unreasonable.

1 Cases that cite this headnote

**[3]** **Appeal and Error**
 Abuse of Discretion

Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.

2 Cases that cite this headnote

**[4]** **Judgment**
 Matters of Fact or Conclusions

Statements contained in vendor's summary judgment affidavit, submitted in litigation arising out of commercial real estate transaction, that parties never agreed on an amendment to the contract and that vendor's understanding was that amendments must be written, were legal conclusions, rather than statements of fact, and were properly excluded.

Cases that cite this headnote

**[5]** **Contracts**

- Intent of Parties

**Contracts**

- Necessity of Assent

In analyzing contract issues, a determination of whether a meeting of the minds has occurred is based on an objective standard, and evidence of a party's subjective belief about what the contract says or about whether an amendment occurred is not relevant to whether there was a meeting of the minds sufficient to amend the contract.

2 Cases that cite this headnote

[6] **Appeal and Error**

- Particular Orders or Rulings Reviewable in General

**Appeal and Error**

- Rendering Final Judgment

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented, and the reviewing court should render the judgment that the trial court should have rendered.

Cases that cite this headnote

[7] **Judgment**

- Weight and Sufficiency

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim.

Cases that cite this headnote

[8] **Judgment**

- Weight and Sufficiency

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.

Cases that cite this headnote

[9] **Appeal and Error**

- Judgment

When reviewing a summary judgment, Court of Appeals takes as true all evidence favorable to the nonmovant, and indulges every reasonable inference and resolve any doubts in the nonmovant's favor.

Cases that cite this headnote

[10] **Vendor and Purchaser**

- Modification by Subsequent Agreement

Vendor's letter indicating that purchaser could choose either to assume vendor's note or obtain third party financing for transaction was offer to purchaser to choose which option it wanted, which purchaser accepted by failing to send in assumption fees and by sending letter to vendor indicating that it would seek third party financing and would not assume vendor's loan, and once parties agreed to change financing terms, vendor could not unilaterally change them back to terms in original contract, absent purchaser's agreement.

Cases that cite this headnote

[11] **Vendor and Purchaser**

- Conditions and Provisos

Provisions in an earnest money contract that provide for termination of a contract if the buyer is unable to obtain financing are solely for the benefit of the buyer and may be waived by the buyer.

Cases that cite this headnote

[12] **Specific Performance**

- Enforcement by Purchaser

**Specific Performance**

- Necessity

Even a buyer who has not strictly complied with the financing terms in an earnest money contract, but who is nevertheless able to meet its obligations to close a transaction, may enforce specific performance against a seller who thereafter refuses to close the transaction on the ground that the buyer did not obtain the financing on the express terms provided for in the contract.

Cases that cite this headnote

**[13]  Vendor and Purchaser**
  Conditions and Provisos

Financing provision in contract for sale of commercial real estate, which permitted purchaser to assume vendor's loan, was for benefit of purchaser, and could be waived by it.

Cases that cite this headnote

**[14]  Specific Performance**
  Certainty

A contract is subject to specific performance if it contains the essential terms of a contract, expressed with such certainty and clarity that it may be understood without recourse to parol evidence.

Cases that cite this headnote

**[15]  Specific Performance**
  Discretion of Court

**Specific Performance**
  Form of Remedy

Specific performance is an equitable remedy that may be awarded at the trial court's discretion upon a showing of breach of contract.

10 Cases that cite this headnote

**[16]  Specific Performance**
  Inadequacy of Remedy at Law

**Specific Performance**
  Form of Remedy

Specific performance is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate.

5 Cases that cite this headnote

**[17]  Equity**
  He Who Comes Into Equity Must Come with Clean Hands

The doctrine of unclean hands operates as a bar to the equitable relief of specific performance.

2 Cases that cite this headnote

**[18]  Equity**
  He Who Comes Into Equity Must Come with Clean Hands

The party claiming unclean hands has the burden to show that it was injured by the other party's unlawful or inequitable conduct.

2 Cases that cite this headnote

**[19]  Equity**
  He Who Comes Into Equity Must Come with Clean Hands

The clean hands doctrine should not be applied unless the party asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine.

3 Cases that cite this headnote

**[20]  Equity**
  Nature of Unconscionable Conduct

Even if purchaser's letter requesting price reduction letter contained intentional falsehoods, clean hands doctrine did not bar purchaser from obtaining specific performance, since any harm suffered by vendor was due to its insistence that contract had not been validly amended to allow purchaser to purchase the property through third party financing rather than assumption of vendor's loan and by refusing to close unless loan was assumed rather than paid off.

1 Cases that cite this headnote

**[21]  Deposits and Escrows**
  Performance of Conditions or Occurrence of Contingency

Before a grantor or obligee may assert any rights under an escrow contract, it must show compliance with the conditions of the escrow, either actual performance or an offer to perform

that was prevented through no fault of the grantor or obligee.

Cases that cite this headnote

**[22] Contracts**
👉 Time as of the Essence of the Contract

An actual tender in strict compliance with the provisions of the contract, within the time allowed by the contract, is always required when a contract provides that time is of the essence unless it is shown that the defaulting party (1) prevented actual tender by the party attempting to perform or (2) when the defendant has repudiated the contract before the time for performance.

1 Cases that cite this headnote

**[23] Specific Performance**
👉 Nature and Grounds of Duty of Plaintiff

Upon showing either that the defaulting party (1) prevented actual tender by the party attempting to perform or (2) the defendant has repudiated the contract before the time for performance, a party seeking specific performance must only plead and prove that it is ready, willing, and able to perform its part of the contract according to its terms.

2 Cases that cite this headnote

**[24] Specific Performance**
👉 Necessity

Tender otherwise required for specific performance of commercial real estate transaction was excused because vendor clearly repudiated the contract by not only insisting that purchaser assume vendor's note after having agreed to all cash sale, but also by sending letter indicating that the contract was terminated.

Cases that cite this headnote

**[25] Vendor and Purchaser**
👉 Modification by Subsequent Agreement

Upon amendment of commercial real estate contract to provide that purchaser would pay off

vendor's loan at closing, purchaser was obligated to fund purchase price at closing if it failed to terminate during the bargained-for inspection period, and that obligation was consideration for contract.

Cases that cite this headnote

**[26] Specific Performance**
👉 Recovery of Compensation or Damages Instead of Specific Performance

The general rule is that damages constitute an alternative remedy available only when specific performance either is not sought or is not available.

4 Cases that cite this headnote

**[27] Specific Performance**
👉 Recovery of Damages in Addition to Specific Performance

In appropriate circumstances, a court may order, in addition to specific performance, payment of expenses incurred by plaintiffs as a result of a defendant's late performance, which are not considered breach of contract damages but are intended to equalize any losses occasioned by the delay by offsetting them with money payments.

1 Cases that cite this headnote

**[28] Election of Remedies**
👉 Inconsistency of Alternative Remedies

**Specific Performance**
👉 Recovery of Damages in Addition to Specific Performance

Purchaser who sought specific performance in breach of contract litigation arising out of commercial real estate transaction was not precluded by election of remedies doctrine from seeking post-closing damages for lost rental, increased construction costs and increased interest rate on third party financing; such damages were not in the nature of benefit of the bargain damages, but rather an accounting between the parties pending performance of the contract.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*562**  Decker, Jones, McMackin, McClane, Hall & Bates; Mark S. Dugan, Brian K. Yost, and Leslie L. Hunt, Fort Worth, TX, for Appellant/Cross-Appellee.

Carrington, Coleman, Sloman & Blumenthal, L.L.P.; Tim Gavin, Brett Kutnick, and Tim Chastain, Dallas, TX, for Appellees/Cross-Appellants.

PANEL: LIVINGSTON, DAUPHINOT, and McCOY, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### Introduction

This case involves competing motions for summary judgment in a suit over a failed **\*563**  real estate transaction. The trial court granted summary judgment for the purchaser, appellee Warner Alan/Westcliff, Ltd. (Westcliff), and appellee Warner Alan Properties, LLC (Warner Alan), Westcliff's predecessor-in-interest in the purchase and sale contract. It also ordered that Westcliff was entitled to specific performance of the contract as a remedy for the seller's default. The seller, appellant Paciwest, Inc., brings three issues on appeal in which it contends that the trial court erred by sustaining appellees' objections to Paciwest's summary judgment proof, by denying Paciwest's motion for summary judgment and granting appellees', and by granting appellees' request for specific performance. In a single issue in a cross-appeal, appellees contend that the trial court erred by determining that they were precluded from recovering damages in addition to specific performance because of the election of remedies doctrine. We affirm in part and reverse and remand in part.

### Background Facts

On July 28, 2005, Paciwest and Warner Alan entered into a Purchase Agreement under which Paciwest would sell Warner Alan its interest in the Westcliff Manor Apartments in

Fort Worth, Texas. The agreement provided that the purchase price for the property would be $5,780,000, payable as follows:

(a) a portion of the Purchase Price shall be paid by [Warner Alan's] assuming (subject to any limitations on personal liability applicable thereto) the outstanding principal balance owing on the Closing Date (hereinafter defined) on that certain Promissory Note (the "Note") dated October 10, 2002, in the original principal amount of $4,000,000, executed by [Paciwest]....

(b) The balance of the Purchase Price shall be payable at the Closing (hereinafter defined) in immediately available funds.

"Closing" was defined as "9:00 a.m. on the date fifteen (15) days after written approval of [Warner Alan's] assumption of the Note by [the] Lender." The contract also provided that closing could be extended if the lender had not timely sent the title company the signed documents required to evidence the lender's approval of the loan assumption.

Shortly after the parties executed the contract, Ted Broadfoot and Chris Neill of Warner Alan began discussing with Dziem "Jim" Nguyen of Paciwest the possibility that Warner Alan would seek third party financing rather than assume Paciwest's note. On August 6, 2005, Nguyen sent Warner Alan a letter to Neill's attention in which he stated the following:

I am writing you this letter just want to recap my conversation with you and Ted regarding financing of the sale:

1) You will run the number[s] and look into the alternative of paying off the existing note *including defeasance or yield maintenance* by financing with another third party; and you will decide which way this coming week and will send in the 2 assumption fees check of $3,000 each to [the lender] then *if assumption is still the choice.*

2) To accommodate that, I will prepare the assumption paper to send to [the lender] but will not send in until Wednesday or next Thursday morning....

....

4) *If you choose to assume the note,* Parking [repairs] will have to be done prior to the assumption's approval. Then, let me know to what extent you want that done and we will

need an **\*564** addendum to do the repair and increase the contract price. [Emphasis added.]

On August 17, 2005, Neill faxed Nguyen a letter stating, "Please allow this to serve as notice that we will not be assuming the current ... loan which is in place for Westcliff Manor. We will be placing new debt on this property through La Jolla Bank." Subsequently, on August 30, 2005, Nguyen sent a letter to Paciwest's lender, stating, "Please accept this letter as our intent to pay off Loan 01–0207891 within thirty (30) days (by September 30, 2005). At this time we are requesting payoff information be faxed to (972) 613–[illegible.]."

Nguyen faxed Broadfoot a proposed First Amendment to the contract on August 31, 2005. The amendment included the following terms: (1) Warner Alan would pay, in addition to the purchase price, "all the fees in connection with paying off the existing note early, including but not limited to the pre-payment yield maintenance," (2) Warner Alan's inspection period would end at 5 p.m. on September 7, 2005, and (3) closing would take place on or before September 30, 2005, with the option to extend for an additional fifteen days upon Warner Alan's depositing an additional, nonrefundable earnest money of $10,000. It also included a representation that neither party had defaulted under the contract up to that time and a statement that "[a]ll of [Paciwest's] warranty and indemnification to [Warner Alan] in the [a]greement with respect to the existing Loan documents now becomes null and void."

The next correspondence between the parties occurred on September 5, 2005, when Neill faxed a letter to Nguyen asking for a price reduction of $300,000. In the letter, Neill stated that "the appraiser has indicated that the value is much lower than expected and there is a lot of deferred maintenance outside of our original rehab scope." Additionally, he noted that "[t]he occupancy on the property has declined as has the economic collection" and that the "sizeable drop in collections is greatly impacting the value of the property." Neill goes on to state that

> [a]ll of these items are causing our lender to lower the amount they are willing to finance[.] While I fully admit that the property is a nice property in a good area[,] I also have to realistically point out that on paper the property is worth significantly less than 5[.]8 million and is in fact

worth 2.8 million at an 8 percent capitalization rate[.] We are willing to purchase a sizeable portion of the upside, but simply cannot put 2[.]5 million in cash in this deal[.] The unfortunate reality is that we are at a point where we can move forward and try to increase funding but the chances of that are slim [.] We want to do the deal but are at the 23rd hour and are running out of options and need some help from you.

Nguyen was angry when he received this letter and decided not to go forward with the transaction under any terms other than those in the original contract; in other words, Paciwest would perform its obligations under the contract only if Warner Alan was still able to assume Paciwest's note.

The next day, September 6, 2005, Broadfoot faxed Nguyen a letter with changes to the proposed First Amendment. In the cover letter, he noted that the lender had

> indicated that part of prepaying the notes is paying the accrued interest expense which is a full month regardless of prepay date. We do not want to double pay interest and therefore would not want to close anytime other than month end. Currently, our lender believes they will be ready for September 30th, **\*565** but in case they are not, we would want to extend for 30 days instead of 15.

The only changes marked on the amendment are the addition "to the best of their knowledge" to the end of the provision in which each party was to acknowledge that there had been no breach or default of the contract, the deletion of the provision that Paciwest's representations and warranties in the agreement about the existing loan documents are null and void, and the change from fifteen to thirty days on the extension date. According to Neill, Warner Alan did not think an amendment to the contract was necessary, but they "were trying to be accommodating."

Nguyen sent another letter on September 9, 2005, in which he stated that Paciwest could not approve either the price reduction requested by Warner Alan, nor the requested

modifications to the amendment. Thus, Nguyen said, "the contract stands unchanged, as written." On September 20, 2005, Warner Alan's attorneys sent a letter to Paciwest by fax and certified mail indicating that Warner Alan was "ready, willing and able to close this transaction on September 30, 2005" and that Westcliff, [1]

> the affiliate of [Warner Alan] to which the Contract will be assigned, will be present at the September 30 closing and will tender full performance of all its obligations under the Contract, including but not limited to full payment of the Purchase Price. The Note will be fully discharged out of the sale proceeds and any prepayment penalty will be paid by the purchaser. Therefore the net amount received by [Paciwest] will be the same as the net amount it would have received had the Note been assumed.

On September 28, 2005, Paciwest's attorney sent Warner Alan a letter indicating that the contract had automatically terminated by its own terms as of September 26, 2005 because Warner Alan had failed to obtain lender approval to assume Paciwest's loan. Neill and Broadfoot both attended the scheduled closing. Warner Alan wired $5,621,031.91 to the title company, representing the purchase price, less the initial escrow deposit of $35,000, rent and tax prorations, and a credit for security deposits held by Paciwest. Warner Alan also wired an additional $250,000 and had additional funds available if more money was needed. However, Paciwest did not attend and refused to close the transaction.

Appellees sued Paciwest on October 3, 2005, seeking specific performance of the contract and a declaratory judgment that (1) the contract did not terminate on September 26, 2005 or at any other time, (2) appellees are not in breach of the contract, (3) Westcliff can fulfill its obligations under the contract in an all-cash transaction as opposed to assuming the loan, (4) Paciwest breached and repudiated the contract by refusing to close and treating the contract as terminated, and (5) the September 30 closing date was in compliance with the contract terms. They also sought attorneys' fees. Paciwest timely filed an answer. Appellees amended their petition in March, October, and November 2006 to include claims for damages for (1) "the difference in interest rates and interest payments caused by [Paciwest's] failure to transfer the [p]roperty on September 30, 2005," (2) lost profits, management fees, and fair rental value of the property since September 30, 2005, and (3) damages for **\*566** increases in the cost of repair and improvement projects and the financing

of such projects. They also included an alternative prayer for relief for damages only.

Appellees filed a traditional motion for partial summary judgment on the liability and specific performance issues, reserving the damages issues for trial. Paciwest responded and also filed a competing traditional motion for summary judgment that would dispose of all of appellees' claims. The trial court granted appellees' motion, denied Paciwest's, and ordered the following:

> [It is] ORDERED, ADJUDGED, DECREED AND DECLARED that Warner Alan Properties, LLC has the right to pay a portion of the purchase price by paying off Paciwest's loan instead of assuming it; and it is further

> ORDERED, ADJUDGED, DECREED AND DECLARED that [Paciwest] breached the contract by failing to convey the Westcliff Manor Apartments ... on September 30, 2005; and it is further

> ORDERED, ADJUDGED, DECREED AND DECLARED that the Court GRANTS Warner Alan/ Westcliff, Ltd. specific performance and ORDERS [Paciwest] to perform the contract and convey the Westcliff Manor Apartments ... to Warner Alan/Westcliff, Ltd.; and it is further

> ORDERED, ADJUDGED, DECREED AND DECLARED that the only remaining issues to be determined at trial are the amount of [appellees'] damages caused by Paciwest's failure to convey the Westcliff Manor Apartments on September 30, 2005, and the amount of [appellees'] reasonable and necessary attorneys' fees and expenses.

Thus, after the trial court granted appellees' motion, the only issues remaining for trial were whether appellees were entitled to damages as well as specific performance of the contract.

Paciwest subsequently objected to appellees' damages expert and additionally argued that the contract did not provide for the remedy of damages as well as specific performance but rather that the two are mutually exclusive remedies under the contract. The trial court agreed, leaving attorneys' fees as the only issue to be decided. The parties then entered into a stipulation on attorneys' fees.

The trial court entered a final judgment incorporating all of its rulings and the parties' stipulation on attorneys' fees on

September 28, 2007. Appellees filed a notice of appeal on December 13, 2007, and Paciwest filed a notice of appeal on December 21, 2007. The parties later filed an agreed motion to realign the parties, which this court granted, making Paciwest the appellant and cross-appellee and Warner Alan and Westcliff appellees and cross-appellants.

## Issues Presented

In three issues, Paciwest contends that the trial court erred by sustaining appellees' objections to its summary judgment proof, by granting appellees' motion for partial summary judgment and denying Paciwest's motion for summary judgment, and by granting appellees' request for specific performance. In their cross-appeal, appellees contend that the trial court erred by refusing to allow them to recover incidental damages to compensate for Paciwest's delay in conveying the property.

## Objections to Summary Judgment Evidence

Appellees objected to several statements in Nguyen's affidavit offered by Paciwest as summary judgment evidence; the trial **\*567** court sustained some but not all of these objections. Specifically, Paciwest complains about the trial court's sustaining appellees' objections to the following statements: "There was never an agreement reached between the parties concerning an amendment to the Contract," and "It was Paciwest's understanding, which was in accordance with the express terms of the contract, that if an amendment or modification was not agreed to in writing that the amendment or modification was not finalized, nor enforceable."

 [1]  [2]  [3]  We review a trial court's ruling sustaining or overruling objections to summary judgment evidence for an abuse of discretion. *Garner v. Fidelity Bank, N.A.,* 244 S.W.3d 855, 859 (Tex.App.–Dallas 2008, no pet.); *Bd. of Trustees of Fire and Police Retiree Health Fund v. Towers, Perrin, Forster & Crosby, Inc.,* 191 S.W.3d 185, 192–93 (Tex.App.–San Antonio 2005, pet. denied); *see Reynolds v. Murphy,* 188 S.W.3d 252, 259–61 (Tex.App.–Fort Worth 2006, pet. denied), *cert. denied,* –––– U.S. ––––, 127 S.Ct. 1839, 167 L.Ed.2d 323 (2007). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine*

*Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.*

 [4]  Appellees objected to Nguyen's statement that the parties never agreed on an amendment to the contract as being a "legal conclusion." The trial court agreed. Paciwest contends that the trial court abused its discretion by sustaining this objection because it did not sustain its similar objection to a statement in Broadfoot's affidavit that "[i]n a subsequent conversation, Mr. Nguyen and I agreed that the closing would take place on September 30, 2005," or a statement by Neill in his affidavit that "Warner Alan and Paciwest orally agreed that Warner Alan could pay-off Paciwest's Note instead of assuming it." According to Paciwest, appellees opened the door to Nguyen's statement by introducing similar testimony by Neill and Broadfoot. Also, they contend that by sustaining appellees' objection but denying Paciwest's, the trial court prevented Paciwest from presenting conflicting evidence on the matter. We conclude and hold that the trial court did not abuse its discretion by sustaining appellees' objection to Nguyen's statement as a legal conclusion. Neither Neill's nor Broadfoot's statements attempt to broadly conclude that an amendment to the contract was or was not reached; they simply address the underlying facts of what terms were specifically agreed upon. In contrast, Nguyen's statement opines that no legally binding amendment was reached. This is more in the nature of a legal conclusion than a statement of fact. *See Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); *Souder v. Cannon,* 235 S.W.3d 841, 849 (Tex.App.–Fort Worth 2007, no pet.).

 [5]  Moreover, we also conclude and hold that the trial court did not abuse its discretion by sustaining appellees' objection to Nguyen's statement that Paciwest's understanding was that if an amendment or modification was not in writing, it was not enforceable, and that Paciwest's understanding was in accordance with the terms of the contract. To begin with, the part of the statement indicating that Paciwest's understanding is in accordance with the contract terms is an impermissible legal **\*568** conclusion. *See Brownlee,* 665 S.W.2d at 112; *Souder,* 235 S.W.3d at 849. Moreover, as Paciwest pointed out in its objection to the evidence, Paciwest's subjective intent is irrelevant to the issue of whether the parties agreed to change the contract terms. A determination of whether a meeting of the minds has occurred is based on an objective

standard; thus, evidence of Nguyen's subjective belief about what the contract says or about whether an amendment occurred is not relevant to whether there was a meeting of the minds sufficient to amend the contract. *See Cox v. S. Garrett, L.L.C.,* 245 S.W.3d 574, 579 (Tex.App.–Houston [1st Dist.] 2007, no pet.); *Copeland v. Alsobrook,* 3 S.W.3d 598, 604 (Tex.App.–San Antonio 1999, pet. denied).

We overrule Paciwest's third issue.

### Competing Motions for Summary Judgment

In its first issue, Paciwest challenges the summary judgment for appellees, contending that Westcliff is not entitled to specific performance because (1) the statute of frauds and section 9.4 of the contract prohibit enforcement of the contract under the terms proposed by appellee, (2) the trial court disregarded the contract's automatic termination provision and imposed additional obligations on the parties that were not included in the original contract, (3) Warner Alan did not have the unilateral right to change the contract's payment method from assumption to an all-cash transaction, (4) compliance with the contract by Warner Alan was still possible once it received notification from Paciwest that the contract would not be amended as requested, (5) specific performance is unavailable to Warner Alan because it has unclean hands, (6) specific performance is unavailable to Warner Alan because it did not establish that it properly tendered performance, and (7) the original contract is neither valid nor enforceable because it is not supported by consideration and lacks mutuality of obligation.

### 1. Standard of Review

[6] When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). The reviewing court should render the judgment that the trial court should have rendered. *Id.*

[7] [8] A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex.R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS*

*Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004); *see* Tex.R. Civ. P. 166a(b), (c).

[9] When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Mason,* 143 S.W.3d at 798. Questions of law are appropriate matters for summary judgment. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *Westchester Fire Ins. Co. v. Admiral Ins. Co.,* 152 S.W.3d 172, 178 (Tex.App.–Fort Worth 2004, pet. denied) (op. on reh'g).

### 2. Analysis

#### a. Appellees' Evidence of Amendment to Contract

**\*569** Paciwest's first four arguments rest on the assumption that there is no evidence showing the parties amended the contract to allow appellees to obtain third party financing instead of assuming Paciwest's loan.

The statute of frauds requires a real estate contract to be in writing and signed by the person against whom it is to be charged. Tex. Bus. & Com.Code Ann. § 26.01(a), (b) (4) (Vernon Supp.2008); *Chambers v. Pruitt,* 241 S.W.3d 679, 687 (Tex.App.–Dallas 2007, no pet.). Section 9.4 of the contract provides that

> [n]either this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

[10] The plain language of Nguyen's August 6, 2005 letter, which was signed by Nguyen and on Paciwest letterhead, indicates that Warner Alan could choose either to assume the loan or obtain third party financing (with payoff of defeasance or yield maintenance, in other words, any prepayment penalty);[2] Nguyen instructed that Warner Alan should pay the assumption fees if assumption was its choice. It is undisputed that Warner Alan did not pay the assumption fees. Thus, Nguyen's letter is an offer to Warner Alan to choose which option it wants. *See KW Constr. v. Stephens & Sons*

*Concrete Contractors, Inc.,* 165 S.W.3d 874, 883 (Tex.App.–Texarkana 2005, pet. denied) ("To prove a valid offer, a party must show (1) the offeror intended to make an offer; (2) the terms of the offer were clear and definite; and (3) the offeror communicated the essential terms of the offer to the offeree.").

Warner Alan accepted that offer not only by failing to send in the assumption fees but also by sending a written letter to Paciwest on August 17, 2005 indicating that it would seek third party financing and it would not assume Paciwest's loan. [3] Thus, the parties agreed in writing that Warner Alan would no longer be obligated to assume Paciwest's existing note. Once the parties agreed to change the financing terms, Paciwest could not unilaterally change them back to the terms in the original contract without evidence that Warner Alan subsequently agreed that the original terms of the contract would be effective. There is no such evidence in the summary judgment record.

In addition, Warner Alan's letters referencing a September 30 closing, along with **\*570** Nguyen's August 30 letter to Paciwest's lender, show an agreement by the parties to close no later than September 30. *See EP Operating Co. v. MJC Energy Co.,* 883 S.W.2d 263, 266 (Tex.App.–Corpus Christi 1994, writ denied). Moreover, a September 30 closing—two months after the effective date of the contract that originally called for lender approval of a loan assumption—would not have been unreasonable and, thus, could be implied. *See O'Farrill Avila v. Gonzalez,* 974 S.W.2d 237, 244 (Tex.App.–San Antonio 1998, pet. denied).

 **[11]** **[12]** Further, even if the writings between the parties are not sufficient to show an agreement by Paciwest to an all-cash transaction, provisions in an earnest money contract that provide for termination of a contract if the buyer is unable to obtain financing are solely for the benefit of the buyer and may be waived by the buyer. *See R. Conrad Moore & Assocs., Inc. v. Lerma,* 946 S.W.2d 90, 94–95 (Tex.App.–El Paso 1997, writ denied); *Renouf v. Martini,* 577 S.W.2d 803, 803–04 (Tex.Civ.App.–Houston [14th Dist.] 1979, no writ). Thus, even a buyer who has not strictly complied with the financing terms in an earnest money contract, but who is nevertheless able to meet its obligations to close a transaction, may enforce specific performance against a seller who thereafter refuses to close the transaction on the ground that the buyer did not obtain the financing on the express terms provided for in the contract. *See Advance Components, Inc. v. Goodstein,* 608 S.W.2d 737, 739–40 (Tex.Civ.App.–Dallas 1980, writ

ref'd n.r.e); *cf. Potcinske v. McDonald Prop. Invs.,* 245 S.W.3d 526, 530–31 (Tex.App.–Houston [1st Dist.] 2007, no pet.) (distinguishing *Advance Components* and holding that analysis of materiality of financing provisions for purposes of contract enforcement differs from analysis for purposes of contract formation).

 **[13]** Here, a reading of the entire contract shows that the financing provision, although negotiated, was for Warner Alan's benefit and Warner Alan waived its rights involving assumption of Paciwest's loan. The August 17, 2005 letter indicating that Warner Alan chose to pay off the loan rather than assume it, the September 6, 2005 letter enclosing changes to the proposed amendment and indicating that Warner Alan wanted the option to extend for thirty days to minimize interest payments, and the September 20, 2005 letter indicating that Warner Alan was ready to pay the purchase price and any prepayment penalty at closing all indicate Warner Alan's intention to waive the benefit of the assumption financing provisions, including the automatic termination provision.

Paciwest claims that the financing provisions in the contract could not be to appellees' benefit only because other provisions of the contract were dependent upon them and because an all-cash transaction would work a detriment to Paciwest in that it would not receive its tax and insurance reserves from the lender until up to seven days after closing, rather than at closing from the purchaser, as was contemplated between the parties in the contract. However, there is no evidence that the other provisions in the contract, such as the closing date, were tied to assumption for any particular reason other than to facilitate the closing date as quickly as possible, which purpose was not thwarted by the all-cash transaction. Additionally, Paciwest offered no evidence that a seven-day delay in receiving its escrow from the lender would have any material or detrimental effect on Paciwest. Accordingly, we conclude and hold that either (a) sufficient writings indicated an agreement to an all-cash transaction closing on or before September 30 or **\*571** (b) Warner Alan was entitled to waive the benefit of the financing provisions to its benefit and proceed with an all-cash transaction.

**b. Whether Westcliff Is Entitled to Specific Performance**

Paciwest contends that Westcliff is not entitled to specific performance because Warner Alan's wrongful conduct in sending the price reduction letter is what caused the failure of the transaction and because Westcliff failed to tender performance, which Paciwest claims is a prerequisite to

specific performance in this case, because Westcliff did not tender the correct purchase price at closing.

 **[14]**    A contract is subject to specific performance if it contains the essential terms of a contract, expressed with such certainty and clarity that it may be understood without recourse to parol evidence. *Johnson v. Snell,* 504 S.W.2d 397, 398 (Tex.1973); *Rus–Ann Dev., Inc. v. ECGC, Inc.,* 222 S.W.3d 921, 927–28 (Tex.App.–Tyler 2007, no pet.) (holding that lack of closing date in option contract did not preclude enforcement by specific performance). We have already determined that the summary judgment record shows that the original written contract was validly amended, in writing, to provide that Warner Alan could pay the purchase price via third party financing, rather than assumption of Paciwest's loan and that the parties would close within a reasonable time, no later than September 30, 2005.

 **[15]**    **[16]**    Specific performance is an equitable remedy that may be awarded at the trial court's discretion upon a showing of breach of contract. *Kress v. Soules,* 152 Tex. 595, 261 S.W.2d 703, 704 (1953); *Bell v. Rudd,* 144 Tex. 491, 191 S.W.2d 841, 843 (1946); *Stafford v. S. Vanity Magazine, Inc.,* 231 S.W.3d 530, 535 (Tex.App.–Dallas 2007, pet. denied). Specific performance is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate. *Stafford,* 231 S.W.3d at 535; *Scott v. Sebree,* 986 S.W.2d 364, 368 (Tex.App.–Austin 1999, pet. denied).

### i. Unclean Hands

 **[17]**    **[18]**    The doctrine of unclean hands operates as a bar to the equitable relief of specific performance. *Stafford,* 231 S.W.3d at 536 n. 4; *Lazy M Ranch, Ltd. v. TXI Operations LP,* 978 S.W.2d 678, 683 (Tex.App.–Austin 1998, pet. denied). The party claiming unclean hands has the burden to show that it was injured by the other party's unlawful or inequitable conduct. *Stafford,* 231 S.W.3d at 536 n. 4; *Willis v. Donnelly,* 118 S.W.3d 10, 38 (Tex.App.–Houston [14th Dist.] 2003), *aff'd in part and rev'd in part on other grounds,* 199 S.W.3d 262, 278–79 (Tex.2006).

 **[19]**    **[20]**    The evidence is disputed as to whether the price reduction letter contains intentional falsehoods; however, even if it does, Westcliff is not barred from obtaining specific performance. The clean hands doctrine should not be applied unless the party asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine. *Dunnagan*

*v. Watson,* 204 S.W.3d 30, 41 (Tex.App.–Fort Worth 2006, pet. denied). Here, the evidence shows that any harm suffered by Paciwest was its own doing; it had no obligation to lower the purchase price and it rejected Warner Alan's attempt to do so. Ultimately, by failing to terminate during the inspection period, Warner Alan obligated itself and Westcliff to the purchase price as set forth in the contract. However, by insisting that the contract had not been validly amended to allow Warner Alan to purchase the property through third party **\*572** financing rather than assumption and by refusing to close unless the loan was assumed rather than paid off, Paciwest was responsible for its own default under the contract. Accordingly, we conclude and hold that the trial court did not abuse its discretion in determining that Westcliff was not barred from seeking specific performance by the "unclean hands" doctrine. *See Stafford,* 231 S.W.3d at 536 n. 4; *Dunnagan,* 204 S.W.3d at 41.

### ii. Tender of Performance

 **[21]**    **[22]**    **[23]**    Before a grantor or obligee may assert any rights under an escrow contract, it must show compliance with the conditions of the escrow—actual performance—or an offer to perform that was prevented through no fault of the grantor or obligee. *Bell,* 191 S.W.2d at 844; *Roundville Partners, L.L.C. v. Jones,* 118 S.W.3d 73, 79 (Tex.App.–Austin 2003, pet. denied). In cases in which the seller's and buyer's contract obligations are mutual and dependent, in that a deed is required to be delivered upon tender of the purchase price, the purpose of a tender satisfies two purposes: first, it invokes the seller's obligation to convey and places him in default if he fails to do so; second, it satisfies the fundamental prerequisite of specific performance—that the buyer show that he has done or offered to do, or is then ready and willing to do, all the essential and material acts which the contract requires of him. *Krayem v. USRP (PAC), L.P.,* 194 S.W.3d 91, 94 (Tex.App.–Dallas 2006, pet. denied); *Roundville,* 118 S.W.3d at 79. An actual tender in strict compliance with the provisions of the contract, within the time allowed by the contract, is always required when a contract provides that time is of the essence unless it is shown that the defaulting party (1) prevented actual tender by the party attempting to perform or (2) when, as here, the defendant has repudiated the contract before the time for performance. *Krayem,* 194 S.W.3d at 94; *Roundville,* 118 S.W.3d at 79–81.[4] Upon either showing, a party seeking specific performance must only plead and prove that it is ready, willing, and able to perform its part of the contract according to its terms. *Rus–Ann Dev., Inc.,* 222 S.W.3d at 927; *17090 Parkway, Ltd. v.*

*McDavid,* 80 S.W.3d 252, 258 (Tex.App.–Dallas 2002, pet. denied).

 **[24]**  Here, the summary judgment evidence shows that regardless of whether appellees actually tendered performance in strict compliance with the contract terms, such tender is excused because Paciwest clearly repudiated the contract by not only insisting that appellees continue the assumption process but also by sending the September 28, 2005 letter indicating that the contract was terminated.[5] *See Jenkins v. Jenkins,* 991 S.W.2d 440, 447 (Tex.App.–Fort Worth 1999, pet. denied) (stating that repudiation "consists of words or actions by a contracting party that indicate he is not going to perform his contract in the future"). Appellees' pleadings indicate that they "remain ready, willing and able to pay the purchase price, [and] any prepayment penalty, and will perform any other obligations they have." Moreover, they presented summary judgment evidence **\*573** that they were ready, able, and willing to perform these obligations, including paying the entire prepayment penalty,[6] on September 30, 2005. Thus, we conclude and hold that the trial court did not abuse its discretion by determining, upon the undisputed facts set forth in the summary judgment record, that specific performance is an appropriate remedy for appellees. *See Longfellow v. Racetrac Petroleum, Inc.,* No. 02–06–00124–CV, 2008 WL 2404233, at \*2–3, 5 (Tex.App.–Fort Worth June 12, 2008, pet. denied) (mem.op.).

### c. Validity and Enforceability of Original Contract

 **[25]**  Paciwest additionally contends that the original contract is neither valid nor enforceable because it is not supported by consideration and lacks mutuality of obligation. Specifically, Paciwest claims that the contract obligates Warner Alan to purchase the property only if it receives the lender's approval of the loan assumption but that it is not under any obligation to seek such approval and that it could simply terminate by failing to seek such approval. Thus, according to Paciwest, it had the obligation to sell the property at all times, but Warner Alan never had the obligation to purchase it.

Paciwest's argument fails to take into account the evidence showing that it had agreed to amend the contract to provide that Warner Alan would pay off Paciwest's loan at closing; upon that agreement, Warner Alan was obligated to fund the purchase price at closing if it failed to terminate during the bargained-for inspection period. Moreover, numerous contract provisions bind both Warner Alan and Paciwest.

Section 1.3, describing the initial escrow to be deposited by Warner Alan, specifically states that if Warner Alan terminates the contract by right under the contract, Paciwest would be entitled to $100 of the initial escrow deposit as independent consideration for the contract.

As to Paciwest's argument that Section 4.4 of the contract—which states in one part that Warner Alan's "failure to obtain Lender's approval of the proposed assumption in a manner consistent with [section 4.4] shall not be a default by [Warner Alan] under [the contract], but shall entitle [Warner Alan] to terminate [the contract], [and] receive a refund of the Escrow Deposit"—allowed Warner Alan to avoid any obligation under the contract by simply failing to seek the lender's approval of the loan assumption, Paciwest reads this single sentence of section 4.4 out of context. The beginning of the provision obligates Warner Alan to,

> [w]ithin five (5) business days after [its] receipt of Lender's list of required information, ... *apply to Lender for its consent* to [Warner Alan's] acquisition of the Property pursuant to this Agreement and for permission to assume the Note, and *thereafter [to] diligently seek to obtain Lender's approval of such application.* [Emphasis added.]

Thus, even the provision pointed to by Paciwest, when read in its entirety, shows that both parties were mutually obligated under the contract, regardless of the termination rights available to Warner Alan. We conclude and hold that the summary judgment record shows that the contract, as initially entered into and as amended, was supported by adequate consideration. *See Alex Sheshunoff Mgmt. Svcs., Inc. v. Johnson,* 209 S.W.3d 644, 658 (Tex.2006).

We overrule Paciwest's first issue.

### d. Whether Trial Court Should Have Granted Paciwest's Motion

 **\*574** Paciwest's second issue incorporates the arguments in its first issue that Westcliff is not entitled to specific performance of the contract. However, it also argues that if this court does hold that the trial court did not err by determining that Westcliff is entitled to specific performance, there are nevertheless fact issues precluding summary judgment. Specifically, it contends that there are fact issues

concerning "whether any agreement existed as to the different terms or modifications alleged by Warner Alan and accepted by the Trial Court." However, Paciwest cites no other evidence that was not already discussed in its first issue, and we discern no fact issues precluding the trial court's grant of summary judgment in appellees' favor. Thus, we overrule Paciwest's second issue.

### Cross–Appeal

In a single issue on cross-appeal, appellees challenge the trial court's ruling that the only relief to which they are entitled is specific performance.

This ruling occurred as a result of Paciwest's *Robinson* challenge to appellees' damages expert. The trial court held a hearing on Paciwest's objections on May 17, 2007. At the hearing, the trial court specifically directed the parties to brief whether appellees were entitled to additional damages having elected to seek, and having obtained, specific performance.

After taking the issue under advisement, on June 18, 2007, the trial court sent the parties a letter stating that

> [i]t appears that Texas law favors [Paciwest's] Objections to Reliability and Foundation of Opinions of Dr. Frank Voorvaart. I agree with [Paciwest] that [appellees'] remedies are limited to those allowed by the terms of the contract and there is no contractual foundation for Dr. Voorvaart's damage opinions because [appellees] sought and obtained summary judgment for specific performance.

The trial court's order incorporating this ruling, dated June 26, 2007, states that appellees,

> having sought and obtained a summary judgment for specific performance, have elected specific performance as their remedy;
>
> Thus, the law and relevant contract provisions do not provide for the recovery of the additional damages sought by [appellees] in this case;

> That the matters to which Dr. Voorvaart was designated to testify are directed at these additional damages;
>
> That [Paciwest's] [o]bjections are well taken and should be SUSTAINED, that Dr. Voorvaart's opinions should be STRICKEN, and that [appellees] should be prohibited from presenting the testimony and opinions of Dr. Voorvaart at the time of trial. It is therefore,
>
> ORDERED, ADJUDGED, and DECREED that [Paciwest's] Objections and Supplemental Objections to Reliability and Foundation of Opinions of Dr. Frank Voorvaart are SUSTAINED, Dr. Voorvaart's opinions are hereby STRICKEN, and that [appellees] are prohibited from presenting any of the Dr. Voorvaart's testimony and opinions at trial.

Although Paciwest contends that the trial court could have based its ruling on its other objections to Dr. Voorvaart's testimony, construing the trial court's order as a whole to give effect to all provisions, we conclude that the trial court's ruling was based solely on its conclusion that damages were no longer available to appellees after they had already elected to seek, and had obtained, specific performance as a remedy. *See Shanks v. Treadway,* 110 S.W.3d 444, 447 (Tex.2003). Thus, we will **\*575** confine our analysis to the trial court's specific ruling. [7]

 **[26]**     **[27]**     **[28]**     The general rule is that damages constitute an alternative remedy available only when specific performance either is not sought or is not available. *Foust v. Hanson,* 612 S.W.2d 251, 253 (Tex.Civ.App.–Beaumont 1981, no writ); *see Heritage Housing Corp. v. Ferguson,* 674 S.W.2d 363, 365 (Tex.App.–Dallas 1984, writ ref'd n.r.e.). But in appropriate circumstances, the court may order, in addition to specific performance, payment of expenses incurred by plaintiffs as a result of a defendant's late performance. *Heritage Housing Corp.,* 674 S.W.2d at 365–66; *Foust,* 612 S.W.2d at 253–54. This compensation is not considered breach of contract damages, but rather "equalizes any losses occasioned by the delay by offsetting them with money payments." *Heritage Housing Corp.,* 674 S.W.2d at 366. Thus, for example, a purchaser may recover the rental value of property from the time of its demand for performance and tender of the purchase price. *Id.*

Here, appellees pled for, among other things, lost rental, increased construction costs, and an increased interest rate on their third party financing as a result of Paciwest's delay in

performing its obligations under the contract. Because post-closing damages such as these are not in the nature of benefit of the bargain damages, but rather an accounting between the parties pending performance of the contract, we conclude and hold that the trial court erred by determining that appellees were precluded from seeking and presenting evidence as to these types of damages at trial.

We sustain appellees' sole issue in their cross-appeal.

## Conclusion

Having overruled Paciwest's three issues, we affirm the part of the trial court's judgment incorporating its summary judgment rulings in favor of appellees. Having sustained appellees' sole issue in their cross-appeal, however, we reverse that part of the trial court's judgment barring appellees from recovering damages attributable to Paciwest's delay in performing the contract. We remand that part of the case to the trial court for consideration of Paciwest's other objections to the testimony of appellees' damages expert and for further proceedings as to those alleged damages consistent with this opinion.

**All Citations**

266 S.W.3d 559

## Footnotes

1 Warner Alan assigned its rights and duties as purchaser under the contract to Westcliff sometime in September 2005. The assignment document does not show the exact date the assignment occurred.

2 *See River E. Plaza, L.L.C. v. Variable Annuity Life Ins. Co.,* 498 F.3d 718, 719, 721 (7th Cir.2007); George Lefcoe, *Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment,* 28 Real Est. L.J. 202, 202–03 (2000).

3 Paciwest contends that any agreement the parties did come to was indefinite because Warner Alan did not specifically agree in writing to pay the prepayment penalty. However, Warner Alan's letter indicating that it chose to seek third party financing did not indicate that it would not pay any prepayment penalty, nor did it attempt to change the terms of Nguyen's offer in any way. *Cf. Cessna Aircraft Co. v. Aircraft Network, L.L.C.,* 213 S.W.3d 455, 465–466 (Tex.App.–Dallas 2006, pets. denied) ("An acceptance must be identical to the offer, or there is no binding contract."); *Harris v. Balderas,* 27 S.W.3d 71, 77 (Tex.App.–San Antonio 2000, pet. denied) ("If the purported acceptance contains terms that materially change the offer, the acceptance is actually a rejection and counter-offer."). Additionally, by failing to pay the assumption fees, Warner Alan indicated its acceptance of Nguyen's offer on the terms outlined in his letter, which include the payment of any prepayment penalty. *See United Concrete Pipe Corp. v. Spin–Line Co.,* 430 S.W.2d 360, 364 (Tex.1968) (holding that performance may be valid acceptance).

4 *See also Rus–Ann Dev., Inc. v. ECGC, Inc.,* 222 S.W.3d 921, 927 (Tex.App.–Tyler 2007, no pet.); *17090 Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 258 (Tex.App.–Dallas 2002, pet. denied); *Wilson v. Klein,* 715 S.W.2d 814, 822 (Tex.App.–Austin 1986, writ ref'd n.r.e.).

5 This case is thus distinguishable from *Riley v. Powell,* in which this court held that actual tender was required when the seller decided not to close after reviewing closing documents drafted by the purchaser, a real estate broker who also represented the seller. 665 S.W.2d 578, 580–81 (Tex.App.–Fort Worth 1984, writ ref'd n.r.e.).

6 Neill averred in his affidavit that additional funds were available at closing to supplement the $250,000 paid toward the prepayment penalty.

7 Accordingly, appellees were not required to make an offer of proof to preserve this argument, as Paciwest contends. *See Echols v. Wells,* 510 S.W.2d 916, 919 (Tex.1974); *Lewis v. Lewis,* 853 S.W.2d 850, 852 (Tex.App.–Houston [14th Dist.] 1993, no writ).

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Cherukula v. Spradling, Tex.App.-Austin, April 14, 2006

676 S.W.2d 689
Court of Appeals of Texas,
Amarillo.

Mellane A. PARSON, Appellant,
v.
Jamie R. WOLFE, Appellee.

No. 07–83–0020–CV. | Aug. 30, 1984.

The sister of a woman who had died intestate before a contract for the sale of real estate of which she was part owner could be closed, claimed that she inherited one-half of the decedent's interest in the land and was entitled to the proceeds from that interest. The decedent's husband claimed that, under the doctrine of equitable conversion, the land was to be treated as personalty and he was thus entitled to all proceeds from his wife's interest. The 110th Judicial District Court, Floyd County, George W. Miller, J., rendered judgment favorable to the husband as heir of personalty, and the sister appealed. The Court of Appeals, Countiss, J., held that: (1) a four-corners reading of the contract led to the conclusion that a liquidated damages clause was intended as the measure of the time that was reasonable for the buyer's performance, and not as a condition that, if unfulfilled, would bar specific performance; (2) since sellers had the option to require performance or accept liquidated damages upon the purchaser's default, the contract was capable of enforcement by specific performance by either party; and (3) the doctrine of equitable conversion was applicable and the decedent's interest in the land was to be treated as personal property which passed to her husband upon her death under the laws of descent and distribution.

Affirmed.

West Headnotes (11)

**[1]** **Equitable Conversion**
 Realty into personalty in general
**Equitable Conversion**
 Personalty into realty

Equitable conversion is that change in nature of property by which, for certain purposes, realty is considered as personalty and personalty is considered as realty, and property is transmissible as so considered.

1 Cases that cite this headnote

**[2]** **Equitable Conversion**
 In general; nature and grounds of doctrine

The doctrine of equitable conversion is grounded on maxim that equity regards as done that which in fairness and good conscience should be done.

Cases that cite this headnote

**[3]** **Equitable Conversion**
 Conveyances and Contracts
**Equitable Conversion**
 Directions in Will

Equitable conversion may occur by will or by contract.

Cases that cite this headnote

**[4]** **Equitable Conversion**
 Directions in Will

In testamentary situations, doctrine of equitable conversion is used to carry out intent of testator who directs that certain realty be sold or purchased.

2 Cases that cite this headnote

**[5]** **Equitable Conversion**
 Conveyances and Contracts

In equitable conversion by contract, doctrine is used to decide status of parties' interests during period between execution of contract of sale and actual transfer of legal title.

2 Cases that cite this headnote

**[6]** **Equitable Conversion**
 Conveyances and Contracts

When there is equitable conversion by contract, purchaser of land is regarded in equity as owner

of land and debtor for purchase money, and vendor is secured creditor having legal position not unlike that of mortgagee.

1 Cases that cite this headnote

**[7]     Equitable Conversion**
    Conveyances and Contracts

Pivotal question, when determining whether equitable conversion by contract has occurred, is whether contract is specifically enforceable.

Cases that cite this headnote

**[8]     Contracts**
    Conditions Precedent in General

Whether condition precedent exists is determined from reading of entire contract.

Cases that cite this headnote

**[9]     Specific Performance**
    Contracts subject to conditions

Four-corners reading of contract containing clause stating that it was "contemplated" that purchaser of real property would obtain loan, led to conclusion that clause was intended as measure of time that was reasonable for buyer's performance, and not as condition that, if unfulfilled, would bar specific performance, where word "contemplated" indicated that loan was anticipated and permissible but not condition precedent, and parties used word "agree" when intending to create binding duty; thus, the contract was specifically enforceable by either sellers or buyer, and proceeds from sale contracted for were subject to equitable conversion.

1 Cases that cite this headnote

**[10]     Specific Performance**
    Mutuality of remedy

In contract for sale of real property, option to perform or pay damages belonged to sellers, who had option to require performance or accept liquidated damages upon purchaser's default in accordance with liquidated damages clause;

thus, there was no lack of mutuality of remedies to bar specific enforcement by either party, and proceeds resulting from such enforcement were subject to equitable conversion.

1 Cases that cite this headnote

**[11]     Equitable Conversion**
    Conveyances and Contracts

Doctrine of equitable conversion was applicable where one of owners of real estate under contract to be sold died intestate before the contract could be closed and contract was specifically enforceable; thus, decedent's interest in land was to be treated as personal property and passed to her husband under laws of descent and distribution. V.A.T.S. Probate Code, § 38(b), par. 2.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*690**  Richard F. Stovall, Stovall & Laney, P.C., Plainview, for appellant.

Lucian Morehead, Morehead, Sharp & Tisdel, Plainview, for appellee.

Before REYNOLDS, C.J., and COUNTISS and BOYD, JJ.

**Opinion**

COUNTISS, Justice.

This is an equitable conversion case. Dissatisfied with a judgment favorable to the heir of the personalty, the heir of one-half of the realty advances two points of trial court error. We affirm.

Shawna Wolfe, now deceased, and her sister, appellant Mellane A. Parson, contracted on September 17, 1981, to sell 160 acres of their separate realty in Floyd County to their paternal uncle. Before the **\*691** sale could be closed Mrs. Wolfe died, intestate and childless. After her death, the sale was closed and the proceeds in dispute were placed in the registry of the court.

The dispute is between Mrs. Wolfe's surviving husband, appellee Jamie R. Wolfe, and her sister, Mrs. Parson, her only heirs at law. Mrs. Parson says she inherited one-half of Mrs. Wolfe's interest in the land when Mrs. Wolfe died and she is entitled to the proceeds from that interest. Mr. Wolfe says the land must be treated as personalty, under the doctrine of equitable conversion, and he is entitled to all proceeds from Mrs. Wolfe's interest. [1] Thus, the single issue raised by Mrs. Parson's points of error is whether the doctrine of equitable conversion is applicable. If it is, Mrs. Wolfe's interest in the land is to be treated as personalty under the laws of descent and distribution and it belongs to Mr. Wolfe.

 **[1]**   **[2]**   **[3]**   **[4]**   **[5]**   Equitable conversion is generally defined as that change in the nature of property by which, for certain purposes, realty is considered as personalty or personalty is considered as realty, and the property is transmissible as so considered. *Toledo Soc. for Crippled Children v. Hickok,* 152 Tex. 578, 261 S.W.2d 692, 698 (1953); *Sanderson v. Sanderson,* 130 Tex. 264, 109 S.W.2d 744, 748 (1937). The doctrine, developed in the English Court of Chancery over three hundred years ago, is grounded on the maxim that equity regards as done that which in fairness and good conscience should be done. *Lampman v. Sledge,* 502 S.W.2d 957, 959 (Tex.Civ.App.—Waco 1973, writ ref'd n.r.e.); Simpson, *Legislative Changes in the Law of Equitable Conversion by Contract,* 44 Yale L.J. 559, 560 (1935). Equitable conversion may occur by will or by contract. *Simpson, supra,* at 561; *see Toledo Soc., supra.* In testamentary situations, the doctrine is used to carry out the intent of the testator who directs that certain realty be sold or purchased. *Boulware v. Sinclair Prairie Oil Co.,* 219 S.W.2d 536, 538 (Tex.Civ.App.—Beaumont 1949, writ ref'd); *Simmons v. O'Connor,* 149 S.W.2d 1107, 1113 (Tex.Civ.App.—Fort Worth 1941, writ dism'd judgmt cor.). *See generally* 1 H. TIFFANY, REAL PROPERTY §§ 297–98 (3rd ed. 1939). In equitable conversion by contract, however, the doctrine is used to decide the status of the parties' interests during the period between execution of the contract of sale and actual transfer of legal title. *See generally TIFFANY, supra,* §§ 307–310. It is utilized, for example, to allocate the increase or decrease in value of the property during this period, *Guzman v. Acuna,* 653 S.W.2d 315, 319 (Tex.App.—San Antonio 1983, writ dism'd), or, as in this case, to determine how the realty or personalty passes upon the death of either the vendor or vendee. *Toledo Soc., supra; Lampman, supra; Hardcastle v. Sibley,* 107 S.W.2d 432, 437 (Tex.Civ.App.—El Paso 1937, writ ref'd). [2]

 **[6]**   **[7]**   When there is an equitable conversion by contract, the purchaser of land is regarded in equity as owner of the land and debtor for the purchase money, and the vendor is a secured creditor "having a legal position not unlike that of a mortgagee." *Simpson, supra* at 559. As indicated **\*692** by the quotation in marginal note 2, the pivotal question, when determining whether an equitable conversion by contract has occurred, is whether the contract is specifically enforceable. *Accord, Sanderson v. Sanderson, supra; Guzman v. Acuna, supra; Willie v. Waggoner,* 181 S.W.2d 319, 322 (Tex.Civ.App.—Austin 1944, writ ref'd).

In this case, the contract is properly executed and contains all of the provisions necessary in order for it to be binding on, and specifically enforceable by, either the sellers or the buyer. Mrs. Parson advances two arguments to the contrary, however. First, she points to the following provision in the contract:

> It being contemplated that Purchaser will obtain a loan upon the security of the real property above described to provide a part of the consideration hereinabove provided for, the reasonable time hereinafter accorded Purchaser for performance of the obligation required of him by this Contract shall include a reasonable time for processing and consummation of such loan.

That provision, she says, was a condition precedent unfulfilled when Mrs. Wolfe died; thus specific performance was not a viable option at the critical time.

 **[8]**   **[9]**   Whether a condition precedent exists is determined from a reading of the entire contract. *Hudson v. Wakefield,* 645 S.W.2d 427, 430 (Tex.1983). In this case, the choice of the word "contemplated" indicates that a loan was anticipated, and permissible, but it does not indicate that a loan was a condition precedent. *See, e.g., Wall v. Ayrshire Corp.,* 352 S.W.2d 496, 500 (Tex.Civ.App.—Houston 1961, no writ); *Zucht v. Stewart Title Guaranty Co.,* 207 S.W.2d 414, 418 (Tex.Civ.App.—San Antonio 1947, writ dism'd); *Newsome v. Brown,* 157 S.W. 203, 204 (Tex.Civ.App.—Texarkana 1913, no writ). Additionally, we note that the parties used the word "agree" in other portions of the contract when intending to create a binding duty. *Dauray v. Gaylord,* 402 S.W.2d 948, 950–51 (Tex.Civ.App.—Dallas 1966, writ ref'd n.r.e.). Thus, from a four-corners reading of the contract,

we must conclude that the clause was intended as a measure of the time that was reasonable for the buyer's performance, and not as a condition that, if unfulfilled, would bar specific performance. *Compare with Berman v. Rife,* 644 S.W.2d 574, 576 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.); *Lampman, supra; Faulkner v. Otto,* 230 S.W. 447, 448 (Tex.Civ.App.—Amarillo 1921, writ dism'd).

 **[10]** Mrs. Parson's second argument is grounded on the contract's liquidated damages clause, which says:

> As earnest money for prompt performance of this Contract on his part, Seller [sic] shall deposit in escrow, together with copy of this Contract, in First National Bank, Floydada, Texas, the sum of $5,000.00, and in event that Purchaser shall fail or refuse, upon tender of performance by Sellers, to carry out and perform the terms of this Contract, Sellers may, at their election, declare this Contract terminated, whereupon such sum of $5,000.00 shall forfeit and become the absolute property of Sellers as liquidated damages for breach of this Contract.

She argues that, because of this provision, there is no mutuality of remedies; therefore the contract cannot be specifically enforced. She cites *Willie v. Waggoner,* 181 S.W.2d 319 (Tex.Civ.App.—Austin 1944, writ ref'd), in which it was held there was no equitable conversion because a liquidated damages provision under the contract made specific performance impossible. In that case, however, the option to perform or pay damages belonged to the purchaser. *Id.* at 322. In our case, it belongs to the sellers, who have the option to require performance or accept liquidated damages, upon the purchaser's default. Thus, the contract was capable of enforcement by specific performance by either party. *Sanderson, supra; Gala Homes, Inc. v. Fritz,* 393 S.W.2d 409, 411 (Tex.Civ.App.—Waco 1965, writ ref'd n.r.e.).

 **[11]** We conclude that the doctrine of equitable conversion is applicable to this case, that Mrs. Wolfe's interest in the land **\*693** is to be treated as personal property and that, upon her death, it passed to her husband under the laws of descent and distribution. Points of error one and two are overruled.

The judgment is affirmed.

**All Citations**

676 S.W.2d 689

---

Footnotes

1   Descent and distribution in this case is dictated by § 38(b) 2 of the Probate Code, which states:
    2. If the deceased have no child or children, or their descendants, then the surviving husband or wife shall be entitled to all the personal estate, and to one-half of the lands of the intestate, without remainder to any person, and the other half shall pass and be inherited according to the rules of descent and distribution....
    Tex.Prob.Code Ann. § 38(b)(2) (Vernon 1980).

2   Professor Simpson describes the differences in the two applications as follows:
    > "Equitable conversion by will is wholly a part of the law of wills, descent and distribution; equitable conversion by contract has a wide importance in the law of vendor and purchaser. The former depends upon the intention of the testator; the latter does not depend upon intention, but rather upon rules of law as to consequences of the right to specific performance of a land contract."
    Simpson, *Legislative Changes in the Law of Equitable Conversion by Contract,* 44 Yale L.J. 559, 561 n. 10 (1935).

---

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5076294
Only the Westlaw citation is currently available.
Court of Appeals of Texas,
Houston (1st Dist.).

Sandra Perez, Appellant

v.

Brian Williams, Appellee

NO. 01–14–00504–CV    |
Opinion issued August 27, 2015

**Synopsis**
**Background:** Father filed petition in a Suit Affecting the Parent-Child Relationship (SAPCR), seeking to be named sole managing conservator of child and asking that mother be ordered to pay child support. Mother counter-petitioned for divorce, alleging she had an informal marriage with father. The 257th District Court, Harris County, entered summary judgment finding that no informal marriage existed and, after bench trial, named mother and father joint managing conservators and granted father exclusive right to designate child's primary residence. Mother appealed.

**Holdings:** The Court of Appeals, Evelyn V. Keyes, J., held that:

[1] trial court acted within its discretion in denying mother's motion to substitute legal counsel;

[2] trial court was not required to take judicial notice of motions and written agreements which were filed in connection with father's separate custody dispute with his ex-wife;

[3] trial court acted within its discretion in excluding photographs depicting bruises that mother alleged she received from father; and

[4] trial court acted within its discretion in awarding primary conservatorship rights to father.

Affirmed.

West Headnotes (14)

[1] **Appeal and Error**
 **On consent, offer, or admission**

For a judgment to be considered an agreed or consent judgment, such that no appeal can be taken from it, either the body of the judgment itself or the record must indicate that the parties came to some agreement as to the case's disposition; simple approval of the form and substance of the judgment does not suffice.

Cases that cite this headnote

[2] **Appeal and Error**
 **On consent, offer, or admission**

Each party must explicitly and unmistakably give its consent for a consent judgment to be valid consent judgment, as would preclude appeal.

Cases that cite this headnote

[3] **Divorce**
 **Presumptions**

Court of Appeals would presume that trial court did not consider mother's response to father's motion for summary judgment as to issue of whether mother and father had an informal marriage, in mother's divorce claim alleging such a marriage existed, where mother filed response the day before summary judgment hearing, making response untimely, and nothing in record indicated that trial court granted leave for mother to file her response late. Tex. R. Civ. P. 166a(c).

Cases that cite this headnote

[4] **Child Custody**
 **Hearing**

Trial court acted within its discretion in denying mother's motion to substitute legal counsel in child custody proceeding, where motion was made orally, mother did not file written motion



or notice to court and other parties, and motion was made mid-trial. Tex. R. Civ. P. 8, 10.

Cases that cite this headnote

**[5]    Appeal and Error**

 Allowance of remedy and matters of procedure in general

Appellate court reviews a trial court's decision to grant or deny a motion to substitute counsel for an abuse of discretion. Tex. R. Civ. P. 8, 10.

Cases that cite this headnote

**[6]    Evidence**

 Mode of ascertaining facts required to be noticed; motions and notice of reliance

Trial court was not required to take judicial notice of motions and written agreements which were filed in connection with father's separate custody dispute with his ex-wife and which were proffered by mother in custody dispute between mother and father regarding mother and father's child, where mother did not provide trial court with certified copies of the documents at time she requested that court take judicial notice. Tex. R. Evid. 201(b), 201(c)(2).

Cases that cite this headnote

**[7]    Evidence**

 Proceedings in other courts

A court will take judicial notice of another court's records if a party provides proof of the records. Tex. R. Evid. 201(b).

Cases that cite this headnote

**[8]    Evidence**

 Proceedings in other courts

The contents of an unauthenticated or uncertified record from another court are not the type of evidence of which the court can take judicial notice. Tex. R. Evid. 201(b).

Cases that cite this headnote

**[9]    Child Custody**

 Discovery

Trial court acted within its discretion in excluding photographs depicting bruises that mother alleged she received from father, in child custody dispute between mother and father, where mother did not produce photographs during discovery, and mother offered no explanation for this failure. Tex. R. Civ. P. 193.6(a), 193.6(b).

Cases that cite this headnote

**[10]    Child Custody**

 Discovery

Trial court acted within its discretion in precluding mother from questioning father as to whether father had seen a psychologist, in custody dispute between mother and father in which father acknowledged that, as part of his agreement with ex-wife regarding custody of father and ex-wife's children, father was to take children to assessments with psychologist; mother did not make offer of proof or establish that testimony was material to custody issues regarding mother and father's child.

Cases that cite this headnote

**[11]    Divorce**

 Pleadings

Issue of whether a gift existed from father to mother for a particular vehicle was not tried by consent, in mother's petition for divorce alleging that mother and father had an informal marriage, where, at bench trial, father objected to mother's testimony about purported gift on ground that mother had not sought an adjudication of her entitlement to the vehicle in any of her pleadings.

Cases that cite this headnote

**[12]    Child Custody**

 Primary caregiver

Trial court acted within its discretion in awarding primary conservatorship rights for child to father, where father testified he had

regular employment, stable housing, and reliable transportation, that he had been child's primary caregiver since she was born and that he had been her exclusive caregiver for approximately a year, that mother had become violent with father or one of mother's children on numerous occasions, and that mother had advertised on adult entertainment websites, and mother did not contradict this evidence.

Cases that cite this headnote

**[13]** **Child Custody**
    Discretion

Trial courts have wide discretion to determine a child's best interest, including issues of custody, control, possession, and visitation.

Cases that cite this headnote

**[14]** **Child Custody**
    Questions of Fact and Findings of Court

Appellate court will reverse a trial court's determination of conservatorship only if a review of the entire record reveals that the trial court's decision was arbitrary or unreasonable.

Cases that cite this headnote

**On Appeal from the 257th District Court, Harris County, Texas, Trial Court Case No. 2013–05419**

**Attorneys and Law Firms**

David T. Altenbern, Altenbern & Associates, P.L.L.C., Houston, TX, for appellant.

Janice L. Berg, Daniel J. Lemkuil, Houston, TX, for appellee.

Panel consists of Justices Keyes, Huddle, and Lloyd.

**OPINION**

Evelyn V. Keyes, Justice

**\*1** Appellant, Sandra Perez, alleged that she had a common-law, or informal, marriage with appellee, Brian Williams.

Perez and Williams also have a minor child, E.A.W., over whom both parents sought custody. The trial court ruled, via Williams's motion for summary judgment, that no informal marriage existed. Following a bench trial, the trial court named Perez and Williams joint managing conservators of E.AW. and granted Williams the exclusive right to designate E.A.W.'s primary residence.

In seven issues, Perez argues that the trial court erred: (1) in granting Williams's motion for summary judgment determining that no informal marriage existed; (2) in denying her mid-trial motion to substitute legal counsel; (3) in refusing to take judicial notice of copies of court documents filed in judicial proceedings related to Williams's custody dispute over his three children from a previous relationship; (4) in refusing to award her a vehicle that she asserts was a gift from Williams; (5) in sustaining Williams's objection to four photographs that she sought to admit into evidence; (6) in sustaining Williams's objection to her questioning regarding whether he had seen a psychologist; and (7) in "failing to award [her] primary conservatorship rights" to E.AW. or, alternatively, in failing to award her visitation pursuant to a standard possession order.

We affirm.

**Background**

Perez and Williams began living together in May 2010. At that time, Perez was still married to Miguel Perez, and Williams had divorced his ex-wife, Devinah Finn, in 2009. Both Perez and Williams had children from previous relationships. Perez's divorce from her previous husband became final on November 3, 2010. E.A.W., the child of Perez and Williams, was bom on October 12, 2011.

On January 29, 2013, Williams filed his original petition in a Suit Affecting the Parent–Child Relationship ("SAPCR") seeking to be named sole managing conservator of E.A.W. and asking that Perez be ordered to pay child support to him.

On March 1, 2013, Perez filed her original answer and counter-petition for divorce, alleging that an informal marriage existed between Williams and herself and seeking a disproportionate division of the resulting community estate. She alleged that she and Williams "were married on or about June 2010 and have ceased to live together as man and wife"

and that they were the parents of E.A.W. She also sought to be named E.A.W.'s sole managing conservator.

On October 7, 2013, Williams moved for partial traditional and no-evidence summary judgment asserting that no genuine issue of material fact existed as to whether he should be adjudicated the father of E.A.W. Williams also asserted traditional and no-evidence grounds for summary judgment on the issue of informal marriage.

On December 4, 2013, Perez filed her "Original Answer to Partial Traditional and No–Evidence Summary Judgment." She argued that both she and Williams were married to other people when they first started their relationship, they both divorced their respective spouses in 2010, they began cohabitating on May 3, 2010, and E.A.W. was born on October 12, 2011. Perez argued that a fact question existed as to whether the parties were informally married beginning in January 2011, after her divorce from Perez was finalized. She supported her response with her own affidavit, her 2010 divorce decree, E.A.W.'s birth certificate listing Williams as the father, a copy of a document in which Williams listed her as his "relative for contact purposes," copies of greeting cards calling her "wife," and photographs of her "wedding rings."

 **\*2** On December 5, 2013, the day after Perez filed her response, the trial court held the summary judgment hearing. On December 13, 2013, "[a]fter considering the motion and evidence submitted," the trial court granted Williams's motion for partial summary judgment. It adjudicated Williams to be E.A.W.'s father, stated that Williams and Perez "are found and declared not to be married," and dismissed the issues of marriage and division of community property from the suit.

The parties tried the remaining issues of conservatorship of E.A.W., visitation, and child support to the bench on February 6, 2014, and, following a continuance to address problems with the translator, on March 28, 2014. On February 6, 2014, Perez was represented by attorneys Mark Lipkin and Diane Perez. Williams, who was likewise represented by counsel, testified that he had three children with his ex-wife, Finn, and one child, E.A.W., with Perez. He had earned an MBA from Harvard Business School and worked as an investment banker until "early 2013" when he started his own oil-field service business so that he would have more time to spend with his family.

Williams testified that he had been E.A.W.'s primary caregiver, had taken her to her doctor's appointments, and had provided for her basic care and support. He stated that he had had exclusive care of E.A.W. since September 2013, when Perez moved out of his house, "but even for the year-and-a-half prior to that she was an absentee, inactive mother." Williams testified that Perez was "active during breastfeeding for a little bit and would be there, you know, a couple of hours during the evenings, but she would run off to work and come back late at night." He testified that he was the one who changed E.A.W.'s diapers, prepared her meals, and provided other care.

Regarding his relationship with Perez, Williams testified that he invited her and her two teenaged sons to move in with him in spring 2010. He testified that Perez's oldest child, who was eighteen at the time of the trial, had been physically violent toward him on multiple occasions and ultimately "had to leave the house" in the fall of 2012. Williams also stated that Perez had hit, pushed, or shoved him on "numerous occasions." He testified that he never sustained any injuries requiring hospitalization because he was much larger than Perez, but she was frequently violent. He testified specifically about an incident in December 2010 in which Perez "came at [him] with a knife" which resulted in a call to the police and in Perez being charged with deadly conduct. He also testified about an incident that occurred on Christmas Eve of 2012. Perez "became very violent in front of my three older kids, ... picked up a Christmas tree, threw it over. Started punching and punching me as I stood between her and [E.A.W.] as she was threatening to run out of the house with the baby." Williams stated that, at that point, he decided to ask Perez to leave his house and to file the underlying lawsuit. Williams testified that he had never hit Perez or hurt her. However, she had threatened to "make those allegations against him" and to "hurt herself and blame it on [Williams]" and had followed through on those threats.

Williams testified that he filed the present suit one month after the Christmas Eve incident, in January 2013. He also asked Perez to leave his home multiple times, but she kept returning periodically. He eventually changed the locks in September 2013. He also testified that he provided Perez with money to use toward a deposit on an apartment so that she would have somewhere else to go.

 **\*3** Regarding Perez's relationship with E.A.W., Williams testified that he believed Perez loved E.A.W. However, he had also observed Perez "smack the baby in the face" for

being "too fussy" and because Perez believed the child had "to learn to respect [Perez]." He stated that Perez had threatened to take the baby to live in the Dominican Republic, where Perez was born and where she still had family members residing. He also testified about an occasion when Perez became violent with one of her sons from her previous relationship, and he introduced an audio recording supporting his testimony.

Williams also testified regarding Perez's employment. Williams purchased a hair salon for Perez, and she operated it from "early 2010" on for the next several years. Perez told Williams that she "rent[ed] out rooms in the back where people would provide massages and sexual services" and that she "was selling stolen items, clothing and other items in a little boutique she built in one of the massage rooms." He also testified that Perez had indicated that drug deals had occurred at her salon on two occasions. Williams introduced copies of internet advertisements for massage services and "adult entertainment" showing Perez in revealing clothing. Williams testified that he discovered the advertisements in May 2013 by searching phone numbers from Perez's cell phone after he became "increasingly concerned by [Perez's] behavior and complete absence from [E.A.W.'s] life...." The trial court also admitted Perez's "entertainer license" issued by "HPD Vice Division," which Perez had told Williams she needed to work in adult entertainment. Williams testified that he knew Perez was involved on the "periphery" of sexually-oriented business, but he did not know that she herself was involved in it until after he filed the underlying suit.

Perez testified at trial that her relationship with Williams started out well, but problems began to arise around the time she got pregnant with E.A.W. Perez stated that Williams "never wanted the child" and encouraged her to get an abortion. Perez also testified regarding her employment. She stated that she still owned the salon and that she knew at one point a "young lady ... was doing massages to lose weight" at her salon, which Perez believed was illegal because the woman did not have a license. Perez testified that she asked the woman to leave.

Perez testified that when she left Williams's home she took the Range Rover that he had given her to drive. She drove the vehicle until Williams eventually sent police to recover it, at which time she returned it to Williams's residence.

Perez further stated that she attempted to visit E.A.W. "many times" after Williams locked her out of his home, but he would not let her see her daughter. Perez testified regarding an incident that had happened the day after Williams changed the locks in September 2013, when she "went with the police" but was refused entry by the neighborhood security.

The trial on the merits was then recessed "[b]ecause of translator problems." Trial resumed on March 28, 2014. Attorney David Altenbern appeared on Perez's behalf, along with her attorneys from the first day of trial, Lipkin and Diane Perez. On the record in open court, Altenbern asked the trial court to grant Perez's motion to substitute him as her lead counsel. Williams's counsel objected on multiple grounds, including that he had not been served with notice of the motion, and the trial court ultimately denied Perez's request to substitute Altenbern as lead counsel but allowed him to appear as co-counsel.

**\*4** Perez then continued her testimony with her attorney, Lipkin, questioning her. Perez testified that she had no history of psychiatric treatment, no criminal history, and no history of substance abuse or illegal drug use. Perez also testified that there were no restrictions on her custody or visitation with her other minor child—her son from her previous relationship—and that she believed she had "always taken care of [her] children." She also stated that if she were awarded custody of E.A.W., she would be able to provide for her care, that she would abide by the trial court's visitation orders, and that she would allow Williams access to the child.

Perez testified that Williams had been violent with her on numerous occasions. She testified that, in one instance, Williams struck her on the arm, and she offered into evidence photographs "of what happened on that day," but the trial court refused to admit them into evidence after Williams objected on the basis that Perez had not produced the photographs during discovery. Perez further acknowledged that Williams had never been arrested based on her allegations of violence. She acknowledged that she had been arrested, but not convicted, for attacking Williams.

Perez testified that she had last seen Williams's three children with Finn on December 24, 2012. She also testified that Williams had told her that he had supervised visitation with his three children and that he had to see a psychologist. On cross-examination, she conceded that she had not seen any court orders from his custody dispute with Finn and that Williams told her that the visitation and family counseling arrangements were part of an agreement he had reached with Finn. Perez admitted that she had met with Finn and Finn's

lawyers and that Finn's lawyers had offered her "money in this case to prolong it to affect that case" but she did not accept it.

Perez asked the trial court to take judicial notice of two motions and a Rule 11 Agreement filed in Williams's custody proceeding regarding his three children with Finn. Williams objected on multiple grounds, including that Perez had not provided certified copies of the documents to the trial court in making her request, and the trial court sustained the objection. However, the trial court allowed Perez to recall Williams to testify on these issues. [1] Williams testified that his visitation with his and Finn's children was governed by his 2009 divorce decree, that he picked his children up at Finn's house pursuant to that decree, that it was "incorrect" that his visitation with his children was required to be supervised, and that he had never been required to pick his children up at a psychologist's office. Perez's attorney asked multiple other questions regarding Williams's custody arrangements with Finn and regarding documents filed in that custody dispute, including, "Have you seen a psychologist?" Williams's counsel objected on multiple bases, and the trial court sustained the objection. However, Williams acknowledged that he entered into a Rule 11 Agreement with Finn, and he briefly described the content and purpose of that agreement on the record.

**[1] [2]** On April 25, 2014, the trial court signed its order incorporating the previous summary judgment ruling that Williams was adjudicated to be E.A.W.'s father and that Williams and Perez were never married. The trial court declared Williams and Perez joint managing conservators of E.A.W., with Williams receiving the exclusive right to designate E.A.W.'s primary residence. Perez was granted periods of visitation that were ordered to increase gradually until her visitation schedule conformed with a standard possession order by April 1, 2015. The trial court also ordered Perez to pay Williams child support in the amount of $195.69 per month until October 30, 2018, at which time her monthly payments would increase to $223.64. Williams and Perez both signed the order under a heading that provided that it was approved as to form and substance. [2]

**\*5** Perez filed a motion for new trial complaining of various trial court rulings before and during trial. The trial court denied the motion for new trial and this appeal followed.

### Summary Judgment on Informal Marriage Claim

In her first issue, Perez argues that the trial court erred in granting summary judgment on the issue of informal marriage. Williams argues that the trial court did not err in granting summary judgment on this issue. Among other grounds, Williams asserts that the trial court properly granted his no-evidence motion for summary judgment on this issue because Perez failed to file a timely response.

### A. Facts Relevant to Summary Judgment on Informal Marriage

Williams moved for summary judgment on October 7, 2013, arguing, in relevant part, that he was entitled to no-evidence summary judgment on the issue of informal marriage because Perez could provide no evidence that they had agreed to be married or that they had a reputation in the community for being married. One day before the hearing on Williams's summary judgment motion, Perez filed her response and supporting evidence. The record does not contain any indication that Perez sought leave to file her response late or that she sought a continuance of the summary judgment hearing. The trial court stated in its order granting Williams's partial summary judgment motion that it considered "the motion and evidence submitted."

### B. Standard of Review

The party moving for no-evidence summary judgment must specifically state the elements as to which there is no evidence. *See* TEX. R. CIV. P. 166a(i). The burden then shifts to the nonmovant to produce evidence raising a fact issue on the challenged elements. *Id.* The reviewing court must view the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). The trial court must grant the no-evidence summary judgment unless the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX. R. C IV. P. 166a(i); *see King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003).

A trial court need only consider the record as it properly appears before it when the motion for summary judgment is heard. *Billelo v. Techline Servs., L.P.,* 372 S.W.3d 232, 235 (Tex.App.–Dallas 2012, no pet.)(citing *WTFO, Inc. v. Braithwaite,* 899 S.W.2d 709, 721 (Tex.App.–Dallas 1995, no writ)); *Marek v. Tomoco Equip. Co.,* 738 S.W.2d 710, 712 (Tex.App.–Houston [14th Dist.] 1987, no writ). The nonmovant must file its summary judgment response and

evidence at least seven days before the summary judgment hearing, unless the nonmovant gets permission to file it later. TEX. R. CIV. P. 166a(c). If the court allows the late filing of evidence, the court must affirmatively indicate in the record acceptance of the late filing. *SeeBenchmark Bank v. Crowder,* 919 S.W.2d 657, 663 (Tex.1996); *Goswami v. Metro. Sav. & Loan Ass'n,* 751 S.W.2d 487, 490 n. 1 (Tex.1988); *WTFO, Inc.,* 899 S.W.2d at 721. Absent any indication leave was granted, we must presume the trial court did not consider the late-filed evidence. *See Fertic v. Spencer,* 247 S.W.3d 242, 250–51 (Tex.App.–El Paso 2007, pet. denied); *see alsoBenchmark Bank,* 919 S.W.2d at 663; *WTFO, Inc.,* 899 S.W.2d at 721.

**\*6** Furthermore, the summary judgment rules afford a party who did not have adequate time an opportunity to obtain additional time to file a response, either by moving for leave to file a late response or by requesting a continuance of the summary-judgment hearing. TEX. R. CIV. P. 166a(c); *Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 685 (Tex.2002) (discussing remedies available for summary judgment nonmovants who have inadequate time to respond to summary judgment motion and stating that trial court's ruling on motions for leave to late-file response or for continuance of hearing are reviewed for abuse of discretion).

## C. Analysis

 **[3]** Williams moved for summary judgment in part on the basis that Perez could present no evidence that they had agreed to be married or had represented to others that they were married. *See*TEX. FAM. CODE ANN. § 2.401(a)(2) (Vernon 2006) (providing that informal marriage exists if parties (1) agreed to be married, (2) lived together in Texas as husband and wife after such agreement, and (3) represented to others that they were married). Thus, the burden shifted to Perez to produce summary judgment evidence raising a genuine issue of material fact on these elements. *See*TEX. R. CIV. P. 166a(i). Perez filed a response the day before the summary judgment hearing; thus, her response was untimely. *See*TEX. R. CIV. P. 166a(c). Perez failed to move for leave to late-file her response or for a continuance of the summary judgment hearing. Perez did not present any explanation, either at trial or on appeal, for her failure to file a timely response to Williams's motion for summary judgment. Nor does it appear that the trial court considered Perez's late-filed response—the trial court's partial summary judgment order reflected that it considered only "the motion and evidence submitted" in granting summary judgment on Williams's paternity of E.A.W. and Perez's informal marriage claim.

Because nothing in the record indicates that the trial court granted leave for Perez to file her response late, we presume that the trial court did not consider it, and we likewise do not consider it on appeal. *SeeFertic,* 247 S.W.3d at 250–51 (holding that appellate court would not consider plaintiff's motion for partial summary judgment filed in response to defendant's no-evidence motion for summary judgment because, even if it construed plaintiff's motion as response, it was not timely filed and court presumed that trial court did not consider it); *Johnston v. Vilardi,* 817 S.W.2d 794, 796 (Tex.App.–Houston [1st Dist.] 1991, writ denied) (holding that appellant's untimely amended response to motion for summary judgment could not be considered); *cf.Carpenter,* 98 S.W.3d at 687–88 (holding that trial court did not abuse its discretion in denying motion for leave to file late response because party offered no explanation for its failure to timely respond).

Thus, although Perez argues that genuine issues of material fact remain on all elements of her informal marriage claim, she failed to demonstrate that the record before the trial court contained any such evidence at the time the court heard Williams's motion for summary judgment. *SeeBillelo,* 372 S.W.3d at 235. Accordingly, Perez failed to meet her burden to produce summary judgment evidence raising a genuine issue of material fact on these elements. *See*TEX. R. CIV. P. 166a(i). We conclude that the trial court did not err in granting summary judgment in favor of Williams on Perez's informal marriage claim. *See id.*

 **\*7** We overrule Perez's first issue.

### Motion to Substitute Legal Counsel

 **[4]** In her second issue, Perez argues that the trial court erred in denying her motion to substitute legal counsel following a continuance of the trial on the merits. Perez argues that the trial court's denial of her motion to substitute counsel violated her fundamental right to counsel of her own choosing.

## A. Facts Relevant to the Motion to Substitute Legal Counsel

On the second day of trial, Perez requested that the trial court grant her motion to substitute new counsel, Altenbern. However, the trial court stated that it had not received a motion for substitution and saw only Altenbern's notice of

entry of appearance. Altenbern informed the trial court that the motion to substitute had been electronically filed earlier that same day, and he asserted Perez's right to have counsel of her choosing represent her at trial.

Williams's counsel opposed the motion to substitute, arguing that it was "completely a surprise" and a "trial tactic" to attempt to substitute new counsel with approximately an hour of trial remaining. He also argued that the motion to substitute was untimely and not properly noticed and that Perez's first attorney had already begun questioning her and no other witnesses had been designated, so "[t]here [was] no functional ability for [Altenbern] to take over and examine any witness" under the "one witness, one lawyer rule." The trial court denied Altenbern's motion to substitute, stating it was concerned that opposing counsel did not have notice of the motion.

Neither the notice of Altenbern's appearance on Perez's behalf nor the motion to substitute is included in the clerk's record on appeal. Nor does it appear from the record that Perez's first attorneys, Lipkin and Diane Perez, sought to withdraw or were unable to adequately represent Perez at trial.

**B. Standard of Review**

 **[5]**   We review a trial court's decision to grant or deny a motion to substitute counsel for an abuse of discretion. *Spinks v. Brown,* 103 S.W.3d 452, 459 (Tex.App.–San Antonio 2002, pet. denied). "Under an abuse of discretion standard, an appellate court may reverse the decision of a trial court only if the trial court's ruling was without reference to any guiding rules or principles." *Id.*; *seeDowner v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

While a party has the right to be represented by counsel of its own choice, that right is not absolute. *SeeSpinks,* 103 S.W.3d at 459. The Rules of Civil Procedure provide that designations of new lead counsel and motions to withdraw and substitute new counsel must be made in writing and that the party designating new counsel or substituting a new attorney must serve notice on the court and all other parties. *See*TEX. R. CIV. P. 8, 10.

**C. Analysis**

Although Perez argues on appeal that she filed a written notice of Altenbern's appearance as her counsel and a written motion to substitute him as lead counsel, neither document appears in the record. The reporter's record reflects that Altenbern

requested to be substituted as lead counsel for Perez in open court at the beginning of the second day of trial. The trial court stated on the record that it had not received a written motion to substitute, and Williams objected on the basis that he had not received notice of the substitution. The trial court sustained this objection and denied Altenbern's request.

 **\*8**  Because the record does not demonstrate that Perez filed a written motion or notice to the trial court and all other parties, we cannot conclude that the trial court abused its discretion in denying Perez's oral request, made on the record mid-trial, to substitute new lead counsel. *See*TEX. R. CIV. P. 8, 10; *Spinks,* 103 S.W.3d at 459.

We overrule Perez's second issue.

### Evidentiary Issues

In her third, fifth, and sixth issues, Perez argues that the trial court erred in making various evidentiary rulings.

**A. Standard of Review**

"Evidentiary rulings are committed to the trial court's sound discretion." *U–Haul Int'l, Inc. v. Waldrip,* 380 S.W.3d 118, 132 (Tex.2012). A trial court abuses its discretion if it acts without regard for guiding rules or principles. *Id.* To show the trial court abused its discretion, an appellant must demonstrate that: (1) the court erred in not admitting the evidence; (2) the excluded evidence was controlling on a material issue dispositive of the case and was not cumulative; and (3) the error probably caused rendition of an improper judgment in the case. *Jones v. Pesak Bros. Constr., Inc.,* 416 S.W.3d 618, 632 (Tex.App.–Houston [1st Dist.] 2013, no pet.)(citing Tex. R. App. P. 44.1(a), and *Tex. Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000)). We uphold the trial court's evidentiary ruling if we discern a legitimate basis for it. *Id.* (citing *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998)).

**B. Court Documents**

 **[6]**   In her third issue, Perez argues that the trial court erred in refusing to admit copies of court documents relating to Williams's other judicial proceedings "pursuant to the doctrine of judicial notice." She argues that the documents were relevant to the conservatorship proceedings and to E.A.W.'s best interests.

Perez asked the trial court to take judicial notice of two motions and two copies of a Rule 11 Agreement—one handwritten draft and one typed final agreement—filed in connection with Williams's custody dispute with Finn. In making her request for the trial court to take judicial notice, her attorney stated that "certified copies are on the way, and I want ... judicial notice taken in this case." Williams objected, arguing

> [the documents are] not a proper subject matter for the judicial notice. He's required to provide the documents at the time he requests judicial notice. Additionally, all of the motions are not by—by operation of law evidence of anything. They are requests and allegations subject to verification. So, I would object, one: Improper verification; two: Improper presentation in this proceeding; three: Not evidence, as a matter of law.

The trial court confirmed that none of the proffered documents were final orders, but rather were motions and a Rule 11 Agreement, and it sustained Williams's objection.

However, Williams subsequently testified regarding some of the documents, including the Rule 11 Agreement with Finn. He stated that the purpose of the agreement was

> to see my children that my ex-wife has kept from me for over a year because of the actions of Ms. Perez at Christmas last year, sir. And it was so I could see my kids for one day at Christmas at the museum. And I agreed that I would take my kids and my ex-wife and me to individual assessments with [a psychologist].

**\*9** Perez subsequently asked to include the documents in the record as part of a bill of exceptions, and the trial court admitted the documents for that purpose. The documents that appear in the record are not certified—they contain only a file stamp from the Harris County Clerk's Office.

[7] [8] To be the proper subject of judicial notice, an adjudicative fact must be "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." TEX. R. EVID. 201(b); *FreedomCommc'ns, Inc. v. Coronado,* 372 S.W.3d 621, 623 (Tex.2012). Judicial notice is mandatory if a party makes the request and supplies the court with the necessary information. See TEX. R. EVID. 201(c)(2); *Coronado,* 372 S.W.3d at 623; *MCISales & Serv., Inc. v. Hinton,* 329 S.W.3d 475, 484 n. 7 (Tex.2010). "Under this standard, a court will take judicial notice of another court's records if a party provides proof of the records." *Coronado,* 372 S.W.3d at 623 (citing *Hinton,* 329 S.W.3d at 497 n. 21, and *WorldPeace v. Comm'n for Lawyer Discipline,* 183 S.W.3d 451, 459 (Tex.App.–Houston [14th Dist.] 2005, pet. denied)). The contents of an unauthenticated or uncertified record from another court are not the type of evidence of which the court can take judicial notice. *Ex parte Luan Le,* No. 05–12–00248–CV, 2013 WL 2725593, at *4 (Tex.App.–Dallas June 12, 2013, no pet.)(mem.op.); *see alsoEx parte Wilson,* 224 S.W.3d 860, 863 (Tex.App.–Texarkana 2007, no pet.) ("Judicial records ... from a domestic court other than the court being asked to take judicial notice have not been deemed so easily ascertainable that no proof is required; they are to be established by introducing into evidence authenticated or certified copies ... of those records.").

Furthermore, "while the trial court can take judicial notice of the existence of certain documents in its records, it 'may not take judicial notice of the truth of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file.' " *Kenny v. Portfolio Recovery Assocs., LLC,* 464 S.W.3d 29, ——, 2015 WL 1135410, at *3 (Tex.App.–Houston [1st Dist.] 2015, no pet.)(citing *Guyton v. Monteau,* 332 S.W.3d 687, 693 (Tex.App.–Houston [14th Dist.] 2011, no pet.)).

A trial court's erroneous decision whether to take judicial notice of requested facts is subject to a harm analysis under Rule of Appellate Procedure 44.1(a). *See*TEX. R. APP. P. 44.1(a); *In re Estate of Downing,* 461 S.W.3d 231, 239 (Tex.App.–El Paso 2015, no pet.). Thus, we may not reverse the judgment of the trial court on this issue unless we conclude that the trial court erred and that the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a).

Here, the trial court denied Perez's request to take judicial notice of two motions and a Rule 11 Agreement filed in another court in conjunction with Williams's custody dispute with Finn. However, the record reflects that Perez did not provide the trial court with certified copies of the documents at the time she requested that the court take judicial notice.

Rather, her attorney stated on the record that the certified copies of the documents were "on the way," and the copies provided in her bill of exceptions were likewise not certified. Under these circumstances, we cannot conclude that the trial court erred in refusing to take judicial notice of the motions and Rule 11 Agreement filed in that other case. *See Ex parte Luan Le,* 2013 WL 2725593, at \*4 ("[T]he contents of an unauthenticated or uncertified record from another court is not the type of evidence of which the court can take judicial notice.").

 **\*10** Moreover, even if we determined that the trial court had erred in refusing to take judicial notice of those documents, Perez cannot show that any such error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *In re Estate of Downing,* 461 S.W.3d at 239. The trial court could only have taken judicial notice of the existence of the documents—it could not have taken judicial notice of the truth of any factual statements or allegations contained in those documents. *See Kenny,* 464 S.W.3d at ——, 2015 WL 1135410, at \*3. The existence of the motions or Rule 11 Agreement filed in Williams's custody dispute with Finn is not relevant to issues of E.A.W.'s conservatorship or support. Furthermore, the trial court permitted Perez to question Williams regarding his custody dispute with his ex-wife, and he testified on the record regarding the purpose and content of the Rule 11 Agreement.

We overrule Perez's third issue.

### C. Photographs

 **[9]** In her fifth issue, Perez argues that the trial court erred in excluding photographs depicting bruising that she alleges she received from Williams.

Perez testified regarding one occasion when Williams struck her and offered the photographs as evidence "of what happened on that day." Williams objected that she had laid an improper foundation for the photographs and that she had not produced the photos in discovery responses in spite of their having been requested. The trial court asked Perez's counsel whether they had been produced, and he responded, "I can't tell you. I didn't do the discovery, honestly." The trial court sustained Williams's objection.

The Rules of Civil Procedure provide:

> A party who failed to make, amend, or supplement a discovery response in a timely manner may not introduce

in evidence that material or information that was not timely disclosed ... unless the court finds that:

(1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

(2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

TEX. R. CIV. P. 193.6(a). The party seeking to introduce the evidence bears the burden of establishing good cause or lack of unfair surprise or unfair prejudice. TEX. R. CIV. P. 193.6(b).

After Perez proffered the photographs, Williams's attorney objected on the basis that although he had requested the photographs during discovery, Perez had not produced them. Perez offered no explanation of her failure to produce the photographs during discovery. Her counsel stated that he "didn't do the discovery" in this case. Thus, Perez failed to meet her burden under Rule of Civil Procedure 193.6(b). *See Carpenter,* 98 S.W.3d at 687 (citing predecessor rule to Rule 193.6 and holding that inadvertent failure to supplement responses was insufficient to establish good cause, even if admitting evidence would not be unfair to opposing party) (citing *Sharp v. Broadway Nat'l Bank,* 784 S.W.2d 669, 672 (Tex.1990)).

We cannot conclude that the trial court abused its discretion in excluding the photographs from evidence. *See In re T.K.D.–H.,* 439 S.W.3d 473, 480 & n. 4 (Tex.App.–San Antonio 2014, no pet.)(holding that trial court did not abuse its discretion where proponent failed to produce photographs in discovery and failed to provide good cause for admitting photographs).

We overrule Perez's fifth issue.

### D. Questioning

 **[10]** In her sixth issue, Perez argues that the trial court erred in sustaining Williams's objection to her question, "Have you seen a psychologist?"

Perez asked Williams multiple questions about his custody dispute with Finn, including, "Have you seen a psychologist?" Williams's attorney objected to this question, arguing, "There's no motion on file by them to request any kind of psychiatric care or examination." The trial court

sustained the objection. Perez's attorney argued that evidence of Williams's mental health, including whether and why he had seen a psychologist, was relevant. Williams's attorney responded that the question was "an impermissible attempt to get in the hearsay ... [and] impermissible filings and the motions in the other case." He also asserted that the question was improper because Perez had not filed any pleadings challenging Williams's mental health or seeking to require Williams to participate in counseling or mental health treatment. The trial court again sustained Williams's objection. Williams did not answer the question, and Perez did not make an offer of proof regarding what information she had expected to elicit from Williams on this issue. However, Williams acknowledged that, as part his Rule 11 Agreement with Finn, he "would take my kids and my ex-wife and me to individual assessments with [a psychologist]."

**\*11** Perez cannot show that the excluded testimony was controlling on a material issue dispositive of the case and was not cumulative or that the trial court's ruling probably caused the rendition of an improper judgment. *See* *Jones,* 416 S.W.3d at 632. Perez failed to make an offer of proof, so the record does not reflect what Williams's testimony on this topic would have been. *See* *Akin v. Santa Clara Land Co., Ltd.,* 34 S.W.3d 334, 339 (Tex.App.–San Antonio 2000, pet. denied) ("The failure to make an offer of proof containing a summary of the excluded witness's intended testimony waives any complaint about the exclusion of the evidence on appeal."). Williams testified regarding his agreement with his ex-wife to attend family counseling, but he did not indicate whether he had actually begun the counseling. Thus, Perez failed to establish that Williams's excluded testimony would have been material to issues of custody and support of E.A.W. and that its exclusion probably caused the rendition of an improper judgment, as required to demonstrate that the trial court abused its discretion. *See* *Jones,* 416 S.W.3d at 632.

Thus, we cannot conclude that the trial court abused its discretion in sustaining Williams's objection to this question. *See* *Waldrip,* 380 S.W.3d at 132.

We overrule Perez's sixth issue.

### Gift of Vehicle

**[11]** In her fourth issue, Perez argues that the trial court erred in "refusing to determine that a gift existed for an award of a Range Rover motor vehicle." Perez argues that

she testified that Williams intended that the Range Rover be a gift to her and that Williams failed to provide any evidence contradicting her testimony.

Perez testified that after Williams asked her to leave his home, she took the Range Rover with her. She stated that she had driven the car for three years until Williams "sent for the car to be taken away from [her]." Perez testified that she believed the Range Rover belonged to her. Williams's counsel objected to this testimony on relevance grounds and asserted that "[c]ar titles control ownership.... It's ... not relevant what she thought." The trial court sustained this objection. Williams's counsel also objected to further questioning regarding ownership of the Range Rover, arguing that there were no property issues remaining to be resolved in the trial because "[t]he divorce [issue] has already been ruled on" and "there's no suit for conversion or anything else."

Perez's counsel asserted that Perez's testimony about the vehicle "doesn't have anything to do with property and property rights, but it has to do with how Mr. Williams treated her and allowed her to take care of her son [from her previous relationship]." The trial court overruled Williams's objection and allowed Perez to testify that Williams sent police to "take [the vehicle] away" and left her with no other way to transport her son from a previous relationship except to use a taxi. Perez testified, "[Williams] gave a Range Rover to me.... He told me that it was a present, that it was mine." She acknowledged that Williams had asked her to return the Range Rover multiple times and had sent a certified letter requesting its return before he sent the police to collect the vehicle. The trial court also admitted into evidence the title to the Range Rover, listing Williams as the owner. Perez acknowledged that she was not listed as the owner of the vehicle.

The record demonstrates that the Range Rover's ownership was not at issue during the bench trial. The trial court granted Williams's partial motion for summary judgment, ruling that the parties were never married and dismissing the issues of divorce and property division from the case. We have overruled Perez's complaints regarding this order. Perez did not file any other pleadings that might be construed as seeking a determination of ownership of the vehicle. *See* TEX. R. CIV. P. 301 (providing that judgment must conform to pleadings).

Furthermore, when the question of whether the Range Rover was a gift from Williams to Perez arose at trial, Williams objected to Perez's testimony on the ground that she had not sought an adjudication of her entitlement to the Range Rover

in any of her pleadings. He also objected on the basis that the title speaks for itself and establishes that Williams was the sole owner of the vehicle. Perez's counsel then argued that the testimony was not intended to establish a property right but to show how Williams treated her. Thus, the issue was not tried by consent. See *Reed v. Wright,* 155 S.W.3d 666, 670 (Tex.App.–Texarkana 2005, pet. denied) (holding that trial by consent applies in exceptional cases when record as whole clearly demonstrates that parties tried unpled issue); *Mastin v. Mastin,* 70 S.W.3d 148, 154 (Tex.App.–San Antonio 2001, no pet.)(stating that to determine whether issue was tried by consent, appellate court must examine record for evidence of trial of issue).

 **\*12** We cannot conclude that the trial court erred in failing to grant relief that Perez never requested.

We overrule Perez's fourth issue.

### Conservatorship of E.A.W.

 **[12]** In her seventh issue, Perez argues that the trial court erred in "awarding primary conservatorship rights" to Williams. Because the trial court made Perez and Williams joint managing conservators of E.A.W., we construe this as an argument that the trial court abused its discretion by granting Williams the exclusive right to determine E.A.W.'s primary residence. In the alternative, Perez argues that the trial court erred in awarding her less-than-standard visitation.

### A. Standard of Review

 **[13]** **[14]** Trial courts have wide discretion to determine a child's best interest, including issues of custody, control, possession, and visitation. *Gillespie v.Gillespie,* 644 S.W.2d 449, 451 (Tex.1982); *Holley v. Holley,* 864 S.W.2d 703, 706 (Tex.App.–Houston [1st Dist.] 1993, writ denied). Thus, we will reverse a trial court's determination of conservatorship only if a review of the entire record reveals that the trial court's decision was arbitrary or unreasonable. *In re J.A.J.,* 243 S.W.3d 611, 616 (Tex.2007); *Patterson v. Brist,* 236 S.W.3d 238, 239–40 (Tex.App.–Houston [1st Dist.] 2006, pet dism'd). A trial court does not abuse its discretion "as long as some evidence of a substantive and probative character exists to support [its] decision." *In re W.M.,* 172 S.W.3d 718, 725 (Tex.App.–Fort Worth 2005, no pet.). We must view the evidence in the light most favorable to the trial court's

decision and indulge every legal presumption in favor of its judgment. *Holley,* 864 S.W.2d at 706.

When, as here, there are no findings of fact or conclusions of law, we "presume that all factual disputes were resolved in favor of the trial court's ruling." *Aduli v. Aduli,* 368 S.W.3d 805, 813 (Tex.App.–Houston [14th Dist.] 2012, no pet.). Thus, we uphold the trial court's ruling unless "it is so contrary to the overwhelming weight of the evidence as to be wrong and unjust." *Id.* at 814; see *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990).

### B. Conservatorship Determination

Perez argues that she had no psychological or substance abuse problems and, thus, there is no evidence supporting the trial court's determination awarding Williams the exclusive right to designate E.A.W.'s primary residence. Even considering that evidence, we cannot conclude that the trial court abused its discretion.

Viewing the evidence in the light most favorable to the trial court's decision and indulging every legal presumption in favor of its judgment, as we must, we conclude that the trial court's ruling is not so contrary to the overwhelming weight of the evidence as to be wrong and unjust. See *Holley,* 864 S.W.2d at 706; *Aduli,* 368 S.W.3d at 813. Williams and Perez both testified regarding their interactions with each other and with E.A.W., their respective employment, and their home environments.

Williams testified that he had regular employment, stable housing, and reliable transportation. Williams also testified that he had been E.A.W.'s primary caregiver since she was born and that he had been her exclusive caregiver since September 2013. Williams stated that he was a former investment banker who had started a new career so that he would have more time for his family. He testified about numerous instances in which Perez became violent with him or one of her children, including E.A.W. Williams also testified that since he and Perez had ended their romantic relationship Perez had advertised on "adult entertainment" websites, and he provided copies of those advertisements to the trial court. Perez did not contradict this evidence. Perez also acknowledged that she had been arrested for assaulting Williams.

 **\*13** We conclude that the trial court's decision to grant Williams the exclusive right to determine E.A.W.'s residence was supported by "some evidence of a substantive and

probative character." *SeeIn re W.M.,* 172 S.W.3d at 725. Thus, the trial court's conservatorship determination was not arbitrary or unreasonable and did not constitute an abuse of discretion. *SeeIn re J.A.J.,* 243 S.W.3d at 616.

### C. Visitation

Perez also argues that, even if we affirm the trial court's conservatorship determination, the trial court erred in not granting her visitation pursuant to a standard possession order. However, we observe that the trial court's order provides that Perez is to have visitation with E.A.W. pursuant to a standard possession order as of April 1, 2015. Thus, this complaint is now moot. *SeeIn re H & R Block Fin. Advisors, Inc.,* 262 S.W.3d 896, 900 (Tex.App.–Houston [14th Dist.] 2008, orig. proceeding) ("An issue may become moot when a party seeks a ruling on some matter which, when rendered, would not have any practical legal effect on a then-existing controversy.").

We overrule Perez's seventh issue.

### Conclusion

We affirm the order of the trial court.

### All Citations

--- S.W.3d ----, 2015 WL 5076294

## Footnotes

1  The trial court also permitted Altenbern to conduct Williams's questioning.

2  In his brief, Williams argues that this statement makes the trial court's order an agreed order and, thus, Perez cannot complain on appeal of any of its provisions. However, for a judgment to be considered an agreed or consent judgment, such that no appeal can be taken from it, either the body of the judgment itself or the record must indicate that the parties came to some agreement as to the case's disposition; simple approval of the form and substance of the judgment does not suffice. *See, e.g.,DeClaris Assoc. v. McCoy Workplace Solutions, L.P.,* 331 S.W.3d 556, 560 (Tex.App.–Houston [14th Dist.] 2011, no pet.); *Oryx Energy Co. v. Union Nat'l Bank of Tex.,* 895 S.W.2d 409, 417 (Tex.App.–San Antonio 1995, writ denied) (holding that order, despite notation that it was "Approved and Agreed," was not agreed order when "nothing in the record or the judgment indicates that the parties entered or even contemplated a settlement or agreed judgment"). Each party must explicitly and unmistakably give its consent for a consent judgment to be valid. *Chang v. Nguyen,* 81 S.W.3d 314, 318 (Tex.App.–Houston [14th Dist.] 2001, no pet.)(stating that, for instance, body of judgment must suggest that case had been settled or that judgment was rendered by consent). No such agreement is evident in this case.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** [Haden v. David J. Sacks, P.C.,](#) Tex.App.-Hous. (1 Dist.), May 7, 2009

124 S.W.3d 283
Court of Appeals of Texas,
Houston (14th Dist.).

Robert RASMUSSON, Appellant,
v.
LBC PETROUNITED, INC., Appellee.

No. 14–02–01053–CV. | Nov. 25, 2003.
| Supplemental Opinion Dec. 23, 2003.

**Synopsis**

**Background:** Former employee brought action against employer for fraud and breach of contract, and employer counterclaimed for specific performance of arbitration provision of severance agreement and sought attorney fees and costs incurred to compel arbitration. The 269th District Court, Harris County, [John Thomas Wooldridge](#), J., compelled arbitration, and thereafter, the arbitrator denied former employee's claims and referred the issue of attorney fees and costs to the trial court, and former employee nonsuited his claims. The District Court awarded attorney fees and costs to employer. Former employee appealed.

**Holdings:** The Court of Appeals, [Richard H. Edelman](#), J., held that:

[1] employer was not statutorily precluded from recovering attorney fees incurred to compel arbitration;

[2] arbitration provision of severance agreement did not preclude such recovery; and

[3] employer did not establish the costs it incurred were reasonable and necessary, but employer's voluntary remittitur of costs cured the reversible error.

Affirmed as reformed.

West Headnotes (9)

**[1]** **Alternative Dispute Resolution**
 Decisions Reviewable

Trial court's post-arbitration order granting employer attorney fees and costs incurred to compel arbitration of former employee's breach of contract and fraud claims was not a final judgment that was immediately appealable, where trial court had not yet granted former employee's motion for nonsuit and the order therefore did not dispose of all pending claims, and the order did not contain language purporting to dispose of all remaining claims or otherwise unequivocally express an intent to finally dispose of the case.

2 Cases that cite this headnote

**[2]** **Appeal and Error**
 Final Judgments or Decrees
**Appeal and Error**
 Finality as to All Parties
**Appeal and Error**
 Determination of Controversy

A judgment issued without a conventional trial is final and therefore immediately appealable only if it either actually disposes of all claims and parties then before the court, or states with unmistakable clarity that it is a final judgment as to all claims and parties, even if it is not.

Cases that cite this headnote

**[3]** **Appeal and Error**
 Order or Decree of Dismissal

Appellate timetables run from the date an order granting a nonsuit is signed, rather than the date a nonsuit is filed.

Cases that cite this headnote

**[4]** **Alternative Dispute Resolution**
 Costs

Statute pertaining to judgments confirming, modifying, or correcting an arbitration award did not preclude a party from recovering attorney fees for compelling arbitration. V.T.C.A., Civil Practice & Remedies Code § 171.092(a).

Cases that cite this headnote

**[5]** **Alternative Dispute Resolution**
 Costs

Arbitration provision of employee's severance agreement, making each party responsible for its own attorney fees and costs for any disputes arising under or in connection with the agreement, did not preclude a party from collecting attorney fees and costs incurred to compel arbitration.

Cases that cite this headnote

**[6]** **Costs**
 Contracts

**Specific Performance**
 Costs

A "valid claim," within meaning of statute allowing a party to recover attorney fees in addition to the amount of a valid claim for breach of contract, is not limited to a claim for monetary damages, and may include a claim for specific performance. V.T.C.A., Civil Practice & Remedies Code § 38.001(8).

10 Cases that cite this headnote

**[7]** **Appeal and Error**
 Judgment

A nonmovant need not respond to a motion for summary judgment to contend on appeal that the movant's summary judgment proof is insufficient as a matter of law to support summary judgment.

Cases that cite this headnote

**[8]** **Appeal and Error**
 Costs and Allowances

**Appeal and Error**
 Attorney Fees

Abuse of discretion was not the appropriate standard for reviewing an award of attorney fees and costs rendered by summary judgment.

2 Cases that cite this headnote

**[9]** **Alternative Dispute Resolution**
 Costs

Conclusory statement, in summary judgment affidavit of attorney for employer, that "reasonable costs of $403.71 have been incurred in performing the tasks cited above" to compel arbitration of former employee's claims for fraud and breach of contract, with no indication of what the costs consisted of, was insufficient to prove the costs were reasonable and necessary, as would be required for employer to recover costs incurred to compel arbitration.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*284** Kent M. Hanszen, Houston, for appellant.

Tracy C. Temple, Thomas M. Melo, Houston, for appellee.

Panel consists of Justices EDELMAN, FROST, and GUZMAN.

### OPINION

RICHARD H. EDELMAN, Justice.

In this employment dispute, Robert Rasmusson appeals a judgment in favor of LBC PetroUnited, Inc. ("LBC") on the ground that the trial court erroneously awarded LBC attorney's fees. We affirm in part and reverse and remand in part.

### Background

Rasmusson filed suit against LBC, his former employer, alleging fraud and breach of contract. LBC filed a counterclaim seeking specific performance of the arbitration provision of the parties' severance agreement (the

"agreement") and recovery **\*285** of the attorney's fees and costs expended to compel arbitration. LBC then moved to compel arbitration, the trial court granted LBC's motion, and the resulting arbitration award denied Rasmusson's claims and referred the issue of attorney's fees and costs to compel arbitration back to the trial court. Rasmusson subsequently nonsuited the claims he had originally filed in the trial court, and LBC filed a motion for judgment (the "motion") on its claim for attorney's fees and costs. On September 6, 2002, the trial court signed a final judgment (the September judgment) awarding LBC those fees and costs.

### Timeliness of Appeal

 **[1]**    As a preliminary matter, LBC claims that Rasmusson's appeal should be dismissed because it was untimely. LBC contends that a February 19, 2002 order (the "February order"), granting LBC attorney's fees and costs, was a final judgment because it disposed of the only claim then remaining in the case and thus rendered Rasmusson's appeal, filed after the September judgment, untimely.

 **[2]**    **[3]**    In a case, such as this, where only one final and appealable judgment can be rendered, a judgment issued without a conventional trial is final for purposes of appeal only if it either actually disposes of all claims and parties then before the court, or states with unmistakable clarity that it is a final judgment as to all claims and parties (even if it is not). *Guajardo v. Conwell,* 46 S.W.3d 862, 863–64 (Tex.2001); *Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 192–3, 200 (Tex.2001). Appellate timetables run from the date an order granting a nonsuit is signed, rather than the date a nonsuit is filed. *In re Bennett,* 960 S.W.2d 35, 38 (Tex.1997).

In this case, the record does not contain a signed order that had granted Rasmusson's motion for nonsuit at the time the February order was entered. Therefore, the record does not reflect that the February order actually disposed of all the claims remaining at that time. Nor did the February order contain language purporting to dispose of all remaining claims and parties or otherwise unequivocally express an intent to finally dispose of the case. [1] Therefore, it was not a final order that began the time period in which Rasmusson's appeal had to be filed and caused his appeal to be untimely.

### Standard of Review

Although the motion does not contain the term, "summary judgment," it states that it was filed pursuant to Texas Rule of Civil Procedure 166a, which describes the procedure and requirements for summary judgment motions. Similarly, although **\*286** the statement of facts in Rasmusson's brief states that the September judgment was entered without a motion for summary judgment, the brief not only does not dispute that the motion was filed in accordance with Rule 166a, it recites the summary judgment standard of review as being applicable to the case. We will follow the same approach.

A traditional motion for summary judgment may be granted if the motion and summary judgment evidence show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or response. TEX.R. CIV. P. 166a. In reviewing a traditional summary judgment, we take all evidence favorable to the nonmovant as true and resolve every doubt, and indulge every reasonable inference, in the nonmovant's favor. *Tex. Commerce Bank, N.A. v. Grizzle,* 96 S.W.3d 240, 252 (Tex.2002).

### Award of Attorney's Fees and Costs

Rasmusson's sole point of error challenges the trial court's award of attorney's fees and costs to LBC on the grounds that: (1) the law does not allow recovery of attorney's fees incurred in compelling arbitration; (2) the agreement unambiguously provides that each party will bear its own attorney's fees incurred in any agreement dispute; (3) LBC failed to prove any contract damages supporting an attorney's fees award; (4) LBC waived its claim for attorney's fees when it failed to present its breach of contract claim to the arbitrator, asking instead for fees incurred merely to compel arbitration; (5) the attorney's fees awarded were unreasonable and unnecessary; (6) LBC's breach of contract claim was never adjudicated, and Rasmusson never got his day in court to assert his defenses to it; and (7) LBC failed to provide any evidence in support of the costs awarded.

 **[4]**    In support of his first argument, Rasmusson contends that section 171.092 of the Texas Civil Practice and Remedies Code ("CPRC") disallows recovery of attorney's fees for compelling arbitration. However, that section pertains to a judgment confirming, modifying, or correcting an award, not an order compelling arbitration, as in this case. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.092(a) (Vernon

Supp.2004). [2] Therefore, Rasmusson has not demonstrated that the law precludes a recovery of attorney's fees in this case.

 **[5]** In support of his second argument, Rasmusson argues that the award of attorney's fees and costs directly contradicts the plain language of the agreement, which requires each party to bear his or its own costs incurred in any dispute arising from the agreement:

> Any disputes arising under or in connection with this Agreement shall be resolved by arbitration to be held in Houston, Texas in accordance with the rules and procedures of the American Arbitration Association. All arbitration fees shall be borne equally by [the parties] and [each shall be] responsible for any attorneys' fees or other expenses incurred by either [of them].

(the "arbitration provision"). On the contrary, this provision applies only to fees and expenses incurred in resolving disputes by arbitration, *i.e.,* in accordance with the agreement, not to costs necessitated by a party's opposition to resolving **\*287** disputes by arbitration, in contravention of the agreement. Therefore, Rasmusson has not demonstrated that the award of attorney's fees and costs is inconsistent with the agreement.

 **[6]** Rasmusson next contends that attorney's fees could not be recovered by LBC under section 38.001(8) of the CPRC because LBC recovered no other monetary contract damages besides the attorney's fees and associated costs. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997) (allowing recovery of attorney's fees "in addition to the amount of a valid claim" for breach of contract). However, a "valid claim" for this purpose is not limited to one for monetary damages [3] and may include a claim for specific performance. *See Jones v. Kelley,* 614 S.W.2d 95, 96, 100–01 (Tex.1981) (reforming judgment to award attorney's fees, in accordance with jury verdict, under predecessor statute to section 38.001 in suit for specific performance of earnest money contract for sale of real estate). Because LBC sought attorney's fees in addition to its claim for specific performance of the arbitration provision of the agreement, its failure to recover other money damages did not preclude the award of attorney's fees.

Rasmusson next contends that LBC waived asserting its claim for attorney's fees *as a claim for breach of contract* by instead presenting it to the arbitrator as merely a claim for fees to compel arbitration. [4] The only portion of our record that reflects how LBC's attorney's fee claim was presented to the arbitrator is the following exchange:

> ARBITRATOR: And [LBC] is seeking attorney's fees that it incurred in going to court and compelling arbitration pursuant to the arbitration clause of the [agreement].... Is that correct?
>
> [LBC'S COUNSEL]: Correct.

The arbitration award similarly states:

> [LBC] seeks $16,707.50 in attorney's fees and $403.71 in court costs, [[ [5] ]] both of which were incurred when compelling arbitration in this matter. However, pursuant to the District Court's order compelling arbitration, and its subsequent abatement pending the arbitration outcome, it appears that the merits of the case are to be determined by the Arbitrator while the award of attorney's fees and costs to compel arbitration should be determined by the District Court. Therefore, the Arbitrator refers the matter of attorney's fees and costs to the District Court for adjudication.

\* \* \* \*

> The cost of arbitration is to be shared equally by the parties. The issue of attorney's fees incurred in court to compel arbitration is reserved for the District Court.
>
> All other relief not expressly granted is denied.

(paragraph numbers omitted). While it is not clear on what basis the arbitrator was distinguishing the "merits of the case" from the award of attorney's fees, we cannot say from this record that LBC presented its claim for attorney's fees to the arbitrator as something other than a **\*288** breach of contract claim and thereby waived its claim as such. [6]

Rasmusson next contends that the amount of attorney's fees sought and recovered by LBC was unreasonable and unnecessary for preparing and arguing a three-page motion to compel arbitration at a fifteen-minute hearing. However, because Rasmusson filed neither a cross-motion for summary judgment [7] nor summary judgment evidence controverting

that supporting LBC's motion on this issue,[8] we can neither render judgment in Rasmusson's favor nor conclude that a fact issue was raised on the reasonableness and necessity of the amount of attorney's fees awarded.

Rasmusson next argues that LBC never had its breach of contract claim formally adjudicated by the arbitrator or trial court and, accordingly, Rasmusson never got his day in court on his defenses to those claims. However, the motion plainly referred to the arbitration provision and argued that Rasmusson's filing of suit rather than submitting the dispute to arbitration was a breach of the agreement as a matter of law, causing LBC to incur expense in filing its motion to compel arbitration, as described in the attached affidavit of LBC's attorney. Rasmusson filed a response to the motion (the "response") in which he argued that: (1) LBC waived the claim by failing to ask the arbitrator to rule on whether Rasmusson had breached the contract; (2) LBC's request for relief from the court essentially sought to modify or vacate the arbitrator's award without satisfying the requisites for doing so; and (3) he disputed the reasonableness and necessity of the fees (but without supporting summary judgment evidence). Under these circumstances, it is not apparent how LBC's breach of contract claim was not formally adjudicated by summary judgment in its motion, Rasmusson's response, and the September judgment.

 **[7]**   **[8]**   **[9]**   Rasmusson lastly asserts that the trial court erred in awarding costs against him because LBC failed to provide any evidence of those costs.[9] The only summary judgment evidence LBC provided regarding costs was a single sentence in its attorney's affidavit: "Further, reasonable costs of $403.71 have been incurred in performing the tasks cited above [to compel **\*289** arbitration]." Because there is no indication of what these costs consisted of, there is no basis to establish whether they were reasonable or necessary other than the conclusory statement of the attorney, which is insufficient to support a summary judgment.[10] Therefore, we sustain Rasmusson's challenge to the sufficiency of the evidence to support the trial court's award of costs to LBC, reverse the portion of the judgment making that award, remand that issue to the trial court for further proceedings, and affirm the remainder of the judgment.

## SUPPLEMENTAL OPINION

Following the issuance of our original opinion, reversing the costs awarded by the trial court's judgment, appellee, LBC PetroUnited, Inc., timely filed a voluntary remittitur of those costs. *See* TEX.R.APP. P. 46.5. We conclude that LBC's voluntary remittitur cures the reversible error and accept it. Accordingly, we reform the judgment to remove the award of costs and affirm the judgment in accordance with the remittitur. *See id.*

### All Citations

124 S.W.3d 283

## Footnotes

1    The entire body of the February order stated:
Having considered all of the pleadings and the evidence in this case, this Court finds that [LBC's] Motion for Judgment on Fees and Costs is GRANTED.
It is ordered that LBC is entitled to the sum of $16,707.50 in attorneys' fees and $403.71 in costs for a total of $17,111.21.
By contrast, the September judgment is not only entitled "Final Judgment" but contains language unequivocally expressing an intent to finally dispose of the only remaining claim in the case (even though an order granting Rasmusson's nonsuit was apparently never entered):
This case came before the Court for final adjudication.... On September 24, 2001, [Rasmusson] non-suited its [sic] own claims leaving [LBC's] counter-claim the only remaining claim at issue in the case.
\* \* \* \*
It is therefore,
\* \* \* \*
ORDERED, ADJUDGED AND DECREED that this is a Final Judgment and that all relief sought in this case which is not specifically granted is hereby denied.

Nor are we at liberty to extrapolate the effect of this statute to circumstances outside its scope. *See City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 358 (Tex.2000) (noting that courts are not responsible for omissions in legislation, but must take statutes as they find them).

*Butler v. Arrow Mirror & Glass, Inc.,* 51 S.W.3d 787, 796 (Tex.App.-Houston [1st Dist.] 2001, no pet.).

However, neither party has cited a basis to recover attorney's fees to compel arbitration other than under section 38.001 of the CPRC.

The record does not reflect whether these costs were actually taxable court costs.

Rasmusson's brief states that the issue presented in this case is whether the trial court had authority to award attorney's fees. However, to the extent the claim for attorney's fees was within the scope of the arbitration provision, Rasmusson's brief does not challenge the authority of the arbitrator to refer it back to the trial court or the trial court's authority to decide the issue based on that referral.

*See, e.g., Dow Chem. Co. v. Bright,* 89 S.W.3d 602, 605 (Tex.2002) (reiterating that when both sides have moved for summary judgment, and one motion is granted and the other denied, the appeals court determines all questions presented and renders the judgment the trial court should have rendered).

*See, e.g., Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995) (reiterating that once a movant produces evidence sufficient to establish a right to summary judgment, the nonmovant must present evidence sufficient to raise a fact issue).

LBC contends that Rasmusson waived this complaint by failing to raise it in his response and that a trial court's award of attorney's fees and costs is reviewed for abuse of discretion. However, a nonmovant need not respond to a motion for summary judgment to contend on appeal that the movant's summary judgment proof is insufficient as a matter of law to support summary judgment. *M.D. Anderson Hosp. and Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000). Similarly, to whatever extent an award of attorney's fees and costs is reviewable for abuse of discretion in other contexts, LBC has not cited, and we have not found, any authority for doing so where such an award has been rendered by summary judgment.

*See Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) (reversing summary judgment because expert's affidavit, stating that defendant met the applicable standard of care, did not explain its basis to link that conclusion to the facts or explain why the procedure was medically warranted); *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999) (reiterating that conclusory statements made by an expert witness are insufficient to support summary judgment).

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**     Bourland v. Huffhines,     Tex.Civ.App.-Amarillo, October 25, 1922

104 Tex. 21
Supreme Court of Texas.

REDWINE

v.

HUDMAN.

Jan. 11, 1911.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Action by W. F. Hudman against R. A. Henderson and another. There was a judgment of the Court of Civil Appeals reversing a judgment for defendants, and defendant M. M. Redwine brings error. Judgment of Court of Civil Appeals reversed, and judgment of District Court affirmed.

West Headnotes (7)

**[1]     Contracts**
          Reasonableness of Construction

The court, in construing a contract, may reject an unreasonable, suggested construction when a more reasonable one is as consistent with the language used.

1 Cases that cite this headnote

**[2]     Public Lands**
          Abandonment

Where one settled and located his home on a school section, and purchased it and two other sections from the state, and then conveyed the three sections to a third person, who settled on the first section, it was necessary to the acquisition of title that the actual settlement should continue either on the original home section or on one of the additional sections for three years from the date of the original purchase.

Cases that cite this headnote

**[3]     Specific Performance**
          Performance Impossible

Specific performance of a contract will not be decreed unless complete performance by each party can be enforced, and equity will not decree a conveyance pursuant to a contract of sale which will defeat the title to be conveyed, or a conveyance which will not substantially accomplish the end intended.

5 Cases that cite this headnote

**[4]     Specific Performance**
          Performance Impossible

A purchaser of school land contracted to sell the land to a third person before title had vested in the purchaser by reason of continued actual settlement for the required statutory period, and agreed to execute a deed on the termination, in favor of the purchaser, of a pending suit involving the title to the land. The purchaser, before the completion of the time to acquire title by settlement, conveyed the land to another, who settled on it and complied with the statute so as to become a purchaser from the state. Held, that the third person could not compel a specific performance of the purchaser's contract, since the contract to convey to the third person was dependent on the purchaser's future action to acquire title, which action the court could not control.

1 Cases that cite this headnote

**[5]     Specific Performance**
          Options

A contract stipulating that one of two things shall be done at the election of the party who is to perform the contract, so as to give him the right to elect to perform the act called for or to pay a specific sum, cannot be specifically enforced, where the contract is satisfied by the payment of the money.

4 Cases that cite this headnote

**[6]** **Specific Performance**
 Options

A contract, stipulating that, in consideration of described personal property delivered by the purchaser to the vendor, the latter agrees to execute and deliver a deed to the purchaser of real estate described, and providing for the return of the personal property if the vendor shall fail or refuse from any cause to execute and deliver the deed, does not give the vendor the right to elect whether to return the personal property or execute a deed, but requires him to return the personal property when his failure to convey is justified, and the contract is in form subject to specific performance.

10 Cases that cite this headnote

**[7]** **Specific Performance**
 Effect of Stipulations for Liquidated Damages or Penalty

A contract which calls for the doing of an act, with a sum annexed as penalty or damages, to secure the performance of the act, may be specifically enforced.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*22** **\*\*427** John P. Marrs, L. W. Dalton, G. W. Perryman, and Wm. J. Berne, for plaintiff in error.

H. C. Ferguson, for defendant in error.

**Opinion**

WILLIAMS, J.

This action was brought by Hudman against R. A. Henderson for specific performance of a contract for the conveyance of land; Redwine, the plaintiff in error, being joined as a subsequent purchaser from Henderson. The contract is as follows: "The State of Texas, County of Lynn. This agreement this day entered into between R. A. Henderson, party of the first part, and W. F. Hudman, party of the second part, witnesseth: That said party of the first part, for and in

consideration of the following described property, to wit: One bay horse about 14 1/2 hands high, nine years old unbranded. Also one bay horse about 14 1/2 hands high four years old and branded X on left thigh. Also two sorrel horses, one four and one five years old branded R. F. on left shoulder. **\*23** Also four buggies, one Perry buggy, been in use about thirteen months and three new Banner buggies. Two new sets of single harness and one set of old single buggy harness and one set of new double harness. Said property of the reasonable market value of three hundred and twenty dollars. Said property this day sold and delivered by the party of the second part to the said party of the first part herein. The said party of the first part agree to make, execute and deliver to the party of the second part a good and sufficient deed to a certain section of state school land in Lynn county, Texas, after a certain suit which is now pending involving the title to said land shall have been terminated in favor of the party of the first part herein. Said land described as follows, to wit: Being all of state school section No. 448, Cert. No. 446, in block No. 1, E. L. & R. R. R. R. Co. Said land of a reasonable market value of three hundred and twenty dollars. It is further agreed and understood by and between the parties herein mentioned that if the said party of the first part herein shall fail or refuse from any cause to execute and deliver said deed to said party of the second part then and in that event the party of the first part shall deliver to the party of the second part said property herein conveyed to him and in the event of his failure or inability to deliver said property then the party of the first part shall pay to the party of the second part the reasonable market value of said property. It is further agreed and understood between and by the parties to this contract that the party of the second part agrees to pay off and discharge any and all indebtedness that may be against said property herein conveyed and to warrant and defend the title to the same against any and all incumbrances, liens and claims whatsoever. In testimony whereof we have hereunto set our hands and seals this the 5th day of September, 1903. R. A. Henderson, Party of the First Part. W. F. Hudman, Party of the Second Part." The judgment of the district court was in favor of defendant, but it was reversed by the Court of Civil Appeals, and another was rendered by that court in plaintiff's favor for the land, subject to such right as Redwine might show to compensation for improvements in good faith, for inquiry into which subject alone the cause was remanded.

The first objection made to the judgment is that it is not authorized by the contract, which, it is urged, did not bind Henderson to convey the land, but left him the right to rfeuse to do so and, instead, to return the property received as the consideration, or to pay its market value. Irrespective of the

other features of the case discussed later, **\*\*428** we do not think the suggested construction of the contract is the proper one. Much has been well said in the opinions of this court from Hemming v. Zimmerschitte, 4 Tex. 159, to Moss v. Wren, 102 Tex. 567, 113 S. W. 739, 120 S. W. 847, affirming the right to specific performance of contracts for the conveyance of land which contain stipulations for the payment of sums of money, called penalties, or liquidated damages, inserted to secure the performance of the act agreed to be performed. A different **\*24** class of contract is that where one of the parties is given the election to do something else in lieu of conveying the land.

The principle which controls is well settled. It is thus stated: 'The question always is: What is the contract? Is it that one certain act shall be done, with a sum annexed, whether by way of penalty or admages, to secure the performance of this very act? Or is it that one of two things shall be done at the election of the party who has to perform the contract, namely, the performance of the act or the payment of the sum of money? If the former, the fact of the penal or other like sum being annexed will not prevent the court enforcing the performance of the very act, and thus carrying into execution the intention of the parties. If the latter, the contract is satisfied by the payment of a sum of money, and there is no ground for proceeding against the party having the election, to compel the performance of the other alternative.' Fry on Specific Performance, § 115. See, also, 36 Cyc. 571, 572. Whether a contract belongs to one class or the other depends on the intention deduced from a proper construction of the instrument in which the parties have expressed their agreement.

There is certainly no room for the contention that the contract sued on belongs to the first class mentioned in the above quotation. No sum of money is mentioned either as a penalty or as liquidated damages to secure the conveyance of the land. On the contrary, the agreement is to return the consideration, or its equivalent, in case the deed is not executed; that is, to do that which would constitute a rescission. We think counsel for defendant is clearly correct in giving that construction to the instrument. We are unable to admit, however, that the rescission is authorized at Henderson's mere election. The agreement is not so expressed. The first stipulation is that he will convey, and the second is that if he 'fail or refuse from any cause' to execute the deed he shall do the other thing, which is not apt or appropriate language in which to express an unconditional right of rescission at the mere election of the vendor. If it has the effect of a reservation of such a

right, it must be because that right is necessarily involved in that which the contract allows. Was it the intention that Henderson should not be bound to convey the land at all if without just cause he should choose not to do so? That it was is the contention of the defendant, expressed in its simplest form. We think it does not give proper weight to the word 'cause.'

The contract does not say or mean that Henderson will return the property delivered or its value, if he elect or choose not to convey, but that he will return, etc., if he fail or refuse to convey for cause, that is, for something causing him to fail or refuse, and justifying his failure or refusal rather than the mere exercise of his own volition. This explanation frees the contract from a criticism that would render it not only unreasonable, but well-nigh futile. We thus characterize the contract, as the defendant would construe it, because of the fact of the delivery of the perishable personal property into the possession of the vendor, as the price of the land, to be held and enjoyed by him at least so long as the law suit referred to should last, with no corresponding obligation but that finally to elect whether he would convey the land **\*25** or return the property, or its value, with no provision for deterioration in it or compensation for its use. Of course mere improvidence in a contract does not control its plain provisions, but an unreasonableness in a suggested construction may justly prevent its adoption when a more reasonable one is as consistent with the language used. The construction contended for gives to the words so often quoted the same meaning as if they were 'if the vendor shall fail or refuse for any reason satisfactory to himself.' Those used may reasonably be interpreted differently so as to avoid absurd consequences.

We conclude that in the mere wording of the contract a conclusive reason is not found against specific performance, and, therefore, take up the next objection, which is that such relief cannot properly be adjudged because Henderson, a purchaser of the land from the state as an actual settler under the statutes regulating sales of the public school lands, not having completed the required occupancy, could not legally bind himself to convey as attempted. The facts are these: One Green first settled and located his home on another section and then purchased it and two others in addition, one of which is the land in controversy. He conveyed the three to Henderson, who also settled on the one first mentioned, and properly recorded and filed in the land office his deed and was substituted in place of Green as purchaser. It was therefore necessary to the acquisition of title that an actual settlement

be continued either on the original home section, or on one of the additional ones, for three years from the date of Green's purchase. Henderson made the contract with Hudman with his claim to the land in this situation, and afterwards, before the completion of the three **\*\*429** years, conveyed the section in controversy and the other additional one to Redwine, who settled on the latter, and filed his deed and obligations in the land office in compliance with the statute so as to become a purchaser from the state. The lawsuit referred to in the contract was decided in 1908 in Henderson's favor.

We are not prepared to hold that the contract between Henderson and Hudman was illegal, in that it was necessarily violative of the provisions or policies of the statutes, under which the former held. The instrument contains no stipulation that, so far as we can now see, would necessarily contravene any of the purposes disclosed in the statutes; and, if Henderson had retained the section in question until he completed his occupancy, it may be that there would be no obstacle to the enforcement of his agreement. It is well, however, to proceed with caution in dealing with this subject, and we find it unnecessary to determine this question definitely. Conceding that the contract is a lawful one, it by no means follows that it is one to which the remedy of specific performance can be applied. That it is not will, we think, appear from a proper consideration of the facts stated.

Of course a court of equity will not decree a conveyance which will defeat the title to be conveyed, nor one which will not substantially accomplish the end intended. It is obvious that, if the lawsuit had been decided before the three years' occupancy was complete, no performance of the contract could properly have been decreed. The reason is that the court could not have required Henderson to maintain the settlement necessary to the efficacy of the decree to confer any title. **\*26** Thus that title would have been exposed to a danger against which the court could not have provided. If it be said Hudman could have settled and completed the occupancy, the answer

is that the court could not have compelled him to do so, even if the contract had contemplated that he should, which is admitted not to have been the case. Specific performance will not be decreed unless complete performance by each party can be enforced, which was not true here as to either party. Therefore at the time Henderson conveyed to Redwine there was no right in Hudman to enforce a conveyance of the land. Such a right could only have become complete from a compliance by Henderson with the statutory requirement as to occupancy and a consequent acquisition of the title. The contract to convey the land was necessarily dependent on Henderson's future action, and, as that action was not to be of a nature that could be required of Henderson by the decree of any court, no enforceable right to a conveyance could arise against him unless he obtained the title. He has never done that; but Redwine, proceeding in strict accordance with the statutes, has put himself in the position of purchaser from the state and as such has completed the necessary occupancy, and, under positive statutory provisions, is entitled to be recognized by the state as owner.

When Henderson contracted to convey to Hudman, the title was in the state to be acquired in accordance with the statute. Redwine has strictly complied with those statutes, and Hudman has not. The equitable jurisdiction of courts of equity to enforce specific performance is inapplicable to such a situation.

The judgment of the district court was correct, and that of the Court of Civil Appeals erroneous.

Judgment of Court of Civil Appeals reversed. Judgment of district court affirmed.

**All Citations**

104 Tex. 21, 133 S.W. 426

**WestlawNext** © 2015 Thomson Reuters. No claim to original U.S. Government Works. 4

118 S.W.3d 73
Court of Appeals of Texas,
Austin.

ROUNDVILLE PARTNERS, L.L.C. and
Quintana Development Corporation, Appellants,

v.

Stephen M. JONES and
Frankie Sue Jones, Appellees.

No. 03–02–00712–CV. | Aug. 29,
2003. | Rehearing Overruled Nov. 13, 2003.

Purchasers brought action against vendors arising out of the failure to consummate a sale of real property, seeking specific performance of the earnest money contract. Summary judgment was awarded to vendors, and the Court of Appeals reversed and remanded. On remand, after a bench trial, the 26th Judicial District Court, Williamson County, Billy Ray Stubblefield, J., rendered judgment in favor of vendors. Purchasers appealed. The Court of Appeals, David Puryear, J., held that vendors' failure to perform their obligations under the contract did not prevent purchasers from tendering performance, and thus purchasers were not entitled to specific performance.

Affirmed.

West Headnotes (10)

**[1]**    **Appeal and Error**
 Sufficiency of Evidence in Support

When the trial court acts as a fact finder, Court of Appeals reviews its findings under the legal and factual sufficiency standards.

2 Cases that cite this headnote

**[2]**    **Specific Performance**
 Discretion of Court

**Specific Performance**
 Form of Remedy

Specific performance is an equitable remedy that rests in the discretion of the court.

2 Cases that cite this headnote

**[3]**    **Specific Performance**
 Necessity

**Vendor and Purchaser**
 Obligation to Convey in General

**Vendor and Purchaser**
 Tender

In cases where the vendor's and purchaser's contract obligations pertaining to the sale of real property are mutual and dependent, in that a deed is required to be delivered upon tender of the purchase price, a valid tender of the purchase price invokes the vendor's obligation to convey and places him in default if he fails to do so, and the tender also satisfies the fundamental prerequisite of specific performance—that the purchaser show that he has done or offered to do, or is then ready and willing to do, all the essential and material acts which the contract requires of him.

5 Cases that cite this headnote

**[4]**    **Tender**
 Mode and Sufficiency

The term "tender" means to notify the other party that one intends to perform one's side of a bargain immediately or at a specific time and place and to demand that the other party do likewise.

3 Cases that cite this headnote

**[5]**    **Specific Performance**
 Necessity

In general, actual tender of performance is a prerequisite to obtaining the remedy of specific performance; however, when actual tender would have been a useless act, an idle ceremony, or wholly nugatory, constructive tender will suffice.

Cases that cite this headnote

**[6]**    **Specific Performance**
 Time as of the Essence of the Contract

When a contract for the sale of real property specifies that time is of the essence, the purchaser must make an actual tender of the price and demand of the deed within the time allowed by the contract in order to be entitled to specific performance.

2 Cases that cite this headnote

[7] **Specific Performance**
 Time as of the Essence of the Contract

When time is of the essence in a contract, a party must perform or tender performance in strict compliance with the provisions of the contract and within the time prescribed in order to be entitled to specific performance.

4 Cases that cite this headnote

[8] **Specific Performance**
 Necessity

Vendors' failure to execute a deed and other necessary documents under contract for sale of real property, and their failure to take affirmative action to close the contract, did not prevent purchasers from tendering their own performance before expiration of the contract, and thus purchasers were not entitled to specific performance; purchasers executed all necessary documentation after expiration of the contract even though vendors still had not performed the obligations purchasers alleged prevented them from tendering performance, and there was no evidence purchasers could not have done so before expiration of the contract.

1 Cases that cite this headnote

[9] **Specific Performance**
 Necessity

Vendors' failure to pay property taxes and obtain a waiver of a right of first refusal did not prevent purchasers from tendering performance under contract for sale of real property, and thus purchasers were not entitled to specific performance of contract, where contract specified that vendors' obligations were due at

closing, contract never closed, and thus vendors' performance was not yet due.

Cases that cite this headnote

[10] **Contracts**
 Grounds of Action

The elements of a breach of contract claim are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages to the plaintiff resulting from the breach.

7 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*74** Eric J. Taube, Sarah Elizabeth Starnes, Hohmann, Taube & Summers, L.L.P., Robert C. DeCarli, Law Offices DeCarli & Irwin, Austin, R. Mark Dietz, Dietz & Associates, P.C., Round Rock, for Appellants.

Don H. Magee, David B. Young, Michael A. Wren, McGinnis, Lochridge & Kilgore, L.L.P., Austin, for Appellees.

Before Chief Justice LAW, Justices B.A. SMITH and PURYEAR.

*OPINION*

DAVID PURYEAR, Justice.

After a sale of commercial real estate was not consummated, appellants Roundville Partners, L.L.C. and Quintana Development **\*75** Corporation (collectively "Roundville")  sued Stephen M. and Frankie Sue Jones seeking specific performance of the commercial earnest-money contract. Both parties moved for summary judgment, and the district court granted the Joneses' motion and denied Roundville's motion. Roundville appealed to this Court and we reversed and remanded, holding that a genuine issue of material fact existed. *See Roundville Partners, L.L.C. v. Jones,* No. 03–00–00724–CV, 2001 WL 838736, 2001 Tex.App. LEXIS 4970 (Austin July 26, 2001) (not designated for publication) [hereinafter "*Roundville I* "]. Following a

bench trial, the district court rendered judgment in favor of the Joneses and ordered that Roundville take nothing. On appeal, Roundville claims that (1) there is legally and factually insufficient evidence to support the trial court's holding that Roundville was not entitled to specific performance; (2) there is legally and factually insufficient evidence to support several of the district court's findings of fact and conclusions of law, specifically its findings regarding the Joneses' affirmative defenses; and (3) there is legally and factually insufficient evidence to support the district court's holding that Roundville is not entitled to attorney's fees. We will affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 1997, Michael Macs, the president and sole shareholder of Quintana, executed an earnest-money contract with the Joneses, through their real estate agent, Bob Elder, for the sale of 22.3 acres of land. The property, a platted subdivision known as the Henderson Tract Subdivision, is located in Round Rock, Texas, and consists of five lots. The property included a single house that straddled lots 1 and 4. The parties negotiated a purchase price of $1,800,000 based on an average valuation of $1.83 per square foot, with $360,000 to be paid in cash at closing and the balance of the purchase price to be financed by a long-term note payable to the Joneses ("contract one"). Prior to the closing date of December 31,1997, Elder approached Macs with a request from the Joneses to restructure the deal into two separate contracts ("contract two" and "contract three") to allow the Joneses to take advantage of the tax deferral for the sale of their primary residence. Contract two is a residential earnest money contract and contract three is a commercial earnest-money contract. [2] The parties agreed to close the second contract on December 31, 1997. [3] The third contract was to close on or before January 30, 1998.

Under contract two, the Joneses agreed to convey the property containing their residence, consisting of all of lot 4 and approximately five acres of lot 1, for $560,000—approximately $1.83 per square foot. [4] Macs was to pay $360,000 in cash and execute a long-term note to the Joneses for $200,000.

On December 31, 1997, the parties met at Alamo Title Company to close contract two. Carolyn Stegall, the closing agent, **\*76** informed Macs that because the portion of

Lot 1 included in contract two was not surveyed, the title company would not issue a title commitment or title policy. Additionally, Macs discovered that a partial conveyance of Lot 1 might jeopardize the property's status as a platted subdivision and cause the property's value to decrease significantly. The parties agreed to modify the property description in contract two to encompass only Lot 4. Although the amount of the property to be conveyed was reduced, there was no adjustment to the purchase price. Consequently, at closing the Joneses received $560,000, an amount that exceeded the fair market value of Lot 4, which was approximately $68,000.

Because Roundville lacked sufficient cash to close contract two as originally agreed, the Joneses agreed to restructure the financing for the $560,000 purchase price. As a result, Roundville paid the Joneses $331,537.17 in cash, rather than the $360,000 originally contemplated. Roundville executed a long-term note for $200,000 to the Joneses as originally agreed and executed a second promissory note to the Joneses for $6,862.83, payable on or before January 13, 1998. [5] Both Macs and Elder testified that the understanding of the parties at the time contract two closed was that contract three would close within a couple of weeks, enabling Roundville to pay the $6,862 contemporaneously with the closing of contract three.

Consistent with the changes made to contract two, the parties modified the property description in contract three to encompass Lot 1 in its entirety, along with Lots 2, 3, and 5. Section nine of the contract required that the parties close the sale on or before January 30, 1998. Further, in section twenty-three, the parties agreed that "time is of the essence."

Stegall had closing documents prepared on January 23, 1998, with an anticipated closing to be held on January 30, 1998. Included in these documents was a HUD settlement statement that showed the Joneses would need $15,000 at closing. Stegall testified that she was informed by the Joneses that they did not have the cash to close. Stegall told Elder, who immediately called the Joneses and confirmed that they did not have sufficient funds to close by January 30, 1998.

Mr. Jones denied telling anyone that he lacked the funds to close, although in his earlier deposition testimony he stated that he could not remember whether he told anyone that he could not close on contract three because of a cash shortage. He also admitted that he did not then possess the money

necessary to close, but claimed he could have borrowed the money from relatives.

Meanwhile, the due date on the $6,862 note from Roundville had passed. The Joneses told Elder they wanted payment on the note. Elder called Macs to inform him that the Joneses were looking for payment on the second note. Macs expressed concern about giving more money to the Joneses before contract three closed and wanted to tie the payment of the $6,862 note to the closing on contract three, either by crediting the note against the amount the Joneses owed at closing or by tendering the check to them at the closing. The Joneses refused this because they regarded the $6,862 note as a separate obligation under contract two, and unrelated to contract three. Mr. Jones testified that he viewed Macs's attempt to **\*77** tie the payment of the note to the closing on contract three as an attempt to "blackmail" him to close.

The closing on contract three did not take place in January 1998. Stegall, Elder, and Macs all testified that their understanding of why contract three did not close in January was that the Joneses needed more time because they lacked sufficient funds to close. The Joneses, however, testified that the reason contract three did not close was because they were never told an exact date and time for the closing and they were never provided a closing statement showing how much money they needed to close.

After the original closing date of January 30, 1998 passed, Macs, Elder, and Stegall all testified that they were under the impression that the closing deadline would be extended. Elder asked Stegall to prepare an addendum to the purchase agreement extending the closing date. Stegall prepared the extension and sent it to Elder, who then contacted the Joneses. Elder testified that he believed they were proceeding forward. Both Elder and Macs signed the extension. The Joneses, however, never signed the extension.

At some point after January 30, the Joneses hired Rick Akins to collect the amount owed them on the $6,862 note from Roundville. Meanwhile, both parties made several subsequent attempts during the spring to close contract three. Closing dates were set for February 27 and then again for March 3, but the parties did not consummate the sale on either of those dates. On March 20 by a letter to Akins, Roundville demanded that the Joneses close contract three no later than March 27, 1998, at 5:00 p.m. On March 27, Roundville notified Akin that the closing was set for that day at 4:00 p.m. Macs and Elder arrived at Stegall's office for the

closing, but the Joneses did not attend. At that time, Macs signed the deed of trust and accompanying real estate lien note. Another closing date was set for April 10, but that also did not take place. Akin then scheduled a closing date for April 17, which was later delayed to April 20. This attempt to close contract three was also unsuccessful.

As a result of the failure to close contract three, Roundville filed suit against the Joneses in May 1998 to compel the Joneses to convey the remainder of the property as required under contract three. Both parties moved for summary judgment. Roundville moved for summary judgment on the issue of specific performance. In support of their motion for summary judgment, the Joneses claimed, among other things, that Roundville had failed to tender performance and the contract had expired under its own terms. In June 1999, the district court rendered judgment granting the Joneses' motion and denying Roundville's motion. Roundville appealed to this Court, which reversed the trial court's summary judgment, finding that a genuine issue of material fact existed concerning the Joneses' actions and whether they prevented Roundville from complying with the terms of the third contract. *See Roundville I,* No. 03–00–00724–CV, 2001 WL 838736, 2001 Tex.App. LEXIS 4970.

Meanwhile, in May 1999, Roundville declared bankruptcy. Roundville attempted to recover all monies conveyed to the Joneses under contract two that exceeded the fair market value of Lot 4, asserting that such amount was a fraudulent transfer under federal and Texas law. [6] *See* **\*78** 11 U.S.C.A. § 548(a)(1)(B)(i), (ii)(I) (West Supp.2003); Tex. Bus. & Com.Code Ann. § 24.006(a) (West 2002). After a bench trial, the bankruptcy court rejected Roundville's fraudulent-transfer argument. Roundville, however, did obtain a discharge of its obligation under the $200,000 note to the Joneses to the extent that it exceeded the fair market value of Lot 4, apparently because the Joneses did not file a proof of claim.

In June 2002, this case was tried to the court. After a bench trial, the district court rendered judgment in favor of the Joneses and against Roundville. It is from this judgment that Roundville now appeals.

### DISCUSSION

#### *Standard of Review*

 [1]  When the trial court acts as a fact finder, we review its findings under the legal and factual sufficiency standards. *In*

*re Doe,* 19 S.W.3d 249, 253 (Tex.2000). When we review legal sufficiency, we review the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *Lee Lewis Const., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). If more than a scintilla of evidence exists, it is legally sufficient. *Id.* More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Id.* at 782–83.

In reviewing a factual sufficiency issue, we conduct a neutral review of all the evidence. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We reverse the ruling for factual insufficiency of the evidence only if the ruling is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.* We will not substitute our judgment for that of the trier of fact merely because we might reach a different conclusion. *The Cadle Co. v. Regency Homes, Inc.,* 21 S.W.3d 670, 674 (Tex.App.-Austin 2000, pet. denied).

*Specific Performance*

In its first issue, Roundville claims that the evidence was legally and factually insufficient to support the trial court's holding that it was not entitled to specific performance. Roundville first claims that it was entitled to specific performance based on the decision by this Court in *Roundville I,* where we held that Roundville must show at trial that it was prevented from tendering performance by the Joneses. *Roundville I,* No. 03–00–00724–CV, 2001 WL 838736, 2001 Tex.App. LEXIS 4970. Roundville claims that it established conclusively that the Joneses prevented it from tendering performance by not performing several of their obligations under contract three. Specifically, Roundville argues that the failure of the Joneses to execute a warranty deed prevented it from executing a real estate lien note. Further, Roundville argues that the Joneses prevented a closing date from being set by causing all persons involved with the closing to believe that they lacked money to close and wished to extend the closing deadline.

 **[2]**    As this Court discussed in *Roundville I,* specific performance is an equitable remedy that rests in the discretion of the court. *Scott v. Sebree,* 986 S.W.2d 364, 370 (Tex.App.-Austin 1999, pet. denied); *Nash v. Conatser,* 410 S.W.2d 512, 519 (Tex.Civ.App.-Dallas 1966, no writ). This Court has previously acknowledged that this equitable remedy is frequently granted when a **\*79** valid contract to purchase real property is breached by the seller. *Scott,* 986 S.W.2d at 370 (citing *Kress v. Soules,* 152 Tex. 595, 261 S.W.2d 703,

704 (1953)). A decree of specific performance is not a matter of right even to enforce terms of a contract, but is "a matter of grace" in the discretion of the court. 14 *Powell on Real Property* § 81.04[1][c] (Michael Allan Wolf ed., 2000).

 **[3]    [4]**    In *Bell v. Rudd,* the supreme court held, as a fundamental matter, that before a grantee or obligee may assert any rights under an escrow contract he must show that he has complied with the conditions of the escrow, *i.e.,* actually tendered performance, or has offered to perform and was *prevented* without fault of his own. 144 Tex. 491, 191 S.W.2d 841, 844 (1946). In cases where the seller's and buyer's contract obligations are mutual and dependent, in that a deed is required to be delivered upon tender of the purchase price, the purpose of a tender satisfies two purposes. First, a valid tender of the purchase price invokes the seller's obligation to convey and places him in default if he fails to do so. Second, the tender satisfies the fundamental prerequisite of specific performance—that the buyer show that he has done or offered to do, or is then ready and willing to do, all the essential and material acts which the contract requires of him.[7] *Wilson v. Klein,* 715 S.W.2d 814, 821 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (citing 4 *Pomeroy's Equity Jurisprudence* § 1407, p. 1050 (5th ed.1941); 17 Am.Jur.2d §§ 63, 64, pp. 91–92 (1973); annot., 79 A.L.R. 1240 (1932)).

 **[5]    [6]    [7]**    In *Wilson,* this Court contemplated under what circumstances an actual tender is required or when a constructive tender will suffice. *Id.* In general, actual tender is a prerequisite to obtaining the remedy of specific performance. However, when actual tender would have been a useless act, an idle ceremony, or wholly nugatory, constructive tender will suffice. *Id.* at 822. For example, when a seller has conveyed the property to a third person, actual tender by a buyer is unnecessary. *Id.* However, when the contract specifies that "time is of the essence," as this contract does, there is a more particular rule that applies. *Id.* "In such cases, the buyer 'must make an actual tender of the price and demand of the deed' *within the time allowed by the contract.*" *Id.* (quoting 4 Pomeroy, *supra,* at 1052). When time is of the essence in a contract, a party must perform or tender performance in strict compliance with the provisions of the contract and within the time prescribed in order to be entitled to specific performance. *Id.* (citing *Liedeker v. Grossman,* 146 Tex. 308, 206 S.W.2d 232, 234–35 (1947)).

Where one party claims that it was prevented from tendering actual performance in strict compliance within the prescribed time, as in this case, *Ratcliffe v. Mahres* is instructive. 122

S.W.2d 718, 721 (Tex.Civ.App.-El Paso 1938, writ ref'd). In *Ratcliffe,* the court of appeals considered a suit for specific performance on a contract to convey an undivided interest in an oil well and certain oil leases. *Id.* The court noted that the language of the contract, as well as the nature of the transaction, indicated that time was of the essence. *Id.* The court then stated that for Ratcliffe to obtain specific performance, he had to show that he had complied with the contract obligations, or that compliance was prevented by Mahres, attributing the rule **\*80** governing these circumstances to Pomeroy's treatise, *Equity Jurisprudence. Id.* at 721–22. After reviewing the evidence concerning Mahres's conduct and noting that Ratcliffe had not produced evidence of facts sufficient to excuse his non-performance, the court concluded that Ratcliffe was not entitled to specific performance. *Id.* at 722.

 **[8]**    It is undisputed that Roundville did not actually tender performance on this contract within the time specified— January 30, 1998. Because Roundville conceded that it did not actually tender performance, it had the burden to prove at trial that it was prevented from tendering performance by the actions of the Joneses. In *Roundville I,* we held that a genuine issue of material fact existed as to whether or not the Joneses prevented Roundville from tendering performance. *Roundville I,* No. 03–00–00724–CV, 2001 WL 838736 at \*9–10, 2001 Tex.App. LEXIS 4970 at \*29–31. Roundville asserts that it has satisfied the prerequisite of tender because, at all times it has been ready, willing, and able to tender performance on contract three but was prevented from doing so by the actions of the Joneses. Roundville claims that the Joneses failed to fulfill their obligations in the following ways: (1) failure to execute a warranty deed and prepare other necessary documents; (2) failure to obtain a right of first refusal from GTE; [8] and (3) failure to pay property taxes.

Macs testified that all Roundville needed to do to close was show up and sign a real estate lien note and deed of trust. He said that when he stopped by the title company in late January there was a draft of a note and deed, but they were incomplete, missing dates and some addresses. Stegall told him that they would be filled in at the closing, which was not yet scheduled. Macs testified that he was in constant contact with Stegall to arrange for a closing date, yet a closing was never scheduled in January. However, a closing was scheduled at least six times after the January 30 closing date specified in the contract. Further, while Macs was in contact with the title company, he never contacted the Joneses to offer or demand to close on or before January 30. [9]

The Joneses testified that the reason a closing was not scheduled in January was because they were not provided with a closing statement indicating what they needed in order to close. They also indicated that they were never told a time or place when closing would occur. Mr. Jones testified that he never told anyone that he did not have enough cash to close. He indicated that while he did not personally have sufficient funds, he had the ability to borrow what was needed from a family member. He claimed that he could not do so until he was provided a closing statement showing him exactly how much he needed.

It is clear that neither party involved made an explicit request or demand that the contract close in January. The Joneses did not schedule a closing, nor did Roundville. The Joneses allowed the closing date to come and go without any affirmative action on their part to ensure that contract three closed by January 30. They claimed that they were waiting for **\*81** the title company to provide them with a closing statement and for notification of when and where the closing would take place. The Joneses were not in default under the contract prior to or on January 30, at which time the contract expired by its own terms. We cannot say that the inaction on the part of the Joneses rises to the level of affirmatively preventing Roundville from tendering performance.

 **[9]**    Roundville claims that it was prevented from executing a real estate lien note because of the failure of the Joneses to execute a deed conveying the property. [10] However, Roundville did execute a lien note without a deed on March 27, 1998. On March 20, Roundville demanded that the Joneses close contract three by March 27 at 5:00 p.m. Roundville set the closing for March 27 at 4:00 p.m., notifying the Joneses through Akin. Roundville then went to the title company and executed all the documents necessary for closing, even though the Joneses were not present and did not furnish the documents called for in contract three, specifically the deed conveying the property. There is no evidence that Roundville could not have done the same thing on or before January 30, 1998. The Joneses' actions or inactions did not prevent Roundville from tendering performance in March. There is nothing in the record that explains why Roundville could not have executed the necessary documents to close in January.

The evidence surrounding the events leading up to the attempted closing of contract three is not disputed. Roundville did not set a closing or demand that one be set on or before

January 30. Neither did the Joneses. Neither party went to the title company to tender performance of their obligations under contract three by the January 30 deadline, when the contract expired by its own terms. Roundville claims that it assumed, by the parties' actions that the contract had been extended, but in fact the Joneses never signed the extension agreement prepared by Elder. The only dispute is whether the actions of the Joneses *prevented* Roundville from tendering performance. Roundville has not established that the Joneses prevented it from actual tender of performance within the time specified.

The acts Roundville complains of as preventing it from tendering performance under contract three do not establish that it was in fact prevented from performing its obligations. There were no contrary facts for the district court to consider. Rather, the dispute is in the conclusion that the actions complained of did or did not prevent Roundville from tendering performance. Because there is only one version of the facts on the pivotal point of whether the Joneses prevented Roundville from tendering performance, we cannot say that the district court's judgment is clearly wrong or unjust. These convoluted negotiations appear to have produced an inequitable result, but under the facts presented, Roundville is not entitled to the remedy of specific performance. We hold that the evidence is legally and factually sufficient to support the district court's findings and conclusions that Roundville is not entitled to specific performance. Issue one is overruled. Because we hold that the trial court did not err in holding that Roundville was not entitled to specific performance, it is unnecessary to reach issues two, three, and four.

**\*82** *Breach of Contract*

**[10]**  In its fifth issue, Roundville argues that the trial court erred in its failure to find that the Joneses breached contract three. The elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach. *National W. Life Ins. Co. v. Rowe,* 86 S.W.3d 285, 297 (Tex.App.-Austin 2002, pet. filed). Because we have held that Roundville did not tender performance and its tender was not prevented by the Joneses, its breach of contract claims also fails. We overrule issue five.

*Attorney's Fees*

In its sixth issue, Roundville claims it conclusively established its entitlement to attorney's fees. However, in order to be entitled to attorney's fees, a party must prevail on its suit based on a written contract. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8) (West 1997). Because Roundville has not prevailed on any of its claims, it is not entitled to attorney's fees. Issue six is overruled.

**CONCLUSION**

Having overruled Roundville's issues, we affirm the judgment of the trial court.

**All Citations**

118 S.W.3d 73

Footnotes

1    Quintana Development Corporation owns a seventy-percent interest in Roundville Partners, L.L.C. and serves as Roundville's manager.

2    Contract two and contract three do not contain any references to each other.

3    The Joneses needed to close contract two on December 31, 1997, because they had planned to use the proceeds of the sale in a simultaneous closing on a new house.

4    It was the intent of the parties that contract two would convey $560,000 worth of land at $1.83 per square foot, maintaining the price per square foot established in contract one.

5    In order to facilitate the closing in light of the cash shortage, Elder agreed to take his commission in the form of two notes—one from the Joneses and one from Roundville in the amount of $21,600. This note, coupled with the $6,862.83 note to the Joneses, covered the cash shortage of $28,462.83.

6    A transfer may be fraudulent if a debtor made the transfer without receiving a reasonably equivalent value in exchange, and the debtor was insolvent or became insolvent because of the transaction. 11 U.S.C.A. § 548(a)(1)(B)(i), (ii)(I) (West Supp.2003); Tex. Bus. & Com.Code Ann. § 24.006(a) (West 2002).

7    The term "tender" means to notify the other party that one intends to perform one's side of the bargain immediately or at a specific time and place and to demand that the other party do likewise. *Perry v. Little,* 419 S.W.2d 198, 200–01 (Tex.1967).

8    GTE had a lease on the property to be conveyed under contract three that included a right of first refusal on any offer to purchase the property. The Joneses were required to obtain a waiver of this right at closing.

9    Macs also testified that he was told that there would not be a closing in January because the Joneses did not have sufficient funds to close; however, this information was provided by Stegall or Elder, not the Joneses.

10   Roundville also claims that the Joneses failure to pay property taxes and obtain a right of first refusal from GTE prevented it from tendering performance. This argument is without merit. The contract specified that these items would be furnished *at closing.* Since this contract has not yet closed, performance is not yet due.

---

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    Olley v. HVM, L.L.C.,    Tex.App.-Hous. (14 Dist.), October 14, 2014

222 S.W.3d 921
Court of Appeals of Texas,
Tyler.

RUS–ANN DEVELOPMENT, INC., Appellant,
v.
ECGC, INC., Appellee.

No. 12–06–00324–CV.    |    April 30, 2007.    |    Rehearing Overruled May 30, 2007.

**Synopsis**

**Background:** Commercial lessee of golf course brought action seeking a temporary injunction to prevent lessor from evicting it under the terms of the lease, and then amended its suit to seek specific enforcement of an option agreement. The 173rd Judicial District Court, Henderson County, Dan Moore, J., entered the temporary injunction. Lessor appealed.

**Holdings:** The Court of Appeals, James T. Worthen, C.J., held that:

[1] lessee did not breach its lease prior to timely exercise of its option to purchase leased property;

[2] fact that lessee did not tender payment on the option contract did not preclude it from demonstrating that it would suffer probable injury if it did not obtain a temporary injunction; and

[3] lessee was able to demonstrate a probable right of recovery on its cause of action for specific performance of the option contract.

Affirmed.

West Headnotes (24)

**[1]    Injunction**
        Preservation of status quo

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits.

Cases that cite this headnote

**[2]    Injunction**
        Preservation of status quo

In deciding whether to grant a temporary injunction, the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits.

Cases that cite this headnote

**[3]    Injunction**
        Grounds in general;  multiple factors

To obtain a temporary injunction, an applicant must plead and prove three specific elements: (1) the cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

3 Cases that cite this headnote

**[4]    Appeal and Error**
        Injunction

**Appeal and Error**
        Refusing injunction

**Injunction**
        Discretionary Nature of Remedy

The decision to grant or deny a temporary writ of injunction lies within the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion.

Cases that cite this headnote

**[5]    Appeal and Error**
        Abuse of discretion

The trial court abuses its discretion when it misapplies the law to the established facts or when the evidence does not reasonably support the conclusion that the applicant has a probable

right of recovery; the trial court does not abuse its discretion if some evidence reasonably supports its decision.

Cases that cite this headnote

**[6]** **Appeal and Error**
  Findings of fact and conclusions of law

**Appeal and Error**
  Sufficiency of Evidence in Support

When, on appeal from a trial court's decision to deny or grant a temporary injunction, specific findings of fact and conclusions of law are filed and a reporter's record is before the appellate court, the findings will be sustained if there is evidence to support them, and the appellate court will review the legal conclusions drawn from the facts found to determine their correctness.

2 Cases that cite this headnote

**[7]** **Landlord and Tenant**
  Existence of relation of landlord and tenant

A forcible entry and detainer action is dependent on proof of a landlord-tenant relationship.

1 Cases that cite this headnote

**[8]** **Forcible Entry and Detainer**
  Justices of the peace

Jurisdiction of forcible entry and detainer actions is expressly given to the justice court of the precinct where the subject property is located.

Cases that cite this headnote

**[9]** **Justices of the Peace**
  Forcible entry and detainer, and recovery of possession by landlord

**Landlord and Tenant**
  Jurisdiction

Without a landlord-tenant relationship, a justice court has no jurisdiction to enter a judgment in a forcible entry and detainer action and may be enjoined by a district court from doing so.

1 Cases that cite this headnote

**[10]** **Landlord and Tenant**
  Purchase under option

When a tenant under a lease containing an option to purchase exercises the option, a binding bilateral contract is formed, and the relation of landlord and tenant ceases and that of vendor and purchaser arises.

Cases that cite this headnote

**[11]** **Landlord and Tenant**
  Waiver of notice

Commercial lessee extended term of lease for golf course notwithstanding lessee's alleged failure to notify lessor in writing, as required by lease, of lessee's intent to extend the lease, where lessee increased its monthly rental payment from $7500 to $8500 after original term of lease ended, which lessee was permitted to do, and lessor accepted those increased monthly payments.

Cases that cite this headnote

**[12]** **Landlord and Tenant**
  Acceptance of rent

A lessor waives its right to declare a lease terminated after its primary term if it continues to accept monthly rental payments.

Cases that cite this headnote

**[13]** **Landlord and Tenant**
  Improvements

Commercial lessee that allegedly failed to make required improvements to leased property, a golf course, did not breach its lease in manner permitting lessor to terminate the lease prior to lessee's exercise of option to purchase the leased property; addendum that included the allegedly breached terms was entitled "Promissory Note" and was signed more than two months after lease was signed, addendum was not signed on behalf of lessee, and lease set forth no deadline by which lessee was to make the required improvements.



Cases that cite this headnote

**[14]** **Landlord and Tenant**
    Nature of the contract

The rights and duties of a lessor and lessee are determined by the lease and are contractual.

Cases that cite this headnote

**[15]** **Landlord and Tenant**
    Questions of law or fact

Whether a lease contract has been breached is a question of law.

Cases that cite this headnote

**[16]** **Injunction**
    Landlord and tenant

**Specific Performance**
    Necessity

Commercial lessee was not required to tender payment on its option contract for purchase of leased property and close sale within 90 days of exercising option in order to establish probable injury based on lessor's refusal to proceed with sale, in support of lessee's request for temporary injunction preventing lessor from proceeding with forcible entry and detainer action to recover leased golf course, thus giving lessee opportunity to show, at final hearing, that it was entitled to specific performance of option contract, where lessor's refusal to proceed with sale was clear, and lessee was ready, willing, and able to perform its duties under the option contract.

Cases that cite this headnote

**[17]** **Injunction**
    Real property in general

The potential loss of rights in real property is a probable, imminent, and irreparable injury that qualifies a party for a temporary injunction.

3 Cases that cite this headnote

**[18]** **Specific Performance**

    Contracts Relating to Real Property

**Specific Performance**
    Contracts Relating to Personal Property

Specific performance is more readily available as a remedy for the sale of real estate than for the sale of personal property; this is because damages are generally believed to be inadequate in connection with real property.

Cases that cite this headnote

**[19]** **Specific Performance**
    Necessity

Where a defendant has openly and avowedly refused to perform his part of the contract or declared his intention not to perform it, the plaintiff need not make tender of payment of the consideration before bringing suit for specific performance.

2 Cases that cite this headnote

**[20]** **Specific Performance**
    Nature and grounds of duty of plaintiff

Where tender of performance is excused, the party seeking specific enforcement of a contract must plead and prove that he is ready, willing, and able to perform.

2 Cases that cite this headnote

**[21]** **Injunction**
    Landlord and tenant

Commercial lessee was able to demonstrate a probable right of recovery on its cause of action for specific performance of an option contract to purchase leased property, a golf course, as required to allow lessee to obtain a temporary injunction preventing lessor from filing a forcible entry and detainer action, despite lessor's contention that the option contract lacked essential terms, defeating any right to specific performance; the option contract contained the price, the property description, and the seller's signature, and other material terms were determinable as they appeared in the parties' lease agreement.

4 Cases that cite this headnote

**[22]** **Frauds, Statute Of**
 👈 Necessity that writing show all the terms

**Frauds, Statute Of**
 👈 Sufficiency

**Specific Performance**
 👈 Contracts relating to real property

Before a court will decree the specific performance of a contract for the sale of land, or entertain a suit for damages for the breach thereof, the written agreement or memorandum required by statute must contain the essential terms of a contract, expressed with such certainty and clarity that it may be understood without recourse to parol evidence.

5 Cases that cite this headnote

**[23]** **Frauds, Statute Of**
 👈 Description of Lands

**Frauds, Statute Of**
 👈 Statement of price

**Frauds, Statute Of**
 👈 Agreements relating to land

The essential elements required, in writing, for the sale of real property are the price, the property description, and the seller's signature.

Cases that cite this headnote

**[24]** **Specific Performance**
 👈 Completeness

The failure of a real estate sales contract to provide the fundamental provisions of a deed of trust, or terms relating to the proration of taxes, or the place of closing, does not render it unenforceable by specific performance.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*924** George S. Henry, for appellant.

Allen B. Boswell, Deborah J. Race, for appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION

JAMES T. WORTHEN, Chief Justice.

Rus–Ann Development, Inc. appeals a temporary injunction granted by the trial court enjoining it from proceeding with a forcible entry and detainer action to recover a golf course it had leased to ECGC, Inc. In three issues, Rus–Ann contends the trial court abused its discretion in granting the temporary injunction because ECGC had not timely exercised the option to purchase that was part of the lease, ECGC had failed to comply with essential terms of the option contract, and specific performance was not available to ECGC as a remedy. We affirm.

## BACKGROUND

ECGC leased the Echo Creek Country Club (the "golf course") from Rus–Ann for one year beginning October 1, 2004. ECGC exercised an option to continue the lease through September 30, 2006. On December 6, 2005, Homer A. Lambert, President of Rus–Ann Development Company, sent ECGC a letter declaring that it was in default under the terms of the lease. On December 14, ECGC sent a letter in response stating that it was not in default but asking for more information on the alleged defaults. On December 21, 2005, ECGC filed suit seeking a temporary injunction to prevent Rus–Ann from evicting it under the lease. Correspondence flowed back and forth between Rus–Ann and ECGC over the next several months regarding the alleged defaults under the terms of the lease. On March 21, 2006, Rus–Ann sent ECGC a letter declaring that the lease was terminated. The next day, ECGC sent Rus–Ann a letter declaring that it was exercising its option to purchase the golf course. On April 7, ECGC amended its suit for temporary injunction, stating that it was "prepared and willing to perform in accordance with the [option] agreement." The trial court held two hearings on ECGC's temporary injunction. After the second hearing, the court said it would enter an order granting the temporary injunction if ECGC tendered $400,000 into the registry of the **\*925** court along with a $1,000,000 promissory note made payable to Rus–Ann Development to be paid over thirty

years at six percent interest. These were the terms specified in the option to purchase. Following ECGC's compliance with these terms, the trial court entered an order for a temporary injunction enjoining Rus–Ann from any attempt to evict ECGC from the golf course pending a trial on the merits in the case.

Rus–Ann requested findings of fact and conclusions of law, which were timely filed by the trial court. Rus–Ann appealed the granting of the temporary injunction to this court.

### STANDARD OF REVIEW

 **[1]** **[2]** **[3]** A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). The only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993). To obtain a temporary injunction, the applicant must plead and prove three specific elements: 1) the cause of action against the defendant; 2) a probable right to the relief sought; and 3) a probable, imminent, and irreparable injury in the interim. *Butnaru,* 84 S.W.3d at 204; *Walling,* 863 S.W.2d at 57.

 **[4]** **[5]** The decision to grant or deny a temporary writ of injunction lies within the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion. *Butnaru,* 84 S.W.3d at 204. The trial court abuses its discretion when it misapplies the law to the "established facts or when the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery." *Khaledi v. H.K. Global Trading, Ltd.,* 126 S.W.3d 273, 280 (Tex.App.-San Antonio 2003, no pet.) (citing *State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex.1975)). The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision. *Butnaru,* 84 S.W.3d at 211.

 **[6]** When, as here, specific findings of fact and conclusions of law are filed and a reporter's record is before the appellate court, the findings will be sustained if there is evidence to support them, and the appellate court will review the legal conclusions drawn from the facts found to determine their correctness. *TMC Worldwide, L.P. v. Gray,* 178 S.W.3d 29, 36 (Tex.App.-Houston [1st Dist.] 2005, no pet.). After the trial court files its original findings of fact and conclusions of

law, any party may file a request for specified additional or amended findings of fact or conclusions of law. TEX.R. CIV. P. 298; *Gentry v. Squires Constr., Inc.,* 188 S.W.3d 396, 408 (Tex.App.-Dallas 2006, no pet.)

### CAUSE OF ACTION

In its first issue, Rus–Ann contends the trial court abused its discretion in granting a temporary injunction enjoining it from proceeding with its forcible entry and detainer action because there was no evidence or insufficient evidence that ECGC had timely exercised its option to purchase the golf course. In the absence of a timely exercise of the option, there can be no cause of action for specific performance.

 **[7]** **[8]** **[9]** **[10]** A forcible entry and detainer action is dependent on proof of a landlord-tenant relationship. *Dass, Inc. v. Smith,* 206 S.W.3d 197, 200 (Tex.App.-Dallas 2006, no pet.). Jurisdiction of forcible entry and detainer actions is expressly given to the justice court of the precinct where the property is located. *Aguilar v. Weber,* 72 S.W.3d 729, 731 (Tex.App.-Waco 2002, no pet.). Without a landlord-tenant relationship, **\*926** a justice court has no jurisdiction to enter a judgment and may be enjoined by a district court from doing so. *See id.* at 732. When a tenant under a lease containing an option to purchase exercises the option, a binding bilateral contract is formed. *Pitman v. Sanditen,* 626 S.W.2d 496, 498 (Tex.1981). The relation of landlord and tenant ceases and that of vendor and purchaser arises. *Id.* Therefore, if ECGC timely exercised its option to purchase, then the trial court properly enjoined Rus–Ann from continuing its forcible entry and detainer action in the justice court.

 **[11]** **[12]** Rus–Ann first contends that the contract terminated because ECGC failed to notify it in writing, as required by the lease, that it was extending the term of the lease past September 30, 2005. Evidence before the trial court showed that ECGC could continue the lease following September 30, 2005 by increasing its monthly rental payment from $7,500 to $8,500. It did so. Rus–Ann accepted these increased monthly payments. A lessor waives its right to declare a lease terminated after its primary term if it continues to accept monthly rental payments. *Nardis Sportswear v. Simmons,* 147 Tex. 608, 614, 218 S.W.2d 451, 454 (1949).

 **[13]** Rus–Ann also contends that it terminated the lease by letter dated March 21, 2006, due to alleged breaches by ECGC. Specifically, it complains that ECGC failed to install

a new entry gate, replace a shed, and install new carpet in the clubhouse as required by an addendum to the lease. On March 22, 2006, ECGC sent Rus–Ann a letter declaring its intent to exercise its option to purchase the property. The trial court made a finding that ECGC had exercised its option to purchase.

[14] [15] The rights and duties of the lessor and lessee are determined by the lease and are contractual. *Exxon Corp. v. Pluff,* 94 S.W.3d 22, 29 (Tex. App.–Tyler 2002, pet. denied) (op. on reh'g). Whether a lease contract has been breached is a question of law. *See id.; see also Jack v. State,* 694 S.W.2d 391, 398 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.). Therefore, the issue of whether ECGC had breached the contract in a manner that allowed Rus–Ann to terminate the lease before ECGC exercised its option to purchase was a question of law for the court to decide. The addendum including the allegedly breached terms is entitled "Promissory Note" and was signed more than two months after the lease was signed. Lambert signed for Rus–Ann, but no one signed for ECGC. The lease does not impose a deadline for accomplishing the three tasks. The court heard evidence from officers of both Rus–Ann and ECGC, who gave conflicting testimony about whether the lease had been breached. The trial court does not abuse its discretion if there is some evidence reasonably supporting its decision. *Butnaru,* 84 S.W.3d at 211; *see also Advance Components, Inc. v. Goodstein,* 608 S.W.2d 737, 739 (Tex.Civ.App.-Dallas 1980 writ ref'd n.r.e.) (a departure from the contract terms, not amounting to a material breach of the contract, will not prevent the plaintiff from having the remedy of specific performance). Rus–Ann's first issue is overruled.

### PROBABLE INJURY

[16] In its second issue, Rus–Ann contends that the trial court abused its discretion in granting the temporary injunction because there was no evidence or insufficient evidence that ECGC had complied with the material terms of the contract and therefore was entitled to specific performance. Rus–Ann contends that ECGC was required to close the sale within ninety days of the date in which it exercised its **\*927** option to purchase the golf course. ECGC contends that it is entitled to a temporary injunction and is allowed to show at the final hearing that it is entitled to specific performance even though it did not tender payment within ninety days as required by the option to purchase. We agree.

[17] [18] [19] In Texas, the potential loss of rights in real property is a probable, imminent, and irreparable injury that qualifies a party for a temporary injunction. *See Franklin Savs. Ass'n v. Reese,* 756 S.W.2d 14, 15–16 (Tex.App.-Austin 1988, no writ) (op. on reh'g). It is well understood that specific performance is more readily available as a remedy for the sale of real estate than for the sale of personal property. *Scott v. Sebree,* 986 S.W.2d 364, 369 (Tex.App.-Austin 1999, pet. denied). This is because damages are generally believed to be inadequate in connection with real property. *Id.* at 370. It is thoroughly settled that where a defendant has openly and avowedly refused to perform his part of the contract or declared his intention not to perform it, the plaintiff need not make tender of payment of the consideration before bringing suit. *Burford v. Pounders,* 145 Tex. 460, 466, 199 S.W.2d 141, 144 (1947).

[20] Beginning with its December 6, 2005 letter and subsequent correspondence, Rus–Ann left no doubt that it was refusing any attempt by ECGC to proceed with the purchase of the golf course. Where tender of performance is excused, the party must plead and prove that he is ready, willing, and able to perform. *17090 Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 256 (Tex.App.-Dallas 2002, pet. denied). ECGC pleaded that it was "prepared and willing to perform in accordance with the Agreement between Plaintiff and Defendant." During the two hearings on the temporary injunction, ECGC presented testimony that it was ready to tender the $400,000 in cash and the $1,000,000 promissory note into the registry of the court to close the purchase of the golf course. Rus–Ann complains that ECGC changed its manner of financing for the $400,000 between the first and second hearings on the temporary injunction. This is irrelevant. When the trial court required tender into the registry of the court, ECGC did so. The record shows that ECGC was not required to tender payment of the consideration before bringing suit due to Rus–Ann's refusal to perform and that there is sufficient evidence that ECGC was ready, willing, and able to perform its duties under the terms of the option contract. Rus–Ann's second issue is overruled.

### PROBABLE RIGHT OF RECOVERY

[21] In its third issue, Rus–Ann contends that the trial court abused its discretion in granting a temporary injunction because the option contract was not sufficiently clear and definite for enforcement by specific performance. It argues

that essential terms are missing, eliminating ECGC's right to specific performance.

**[22]** **[23]** Before a court will decree the specific performance of a contract for the sale of land, or entertain a suit for damages for the breach thereof, the written agreement or memorandum required by statute must contain the essential terms of a contract, expressed with such certainty and clarity that it may be understood without recourse to parol evidence. *Wilson v. Fisher,* 144 Tex. 53, 56, 188 S.W.2d 150, 152 (1945); *see also Johnson v. Snell,* 504 S.W.2d 397, 398 (Tex.1973). ("Specific performance will be decreed only if the essential terms of the contract are expressed with reasonable certainty.") The essential elements required, in writing, for the sale of real property are the price, the property description, and the seller's signature. *See* **\*928** *Lynx Exploration and Prod. Co. v. 4–Sight Operating Co.,* 891 S.W.2d 785, 788 (Tex.App.-Texarkana 1995, writ denied). Those three essential elements are in the lease with option to purchase in the instant case.

Rus–Ann contends that the only terms of the seller financing included in the option to purchase contract were the term of thirty years and the interest rate of six percent. It says that the other terms of the seller financing such as how, when, where, how much, and to whom payments were to be made were not included. However, these terms were part of the provisions of the lease agreement. The court can look at both the option to purchase and the lease in determining the terms of a contract to be enforced by specific performance. *See Frost Nat'l Bank v. L & F Distributors, Ltd.,* 165 S.W.3d 310, 312–13 (Tex.2005).

**[24]** Rus–Ann also contends that because the deed of trust clause stating whether the note is assumable or due on sale is not included in the contract, it is unenforceable by specific performance. We disagree. The failure of a real estate sales contract to provide the fundamental provisions of a deed of trust does not render it unenforceable by specific performance. *Smith v. Hues,* 540 S.W.2d 485, 492 (Tex.Civ.App.Houston [14th Dist.] 1976, writ ref'd n.r.e.). Rus–Ann further complains that the option contract does not include terms relating to proration of taxes or the place of closing. Again, failure to include these terms in the contract for the sale of real property does not render it unenforceable by specific performance. *See id.* Finally, Rus–Ann contends that the option to purchase does not include whether ECGC had a right to the partial release of lots that it sold on the golf course during the thirty years. That matter was covered in the lease. Therefore, it is a term that can be determined by the trial court at the final hearing. *See Frost Nat'l Bank,* 165 S.W.3d at 312–13. We hold that the contract contained the essential terms for a decree of specific performance and establishing a probable right to the relief sought. Rus–Ann's third issue is overruled.

## DISPOSITION

Having overruled Rus–Ann's three issues, we *affirm* the trial court's order granting a temporary injunction commanding Rus–Ann to refrain from prosecuting an action to evict ECGC from the property known as Echo Creek Country Club.

**All Citations**

222 S.W.3d 921

---

  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

[4] lost profits were not established with reasonable certainty.

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Barton v. Fashion Glass and Mirror, Ltd., Tex.App.-Hous. (14 Dist.), July 20, 2010

255 S.W.3d 690
Court of Appeals of Texas,
Amarillo.

SOUTH PLAINS SWITCHING, LTD. CO. and
South Plains Lamesa Railroad, L.L.C., Appellants
v.
BNSF RAILWAY COMPANY f/k/a The Burlington
Northern and Santa Fe Railway Company, Appellee.

No. 07–06–0165–CV. | April 17, 2008.
| Rehearing Overruled May 19, 2008.

**Synopsis**
**Background:** Two shortline railroads with common ownership, as buyers of rail lines, brought action against Class I railroad, as seller, for breach of asset sale agreement, breach of duty of good faith and fair dealing with consequent exemplary damages, specific performance, and mandatory injunctive relief. The 72nd District Court, Lubbock County, Ruben Reyes, J., granted partial summary judgment to defendant, and at conclusion of evidence at trial granted directed verdict to defendant on claim of breach of duty of good faith and fair dealing, and after jury answered eight questions with findings of breach of contract, granted judgment notwithstanding the verdict (JNOV) to defendant as to three jury findings, denied all of one plaintiff's equitable requests and most of other plaintiff's equitable requests, and awarded attorney fees to one plaintiff. Plaintiffs appealed and defendant cross-appealed.

**Holdings:** The Court of Appeals, John T. Boyd, J. (Retired), held that:

[1] some claims asserted by plaintiffs had been compulsory counterclaims in earlier action, though plaintiffs had non-suited those counterclaims in earlier action;

[2] defendant did not have duty of good faith and fair dealing;

[3] plaintiffs were not entitled to specific performance or mandatory injunction; and

Affirmed as modified.

West Headnotes (36)

**[1]** **Set–Off and Counterclaim**
⚖ Effect of failure to assert or claim; compulsory counterclaim

A counterclaim is a "compulsory counterclaim" if: (1) it arises out of the transaction or occurrence that gives rise to the opposing party's claim; (2) it is mature and owned by the counterclaimant; (3) it is against an opposing party in the same capacity; (4) it does not require third parties who cannot be brought into the suit; (5) it is within the court's jurisdiction; and (6) it is not pending elsewhere. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

1 Cases that cite this headnote

**[2]** **Set–Off and Counterclaim**
⚖ Effect of failure to assert or claim; compulsory counterclaim

If a claim meets the elements of a compulsory counterclaim, it must be asserted in the initial action and cannot be later raised. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

Cases that cite this headnote

**[3]** **Set–Off and Counterclaim**
⚖ Effect of failure to assert or claim; compulsory counterclaim

Under the transactional approach for determining whether compulsory counterclaim rule is applicable in a given case, weight should be given to such considerations as whether facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to parties' expectations or business understanding or usage. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

Cases that cite this headnote

**[4]** **Set–Off and Counterclaim**
 ⚷ Effect of failure to assert or claim; compulsory counterclaim

The "same transaction or occurrence" requirement, for a compulsory counterclaim, is broadly construed. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

Cases that cite this headnote

**[5]** **Set–Off and Counterclaim**
 ⚷ Effect of failure to assert or claim; compulsory counterclaim

Where there is a legal relationship such as under a lease or contract, all the claims that arise from that relationship will arise from the same subject matter and be subject to the application of the compulsory counterclaim rule in a proper case. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

3 Cases that cite this headnote

**[6]** **Set–Off and Counterclaim**
 ⚷ Effect of failure to assert or claim; compulsory counterclaim

Where a defendant's claim to affirmative relief asserts a theory distinct from and independent of the issues raised in a plaintiff's claim, it is not a compulsory counterclaim. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

2 Cases that cite this headnote

**[7]** **Judgment**
 ⚷ Matters for defense in former action as cause of action in second

Under compulsory counterclaim rule, shortline railroad was precluded, in subsequent action, from bringing claims that Class I railroad, which had sold rail lines to shortline railroad pursuant to asset sale agreement, failed to appropriately deal with shortline railroad on certain real estate claims relating to leases, where those same leases had been at issue in earlier action

between shortline railroad and Class I railroad, in which action shortline railroad had asserted that pursuant to asset sale agreement, quitclaim deed was prepared that purportedly assigned to shortline railroad certain leases and rental income, and had asserted that it was damaged because Class I railroad had failed to properly assign those leases and rental income from them. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

Cases that cite this headnote

**[8]** **Judgment**
 ⚷ Voluntary dismissal or nonsuit in general
**Judgment**
 ⚷ Matters for defense in former action as cause of action in second
**Judgment**
 ⚷ What constitutes

Shortline railroad was precluded, under compulsory counterclaim rule, from bringing claim that Class I railroad, which had sold rail lines to shortline railroad pursuant to asset sale agreement, breached the agreement by failing to allow shortline railroad to service customers along certain tracks which had been included in quitclaim deed, where in earlier action between those parties, both parties had asserted claims involving those tracks, i.e., Class I railroad had sought declaration that asset sale agreement did not include those tracks because of mutual mistake, and shortline railroad had counterclaimed that Class I railroad had breached the agreement by continuing to serve certain feeders and tracks, but shortline railroad had non-suited the counterclaim when it had received adverse ruling on its damages; same subject matter was involved in earlier and subsequent actions. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

Cases that cite this headnote

**[9]** **Judgment**
 ⚷ Voluntary dismissal or nonsuit in general
**Judgment**

Matters for defense in former action as cause of action in second

**Judgment**
What constitutes

Under compulsory counterclaim rule, shortline railroad was precluded, in subsequent action, from bringing damages claim asserting that Class I railroad, which had sold rail lines to shortline railroad pursuant to asset sale agreement in which Class I railroad had reserved the right to set through routes and rates for customers, unreasonably withheld consent to request for surcharge on traffic, where in earlier action, both parties had asserted claims regarding request for surcharge and refusal to consent, i.e., Class I railroad had sought declaratory relief and shortline railroad had sought damages for refusal to consent but had non-suited its surcharge counterclaim when its damages testimony was excluded; controversy in subsequent action arose out of same subject matter as that involved in earlier action. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

Cases that cite this headnote

**[10]**     **Judgment**
Voluntary dismissal or nonsuit in general

**Judgment**
Matters for defense in former action as cause of action in second

Shortline railroad was precluded, under compulsory counterclaim rule, from bringing claim that Class I railroad, which had sold rail lines to shortline railroad pursuant to asset sale agreement, breached the agreement by failing to recognize shortline railroad's right to dispatch trains on a certain track, where in earlier action between those parties, both parties had asserted claims concerning operations on that track, i.e., Class I railroad had claimed that under the agreement it retained all rights to access and use the track and asked the court to so construe the agreement while shortline railroad had counterclaimed that Class I railroad violated the agreement by refusing to recognize its right to dispatch trains on the track but had chosen to non-suit the counterclaim after

receiving unfavorable ruling on its damages evidence; claim in subsequent action was asserted in language identical to that used for non-suited counterclaim in earlier action, and claim in subsequent action arose out of the same agreement in dispute in earlier action. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

Cases that cite this headnote

**[11]**     **Judgment**
Nature of Action or Other Proceeding

**Judgment**
Matters for defense in former action as cause of action in second

Under compulsory counterclaim rule, shortline railroad was precluded, in subsequent action, from bringing claim asserting that Class I railroad, which had sold rail lines to shortline railroad pursuant to asset sale agreement, breached the agreement by paying it less than that to which it was entitled under shortline railroad's interpretation of the meaning of "billing" for purposes of agreement's division-of-revenue provision, where in earlier action, both parties had disputed the meaning of "billing" for purposes of division-of-revenue provision, and Class I railroad had received a favorable declaratory judgment as to its interpretation. Vernon's Ann.Texas Rules Civ.Proc., Rule 97(a).

Cases that cite this headnote

**[12]**     **Trial**
Insufficiency to support other verdict; conclusive evidence

A plaintiff is entitled to a directed verdict when reasonable minds can draw only one conclusion from the evidence.

Cases that cite this headnote

**[13]**     **Appeal and Error**
Effect of evidence and inferences therefrom on direction of verdict

On review of granting of motion for directed verdict, task of reviewing court is to consider

all the evidence in a light most favorable to party against whom verdict was instructed, discarding all contrary evidence and inferences, and determine whether there is any evidence of probative force to raise fact questions on material questions presented.

Cases that cite this headnote

**[14]     Railroads**
            Contracts for sale

Class I railroad did not have duty of good faith and fair dealing, as seller of tracks to two shortline railroads under asset sale agreements that granted Class I railroad exclusive rate-making authority and required shortline railroads to obtain dispatch authority from Class I railroad as to when they might use the main track or enter Class I railroad's two yards for interchange of trains to be spotted to customers; agreements were result of arm's length dealing between parties and were not of a nature to demonstrate a special relationship sufficient to support a duty of good faith and fair dealing.

1 Cases that cite this headnote

**[15]     Contracts**
            Terms implied as part of contract

There is no general duty of good faith and fair dealing in ordinary arm's length commercial transactions.

2 Cases that cite this headnote

**[16]     Specific Performance**
            Nature and purpose in general

The purpose of specific performance is to compel a party who is violating a duty under a valid contract to comply with his obligations.

1 Cases that cite this headnote

**[17]     Specific Performance**
            Inadequacy of remedy at law

The rationale for specific performance as a remedy is that the recovery of monetary damages would be inadequate to compensate the

complainant and thus the transgressor should be compelled to perform that which he had promised in his contract.

3 Cases that cite this headnote

**[18]     Specific Performance**
            Inadequacy of remedy at law

It is a fundamental rule of equity that specific performance may not be granted unless it is shown there is no adequate remedy at law.

1 Cases that cite this headnote

**[19]     Specific Performance**
            Defenses or Objections to Relief
        **Specific Performance**
            Presumptions and burden of proof

The burden of invoking the court's equity jurisdiction, with respect to specific performance, is on the party seeking it, and the comparative advantages of the equitable remedy must be shown to outweigh those of the legal remedy.

Cases that cite this headnote

**[20]     Specific Performance**
            Defenses or Objections to Relief

Among the factors to be considered, when court determines whether to exercise its equity jurisdiction with respect to specific performance, are whether long-continued supervision by the court will be required, whether complete relief can be rendered by the remedy sought, and whether, if the remedy sought is granted, it can be adequately enforced.

2 Cases that cite this headnote

**[21]     Specific Performance**
            Contracts for continuous acts during long period

A court generally will not decree, by specific performance, a party to perform a continuous series of acts which extend through a long period

of time and require constant supervision by the court.

2 Cases that cite this headnote

**[22]** **Appeal and Error**
&#128273; Injunction

**Appeal and Error**
&#128273; Refusing injunction

When a trial court grants, or refuses, a permanent injunction, the standard of review is whether it committed an abuse of discretion.

Cases that cite this headnote

**[23]** **Injunction**
&#128273; Railroads

**Specific Performance**
&#128273; Contracts for continuous acts during long period

Shortline railroad, as buyer of tracks from Class I railroad pursuant to asset sale agreement in which Class I railroad reserved the right to set through routes and rates for customers, was not entitled to specific performance or mandatory injunction, to require Class I railroad to interchange to shortline railroad all trains headed to customers on certain tracks owned by Class I railroad, to refrain from attempting to relocate any of the business from customers on those tracks, and to refrain from charging discriminatory freight rates for trains headed to a certain destination; shortline railroad's request for specific performance, in essence, was one seeking mandatory injunction, shortline railroad had not suffered irreparable injury, it had adequate remedy at law in form of contract damages for breach of contract, and grant of mandatory injunction would require continued onerous judicial supervision.

2 Cases that cite this headnote

**[24]** **Damages**
&#128273; Loss of profits

Shortline railroad, as buyer of tracks from Class I railroad pursuant to asset sale agreement in which Class I railroad reserved the right

to set through routes and in which parties agreed to division of revenue, did not establish, with reasonable certainty, its lost profits from alleged breach of contract by Class I railroad, in allegedly wrongfully diverting some trains and refusing to allow shortline railroad to service certain customers; while witness testified as to division of revenue that would be received by shortline railroad on each train in issue and testified in considerable detail about amount of fuel cost that would be used in handling those trains, there was no testimony about other necessary expenses of doing business, such as depreciation, payroll expenses, administrative expenses, equipment expenses, and maintenance expenses.

2 Cases that cite this headnote

**[25]** **Judgment**
&#128273; Where directed verdict or binding instructions would have been proper

**Judgment**
&#128273; Where there is no evidence to sustain verdict

A trial court may grant a judgment notwithstanding the verdict (JNOV) if there is no evidence to support one or more of the jury's findings on issues necessary to liability, or conversely, if the evidence established an issue as a matter of law.

Cases that cite this headnote

**[26]** **Damages**
&#128273; Mode of estimating damages in general

The measure of damages for the loss of profit, as consequential damages for breach of contract, is "net profits," which means what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business.

2 Cases that cite this headnote

**[27]** **Damages**
&#128273; Breach of contract

**Damages**

**Loss of profits**

Lost profits, as damages for breach of contract, need not be susceptible to exact calculation, and need only be shown to a reasonable certainty.

1 Cases that cite this headnote

**[28] Damages**

**Loss of profits**

An award of damages for lost profits, in an action for breach of contract, may be based on estimates that are based upon objective facts, figures, or data.

1 Cases that cite this headnote

**[29] Deeds**

**Operation of quitclaim deed**

**Railroads**

**Conveyances or release by railroad company**

Class I railroad, which sold rail lines to shortline railroad pursuant to asset sale agreement requiring Class I railroad to convey to shortline railroad, by quitclaim deem, land that was covered by lease, but which conveyed the land to third party by special warranty deed before delivering quitclaim deed to shortline railroad and before the closing of the asset sale, was not required, under asset sale agreement, to assign the lease or rents thereunder to shortline railroad after third party had reconveyed the land and lease to Class I railroad; quitclaim deed conveyed only whatever interest Class I railroad had in the lease when quitclaim deed was delivered, and Class I railroad no longer had an interest in the lease when quitclaim deed was delivered.

Cases that cite this headnote

**[30] Deeds**

**Operation of quitclaim deed**

While a warranty deed to land conveys property, a quitclaim deed conveys only the grantor's right in it, if any.

1 Cases that cite this headnote

**[31] Deeds**

**Operation of quitclaim deed**

A quitclaim deed expresses upon its face doubts about a grantor's interest, and a buyer is necessarily put on notice as to those doubts.

1 Cases that cite this headnote

**[32] Limitation of Actions**

**Causes of action in general**

When the legislature employs the term "accrues" in a statute of limitations, without an accompanying definition, it is the responsibility of the courts to determine when the cause of action accrues and thus when the statute of limitations begins to run.

1 Cases that cite this headnote

**[33] Limitation of Actions**

**Breach of contract in general**

**Limitation of Actions**

**Contracts; warranties**

An action for damages for breach of a written contract accrues, for limitations purposes, when the breach occurs or when the claimant has notice of facts sufficient to place him on notice of the breach. V.T.C.A., Civil Practice & Remedies Code § 16.051.

1 Cases that cite this headnote

**[34] Limitation of Actions**

**Contracts; warranties**

Assuming that Class I railroad, as seller of rail lines to shortline railroad pursuant to asset sale agreement, was required under the agreement to assign leases to shortline railroad in some way other than by quitclaim deed, shortline railroad's claim for breach of contract accrued, for limitations purposes, when the asset sale transaction closed, which closing involved only quitclaim deed; at such time, shortline railroad must have had actual knowledge that no lease

assignments had been made. V.T.C.A., Civil Practice & Remedies Code § 16.051.

Cases that cite this headnote

**[35]    Railroads**
        Title, estate, or interest acquired

Easement allowing shortline railroad to operate on tracks crossing land owned by Class I railroad did not entitle shortline railroad to receive any portion of rent payments received by Class I railroad under a lease of the land; easement conveyed only a right of use, and not title to the property.

1 Cases that cite this headnote

**[36]    Easements**
        Nature and elements of right

An easement extends to certain persons or entities the right to use the land of another for the purpose or purposes specified in the easement, and does not convey title to the property.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*695** James L. Gorsuch, James L. Gorsuch, P.C., Lubbock, for Appellants.

**\*696** D. Thomas Johnson, McWhorter, Cobb and Johnson, Lubbock, Chris S. Greer, Donald E. Herrmann, Kelly Hart & Hallman LLP, Michael E. Roper, Fort Worth, for Appellee.

Before CAMPBELL and PIRTLE, JJ., and BOYD, S.J. [1]

**Opinion**

BOYD, Senior Justice (Retired).

This case arises because of disputes between South Plains Switching, Ltd. Co. (SAW), South Plains Lamesa Railroad, L.L.C. (SLAL), and Burlington Northern Railway Company, formerly known as Burlington Northern and Santa Fe Railway Company (BNSF).

**History**

Because of the convoluted and extensive history of these disputes, it is necessary to go into that history in some detail. BNSF is a Class I railroad whose principal business is the transportation of freight in the western, midwestern, and southwestern regions of the United States. SAW and SLAL are known as "shortline" railroads that operate in the vicinities of Lubbock and Slaton, Texas. They provide switching services to BNSF and its customers.

In the early 1990s, major Class I railroads such as BNSF began selling off portions of their rail lines located near industrial centers or that served rural areas, and the sales from which were known as "Shortline Sales." In 1993, prior to its merger with the Burlington Northern Railway Company (Burlington Northern), the Santa Fe Railroad Company (Santa Fe) sold a portion of its line running generally southwest from Slaton to Lamesa, Texas, to SLAL. The agreement between those parties was memorialized in what is referred to here as the SLAL Asset Sale Agreement. It provided that Santa Fe conveyed to SLAL rail freight transportation business that it had formerly conducted on the rail lines but it reserved the right to set through routes and rates for customers. SLAL was to be paid by a division of revenue by which SLAL would receive a certain amount of money per car that was handled by the parties on the line covered by the agreement.

In 1999, after Santa Fe and Burlington Northern merged and became BNSF, the entity sold to SAW approximately fourteen miles of its track that served industrial customers in east Lubbock. This sale was memorialized in another Asset Sale Agreement. The SAW Asset Sale Agreement provided that for cars that were billed in units of 27 or more, the charge rate was to be $400 per car. SAW and SLAL share common ownership.

**The Fort Worth Suit**

Soon after the SAW Asset Sale Agreement was finalized in 1999, disputes arose between the parties which resulted in a declaratory judgment action brought by BNSF in Fort Worth in 2002. In its suit, BNSF asked the court to declare that: 1) SAW could not unilaterally impose a surcharge on traffic without its consent; 2) SAW was not entitled under the SAW Asset Sale Agreement to acquire further assets of BNSF; 3)

the SAW Asset Sale Agreement did not limit or proscribe BNSF from providing rail service to Vulcan Materials on Track 9200 (which SAW contended had been sold to it together with business to be conducted on it); 4) that a 1999 quitclaim deed delivered pursuant to the SAW Asset Sale Agreement included tracks referred to as the "Burris Tracks" by mistake and the deed should **\*697** be reformed; 5) that the term "billed" as used in the pertinent provision of the SAW Asset Sale Agreement meant "billed to the customer" and did not mean "waybilled" for purposes of division of revenue; and 6) the SAW Asset Sale Agreement did not impose liability on BNSF for what might be termed "wrongful deprivation of rent."

SAW and SLAL responded to the suit with counterclaims alleging various breaches by BNSF of the SAW Asset Sale Agreement including: 1) unreasonably withholding consent to SAW's proposed surcharge; 2) providing rail service to Vulcan Materials on Track 9200; 3) continuing to serve customers on the Burris Tracks; and 4) improperly paying the division of revenue based on customer billing instead of waybills. They also made claims that BNSF had improperly transferred properties described in the SAW Asset Sale Agreement to a property management company which had then sold or disposed of the properties.

Prior to trial, BNSF successfully filed a motion to exclude SAW's and SLAL's damage testimony. SAW and SLAL then non-suited their counterclaims for breach of contract and damages. The case then proceeded to trial on BNSF's declaratory judgment claims that: 1) it did not act unreasonably by refusing to consent to SAW's surcharge on its customers of $40–$60 per car; 2) that under the SAW Asset Sale Agreement, it had reserved the right to serve Vulcan Materials on Track 9200; 3) that the Burris Tracks were included by mistake in the 1999 quitclaim deed executed by it in connection with the Asset Sale Agreement and the deed should be reformed to correct that error; and 4) the term "billed" referred to in the agreement meant billed to the customer and did not mean "waybilled" as contended by SAW.

After a four-day jury trial, the jury found that SAW had the right to impose a surcharge upon its customers, that BNSF had access rights to Track 9200 for storage purposes only, that the division of revenue under the agreement was to be paid on a waybill basis and not on a freight bill basis, and that the Burris Tracks had been validly conveyed to SAW. Those findings were incorporated into a final judgment which was appealed

by BNSF to the Fort Worth Court of Appeals. The trial court judgment was affirmed with the exception that the appellate court held that BNSF was entitled to use Track 9200 for other than storage purposes. *See Burlington Northern & Santa Fe Railway Co. v. South Plains Switching Ltd., Co.,* 174 S.W.3d 348 (Tex.App.-Fort Worth 2005, no pet.).

### The Lubbock Suit

The suit directly underlying this appeal was filed in Lubbock on June 1, 2004. In it, SAW asserted that BNSF had breached the Asset Sale Agreement and was liable because BNSF had: 1) unreasonably withheld consent to a surcharge; 2) wrongfully provided rail service to Vulcan Materials on Track 9200 and refused to allow SAW to serve Vulcan Materials on the track; 3) improperly continued to serve customers on the Burris Tracks; 4) paid less than it should have under the division of revenue provisions of the Asset Sale Agreement; and 5) failed to appropriately deal with SAW on certain real estate claims.

Additionally, SAW and SLAL claimed that BNSF had breached a duty of good faith and fair dealing warranting an award of exemplary damages. They also claimed they were entitled to specific performance and mandatory injunctive relief pursuant to the Asset Sale Agreement. Moreover, SLAL claimed that BNSF had breached its Asset Sale Agreement by diverting Vulcan Materials' trains or by refusing to allow Vulcan Materials' trains to be routed to SLAL.

**\*698** Subsequently, BNSF filed a motion seeking a partial summary judgment dismissing all claims that had been asserted by SAW and SLAL in the Fort Worth suit and subsequently nonsuited on the basis that they were barred under the compulsory counterclaim rule, Texas Rule of Civil Procedure 97. This motion was granted by the Lubbock trial court. The effect of the granting of this motion was that issues regarding the surcharges and payment under the freight bill were eliminated from the Lubbock County trial and the claims relating to Vulcan Materials' trains, the Burris traffic and lease assignments were barred as to events occurring prior to the date of the filing of the Lubbock case on June 1, 2004.

At the conclusion of evidence, the trial court granted BNSF's motion seeking dismissal of SAW and SLAL's quest for recovery because of breach of a duty of good faith and fair dealing with consequent exemplary damages. At the conclusion of the trial, eight questions were submitted to

the jury. In its answers to questions 1 and 2, the jury found that BNSF had failed to comply with the SLAL Asset Sale Agreement by wrongfully diverting 18 Vulcan Materials trains to its yard in Slaton, Texas, and thereby caused damages to SLAL in the amount of $70,500. In answers to questions 3 and 4, the jury found that BNSF failed to comply with the SLAL Asset Sale Contract by refusing to direct or allow any of the Vulcan Materials trains described in SLAL's exhibit 12 to use Track 9200 or to use a SAW switching track which caused damages to SAW in the amount of $2,928.93.

In its answers to questions 5 and 6, the jury found BNSF failed to comply with the SAW Asset Sale Agreement by refusing to allow SAW to serve traffic which damaged SAW in the amount of $27,296.85. In its answers to questions 7 and 8, the jury found that BNSF had failed to comply with the Asset Sale Agreement by failing to assign the West Texas Industries lease which caused damages to SAW in the amount of $12,600.

Subsequent to the return of the jury verdict, BNSF filed a motion for judgment n.o.v. in which it contended that SAW and SLAL's lost profit calculations were improper as a matter of law. The trial court granted the motion in regard to the jury findings in Questions 2, 4, and 6, but left intact the jury findings in Questions 7 and 8. The trial court then entered judgment granting SAW relief on the real estate issues and for its attorney's fees but denied all of SLAL's equitable requests and most of SAW's equitable requests.

In pursuing their appeal, SAW and SLAL raise four issues for our discussion. In their first issue, they contend that the trial court erred in granting BNSF's motion for partial summary judgment excluding all of their claims prior to June 1, 2004, because the Fort Worth court's judgment is not *res judicata* to those claims and the claims were not compulsory counterclaims.

In their second issue, relating to good faith and fair dealing exemplary damages, they argue that the trial court erred in granting BNSF's motion for directed verdict because the "special relationship" between the parties supports the placing of such a duty and, thus, it follows that a claim for exemplary damages should also have been allowed.

Their third issue concerns their injunctive relief/specific performance claims. They reason that the trial court erred in granting judgment n.o.v. denying those claims because they established their right to those claims either as a matter of law,

or, in the alternative, by the great weight and preponderance of the evidence.

 **\*699**  In their fourth issue, they posit that the trial court erred in granting BNSF's motion for judgment n.o.v. and in denying them damages for the wrongful diversion of Vulcan trains and the wrongful refusal of BNSF to allow SAW to service the Burris customers.

Summarized, this appeal is a challenge to the trial court's ruling on three BNSF motions, namely, its motion for partial summary judgment, in which it held that SAW could not re-litigate the contract claims that were initially brought in the Fort Worth suit but then non-suited; its motion for directed verdict in which the trial court held there was no factual basis to support the claims for breach of an alleged duty of good faith and fair dealing; and its motion for directed verdict in which the trial court held that appellants' "lost profits" calculations were improper.

### BNSF Motion for Partial Summary Judgment

The standards by which summary judgments are reviewed are by now axiomatic. When reviewing a summary judgment, the reviewing court takes as true all evidence favorable to the nonmovant, and resolves any doubts and indulges any reasonable inferences in the nonmovant's favor. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003); *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). The summary judgment is reviewed *de novo,* and, when the trial court's order does not specify the ground or grounds relied upon for its ruling, it will be affirmed on appeal if any of the theories advanced are meritorious. *Dow Chemical Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001).

BNSF's motion rested upon Texas Rule of Civil Procedure 97, the compulsory counterclaim rule. In relevant part, that rule provides:

> a. **Compulsory Counterclaims.** A pleading shall state as a counterclaim any claim within the jurisdiction of the court, not the subject of a pending action, which at the time of filing the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing

party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction;....

As we have noted, in the Lubbock case, SAW contended that BNSF breached the Asset Sale Agreement and became liable for damages because: 1) BNSF unreasonably withheld consent to a disputed surcharge; 2) BNSF provided rail service to Vulcan Materials on Track 9200 and failed to allow SAW to serve Vulcan Materials on that track; 3) BNSF continued to serve customers on the Burris Tracks and would not allow SAW to do so; 4) under the SAW Asset Sale Agreement, BNSF paid less to SAW than it was required to do; and 5) BNSF failed to properly deal with SAW on "real estate claims." Thus, SAW's affirmative relief claims replicated the counterclaims it had asserted, but non-suited, in the Fort Worth case.

 **[1]** **[2]** A counterclaim is compulsory if: 1) it arises out of the transaction or occurrence that gives rise to the opposing party's claim; 2) it is mature and owned by the counterclaimant; 3) it is against an opposing party in the same capacity; 4) it does not require third parties who cannot be brought into the suit; 5) it is within the court's jurisdiction; and 6) it is not pending elsewhere. *Tex.R. Civ. P. 97(a)*; *Wyatt v. Shaw Plumbing Co., 760 S.W.2d 245, 247 (Tex.1988)*. If a claim meets those elements, it must be asserted in the initial action and cannot be later raised. *Id.*

 **\*700** **[3]** **[4]** **[5]** **[6]** Our Supreme Court has adopted a transactional approach in determining whether the compulsory counterclaim rule is applicable in a given case. It has instructed that in determining whether a transaction is within the purview of the rule, weight should be given to "such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understanding or usage." *Barr v. Resolution Trust Corp., 837 S.W.2d 627, 631 (Tex.1992)*, *citing* Restatement of Judgments, §§ 24(1) & 24(2). This court has noted that the Rule 97a "same transaction or occurrence" requirement has been broadly construed. *See Lesbrookton, Inc. v. Jackson, 796 S.W.2d 276, 281 (Tex.App.-Amarillo 1990, writ denied)*. Additionally, where as here, there is a legal relationship such as under a lease or contract, all the claims that arise from that relationship will arise from the same subject matter and be subject to the application of the rule in a proper case.

*Sanders v. Blockbuster, Inc., 127 S.W.3d 382, 386 (Tex.App.-Beaumont 2004, pet. denied)*; *see also Weiman v. Addicks–Fairbanks Road Sand Co., 846 S.W.2d 414, 419 (Tex.App.-Houston [14th Dist.] 1992, writ denied)*. However, where a defendant's claim to affirmative relief asserts a theory distinct from and independent of the issues raised in a plaintiff's claim, it is not a compulsory counterclaim. *Astro Sign Co. v. Sullivan, 518 S.W.2d 420, 426 (Tex.Civ.App.-Corpus Christi 1974, writ ref'd n.r.e.)*

In contending that Rule 97a is not applicable, SAW argues that BNSF's claims are too broad and posits that a party is not required to bring every claim based on a contract in a particular suit, particularly when it covers several different matters which could involve different fact scenarios, different witnesses, and different theories of recovery. SAW characterizes its real estate claims as involving the asserted failure of BNSF to assign leases to SAW, and, in addition, that BNSF did not assign "other income" (*i.e.* rent) that was due it under the Asset Sale Agreement, as well as the purported fraudulent "transfer of some or all of the properties involved either before or after the signing of the Asset Sale Agreement."

 **[7]** However, in the Lubbock case, SAW asserted that pursuant to the Asset Sale Agreement, a quitclaim deed was prepared that purportedly assigned it certain leases and rental income and claimed it was damaged because BNSF had failed to properly assign those leases and the rental income from them. The record shows that those were the same leases at issue in the Fort Worth case. That being so, the compulsory counterclaim rule would be applicable and would prevent the relitigation of those real estate claims in the Lubbock case. *Sanders v. Blockbuster, Inc., 127 S.W.3d at 386*.

 **[8]** With regard to the Burris Tracks, both parties asserted claims involving them in the Fort Worth case. BNSF sought a declaration that the Asset Sale Agreement did not include the Burris Tracks because of a mutual mistake, and SAW counterclaimed that BNSF had breached the agreement by "continuing to serve Lubbock Feeders subsequent to May 3, 1999" and by "continuing to serve Jarvis Metals on Tracks 7 and 12 at Burris...." SAW chose to non-suit its Burris Track claims in the Fort Worth case when it received an adverse ruling on its damages.

In the Lubbock case, SAW again alleged that the failure of BNSF to allow it to service customers along the Burris Tracks constituted a breach of the Asset Sale Agreement.

Those Burris Track claims **\*701** involved the same subject matter as the Fort Worth case. If the compulsory counterclaim rule was applicable, and we think it was, the trial court's summary judgment in that regard was proper. *See Compass Exploration, Inc. v. B–E Drilling Co.,* 60 S.W.3d 273, 278–79 (Tex.App.-Waco 2001, no pet.).

 **[9]** Both parties had claims in the Fort Worth case concerning SAW's request for a surcharge and BNSF's refusal to give consent. BNSF sought declaratory relief and SAW sought damages. When its damage testimony was excluded, SAW non-suited its surcharge counterclaim. BNSF's surcharge claim was submitted to the jury and it received a favorable answer. In the Lubbock case, SAW again asserted its surcharge claim that BNSF unreasonably withheld consent to a surcharge and sought damages for its refusal to give consent. Once more, this controversy arose out of the same subject matter as that involved in the Fort Worth case and thus was subject to the compulsory counterclaim rule. *See id.*

 **[10]** Both BNSF and SAW asserted claims in the Fort Worth case concerning operations on Track 9200. BNSF claimed that under the Asset Sale Agreement, it retained all rights to access and utilize Track 9200 and asked the court to so construe the agreement. SAW counterclaimed that BNSF violated the Asset Sale Agreement by refusing to recognize its right to dispatch trains on Track 9200. After it received an unfavorable ruling on its damages evidence, SAW chose to nonsuit its Track 9200 claim.

In the Lubbock case, SAW again asserted that BNSF failed to comply with its right to dispatch traffic on Track 9200 and thereby prevented it from providing direct rail service to its customers. This was done in language identical to that used by it in its non-suited counterclaim in the Fort Worth case. It arose out of the same Asset Sale Agreement in dispute in the Fort Worth case. Relitigation of the question was thus barred by the compulsory counterclaim rule. *See id.*

 **[11]** Again, in the Fort Worth case, SAW contended that a dispute existed between BNSF and SAW concerning the meaning of "billed" as used in the division of revenue provision in the Asset Sale Agreement and that BNSF breached the agreement by paying it less than that to which it was entitled. BNSF asked for a declaratory order construing that provision of the agreement and received a favorable result.

Because that issue was litigated in the Tarrant County trial, it is subject to the compulsory counterclaim rule and cannot be relitigated in the Lubbock County case. We have considered SAW's argument that the compulsory counterclaim rule only applies to issues that were specifically submitted as jury issues in the prior case and that its right to non-suit counterclaims in the Fort Worth suit was unqualified and absolute. However, we believe that the compulsory counterclaim rule is broader than the doctrine of *res judicata,* and, in a case such as this one, is applicable. *See Weiman v. Addicks–Fairbanks Road Sand Co.,* 846 S.W.2d at 421. The first point is overruled.

## BNSF Motion for Directed Verdict

 **[12]** **[13]** In their second point, SAW and SLAL contend the trial court erred in granting BNSF's motion for directed verdict on their quest for exemplary damages because the terms of the Asset Sale Agreements, the relationship between the parties, and the superior bargaining position of BNSF gave rise to a duty of good faith and fair dealing between them and BNSF. In considering this point, we recognize **\*702** the established rule that a plaintiff is entitled to a directed verdict when reasonable minds can draw only one conclusion from the evidence. The task of a reviewing court is to consider all the evidence in a light most favorable to the party against whom the verdict was instructed, discarding all contrary evidence and inferences, and determine whether there is any evidence of probative force to raise fact questions on the material questions presented. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978).

In support of their point, appellants place considerable weight upon the decision in the seminal case of *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987). In that case, the court found there is a duty on the part of insurers to deal fairly and in good faith with their insured. *Id.* at 167. In doing so, the court noted that it had declined to impose an implied covenant of good faith and fair dealing in every contract but, "a duty of good faith and fair dealing may arise as a result of a special relationship between the parties governed or created by a contract." *Id.* In the course of its discussion and in the context of insurance contracts, the court specifically noted that an insurance company had exclusive control over the evaluation and processing and denial of claims and that in such instances, the nature of insurance contracts gave rise to unequal bargaining power "which would allow unscrupulous insurers to take advantage

of their insureds' misfortunes in bargaining for settlement or resolution of claims." *Id.*

 **[14]** **[15]** Appellants contend that provisions in the agreements concerning such matters as their grant to BNSF of exclusive rate-making authority and the necessity for them to obtain dispatch authority from BNSF as to when they might use the main track or enter BNSF's two yards for interchange of trains to be spotted to customers is sufficient evidence of unequal bargaining power between the parties similar to that existing between insurance companies and their insureds. They argue that BNSF's control of rate making authority and use of its track together with its sole dispatch authority over its main line is so similar to an insurance company's control of its claim process as to give rise to a duty of good faith and fair dealing similar to that imposed upon insurance companies by the *Arnold* court. However, our Supreme Court has recognized that there is no general duty of good faith and fair dealing in ordinary arm's length commercial transactions. *See Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 52 (Tex.1998); *see also Wil–Roye Inv. II v. Washington Mut. Banks, F.A.,* 142 S.W.3d 393, 410 (Tex.App.-El Paso 2004, no pet.) (the duty of good faith and fair dealing does not arise in ordinary commercial transactions). In *Lovell v. Western Nat'l Life Ins. Co.,* 754 S.W.2d 298 (Tex.App.-Amarillo 1988, writ denied), this court noted the explication in the *Arnold* case as holding that the duty of good faith and fair dealing does not exist in Texas unless intentionally created by express language in a contract or unless a special relationship of trust and confidence exists between the parties to the contract. *Id.* at 302–03.

Indeed, in *Farah v. Mafrige & Kormanik,* 927 S.W.2d 663 (Tex.App.-Houston [1st Dist.] 1996, no writ), cited by appellants, the court explicated that "[t]he fact that one businessman trusts another and relies upon another to perform a contract does not rise to a confidential relationship." *Id.* at 675–76. In *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477 (Tex.App.-Corpus Christi 1989, writ denied), although the court recognized the rule that certain types of contracts might lead to the finding **\*703** of a special relationship of such a nature as to give rise to a cause of action in tort, the court cautioned that the special relationship cause of action did not extend to ordinary commercial relationships. *Id.* at 481.

In *English v. Fischer,* 660 S.W.2d 521 (Tex.1983), also cited by appellants, the Court had occasion to discuss a theory prevalent in California law that in every contract there was an

implied covenant of good faith and fair dealing. In refusing to accept such a concept, the Court cautioned that to do so, would "let each case be decided upon what might seem 'fair and in good faith' by each fact finder," which the Court was unwilling to do. *Id.* at 522.

Suffice it to say, this record is sufficient to support the trial court's evident conclusion that the agreements were the result of arm's length dealing between the parties and were not of a nature to demonstrate a "special relationship" sufficient to support a tort duty of good faith and fair dealing. As appellants recognize, under the Punitive Damages Act, the term "malice" is defined as a specific intent to cause substantial injury or harm to a plaintiff. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.001(7) (Vernon Supp.2007). Additionally, the trial court did not reversibly err in concluding the evidence insufficient to support the submission of exemplary damages to the jury. Appellants' second issue is overruled.

## Specific Performance and Injunctive Relief

 **[16]** **[17]** **[18]** **[19]** **[20]** **[21]** In their third issue, appellants contend that the trial court erred in denying their request for specific performance and injunctive relief. The purpose of specific performance is to compel a party who is violating a duty under a valid contract to comply with his obligations. The rationale for that remedy is that the recovery of monetary damages would be inadequate to compensate the complainant and thus the transgressor should be compelled to perform that which he had promised in his contract. *Estate of Griffin v. Sumner,* 604 S.W.2d 221, 225 (Tex.Civ.App.-San Antonio 1980, writ ref'd n.r.e.). It is a fundamental rule of equity that specific performance may not be granted unless it is shown there is no adequate remedy at law. *American Housing Resources, Inc. v. Slaughter,* 597 S.W.2d 13, 15 (Tex.Civ.App.-Dallas 1980, writ ref'd n.r.e.). The burden of invoking the court's equity jurisdiction is on the party seeking it and the comparative advantages of the equitable remedy must be shown to outweigh those of the legal remedy. Among the factors to be considered are whether long-continued supervision by the court will be required, whether complete relief can be rendered by the remedy sought, and whether, if the remedy sought is granted, it can be adequately enforced. *Id.* A court generally will not decree a party to perform a continuous series of acts which extend through a long period of time and require constant supervision by the court. *Canteen*

*Corp. v. Republic of Texas Properties, Inc.,* 773 S.W.2d 398, 401 (Tex.App.-Dallas 1989, no writ).

 **[22]**  In this case, appellant's quest for specific performance, in its essence, was one seeking a mandatory injunction. When a trial court grants, or refuses, a permanent injunction, the standard of review is whether it committed an abuse of discretion. The test for determining whether a trial court abused its discretion is whether it acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

 **[23]**  SAW asked that BNSF be ordered to:

  ***704**  1) Interchange to SAW all trains headed to customers on the Burris Tracks owned by BNSF, not to attempt to relocate any business from customers on the Burris Tracks owned by BNSF, and refrain from attempting to relocate any of the business from customers on the Burris Tracks.

 2) Interchange all Vulcan Materials' trains headed to Lubbock, Texas to SAW for unloading on Track 9200 and refrain from requiring Vulcan Materials to lease or use any BNSF track in the Lubbock area for unloading operations on trains routed to SAW; and

 3) Refrain from charging two different discriminatory freight rates for trains destined to Lubbock, Texas.

Examination of the Asset Sale Agreement reveals that although it gave SAW title to the Burris Tracks, it made no specific provision for its operation on BNSF's mainline to get there. The record supports the trial judge's evident conclusion that SAW had not suffered an irreparable injury and that it did have an adequate remedy at law in the form of contract damages if a breach of the contract had occurred. Additionally, the record would support the court in concluding that the grant of a mandatory injunction in a situation such as was presented to it would require continued onerous judicial supervision. In sum, this record does not show that the court erred in concluding that SAW did not meet the prerequisite requirements to justify the equitable remedy it sought in connection with the Burris Tracks.

Appellants also sought a judicial prohibition preventing BNSF from quoting different freight rates for trains destined to Lubbock and Slaton, Texas. In doing so, they argued that they had lost business from Vulcan Materials because BNSF had established different through rates. However, the record shows that they did not specify or demonstrate the amount of business they may have lost because of such rates or that they lost Vulcan Materials or any other entity as a customer. Those losses would have been susceptible of determination. Thus, under this record, they did not make the showings of a lack of an adequate remedy at law or irreparable injury requisite to support the equitable relief they sought.

Additionally, the Asset Sale Agreement specifically provided that BNSF "shall have authority to establish through routes and offer through freight rates via through routes involving both [appellants] and [BNSF] with interchange between [appellants] and [BNSF]...." The Agreements also stated that appellants "automatically concur in all such through rates established by [BNSF] ... so long as [appellants] receive for transporting the traffic [their] division of revenues...." There are no provisions in the Asset Sale Agreement preventing BNSF from charging different through rates for traffic interchanged with appellants, and we find no evidence produced at trial that the parties intended otherwise. In sum, the trial court could reasonably conclude that the specific performance sought by appellants in this regard would have compelled conduct inconsistent with the agreements.

Likewise, the record does not show evidence that appellants suffered imminent irreparable injury with no remedy at law because of BNSF's practices in handling Vulcan Materials' trains. Indeed, appellants sought and received from the trial jury money damages tied to BNSF's diversion of Vulcan Materials' trains and its refusal to allow Vulcan Materials to use Track 9200.

Moreover, even though SAW argues that BNSF had locked the switch to Track 9200 which had the effect of denying it the ***705**  ability to serve Vulcan Materials on that track, SAW acknowledged at trial that it still had access to Track 9200 when the switch was locked, and that on the trial date, the switch was no longer locked. Thus, the record does not show the requisite irreparable injury related to BNSF's conduct but does demonstrate that there was an adequate remedy at law in the form of contract damages.

Appellants also contend that BNSF assigned the Vulcan Materials business in the Asset Sale Agreements. However, perusal of the agreements demonstrates there are no provisions restraining BNSF from serving customers such as Vulcan Materials on its own rail line. Thus, appellants did not show any entitlement to specific performance. In sum, appellants' third issue is overruled.

**Damages**

[24]   In their fourth issue, appellants contend the trial court reversibly erred in granting BNSF's motion for judgment n.o.v. regarding appellants' recovery of damages for the wrongful diversion of Vulcan trains and the refusal of BNSF to allow SAW to service the Burris customers.

[25]   A trial court may grant a judgment n.o.v. if there is no evidence to support one or more of the jury's findings on issues necessary to liability or, conversely, if the evidence established an issue as a matter of law. *Brown v. Bank of Galveston, N.A.,* 963 S.W.2d 511, 513 (Tex.1998); *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

In responding to appellants' fourth issue, BNSF argues that although appellants now argue that they were entitled to "benefit of the bargain" damages, in their pleadings, they only claimed damages based upon "lost profits" and/or lost revenue. Moreover, during the course of the trial, appellants continued to argue that they had lost profits and revenues because of BNSF's breaches of the Asset Sale Agreements. They did offer a trial amendment after the close of evidence seeking recovery of benefit of the bargain damages but the trial judge refused to let them do so. Thus, under this record, they were not entitled to submission of that theory and we are relegated to the task of determining whether the testimony they produced was sufficient to support a "lost profits" recovery.

[26]   [27]   [28]   In a breach of contract action such as this one, the measure of damages is just compensation for the loss or damage actually sustained. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952). The measure of damages for the loss of profit as consequential damages means net profits. Net profits means what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business. The lost profits need not be susceptible to exact calculation, but must only be shown to a reasonable certainty. An award of damages may be based on estimates that are based upon objective facts, figures or data. *Interceramic, Inc. v. South Orient R.R. Co., Ltd.,* 999 S.W.2d 920, 929 (Tex.App.-Texarkana 1999, pet. denied); *Turner v. PV Intern. Corp.,* 765 S.W.2d 455, 465 (Tex.App.-Dallas 1988, writ denied).

Appellants assert the testimony of Larry Wisener is sufficient to establish their lost profits. Wisener testified as to the division of revenue that would be received by appellants on each train in issue and in considerable detail about the amount of fuel cost that would be used in handling those trains. However, there was no testimony about other necessary expenses of **\*706** doing business such as depreciation, payroll expenses, administrative expenses, equipment expenses, and maintenance expenses. In sum, Wisener's testimony falls short of fulfilling the requirement that lost profits be shown with reasonable certainty. *See Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.,* 131 S.W.3d 203, 209 (Tex.App.-Fort Worth 2004, pet. denied). Thus, the trial court did not reversibly err in disregarding the jury's answers to questions 2, 4, and 6. Appellants' fourth issue is overruled.

**BNSF'S Cross–Appeal**

[29]   In presenting its cross-appeal, BNSF presents three issues for our decision. First, it asserts the evidence is legally and factually insufficient to support the jury's answers to questions 7 and 8. In question 7, the jury was queried whether BNSF failed to comply with the Asset Sale Agreement by failing to assign the West Texas Industries lease or rent to SAW. Question 8 was predicated on an affirmative answer to question 7 and inquired as to what sum of money would compensate SAW for its damages, if any, resulting from the failure to assign the West Texas Industries lease. In arriving at its answer, it was instructed that it might only consider the "amount of rent under the lease from West Texas Industries, Inc. paid to BNSF after May 1, 2004." The answer was $12,600.

It is not disputed in the record that: 1) the property covered by the West Texas Industries lease was within the property description of the land to be conveyed to SAW by quitclaim deed under the SAW Asset Sale Agreement and that the Asset Sale Agreement was signed on May 3, 1999; 2) the property covered by that lease was conveyed by BNSF to a third party by a special warranty deed on June 29, 1999; 3) the quitclaim deed was executed by BNSF on June 29, 1999, but was not delivered on that date and was held by BNSF pending closing. The Asset Sale Agreement closed, and the quitclaim deed was delivered to SAW on July 2, 1999. It is undisputed that the lease was reconveyed to BNSF by the third party on October 25, 2002.

SAW argues that BNSF was obligated to assign it either the West Texas Industries lease or the rent generated from the lease. In support of that position, it relies upon section 1(e) which provides:

> Seller [BNSF] shall assign to Buyer [SAW] on the day of closing, subject to all terms and conditions set forth in this agreement, or in any agreement assigned by Seller to Buyer in accordance with the terms of this agreement, all assignable rights and obligations of Seller to the extent that they are related to the rail line and are set forth in any agreement identified in Exhibit D which is attached hereto.... If any contract is related to the rail line and inadvertently not identified in Exhibit D, it is the intent of Seller and Buyer that such contract be deemed to have been assigned by Seller to Buyer in whole or part as appropriate effective the date of closing.

It also relies upon section 12 of the agreement which provides:

> Prepaid rentals, utilities and other income or fees attributable to the contracts related to the rail line that are being assigned under ¶ 1 of this agreement, shall be prorated between Buyer and Seller in such a manner as to allocate to Seller all income received and all expenses incurred, on or prior to the date of closing, and to allocate to Buyer all income received, and expenses incurred after the date of closing.

**[30]** **[31]** SAW contends that under the contract BNSF's obligation was continuing **\*707** and that when the property was deeded back to BNSF, it had an obligation to transfer the lease back to SAW. However, BNSF's obligation under the contract was only to deliver a quitclaim deed. While a warranty deed to land conveys property, a quitclaim deed conveys only the grantor's right in it, if any. *Geodyne Energy Income Prod. P'ship I–E v. Newton Corp.,* 161 S.W.3d 482, 486 (Tex.2005). A quitclaim deed conveys upon its face doubts about a grantor's interest and a buyer is necessarily put on notice as to those doubts. The record demonstrates that

the quitclaim deed was delivered subsequent to the time that BNSF had no title to the lease. Consequently, it could not be liable for, and there is no evidence to support the jury answers to questions 7 and 8.

**[32]** **[33]** **[34]** Additionally, the statute of limitations for a breach of contract is four years. Tex. Civ. Prac. & Rem.Code Ann. § 16.051 (Vernon 1997). The limitations period begins to run when the cause of action accrues. When the legislature employs the term "accrues" without an accompanying definition, it is the responsibility of the courts to determine when the cause of action accrues and thus when the statute of limitations begins to run. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). An action for damages for breach of a written contract accrues when the breach occurs or when the claimant has notice of facts sufficient to place him on notice of the breach. *Rose v. Baker & Botts,* 816 S.W.2d 805, 810 (Tex.App.-Houston [1st Dist.] 1991, writ denied). Assuming, *arguendo,* that BNSF had breached the Asset Sale Agreement by failing to assign the West Texas Industries lease, that breach occurred on July 2, 1999. If BNSF was required to assign leases in some way other than by quitclaim deed, on July 2, 1999, when the deal was closed, SAW must have actual knowledge that there were no lease assignments made. However, SAW did not make its breach of contract claim until June 1, 2004, some five years later. The claim is barred by limitations.

Likewise, SAW's claims relating to the Furr's Cafeteria and Brite Trucking leases accrued on the date of the closing of the Asset Sale Agreement, and, like the other claims, SAW did not make its breach of contract claim in that regard until June 1, 2004, some five years later. Those claims are also barred by limitations.

**[35]** **[36]** SAW additionally contends that it is entitled to receive one-half of all of the rent payments received by BNSF from the B & R Auto lease. However, it is undisputed that the land leased to B & R Auto was not included in the description of land to be covered by quitclaim deed as provided in the Asset Sale Agreement. All that SAW received on that tract was an easement to operate on tracks crossing the land. It is SAW's contention that a landowner is obligated to share rent proceeds with those holding easements on the land. We disagree. An easement extends to certain persons or entities the right to use the land of another for the purpose or purposes specified in the easement and does not convey title to the property. *Magnolia Petroleum Co. v. Caswell,* 1 S.W.2d 597, 600 (Tex. Comm'n App.1928, judgm't adopted); *Long Island*

*Owner's Ass'n v. Davidson,* 965 S.W.2d 674, 684 (Tex.App.-Corpus Christi 1998, pet. denied). That being so, SAW would not be entitled to any portion of rentals owed by B & R Auto for the use of the property.

For the reasons we have expressed, the judgment of the trial court is modified to delete those portions of the judgment awarding $12,600 in damages to SAW with respect to the West Texas Industries lease, to delete that portion of the judgment **\*708** awarding injunctive relief and specific performance to SAW, to delete that portion of the judgment awarding attorney's fees to SAW, and to provide that SAW take nothing on those claims. As modified, the judgment is affirmed. Tex.R.App. P. 43.2.

**All Citations**

255 S.W.3d 690

Footnotes

1    John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp.2007).

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

164 S.W.2d 197
Court of Civil Appeals of Texas, San Antonio.

SAN ANTONIO JOINT STOCK LAND BANK

v.

MALCHER.

No. 11180. | July 22, 1942.
| Rehearing Denied Aug. 19, 1942.

Appeal from District Court, Atascosa County; S. B. Carr, Judge.

Suit by August Malcher against the San Antonio Joint Stock Land Bank of San Antonio and Edwin Seay to set aside a trustee's deed, and, in the alternative, for judgment decreeing specific performance of an alleged agreement to convey realty, together with an injunction prohibiting the bank from interfering with plaintiff's possession of the realty, and, further, in the alternative, for a money judgment against the bank, wherein the bank filed a cross-action. From an adverse judgment, the bank appeals.

Judgment amended, and, as amended, affirmed.

West Headnotes (7)

**[1]** **Landlord and Tenant**
 Time

Where rental contract provided that lessor gave lessee the right to purchase realty for certain amount, and that option, if not exercised, expired on certain date, and lessee notified lessor before such date of his intention to exercise the option, lessee had a reasonable time after such date to pay the money and otherwise complete the deal.

1 Cases that cite this headnote

**[2]** **Vendor and Purchaser**
 Exercise

Where an option to purchase realty is in writing and is signed by both parties, it may be orally accepted.

5 Cases that cite this headnote

**[3]** **Vendor and Purchaser**
 Exercise

Where option to purchase realty does not contain provisions to the contrary, all that is required by optionee is that he notify optionor, prior to date of expiration of option, of his decision to exercise the option, and he thereafter has a reasonable time within which to complete the deal.

8 Cases that cite this headnote

**[4]** **Vendor and Purchaser**
 Exercise

Optionee, who tendered money to optionor for the purchase of realty 18 days after date when he was to exercise the option, tendered the money within a "reasonable time".

7 Cases that cite this headnote

**[5]** **Specific Performance**
 Options

Where optionee tendered money to optionor for purchase of realty within a reasonable time after date when option was to be exercised, but optionor refused to accept the tender, optionee was entitled to specific performance of option contract.

7 Cases that cite this headnote

**[6]** **Appeal and Error**
 Total omission of findings; delay

Where trial judge, when notified of his failure to file findings of fact requested by appellant, at once began such preparation, but because appellant's attorneys had some of the exhibits in their possession, he was delayed in such preparation, and findings were not filed within time required by rule of civil procedure, and there was a complete statement of facts filed by appellant after appellant knew of delay in filing the findings, and appellant secured an extension of time to file such statement of facts, and appellant did not show that it was prejudiced by

delay, delay did not constitute reversible error. Rules of Civil Procedure, rule 297.

3 Cases that cite this headnote

**[7]** **Appeal and Error**
&#9758; To verdict, findings, or judgment

Where appellant made several points challenging findings of fact made by trial court as not being supported by the evidence, but those points were not briefed, they were "waived". Rules of Civil Procedure, rule 418.

15 Cases that cite this headnote

**Attorneys and Law Firms**

**\*198** Kelso, Locke & King and Wm. F. Koch, all of San Antonio, for appellant.

O. F. Burney, of Floresville, for appellee.

**Opinion**

MURRAY, Justice.

This suit was instituted by August Malcher in the District Court of Atascosa County against San Antonio Joint Stock Land Bank of San Antonio, a corporation, and Edwin Seay seeking to set aside a certain trustee's deed conveying 221.4 acres of land out of the J. T. Eubanks Survey No. 506, in Atascosa County, Texas, to the above named Land Bank and, in the alternative for judgment decreeing specific performance of an alleged agreement on the part of the Land Bank to convey said 221.4 acres of land to Malcher, together with an injunction prohibiting the Land Bank from in any way interfering with Malcher's possession of said 221.4 acres of land, and, further, in the alternative, for a money judgment against the Land Bank in the sum of $1,863.94.

The trial was to the court without the intervention of a jury and resulted in judgment in Malcher's favor requiring the Land Bank to execute and deliver to the Clerk of the District Court, for August Malcher, a deed conveying to August Malcher all the right, title and interest to said 221.4 acres of land that the Land Bank has in said property, and also that Edwin Seay has in said land, upon the payment by Malcher to said District Clerk for the Land Bank of the sum of $3,262; and further enjoining the Land Bank from in any way interfering with

Malcher's possession of the 221.4 acres of land. The trial judge made elaborate findings of fact resolving all fact issues against the Land Bank.

From this judgment the San Antonio Joint Stock Land Bank alone has prosecuted this appeal.

Appellant presents its first three points together, and they are as follows:

"First Point. The court erred in rendering judgment for Appellee, Malcher, herein, for the relief prayed for by him and in rendering judgment against Appellant upon its cross-action, because, under the undisputed evidence, Appellee, Malcher, was not entitled to recover herein and Appellant **\*199** was entitled to judgment on its cross-action.

"Second Point. The court erred in granting Appellee Malcher's prayer for specific performance of his alleged contract to repurchase the land in suit, because the undisputed evidence shows that appellee never offered to perform his alleged option contract, to repurchase said land until the time allowed him to exercise such option had expired.

"Third Point. The court erred in granting Appellee Malcher's prayer for specific performance of his alleged agreement to repurchase the land in controversy because the undisputed evidence shows that Appellee never at any time prior to the filing of this suit made a valid tender of performance of his option to purchase."

On August 19, 1929, August Malcher and wife executed a deed of trust to William B. Lupe, Trustee, upon the 221.4 acres of land involved herein, to secure the Land Bank in the payment of a deed of trust note in the sum of $4,500.

On June 4, 1940, a trustee's sale of the land was had and the Land Bank bid it in for the sum of $2,250, leaving a balance due on the note of $2,254.47.

On June 7, 1940, Malcher went to San Antonio and had a conversation with William B. Lupe, Jr., a vice-president of the Land Bank. Malcher paid Lupe the sum of $1,500 and understood that he would be permitted to redeem the land by paying in full the amount due on the note. The Land Bank, through its officers and attorney, wrote Malcher several letters thereafter urging him to come in and complete the deal, but Malcher neglected to answer these letters.

Malcher never went back to see Mr. Lupe until about October, 1940, at which time he agreed to pay the taxes upon the land.

After the taxes were paid he received the following letter from Mr. Lupe, which is self-explanatory, to-wit:
"November 8th, 1940

"Dear Sir:                    In re: Loan 3008

"Confirming our conversation of October 10, 1940, in regard to re-purchasing your farm, the Bank agreed that if you would pay up all taxes by the 15th of October, that we would give you an option until December 1, 1940, to re-purchase the farm at the amount of investment the Bank has in the farm as of December 1, 1940.

"Since you have paid the taxes as per your agreement, this is to confirm our agreement that you have the option to re-purchase up to December 1, 1940, and the figure will be $4,639.30 less $1,500.00 or $3,139.30.
"Yours very truly,

"Wm. B. Lupe, Jr.

"Vice-President."


Malcher did not re-purchase the land under this option, but in June, 1941, he entered into a rental contract with the Bank, whereby he rented the land from the Bank for the year 1941. This rental contract was signed by both Malcher and the proper officer of the Bank and contained the following option:

"The Lessor hereby gives Lessee (August Malcher) the right to purchase the above described tract of land for a consideration of $3,009.70, plus 6% interest from June 7, 1940, to date of purchase. This option, if not exercised, expires September 30, 1941, is not transferrable, and is subject to right of sale by Lessor prior to September 30, 1941."

August Malcher testified to facts which support the trial court's finding to the effect that he notified the Land Bank, in August, 1941, that he was exercising his option to purchase, however, he did not tender the money or secure a deed to the property prior to September 30, 1941. He did tender the money to the Bank on October 18, 1941, which tender was not accepted by the Bank.

[1]    This brings us to a consideration of the all-important question in the case, which is, whether under the option Malcher was required to pay or tender the purchase money to the Bank on or before September 30, 1941, or whether, having

"Mr. August Malcher

"Poth, Texas

notified the Bank of his intention to exercise the option, he would have a reasonable time after September 30th to pay the money and otherwise complete the deal. We conclude that he would have such reasonable time. It will be borne in mind that the contract does not require that the option be accepted in writing not later than September 30, 1941, neither does it require in express terms that the money be paid or tendered not later than that date; nor does it require that the money be tendered in cash. It simply provides that the "option, if not exercised, expires September 30, 1941."

**\*200**    [2]    Where an option to purchase real estate is in writing and signed by both parties it may be orally accepted. Haskell v. Merrill, Tex.Civ.App., 242 S.W. 331; 43 Tex.Jur. 100; 66 C.J. 499; Killough v. Lee, 2 Tex.Civ.App. 260, 21 S.W. 970.


In Anderson v. Tinsley, 28 S.W. 121, 122, Justice Fly, speaking for this court, said: "* * * The 10-days limit does not, and evidently was not intended to, apply to the passing of the deed. 'The offer to remain in force for ten days from this date,' upon a fair construction, means that the 10-days limit is given in which to accept the offer. It was accepted within the 10 days. The contract was then in a condition that it could be enforced by either party."

[3]    Where an option does not contain provisions to the contrary all that is required by the optionee is that he notify the optionor, prior to the date of expiration, of his decision to exercise the option and he thereafter has a reasonable time within which to complete the deal. 66 C.J. 500; Horgan v. Russell, 24 N.D. 490, 140 N.W. 99, 43 L.R.A.,N.S., 1150; Killough v. Lee, supra.

[4]    [5]    The trial court held upon sufficient evidence that Malcher tendered the money to the Land Bank within a reasonable time after September 30th, and such tender was not accepted by the Bank. This being true Malcher is entitled to specific performance of his option contract.

[6]    As we have previously stated, the trial court filed elaborate findings of fact sufficient to support the judgment rendered. Appellant contends we should not consider these

findings, but should reverse the judgment because such findings were not filed within the time required by Rule No. 297, Rules of Civil Procedure. The findings of fact should have been filed not later than January 18, 1942, but were not filed until January 23, 1942. The trial judge, in explaining the delay in filing his findings, shows that he did not have actual knowledge of the written request of appellant for such findings. When he was notified of his failure to file such findings he at once began such preparation, but due to the fact that attorneys for appellant had some of the exhibits in their possession he was delayed in such preparation. There is a complete statement of facts in the case, filed by appellant after it knew of the delay in filing the findings of fact. Appellant secured an extension of time so that it might be enabled to file such statement of facts. Appellant has not shown that it was in any way prejudiced by the delay in filing the findings. Under such circumstances such delay on the part of the trial judge in filing his findings of fact does not constitute reversible error. Barry v. Barry, Tex.Civ.App., 162 S.W.2d 440; Grant v. Pendley, Tex.Civ.App., 88 S.W.2d 132; McNabb v. Cruze, Tex.Civ.App., 101 S.W.2d 902.

 **[7]** Appellant has made several points challenging certain findings of fact made by the trial court as not being supported by the evidence, but these points have not been briefed and are therefore waived. Rule No. 418, Rules of Civil Procedure; 3 Tex.Jur. 901; Lov Vorn v. Wilkinson, Tex.Civ.App., 112 S.W.2d 749; Alamo Downs, Inc., v. Briggs, Tex.Civ.App., 106 S.W.2d 733.

The judgment will be amended so as to provide that if Malcher should fail to pay to the Clerk of the District Court of Atascosa County the sums of money provided for in the judgment, within the time provided therein, then and in that event he should lose all rights under his option contract and under the judgment, and, further, in such event the injunction will be dissolved.

Amended and affirmed.

**All Citations**

164 S.W.2d 197

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

283 S.W.3d 537
Court of Appeals of Texas,
Dallas.

Benjie SMITH d/b/a Oak Cliff Metals, Appellant,

v.

DASS, INC., Appellee.

No. 05–07–01023–CV. | May 8, 2009.

**Synopsis**
**Background:** Commercial tenant brought action against landlord and equipment lessor for breach of contract, reformation of sales document and a declaration that reformed sales document would be valid and enforceable. The 160th Judicial District Court, Dallas County, Jim Jordan, J., entered judgment for tenant on jury verdict for money damages and denied all other requested relief. Tenant appealed.

**Holdings:** The Court of Appeals, Lang, J., held that:

[1] landlord did not waive any purported complaint regarding the lack of a jury charge and jury finding on issue of whether lessee complied with provisions of sales agreement, and

[2] evidence was insufficient to support award of specific performance.

Affirmed.

West Headnotes (11)

[1] **Specific Performance**
  Discretion of Court
  **Specific Performance**
  Form of Remedy

Specific performance is an equitable remedy committed to the trial court's discretion.

1 Cases that cite this headnote

[2] **Appeal and Error**
  Abuse of Discretion

The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles; the trial court's ruling should be reversed only if it was arbitrary or unreasonable.

1 Cases that cite this headnote

[3] **Specific Performance**
  Nature and Grounds of Duty of Plaintiff

The equitable remedy of specific performance may be awarded upon a showing of breach of contract; however, a party seeking specific performance must plead and prove (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation and (2) the readiness, willingness, and ability to perform at relevant times.

Cases that cite this headnote

[4] **Jury**
  Issues of Fact in Equitable Actions

When contested fact issues must be resolved before a court can determine the expediency, necessity, or propriety of the equitable relief, a party is entitled to have a jury resolve the disputed fact issues.

Cases that cite this headnote

[5] **Estates in Property**
  Nature and Incidents in General
  **Property**
  Nature of Right of Property and Acquisition in General

"Equitable title" is the present right to compel legal title.

3 Cases that cite this headnote

[6] **Appeal and Error**
  Necessity of Presentation in General

As a general rule, a party is required to present a complaint to the trial judge before being allowed to raise an issue on appeal.

Cases that cite this headnote

**[7]    Specific Performance**
     Appeal

Landlord did not waive any purported complaint regarding the lack of a jury charge question and jury finding on issue of whether commercial tenant complied with sale agreement pursuant to rule providing failure to submit a question shall not be deemed a ground for reversal of judgment unless it had been requested in writing and tendered by party complaining of judgment, in tenant's action for specific performance of the agreement; landlord did not assert a failure to submit a question as a ground for reversal of judgment and did not object when tenant did not submit jury question on issue as to which he had burden of proof. Vernon's Ann.Texas Rules Civ.Proc., Rule 278.

Cases that cite this headnote

**[8]    Specific Performance**
     Performance, Good Faith, and Diligence of Plaintiff

Commercial tenant's equivocal testimony as to whether he complied with sales contract provision that required details of title be worked out with the Environmental Protection Agency (EPA) before he could purchase leased property from landlord was insufficient to support award of specific performance of contract in his action against landlord. Vernon's Ann.Texas Rules Civ.Proc., Rule 54.

Cases that cite this headnote

**[9]    Jury**
     Issues of Fact in Equitable Actions

When contested fact issues must be resolved before a court can determine the expediency, necessity, or propriety of equitable relief, a party is entitled to have a jury resolve the disputed fact issues.

Cases that cite this headnote

**[10]    Specific Performance**
     Presumptions and Burden of Proof

Commercial tenant seeking specific performance of sales contract with landlord had burden of proving that he had worked out title details required by the contract and was ready, willing, and able to perform as to such details.

Cases that cite this headnote

**[11]    Vendor and Purchaser**
     Effect of Executory Contract on Title to Property

Commercial tenant's failure to plead and prove that he complied with sales contract provision that required details of title be worked out with the Environmental Protection Agency (EPA), precluded award of equitable title in real property; there was no finding of fact by jury that tenant performed his obligations under sale document regarding title details, thus there was no jury finding showing tenant's entitlement to equitable title in real property. Vernon's Ann.Texas Rules Civ.Proc., Rule 54.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*539** Shawn M. McCaskill, Goodwin Ronquillo, L.L.P., Dallas, TX, for Appellant.

Michael H. Myers, John Thomas Wilson, Myers Wilson P.C., Dallas, TX, for Appellee.

Before Justices BRIDGES, O'NEILL and LANG.

## OPINION ON AMENDED MOTION FOR REHEARING

Opinion by Justice LANG.

On March 12, 2009, this Court issued an opinion affirming the trial court's judgment. Appellant Benjie Smith d/b/a Oak

Cliff Metals ("Smith") filed a motion for rehearing on April 9, 2009. On April 29, 2009, with his April 9, 2009 motion still pending, Smith filed a motion for leave to file an amended motion for rehearing, to which he attached his amended motion for rehearing. By separate order, we have granted Smith's motion for leave to file an amended motion for rehearing. We deny Smith's amended motion for rehearing. In addition, we withdraw our March 12, 2009 opinion and vacate the judgment of that date. This is now the opinion of the Court.

This case involves a dispute over an agreement to purchase a parcel of real property. The trial court signed a judgment in favor of Smith awarding damages against appellee DASS, Inc. ("DASS") for breach of that agreement. However, appellant contends the trial court erred when it refused to sign a judgment granting specific performance or a declaratory judgment awarding equitable title. In his three issues on appeal, Smith specifically contends (1) the trial court abused its discretion by denying his election of the remedy of specific performance of the agreement to purchase, (2) the trial court erred by denying his request for the alternative remedy of a declaratory judgment awarding him equitable title to the real property, and (3) the trial court's purported reasons for denying the relief requested by him are erroneous and without merit.

For the reasons below, we decide Smith's first and second issues against him. We need not reach Smith's third issue. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1999, Falcon Transit, Inc., a corporation owned by Benjie Smith, leased real property located at 523 Pontiac Avenue in Dallas from DASS, the owner of the real property, for the operation of a scrap metal business called Oak Cliff Metals. The written commercial lease agreement provided for a thirty-month term commencing February 1, 1999, with a monthly lease payment of $2000. In addition, Smith agreed to pay property taxes and utilities. DASS's director, Steve McFalls, signed the commercial lease agreement on behalf of DASS. Under a separate written lease agreement, Smith leased equipment on the premises for the same term from Texas Industrial Recycling Company ("TIRC"), a company owned by McFalls, for a monthly lease payment of $3000. McFalls signed the equipment lease agreement on behalf of TIRC.

Smith contends the parties executed a document dated August 31, 2001, titled "Pending Sale of Land" (the "Sale document"). The Sale document read as follows:

### *Pending Sale of Land*

8/31/01

*From:*

Texas Industrial Recycling

Scrap yard located at 523 Pontiac Avenu, Dallas, Texas, known as Oak Cliff Metals

*To:*

Benjie L. Smith

[*] $100,000.

[*] To be paid $1500 plus property taxes per month until details on title are worked out between Benjie Smith's attorney and EPA.

**\*540** The Sale document was purportedly signed by Smith, as "Buyer," and McFalls, as "Seller." In addition, Smith contends two August 31, 2001 bills of sale were signed by McFalls regarding sale of the leased equipment from TIRC to

Smith. McFalls denies signing the Sale document or the bills of sale.

In a letter dated October 26, 2005, DASS and TIRC purported to provide Falcon Transit, Inc. with notice of termination of the commercial lease agreement and equipment lease

agreement. According to the notice of termination letter, upon expiration of the thirty-month lease term on August 1, 2001, Falcon Transit, Inc. became a month-to month tenant of the premises at 523 Pontiac Avenue and maintained a month-to-month lease of the equipment. The notice of termination letter ordered Falcon Transit, Inc. to vacate the leased premises and return possession of the leased equipment no later than December 1, 2005. Smith responded by filing suit.

In his third amended petition, the pleading upon which the parties went to trial, Smith asserted several claims.[1] First, he pleaded a breach of contract claim, but alleged a mistake in the Sale document in naming TIRC as the seller, rather than DASS. Next, Smith requested (1) reformation of the Sale document to "reflect the actual agreement of the parties," and (2) a declaratory judgment that the Sale document, as reformed, was valid and enforceable, that he obtained equitable title to the real property at issue "on the date of payment of the last monies owed for the Property under the contract," and that he was entitled to "an adequate conveyance of the Property, including a transfer to Plaintiff of legal title."

Finally, Smith pleaded for specific performance of the Sale document, asserting in relevant part, "Plaintiff has performed all obligations imposed on Plaintiff by the [Sale document]. Plaintiff has fully paid Defendant the agreed purchase price." Smith requested defendants be required to comply with "the terms of the contract, as reformed, specifically that they be required to execute and deliver to Plaintiff an adequate and sufficient conveyance of title to the Property to Plaintiff."

The jury found[2] in answer to question 1 of the charge of the court that McFalls signed the Sale document. In answer to question 2 of the charge, the jury found before the Sale document was prepared **\*541** and signed, DASS and Smith orally agreed to the terms set forth in that document, but in the preparation of that document TIRC was erroneously written into the document instead of DASS as a result of a mutual mistake of the parties. The jury found in answer to question 3 of the charge that DASS failed to comply with the Sale document. In answer to question 4 of the charge, the jury awarded Smith $137,755 in damages for DASS's "failure to comply with the [Sale document]." Those damages included (1) $100,000 for "[m]oney paid by or on behalf of [Smith] pursuant to the [Sale document]"; (2) $15,314 for "[m]oney paid by or on behalf of [Smith] in excess of the amount required under the [Sale document]"; and (3) $22,441 for "[p]roperty taxes paid on or behalf [sic] of [Smith] pursuant to

the [Sale document]." The remaining questions and answers in the charge are not pertinent to this appeal.

Smith filed a "Motion for Entry of Judgment." In that motion, Smith requested the trial court in relevant part (1) render and sign a judgment in favor of Smith in accordance with the jury's verdict and (2) reform the Sale document and order specific performance of that document, as reformed, by DASS. In defendants' response to Smith's motion for entry of judgment, they asserted in part Smith "is not entitled to the equitable remedy of specific performance because there is no evidence [he] has satisfied his obligations under the [Sale document]." The record does not contain a record of a hearing on Smith's motion for entry of judgment or show a ruling on that motion.

The final judgment stated it was "[b]ased upon the jury's verdict" and awarded Smith money damages in the amount of $137,755, attorney's fees, prejudgment interest, post judgment interest, and taxable costs of court. Further, the final judgment denied "[a]ll other relief requested by any party to this case."

In his "Motion to Modify, Correct or Reform the Judgment," Smith requested the trial court, in relevant part, (1) reform the Sale document and order specific performance of the reformed document on the part of DASS and conveyance of legal title to the real property, or (2) in the alternative, render a declaratory judgment Smith has equitable title in the real property "based on the jury's findings as to the existence of the agreement and Benjie Smith's compliance therewith" by "making the full and final payment (as found by the jury)." Following a hearing, the trial court denied Smith's motion to modify, correct, or reform the judgment.[3] This appeal timely followed.

## II. REQUIRED JURY FINDINGS

In his first and second issues on appeal, Smith contends, in essence, (1) the trial court abused its discretion by denying his election of the remedy of specific performance of the agreement in the Sale document and (2) the trial court erred by denying his request for the alternative remedy of a declaratory judgment awarding him equitable title as to the real property. DASS contends, in relevant part, Smith is not entitled to specific performance or equitable title because the facts required to support those remedies were not found by the jury. With respect to DASS's argument regarding required jury findings, we address Smith's first and second issues together.

**\*542** *A. Standard of Review and Applicable Law*

### 1. Specific Performance

 **[1]** **[2]** Specific performance is an equitable remedy committed to the trial court's discretion. *Stafford v. S. Vanity Magazine, Inc.,* 231 S.W.3d 530, 535 (Tex.App.-Dallas 2007, pet. denied). The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but "whether the court acted without reference to any guiding rules and principles." *Cire v. Cummings,* 134 S.W.3d 835, 838–39 (Tex.2004) (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)). The trial court's ruling should be reversed only if it was arbitrary or unreasonable. *Id.* at 839.

 **[3]** **[4]** The equitable remedy of specific performance may be awarded upon a showing of breach of contract. *Stafford,* 231 S.W.3d at 535. However, a party seeking specific performance must plead and prove (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation and (2) the readiness, willingness, and ability to perform at relevant times. *DiGiuseppe v. Lawler,* 269 S.W.3d 588, 593–94, 601 (Tex.2008); *see also 17090 Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 258 (Tex.App.-Dallas 2002, pet. denied). When contested fact issues must be resolved before a court can determine the expediency, necessity, or propriety of equitable relief, a party is entitled to have a jury resolve the disputed fact issues. *DiGiuseppe,* 269 S.W.3d at 596; *Stafford,* 231 S.W.3d at 536 (citing *Burrow v. Arce,* 997 S.W.2d 229, 245 (Tex.1999)).

### 2. Equitable Title

 **[5]** Equitable title is the present right to compel legal title. *See Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.,* 140 S.W.3d 833, 840 (Tex.App.-Austin 2004, no pet.). In *Johnson v. Wood,* 138 Tex. 106, 157 S.W.2d 146, 148 (1941), the parties entered into a written contract to convey certain real property by warranty deed upon payment of the agreed purchase price. *Id.* at 147. The jury found "Johnson made payment of all the monthly installments due under the contract." *Id.* The court concluded, based on the jury's

findings, "Johnson had paid the purchase price and fully performed his obligations under the contract." *Id.* at 148. Upon such performance, the court held, Johnson became vested with equitable title in the property. *Id.; see also Cullins v. Foster,* 171 S.W.3d 521, 533 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) ("Equitable title may be shown when the plaintiff proves that he has paid the purchase price and fully performed the obligations under the contract."); *White v. Hughs,* 867 S.W.2d 846, 849 (Tex.App.-Texarkana 1993, no writ) (same).

*B. Application of Law to Facts*

With respect to specific performance, DASS argues in part in its brief before this Court that Smith did not submit appropriate jury questions relating to his performance of the material terms of the Sale document. Specifically, DASS contends

> The [Sale document] states that the consideration for the purchase was to be paid "$1,500 plus property taxes per month until details on title are worked out between Benjie Smith's attorney and the EPA." Smith testified that the details on the title haven't been worked out as of the date of the trial proceedings. Moreover, Smith did not submit questions to the jury evidencing whether he **\*543** was ready, willing, or able to work out the details on title with the EPA.

(citations to record omitted). Therefore, DASS asserts, Smith is not entitled to the equitable relief of specific performance.

Similarly, with respect to equitable title, DASS asserts in relevant part, "Smith failed to submit questions to the jury providing evidence of his complete performance of the [Sale document], and therefore, cannot demonstrate that he is entitled to equitable title of the real property." In particular, DASS alleges, there was no finding of fact Smith performed "his obligations related to the EPA."

Smith asserts submission of any such questions to the jury was unnecessary. He states in his brief to this Court, "The jury correctly found in Question 4 that Smith had fully performed and complied with the [Sale document], and that Smith paid $15,314,00 in excess of the amount required under the [Sale document] to purchase the real property." Further, Smith asserts, he was entitled to a declaratory judgment awarding him equitable title in the real property "upon making the full

and final payment under the [Sale document], whereby such equitable title vested by operation of law."

 **[6]**   In his reply brief before this Court, Smith argues DASS's claim he failed to submit a question to the jury regarding his performance of the terms of the Sale document and therefore failed to "plead and prove that he complied with the terms" is "legally and factually without merit." Smith asserts he pleaded in his third amended petition (1) he fully performed all his obligations under the contracts, (2) he had already made all of the requisite lump sum and monthly payments to McFalls and DASS to complete the purchase of the real property pursuant to the Sale document, and (3) "[a]ll conditions precedent to Plaintiff's recovery have been performed, have occurred, or have been waived." [4]   In addition, Smith contends he testified at trial the payments required under the Sale document had been made to McFalls and DASS. Further, Smith argues "[i]t is not necessary for a party requesting specific performance of a contract to plead and prove both (1) full performance and compliance with the contract and (2) being ready, willing, and able to perform and comply with that same contract."

 **[7]**   Also in his reply brief, Smith asserts that, pursuant to rule 278 of the Texas Rules of Civil Procedure,

> **\*544**   DASS waived any purported complaint ... regarding the lack of jury charge question and jury finding on the specific issue of whether Smith complied with the [Sale document] by failing to (1) object to the omission of such a question or (2) request the submission of such a question in substantially correct wording during the jury charge conference before the trial court.

Accordingly, Smith contends, DASS cannot complain for the first time on appeal that a separate issue on Smith's compliance with the reformed Sale document was not submitted to the jury.

Finally, Smith argues in his reply brief that, given the jury's findings and answers as to the damages to him resulting from DASS's failure to comply with the reformed Sale document, the omission of a jury charge question on the issue of whether he complied with the Sale document was "immaterial and harmless error, if error at all."

## 1. Waiver Under Rule 278

Rule 278 of the Texas Rules of Civil Procedure addresses submission of jury questions, definitions, and instructions. *See* TEX.R. CIV. P. 278. Pursuant to rule 278, Smith asserts "DASS cannot complain for the first time on appeal that a separate issue on Smith's compliance with the reformed [Sale document] was not submitted to the jury." The portion of rule 278 cited by Smith provides

> Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment; provided, however, that objection to such failure shall suffice in such respect if the question is one relied upon by the opposing party.

*Id.* Here, DASS is not asserting "[f]ailure to submit a question" as "a ground for reversal of the judgment." *See id.* Moreover, Smith does not explain how defendants were obligated to object when Smith did not submit a jury question on issues as to which he had the burden of proof. *See DiGiuseppe,* 269 S.W.3d at 596; *Cullins,* 171 S.W.3d at 533. We cannot agree with Smith that DASS has "waived any purported complaint ... regarding the lack of jury charge question and jury finding on the specific issue of whether Smith complied with the [Sale document]" pursuant to rule 278.

## 2. Specific Performance

 **[8]**   "[A] plaintiff seeking specific performance must plead and prove (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation, and (2) the readiness, willingness, and ability to perform at relevant times." *DiGiuseppe,* 269 S.W.3d at 601. The record shows the Sale document, on its face, stated the purchase price was "[t]o be paid $1500 plus property taxes per month until details on title are worked out between Benjie Smith's attorney and EPA." Even assuming, without deciding, that the jury's answer to question 4 of the charge of the court found payment by Smith of the full amount of money required under the Sale document, such a finding does not address

Smith's performance or compliance as to any obligations to work out title "details" with the EPA.

The testimony in the record regarding Smith's performance or compliance as to obligations to work out title details with the EPA is limited to the following testimony of Smith on cross-examination:

Q. Would you agree with me that if we're here today details on title haven't been worked out?

**\*545** A. Not specifically, no.

In its brief on appeal, DASS asserts, "Smith testified that the details on the title haven't been worked out as of the date of the trial proceedings." Smith did not address that characterization of his testimony in his reply brief on appeal or in his post-submission supplemental brief. In his amended motion for rehearing, Smith cites the testimony set forth above and asserts counsel for DASS "asked Smith on cross-examination if Smith would agree that the details on title had not been worked out between Smith's attorney and the EPA as of the date of trial, and Smith answered 'no' he would not agree." However, the record shows that, rather than answering "no," Smith answered, "Not specifically, no." It is not clear from the record whether Smith's answer addressed (1) whether he agreed with his questioner, or not, or (2) whether the details on title had been worked out. Accordingly, the testimony is equivocal. We are cited to no other evidence in the record, nor can we find any, that addresses Smith's performance or compliance as to "details on title" having been "worked out." On this record, Smith did not conclusively establish the fact at issue. *See Gifford Hill Am., Inc. v. Whittington,* 899 S.W.2d 760, 764 (Tex.App.-Amarillo 1995, no writ) (equivocal testimony did not conclusively establish fact and submission to jury was therefore required).

Additionally, Smith argues in his reply brief on appeal "[i]t is not necessary for a party requesting specific performance of a contract to plead and prove both (1) full performance and compliance with the contract and (2) being ready, willing, and able to perform and comply with that same contract." According to Smith, given that he "pleaded and proved full performance and compliance with the [Sale document]," it would have been "inconsistent and unnecessary for [him] to likewise plead and prove that he was ready, willing, and able to perform." In support of that argument, Smith cites *Stafford* for the proposition "a party seeking specific performance must have either performed or tendered performance." *See Stafford,* 231 S.W.3d at 535. However, we disagree with

Smith. *Stafford* does not address the precise issue presented here. *See id.* As noted above, the Texas Supreme Court has stated a plaintiff seeking specific performance must plead and prove (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation, *and* (2) the readiness, willingness, and ability to perform at relevant times. *See DiGiuseppe,* 269 S.W.3d at 593–94, 601.

**[9]** **[10]** When contested fact issues must be resolved before a court can determine the expediency, necessity, or propriety of equitable relief, a party is entitled to have a jury resolve the disputed fact issues. *See id.* at 596. Defendants did not concede or stipulate in the trial court Smith performed regarding working out title details or that he was ready, willing, and able to perform as to such details. *See id.* at 601. No jury questions were requested regarding Smith's performance or compliance as to title details or whether he was ready, willing, and able to perform. *See id.* at 593–94, 601. Also, there was no objection to the omission of such questions. *See id.* at 595. Those issues were ones on which Smith, as the party seeking specific performance, had the burden of proof at trial. *Id.* at 596. Because there are no jury findings on elements of specific performance as to which the facts were disputed and on which Smith had the burden of proof, we conclude the trial court's denial of Smith's request for specific performance was not an abuse of discretion. We decide against Smith on his first issue.

### *\*546 3. Equitable Title

**[11]** As stated above, the jury's findings in question 4 of the charge of the court do not address Smith's performance as to obligations under the Sale document to work out title "details" with the EPA. Further, as discussed above, there was no finding of fact by the jury that Smith performed his obligations under the Sale document regarding title "details." Therefore, the record shows no jury finding Smith fully performed his obligations under the Sale document in order to show entitlement to equitable title. *See Johnson,* 157 S.W.2d at 148; *see also Cullins,* 171 S.W.3d at 533 ("Equitable title may be shown when the plaintiff proves that he has paid the purchase price and fully performed the obligations under the contract."). Accordingly, we conclude the trial court did not err in denying Smith's request for a declaratory judgment awarding Smith equitable title in the real property. Smith's second issue is decided against him.

## III. "PURPORTED REASONS" FOR DENIAL OF EQUITABLE RELIEF

In his third issue, Smith asserts the trial court's "purported reasons" for denying the relief requested by him are erroneous and without merit. Specifically, Smith contends (1) because DASS did not plead a statute of frauds defense, the trial court was not limited to the Sale document in determining the sufficiency of the description of the real property to be conveyed; (2) the issue of whether the Sale document was ambiguous was not pleaded by DASS, thus precluding the issue from being submitted to the jury; (3) because the evidence and testimony provided an undisputed description of the real property to be conveyed, that issue was not required to be submitted to the jury; (4) the parties intended for DASS to convey its title to the real property to Smith, and Smith is entitled to whatever title DASS holds in the property; (5) Smith properly filed breach of contract and declaratory judgment actions, rather than a trespass to try title action; and (6) DASS waived any complaint as to "the lack of a trespass to try title action."

We concluded above the trial court did not err in denying Smith's requests for specific performance and declaratory judgment awarding him equitable title because the record does not show the jury findings required for such relief.

Therefore, regardless of whether the "purported reasons" speculated by Smith in his third issue as the bases for the trial court's denial of that relief are, as contended by Smith, "erroneous and without merit," Smith would not be entitled to the equitable relief he has requested. We need not address Smith's third issue.

## IV. CONCLUSION

We conclude the trial court's denial of Smith's request for specific performance was not an abuse of discretion because there are no jury findings on elements of specific performance as to which the facts were disputed and on which Smith had the burden of proof. Further, because the record shows no jury finding Smith fully performed his obligations under the Sale document, we conclude the trial court did not err in denying Smith's request for the alternative remedy of a declaratory judgment awarding Smith equitable title in the real property.

Smith's first and second issues are decided against him. We need not address Smith's third issue. The trial court's judgment is affirmed.

**All Citations**

283 S.W.3d 537

---

Footnotes

1    Causes of action asserted by Smith in his third amended petition, but not relevant to this appeal, included violations of the Texas Deceptive Trade Practices and Consumer Protection Act, common law fraud, and statutory fraud.

2    Smith's brief before this Court states the following, which is not disputed by DASS:
     The Charge of the Court signed by the trial court judge and the jury's answers thereto and verdict were lost or destroyed, and the parties did not have any copies of the signed Charge of the Court or the jury's verdict. The unsigned Charge of the Court contained in the trial court's file and the Clerk's Record constitutes a true, correct, and accurate copy of the Charge of the Court signed by the trial court judge and submitted to the jury upon which the jury returned its verdict. TEX.R.APP. P. 34.5(e).
     (citations to record omitted). The trial court judge recited the jury's verdict into the reporter's record, and the facts herein regarding the jury's verdict are based on that record.

3    Additionally, Smith filed a request for findings of fact and conclusions of law with respect to the trial court's denial of specific performance, reformation, and declaratory relief. The record does not show findings of fact and conclusions of law were issued by the trial court.

4    In a post-submission letter brief, Smith argues, inter alia, that pursuant to rule 54 of the Texas Rules of Civil Procedure, he had no burden to prove performance or compliance with the Sale document or obtain a jury finding on that issue. See TEX.R. CIV. P. 54 (party pleading performance of conditions precedent is required to prove only those specifically denied by opposite party). However, Smith's pre-submission briefs before this Court do not cite rule 54 or present that argument. Therefore, Smith's post-submission argument regarding his lack of burden pursuant to rule 54 presents nothing for this Court's review. See Tex. Med. Ass'n v. Tex. Workers Comp. Comm'n, 137 S.W.3d 342, 351 (Tex.App.-Austin 2004, no pet.) (argument waived where asserted during oral argument and in post-submission brief, but not in pre-submission briefs); see also City of Houston v. Precast Structures, Inc., 60 S.W.3d 331, 340 n. 4 (Tex.App.-Houston [14th Dist.] 2001,

pet. denied) (argument waived where raised in letter brief filed after oral argument); TEX.R.APP. P. 38.1(f) (appellant's brief must state concisely all issues or points presented for review). Moreover, as a general rule, a party is required to present a complaint to the trial judge before being allowed to raise an issue on appeal. *See Ochoa v. Craig,* 262 S.W.3d 29, 32–33 (Tex.App.-Dallas 2008, pet. denied); TEX.R.APP. P. 33.1. The record shows testimony at trial from both sides regarding Smith's performance or compliance with the Sale document. However, the record shows no objection or complaint by Smith in the trial court regarding his alleged lack of burden to prove that issue.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

[4] there was no evidence that corporation did not intend to transfer stock to contractor at time of agreement, precluding contractor's fraud claim.

Affirmed.

West Headnotes (21)

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Smith v. Dass, Inc., Tex.App.-Dallas, May 8, 2009

231 S.W.3d 530
Court of Appeals of Texas,
Dallas.

Kelly STAFFORD, Appellant/Cross–Appellee
v.
SOUTHERN VANITY MAGAZINE,
INC., Appellee/Cross–Appellant
and
Perry Hollingsworth and Allison
Hollingsworth, Appellees.

No. 05–06–00545–CV. | Aug. 14, 2007.

**Synopsis**

**Background:** Independent contractor brought action against a closely-held corporation asserting a fraud claim and a breach of contract claim regarding contract by which corporation allegedly promised to convey 20% of corporate stock to contractor. The County Court at Law No. 3, Dallas County, Sally Montgomery, J., entered judgment on jury verdict finding in favor of contractor on the contract claim, but against contractor on the fraud claim. Contractor's motion for a new trial on the fraud claim was denied, but motion for specific performance of contract was granted. Contractor appealed, and corporation cross-appealed.

**Holdings:** The Court of Appeals, Carolyn Wright, J., held that:

[1] contractor's pleadings were sufficient to put closely-held corporation on notice that contractor was seeking specific performance of stock transfer agreement;

[2] contractor performed obligations under stock transfer agreement and had no adequate remedy at law, allowing specific performance;

[3] there were no disputed issues of fact to submit to jury as would preclude the trial court's grant of specific performance; and

### [1] **Specific Performance**
 **Prayer for Relief**

Independent contractor's pleadings were sufficient to put closely-held corporation on notice that contractor was seeking specific performance of stock transfer agreement; contractor pleaded a cause of action for breach of contract, asserted that she did not have an adequate remedy at law, and, in her prayer for relief, sought a 20% ownership share in the corporation, or in the alternative, the value of a 20% share in the corporation.

1 Cases that cite this headnote

### [2] **Pleading**
 **Sufficiency of Allegations in General**

Texas follows a "fair notice" standard for pleading, which tests whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what evidence might be relevant.

Cases that cite this headnote

### [3] **Pleading**
 **Statement of Cause of Action in General**

Under the "fair notice" standard of pleading, a petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim.

2 Cases that cite this headnote

### [4] **Pleading**
 **Sufficiency of Allegations in General**
**Pleading**

☞ Statement of Cause of Action in General

The purpose of the "fair notice" standard of pleading is to give the opposing party information sufficient to enable him to prepare a defense.

2 Cases that cite this headnote

**[5]** **Specific Performance**
☞ Nature and Purpose in General

**Specific Performance**
☞ Form of Remedy

"Specific performance" of a contract is an equitable remedy that may be awarded upon a showing of breach of contract.

21 Cases that cite this headnote

**[6]** **Specific Performance**
☞ Inadequacy of Remedy at Law

"Specific performance" of a contract is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate.

18 Cases that cite this headnote

**[7]** **Specific Performance**
☞ Sufficiency of Performance by Plaintiff in General

Independent contractor performed her obligations under contract with closely-held corporation, as required in order for contractor to seek specific performance of the contract, in which corporation promised to convey 20% of its stock to contractor if contractor continued to work for the corporation; contractor returned to work after receiving the stock offer.

Cases that cite this headnote

**[8]** **Specific Performance**
☞ Discretion of Court

**Specific Performance**
☞ Form of Remedy

Specific performance of a contract is an equitable remedy committed to the trial court's discretion.

11 Cases that cite this headnote

**[9]** **Specific Performance**
☞ Nature and Grounds of Duty of Plaintiff

A party seeking specific performance of a contract must demonstrate that they have performed, or tendered performance, of their obligations under the contract.

1 Cases that cite this headnote

**[10]** **Specific Performance**
☞ Inadequacy of Remedy at Law

**Specific Performance**
☞ Contracts Relating to Personal Property

A contract will not be specifically enforced if there is an adequate remedy at law; however, specific performance may be awarded when the personal property has a special, peculiar, or unique value or character.

1 Cases that cite this headnote

**[11]** **Specific Performance**
☞ Corporate Stock or Securities

A party may seek specific performance to enforce a stock purchase agreement when a closely-held corporation's stock has no ascertainable value.

Cases that cite this headnote

**[12]** **Specific Performance**
☞ Corporate Stock or Securities

Independent contractor had no adequate remedy at law, enabling her to seek specific performance of contract with closely-held corporation, under which corporation had agreed to convey 20% of its stock to contractor, where the stock had no ascertainable value.

Cases that cite this headnote

**[13]** **Equity**

🔑 He Who Comes Into Equity Must Come with Clean Hands

The doctrine of unclean hands did not preclude independent contractor from seeking specific performance of stock transfer agreement that contractor had with closely-held corporation, absent any allegation from the corporation that it was harmed by contractor's illegal or inequitable conduct.

2 Cases that cite this headnote

**[14]    Equity**
🔑 He Who Comes Into Equity Must Come with Clean Hands

The doctrine of unclean hands operates as a bar to the equitable relief of specific performance.

3 Cases that cite this headnote

**[15]    Specific Performance**
🔑 Trial or Hearing

There were no disputed issues of fact to submit to jury as would preclude trial court from granting specific performance to independent contractor in contractor's breach of contract action against closely-held corporation; the jury had determined the existence of a valid contract and also determined that contractor performed her obligations under the contract.

1 Cases that cite this headnote

**[16]    Jury**
🔑 Issues of Fact in Equitable Actions

When contested fact issues must be resolved before equitable relief can be determined, a party is entitled to have a jury resolve the fact dispute.

1 Cases that cite this headnote

**[17]    Specific Performance**
🔑 Performance Impossible

Regarding an award of specific performance in a breach of contract action, impossibility of performance is not available as a defense to a party which, by its voluntary act, created the impossibility.

1 Cases that cite this headnote

**[18]    Appeal and Error**
🔑 Refusal of New Trial

The Court of Appeals reviews the trial court's denial of a motion for new trial for an abuse of discretion.

2 Cases that cite this headnote

**[19]    New Trial**
🔑 Time of Discovery

Evidence that closely-held corporation had issued all its stock to one stockholder, making it impossible for the corporation to transfer any stock to independent contractor as promised in stock transfer agreement, was not "newly discovered" evidence entitling contractor to a new trial on her fraud claim against the corporation, where the stockholder owned 100% of the corporation's stock at all times relevant to contractor's action.

Cases that cite this headnote

**[20]    New Trial**
🔑 Power and Duty of Court in General

A party who seeks a new trial on the ground of newly discovered evidence must show the trial court: (1) the evidence came to the party's knowledge after trial; (2) it was not owing to the want of due diligence that it did not come sooner; (3) it is not cumulative; and (4) it is so material that it would probably produce a difference result if a new trial were granted.

1 Cases that cite this headnote

**[21]    Fraud**
🔑 Existing Facts or Expectations or Promises

There was no evidence that closely-held corporation did not intend to transfer stock to independent contractor at the time it formed stock transfer agreement with contractor, precluding contractor's fraud claim against the

corporation; the corporation believed that the stock transfer was contingent on the corporation becoming profitable.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*533** Kurt C. Banowsky, Banowsky & Levine, P.C., Dallas, for appellant.

Kendra Karlock, David R. Weiner, Glast, Phillips & Murray, P.C., Dallas, for appellee.

Before Justices WRIGHT, RICHTER, and SMITH. [1]

**OPINION**

Opinion by Justice WRIGHT.

Kelly Stafford sued Southern Vanity Magazine, Inc. (Southern Vanity), Perry Hollingsworth, and Allsion Hollingsworth for breach of contract and fraud based on Southern Vanity's failure to transfer twenty percent of the stock of the corporation to appellant. [2] The jury determined Southern Vanity breached its agreement to convey the stock, but found for appellees on the fraud claim. In two issues, appellant contends the trial court erred by denying her motion for new trial. In two cross-issues, Southern Vanity contends (1) the trial court erred by awarding specific performance to appellant, and (2) consequently, the award of attorney's fees should be reversed. We overrule appellant's issues and Southern Vanity's cross-issues, and affirm the trial court's judgment.

**Background**

Southern Vanity was formed in late 2002 by Perry Hollingsworth, Allison Hollingsworth, and Lisa Applewhite to publish a magazine. Allison and Perry both testified that, at all relevant times, Perry owned one hundred percent of the stock of Southern Vanity. Southern Vanity published its first issue in February 2003.

Appellant began working for the magazine in April 2003 as an independent contractor selling advertisements in the magazine in return for a twenty percent commission. Shortly after appellant began working for Southern Vanity, Allison and Applewhite had a business dispute. Allison and Perry removed Southern **\*534** Vanity's property from the magazine's offices and considered shutting down the magazine. For a period of several weeks, the magazine was in "limbo" and appellant did no work for Southern Vanity. Allison and Perry ultimately decided to continue with the magazine and asked appellant to return to work. Southern Vanity could not pay appellant a salary, but on June 26, 2003, Allison sent the following e-mail to appellant and Donana Galloway, another independent contractor selling advertisements for Southern Vanity:

> Steve (Southern Vanity att.) is working day and night on legal issues with Lisa Applewhite Brandt, so he will start working on the following documents next week. Of course I have put numerous amounts of time and money into the magazine and wound up with a disgruntled, out of control associate. I never want this to happen again!
>
> I appreciate both of you and all of your hard work getting Southern Vanity back on track. There is much more to do (sales, sales, sales)! I regret salaries and benefits are not an option as of yet, but will be in the future. Because of your help and continued support in building Southern Vanity Magazine, I would like to offer each of you stock and 20% of the company. Perry and I expect our investments back from the company as each of you expect to be reimbursed for your expenses as Southern Vanity profits.

Following this e-mail, appellant continued to work at Southern Vanity, received the title of Principal/Director of Marketing, and took on additional duties. Southern Vanity did not transfer the stock to appellant. In September 2003, appellant left Southern Vanity. [3]

Appellant sued Southern Vanity, Perry, and Allison based on Southern Vanity's failure to transfer the stock. At trial, appellant contended she was entitled to receive the stock as of June 26, 2003. Appellees argued Southern Vanity was not required to transfer the stock until it became profitable and appellant contributed to its success. The jury determined Southern Vanity breached its agreement to convey the stock, but found for appellees on the fraud claim. Appellant moved for specific performance of the contract. Southern Vanity filed an affidavit executed by Allison stating it was impossible for Southern Vanity to convey any stock to appellant because all stock had been issued to Perry.

Appellant then filed a motion for new trial on her fraud cause of action, contending the fact the stock had been issued to Perry was newly discovered evidence that entitled her to a new trial and that the jury's adverse finding on the fraud claim was against the great weight of the evidence. The trial court granted appellant's request for specific performance. Appellant's motion for new trial was overruled by operation of law. Both appellant and Southern Vanity appealed.

## Specific Performance

Because appellant's issues both pertain to the motion for new trial, we begin our analysis with Southern Vanity's cross-issue alleging the trial court erred in awarding specific performance. Southern Vanity maintains we must reverse the trial court's judgment because appellant did not (1) plead for specific performance, (2) offer any evidence on the essential elements of specific performance, or (3) request jury questions on the elements of specific performance. Additionally, Southern Vanity claims specific performance is impossible **\*535** in this case because all of the stock is owned by Perry, making it impossible for Southern Vanity to transfer stock to appellant. We will address each of Southern Vanity's contentions in turn.

 **[1]**    **[2]**    **[3]**    **[4]**    Southern Vanity first contends specific performance is a separate cause of action that appellant failed to plead. After reviewing the pleadings, we disagree. Texas follows a "fair notice" standard for pleading, which tests whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what evidence might be relevant. *Low v. Henry,* 221 S.W.3d 609, 612 (Tex.2007); *Emerson Elec. Co. v. Am. Permanent Ware Co.,* 201 S.W.3d 301, 309 (Tex.App.-Dallas 2006, no pet.). Under this standard, "[a] petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim." *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 897 (Tex.2000). The rule's purpose is to give the opposing party information sufficient to enable him to prepare a defense. *Id.* When, as here, a party fails to specially except, we construe the pleadings liberally in favor of the pleader. *Horizon/CMS Healthcare Corp.,* 34 S.W.3d at 897; *Emerson Elec. Co.,* 201 S.W.3d at 309.

 **[5]**    **[6]**    Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. *Kress v. Soules,* 152 Tex. 595, 597, 261 S.W.2d 703, 704 (1953); *Living Christ Church, Inc. v. Jones,* 734 S.W.2d 417, 419 (Tex.App.-Dallas 1987, writ denied). Specific performance is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate. *See Scott v. Sebree,* 986 S.W.2d 364, 368 (Tex.App.-Austin 1999, pet. denied). Here, appellant pleaded a cause of action for breach of contract. In the punitive damages portion of her pleading, appellant asserted she did not have an adequate remedy at law. And, in her prayer for relief, she sought "a 20% ownership share in the corporations, or in the alternative, the value of the 20% share in the corporations." Southern Vanity did not specially except to appellant's pleading. Construing the pleadings liberally in appellant's favor, we conclude they are sufficient to put Southern Vanity on notice that appellant was seeking, among other things, specific performance for Southern Vanity's breach of contract.

 **[7]**    **[8]**    **[9]**    **[10]**    **[11]**    Southern Vanity next contends there is "no evidence that would support an award of specific performance." Specific performance is an equitable remedy committed to the trial court's discretion. *Bell v. Rudd,* 144 Tex. 491, 191 S.W.2d 841, 843 (1946); *Roundville Partners, L.L.C. v. Jones,* 118 S.W.3d 73, 79 (Tex.App.-Austin 2003, pet. denied); *Scott,* 986 S.W.2d at 368 (Tex.App.-Austin 1999, pet. denied). A party seeking specific performance must demonstrate that they have performed, or tendered performance, of their obligations under the contract. *Am. Apparel Prods., Inc. v. Brabs, Inc.,* 880 S.W.2d 267, 269 (Tex.App.-Houston [14th Dist.] 1994, no writ). A contract will not be specifically enforced if there is an adequate remedy at law. *Id.* However, specific performance may be awarded when the personal property has a "special, peculiar, or unique value or character." *Madariaga v. Morris,* 639 S.W.2d 709, 711 (Tex.App.-Tyler 1982, writ ref'd n.r.e.). Further, when a closely-held corporation's stock has no ascertainable value, the party may seek specific performance to enforce a stock purchase agreement. *Miga v. Jensen,* 96 S.W.3d 207, 217 (Tex.2002) (citing *Bendalin v. Delgado,* 406 S.W.2d 897, 900 (Tex.1966) (plaintiff could seek specific performance to enforce stock purchase agreement **\*536** where corporation was closely held and stock had no market value)).

With respect to whether appellant complied with the terms of the contract, the record shows that on June 26, 2003, Southern Vanity offered appellant twenty percent of the stock in the corporation if appellant continued to work for Southern Vanity. At trial, appellant maintained she was entitled to receive the stock at the point she agreed to continue, and

did continue, to work for the magazine. Although Southern Vanity argued appellant was not entitled to receive the stock until the magazine became profitable, the jury decided the issue adversely to Southern Vanity by finding it failed to comply with the agreement to transfer stock. It is undisputed appellant returned to work at the magazine after receiving the stock offer. Thus, we cannot conclude the trial court abused is discretion by determining appellant demonstrated she performed her obligations under the contract.

 [12]    [13]    [14]    As to whether appellant had an adequate remedy at law, the record does not contain evidence the Southern Vanity stock had any ascertainable value. Rather, Southern Vanity lost money from its inception and was still losing money at the time of trial. Allison testified the value of the stock was "zero or worse," and Perry testified he could not sell Southern Vanity due to the amount of debt the company had incurred. Thus, the record shows Southern Vanity's stock had no ascertainable value, and appellant could seek specific performance to enforce the stock transfer agreement. *See Miga,* 96 S.W.3d at 217; *Bendalin,* 406 S.W.2d at 900. [4]

 [15]    We next turn to Southern Vanity's complaint regarding jury questions. Relying on *Lawler v. Digiuseppe,* No. 05–03–00468–CV, 2004 WL 1209569 (Tex.App.-Dallas June 3, 2004, pet. granted) (memo. op. on reh'g), Southern Vanity contends appellant is not entitled to specific performance because she "did not request any jury questions on the essential elements of specific performance." In *Lawler,* the purchasers sued for breach of a contract to sell real estate. The jury found the seller breached the contract and awarded $295,696.93 in damages. However, on the purchasers' motion, the trial court entered final judgment granting specific performance. The seller appealed, arguing the trial court erred in granting specific performance because the purchasers failed to obtain a jury finding that the purchasers were ready, willing, and able to perform the contract. We concluded the issue of whether the purchasers were ready, willing, and able to perform was disputed at trial and, therefore, had to be resolved before equitable relief could be awarded. *Id.* at *1–2.

 [16]    When contested fact issues must be resolved before equitable relief can be determined, a party is entitled to have a jury resolve the fact dispute. *Burrow v. Arce,* 997 S.W.2d 229, 245 (Tex.1999); **\*537** *Hudson v. Cooper,* 162 S.W.3d 685, 688 (Tex.App.-Houston [14th Dist.] 2005, no pet.). However, Southern Vanity has not pointed to a disputed issue of fact that should have been submitted to the jury. The jury determined

Southern Vanity breached its contract to convey stock to appellant, necessarily finding a contract existed as of June 26, 2003 when Southern Vanity offered stock in exchange for appellant continuing to work at the magazine. It is undisputed appellant continued to work at the magazine after June 26, 2003 and, therefore, performed under the contract. Thus, appellant was not required to obtain a jury finding on whether she was ready, willing, and able to perform under the contract. *Chilton Ins. Co. v. Pate & Pate Enters.,* 930 S.W.2d 877, 886 (Tex.App.-San Antonio 1996, writ denied) (no jury question necessary if evidence conclusively proves fact). As to whether appellant had unclean hands or an adequate remedy at law, these questions "present legal policy issues well beyond the jury's province of judging credibility and resolving factual disputes." *Burrow,* 997 S.W.2d at 245 (adequacy of other remedies); *Hudson,* 162 S.W.3d at 688 (equitable considerations such as whether plaintiff had unclean hands and whether, and how much, equitable relief should be awarded must be determined by trial court rather than jury). Accordingly, there were no additional disputed issues of fact in support of appellant's claim for specific performance that needed to be submitted to the jury.

Again relying on *Lawler,* Southern Vanity next argues the submission of the breach of contract question was not necessarily referable to appellant's claim for specific performance and did not put it on notice appellant was seeking specific performance. In *Lawler,* we concluded jury questions asking whether the seller or one of the purchasers breached the contract, standing alone, were not necessarily referable to a claim for specific performance. *Lawler,* 2004 WL 1209569, at *2. Therefore, the questions did not put the seller on notice the purchasers were seeking specific performance so the seller could object to the omission of a jury question on whether the purchasers were ready, willing, and able to perform the contract. *Id.*

However, in this case, we have concluded appellant pleaded for specific performance. Appellant's counsel also raised the issue of specific performance in argument before the trial court. And, the trial court did not submit a damages question relating to Southern Vanity's breach of contract, putting Southern Vanity on notice damages were not an available remedy. Finally, there were no additional issues of fact that needed to be submitted to the jury in this case. Accordingly, unlike *Lawler,* Southern Vanity not only was on notice appellant was seeking specific performance, but there was no basis for Southern Vanity to object to the omission of any issue.

 **[17]**    Southern Vanity's final complaint regarding the award of specific performance is that specific performance of the contract by Southern Vanity is impossible. Specifically, Southern Vanity maintains that because it has issued one hundred percent of its stock to Perry, it is impossible for it to transfer any stock to appellant. Impossibility of performance is not available as a defense to a party which by its voluntary act created the impossibility. *Solomon v. Greenblatt,* 812 S.W.2d 7, 18 (Tex.App.-Dallas 1991, no writ) (citing *Martin v. Star Publishing Co.,* 126 A.2d 238, 242 (Del.1956) and 6 S. WILLISTON: A TREATISE ON THE LAW OF CONTRACTS § 1960). Here, the transfer of stock from Southern Vanity to Perry is a situation voluntarily created by Southern Vanity and Perry. Thus, Southern Vanity may not rely on **\*538**  impossibility of performance as a defense in this case. *See Solomon,* 812 S.W.2d at 18.

Having determined appellant's pleadings were adequate to put Southern Vanity on notice of her request for specific performance, the evidence is legally sufficient to support the trial court's award of specific performance, no additional jury questions were necessary in this case, and that the defense of impossibility is not available in this case, we conclude the trial court did not abuse its discretion in awarding appellant specific performance. Therefore, we overrule Southern Vanity's first cross-issue. Due to our disposition of Southern Vanity's first cross-issue, we need not address its second cross-issue challenging the award of attorney's fees and costs.

### Motion for New Trial

 **[18]**    We now turn to appellant's two issues contending the trial court erred in denying her motion for new trial on her fraud claim. According to appellant, the trial court should have granted her motion because (1) Allison's affidavit filed after trial asserting Southern Vanity has no stock to transfer to appellant is newly discovered evidence that entitled appellant to a new trial, and (2) the jury's finding is against the great weight of the evidence. We review the trial court's denial of a motion for new trial for an abuse of discretion. *In re R.R.,* 209 S.W.3d 112, 114 (Tex.2006) (per curiam); *El Dorado Motors, Inc. v. Koch,* 168 S.W.3d 360, 368 (Tex.App.-Dallas 2005, no pet.). The trial court abuses its discretion only if it acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Downer*

*v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985); *El Dorado Motors, Inc.,* 168 S.W.3d at 368.

 **[19]**    **[20]**    In her first issue, appellant contends the trial court erred by denying her motion for new trial on the fraud issues because Allison's affidavit asserting Southern Vanity has no stock to transfer to appellant is newly discovered evidence that entitled her to a new trial. A party who seeks a new trial on the ground of newly discovered evidence must show the trial court (1) the evidence came to her knowledge after trial; (2) it was not owing to the want of due diligence that it did not come sooner; (3) it is not cumulative; and (4) it is so material that it would probably produce a difference result if a new trial were granted. *Johnson v. Legacy Bank of Texas,* 167 S.W.3d 643, 645–46 (Tex.App.-Dallas 2005, no pet.). Appellant contends the newly discovered evidence is that Southern Vanity has issued all its stock to Perry, making it impossible for Southern Vanity to transfer any stock to appellant. Regardless of when the stock was issued to Perry, it was undisputed at trial that Perry owned one hundred percent of the stock of Southern Vanity at all relevant times. [5] Thus, any stock transferred to appellant would necessarily come from Perry. Appellant has failed to show the fact Southern Vanity issued the stock to Perry is newly discovered evidence. We overrule appellant's first issue.

 **\*539**  **[21]**    In her second issue, appellant contends the trial court erred by overruling her motion for new trial because the jury's finding that appellees did not commit fraud is against the great weight of the evidence. When a party attacks the factual sufficiency of an adverse finding on which she had the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (per curiam). When reviewing a finding for factual sufficiency, we consider all of the evidence and will set aside a finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

Appellant argues the evidence is factually insufficient to support the jury's finding because the "evidence at trial, when considered in conjunction with the evidence discovered post-trial, establishes that [appellees] committed fraud by promising stock they did not intend to transfer" to appellant. However, the evidence supports the parties' different interpretations of when the stock was to be transferred to appellant. Both Perry and Allison testified they believed Southern Vanity was not obligated to transfer stock

to appellant until Southern Vanity became profitable. Perry testified he agreed to the offer of stock to appellant and "when the company became profitable and we was [sic] paid back our investment for the money I had put into the company, then they would receive their shares equal at 20 percent a piece." Allison testified Perry was willing to release the stock after Southern Vanity became profitable. But, appellant testified she believed she was entitled to the stock without the profitability condition, and the jury agreed with her. There was no evidence Perry or Southern Vanity did not intend to transfer the stock when Southern Vanity entered into the stock transfer agreement. Thus, we cannot conclude the jury's finding appellees did not commit fraud in making the stock offer to appellant is against the great weight and preponderance of the evidence. Consequently, we cannot conclude the trial court abused its discretion by denying appellant's motion for new trial on that basis. We overrule appellant's second issue.

Accordingly, we affirm the trial court's judgment.

**All Citations**

231 S.W.3d 530

Footnotes

1   The Honorable Bea Ann Smith, Justice, Court of Appeals, Third District of Texas at Austin, Retired, sitting by assignment.
2   Appellant also asserted claims for breach of contract and unjust enrichment due to Southern Vanity's failure to reimburse appellant for certain expenses and breach of contract and tortious interference with contract due to Southern Vanity's failure to assume appellant's apartment lease. These claims are not at issue in this appeal.
3   The evidence was disputed over whether appellant was terminated or resigned.
4   To the extent Southern Vanity suggests specific performance was improper because appellant failed to put on evidence showing she had clean hands, again we disagree. The doctrine of unclean hands operates as a bar to the equitable relief of specific performance. *Lazy M Ranch, Ltd. v. TXI Operations LP,* 978 S.W.2d 678, 683 (Tex.App.-Austin 1998, pet. denied). As the party claiming appellant had unclean hands, it is Southern Vanity's burden to show it was injured by appellant's unlawful or inequitable conduct. *Willis v. Donnelly,* 118 S.W.3d 10, 38 (Tex.App.-Houston [14th Dist.] 2003), *aff'd in part and rev'd in part on other grounds,* 199 S.W.3d 262, 278–79 (Tex.2006). Southern Vanity has neither argued nor shown it was harmed by any illegal or inequitable conduct by appellant relating to the stock transfer agreement. Thus, we cannot conclude the award of specific performance was improper on that basis.
5   As noted, it was undisputed at trial that Perry owned one hundred percent of the stock in Southern Vanity. Indeed, Southern Vanity's counsel represented to the trial court that:

> Southern Vanity had no stock to give. Perry Hollingsworth owned a hundred percent of the stock. If some of that stock was going to go somewhere, it was going to come from [Perry].... [T]hey weren't going to issue new stock. [Perry] owned the stock and he was going to transfer it to her pursuant to this agreement.... Southern Vanity had no stock to give. It had been-it was all held by [Perry].

Neither appellant nor Southern Vanity have cited to any authority that the actual issuance of stock to Perry affected this agreement.

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

218 S.W.3d 109
Court of Appeals of Texas,
Houston (14th Dist.).

Pablo TELLO, Appellant
v.
BANK ONE, N.A. and Banc One
Acceptance Corp., Appellees.

No. 14–04–00888–CV.  |  Jan. 9, 2007.

**Synopsis**
**Background:** Lessor and lienholder filed claim against lessee for breach of vehicle lease agreement. Lessee counterclaimed for Deceptive Trade Practices Act (DTPA) violations, common-law fraud, and breach of contract. The County Civil Court at Law No. 2, Harris County, Gary Michael Block, J., granted summary judgment for lessor and lienholder. Lessee appealed.

**Holdings:** The Court of Appeals, Seymore, J., held that:

[1] lessee waived challenge to ruling on lessor's breach of contract claim;

[2] lessee waived challenge to ruling on counterclaims of common-law fraud and breach of contract;

[3] lessee failed to raise fact question that would preclude summary judgment on DTPA claim;

[4] lessee waived affirmative defense of failure of consideration; and

[5] lessee waived offset claim.

Affirmed.

Frost, J., filed dissenting opinion.

West Headnotes (20)

**[1]    Evidence**
🔑 Records or Decisions in Same Case

On appeal from amended summary judgment, Court of Appeals would take judicial notice of record for appeal from original summary judgment.

9 Cases that cite this headnote

**[2]    Judgment**
🔑 Effect of Counterclaim
**Judgment**
🔑 Presumptions and Burden of Proof

For a plaintiff to prevail on a motion for summary judgment when the defendant has asserted a counterclaim, the plaintiff must prove, as a matter of law, each element of its cause of action and show it is entitled to summary judgment on the counterclaim. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

2 Cases that cite this headnote

**[3]    Judgment**
🔑 Motion or Other Application

Although plaintiffs used language applicable to both traditional summary judgment motion and no-evidence summary judgment motion in opposing defendant's counterclaims, language would be construed as traditional motion, since motion did not unambiguously state it was filed under no-evidence rule, and did not strictly comply with rule. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c), (i).

1 Cases that cite this headnote

**[4]    Judgment**
🔑 Weight and Sufficiency

If the non-movant relies on an affirmative defense to oppose a summary judgment motion, he must provide sufficient summary judgment evidence to create a fact issue on each element of the defense. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

5 Cases that cite this headnote

**[5]    Judgment**

☞ Weight and Sufficiency

The non-movant is not required to prove an affirmative defense, raised to oppose a summary judgment motion, as a matter of law; raising a fact issue on each element of the defense is sufficient to defeat summary judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

5 Cases that cite this headnote

[6] **Appeal and Error**
☞ Insufficient Discussion of Objections

Lessee waived his challenge on appeal to grant of summary judgment that lienholder failed to prove elements of breach of vehicle lease agreement claim, where lessee only made bare assertion that genuine issue of material fact existed on claim, and never asserted in its argument on appeal that lienholder failed to prove elements of its claim. Rules App.Proc., Rule 38.1(h); Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

[7] **Appeal and Error**
☞ Insufficient Discussion of Objections

Lessee waived any challenge to grant of summary judgment for counterclaims of common-law fraud and breach of vehicle lease agreement, where lessee presented no issue or argument on appeal. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c); Rules App.Proc., Rule 38.1(h).

Cases that cite this headnote

[8] **Judgment**
☞ Evidence and Affidavits in Particular Cases

On its motion for summary judgment on vehicle lessee's Deceptive Trade Practices Act (DTPA) counterclaim, lienholder negated lessee's assertion that former lessor's salesperson misrepresented the lease as a purchase, thus shifting burden to lessee to raise issue of fact, by presenting affidavit of lienholder's representative, averring that lienholder made no representations to lessee before, during, or at

time of execution of lease, that lienholder had no representative present at time of transaction, that lienholder was purely a financial institution which purchased vehicle and lease from lessor, and that lessor was not agent of lienholder or authorized by it to make any representations to lessee. V.T.C.A., Bus. & C. §§ 17.45(5), 17.46(b)(12), 17.50(a)(1)(A), (a)(1)(3); Rules App.Proc., Rule 38.1(h); Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

[9] **Appeal and Error**
☞ Nature and Grounds of Right

**Appeal and Error**
☞ Points and Arguments

The Court of Appeals must construe the Rules of Appellate Procedure reasonably, yet liberally, so that the right to appeal is not lost by imposing requirements not absolutely necessary to effect the purpose of a rule; however, no authority obligates the court to become advocates for a particular litigant through performing their research and developing their argument for them. Rules App.Proc., Rule 38.9.

10 Cases that cite this headnote

[10] **Appeal and Error**
☞ Asserting Invalidity of Contract or Other Instrument

**Appeal and Error**
☞ Ratification, Estoppel, Waiver, and Res Judicata

If Court of Appeals were to craft, on appellant's behalf, an argument for his affirmative defenses of fraudulent inducement and equitable estoppel that he had not made in response to motion for summary judgment, the court would improperly become his advocate and improperly consider issues not expressly presented to trial court. Rules App.Proc., Rule 38.1(h); Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

[11] **Appeal and Error**

 To Verdict, Findings, or Judgment

Lessee waived claim that evidence raised a genuine issue of material fact on affirmative defense of failure of consideration for vehicle lease agreement sufficient to defeat summary judgment, where he presented no issue or argument on appeal addressing this defense. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c); Rules App.Proc., Rule 38.1(h).

1 Cases that cite this headnote

[12]  **Appeal and Error**
 Insufficient Discussion of Objections

Lessee waived claims on appeal of summary judgment that he might be entitled to avoid liability with current lessor and lienholder or to offset damages by return of leased vehicle to former lessor; lessee failed on appeal to cite any authority, offer any argument, point to any evidence, make any substantive analysis, or identify elements of lessor's claim on which return of vehicle allegedly raised fact issue. Rules App.Proc., Rule 38.1(h); Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

2 Cases that cite this headnote

[13]  **Judgment**
 Motion or Other Application

The non-movant must expressly present to the trial court, by written answer or response, any issues defeating the movant's entitlement to summary judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

15 Cases that cite this headnote

[14]  **Judgment**
 Motion or Other Application

The requirement that issues be expressly presented on appeal of summary judgment by the non-movant's written answer or response refers to an answer or response to the motion for summary judgment, not to the pleadings. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

11 Cases that cite this headnote

[15]  **Appeal and Error**
 Defects, Objections, and Amendments

Issues are not expressly presented on appeal of summary judgment by the non-movant's mere reference to summary judgment evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

[16]  **Judgment**
 Motion or Other Application

**Judgment**
 Effect of Failure to File Affidavit

Summary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

1 Cases that cite this headnote

[17]  **Appeal and Error**
 Nature or Subject-Matter in General

**Judgment**
 Motion or Other Application

**Judgment**
 Effect of Failure to File Affidavit

If a non-movant fails to present any issues in its response or answer to summary judgment, the movant's right is not established and the movant must still establish its entitlement to summary judgment; the effect of such a failure is that the non-movant is limited on appeal to arguing the legal sufficiency of the grounds presented by the movant. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

4 Cases that cite this headnote

[18]  **Appeal and Error**
 Sufficiency of Presentation of Questions

The Court of Appeals could not construe lessee's single reference to general standard applicable to every summary judgment motion, without any argument concerning, or reference to, evidence of lessor and lienholder as an adequate argument challenging sufficiency of their motion for summary judgment and evidence to support damages awarded. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c); Rules App.Proc., Rule 38.1(h).

Cases that cite this headnote

**[19]** **Appeal and Error**
    Nature or Subject-Matter in General

For issue to have been "expressly" presented in response to motion for summary judgment, as required for issue to be considered on appeal as grounds for reversal, written answer or response to motion must fairly apprise movant and court of issues non-movant contends should defeat the motion. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

18 Cases that cite this headnote

**[20]** **Appeal and Error**
    Sufficiency of Presentation of Questions

The requirement that the non-movant "fairly apprise" the trial court of the issues allegedly defeating summary judgment clearly contemplates that the trial court is not required to guess why a non-movant presents certain evidence or consider every possible reason the evidence might defeat summary judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*112** William Peter Capasso, Houston, for appellants.

George M. McDonald, Richardson, for appellees.

Panel consists of Justices HUDSON, FROST, and SEYMORE.

## MAJORITY OPINION

CHARLES W. SEYMORE, Justice.

Appellant, Pablo Tello, appeals a summary judgment in favor of appellees, Bank One, N.A. and Bank One Acceptance Corp., on their claim against Tello for breach of a vehicle lease agreement and on Tello's counterclaims for DTPA violations, common-law fraud, and breach of contract. We affirm.

## I. BACKGROUND

Tello entered into a written agreement to lease a truck from Randall Reed Ford. The lease shows Randall Reed Ford as lessor and Tello as lessee. In the same agreement, Randall Reed Ford assigned the lease and the vehicle to Banc One Texas Leasing Corp. Subsequently, Banc One Texas Leasing Corp. merged with Banc One Acceptance Corp. By virtue of this merger, Banc One Acceptance Corp. became the owner/lessor of the vehicle. The title to the vehicle shows Bank One Texas N.A. as lienholder. Bank One Texas N.A. subsequently merged with Bank One, N.A. By virtue of this merger, Bank One, N.A. became lienholder.

Bank One, N.A. and Banc One Texas Leasing Corp. eventually sued Tello, alleging he defaulted on the lease by failing to make some monthly payments.[1] In his answer, Tello raised the affirmative defenses of failure of consideration, fraudulent inducement, and equitable estoppel. He also asserted counterclaims for DTPA violations, common-law fraud, and breach of contract, seeking to recover his own alleged damages and offset any recovery by the Bank on its breach of contract claim. His affirmative defenses and counterclaims **\*113** were all based on his allegation that he does not read or write English and the Randall Reed Ford salesperson induced him to sign the lease by misrepresenting it was an agreement to purchase the vehicle.

**[1]** Bank One, N.A. and Banc One Acceptance Corp. moved for summary judgment on their claim against Tello and on his counterclaims. The trial court signed a "First Amended Summary Judgment" on July 27, 2004, granting

summary judgment in favor of Bank One, N.A. and Banc One Acceptance Corp. on their claim against Tello and on his counterclaims. [2] The trial court awarded the Bank $29,366.24 in damages, $13,933.86 for attorney's fees and costs, and post-judgment interest. [3] The trial court also ordered Tello to surrender the vehicle to the Bank. [4]

## II. DISCUSSION

In six issues, Tello contends the trial court erred by (1) granting the Bank's motion for summary judgment on its breach of contract claim; (2) granting the Bank's motion for summary judgment on Tello's affirmative defense of fraudulent inducement; (3) granting the Bank's motion for summary judgment on Tello's affirmative defense of equitable estoppel; (4) granting the Bank's motion for summary judgment on Tello's DTPA counterclaim; (5) generally granting the Bank's motion for summary judgment; and (6) granting the Bank's motion for summary judgment on its claim for damages.

 **[2]  [3]**  For a plaintiff to prevail on a motion for summary judgment when, as here, the defendant has asserted a counterclaim, the plaintiff must prove, as a matter of law, each element of its cause of action and show it is entitled to summary judgment on the counterclaim. *See First State Bank of Athens, Mabank Branch v. Purina AG Capitol Corp.,* 113 S.W.3d 1, 4 (Tex.App.-Tyler 1999, no pet.); *see also Rush v. Barrios,* 56 S.W.3d 88, 97 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). A plaintiff asserting a traditional motion for summary judgment in opposition to a defendant's counterclaim must disprove at least one essential element of the counterclaim as a matter of law. [5] *See*  **\*114** TEX.R. CIV. P. 166a(c); *First State Bank,* 113 S.W.3d at 4; *Rush,* 56 S.W.3d at 97; *Taylor v. GWR Operating Co.,* 820 S.W.2d 908, 910 (Tex.App.-Houston [1st Dist.] 1991, writ denied). If the movant establishes a right to summary judgment, the burden shifts to the non-movant to present evidence raising a material fact issue. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995).

 **[4]  [5]**  If, as here, the non-movant relies on an affirmative defense to oppose the summary judgment motion, he must provide sufficient summary judgment evidence to create a fact issue on each element of the defense. *See Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell,* 193 S.W.3d 87, 95 (Tex.App.-

Houston [1st Dist.] 2006, pet. denied). The non-movant is not required to prove the affirmative defense as a matter of law; raising a fact issue is sufficient to defeat summary judgment. *See Brownlee,* 665 S.W.2d at 112; *Anglo–Dutch Petroleum,* 193 S.W.3d at 95.

We review a summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). We take all evidence favorable to the nonmovant as true and indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Id.*

### A. The Bank's Breach of Contract Claim

 **[6]**  In his first stated issue, Tello contends the trial court erred by granting the Bank's motion for summary judgment on its breach of contract claim. Tello makes one argument, consisting of two-and-a-half-page pages, to support all his issues challenging the summary judgment with respect to his liability to the Bank and with respect to his counterclaim. At the outset of this argument, he makes a bare assertion that a genuine issue of material fact existed on the Bank's breach of contract claim. However, in the argument that follows, he never asserts that the Bank failed to prove the elements of its breach of contract claim. Instead, in what little argument he does advance, he mentions only the factual allegations which form the basis of his counterclaim and affirmative defenses. Therefore, to the extent, he contends the Bank failed to prove the elements of its breach of contract claim, he has waived any such contention by failing to include any argument. [6] *See* TEX.R.APP. P. 38.1(h) (providing that appellant's brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and the record); *Sunnyside Feedyard, L.C. v. Metropolitan* **\*115** *Life Ins. Co.,* 106 S.W.3d 169, 173 (Tex.App.-Amarillo 2003, no pet.) (recognizing failure to either cite authority or advance substantive analysis waives an issue on appeal). We overrule his first issue.

### B. Tello's DTPA Counterclaim

 **[7]**  We will next address Tello's fourth issue, in which he challenges the summary judgment on his DTPA counterclaim. [7] At the outset of his argument, he generally contends that a genuine issue of material fact existed on his DTPA counterclaim and refers to the DTPA as 17.46(b) of the Texas Business and Commerce Code. However, he does not thereafter mention the DTPA again, cite the elements of a DTPA claim, or specify which acts prohibited by the

DTPA were allegedly committed by the Bank. *See Proctor v. White,* 155 S.W.3d 438, 441 (Tex.App.-El Paso 2004, pet. denied) (finding appellants waived challenge to summary judgment on several claims because their argument consisted of several pages referring to evidence in support of factual allegations without a single reference to a relevant case or legal principle).

Nonetheless, in his pleading, Tello alleged that the Bank violated the DTPA by: (1) representing "that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," *see* TEX. BUS. & COM.CODE ANN. § 17.46(b)(12) (Vernon Supp.2006); TEX. BUS. & COM.CODE ANN. § 17.50(a)(1)(A) (Vernon Supp.2006); and (2) engaging in an "unconscionable action or course of action" by taking "advantage of the lack of knowledge, ability, experience, or capacity of [Tello] to a grossly unfair degree." *See* TEX. BUS. & COM.CODE ANN. § 17.50(a)(3) (Vernon Supp.2006); TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon 2002).

 **[8]**    Although Tello asserted that the Bank violated these provisions, the factual allegation he pleaded was that the *Randall Reed Ford salesperson* misrepresented the lease was a purchase agreement. In support of its motion for summary judgment, the Bank presented an affidavit of its representative who averred as follows: the Bank made no representations to Tello before, during, or at the time of execution of the lease; the Bank had no representative present at the time of the transaction; the Bank was purely a financial institution which purchased the vehicle and the lease from Randall Reed Ford; and Randall Reed Ford was not an agent of the Bank or authorized by the Bank to make any representations to Tello. [8] Therefore, the Bank negated the assertion that it made any misrepresentations to Tello as alleged in his counterclaim and shifted the burden **\*116** to Tello to raise a fact issue on that claim. [9] *See Centeq Realty,* 899 S.W.2d at 197.

In response to the motion for summary judgment and on appeal, Tello merely referred to the contents of his affidavit attached to his response. [10] In the affidavit, he averred that he does not speak or write English and an unnamed Randall Reed Ford salesperson led him to believe the lease was a purchase agreement. Therefore, despite the Bank's evidence, Tello continued to rely solely on the Randall Reed Ford salesperson's alleged misrepresentation to purportedly create a fact issue on his DTPA counterclaim against the Bank. However, in response to the motion for summary judgment and on appeal, Tello offered no argument, authority, or theory

to show that the Bank entities who are the current lessor and lienholder may be liable under the DTPA for the Randall Reed Ford salesperson's alleged misrepresentation.

 **[9]**    We recognize that we must "construe the Rules of Appellate Procedure reasonably, yet liberally, so that the right to appeal is not lost by imposing requirements not absolutely necessary to effect the purpose of a rule." *Republic Underwriters Ins. Co. v. Mex–Tex, Inc.,* 150 S.W.3d 423, 427 (Tex.2004); *see* TEX.R.APP. P. 38.9. However, "we know of no authority obligating us to become advocates for a particular litigant through performing their research and developing their argument for them." *See Jordan v. Jefferson County,* 153 S.W.3d 670, 676 (Tex.App.-Amarillo 2004, pet. denied). We would improperly become an advocate for Tello if we were to develop an argument for imposition of liability on the Bank entities who are the current lessor and lienholder because of the Randall Reed Ford salesperson's alleged misrepresentations. In addition, we may not consider grounds for reversal of a summary judgment that were not expressly presented to the trial court by written response to the motion. *See* TEX.R. CIV. P. 166a(c); *see McConnell v. Southside Indep. School Dist.,* 858 S.W.2d 337, 343 (Tex.1993) (plurality op.). Accordingly, Tello has not demonstrated that there was a genuine issue of material fact on his DTPA counterclaim against the Bank. We overrule his fourth issue.

## C. Tello's Affirmative Defenses

 **[10]**    **[11]**    In his second and third issues, Tello contends he raised a fact issue on his affirmative defenses of fraudulent inducement and equitable estoppel sufficient to defeat the Bank's motion for summary **\*117** judgment. [11] Tello generally refers to his affidavit, but other than the general summary judgment standards, he cites no authority. He does not cite the elements of the doctrines of fraudulent inducement and equitable estoppel, much less argue why his affidavit raised a fact issue on each element of these defenses. *See Sunnyside Feedyard,* 106 S.W.3d at 173 (holding appellant waived contention that fact issue existed on legal doctrines sufficient to defeat summary judgment by referring to well-developed doctrines without citing basic authority as to their elements or any analysis to show a fact issue existed on these doctrines).

Nevertheless, in response to the motion for summary judgment and on appeal, Tello relied solely on the Randall Reed Ford salesperson's alleged misrepresentation to purportedly raise a fact issue on his affirmative defenses to

the Bank's breach of contract claim. However, Tello offered no argument, authority, or theory to show that the Bank entities who are the current lessor and lienholder should be bound by the Randall Reed Ford salesperson's alleged misrepresentation or otherwise subject to any defenses Tello may have had against Randall Reed Ford. Again, if we were to craft such an argument on Tello's behalf, we would improperly become his advocate and improperly consider an issue not expressly presented to the trial court in his summary judgment response. Accordingly, Tello has not demonstrated that he raised a genuine issue of material fact issue on his affirmative defenses. We overrule his second and third issues.

In his fifth issue, Tello generally states that the trial court erred by granting the Bank's motion for summary judgment. Because we have addressed all the arguments purportedly raised in his first five issues with respect to his liability on the Bank's breach of contract claim and with respect to his counterclaim, we overrule his fifth issue.

**D. The Bank's Damages**

In his sixth issue, Tello asserts that the trial court erred by entering summary judgment because there is a genuine issue of material fact regarding the Bank's claim for damages. With respect to this issue, Tello primarily refers to his affidavit, in which he averred that, approximately three years after he executed the agreement, he called the Bank to inquire about his balance and was informed the agreement was a lease—not a purchase agreement. Within about a month, he returned the vehicle to Randall Reed Ford. Other than reciting the general summary judgment standards, Tello's argument regarding the effect of this averment consists solely of the following:

> Had the trial court taken into account [Tello's] claim that he returned the vehicle, the damages would be significantly decreased. The affidavit filed by [Tello] clearly raises a genuine issue of material fact, which is an issue for a judge and jury to decide.

 [12]    It is not clear whether Tello seeks to avoid liability on the lease based on his return of the vehicle or merely offset the amount of the Bank's damages, although his assertion suggests the latter. Nevertheless, Tello does not cite any authority, offer any argument, or point to any evidence generally showing why he might be entitled to avoid liability on the lease or offset the Bank's damages based on his **\*118** return of the vehicle. Even liberally construing his brief, we

do not know the basis for his allegation that he was entitled to avoid liability or offset the damages by returning the vehicle. Based on his scant argument, we cannot determine whether he is relying on a provision of the lease, some legal principle, or both.

More particularly, Tello does not cite any authority, offer any argument, or point to any evidence showing why he might be entitled to avoid liability or offset the damages awarded the *Bank entity,* who is the current owner and lessor, based on his return of the vehicle to *Randall Reed Ford,* the former owner and lessor. Consequently, by failing to make any substantive analysis whatsoever, Tello has waived his contention that his return of the vehicle raised a fact issue sufficient to defeat the Bank's claim for damages or offset its damages. *See* TEX.R.APP. P. 38.1(h); *Sunnyside Feedyard,* 106 S.W.3d at 173; *see also Nguyen v. Kosnoski,* 93 S.W.3d 186, 188 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (finding appellant waived issue on appeal by failing to support argument with legal authority or references to the record); *cf. Mex–Tex, Inc.,* 150 S.W.3d at 427 (holding appellant did not waive argument by citing only one statute in its brief considering it was clear appellant was relying solely on this statute and no other authority was necessary).[12]

 [13]    [14]    [15]    [16]    [17]    Moreover, in response to the motion for summary judgment, Tello did not raise his contention that his return of the vehicle should offset the Bank's damages or otherwise defeat its entitlement to summary judgment. The non-movant must expressly present to the trial court, by written answer or response, any issues defeating the movant's entitlement to summary judgment. *McConnell,* 858 S.W.2d at 343 (citing *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979)); *Dubose v. Worker's Medical, P.A.,* 117 S.W.3d at 916, 920 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *see* TEX.R. CIV. P. 166a(c). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX.R. CIV. P. 166a(c); *see McConnell,* 858 S.W.2d at 343; *Dubose,* 117 S.W.3d at 920. Issues are not expressly presented by mere reference to summary judgment evidence. *McConnell,* 858 S.W.2d at 341; *see Dubose,* 117 S.W.3d at 920; *D.M. Diamond Corp. v. Dunbar Armored, Inc.,* 124 S.W.3d 655, 659–60 (Tex.App.-Houston [14th Dist.] 2003, no pet.).[13] However, summary judgments must stand or fall on their own merits, and **\*119** the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right. *McConnell,*

858 S.W.2d at 343 (citing *Clear Creek,* 589 S.W.2d at 678). If a non-movant fails to present any issues in its response or answer, the movant's right is not established and the movant must still establish its entitlement to summary judgment. *Id.* "The effect of such a failure is that the non-movant is limited on appeal to arguing the legal sufficiency of the grounds presented by the movant." *Id.* (citing *Clear Creek,* 589 S.W.2d at 678).

 **[18]** Tello's suggestion on appeal that he may offset the Bank's damages or otherwise avoid liability on the lease based on his return of the vehicle is an issue by which he seeks to defeat the Bank's entitlement to summary judgment—not a challenge to the legal sufficiency of the Bank's summary judgment grounds. To prove its breach of contract claim, the Bank presented portions of the lease and its representative's affidavit purportedly showing Tello failed to make certain payments as agreed and setting forth the balance due. Tello does not contend that this evidence is insufficient to prove the amount of the damages awarded by the trial court. [14] Rather, what little argument Tello does advance suggests he should offset the Bank's damages or otherwise avoid liability, notwithstanding the Bank's proof, because he returned the vehicle to Randall Reed Ford. Consequently, he was required to "expressly" present this issue to the trial court in response to the motion for summary judgment. *See* TEX.R. CIV. P. 166a(c); *McConnell,* 858 S.W.2d at 343; *Dubose,* 117 S.W.3d at 920.

 **[19]** To "expressly" present issues pursuant to Rule 166a(c), "[t]he written answer or response to the motion must fairly apprise the movant and the court of the issues the non-movant contends should defeat the motion." *Clear Creek,* 589 S.W.2d at 678; *see Engel v. Pettit,* 713 S.W.2d 770, 771–72 (Tex.App.-Houston [14th Dist.] 1986, no pet.). The extent of Tello's summary judgment response with respect to the Bank's breach of contract claim was his general statement that a genuine issue of material fact existed on the claim and his reference to his attached evidence and his pleading. Tello made a bare averment in his attached affidavit that he returned the vehicle during a particular time period. However, he made no statement in his affidavit or response regarding the effect of this averment on the Bank's entitlement to summary judgment. Specifically, he did not mention that his return of the vehicle should offset the Bank's damages or otherwise defeat summary judgment, as he now suggests on appeal, much less mention why his return of the vehicle should offset the damages or otherwise defeat summary judgment. He did not even identify the element[s] of the Bank's breach of

contract claim on which his return of the vehicle allegedly raised a fact issue or suggest **\*120** why it raised a fact issue on any particular element[s].

 **[20]** The requirement that the non-movant "fairly apprise" the trial court of the issues allegedly defeating summary judgment clearly contemplates that the trial court is not required to guess why a non-movant presents certain evidence or consider every possible reason the evidence might defeat summary judgment. In short, Tello's bare assertion in his affidavit that he returned the vehicle did not "fairly apprise" the trial court what, if anything, he wanted the trial court to do with that information. *Cf. Engel,* 713 S.W.2d at 771–72 (holding affidavit of attorney filed by non-movant in response to motion for summary judgment requesting recovery of movant's attorneys' fees fairly apprised trial court of issue allegedly defeating the motion by stating the fees were "excessive and unreasonable.").

In sum, trial court could not have erred by refusing to consider the effect, if any, of Tello's return of the vehicle on the Bank's entitlement to summary judgment when Tello never requested that it be considered. Accordingly, because Tello failed to "expressly" present his issue that his return of the vehicle should offset the Bank's damages or otherwise defeat its entitlement to summary judgment in response to the motion for summary judgment, we may not consider it as grounds for reversal. [15] *See Querner Truck Lines, Inc. v. Alta Verde Indus., Inc.,* 747 S.W.2d 464, 469 (Tex.App.-San Antonio 1988, no writ) (finding non-movant waived argument on appeal that it was entitled to additional offset against movant's damages than offset allowed by trial court because non-movant did not raise issue of additional offset in its summary judgment response). We overrule his sixth issue.

Accordingly, the judgment of the trial court is affirmed.

FROST, J., dissenting.

KEM THOMPSON FROST, Justice, dissenting.
Appellees Bank One, N.A. ("Lienholder") and Banc One Acceptance Corporation ("Assignee") filed suit against appellant Pablo Tello to recover sums they claim were owing under the lease agreement; however, they attached only part of the lease agreement to their pleadings, and when they moved for summary judgment in the trial court, they made the same mistake. Consequently, our appellate record contains

only part of the contract upon which the trial court's summary judgment is based. As explained in more detail below, this omission is significant because to **\*121** recover damages for breach of a contract as a matter of law, the movant must establish the amount of damages flowing from the breach. In this case, the part of the lease agreement omitted from our record contains terms regarding early termination of the lease, any security interest in the vehicle, and default charges —parts that would show how much Tello would owe if he terminated the lease before the end of its term and how much the Lienholder and the Assignee (hereinafter collectively "Bank One Entities") would be entitled to recover for breach of the lease agreement. Moreover, because the Assignee does not have the vehicle and has no way of knowing the amount of mileage on the vehicle, it is not possible to calculate any applicable mileage penalty, a data point necessary to determine the amount ostensibly due under the lease. Based on the portions of the lease that *are* in the summary-judgment evidence, Tello owes only a fraction of the amount the trial court awarded in actual damages.

In his appellate brief, Tello asserts that the trial court erred in granting summary judgment as to the amount of contract damages for which he is liable. Construing Tello's brief liberally, as this court must, Tello argues that the traditional summary-judgment motion and attached evidence did not prove the lack of a genuine issue of fact and that the Bank One Entities are entitled to judgment as a matter of law for the damages awarded on their contract claim. This assertion is correct and should be sustained, but rather than reaching the merits of Tello's winning argument, the court erroneously concludes that Tello should lose based on a failure to preserve error.

According to the majority, Tello did not expressly present his sixth issue to the trial court, thereby waiving this issue. This analysis is based on the majority's conclusion that Tello's argument is not an attack on the sufficiency of the summary-judgment motion, a point that need not be raised in the trial court to be asserted on appeal. This conclusion is incorrect because, under a liberal construction, Tello's argument under his sixth issue challenges the sufficiency of the Bank One Entities' motion and proof of their entitlement to summary judgment on their contract claim. Therefore, contrary to the majority's assertion, this argument did not have to be raised in the trial court. *See M.D. Anderson Hosp. and Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000) (stating that, as to traditional motions for summary judgment, nonmovant has no duty to respond unless the movant conclusively establishes its

claim or defense). There is no valid basis to find waiver for failure to preserve error in the trial court.

The court also holds that Tello waived this point through inadequate briefing. This analysis, though a somewhat subjective call, is contrary to the standards the Texas Supreme Court has articulated for disposing of parties' appellate rights without reaching the merits of their appellate points. Under both the Texas Rules of Appellate Procedure and Texas Supreme Court precedent, this court must construe the briefing rules reasonably, yet liberally. *See* TEX.R.APP. P. 38.1(h), 38.9; *Republic Underwriters Ins. Co. v. Mex–Tex, Inc.,* 150 S.W.3d 423, 427 (Tex.2004). Substantial compliance with the briefing rules may be sufficient, and this court is not required to insist on unerring compliance with them. *Bufkin v. State,* 179 S.W.3d 166, 174 (Tex.App.-Houston [14th Dist.] 2005), *aff'd,* 207 S.W.3d 779 (Tex.Crim.App., 2006). Texas courts have embraced this liberal briefing standard largely because the proper objective of a reviewing court is to reach a just, fair, and equitable adjudication of the rights of litigants under established principles of substantive law. **\*122** While well-organized and sharply focused writing is always appreciated, that is not the standard by which we determine the legal adequacy of appellate briefs. The Texas Supreme Court has set a far more forgiving standard, one that requires appellate courts to construe arguments liberally so that parties' poor presentation of their appellate points does not result in a forfeiture of the opportunity for a merits review.

Ideally, an appellant's brief should contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. TEX.R.APP. P. 38.1(h). We must interpret this requirement reasonably and liberally. *See* TEX.R.APP. P. 38.1(h), 38.9; *Mex–Tex, Inc.,* 150 S.W.3d at 427; *see also Tribble & Stephens Co. v. RGM Constructors, L.P.,* 154 S.W.3d 639, 675 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) (plurality op.) (construing appellate brief liberally as asserting that contract was ambiguous even though brief did not state that contract was ambiguous). Applying these standards in construing Tello's appellate brief, this court should discern, at a minimum, an argument challenging the trial court's summary judgment in favor of the movants, the Bank One Entities, on their contract claim.

Under the applicable standard of review, we must take as true all evidence favorable to Tello and make all reasonable inferences in his favor. *See Dolcefino v. Randolph,* 19 S.W.3d 906, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

Thus, in evaluating the propriety of summary judgment, we must consider the following facts and all reasonable inferences therefrom:

Tello, who speaks Spanish but does not read or speak English, went to Randall Reed Ford in May 1999, to buy a truck. He signed a contract, written in English, which he believed to be an agreement to purchase the vehicle, based on conversations he had with the Spanish-speaking salesman. However, the contract he signed was a lease agreement and he unknowingly had agreed to lease—not buy—the truck. The lease identified an assignee, Bank One Texas Leasing Corporation, to whom monthly payments were to be made. Tello made monthly payments on the truck for the next three years. Then one day he called to find out the outstanding balance and was told that he had not bought the truck but had leased it instead. While still current in his payments, in July 2002, Tello returned the truck to Randall Reed Ford, and continued to make payments on it through September 2002.

In his sixth issue, Tello asserts that the trial court erred in granting summary judgment because, under the applicable standard of review, Tello's affidavit raised a genuine issue of material fact regarding the amount of contract damages for which he is liable to the Bank One Entities. Tello points to his testimony that, after he learned the agreement he signed was a lease and not a sales contract, he returned the vehicle to Randall Reed Ford. Tello then asserts that (1) "[t]he motion for summary judgment and its supporting evidence must show there is no genuine issue of a material fact and that the movant is entitled to judgment as a matter of law"; and (2) "[h]ad the trial court taken into account appellant's claim that he returned the vehicle, the damages would be significantly decreased." (citations omitted). Read liberally, Tello's brief contains the argument that, based on his return of the truck three years after signing the contract and three months before he stopped making payments, the trial court erred in granting summary judgment on the Bank One Entities' contract claim because their motion and supporting evidence did not **\*123** show that they are entitled to judgment as a matter of law for the amount of damages awarded—more than $29,000, before attorney's fees. Tello points to his summary-judgment proof that he returned the vehicle to Randall Reed Ford in July 2002, and asserts that, if this evidence is true (and we must presume that it is), then the damages would be significantly decreased.

The majority reaches the wrong conclusion—that the Bank One Entities are entitled to summary judgment on their claim for contract damages—partly because it is asking (and then answering) the wrong question. The inquiry is not whether Tello defeated the Bank One Entities' traditional summary-judgment motion but whether the Bank One Entities, as movants, established their entitlement to the amount of damages awarded as a matter of law. The majority erroneously frames the issue as one of Tello failing to establish an offset when it is actually a failure by the Bank One Entities to carry their summary-judgment burden—or even to present a prima facie case to recover the amount of damages awarded under the lease. Instead of faulting the movants (the Bank One Entities) for failing to show from their own summary-judgment proof how they arrived at the amount awarded, the majority criticizes the non-movant (Tello) for failing to "cite any authority or evidence to inform us why he was allegedly entitled to offset the Bank's damages or otherwise defeat summary judgment." [1] The problem with the summary judgment is not what Tello failed to do in attacking it, but what the Bank One Entities failed to do in the first instance to prove their damages as a matter of law.

Recovery under a lease agreement is not automatic nor is there a universal measure of damages for breach. "The ultimate goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach." *Mays v. Pierce,* 203 S.W.3d 564, 577 (Tex.App.-Houston[14th Dist.] 2006, pet. filed); *Walden v. Affiliated Computer Servs., Inc.,* 97 S.W.3d 303, 328 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Typically, the measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed. *Mays,* 203 S.W.3d at 577; *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.,* 128 S.W.3d 304, 317 n. 6 (Tex.App.-Dallas 2004, no pet.). Because the movants failed to show what the contract provides as the measure of their recovery (or to show from the terms of the contract that the damage calculations would not be impacted by the missing portions of the contract), the Bank One Entities failed to establish a prima facie case for the damages awarded, let alone establish their entitlement to damages as a matter of law.

This is not a suit on a sworn account in which the plaintiff's sworn and unrefuted assertion of the amount allegedly owed itself will constitute prima facie evidence of damages; rather, this is a breach-of-contract case in which the movants are required to prove their entitlement to damages by establishing the amount of those damages under the terms

of the contract. *See e.g. Park v. Swartz,* 110 Tex. 564, 222 S.W. 156 (1920) (holding that plaintiff *"prima facie* was entitled to as damages the amount which *under the contract* he would, presumably, have earned ...")(emphasis added); *Consol. Petroleum Partners, I, LLC v. Tindle,* 168 S.W.3d 894, 900 (Tex.App.-Tyler 2005, no pet.) (determining **\*124** damages based on "the amount of money to which [plaintiff] was entitled as reimbursement *pursuant to the agreement"* ) (emphasis added); *Garza v. Allied Fin. Co.,* 566 S.W.2d 57, 62 (Tex.Civ.App.-Corpus Christi 1978, no writ)(holding that summary-judgment evidence consisting of "the manager's affidavit and *copy of the note and security agreement* present evidence establishing a *prima facie* case in a suit on a promissory note ...") (emphasis added); *Hagar v. Texas Distrib., Inc.,* 560 S.W.2d 773, 775 (Tex.Civ.App.-Tyler 1977, writ ref'd n.r.e.)(holding summary-judgment proof sufficient in promissory note case after looking to the "face of the note" and determining the amount that was due thereon). The Bank One Entities not only failed to prove the terms of the lease agreement that would entitle them to the sums awarded, they omitted portions of it that are germane to their dispute with Tello and the proper calculation of damages flowing from his alleged failure to perform. As the movants, the Bank One Entities had to present evidence to support the damages they sought under the contract. They failed to satisfy this burden. It is simply not possible to tell from the Bank One Entities' summary-judgment proof how much (if any) is owing under the lease. According to the Bank One Entities' affidavit, the first payment Tello failed to make under the lease was the payment due in October 2002, three months after Tello returned the vehicle to Randall Reed Ford. While Randall Reed Ford is an entity distinct from the Bank One Entities, the lease agreement contains defined terms which include Randall Reed Ford and any party to whom the lease is assigned in its definition of "we," "us," and "our" as used in the lease. Furthermore, the lease states at least three times that there are additional terms and conditions on the reverse side of the pages of the lease, none of which are in our record. The lease portion that *is* in the record unambiguously states that the back of the lease document contains *"additional information on early termination, ... late and default charges, ... and any security interest, if applicable."* [2] Because our record does not contain a copy of the reverse sides of these pages, this court is not aware—and presumably the trial court was not aware—of all of the terms of the lease, any one of which could undermine the damage calculation proffered by the Bank One Entities. The absence of the contract or other proof of its terms creates an ambiguity

that cannot be resolved by turning to the summary-judgment proof before this court.

Because the part of the lease contained in the record does not address early termination, default, credits, or what happens if Tello returns the vehicle before expiration of the lease term, it provides no basis for determining the amounts owing, if any, under the lease. The Bank One Entities' summary-judgment affidavit states the following:

● Tello missed at least six payments starting in October 2002.

● After all offsets, payments, and credits were allowed and applied, the outstanding balance on the lease including principal and interest was $25,693.46 as of January 14, 2003.

● Prejudgment interest has been accruing at the rate of six percent per annum, which equates to $4.22 per day.

However, there is no summary-judgment evidence addressing how credits are applied under the lease agreement or addressing the effect, if any, of Tello's return of the vehicle in July 2002, on Tello's liability **\*125** for various sums allegedly owing under the lease. The Bank One Entities asserted that they did not have the vehicle and that Tello had concealed it and refused to surrender possession of it to them. Nothing in their summary-judgment evidence shows that the Bank One Entities had knowledge of the truck's whereabouts or its odometer reading. Therefore, the Bank One Entities have no way of knowing the amount of mileage on the truck to calculate any applicable mileage penalty. Based on the summary-judgment evidence and the parts of the lease the Bank One Entities did attach to their motion, Tello would owe only $9,870 (21 monthly payments of $470) plus a $350 return fee. Nonetheless, the trial court awarded the Assignee in excess of $29,000 in actual damages, even though this amount is not supported by the part of the contract contained in the summary-judgment evidence and even though the missing parts of the lease (like certain parts of it that *are* in the record) may use the term "we" or "us" for the person to whom the truck may be returned, which terms would include Randall Reed Ford.

Though an affidavit containing a statement of balance due can in some instances suffice to satisfy a movant's summary-judgment burden, when, as in this case, the summary-judgment affidavit itself creates a fact question that cannot be resolved by turning to the summary-judgment proof, a

material fact issue as to the measure of damages arises and precludes summary judgment. *General Specialties, Inc. v. Charter Nat'l Bank–Houston,* 687 S.W.2d 772, 774 (Tex.App.-Houston [14th Dist.] 1985, no writ) (ambiguous lump sum figure in suit for collection on note, that is unexplained by other summary-judgment proof raises fact issue precluding summary judgment); *FFP Mktg. Co., Inc. v. Long Lane Master Trust IV,* 169 S.W.3d 402, 411–12 (Tex.App.-Fort Worth 2005, no pet.). Because the Bank One Entities did not prove up all of the terms of the lease on which they sought and obtained summary judgment, this court has no way of knowing the appropriate amount of damages for breach of the agreement or whether Tello's return of the vehicle affected the calculation of damages under the Bank One Entities' contract claim. These ambiguities cannot be resolved by turning to their summary-judgment proof. Thus, on a merits review, the summary-judgment evidence does not support the amount of damages the Bank One Entities sought and the trial court awarded. Therefore, even if Tello had not responded at all, it would not have been proper to grant summary judgment on the Bank One Entities' breach-of-contract claim.

Moreover, even if the Bank One Entities had not failed in the first instance, they still would not be entitled to summary judgment because Tello raised a fact issue as to the proper amount of damages based on his affidavit demonstrating he returned the leased vehicle and received no credit for it. Summary judgment is not proper because Tello raised a fact issue that had the Bank One Entities calculated the sums they claim are owing in accordance with the lease agreement, the amount of damages awarded would have been less. In Tello's words, *"[h]ad the trial court taken into account appellant's claim that he returned the vehicle, the damages would be significantly decreased."* [3] (citations omitted).

For these reasons, the Bank One Entities did not prove their entitlement to summary judgment on their contract claim as a matter of law. *See* **\*126** *McCulley Fine Arts Gallery, Inc. v. "X" Partners,* 860 S.W.2d 473, 478 (Tex.App.-El Paso 1993, no writ) (reversing summary judgment based on failure to prove contract claim as a matter of law). This court should sustain Tello's sixth issue, reverse the summary judgment as to the Bank One Entities' contract claim against Tello, sever, and remand for further proceedings. Because it does not, I respectfully dissent.

**All Citations**

218 S.W.3d 109

Footnotes

1    Despite the previous merger of Banc One Texas Leasing Corp. into Banc One Acceptance Corp., the petition showed Banc One Texas Leasing Corp. as one of the plaintiffs. The trial court later allowed Banc One Acceptance Corp. to be substituted for Banc One Texas Leasing Corp.

2    An original motion for summary judgment was filed by Bank One, N.A. and Bank One Texas Leasing Corp., although Bank One Texas Leasing Corp. had merged into Banc One Acceptance Corp. On May 14, 2003, the trial court entered an order granting summary judgment. Tello appealed the summary judgment to this court under case number 14–03–00644–CV. We dismissed the appeal on the ground the summary judgment was not final because it did not dispose of Bank One Texas Leasing Corp.'s claims. *See Tello v. Bank One, N.A.,* 138 S.W.3d 533 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Bank One, N.A. and Banc One Acceptance Corp. then filed a supplemental petition and supplemental motion for summary judgment to clarify the issues concerning their identities. They presented proof that Banc One Acceptance Corp. is the current lessor/owner by virtue of its merger with Bank One Texas Leasing Corp. In the First Amended Summary Judgment, the trial court allowed Banc One Acceptance Corp. to be substituted for Banc One Texas Leasing Corp. and then granted summary judgment in favor of Bank One, N.A. and Banc One Acceptance Corp.

3    Now that we have clarified the correct names of the Bank entities who are parties to this suit, we will refer to the appellees, Bank One, N.A. and Banc One Acceptance Corp., collectively as "the Bank," except where necessary to refer to them separately.

4    Pertinent pleadings, including the original motion for summary judgment and Tello's response, are not included in the appellate record for this cause number. However, they are included in the record for the appeal from original summary judgment. Accordingly, we have taken judicial notice of that record.

5    The Bank did not specify whether the part of its motion opposing Tello's counterclaims was a traditional motion or a "no-evidence" motion. *Compare* TEX.R. CIV. P. 166a(c) *with* TEX.R. CIV. P. 166a(i). At times, the Bank used language applicable to a traditional motion; but at other times, the Bank generally asserted that Tello has "no evidence" to support his various claims or factual allegations. However, the motion did not "state the elements as to which there is no evidence"

as required by Rule 166a(i). *See* TEX.R. CIV. P. 166a(i). Because the motion did not unambiguously state it was filed under Rule 166a(i) and did not strictly comply with that rule, we construe it as a traditional motion. *See Adams v. Reynolds Tile & Flooring, Inc.,* 120 S.W.3d 417, 420 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

We note that the evidence indicates that only one of the Bank entities, Banc One Acceptance Corp., is the lessor of the vehicle. The evidence shows Bank One, N.A. is a lienholder on the vehicle, but does not show this lien secures the indebtedness that is the subject of the lease at issue or how being a lienholder entitled Bank One, N.A. to recover under the lease. Nevertheless, on appeal, Tello does not argue that both Bank entities failed to prove the initial elements of their breach of contract claim.

Tello also pleaded counterclaims for common-law fraud and breach of contract. However, on appeal, he presents no issue or argument challenging the summary judgment on those counterclaims. Therefore, he has waived any challenge to the summary judgment on those counterclaims. *See Jacobs v. Satterwhite,* 65 S.W.3d 653, 655–56 (Tex.2001) (recognizing appellate court may not reverse summary judgment on a particular claim when appellant fails to challenge summary judgment on that claim).

The Bank representative made these averments with respect to Bank One, N.A. and Banc One Texas Leasing Corp., although Banc One Texas Leasing Corp. had already merged with Banc One Acceptance Corp. However, the Bank entities presented proof in their supplemental motion for summary judgment that Banc One Acceptance Corp. became the lessor and owner of the vehicle by virtue of its merger with Banc One Texas Leasing Corp. Therefore, the averments concerning Banc One Texas Leasing Corp. necessarily apply equally to Banc One Acceptance Corp.

The Bank's motion did not specifically address the DTPA counterclaim, although it addressed the factual allegation forming the basis of the counterclaim. *See Black v. Victoria Lloyds Ins. Co.,* 797 S.W.2d 20, 27 (Tex.1990) (stating defendant moving for summary judgment on ground there is no genuine issue of material fact on essential element of plaintiff's claim must identify or address the claim and its elements). However, on appeal, Tello does not challenge the summary judgment on his DTPA counterclaim on the ground that the Bank's motion was deficient or the trial court granted more relief than requested. *See Beathard Joint Venture v. W. Houston Airport Corp.,* 72 S.W.3d 426, 436 (Tex.App.-Texarkana 2002, no pet.) (recognizing appellant must raise an issue on appeal that excess relief was improperly granted in summary judgment order); *Toonen v. United Servs. Auto. Ass'n,* 935 S.W.2d 937, 942 (Tex.App.-San Antonio 1996, no writ) (same). Instead, he suggests there was a fact issue on the counterclaim.

In his response to the motion for summary judgment, Tello repeated the same general statement to address each counterclaim (as well as each affirmative defense). He merely stated that "a genuine issue of material fact exists as to [counterclaim/affirmative defense]" and referred to his attached evidence and pleadings.

Tello also pleaded the affirmative defense of failure of consideration. However, in his appellate brief, he presents no issue or argument addressing this defense. Therefore, he has waived any contention that the evidence raised a genuine issue of material fact on this defense sufficient to defeat summary judgment. *See Jacobs,* 65 S.W.3d at 655–56.

Contrary to our dissenting colleague's suggestion, the inadequacy in Tello's brief with respect to this issue is not just a lack of "well-organized and sharply focused writing," but a failure to advance any substantive analysis and cite any authority or evidence to inform us why he was allegedly entitled to offset the Bank's damages or otherwise defeat the summary judgment based on his return of the vehicle to Randall Reed Ford. Moreover, the dissent would reverse the summary judgment because the Bank omitted the back of the lease from its summary judgment evidence and a missing provision may address the effect of Tello's return of the vehicle to Randall Reed Ford on his liability to the Bank or the amount of its damages. However, Tello does not complain that the back of the lease was omitted, much less assert that any missing provisions may address his return of the vehicle. The fact that the dissent advocates reversal on this basis, when Tello makes no such argument, merely accentuates that his contention is inadequately briefed.

In addition, the requirement that issues be expressly presented by written answer or response refers to an answer or response to the motion for summary judgment, not to the pleadings. *See Wheeler v. Security State Bank, N.A.,* 159 S.W.3d 754, 756 n. 2 (Tex.App.-Texarkana 2005, no pet.) (citing *Clear Creek,* 589 S.W.2d at 673).

Our dissenting colleague advocates reversal because the Bank's own evidence is insufficient to support the damages awarded, and the dissent then calculates the damages purportedly supported by its evidence. However, Tello makes no such argument challenging the sufficiency of the Bank's motion and evidence. The dissent seems to interpret the following statement in Tello's brief as raising this argument: "The motion for summary judgment and its supporting evidence must show there is no genuine issue of a material fact and that the movant is entitled to judgment as a matter of law." We cannot construe this single reference to the general standard applicable to every summary judgment motion, without any argument concerning, or reference to, the Bank's evidence in this case, as an adequate argument challenging the sufficiency of the Bank's motion and evidence to support the damages awarded.

The dissent also asserts that Tello was not required to raise the issue regarding his return of the vehicle in his summary judgment response because he is attacking the conclusiveness of the Bank's motion and evidence. As we have noted, Tello has not adequately presented an argument attacking the conclusiveness of the Bank's motion and evidence. But, even if he had, that would be a separate issue than his contention he should nonetheless defeat summary judgment based on his own affidavit showing he returned the vehicle. The fact that the dissent (and Tello) must refer to Tello's *own* evidence attached to his response when urging reversal based on his return of the vehicle shows that his contention is not an attack on the conclusiveness of *the Bank's* motion and evidence. Finally, we disagree with the dissent's suggestion that, because an omitted provision on the back of the lease may address the effect of Tello's return of the vehicle, his contention is merely an attack on the conclusiveness of the Bank's motion and evidence. Even if the Bank had attached all the provisions and a missing provision addressed the effect, if any, of Tello's return of the vehicle, such provision would have been inconsequential unless Tello "expressly" presented to the trial court his contention that return of the vehicle should affect the Bank's entitlement to summary judgment.

*See* majority opinion, at 118.

Emphasis added.

Emphasis added.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

400 S.W.3d 139
Court of Appeals of Texas,
Dallas.

TREVINO & ASSOCIATES MECHANICAL,
L.P., and Mike Trevino, Sr., Appellants
v.
The FROST NATIONAL BANK, Appellee.

No. 05–11–00650–CV.  |  April 9, 2013.

**Synopsis**
**Background:** Commercial lender brought action against
borrower and its principal for breach of contract. Borrower
brought counterclaim for fraud, breach of fiduciary duty, and
promissory estoppel, among other claims. The 14th District
Court, Dallas County, Eric Moye, J., entered partial summary
judgment in favor of lender for approximately $1.76 million
and ordered that borrower take nothing on the counterclaims.
Borrower appealed.

**Holdings:** The Court of Appeals, Lang, J., held that:

[1] partial no evidence summary judgment in favor of lender
was warranted on borrower's breach of contract counterclaim,
and

[2] borrower failed to establish detrimental reliance element
of promissory estoppel claim against lender.

Affirmed.

West Headnotes (18)

**[1]    Appeal and Error**
           Reasons for Decision
        An appellant must attack every ground relied on
        for which summary judgment could have been
        granted in order to obtain a reversal.

        6 Cases that cite this headnote

**[2]    Appeal and Error**

           Reasons for Decision
        If an appellant fails to challenge one of the
        grounds for summary judgment, an appellate
        court may affirm the summary judgment on that
        ground alone.

        6 Cases that cite this headnote

**[3]    Appeal and Error**
           On motion for judgment
        The issues determined on a motion for partial
        summary judgment are final, even though the
        judgment is interlocutory. Vernon's Ann.Texas
        Rules Civ.Proc., Rule 166a(e).

        1 Cases that cite this headnote

**[4]    Judgment**
           Construction and operation
        After an interlocutory, partial summary
        judgment is granted, the issues it decides cannot
        be litigated further, unless the trial court sets the
        partial summary judgment aside or the summary
        judgment is reversed on appeal.

        2 Cases that cite this headnote

**[5]    Judgment**
           Construction and operation
        The issues decided by an interlocutory, partial
        summary judgment cannot be relitigated further,
        unless the trial court sets that order aside.

        1 Cases that cite this headnote

**[6]    Judgment**
           Partial summary judgment
        Partial no evidence summary judgment in
        favor of commercial lender was warranted
        on borrower's breach of contract counterclaim,
        where borrower failed to challenge every
        possible ground for the summary judgment.

        Cases that cite this headnote

**[7]    Fraud**

☞ Effect of existence of remedy by action on contract

A plaintiff seeks to recover for negligent misrepresentation and fraud what it would have gained had the alleged oral agreement been performed; the gist of the cause of action is the breach of the alleged oral promise.

Cases that cite this headnote

[8]  **Judgment**
☞ Partial summary judgment

Partial no evidence summary judgment in favor of commercial lender was warranted on borrower's counterclaim for negligent misrepresentation and fraud, where borrower failed to challenge every possible ground for the summary judgment.

Cases that cite this headnote

[9]  **Estoppel**
☞ Future events; promissory estoppel

Generally, promissory estoppel is a viable alternative to breach of contract.

1 Cases that cite this headnote

[10]  **Estoppel**
☞ Future events; promissory estoppel

Promissory estoppel is not applicable to a promise covered by a valid contract between the parties; however, promissory estoppel will apply to a promise outside a contract.

4 Cases that cite this headnote

[11]  **Estoppel**
☞ Future events; promissory estoppel

The elements of a promissory estoppel claim are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial detrimental reliance by the promisee.

4 Cases that cite this headnote

[12]  **Estoppel**

☞ Future events; promissory estoppel

To show detrimental reliance as required for promissory estoppel claim, the plaintiff must demonstrate that he materially changed his position in reliance on the promise.

2 Cases that cite this headnote

[13]  **Estoppel**
☞ Future events; promissory estoppel

Commercial borrower failed to establish detrimental reliance element of promissory estoppel claim against lender, although borrower claimed that lender orally renewed and extended the business loan for three months and, thus, it continued to deposit money in its operating account, which was also with lender; continuing to deposit money in the account did not amount to a material change in borrower's position as a result of lender's promise.

Cases that cite this headnote

[14]  **Conversion and Civil Theft**
☞ In general; nature and elements

To establish a claim for conversion, a plaintiff must prove that: (1) plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property.

Cases that cite this headnote

[15]  **Banks and Banking**
☞ Relation between bank and depositor in general

The relationship of a bank to a general depositor is contractual, that of debtor-creditor arising from the depository contract.

1 Cases that cite this headnote

[16]  **Banks and Banking**

⚷ Application of Deposits to Debts Due Bank or Set-Off by Bank

The nature of the relationship of a bank to a general depositor authorizes a bank to offset deposits against a debt of equal amount owed the bank by that depositor, assuming proof of the amount of the debt owed.

1 Cases that cite this headnote

[17]    **Banks and Banking**
⚷ Applying deposits to debts not matured

A bank is not authorized to offset deposits, unless there is a mature or past-due debt owed by the depositor to the bank.

Cases that cite this headnote

[18]    **Banks and Banking**
⚷ Actions by Depositors or Others for Deposits

A bank depositor's remedy for the wrongful offset of a general account is an action for return of the funds for breach of the depository contract.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*141** Kevin Bernard Wiggins, White & Wiggins, L.L.P., Eric Donald Walker, Carlos Morales, R. Jeronimo Valdez, J., Dallas, TX, for Appellants.

Michael J. Quilling, Quilling Selander Lownds Winslett & Moser, PC, Michael D. Clark, Dallas, TX, for Appellee.

Before Justices BRIDGES, LANG and RICHTER. [1]

**OPINION**

Opinion by Justice LANG.

Trevino & Associates Mechanical, L.P., (TAM) and Mike Trevino, Sr., a/k/a Miguel Trevino, Sr., appeal the trial court's final judgment dismissing all of its counterclaims against The Frost National Bank (Frost Bank). TAM raises two issues on

appeal, claiming the trial court erred when it (1) granted Frost Bank's motion for partial no-evidence summary judgment on its counterclaims for breach of contract, promissory estoppel, negligent misrepresentation, fraud, conversion, and wrongful setoff; and (2) granted Frost Bank's motion for partial traditional summary judgment on its counterclaims as to damages. Trevino did not file a brief in this appeal.

We affirm the trial court's final judgment as to Trevino because he did not file a brief on appeal. We conclude the trial court did not err when it granted Frost Bank's motion for partial no-evidence summary judgment on TAM's counterclaims. Based on this conclusion, we need not address TAM's claim that the trial court erred when it granted Frost Bank's motion for partial traditional summary judgment on TAM's counterclaims. The trial court's final judgment is affirmed.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

TAM is a mechanical contractor that provides plumbing, heating, air conditioning, piping, and duct work. Frost Bank provided TAM with a line of credit to allow it to complete its construction projects and expand its business. In 2006, TAM and Frost Bank signed a business loan agreement for a $3.5 million line of credit that was secured by a commercial security agreement. The business loan agreement matured in 2008, but was renewed and extended to April 30, 2009. On May 12, 2009, Frost Bank sent TAM a notice stating that its line of credit had matured and the amount due was stated. That sum was $2,309,749.89.

On June 4, 2009, Trevino met with representatives of Frost Bank. At the conclusion of the meeting, Trevino believed that Frost Bank had orally renewed and extended the business loan agreement for three months or until July 30, 2009, and he had until June 30, 2009, to provide Frost Bank with a business plan. No written renewal and extension or other written agreement was signed by the parties at that time.

Subsequent to the above meeting, Frost Bank sent TAM a written notice dated June 19, 2009, stating the maturity date of the loan as June 30, 2009 and that TAM's line of credit was due on that date. Also, on June 19, 2009, Frost Bank setoff from TAM's account at Frost Bank $660,089.17, which constituted all of the funds in TAM's **\*142** operating account. Frost Bank sent TAM written notice of the setoff on June 22, 2009. That notice listed the maturity date of the

loan as April 30, 2009. According to TAM, Frost Bank's actions caused TAM to lay off its employees and resulted in its inability to complete eight ongoing construction projects. Liberty Mutual was surety for those projects and incurred the cost of completion. As a result, Liberty Mutual sued TAM and obtained a judgment against it for $6,198,186.00 plus pre- and post-judgment interest.

Frost Bank sued TAM for breach of contract respecting the loan and Trevino on his personal guaranty. Frost Bank claimed it was owed $1,741,469.88, and sought pre- and post-judgment interest and its attorney's fees. It alleged that the loan agreement with TAM matured by its own terms on April 30, 2009, at which time the outstanding principal and interest became due and payable. TAM and Trevino answered the lawsuit generally denying the claims and asserting the affirmative defenses of estoppel, laches, accord and satisfaction, failure of consideration, waiver, failure to satisfy all conditions precedent to recovery, failure to mitigate damages, ratification, and payment and release. They also alleged counterclaims sounding in fraud, fraudulent inducement, negligent misrepresentation, breach of fiduciary duty, special relationship, breach of contract, promissory estoppel, conversion, and wrongful setoff, and sought damages and attorney's fees. All of the counterclaims were based on the allegation that Frost Bank orally renewed and extended the note.

Frost Bank moved for partial traditional summary judgment on its breach of contract claim against TAM and Trevino arguing the loan agreement with TAM and Trevino expired by its own terms. The record contains no response by TAM and Trevino to that motion. The trial court granted partial summary judgment on Frost Bank's breach of contract claim and awarded it $1,758,322.48 in damages, pre-judgment interest, and attorney's fees. *See* TEX.R. CIV. P. 166a(e).

Frost Bank answered the counterclaims of TAM and Trevinio, generally denying the counterclaims, asserting the affirmative defense of failure of consideration, and seeking an offset and reduction of any amount awarded to TAM from the amount already awarded to Frost Bank on its breach of contract claim. Then, Frost Bank filed a series of motions for partial summary judgment, both traditional and no-evidence.

First, Frost Bank filed a motion for partial traditional and no-evidence summary judgment on TAM and Trevino's counterclaims for breach of fiduciary duty and special relationship. There is no response by either TAM or Trevino

in the record on appeal. The trial court granted that motion and ordered that TAM and Trevino take-nothing on those counterclaims.

Second, Frost Bank filed a motion for partial traditional and no-evidence summary judgment on all of Trevino's remaining counterclaims. There is no response to this motion by Trevino in the record on appeal. The trial court granted that motion and ordered that Trevino take-nothing on his counterclaims.

Third, Frost Bank filed a motion for partial traditional and no-evidence summary judgment on TAM's counterclaims for fraud, fraudulent inducement, negligent misrepresentation, breach of contract, promissory estoppel, conversion, and wrongful setoff. This motion for partial traditional summary judgment asserted that TAM's counterclaims lacked merit, as a matter of law, because Frost Bank did not cause TAM's alleged damages since **\*143** the evidence shows that TAM's liabilities exceeded its assets before Frost Bank setoff TAM's operating account.

TAM filed a response to Frost Bank's final motion for partial traditional and no-evidence summary judgment, claiming that in its response it raised an issue of material fact as to its counterclaims for negligent misrepresentation, fraud, breach of contract, promissory estoppel, conversion, wrongful setoff, and damages. TAM did not respond to Frost Bank's motion for partial no-evidence summary judgment on its counterclaim for fraudulent inducement. Also, TAM did not file a motion asking the trial court to reconsider the prior partial traditional summary judgment rendered in favor of Frost Bank on its breach of contract claim. However, TAM filed a motion to strike the affidavit of Frost Bank's senior vice president, which was filed in support of its motions for partial traditional and no-evidence summary judgment on TAM's counterclaims. There is no ruling in the record on that motion.

Frost Bank filed a reply to TAM's summary judgment response that included an objection to some of TAM's summary judgment evidence. Specifically, Frost Bank objected to the judgment, original petition, and motion for summary judgment filed in the suit by Liberty Mutual against TAM as being unauthenticated hearsay. The record does not show the trial court ruled on Frost Bank's objection. In the trial court's final judgment, rendered in favor of Frost Bank, the trial court stated it granted Frost Bank's motion for partial traditional and no-evidence summary judgment on TAM's counterclaims and incorporated its previous, partial summary judgment orders.

In its brief on appeal, TAM specifically challenges only the portion of the trial court's final judgment that granted Frost Bank's motion for partial no-evidence summary judgment on TAM's counterclaims for breach of contract, promissory estoppel, negligent misrepresentation, fraud, conversion, and wrongful setoff, and partial traditional motion for summary judgment as to damages. TAM does not challenge the trial court's partial traditional summary judgment on Frost Bank's breach of contract claim or on TAM's counterclaims for breach of fiduciary duty, special relationship, and fraudulent inducement.

## II. JUDGMENT AGAINST TREVINO

TAM and Trevino filed a joint notice of appeal of the trial court's final judgment. However, Trevino did not file a brief on appeal and TAM's brief does not state or otherwise indicate that it was filed on behalf of Trevino. Accordingly, we affirm the trial court's final judgment as to Trevino.

## III. SUMMARY JUDGMENT ON TAM'S COUNTERCLAIMS

In issue one, TAM argues the trial court erred when it granted Frost Bank's motion for partial no-evidence summary judgment on its counterclaims for breach of contract, negligent misrepresentation, fraud, promissory estoppel, conversion, and wrongful setoff.

### A. Breach of Contract

TAM argues on appeal that its counterclaim for breach of contract was supported by summary judgment evidence that shows Frost Bank orally renewed and extended the loan agreement, agreed not to setoff TAM's operating account, and agreed to negotiate in good faith while TAM prepared its business plan. In its appellate brief, Frost Bank asserts "[TAM] does not challenge the contract documents or the money judgment in favor **\*144** of [Frost Bank]. The express language of those uncontested contracts controls the issues on [TAM's] counterclaims and is dispositive of all issues in the case." Further, Frost Bank responds that TAM cannot show an oral contract was formed at the June 4, 2009 meeting and therefore, there is no breach. Also, Frost Bank argues that TAM failed to produce any evidence demonstrating it

performed or was excused from performing under the alleged oral contract because it admits that it never submitted the required business plan.

### 1. Standard of Review

**[1]** **[2]** An appellant must attack every ground relied on for which summary judgment could have been granted in order to obtain a reversal. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970); *Worldwide Asset Purchasing, LLC v. Rent–A–Center E., Inc.,* 290 S.W.3d 554, 569 (Tex.App.-Dallas 2009, no pet.). If an appellant fails to challenge one of the grounds for summary judgment, an appellate court may affirm the summary judgment on that ground alone. *See Worldwide Asset,* 290 S.W.3d at 569.

### 2. Applicable Law

**[3]** **[4]** The issues determined on a motion for partial summary judgment are final, even though the judgment is interlocutory. *Martin v. First Republic Bank, Fort Worth, N.S.,* 799 S.W.2d 482, 488 (Tex.App.-Fort Worth 1990, writ denied); *Linder v. Valero Transmission Co.,* 736 S.W.2d 807, 810 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.) (clear purpose of former version of Texas Rule of Civil Procedure 166a(e) [2] is to make issues determined in motion for summary judgment final); *Tex. United Ins. Co. v. Burt Ford Enters., Inc.,* 703 S.W.2d 828, 833 (Tex.App.-Tyler 1986, no writ) (discussing former version of rule 166a(e)); *Cunningham v. Eastham,* 465 S.W.2d 189, 192 (Tex.Civ.App.-Houston [1st Dist.] 1971, writ ref'd n.r.e.) (same); *City of Houston v. Socony Mobil Oil Co.,* 421 S.W.2d 427, 430 (Tex.Civ.App.-Houston [1st Dist.] 1967, writ ref'd n.r.e.) (same). [3] After an interlocutory, partial summary judgment is granted, the issues it decides cannot be litigated further, unless the trial court sets the partial summary judgment aside or the summary judgment is reversed on appeal. *Martin,* 799 S.W.2d at 488–89; *Linder,* 736 S.W.2d at 810 (issues decided cannot be further litigated unless interlocutory summary judgment set aside by trial court or reversed on appeal); *Cunningham,* 465 S.W.2d at 192 (same); *Socony,* 421 S.W.2d at 430 (same). [4]

### 3. Application of the Law to the Facts

**[5]** At this juncture, we review whether TAM has challenged all grounds that could support the trial court's final judgment that granted partial no-evidence **\*145** summary judgment on TAM's breach of contract counterclaim. As indicated above, Frost Bank moved for partial traditional summary judgment on its breach of contract claim against TAM arguing it was an "undisputed" material fact that "the loan agreement matured by its own terms on April 30, 2009, at which time all outstanding principal and interest became fully due and payable." The record contains no response by TAM and Trevino to that motion. The trial court granted partial traditional summary judgment on Frost Bank's breach of contract claim and awarded it $1,758,322.48 in damages. The partial traditional summary judgment expressly found, inter alia, both Trevino and TAM were "jointly and severally" liable for damages awarded and Frost Bank's "lien interest in [TAM's] business equipment and accounts receivable are hereby foreclosed." As a matter of law, the partial traditional summary judgment on Frost Bank's breach of contract claim fixed TAM's liability. *See* *Tex. United,* 703 S.W.2d at 833; *Socony,* 421 S.W.2d at 430. The issues decided by an interlocutory, partial summary judgment cannot be relitigated further, unless the trial court sets that order aside. *See* *Martin,* 799 S.W.2d at 488–89; *Linder,* 736 S.W.2d at 810; *Cunningham,* 465 S.W.2d at 192; *Socony,* 421 S.W.2d at 430.

Then, Frost Bank sought partial no-evidence summary judgment on TAM's remaining counterclaims, including its counterclaim for breach of contract. In an attempt to revisit the facts that were established, as a matter of law, by the trial court's partial summary judgment order on Frost Bank's breach of contract claim, TAM responded to the motion for partial no-evidence summary judgment on its breach of contract counterclaim by attaching evidence it claimed demonstrated the loan agreement was orally renewed and extended. TAM did not file a motion to reconsider, modify, or set aside the partial traditional summary judgment on Frost Bank's breach of contract claim. There is nothing in the record indicating the trial court set aside the partial traditional summary judgment order on Frost Bank's breach of contract claim. Further, the trial court granted Frost Bank's motion for partial no-evidence summary judgment on TAM's breach of contract counterclaim. That is consistent with the trial court's earlier partial traditional summary judgment rendered on Frost Bank's breach of contract claim.

**[6]** On appeal, TAM does not challenge the trial court's partial traditional summary judgment on Frost Bank's breach of contract claim. *See, e.g., Socony,* 421 S.W.2d at 430 (when

appellant did not raise as error the trial court's interlocutory, partial summary judgment, the propriety of that partial summary judgment is not considered on appeal). Applying the appropriate standard of review, we must conclude the trial court did not err when it granted Frost Bank's motion for partial no-evidence summary judgment on TAM's breach of contract counterclaim because TAM has not challenged every possible ground for the trial court's summary judgment. *See* *Malooly,* 461 S.W.2d at 121; *Worldwide Asset,* 290 S.W.3d at 569.

### B. Negligent Misrepresentation and Fraud

**[7]** **[8]** Where, as here, a plaintiff seeks "to recover [for negligent misrepresentation and fraud] what [it] would have gained had the [alleged oral agreement] been performed, the gist of [the] cause of action is the breach of the alleged oral promise." *See* *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital,* 192 S.W.3d 20, 29 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Because TAM's negligent **\*146** misrepresentation and fraud counterclaims arise from the alleged oral agreement to extend the loan, based on our resolution of TAM's breach of contract counterclaim, we conclude the trial court did not err when it granted Frost Bank's motion for partial no-evidence summary judgment on those counterclaims. *See* *1001 McKinney,* 192 S.W.3d at 29.

### C. Promissory Estoppel

TAM argues that its counterclaim for promissory estoppel was supported by summary judgment evidence. Frost Bank does not specifically respond on appeal to TAM's argument relating to the partial no-evidence summary judgment on its promissory estoppel counterclaim. However, in its motion for partial no-evidence summary judgment, Frost Bank argued that TAM could produce no evidence supporting any element of its promissory estoppel counterclaim. In its reply to TAM's response to its motion for partial no-evidence summary judgment, Frost Bank argued TAM failed to raise any evidence showing that it made any representation on which TAM justifiably relied or prove causation.

### 1. Applicable Law

**[9]** **[10]** **[11]** **[12]** Generally, promissory estoppel is a viable alternative to breach of contract. *Allied Vista, Inc. v.*

*Holt,* 987 S.W.2d 138, 141 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Promissory estoppel is not applicable to a promise covered by a valid contract between the parties. However, promissory estoppel will apply to a promise outside a contract. *See Richter v. Wagner Oil Co.,* 90 S.W.3d 890, 899 (Tex.App.-San Antonio 2002, no pet.). The elements of a promissory estoppel claim are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial detrimental reliance by the promisee. *See English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983); *Fretz Constr. Co. v. S. Nat'l Bank of Houston,* 626 S.W.2d 478, 480 (Tex.1981). To show detrimental reliance, the plaintiff must demonstrate that he materially changed his position in reliance on the promise. See *English,* 660 S.W.2d at 524 (finding no promissory estoppel when plaintiff could not show he would not have taken his detrimental actions if defendant had not made promise); *Sandel v. ATP Oil & Gas Corp.,* 243 S.W.3d 749, 753 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (demonstrating failure to seek another job was insufficient to show detrimental reliance, employee required to show that but for stock option letter, he would have stopped working for employer).

### 2. Application of the Law to the Facts

In TAM's second amended original answer and counterclaims, TAM alleged it "reasonably and substantially relied, to its detriment, on Frost [Bank's] promises—which is evidenced by TAM's substantial cash deposit made in June 2009. Because of the nature of Frost [Bank's] promise, TAM's reliance was both reasonable and substantial." In its response to Frost Bank's motion for partial no-evidence summary judgment, TAM argued it reasonably and substantially relied on Frost Bank's promise to its detriment as follows:

> Because of Frost [Bank's] promises, TAM continued its banking relationship with Frost [Bank] and continued to deposit money into its Frost [Bank] operating account. Acting in good faith, TAM was preparing its business proposal, but before it had a chance to present it to Frost [Bank], Frost [Bank] setoff its account. As a result, TAM never received the retainage it planned to use to pay down its line of credit and it was forced to cease

operations. In addition, Frost [Bank's] representations prevented TAM from seeking additional funding **\*147** from another source to avoid being put out of business.

(Citations omitted). In support of its argument that it deposited money into its operating account in June 2009, TAM referred the trial court to Trevino's affidavit, which states, "[TAM] further provided assurances to Frost [Bank] that its credit balance would be paid down from its accounts receivables and outstanding retainage and that TAM would continue its banking relationship with Frost [Bank]," and a bank statement for TAM's operating account showing that TAM made several deposits in June 2009. TAM did not cite any summary judgment testimony or evidence to support its claim that Frost Bank's promises prevented TAM from seeking funding from another source or that he continued to make deposits at Frost Bank in June 2009 because of the alleged oral representation.

In TAM's brief on appeal, TAM argued it raised evidence of a fact issue on its promissory estoppel counterclaim as to the element of reliance, claiming:

> The record revealed that Trevino testified by deposition and affidavit that because of Frost [Bank's] promises, TAM continued its banking relationship with Frost [Bank] and continued to deposit money into its Frost [Bank] operating account. Acting in good faith, TAM was preparing its business proposal, but before it had a chance to present it to Frost [Bank], Frost [Bank] setoff its account. There was no evidence in the record to suggest TAM should not have relied on the promises. Instead, the parties' prior actions lent credibility to Frost [Bank's] words at that time.

(Record citations omitted). To support this argument, TAM cites to its summary judgment evidence of a bank statement for TAM's operating account that shows TAM made several deposits in June 2009.

**[13]** In summary, TAM contends that it detrimentally relied on Frost Bank's promise to renew and extend the loan agreement by continuing to deposit money in its operating

account, which was also with Frost Bank. However, even had we concluded Frost Bank did orally promise to renew and extend the loan agreement, TAM falls short of its burden because it offered no evidence of detrimental reliance. Continuing to deposit money in its operating account does not amount to a material change in TAM's position as a result of Frost Bank's promise. *See English,* 660 S.W.2d at 524 (finding no promissory estoppel when plaintiff could not show he would not have taken his detrimental actions if defendant had not made promise); *Sandel,* 243 S.W.3d at 753 (demonstrating failure to seek another job was insufficient to show detrimental reliance, employee required to show that but for stock option letter, he would have stopped working for employer). Also, TAM argues "There was no evidence in the record to suggest TAM should not have relied on the promises." However, to preclude a no-evidence summary judgment, it was TAM's burden to produce evidence raising a fact issue as to each element of each claim in which no-evidence summary judgment was sought. *See* TEX.R. CIV. P. 166a(i); *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 375 (Tex.App.-Dallas 2009, pet. denied); *RTLC AG Prods., Inc. v. Treatment Equip. Co.,* 195 S.W.3d 824, 833 (Tex.App.-Dallas 2006, no pet.). We conclude that TAM did not meet its burden to preclude a partial no-evidence summary judgment on its promissory estoppel counterclaim.

### D. Conversion

[14] Next, TAM argues the trial court erred when it granted Frost Bank's motion **\*148** for partial no-evidence summary judgment on TAM's counterclaim for conversion. Specifically, TAM claims that Frost Bank's setoff of the funds in TAM's operating account constituted conversion. To establish a claim for conversion, a plaintiff must prove that: (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Tex. Integrated,* 300 S.W.3d at 365–66. TAM's claim for conversion is premised on one of its other counterclaims surviving Frost Bank's motion for partial no-evidence summary judgment. Based on our resolution of TAM's counterclaims for breach of contract, negligent misrepresentation, fraud, and promissory estoppel, we need not address TAM's argument that it raised an issue of fact

precluding partial no-evidence summary judgment on its counterclaim for conversion.

### E. Wrongful Setoff

Finally, TAM contends the trial court erred when it granted Frost Bank's motion for partial no-evidence summary judgment on its counterclaim for wrongful setoff because it produced evidence raising a fact issue. Specifically, TAM claims its summary judgment evidence shows that Frost Bank setoff its account before the loan agreement matured and it did not give TAM contemporaneous notice of the setoff.

[15]  [16]  [17]  [18]  The relationship of a bank to a general depositor is contractual, that of debtor-creditor arising from the depository contract. *See Upper Valley Aviation v. Mercantile Nat'l Bank,* 656 S.W.2d 952, 955 (Tex.App.-Dallas 1983, writ ref'd n.r.e.); *Am. Bank of Waco v. Waco Airmotive, Inc.,* 818 S.W.2d 163, 170 (Tex.App.-Waco 1991, writ denied). The nature of the relationship authorizes a bank to offset deposits against a debt of equal amount owed the bank by that depositor, assuming proof of the amount of the debt owed. *See Am. Bank of Waco,* 818 S.W.2d at 170. An offset is not authorized unless there is a mature or past-due debt owed by the depositor to the bank. *See Am. Bank of Waco,* 818 S.W.2d at 170; *see also Bandy v. First State Bank, Overton, Tex.,* 835 S.W.2d 609, 619 (Tex.1992) (discussing claim for wrongful setoff in equity). A depositor's remedy for the wrongful offset of a general account is an action for return of the funds for breach of the depository contract. *See Upper Valley Aviation,* 656 S.W.2d at 955; *Am. Bank of Waco,* 818 S.W.2d at 170.

TAM does not dispute that Frost Bank had a contractual right of setoff. However, TAM's claim for wrongful setoff is premised on the viability of one of its other counterclaims. Based on our resolution of the no-evidence motion for partial summary judgment as to TAM's counterclaims for breach of contract, negligent misrepresentation, fraud, and promissory estoppel, we need not address TAM's argument that it raised an issue of fact precluding no-evidence summary judgment on its counterclaim for wrongful setoff.

### F. No–Evidence Summary Judgment Conclusion

We conclude the trial court did not err when it granted Frost Bank's motion for partial no-evidence summary judgment

on TAM's counterclaims for breach of contract, negligent misrepresentation, fraud, promissory estoppel, conversion, and wrongful setoff. Issue one is decided against TAM.

## *149 IV. TRADITIONAL SUMMARY JUDGMENT ON TAM'S COUNTERCLAIMS

In issue two, TAM argues the trial court erred when it granted Frost Bank's motion for partial traditional summary judgment as to damages. Based on our resolution of issue one, we need not address this issue.

## V. CONCLUSIONS

The trial court's final judgment is affirmed as to Trevino because he did not file a brief on appeal. Also, the trial court did not err when it granted partial no-evidence summary judgment on TAM's counterclaims. Based on this conclusion, we need not address TAM's claim that the trial court erred when it granted frost Bank's motion for partial traditional summary judgment.

The trial court's final judgment is affirmed as to TAM.

### All Citations

400 S.W.3d 139

Footnotes

1       The Hon. Martin E. Richter, retired Justice, sitting by assignment.
2       Effective September 1, 1997, rule 166a(e) was amended by "making minor changes in the wording of that subsection. This change was intended simply as a clarification of the existing rule." Timothy Patton, *Summary Judgments in Texas: Practice Procedure and Review* § 3.03[1] (3d ed. 2012).
3       *See also* Timothy Patton, *Summary Judgments in Texas: Practice Procedure and Review* § 3.03[2] (issues determined by partial summary judgment are final even though judgment is interlocutory) (3d ed. 2012); 3 Roy W. McDonald & Elaine A. Grafton Carlson, *Texas Civil Practice* § 18:4 (2d ed. 2000) ("A summary judgment order that does not purport to dispose of all parties and all issues is interlocutory even though [ ] rule [166a(e) ] anticipates that ordinarily a ruling made under it shall be conclusive at the trial with respect to the facts that it specifies.").
4       *See also* Patton, § 3.03[2]; 3 McDonald & Carlson, § 18:4 (2d ed. Supp.2012).

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

493 S.W.2d 882
Court of Civil Appeals of Texas,
Fort Worth.

UNITED COIN METER
COMPANY, INC. et al., Appellants,

v.

JOHNSON-CAMPBELL LUMBER
COMPANY et al., Appellees.

No. 17394.　|　April 6, 1973.

Lessees filed suit for specific performance by lessors of two written contracts relating to right of lessees to maintain coin-operated laundry equipment in two apartment complexes owned by lessors and for a mandatory injunction requiring lessors to reinstall lessees' laundry equipment which had been removed. The District Court, Tarrant County, Ardell M. Young, J., rendered judgment for lessors, and lessees appealed. The Court of Civil Appeals, Brewster, J., held that where lessees who had been engaged in performing contracts for maintenance of coin-operated laundry equipment in lessors' apartment complexes for more than five years possessed all data needed for proving damages they would sustain by reason of lessors' breach of contracts, lessees' president who had many years of experience in business was bound to have known amount of expenses and depreciation incurred by lessees in performing their obligations under contracts, amount of damages lessees sustained from breach of contracts could be readily proven and only benefit lessees could get from a performance of contracts for rest of their terms was amount of net profit they would realize from complete performance of contracts, plaintiffs had adequate legal remedy at law by way of an action for damages and were not entitled to specific performance of contracts. The Court further held that where term of one of the contracts giving lessees right to install and maintain coin-operated laundry equipment in apartment complex owned by lessors had expired while lessees' action for specific performance of contracts was on appeal, controversy relating to that contract was moot.

Affirmed in part and reversed in part.

West Headnotes (12)

[1]　**Specific Performance**
 Discretion of court

Specific performance of a contract by a court of equity is not a matter of absolute right in the parties demanding it, and applications for such relief are addressed to the sound discretion of the court.

Cases that cite this headnote

[2]　**Specific Performance**
 Existence of other remedy

In order to get specific performance of a contract, party seeking it must show that he has no adequate remedy at law by way of an action for damages for breach of contract, and if an adequate remedy at law is available, then specific performance will not be granted.

5 Cases that cite this headnote

[3]　**Specific Performance**
 Contracts Relating to Real Property

Where a period of several years remained before end of term of one of contracts giving lessees the right to maintain coin-operated laundry equipment in apartment complexes owned by lessors and contract called for performance by parties or their representatives of numerous additional, yet unperformed acts, during that period so that a decree for specific performance of contracts would require considerable supervision, contracts possessed features which influenced discretion of court so that rule requiring specific performance of a contract involving real estate was not applicable to such contracts.

Cases that cite this headnote

[4]　**Specific Performance**
 Inadequacy of remedy at law

Where lessees who had been engaged in performing contracts for the maintenance of

coin-operated laundry equipment in lessors' apartment complexes for more than five years possessed all data needed for proving damages they would sustain by reason of lessors' breach of contracts, lessees' president who had many years of experience in business was bound to have known amount of expense and depreciation incurred by lessees in performing their obligations under contracts, amount of damages lessees sustained from breach of contracts could be readily proven and only benefit lessees could get from specific performance of contracts for rest of their terms was amount of net profit they would realize from complete performance of contracts, lessees had adequate legal remedy at law by way of an action for damages and were not entitled to specific performance of contracts.

1 Cases that cite this headnote

**[5]     Injunction**
         Recovery of damages

When application for injunctive relief has same effect as an application for specific performance, injunctive relief will not be granted where an action for damages affords an adequate legal remedy.

2 Cases that cite this headnote

**[6]     Landlord and Tenant**
         Actions

Where lessees were not entitled to specific performance of contracts giving them the right to maintain coin-operated laundry equipment in lessors' apartment complexes because lessees had adequate remedy at law by way of an action for damages, lessees were not entitled to an injunction ordering lessors to re-install lessees' laundry equipment that had been removed.

Cases that cite this headnote

**[7]     Specific Performance**
         Contracts for continuous acts during long period

A court of equity will ordinarily decree specific performance only when it can dispose of matter

in controversy by a decree capable of present performance; it will not decree a party to perform a continuous series of acts extending through a long period of time, requiring constant supervision by the court.

2 Cases that cite this headnote

**[8]     Specific Performance**
         Contracts for continuous acts during long period

Where contracts giving lessees the right to maintain coin-operated laundry equipment in apartment complexes owned by lessors were in part executory at time of trial and required lessees to install, maintain and repair laundry machines during remainder of contract terms and required lessees monthly, throughout the terms, to go to machines, collect money and give apartment owners their part of proceeds and where one of contracts had several years yet to run, court could not render a decree for specific performance of contracts capable of being presently performed that would dispose of entire controversy; thus, refusal to decree specific performance of contracts was not error.

Cases that cite this headnote

**[9]     Specific Performance**
         Sufficiency in general

Evidence, in lessees' action for specific performance of contracts giving them the right to maintain coin-operated laundry equipment in apartment complexes, supported finding that for arrangement to be successful and financially profitable it was essential that cooperation, goodwill and mutual trust and confidence exist between lessors and lessees.

Cases that cite this headnote

**[10]     Specific Performance**
         Subject-matter and terms of contract

Evidence, in lessees' action for specific performance of contract giving them the right to install and maintain coin-operated laundry equipment in apartment complexes, supported

finding that leases required that corporate lessees perform substantial personal services throughout remaining terms of contracts.

Cases that cite this headnote

**[11]** **Specific Performance**
&#x1F511; Requisites and validity in general

Where terms provided for in a contract have come to an end, court can no longer order specific performance of contract.

Cases that cite this headnote

**[12]** **Appeal and Error**
&#x1F511; Review of specific questions in general

Where term of one of two contracts giving lessees right to install and maintain coin-operated laundry equipment in apartment complex owned by lessors had expired while lessees' action for specific performance of contracts was on appeal, controversy relating to that contract was moot.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*884** Abney, Burleson, Bondies, Conner & Mills and Phil Burleson, Dallas, for appellants.

Loe & Warren and H. J. Loe, Fort Worth, for appellees.

## OPINION

BREWSTER, Justice.

The trial court rendered judgment for the defendants, Johnson-Campbell Lumber Company, a partnership, and Ralph G. Campbell, to the effect that plaintiffs take nothing by their suit and the plaintiffs, United Coin Meter Company, Inc., and United Coin Meter Company have brought this appeal.

The plaintiffs sued for specific performance by the defendants of two separate and distinct written contract relating to the right of plaintiffs to put and keep coin-operated laundry equipment in two different apartment complexes that are

presently owned by the defendants. Plaintiffs also sought a mandatory injunction against defendants ordering defendants to remove the laundry equipment that is presently on the premises involved and to reinstall on such property the laundry equipment belonging to plaintiffs that had been removed. The plaintiffs did not seek in this case to recover damages.

The defendant, Johnson-Campbell Lumber Company, is a partnership, and the defendant, Ralph Campbell, is the managing partner.

At the time of trial defendants were the owners of a 42-unit apartment complex located at 2231 Capri Drive in Fort Worth and of another apartment complex located in Euless, Texas, at 1450 Sagebrush Trail.

On February 11, 1966, a former owner of the apartment units located on Capri Drive entered into a written contract with United Coin Meter Company wherein the owner was referred to as lessor and the Coin Company was referred to as lessee. The agreement provided that lessee hires from lessor the laundry room on the premises described therein for a term of five years from date. Lessee was thereby given **\*885** the right of exclusive installation and operation of coin-operated laundry equipment on the apartment premises for which lessee agreed to pay lessor of the gross receipts taken from the equipment on a monthly basis 30% Thereof as the total lease fee.

The agreement required lessee to maintain public liability insurance without expense to lessor.

The agreement provided that lessor shall furnish gas, water and electricity and shall clean and maintain the premises without expense to lessee. Under the agreement lessee was obligated to service, maintain and repair the equipment that it installs without expense to lessor.

Lessee was given the right of ingress and egress during the term provided for. The agreement provided that it would be binding on the parties and their heirs and assigns.

This agreement further provided that it would be automatically renewed for the same period of time (5 years) unless cancelled by either party in writing 30 days prior to its expiration.

On December 14, 1965, a prior owner of the apartments on Sagebrush Trail in Euless, executed a similar agreement with United Coin Meter Company.

It provided that owner leased to Coin Company all laundry space in this apartment project for the purpose of installing, maintaining and servicing a special washing, drying and laundry equipment system for a term of five years, ending December 13, 1970.

This lease provided that it would continue in force for an additional Two years unless notice of cancellation in writing by owner was given to Coin Company not less than 60 days before the end of the original term of the agreement.

By the agreement the Coin Company was obliged to furnish the investment necessary to equip the laundry room with washing machines and drying equipment and to service the equipment and keep it in repair during term of the contract and to pay owner 35% Of the gross income from the equipment monthly. Coin Company also agreed to furnish at its expense public liability insurance protecting from suits arising from operating the equipment. Coin Company also agreed to furnish necessary advertising and to demonstrate and instruct tenants in the use of the equipment.

The apartment owner agreed to permit Coin Company employees ingress and egress during reasonable hours for purpose of making installations, inspections, servicing equipment and removing coins. The owner agreed not to install or let others install similar equipment on the apartment premises. Owner agreed to promptly report to Coin Company the need for service and to keep the laundry space clean.

It will be noted that the five year term of this last agreement ended on December 13, 1970, and that the agreement only provided for one renewal term and that was for Two years. This two year renewal term expired on December 13, 1972, while this case was on appeal.

The agreement relating to the apartments on Capri Drive was for a term of five years and it provided for a renewal of one five year term. That renewal term will not expire until February 11, 1976.

This was a non-jury trial. The court's findings of fact provided in substance that: while both agreements were in full force on May 14, 1971, the defendants, owners, took possession of the laundry rooms in both apartment units; the machines involved are coin-operated and under the agreement Coin Company employees are required to come on the premises, open the cash boxes, count the receipts and to account to lessor for his share of gross receipts; that for the operation to be profitable it was necessary that cooperation, good will, mutual trust and confidence exist **\*886** between the parties; that the agreements require Coin Company to perform substantial services; that plaintiffs did not seek to recover damages and offered no evidence trying to prove their damages.

The trial court concluded that defendants breached the agreement; that plaintiffs failed to show that they had no adequate remedy at law; plaintiffs failed to show that irreparable injury would result if they were denied specific performance and a mandatory injunction; and that the trial court concludes, in the exercise of its discretion, that the relief plaintiffs sought should not be granted.

Plaintiffs had not breached the agreement at the time defendant took over the laundry rooms.

The evidence showed that defendants acquired the Capri Drive apartments in 1967 and acquired the Sagebrush Trail apartments in 1968. On those dates the Coin Company equipment was already located in the laundry rooms of both apartment units under the terms of these agreements.

The evidence shows that United Coin Meter Company dissolved in April, 1969, at the time that Raymond Johnson bought out the interests of people named Ford. A successor corporation, which was the other plaintiff, was formed and all the assets of the original Coin Company, including its interests in the two contracts here involved, were transferred to this new corporation which is now United Coin Meter Company, Inc.

The basic contentions, as we understand them, in plaintiffs' first four points are: the two written instruments that plaintiffs seek to specifically enforce are actually leases of real estate; since defendants breached the leases, plaintiffs are entitled to have them specifically enforced as a matter of right and as a matter of law under the proof made; that since the written contracts were leases of realty, and since defendants breached them, it was not necessary in this case, to be entitled to have the leases specifically enforced and to get the mandatory injunction sought, that plaintiffs prove that they have no adequate remedy at law and that they will suffer irreparable injury; and that the question of whether or not specific performance and a mandatory injunction should be granted by the trial court was not under the facts of this case a matter that lay within the discretion of the trial court and that plaintiffs, on proving that defendants breached the agreements, were entitled to such relief as a matter of law and as a matter of right.

We overrule plaintiffs' first four points.

We hold that the plaintiffs were not entitled to specific performance as a matter of right and that we are required to affirm the case regardless of whether or not the written contracts involved here are leases of real estate.

' **[1]** As a general rule, the specific performance of a contract by a court of equity is not a matter of absolute right in the parties demanding it, . . . and applications for such relief are addressed to the sound discretion of the court.' See 81 C.J.S. Specific Performance s 9, p. 417; Steves v. United Services Automobile Association, 459 S.W.2d 930 (Beaumont Civ.App., 1970, ref., n.r.e.); Ferguson v. von Seggern, 434 S.W.2d 380 (Dallas Civ.App., 1968, ref., n.r.e.); and W. K. Ewing Co. v. Krueger, 152 S.W.2d 488 (San Antonio Civ.App., 1941, ref., w.o.m.).

**[2]** It is also a settled rule that in order to get specific performance of a contract the party seeking it must show that he has no adequate remedy at law by way of an action for damages for breach of contract, and if an adequate remedy at law is available, then specific performance will not be granted. See 52 Tex.Jur.2d 542, Specific Performance, Sec. 22; 81 C.J.S. Specific Performance s 6, p . 414; and Lone Star Salt Co. v. Texas Short Line Ry. Co., 99 Tex. 434, 90 S.W. 863 (1906).

**\*887** The plaintiffs contend that the first general rule above mentioned does not apply in this case, because the contracts involved here are actually leases of real estate and that a different rule applies in such cases. They contend that in this case they did not have to offer proof that they had no adequate remedy at law because since the contracts involved real estate, it will be presumed that an action for damages is an inadequate remedy.

The rule relied on by plaintiffs is stated in the case of Bennett v. Copeland, 149 Tex. 474, 235 S.W.2d 605 (1951) as follows:

". . . a contract for the sale of land will be enforced as a matter of right, regardless of its wisdom or folly, if fairly and understandingly made. . . . courts cannot arbitrarily refuse specific performance of a contract, because they deem it unwise, or because subsequent events disclose that it will result in a loss to defendant; but to justify the refusal of this relief it must appear that the defendant had been misled and overreached to such an extent that the contract is unconscionable.' . . .

". . . Whenever a contract concerning real property is in its nature and incidents entirely unobjectionable,—When it possesses none of those features which, in ordinary language, influence the discretion of the court,—it is as much a matter of course for a court of equity to decree its specific performance as it is for a court of law to give damages for its breach." (Emphasis ours.)

The same rule is stated in 52 Tex.Jur.2d 638, Specific Performance, Sec. 92. The rule relied on by plaintiffs, as stated there, also makes it clear that such rule does not apply in instances where the contract is objectionable in any of the features that address themselves to the court's discretion.

**[3]** We are convinced that the contracts that are involved here do possess features which influence the discretion of the court.

One such feature is the fact that there remained after the trial a period of several years before the term covered by at least one of the contracts came to an end and the contracts called for the performance by the parties or their representatives of numerous additional, yet unperformed acts, during that future period. A specific performance decree under those circumstances would require considerable supervision. See Edelen v. W. B. Samuels & Co., 126 Ky . 295, 103 S.W. 360 (1907) and 81 C.J.S. Specific Performance s 9, page 421, wherein it is pointed out that a court must use discretion in determining if a legal remedy is adequate and that a discretion is involved in determining if the remedy lacks mutuality. These are additional features of these contracts that influence the discretion of the court.

In Kress v. Soules, 152 Tex. 595, 261 S.W.2d 703 (1953) the Supreme Court stated in substance that although specific performance of a contract for the sale of realty will ordinarily be granted, it is not a remedy that exists as a matter of right. Whether plaintiff seeking specific performance has an adequate remedy at law is an important factor to be considered in such cases.

For the reasons stated we are convinced that the rule relied upon by plaintiffs is not applicable to the facts of this case. Since it is not, the trial court correctly held that a disposition of this case was governed by the general rules relating to specific performance that we have hereinabove stated. In other words the trial court's discretion was properly involved in determining whether or not to grant specific performance and we are convinced that that court did not abuse its

discretion in refusing to grant specific performance under the facts of this case.

Since the disposition of this case was governed by the general rules that we have hereinabove stated, it was also necessary, **\*888** before plaintiffs would be entitled to a decree of specific performance that they prove that they had no adequate remedy at law. This they did not do.

 **[4]** It is obvious that since the plaintiffs had been engaged in the performance of each of these contracts for more than 5 years that all data needed for proving the damages they would sustain by reason of defendants' breach of the contract is readily available to them. The defendants offered into evidence the checks that plaintiffs had paid to them covering their proportionate part of the income from the machines involved. It could easily be determined how much plaintiffs had grossed from the contracts. Plaintiffs' president had many years of experience in the business and is bound to have known the amount of expense and depreciation plaintiffs had incurred in performing their obligations under the contracts during the part of the term that had already expired. It appears obvious to us that the amount of damages plaintiffs sustained from a breach of the contracts could be readily proven. Since the only benefit plaintiffs could get from a performance of the contracts for the rest of their terms is the amount of net profit they would realize from a complete performance of the contracts, a judgment awarding plaintiffs a recovery of that sum would be an adequate remedy. See Lone Star Salt Co. v. Texas Short Line Ry. Co., 99 Tex. 434, 90 S.W. 863 (1906).

Since a disposition of this case is governed by the general rules above announced, the trial court properly denied plaintiffs' prayer for specific performance for the reason that plaintiffs failed to establish that they had no adequate remedy at law. The evidence showed that plaintiffs did have an adequate legal remedy at law by way of an action for damages.

 **[5]** The plaintiffs' application for an injunction is in effect the same as an application for specific performance because the effect of granting the injunctive relief would be to compel the carrying out of the contract. When this is true the application for injunctive relief will not be granted where an action for damages affords an adequate legal remedy. See Beckham v. Munger Oil & Cotton Co., 185 S.W. 991 (Dallas Civ.App., 1916, no writ hist.) wherein the following rule is set out at page 992: "Whether a court of equity will grant an injunction the effect of which is to compel the specific performance of a contract, depends, of course, upon the same principles as govern a direct decree for specific performance. . . ."

 **[6]** The plaintiffs here did not prove themselves entitled to specific performance. The court, therefore, properly refused to grant the injunctions sought in view of the rule just stated.

Plaintiffs were not entitled to a decree of specific performance in this case for other reasons.

' **[7]** It is a settled principle that a court of equity will ordinarily decree specific performance only when it can dispose of the matter in controversy by a decree capable of present performance; it will not decree a party to perform a continuous series of acts extending through a long period of time, requiring constant supervision by the court, . . ..' 81 C.J.S. Specific Performance s 75, page 584. This is the law in Texas. See Beckham v. Munger Oil & Cotton Co., 185 S.W. 991, supra.

The following is from Williston on Contracts, Revised Edition, Vol . 5, Sec. 1430, 'Completeness of relief': 'At least in the enforcement of affirmative promises a court of equity deems it neither wise nor just to enforce one or more of such promises in a contract unless it can enforce all of the contract outstanding at the time of the suit, including the promises of the plaintiff as well as those of the defendant.'

 **\*889** **[8]** The contracts that are here involved were in part executory at the time of the trial and the contracts required the plaintiffs to install the laundry machines, maintain them, service them and keep them repaired during the remainder of the contract term. In addition, the plaintiffs were required monthly, throughout the terms of the contracts, to go to the machines, collect the money from them, count it and to give the apartment owners their part of the proceeds. One of the contracts had several years yet to run.

The facts here were such that the court could not render a specific performance decree capable of being presently performed that would dispose of the entire controversy and this was an additional reason why the court did not err in refusing to decree specific performance of the contracts.

An examination of the contracts involved makes it apparent that many of the things that the plaintiffs were thereby required to do during the remaining terms of the contracts were incapable of being enforced in behalf of defendants by specific performance. Many cases hold that the remedy of specific performance is a mutual one between the parties to a contract and that before such a decree will be granted

mutuality of remedy must exist. E. M. Goodwin, Inc. v. Stuart, 52 S.W.2d 311 (San Antonio Civ.App., 1932, affirmed in 125 Tex. 212, 82 S.W.2d 632, 1935). It does not exist here. Other courts hold that even though mutuality of remedy does not deprive a court of jurisdiction to specifically enforce a contract, it is addressed to the court's discretion and is an element to be considered in determining whether the court should grant specific performance. See 81 C.J.S. Specific Performance s 11, p. 425.

Another case that supports our holding here is the case of Galbreath v. Farrell, 249 S.W. 277 (Dallas Civ.App., 1923, no writ hist.). There the two plaintiffs and defendant agreed that defendant would furnish the money with which to buy a tract of land and the plaintiffs would over a period of time in the future do a number of different things. The three were to be equal owners of the land. The defendant repudiated the contract and plaintiffs sought specific performance. The court said at page 280:

'. . . before a court of equity will enforce affirmative promises made by defendant in behalf of the plaintiff, it must also be able to enforce the affirmative promises made by plaintiff in behalf of the defendant. Such court never deems it wise or just to enforce one or more of the promises in a contract until it can enforce all of the contract outstanding at the time of the suit, including the promises of the plaintiff as well as those of the defendant. . . .

'. . . It is not sufficient to the ends of justice that appellants simply declare their willingness and ability to perform their part of the contract; there must be the ability of the court to enter a decree that compels such performance on their part. . . .'

[9] Plaintiffs' fifth point of error is that the court erred in making its finding of fact No. 9, which was: '. . . for the arrangement to be successful and financially profitable, it is essential that cooperation, goodwill and mutual trust and confidence exist as between lessor and lessee.'

The attack on the finding is based on the contentions that there is no evidence to support it and the finding is against the great weight and preponderance of the evidence.

We overrule the point.

**\*890** The finding was obviously based on the testimony of Raymond Johnson, President of one of the plaintiff corporations.

The contracts required the apartment owners to keep the laundry room clean.

Mr. Johnson had been working for one of the plaintiffs since 1961. He testified that: cleanliness of a laundry room has a definite bearing on its income; apartment management can do almost anything to a laundry room; they can promote it, help the income to be substantial, or they can let it ride and not report machines that are out of order, thus preventing them from being kept in good repair, which will bring the income down; management has a lot to do with it; they can make or break you in the laundry room.

[10] The sixth and last point of error is that the court erred in finding as a fact that the leases required that lessee perform substantial personal services in performing the agreements.

We hold that no reversible error was committed in connection with this finding and therefore overrule the point.

It is true that the services that the contracts obligated the plaintiffs to perform in the future over an extended period of time are not 'personal' services in the sense that they will be performed personally by the plaintiffs. This would be impossible because the plaintiffs are corporations. And they are not 'personal' services in the sense that there is a personal relationship involved as exists between an employer and his employee, and in which case the employee personally does the work. It is true that the word 'personal' was probably not the best word to be used in that finding .

But a reading of the record and the statement of facts makes it apparent that the court was saying by this finding that the contracts involved provide that plaintiffs will be required, in performing their part of the agreement, to furnish in the future, throughout the remaining terms of the contracts, substantial services. The evidence establishing this fact finding is undisputed .

If the court chose the wrong word in calling the services Personal services, then such action is immaterial because it is obvious what services he was talking about.

An attempt by a court to decree specific performance of the services that plaintiffs did agree to perform in the future throughout a period of over two years, even though they are not technically 'personal' services, would require considerable supervision by the court for a long period after the rendition of the decree. This is the type of thing that

influences the discretion of a court in determining whether or not to grant a specific performance decree.

The only relief sought in this suit was specific performance of two separate and distinct contracts and mandatory injunctions the effect of which would be to cause specific performance of the contracts.

The original five year term of the contract relating to the Capri Drive Apartments expired on February 11, 1971. The contract was renewed for another five year term which will not expire until February 11, 1976.

The original five year term of the contract relating to the Sagebrush Trail Apartments ended on December 13, 1970. This lease did not provide for a renewal term of five years, but it did provide for one renewal term of two years. This contract was renewed by the parties for the two year term and this renewal term expired on December 13, 1972.

The courts hold that: 'A cause becomes moot when one 'seeks judgment upon some matter which, when rendered, for any reason, **\*891** cannot have any practical legal effect upon a then existing controversy.'' Bevil v. Wilfert, 241 S.W.2d 195 (Beaumont Civ.App., 1951, no writ hist.). See also McNeill v. Hubert, 119 Tex. 18, 23 S.W.2d 331 (1930).

This case, in so far as the controversy relates to the contract covering the apartments on Sagebrush Trail, has become moot while the case has been on appeal. It was not moot when the trial started in February, 1972.

 **[11]**   It is obvious that since the terms provided for in the contracts have come to an end, that a court can no longer order specific performance of that contract.

We would have affirmed the entire judgment had not part of the case become moot.

The courts hold that when a case becomes moot while it is on appeal it is the duty of the appellate court to reverse the trial court's judgment and to dismiss the case. Texas & N.O.R. Co. v. Priddie, 127 Tex. 629, 95 S.W.2d 1290 (1936). For other cases see 4 Tex.Jur.2d 207, Appeal and Error—Civil, Sec. 703.

 **[12]**   It is therefore ordered that the trial court's judgment in so far as it relates to that part of plaintiffs' action seeking injunctive relief and specific performance of the December 14, 1965, contract that covers the Sagebrush Trail Apartments is hereby reversed and that part of plaintiffs' case is hereby dismissed without prejudice.

That part of the trial court's judgment in so far as it relates to the part of plaintiffs' action seeking injunctive relief and specific performance of the February 11, 1966, contract that covers the apartments located on Capri Drive in Fort Worth is affirmed.

The costs are taxed against appellants.

**All Citations**

493 S.W.2d 882

---

   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> Vernon's Texas Statutes and Codes Annotated
>   Civil Practice and Remedies Code (Refs & Annos)
>     Title 2. Trial, Judgment, and Appeal
>       Subtitle C. Judgments
>         Chapter 38. Attorney's Fees (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 38.001

§ 38.001. Recovery of Attorney's Fees

Currentness

A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:

(1) rendered services;

(2) performed labor;

(3) furnished material;

(4) freight or express overcharges;

(5) lost or damaged freight or express;

(6) killed or injured stock;

(7) a sworn account; or

(8) an oral or written contract.

**Credits**
Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (1441)

V. T. C. A., Civil Practice & Remedies Code § 38.001, TX CIV PRAC & REM § 38.001

Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Appellate Procedure
    Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos)
      Rule 38. Requisites of Briefs (Refs & Annos)

TX Rules App.Proc., Rule 38.1

38.1. Appellant's Brief

Currentness

The appellant's brief must, under appropriate headings and in the order here indicated, contain the following:

(a) *Identity of Parties and Counsel.* The brief must give a complete list of all parties to the trial court's judgment or order appealed from, and the names and addresses of all trial and appellate counsel, except as otherwise provided in Rule 9.8.

(b) *Table of Contents.* The brief must have a table of contents with references to the pages of the brief. The table of contents must indicate the subject matter of each issue or point, or group of issues or points.

(c) *Index of Authorities.* The brief must have an index of authorities arranged alphabetically and indicating the pages of the brief where the authorities are cited.

(d) *Statement of the Case.* The brief must state concisely the nature of the case (e.g., whether it is a suit for damages, on a note, or involving a murder prosecution), the course of proceedings, and the trial court's disposition of the case. The statement should be supported by record references, should seldom exceed one-half page, and should not discuss the facts.

(e) *Any Statement Regarding Oral Argument.* The brief may include a statement explaining why oral argument should or should not be permitted. Any such statement must not exceed one page and should address how the court's decisional process would, or would not, be aided by oral argument. As required by Rule 39.7, any party requesting oral argument must note that request on the front cover of the party's brief.

(f) *Issues Presented.* The brief must state concisely all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.

(g) *Statement of Facts.* The brief must state concisely and without argument the facts pertinent to the issues or points presented. In a civil case, the court will accept as true the facts stated unless another party contradicts them. The statement must be supported by record references.

(h) *Summary of the Argument.* The brief must contain a succinct, clear, and accurate statement of the arguments made in the body of the brief. This summary must not merely repeat the issues or points presented for review.

(i) *Argument*. The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.

(j) *Prayer*. The brief must contain a short conclusion that clearly states the nature of the relief sought.

(k) *Appendix in Civil Cases*.

(1) Necessary Contents. Unless voluminous or impracticable, the appendix must contain a copy of:

(A) the trial court's judgment or other appealable order from which relief is sought;

(B) the jury charge and verdict, if any, or the trial court's findings of fact and conclusions of law, if any; and

(C) the text of any rule, regulation, ordinance, statute, constitutional provision, or other law (excluding case law) on which the argument is based, and the text of any contract or other document that is central to the argument.

(2) Optional Contents. The appendix may contain any other item pertinent to the issues or points presented for review, including copies or excerpts of relevant court opinions, laws, documents on which the suit was based, pleadings, excerpts from the reporter's record, and similar material. Items should not be included in the appendix to attempt to avoid the page limits for the brief.

**Credits**
Eff. Sept. 1, 1997. Amended by Supreme Court March 10, 2008, and Aug. 20, 2008, eff. Sept. 1, 2008. Approved by Court of Criminal Appeals Sept. 30, 2008, eff. Sept. 30, 2008.

Notes of Decisions (937)

Rules App. Proc., Rule 38.1, TX R APP Rule 38.1
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Rules Annotated
  Texas Rules of Appellate Procedure
    Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos)
      Rule 39. Oral Argument; Decision Without Argument (Refs & Annos)

TX Rules App.Proc., Rule 39.1

39.1. Right to Oral Argument

Currentness

A party who has filed a brief and who has timely requested oral argument may argue the case to the court unless the court, after examining the briefs, decides that oral argument is unnecessary for any of the following reasons:

(a) the appeal is frivolous;

(b) the dispositive issue or issues have been authoritatively decided;

(c) the facts and legal arguments are adequately presented in the briefs and record; or

(d) the decisional process would not be significantly aided by oral argument.

**Credits**

Eff. Sept. 1, 1997. Amended by Supreme Court March 10, 2008, and Aug. 20, 2008, eff. Sept. 1, 2008. Approved by Court of Criminal Appeals Sept. 30, 2008, eff. Sept. 30, 2008.

**Editors' Notes**

**NOTES AND COMMENTS**

Comment to 2008 change: Subdivision 39.1 is amended to provide for oral argument unless the court determines it is unnecessary and to set out the reasons why argument may be unnecessary. The appellate court must evaluate these reasons in view of the traditional importance of oral argument. The court need not agree on, and generally should not announce, a specific reason or reasons for declining oral argument.

Rules App. Proc., Rule 39.1, TX R APP Rule 39.1

Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Appellate Procedure
    Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos)
      Rule 43. Judgment of the Court of Appeals (Refs & Annos)

TX Rules App.Proc., Rule 43.4

43.4. Judgment for Costs in Civil Cases

Currentness

In a civil case, the court of appeal's judgment should award to the prevailing party the appellate costs--including preparation costs for the clerk's record and the reporter's record--that were incurred by that party. But the court of appeals may tax costs otherwise as required by law or for good cause.

**Credits**
Eff. Sept. 1, 1997.

Notes of Decisions (17)

Rules App. Proc., Rule 43.4, TX R APP Rule 43.4
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

> Vernon's Texas Rules Annotated
>   Texas Rules of Civil Procedure
>     Part II. Rules of Practice in District and County Courts
>       Section 6. Costs and Security Therefor

TX Rules of Civil Procedure, Rule 139

Rule 139. On Appeal and Certiorari

Currentness

When a case is appealed, if the judgment of the higher court be against the appellant, but for less amount than the original judgment, such party shall recover the costs of the higher court but shall be adjudged to pay the costs of the court below; if the judgment be against him for the same or a greater amount than in the court below, the adverse party shall recover the costs of both courts. If the judgment of the court above be in favor of the party appealing and for more than the original judgment, such party shall recover the costs of both courts; if the judgment be in his favor, but for the same or a less amount than in the court below, he shall recover the costs of the court below, and pay the costs of the court above.

**Credits**
Oct. 29, 1940, eff. Sept. 1, 1941.

Notes of Decisions (99)

Vernon's Ann. Texas Rules Civ. Proc., Rule 139, TX R RCP Rule 139
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

---

**End of Document**　　　　　　　　　　　　　　　© 2015 Thomson Reuters. No claim to original U.S. Government Works.